UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------------x
RUBEN V. FLORES, *et al.*,                              :
         Plaintiffs,                                  :
                                                      :
     v.                                                :
                                                      :    **Case No. 22-cv-1512 (JEB)**
ISLAMIC REPUBLIC OF IRAN and SYRIAN ARAB      :
REPUBLIC,                                                 :
         Defendants.                                  :
-------------------------------------------------------------------------

## PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AS TO LIABILITY FOR FIRST WAVE OF ATTACKS

Plaintiffs, by and through their attorneys, request that the Court enter judgment by default as to liability against Defendants Islamic Republic of Iran and the Syrian Arab Republic pursuant to Fed. R. Civ. P. 55(b). As discussed in the Zoom conference convened by the Court on September 11, 2001, Plaintiffs seek the entry of default judgment as to liability in relation to 32 attacks alleged in Plaintiffs' Amended Complaint and assert that this grouping represents the first "wave" of attacks to be submitted to the Court seeking default judgment as to liability. In support of this request, Plaintiffs rely upon the law, facts, and arguments contained within Plaintiffs' Memorandum of Points and Authorities in Support of their Motion for Default Judgment in addition to the expert reports and exhibits attached thereto.

Dated:  October 11, 2024                                    Respectfully submitted,

                                                   **MOTLEY RICE LLC**

                                                   /s/ John M. Eubanks_____
                                                   John M. Eubanks (D.C. Dist. Ct. Bar No. SC0013)
28 Bridgeside Blvd.
Mount Pleasant, South Carolina 29464
Tel.: (843) 216-9000
Fax: (843) 216-9450

Gary Osen (D.C. Bar No. NJ009)
Dina Gielchinsky (D.C. Bar No. NJ011)
Ari Ungar (D.C. Bar No. NJ008)
Michael Radine (D.C. Bar No. NJ015)
Aaron Schlanger (D.C. Bar No. NJ007)
190 Moore Street, Suite 272
Hackensack, New Jersey 07601
Tel.: (201) 265-6400
Fax: (201) 265-0303

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

------------------------------------------------------------------------x

RUBEN V. FLORES, *et al.*,                  :

        Plaintiffs,                             :

                                      :

    v.                                         :

                                        :    **Case No. 22-cv-1512 (JEB)**

ISLAMIC REPUBLIC OF IRAN and SYRIAN ARAB     :
REPUBLIC,                                    :

        Defendants.                            :

------------------------------------------------------------------------

### PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR DEFAULT JUDGMENT AS TO LIABILITY FOR FIRST WAVE OF ATTACKS

**TABLE OF CONTENTS**

**Page(s)**

**TABLE OF AUTHORITIES** ................................................................................................. **iii**

**I.    PROCEDURAL HISTORY** ..................................................................................... **2**

**II.   LEGAL STANDARD FOR DEFAULT JUDGMENT** ........................................... **3**

   **A. Plaintiffs' Burden of Proof** ............................................................................... **3**

   **B. Evidence** ............................................................................................................ **4**

**III.  FACTUAL BASES FOR DETERMINING LIABILITY FOR THE 33 ATTACKS AT ISSUE IN THIS MOTION** ....................................................................... **7**

   **A. Overview of AQI** ............................................................................................... **7**

   **B. First-Wave Attacks Addressed by Plaintiffs' Expert** ...................................... **10**

     **1.  August 2, 2004, Attack in Fallujah** .......................................................... **12**

     **2.  August 15, 2004, Attack in Fallujah** ........................................................ **12**

     **3.  October 6, 2004, Attack near Fallujah** ..................................................... **12**

     **4.  October 30, 2004, Attack in Zaidon** ......................................................... **13**

     **5.  November 9, 2004, Attack in Fallujah** ...................................................... **13**

     **6.  November 10, 2004, Attack in Fallujah (Jolan District)** ........................... **14**

     **7.  November 10, 2004, Attack near Fallujah (Shark's Fin)** .......................... **14**

     **8.  November 11, 2004, Attack in Fallujah** .................................................... **14**

     **9.  November 12, 2004, Attack in Fallujah** .................................................... **15**

     **10. November 14, 2004, Attack in Fallujah (Sook District)** ........................... **15**

     **11. November 14, 2004, Attack in Fallujah (Shuhada neighborhood)** ........... **16**

     **12. November 16, 2004, Attack in Fallujah** .................................................... **16**

     **13. November 19, 2004, Attack in Fallujah (Jubail District)** .......................... **16**

     **14. November 19, 2004, Attack in Fallujah (Nazzal District)** ........................ **17**

     **15. December 12, 2004, Attack in Fallujah (Nazzal District)** ......................... **17**

     **16. December 12, 2004, Attack in Fallujah (Askari District)** ......................... **17**

     **17. December 14, 2004, Attack in Fallujah** .................................................... **18**

     **18. November 11, 2004, Attack on MSR Michigan near Khalidiyah** ............ **18**

     **19. December 5, 2004, Attack in Khalidiyah** .................................................. **18**

     **20. May 20, 2004, Attack in Mosul** ................................................................ **19**

     **21. September 6, 2004, Attack south of Mosul** .............................................. **19**

22. October 13, 2004, Attack in Mosul ...................................................................... 20

23. December 4, 2004, Attack in Mosul .................................................................... 20

24. December 21, 2004, Attack at Forward Operating Base Marez............................ 20

25. January 13, 2005, Attack in Mosul .................................................................... 21

26. February 16, 2005, Attack in Mosul .................................................................. 21

27. February 17, 2005, Attack in Tal Afar ............................................................... 22

28. April 23, 2005, Attack in Mosul ....................................................................... 22

29. May 4, 2005, Attack in Mosul .......................................................................... 23

30. May 22, 2005, Attack south of Mosul ............................................................... 23

31. June 20, 2005, Attack in Tal Afar ..................................................................... 24

32. July 9, 2005, Attack in Tal Afar ....................................................................... 24

33. November 19, 2005, Attack in Mosul ................................................................ 24

IV.  PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF DEFAULT
     JUDGMENT AS TO LIABILITY FOR THE 33 ATTACKS AT ISSUE IN THE
     INSTANT MOTION........................................................................................... 25

   A. This Court Possesses Subject-Matter Jurisdiction Over the 33 Attacks ................... 25

      1. Defendants were both designated as state sponsors of terrorism at the time of the
         attacks at issue in this motion, and they continue to be designated as such ........ 26

      2. Each attack victim whose claims are at issue in this motion was, at the time of the
         attacks, either a U.S. national, a member of the armed forces, or a U.S.
         government employee or contractor ........................................................................ 26

      3. Plaintiffs' claims are predicated on Defendants' "material support" for acts of
         extrajudicial killings. ............................................................................................. 27

      4. Defendants each provided material support or resources to AQI enabling it to carry
         out the 33 attacks at issue in this motion............................................................... 30

   B. The Court possesses personal jurisdiction over both Iran and Syria ......................... 38

V.  THEORIES OF LIABILITY ........................................................................................ 39

   A. Estates of Individuals who were killed............................................................................ 39

   B. Immediate Family Members of those injured or killed in attacks ............................... 40

   C. Individuals who sustained injuries but survived those injuries .................................. 41

   D. Punitive Damages.............................................................................................................. 43

VI.  CONCLUSION ............................................................................................................. 44

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abedini v. Gov't of the Islamic Republic of Iran*, 422 F. Supp. 3d 118 (D.D.C. 2019)............... 43

*Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018) ......................................... 42

*All v. Islamic Republic of Iran*, No. 20-cv-622 (EGS) (ZMF), 2023 U.S. Dist. LEXIS 135097 (D.D.C. June 27, 2023) ................................................................................................... 11

*Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024).................................. 27, 28

*Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64 (D.D.C. 2017)............................................. 38

*Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21 (D.D.C. 2023) ...................................... 32

*Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 U.S. Dist. LEXIS 127290 (D.D.C. July 19, 2022)....................................................................................................... 11

*Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) .............................. 3

*Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71 (D.D.C. 2017)........................................ 33

*Doe v. Syrian Arab Republic*, No. 18-cv-66 (KBJ), 2020 U.S. Dist. LEXIS 167697 (D.D.C. July 27, 2020) ...................................................................................................................... 35

*Espitia v. Islamic Republic of Iran*, No. 21-cv-123, 2022 U.S. Dist. LEXIS 108841 (S.D. Tex. June 16, 2022) ............................................................................................... 7, 8, 9, 32

*Est. of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61 (GMH), 2022 U.S. Dist. LEXIS 234282 (D.D.C. Dec. 28, 2022) ............................................................................... 31, 32

*Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (D.D.C. 2009) .................. 40, 42

*Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138 (D.D.C. 2016)................................... 5

*Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186 (D.D.C. 2017) ........................................... 39

*Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018)....................................... 5, 39

*Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33 (D.D.C. 2019)........................................... 4

*Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008) ...................................... 31, 35

*Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014) ............... 4

*Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019)................................... 33

*Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2021 U.S. Dist. LEXIS 7170 (D.D.C. Jan. 14, 2021)...................................................................................................... 9

*Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475 (D.D.C. 2021)........................................ 30

*Maupin v. Syrian Arab Republic*, No. 17-cv-1213 (CKK), 2019 U.S. Dist. LEXIS 237831 (D.D.C. Mar. 20, 2019)................................................................................................... 33

*Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193 (EGS)(ZMF), 2022 U.S. Dist. LEXIS 219188 (D.D.C. Sept. 26, 2022) ........................................................................................ 32

*Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) ........................................................... 43

*Owens v. Republic of Sudan*, 826 F. Supp. 2d 128 (D.D.C. 2011) ...................................... 3

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *vacated on other grounds sub nom., Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) ........................................................... 4, 5, 27, 36

*Pautsch v. Islamic Republic of Iran*, Case No. 20-cv-3859 (JEB), 2023 U.S. Dist. LEXIS 215577 (D.D.C. Dec. 5, 2023) ................................................................................................ passim

*Pautsch v. Islamic Republic of Iran*, Case No. 20-cv-3859 (JEB), 2024 U.S. Dist. LEXIS 133054 (D.D.C. July 29, 2024) ............................................................................................. 28, 42

*Pennington v. Islamic Republic of Iran*, No. 19-cv-796 (JEB), 2022 U.S. Dist. LEXIS 9529 (D.D.C. Jan. 19, 2022), *vacated on other grounds, motion granted by, judgment entered by*, 2022 U.S. Dist. LEXIS 238886 (D.D.C. May 3, 2022) ............................................................ 43

*Reed v. Islamic Republic of Iran*, 845 F. Supp.2d 204 (D.D.C. 2012) ............................................ 3

*Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163 (D.D.C. 2010) ..................................... 41

*Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65 (D.D.C. 2023) ..................................... 11, 32

*Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379 (D.D.C. 2015) ..................................... 40, 42

*Rothstein v. UBS*, 708 F.3d 82 (2d Cir. 2013) ................................................................... 36

*Salzman v. Islamic Republic of Iran*, No. 172475 (RDM), 2019 U.S. Dist. LEXIS 163632 (D.D.C. Sep. 25, 2019) ............................................................................................................ 30

*Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22 (D.D.C. 2016) ......................... 33, 34, 38

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010) ..................................... 3, 42

*W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117 (D.D.C. 2019) .......................................... 9

*Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13 (D.D.C. 2002) ..................................... 3

**Statutes**

1608(a) ....................................................................................................................................... 39

18 U.S.C. § 2339A(b)(1) ........................................................................................................... 31

28 U.S.C. § 1330(b) ............................................................................................................ 38, 39

28 U.S.C. § 1605A ........................................................................................................... 1, 41, 43

28 U.S.C. § 1605A(a) ........................................................................................................... 26, 39

28 U.S.C. § 1605A(a)(1) ................................................................................................ 27, 28, 33

28 U.S.C. § 1605A(a)(2) ........................................................................................................... 26

28 U.S.C. § 1605A(a)(2)(A)(ii) ................................................................................................. 26

28 U.S.C. § 1605A(c) ..................................................................................................... 36, 39, 43

28 U.S.C. § 1605A(c)(1) .................................................................................................... 40

28 U.S.C. § 1605A(h)(3) .................................................................................................... 31

28 U.S.C. § 1605A(h)(7) .................................................................................................... 27

28 U.S.C. § 1608(a)(3) .................................................................................................. 2, 38

28 U.S.C. § 1608(a)(4) .................................................................................................. 2, 38

28 U.S.C. § 1608(d) ............................................................................................................. 2

28 U.S.C. § 1608(e) ......................................................................................................... 3, 4

Torture Victim Protection Act of 1991, Pub. L. No. 102–256, 106 Stat. 73 ................................ 27

## Other Authorities

Fact Sheet, U.S. Dep't of State, "Designation of the Islamic Revolutionary Guard Corps" (Apr. 8, 2019) ............................................................................................................... 8

Press Release, U.S. Dep't of Treasury, "Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism" (Feb. 16, 2012) .................. 33

Press Release, U.S. Treasury Dep't, "Treasury Designates Individuals with Ties to Al Qaida, Former Regime" (Dec. 7, 2007) ....................................................................................... 36

Press Statement, U.S. Dep't of State, "Addition of Al-Manar to the Terrorist Exclusion List" (Dec. 28, 2004) ........................................................................................................... 9

Press Statement, U.S. Dep't of State, "Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases" (Oct. 15, 2004) .................................................................. 8

*Restatement (Second) of Torts* § 13 ..................................................................................... 41

*Restatement (Second) of Torts* § 15 ..................................................................................... 42

*Restatement (Second) of Torts* § 21(1) ................................................................................. 42

*Restatement (Second) of Torts* § 46 ..................................................................................... 40

*Restatement (Second) of Torts* § 46(1) ................................................................................. 42

U.S. Dep't of State, State Sponsors of Terrorism, *available at* https://www.state.gov/j/ct/list/c14151.htm ......................................................................... 26

## Rules

Fed. R. Civ. P. 55(e) ........................................................................................................... 3

Fed. R. Evid. 703 ................................................................................................................. 5

This is a civil action brought pursuant to the Terrorism Exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. The Amended Complaint in the instant case includes allegations related to 287 terrorist attacks that were perpetrated between 2003 and 2015.  To allow the Court to address the attacks at issue in this case in a meaningful manner without addressing all of the attacks in a single motion, Plaintiffs' counsel and the Court agreed that Plaintiffs would seek default judgments by motion as to "approximately 25 or more attacks" per motion to allow both liability and damages to be sequenced appropriately over time for the terrorist attacks at issue in this case.  In this motion, designated by Plaintiffs' counsel as the "first wave", Plaintiffs seek a determination of liability against Defendants the Islamic Republic of Iran ("Iran") and the Syrian Arab Republic ("Syria") for 33 attacks that took place in 2004 and 2005 in and around the Iraqi cities of Fallujah and Mosul.  As described in further detail below, the terrorist group responsible for each of these terrorist attacks is the U.S.-designated Foreign Terrorist Organization ("FTO") Al Qaeda in Iraq ("AQI") or another Sunni terrorist group in Iraq ("STGI") associated with or dominated by AQI, all of which were materially supported by Defendants Iran and Syria.

Plaintiffs respectfully move this Court to enter default judgment as to liability against Defendants based on the material support and resources they provided to AQI and associated STGIs, which enabled them to commit the 33 attacks at issue in this motion. In support of their motion, Plaintiffs proffer the sworn expert report of Colonel (Ret.) Joel Rayburn (the "Rayburn Report" or "Rayburn Rep."), attached as **Exhibit A**. Col. Rayburn has held several government posts that are highly relevant to the subject of this lawsuit. He is also the co-author of the two-volume Department of Defense history of the conflict in Iraq between 2003 and 2011. Plaintiffs also request that the Court take judicial notice of the findings and factual records in the many decisions both in and

outside of this District described herein that have awarded default judgement against Defendants for their material support to AQI and its associated STGIs.

## I. PROCEDURAL HISTORY

Plaintiffs initially filed their Complaint against Defendants on May 29, 2022. ECF No. 1. A Notice of Designation of Relates Civil Cases Pending was filed on May 31, 2022 indicating that this case was related to *Pautsch, et al. v. Islamic Republic of Iran, et al.*, Case No. 20-cv-3859 (JEB). On November 21, 2022, Plaintiffs filed an Amended Complaint. ECF No. 9. Plaintiffs filed with the Court affidavits requesting foreign mailing of the Summons, Complaint, and Notice of Suit, along with a translation of each into Arabic for Syria and Farsi for Iran, upon both Defendants. ECF Nos. 11-14.

After receiving no response to the foreign mailing pursuant to 28 U.S.C. § 1608(a)(3), Plaintiffs then attempted service upon Iran and Syria via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). On November 29, 2023, Plaintiffs made a request to the Clerk of the Court by letter to assist in transmitting the service documents. ECF No. 17. The Clerk of the Court transmitted the service documents to the U.S. Department of State that same day via Federal Express. ECF No. 18. The documents were successfully transmitted to Iran and Syria respectively on May 7, 2024 and April 25, 2024, under cover of diplomatic note. ECF Nos. 19 and 20.

Pursuant to 28 U.S.C. § 1608(d), each Defendant's time to file an answer or other responsive pleading expired 60 days after successful transmission under cover of diplomatic note. Therefore, on July 25, 2024, Plaintiffs filed affidavits in support of default against Defendants. ECF No. 21. The Clerk of the Court entered its certificate of default as to each Defendant on July 26, 2024. ECF Nos. 22 and 23. Plaintiffs now move for default judgment as to liability for the first wave of 32 attacks at issue in the Amended Complaint.

## II.    LEGAL STANDARD FOR DEFAULT JUDGMENT

### A.  Plaintiffs' Burden of Proof

When default is sought under the FSIA, Plaintiffs are required to establish their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "This 'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)," and "[i]n evaluating the plaintiffs' proof, the court may accept as true the plaintiffs' uncontroverted evidence." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (internal citations and quotation marks omitted). However, even in the default scenario, "the court must determine that an exception to immunity applies and that the plaintiff has a sufficient legal and factual basis for his claims." *Pautsch v. Islamic Republic of Iran*, Case No. 20-cv-3859 (JEB), 2023 U.S. Dist. LEXIS 215577, at *5 (D.D.C. Dec. 5, 2023).  Further, Court has "a duty to scrutinize plaintiff's allegations" and should not "unquestioningly accept a complaint's unsupported allegations as true."  *Reed v. Islamic Republic of Iran*, 845 F. Supp.2d 204, 211 (D.D.C. 2012).

"In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit." *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011) (citing *Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002)). *See also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (holding that this standard may be satisfied "through uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence") (internal citations and quotations omitted). Notably, the D.C. Circuit emphasized:

> While both § 1608(e) and Rule 55(d) give an unresponsive sovereign some protection against an unfounded default judgment, neither provision relieves the sovereign from the duty to defend cases. Moreover, § 1608(e) does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required.

3

*Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (internal citations and quotations omitted), *vacated on other grounds sub nom.*, *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

In short, the standard of Section 1608(e) is met "when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding." *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 44 (D.D.C. 2019) (internal citations and quotations omitted). The D.C. Court of Appeals in *Owens* observed: "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Owens*, 864 F.3d at 785.

### B. Evidence

In step with the relaxed burden of proof under § 1608(e), "the district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism," and appellate courts "have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial." *Owens*, 864 F.3d at 785 (citing *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048-51 (D.C. Cir. 2014)) (noting "courts have the authority—indeed, we think, the obligation—to adjust evidentiary requirements to differing situations" and admitting affidavits in a FSIA default proceeding).

A district court's "broad discretion" in such cases "extends to the admission of expert testimony, which, even in the ordinary case, does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak." *Id.* (internal citations and quotations omitted). In sum, "[s]ection 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion. This is

part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems." *Id*. at 785-86.

Moreover, plaintiffs in FSIA cases frequently rely on expert testimony rather than primary evidence. As noted above, courts in this District "[r]ecogniz[e] that expert testimony is not only proper, but often sufficient, and even indispensable in 'terrorism cases ... because firsthand evidence of terrorist activities is difficult, if not impossible to obtain.'" *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 57 (D.D.C. 2018) (citing *Owens*, 864 F.3d at 787). Experts, in turn, may rely on evidence that might not otherwise be admissible in forming their opinions. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). *See also Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 175 (D.D.C. 2016) ("[I]n the terrorism context, experts' reliance on hearsay evidence is often critical.").

Accordingly, Plaintiffs proffer the sworn expert report of Colonel Joel Rayburn (Ret.), attached as **Exhibit A**. Certain public documents relied upon by Col. Rayburn in crafting his report are being filed as a Consolidated Appendix with the report.  Other, more sensitive, materials used by Col. Rayburn to formulate his opinions on the specific attacks at issue are being filed with Plaintiffs' motion to file certain documents under seal.  These documents are denoted as **Exhibit B**.

As reflected in his curriculum vitae appended to his report, Col. Rayburn has decades of experience relating to the conflict in Iraq, and the roles Iran and Syria played in it. From July 2018 to January 2021, Col. Rayburn was the U.S. Special Envoy for Syria. In that post, he oversaw U.S. diplomatic activities concerning Syria, supervised more than 100 diplomats and civil servants across the Middle East and Europe, and, from November 2020 to January 2021, served as U.S.

chief of mission for Syria. Until November 2020, Col. Rayburn was also Deputy Assistant Secretary for Levant Affairs, responsible for implementing U.S. policy concerning Syria, Jordan, and Lebanon.

Before joining the State Department, Col. Rayburn served 26 years as a U.S. Army officer, with his final assignment as senior director for Iran, Iraq, Syria, and Lebanon on the National Security Council staff in 2017-2018. Commissioned from West Point in 1992, Col. Rayburn served in assignments in Europe, the Middle East, South Asia, and the United States, including several deployments to Iraq, Afghanistan, and Bosnia. As a field artillery officer, Col. Rayburn served in the 1st Armored Division from 1993-1996, during which he deployed to Kuwait as part of Operation Intrinsic Action and to Bosnia-Herzegovina as part of NATO's Implementation Force. He also served as a Balkans intelligence analyst at the EUCOM Joint Analysis Center at Royal Air Force (RAF) Molesworth in 1999-2000. Col. Rayburn then taught history at West Point from 2002-2005 and served as an advisor to General John Abizaid at U.S. Central Command (the Department of Defense's combatant command responsible for the Middle East) from 2005 to 2007. In 2007, he served on the Joint Strategic Assessment Team assembled by General David Petraeus and Ambassador Ryan Crocker in Baghdad.

From 2008 to 2011, he was a strategic intelligence advisor to General Petraeus in Iraq, Afghanistan, and the Persian Gulf region, with a focus on the activities and plans of the IRGC-Qods Force, Lebanese Hezbollah, and the Assad regime, as well as on the major Sunni terrorist groups active in the northern Middle East. From 2011 to 2012, Col. Rayburn was a senior military fellow at the Institute of National Strategic Studies. From 2013 to 2016, Col. Rayburn directed the Army's Operation Iraqi Freedom Study Group, where he led the writing of the Army's official history of the Iraq war and assembled operational lessons to be drawn from the conflict. In 2018,

6

the group's work was published in the two-volume study *The U.S. Army in the Iraq War*, for which Col. Rayburn was co-author and editor. He holds an MA in History from Texas A&M University and an MS in Strategic Studies from the National War College.

He is the founder and director of the American Center for Levant Studies, a non-profit research organization that focuses on Middle East affairs. He is also a Senior Fellow at the Hudson Institute and a Visiting Fellow at the Hoover Institution. Previously, he served as Special Advisor for Middle East Affairs in the office of Senator Bill Hagerty (R-TN), assisting Senator Hagerty in foreign relations and national security affairs from January to July 2021.

In his report, Col. Rayburn describes his conclusions that AQI, or another STGI associated with AQI or dominated by it, was responsible for each of the attacks in this case, and that Defendants each provided material support to AQI or the STGI which enabled it to perpetrate the attacks.

## III.   FACTUAL BASES FOR DETERMINING LIABILITY FOR THE 33 ATTACKS AT ISSUE IN THIS MOTION

### A.  Overview of AQI

After the United States invaded Afghanistan shortly after the September 11, 2001, attacks, Iran provided safe haven to several Al Qaeda leaders and prominent extremists, including Abu Musab Al-Zarqawi, a Jordanian-born Sunni extremist. *See* Rayburn Rep. at 13-16. *See also Espitia v. Islamic Republic of Iran*, No. 21-cv-123, 2022 U.S. Dist. LEXIS 108841, at *4 (S.D. Tex. June 16, 2022) (finding these facts sufficiently established).

Zarqawi originally operated under the protection of Iran's Islamic Revolutionary Guard Corps ("IRGC") – Iran's special armed forces charged with defending its revolutionary regime, as opposed to its conventional military – and the IRGC's elite Qods Force ("IRGC-QF"), the IRGC's

external operations force (the IRGC and IRGC-QF are designated FTOs[1]). *See* Rayburn Rep. at 15-20. *See also Espitia*, 2022 U.S. Dist. LEXIS 108841, at \*4-5 (finding same). The time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq. *See id.* at \*5. He was permitted by Iran to move back and forth across the Iran-Iraq border in 2001-2002 before settling in Iraq, where he became a leader of Sunni extremists and insurgent groups. *See* Rayburn Rep. at 16; *Espitia*, 2022 U.S. Dist. LEXIS 108841, at \*5 (finding same).

Zarqawi consolidated those groups with his pre-existing terrorist group—Jamaat Tawhid wa al-Jihad ("JTJ"). *See* Rayburn Rep. at 7, 21; *Espitia*, 2022 U.S. Dist. LEXIS 108841, at \*5. On October 17, 2004, he swore allegiance to Osama bin Laden and Al Qaeda and renamed his organization Tanzim Qaidat al-Jihad fi Bilad al-Rafidayn—commonly referred to as Al Qaeda in Iraq, or AQI. *See* Rayburn Rep. at 7, 16; *Espitia*, 2022 U.S. Dist. LEXIS 108841, at \*5. Zarqawi served as the leader of AQI until his death in a U.S. military airstrike in June 2006. *See* Rayburn Rep. at 7, 22.

AQI was the first Al Qaeda affiliate to be designated as an FTO by the United States. *See* Rayburn Rep. at 16 n.18. Initially, JTJ was designated as an FTO by the U.S. Department of State on October 15, 2004. *See id.* (citing Press Statement, U.S. Dep't of State, "Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases" (Oct. 15, 2004)). In making this FTO designation, the State Department cited Zarqawi and JTJ's abduction and execution of American citizens as well as its campaign to foment civil war in Iraq. *See id.* On December 17, 2004, the State Department amended this FTO designation to reflect the fact that Zarqawi and JTJ had publicly declared their allegiance to Osama bin Laden and Al Qaeda in

---

[1]    Fact Sheet, U.S. Dep't of State, "Designation of the Islamic Revolutionary Guard Corps" (Apr. 8, 2019), *available at* https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

October 2004 and renamed themselves Al Qaeda in Iraq. *See id.* (citing Press Statement, U.S. Dep't of State, "Addition of Al-Manar to the Terrorist Exclusion List" (Dec. 28, 2004)). In this amendment, the State Department noted that Zarqawi and AQI had claimed responsibility for attacks against U.S. forces in Iraq as well as for numerous other terrorist attacks. *See id.*

The U.S. invaded Iraq in March 2003, and completed major combat operations and removed the Saddam Hussein regime by May. AQI presented a very serious threat to the post-2003 stability of Iraq, and combating AQI attacks was a focus for the U.S. military in the early years of the Iraqi conflict. *See Espitia*, 2022 U.S. Dist. LEXIS 108841, at *5 (citing expert report). According to a counterterrorism expert in that case, at the time, "the majority of the attacks against U.S. forces came from members of the Iraqi minority Sunni community and [AQI] in particular." *Id.* (citing expert report) (internal quotation marks omitted). The STGIs, including AQI, focused their activity in western and northern Iraq and Baghdad. *See id.* In other regions (and times), terrorist groups associated with Iraq's Shi'a majority (which groups were also backed by Iran and were aimed at attacking U.S. forces), predominated. *See* Rayburn Rep. at 5. *See also W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 125 (D.D.C. 2019) (referring to the "Shia South of Iraq") (citing Col. Rayburn's expert report); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2021 U.S. Dist. LEXIS 7170, at *207 (D.D.C. Jan. 14, 2021) (finding that a 2009 attack in the southern city of Basra using an explosively formed penetrator was committed by a Shi'a "Special Group" because, *inter alia*, the military record from the attack "indicates that Special Groups had increased freedom of movement in the region wherein the May 16, 2009 attack occurred").

As explained below, the primary terrorist groups operating in Iraq were Sunni groups associated with AQI and Shi'a groups openly associated with Iran—but both sets of terrorist groups received assistance from Iran and Syria. *See* Rayburn Rep. at 16-17, 19-20, 26. As described in

9

Section IV.A.4., *infra*, each Defendant provided material support to AQI and other STGIs to achieve its own objectives, including Iran's goal of "harming the interests of the United States and its allies in the Middle East," Rayburn Rep. at 10-11, and "prevent[ing] the United States and its allies from establishing a friendly government in Iraq or from stabilizing the country on terms favorable to the United States." *Id.* at 16. Similarly, Syria's provision of material support was incentivized by its "its interest not just to undermine the U.S.-led Coalition campaign in Iraq, but also to gain leverage and political influence in the post-Saddam Iraq," *id.* at 25, as well as to "actively channel Syrian Sunni extremists' activities outward, against the regime's external enemies, rather than risk having those extremists turn inward against regime rule." *Id.* at 26.

## B. First-Wave Attacks Addressed by Plaintiffs' Expert

The Plaintiffs included in the first wave of attacks addressed in this motion were serving in Iraq as U.S. service members when they were injured or killed in attacks which took place in 2004 and 2005. Col. Rayburn assessed each attack and determined that they were perpetrated by AQI, or an STGI associated with or dominated by AQI.

In doing so, he relied on five types of evidence which can help attribute an attack to AQI or an associated STGI with a high degree of confidence. Evidence in these categories can be cross-referenced to support a finding of attribution, and not all are necessary to do so. These are:

1. Reliable claims of responsibility;

2. Investigative findings by government agencies;

3. The area of the attack;

4. The date of the attack; and

5. The tactics, techniques, and procedures ("TTP") of the attack.

*See id.* at 36-37.

Courts have credited these methods in other cases, including as to AQI attacks. *See, e.g.*, *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 79 (D.D.C. 2023) ("Therefore, based on the time, types of weapons, sophistication of the attack, and the group controlling the region, [the plaintiffs' expert] concluded that only AQI could have been responsible."). *See also All v. Islamic Republic of Iran*, No. 20-cv-622 (EGS) (ZMF), 2023 U.S. Dist. LEXIS 135097, *12 (D.D.C. June 27, 2023) (same relating to AQI attacks); *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 U.S. Dist. LEXIS 127290, *4647 (D.D.C. July 19, 2022) (crediting expert attribution premised on the Taliban's "TTPs" and role as the "main group" in the area). Furthermore, this Court in the *Pautsch* case has credited the methods employed by Col. Rayburn. *See Pautsch*, 2023 U.S. Dist. LEXIS 215577, at *6-*8.

The first wave of attacks being provided for the Court's adjudication as to liability lean heavily on the last three factors for attribution: location, time, and TTP of the attacks. As set forth in the Rayburn Report, Abu Musab Al-Zarqawi's forces (who would adopt the AQI title in October 2004) along with other STGIs who were either dominated by, or working in concert with, were the predominant insurgent forces operating in Fallujah in 2004—and especially so in the leadup to, and the carrying out of, the Second Battle of Fallujah in November and December 2004)—as was also the case in the northern Iraqi city of Mosul and its surrounding areas in Ninewa Province in Iraq. The TTP utilized in these attacks also modeled the preferred TTPs by AQI and the groups dominated by AQI including suicide vehicle-borne improvised explosive device ("SVBIED") attacks, complex attacks utilizing improvised explosive devices followed by (or preceded by) small-arms fire or rocket-propelled grenade ("RPG") attacks, military-style ambushes in urban warfare, and the use of significant quantities of high-intensity explosives in explosive devices to cause as much chaos as possible.

11

### 1.  August 2, 2004, Attack in Fallujah

On August 2, 2004, Marine Corporal ("Cpl.") Dean Pratt was involved in an operation north of Fallujah in the months leading up to Operation Phantom Fury. *See* Rayburn Rep. at 42-43.  Col. Rayburn determined that it was "highly likely" that this attack was conducted by Abu Musab Al-Zarqawi's forces (who would soon become known as AQI) given these forces were the dominant insurgent group operating in the Fallujah vicinity at the time, and the TTP of mortar fire was a preferred AQI tactic. *Id.*

### 2.  August 15, 2004, Attack in Fallujah

Then-Marine Lance Corporal ("LCpl") Jesus Cervantes-Barroso was injured when a vehicle-borne improvised explosive device ("VBIED") was detonated at a Traffic Control Point immediately south of Fallujah followed by small-arms fire.[2] *Id.* at 43.  Col. Rayburn determined that this attack to a "reasonable degree of processional confidence" was carried out by terrorist forces that became known as AQI or by an STGI closely associated with AQI based on AQI's predominance in the Fallujah vicinity at the time and the fact that the TTPs employed in the attack of a VBIED followed by small-arms fire (a "complex attack") were the preferred tactics of AQI at the time. *Id.* at 44.

### 3.  October 6, 2004, Attack near Fallujah

Sergeant ("Sgt.") Jessica Cawvey was killed when an IED detonated under her 2.5-ton vehicle travelling between Al Nasr Wal Salaam and Fallujah on October 6, 2004.  *Id.* at 44-45.  Col. Rayburn opined that "it is highly unlikely that a group not associated with AQI would have been able to emplace such a large IED in territory controlled by AQI" given the large amount of

---

[2]      The Significant Activity Report for the attack noted one friendly KIA who has been identified as Marine Private First Class Fernando Hannon.

explosives necessary to flip a 2.5-ton vehicle and the fact that attacks with such large IEDs was a common AQI tactic in the area at that time. *Id.* at 45.

### 4.   October 30, 2004, Attack in Zaidon

On October 30, 2004, a complex attack including an SVBIED and insurgent mortar and small-arms fire was conducted against a Medium Tactical Vehicle Replacement traveling between Zaidon and Fallujah killing Marine Private First Class ("PFC") John Lukac and Marine LCpl Andrew Riedel. *Id.* at 45-46. Col. Rayburn found that the location, time period, and the use of a complex attack as a preferred AQI TTP at the time "strongly indicate Zarqawi's AQI or an associated group were the perpetrators." *Id.* at 46.

### 5.   November 9, 2004, Attack in Fallujah

The November 9, 2004 attack was the first attack addressed by Col. Rayburn that took place during Operation Phantom Fury, which has also been called Operation Al-Fajr or the Second Battle of Fallujah. In the fall of 2004, Fallujah had become the operational base for Zarqawi's AQI organization along with the epicenter of the Sunni Muslim insurgency in Iraq which resulted in Zarqawi becoming the de facto leader of the insurgency in Fallujah. *Id.* at 46-47. Coalition commanders and the Iraqi interim government determined that a large-scale clearing operation of Fallujah's insurgent forces was necessary, and they instituted Operation Phantom Fury to accomplish the removal of the Sunni insurgency from Fallujah. On November 9, 2004, Marine LCpl Jesus Martinez was injured while conducting clearing operations in the Jolan District of Fallujah when he was struck by shrapnel from an RPG fired at his unit. *Id.* at 48. While Martinez survived his injuries, his friend Abraham Simpson was killed in the RPG attack. *Id.* In Col. Rayburn's professional opinion, actions carried out by Sunni insurgents in Fallujah were carried

13

out by AQI or by other STGIs closely affiliated with AQI because these AQI-associated insurgents were the only ones who remained in Fallujah to resist the Coalition's incursion. *Id.*

### 6.  November 10, 2004, Attack in Fallujah (Jolan District)

Marine Sgt. Kenneth Distelhorst and Marine Cpl. William Silcox, Jr. both sustained injuries while conducting clearing operations in the Jolan District of Fallujah when a hand grenade thrown by an insurgent exploded at their feet.  *Id.* at 48.  Other members of their unit were ambushed at the same time a few houses away resulting in the death of LCpl Erick Hodges.  *Id.* at 49. For the same reasons as stated above, Col. Rayburn attributed this attack to AQI or by other STGIs closely affiliated with AQI.

### 7.  November 10, 2004, Attack near Fallujah (Shark's Fin)

Marine LCpl Justin Reppuhn was killed on November 10, 2024 in a complex attack against his supply convoy bringing supplies to the "Shark's Fin" area across the Euphrates River from downtown Fallujah.  *Id.* at 49.  He was driving the lead vehicle in the convoy that hit an IED emplaced in a berm that had been spread across the highway casing his 7-ton vehicle to fall off the raised embankment where insurgents barraged the convoy with small-arms fire.  *Id.*  Reppuhn's unit was participating in Operation Phantom Fury, and this attempt to stop a supply convoy from reaching Fallujah while doing so through the use of an AQI-standard TTP of a complex attack led Col. Rayburn to determine in his professional opinion that the attack was carried out by AQI or other STGIs affiliated with AQI.  *Id.* at 49-50.

### 8.  November 11, 2004, Attack in Fallujah

Marine LCpl Kyle Burns was killed when his Light Armored Reconnaissance Battalion was ambushed near the intersection of Main Supply Route Michigan and Phase Line Ethan in the middle of Fallujah.  *Id.* at 50.  Insurgents engaged in intense small-arms fire and RPGs, and Burns

14

was killed when he was struck by the fins of an exploded RPG.  *Id.* Col. Rayburn's professional opinion was that the attack was carried out by AQI or an STGI closely affiliated with AQI as the attack utilized a common AQI TTP (complex attack), it occurred in an area under AQI's control in Fallujah, and it was during a time period where the insurgents confronting the Coalition incursion into Fallujah were all either members of AQI or an STGI closely affiliated with AQI. *Id.*

### 9.  November 12, 2004, Attack in Fallujah

U.S. Army Staff Sergeant James Matteson was killed in an ambush in the Sinah (Industrial) District in Fallujah when he was hit by an RPG.  *Id.* at 51.  Col. Rayburn found that the attack fit with AQI's TTP (ambush and complex attack) during Operation Phantom Fury in an area of Fallujah where the concentration of AQI foreign fighters was larger than in other areas of Fallujah at the time.  *Id.*

### 10. November 14, 2004, Attack in Fallujah (Sook District)

Marine Cpl Mason Fisher sustained injuries while conducting a house-clearing operation in the Sook District in Fallujah on November 14, 2004.  *Id.* at 51-52.  Fisher was behind LCpl George Payton as they were going into a room in the house to clear it when Payton received sustained fire while Fisher attempted to pull Payton out of danger.  *Id.* at 52.  Fisher had a grenade detonate in close proximity to him, but he threw his own grenade into the room that was thrown back into the hall where Fisher quickly threw the grenade a third time back into the room before being able to clear the room of the insurgents.  *Id.* As with the other Operation Phantom Fury attacks, Col. Rayburn opined that this attack was carried out by AQI or STGIs closely affiliated with AQI based on the location in Fallujah, the timing during the Coalition incursion into Fallujah,

15

and the fact that the insurgents remaining in Fallujah were either AQI or STGIs closely affiliated with AQI. *Id*.

### 11. November 14, 2004, Attack in Fallujah (Shuhada neighborhood)

On November 14, 2004, Marine Cpl Nicholas Ziolkowski was providing sniper overwatch in the Shuhada neighborhood in southeast Fallujah when he was killed by an insurgent sniper hit to his head. *Id*. As with the other Operation Phantom Fury attacks, Col. Rayburn opined that this attack was carried out by AQI or STGIs closely affiliated with AQI based on the location in Fallujah, the timing during the Coalition incursion into Fallujah, and the fact that the insurgents remaining in Fallujah were either AQI or STGIs closely affiliated with AQI. *Id.*

### 12. November 16, 2004, Attack in Fallujah

Marine Sgt. Christopher Heflin was killed and Marine LCpl Jonathan Volz sustained injuries when insurgents fired a 60-mm mortar shell at their unit in the Risala District of Fallujah. *Id.* at 53. Col. Rayburn opined that this attack was carried out by AQI or STGIs closely affiliated with AQI based on the location in Fallujah, the timing during the Coalition incursion into Fallujah, and the fact that the insurgents remaining in Fallujah were either AQI or STGIs closely affiliated with AQI. *Id.*

### 13. November 19, 2004, Attack in Fallujah (Jubail District)

While conducting detailed searches in the Jubail District of Fallujah as part of Operation Phantom Fury, Marine Cpl Alexander Sargent was injured by "medium machine gun fire and grenade fragments." *Id.* Three members of Sargent's unit were killed in the attack. *Id.* at 54. Col. Rayburn opined that this attack was carried out by AQI or STGIs closely affiliated with AQI based on the location in Fallujah, the timing during the Coalition incursion into Fallujah, and the fact that the insurgents remaining in Fallujah were either AQI or STGIs closely affiliated with AQI. *Id.*

16

### 14. November 19, 2004, Attack in Fallujah (Nazzal District)

Marine LCpl Demarkus Brown was killed in an ambush by insurgents who had been waving white flags in the vicinity of his unit and then opened fire on the unit. *Id.* Col. Rayburn opined that this attack was carried out by AQI or STGIs closely affiliated with AQI based on the location in Fallujah, the timing during the Coalition incursion into Fallujah, and the fact that the insurgents remaining in Fallujah were either AQI or STGIs closely affiliated with AQI. *Id.* at 55.

### 15. December 12, 2004, Attack in Fallujah (Nazzal District)

While clearing buildings of insurgents in the Nazzal District of Fallujah as part of Operation Phantom Fury, LCpl Jeffery Blanton entered a building and was shot and killed by gunfire from insurgents hiding on the second floor of the building. *Id.* at 55. Col. Rayburn opined that this attack was carried out by AQI or STGIs closely affiliated with AQI based on the location in Fallujah, the timing during the Coalition incursion into Fallujah, and the fact that the insurgents remaining in Fallujah were either AQI or STGIs closely affiliated with AQI. *Id.*

### 16. December 12, 2004, Attack in Fallujah (Askari District)

While conducting security sweeps in the Askari District of Fallujah in preparation for allowing civilian residents to return to the city at the conclusion of Operation Phantom Fury, U.S. Marines Kilo Company, 3d Battalion, 5th Marines encountered a platoon-sized insurgent element. *Id.* at 55-56. With actions taking place in various locations around the house where the insurgents were hiding, Marine SSgt Melvin Blazer, Jr., Marine Cpl Jason Clairday, Marine Cpl Ian Stewart, and Marine Sgt Jeffrey Kirk were all killed in action. *Id.* at 55-57. Col. Rayburn opined that this attack was carried out by AQI or STGIs closely affiliated with AQI based on the location in Fallujah, the timing during the Coalition incursion into Fallujah, and the fact that the insurgents remaining in Fallujah were either AQI or STGIs closely affiliated with AQI. *Id.* at 57.

17

### 17. December 14, 2004, Attack in Fallujah

Marine Cpl Michael Anderson, Jr. was killed by insurgent gunfire while trying to clear a room of insurgents in a house in the Askari District of Fallujah. *Id.* at 58-59. Col. Rayburn opined that this attack was carried out by AQI or STGIs closely affiliated with AQI based on the location in Fallujah, the timing during the Coalition incursion into Fallujah, and the fact that the insurgents remaining in Fallujah were either AQI or STGIs closely affiliated with AQI. *Id.* at 59.

### 18. November 11, 2004, Attack on MSR Michigan near Khalidiyah

U.S. Army SSgt Sean Huey was killed when an SVBIED exploded near his unit that was setting up a cordon to block traffic coming out of Ramadi in the direction of Fallujah. *Id.* at 59-60. Col. Rayburn found that AQI was "highly likely" to have carried out the attack because (1) AQI was the overwhelmingly dominant insurgent group operating in the vicinity of Fallujah during this time period; (2) the attack coincided with the beginning of Operation Phantom Fury in Fallujah; and (3) SVBIED attacks were a common TTP of AQI's forces during this time period. *Id.* at 60-61.

### 19. December 5, 2004, Attack in Khalidiyah

On December 5, 2004, an IED was detonated next to a security patrol on MSR Michigan resulting in the death of U.S. Army SSgt Marvin Trost III. *Id.* at 61. Col. Rayburn opined that AQI was highly likely to have conducted this attack based on: (1) AQI being the dominant insurgent group in the greater Fallujah area, including Khalidiyah, at the time; (2) the attack taking place while Operation Phantom Fury remained ongoing such that the attack was likely part of the ongoing insurgent response to the Fallujah incursion; and (3) many insurgents from AQI fled Fallujah to towns and cities to the west of Fallujah during Operation Phantom Fury including Khalidiyah, Habbaniyah, Ramadi, and points further west. *Id.* at 61-62.

18

### 20. May 20, 2004, Attack in Mosul

As Col. Rayburn's report notes, the Coalition presence in the northern city of Mosul in Iraq was limited; however, because the area appeared to be more stable than other areas in Iraq that were undergoing insurgent activity, in April 2004, Coalition commanders adopted an economy-of-force stance in the Mosul and Ninewa Province operating area that limited the amount of coverage that Coalition Forces could have in this large area. *Id.* at 62-64. As the Coalition presence waned, insurgents began to flock to this area with lesser numbers of Coalition troops and began to assert control in areas throughout Ninewa Province including Mosul and Tal Afar. *Id.* Within this background, SSgt Paul Mardis, Jr.—a member of the U.S. Army's Fifth Special Forces Group out of Fort Campbell, Kentucky—arrived in Mosul and was manning the gunner's turret in an unarmored HMMWV when an IED detonated on the right side of his vehicle impacting him with shrapnel to his head and neck resulting in his death at Walter Reed Army Medical Center in Washington, DC on July 15, 2004. *Id.* at 64. Col. Rayburn found that the attack was "highly likely" carried out by Zarqawi's forces or STGIs associated with Zarqawi's forces because they were the "overwhelmingly dominant insurgency groups operating in Mosul" at the time, and IED attacks on Coalition forces was a standard TTP for Zarqawi's forces at the time. *Id.*

### 21. September 6, 2004, Attack south of Mosul

U.S. Army Sgt Brandon Read was killed while traveling in the lead vehicle of a re-supply convoy in the gunner position approximately 50 kilometers south of Mosul between Qayyarah and Mosul. *Id.* at 65. The attack included an IED detonation followed by small-arms fire at the convoy. *Id.* Col. Rayburn determined this attack was highly likely to have been carried out by AQI because: (1) the use of a complex attack was a common TTP of AQI at this time; (2) AQI and STGIs closely associated with AQI had increased the number of IED attacks against Coalition Forces during this

19

time period because of the economy-of-force posture taken in Ninewa Province; and (3) Qayyarah was one of AQI's strongholds at the time.  *Id.*

### 22. October 13, 2004, Attack in Mosul

U.S. Army Major Charles Soltes, Jr., a preventive medicine officer in Iraq, was killed on October 13, 2004 in an SVBIED attack that targeted his convoy as it returned from a meeting with Iraqi health officials in Mosul.  *Id.*  Col. Rayburn opined that AQI carried out this attack because: (1) it employed an SVBIED which was a known TTP of AQI at the time; and (2) it occurred during a time period where AQI was strengthening in the region and only weeks before AQI would topple the Iraqi government security forces in Mosul on November 10, 2004.  *Id.* at 66.

### 23. December 4, 2004, Attack in Mosul

The U.S. Army's A Company, 3d Battalion, 21st Infantry came under attack with RPG and small-arms fire in the Palestine District of eastern Mosul in the afternoon of December 4, 2004 resulting in the death of Sgt David Mitts.  *Id.*  Col. Rayburn opined to a reasonable degree of professional confidence that this attack was carried out by AQI because: (1) AQI had overrun the Iraqi government security forces in Mosul only a few weeks prior resulting in a week-long battle between Coalition Forces and AQI before Coalition Forces regained control; (2) despite this, AQI continued to engage in intermittent fighting during this time period with U.S. military; and (3) the Palestine neighborhood was an area of frequent armed clashes between AQI-led insurgents and Coalition Forces.  *Id.* at 66-67.

### 24. December 21, 2004, Attack at Forward Operating Base Marez

On December 21, 2004, a suicide bomber from Ansar al-Sunna infiltrated the dining facility at Forward Operating Base Marez in Mosul during the busy lunchtime rush and blew himself killing 22 individuals (14 American soldiers)—including Specialist Cory Hewitt; Captain

20

William Jacobsen, Jr.; Sergeant Robert Johnson; Specialist Nicholas Mason; Staff Sergeant Julian Melo; Sergeant Lynn Poulin, Sr.; and Staff Sergeant Darren VanKomen—and injuring 75 individuals including Specialist Sean Crippen. *Id.* at 67-68. Ansar al-Sunna had sworn fealty to Osama bin Laden and issued statements claiming joint operations with AQI and also providing safe haven to AQI networks that were under pressure when other Sunni groups came together with the Coalition Forces to fight AQI. *Id.* at 68. Col. Rayburn opined that the attack was carried out "by Ansar al-Sunna, an STGI openly affiliated with and operating jointly with AQI and receiving support from both Iran and Syria" based on the U.S. Army's investigation reaching this conclusion, the conviction of an Ansar al-Sunna operative who was involved in filming the video in which Ansar al-Sunna claimed responsibility for the bombing, in addition to timing and location of the attack. *Id.* at 68-69.

### 25. January 13, 2005, Attack in Mosul

A complex attack on a four-vehicle convoy of Stryker vehicles in northeast Mosul on January 13, 2005 involving an IED followed by small-arms fire resulted in the death of U.S. Army Master Sergeant Brian Mack. *Id.* at 69. Col. Rayburn opined to a reasonable degree of professional confidence that the attack was carried out by AQI or an STGI affiliated with AQI because: AQI and STGIs affiliated with AQI were the predominant insurgents conducting attacks against American forces in Mosul at this time; the success of the IED attack showed a level of expertise commensurate with AQI training; and the use of a complex attack was predominantly a TTP of AQI and its affiliated STGIs in the region at that time. *Id.* at 69-70.

### 26. February 16, 2005, Attack in Mosul

U.S. Army Sgt Adam Plumondore was killed when his Stryker convoy struck a VBIED near the Yarmouk Traffic Circle in western Mosul on February 16, 2005. *Id.* at 70. Col. Rayburn

21

determined that AQI or an STGI affiliated with AQI was responsible because AQI and its affiliated STGIs were the predominant insurgent groups operating in the Mosul area at the time; the use of VBIEDs was a known TTP of AQI and its STGIs at that time in Iraq; and the location of the attack was a frequent site of similar insurgent attacks. *Id.*

### 27. February 17, 2005, Attack in Tal Afar

On February 17, 2005, U.S. Army Sgt. Frank Hernandez was killed when his Stryker brigade was hit by an IED in the city of Tal Afar that is approximately 80 kilometers west of Mosul. *Id.* at 71. In the summer of 2004, Zarqawi's forces had taken over Tal Afar forcing Coalition Forces to institute Operation Typhoon in September 2004 to drive out the insurgents. *Id.* Due to the economy-of-force operations in Ninewa Province, the U.S. military withdraw after Operation Typhoon allowing AQI and its affiliated STGIs to return to Tal Afar which they re-took in November 2004. *Id.* Tal Afar became a destination for foreign fighters for AQI coming across the Syrian border with Iraq where they were assigned by AQI leaders to conduct suicide bombings throughout Iraq. *Id.* Col. Rayburn opined that the February 17, 2005 attack was carried out by AQI or an STGI affiliated with AQI because at the time, Tal Afar was an AQI stronghold in the Ninewa Province, this attack was part of a consistent and near-constant confrontation between AQI and Coalition Forces in Tal Afar from summer 2004 to late-2005, and the use of IEDs against Coalition Forces was a standard TTP of AQI and its affiliated STGIs. *Id.* at 72.

### 28. April 23, 2005, Attack in Mosul

U.S. Army Sgt. Anthony Davis, Jr. was killed on April 23, 2005 when his Stryker convoy was struck with an SVBIED approximately 200 meters south of the Yarmouk Traffic Circle in close proximity to where Sgt. Adam Plumondore was killed a little over two months prior. *Id.* Col. Rayburn determined that AQI or an STGI affiliated with AQI was responsible because AQI

22

and its affiliated STGIs were the predominant insurgent groups operating in the Mosul area at the time; the use of SVBIEDs was a known TTP of AQI and its STGIs at that time in Iraq; and the location of the attack was a frequent site of similar insurgent attacks.  *Id.* at 72-73.

### 29. May 4, 2005, Attack in Mosul

Eight 82-mm mortar rounds were fired by insurgents on Forward Operating Base Courage, a former palatial residence for Saddam Hussein in west Mosul, on May 4, 2005 resulting in serious injuries to U.S. Army Sergeant First Class Randy Collins who died from injuries he sustained to his head and eye on May 24, 2005.  *Id.* at 73.  Col. Rayburn determined that only AQI or an AQI-affiliated STGI could have carried out this attack because they were the predominant insurgents operating in Mosul at the time, but also because the firing of multiple mortar rounds required control of territory and freedom of movement through that territory which AQI and its affiliated STGIs possessed at that time.  *Id.*

### 30. May 22, 2005, Attack south of Mosul

On May 22, 2005, near the main road between Mosul and the town of Hammam al-Ali, an up-armored M1114 HMMWV commanded by U.S. Army 1LT Aaron Seesan struck an IED that caught the fuel tank of the HMMWV on fire causing third-degree burns over 85 percent of 1LT Seesan's total body surface area resulting in his death late that afternoon after being airlifted to Landstuhl Medical Center in Germany for treatment.  *Id.* at 73-74.  Col. Rayburn found that AQI and STGIs affiliated with AQI were the predominant insurgent forces in Ninewa Province at the time and that emplacing an IED near a main highway required control of or freedom of movement through the area which only AQI or an STGI affiliated with AQI would have had in this area at that time.  *Id.* at 74.

23

### 31. June 20, 2005, Attack in Tal Afar

U.S. Army Private First Class Christopher Kilpatrick was killed in a complex attack on Route Santa Fe on the eastern edge of Tal Afar when his up-armored M1114 HMMWV was struck with IED following by small-arms fire causing shrapnel injuries to Pfc Kilpatrick's head. *Id.* at 74. Col. Rayburn determined that Tal Afar was the center of the AQI-dominated insurgency in the Ninewa Province at the time; AQI and its affiliated STGIs had made Tal Afar their de facto headquarters of the Sunni insurgency in Iraq; and the use of a complex attack on American forces was a known TTP of AQI and its affiliated STGIs in Iraq at that time. *Id.* at 74-75.

### 32. July 9, 2005, Attack in Tal Afar

On July 9, 2005, the U.S. Army's G Troop, 2d Squadron, 3d Armored Cavalry Regiment was engaged in a raid in the Sarai District of Tal Afar when the troop was ambushed with RPG and small-arms fire where Spc Hoby Bradfield, Jr. sustained multiple gunshot wounds while tending to another member of his troop who had also been shot. *Id.* at 75. When an ambulance transport arrived, the ambulance struck an IED with Spc Bradfield inside, and he was pronounced dead at the Combat Support Hospital in Mosul. *Id.* at 75-76 Col. Rayburn opined that this attack was carried out by AQI or an STGI affiliated with AQI as the Sarai District/neighborhood was the main stronghold for the AQI-led Sunni insurgency in Tal Afar, and Bradfield's unit seized, among other items, a suicide vest in its raid where AQI was the foremost employer of suicide terrorism in Iraq at the time. *Id.* at 76. Further, the use of a complex attack using RPGs, small-arms fire, and an IED demonstrated a known TTP of AQI and its affiliated organizations at the time in Iraq. *Id.*

### 33. November 19, 2005, Attack in Mosul

Iraqi Police followed by a Stryker Brigade Combat Team were ambushed at a house in northeast Mosul on November 19, 2005, and Master Sergeant Anthony Yost, a member of the U.S.

24

Army's 3d Battalion, 3d Special Forces Group and Operational Detachment Alpha 381 gathered a group of U.S. Special Forces and Iraqi Army soldiers Yost had trained to storm the building. *Id.* at 76-77. After entering the house, conducting a room-to-room search, and eliminating insurgents within the house, the insurgents detonated a hidden demolition charge that engulfed the home resulting in Yost's death along with a number of additional casualties. *Id.* at 77. According to Col. Rayburn, "[t]he sophistication of the insurgent operation pointed to AQI, with the use of multiple trigger points to engage in ambushes of Coalition Forces while also rigging a fail-safe building demolition in the event of defeat." *Id.* at 77. Reports had been circulated that Zarqawi himself was in Mosul, and AQI was engaged in intense efforts to maintain its positions in both Mosul and Tal Afar. *Id.* A weapons cache found in the building after the explosion indicated a well-funded organization with AQI being the best-funded insurgent organization at the time in Mosul. *Id.* at 77-78.

## IV. PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF DEFAULT JUDGMENT AS TO LIABILITY FOR THE 33 ATTACKS AT ISSUE IN THE INSTANT MOTION

### A. This Court Possesses Subject-Matter Jurisdiction Over the 33 Attacks

The FSIA's Terrorism Exception confers jurisdiction against a foreign government if: (1) the claims are against a designated "State Sponsor of Terrorism"; (2) the "claimant or the victim" was, at the time of the attack, "a national of the United States," "a member of the armed forces," or a U.S. government employee or contractor; (3) money damages are sought for personal injury or death caused by an act of torture, extrajudicial killing, or hostage taking, or the material support of

such acts; and (4) the act, "or the provision of material support or resources for the act" is "engaged in by an official, employee, or agent of the foreign state." 28 U.S.C. § 1605A(a)(1)–(2).[3]

### 1. Defendants were both designated as state sponsors of terrorism at the time of the attacks at issue in this motion, and they continue to be designated as such

Regarding the first element, the Court may take judicial notice of each of Iran's and Syria's status as a designated State Sponsor of Terrorism, both when the cause of action arose and now. The State Department designated Iran a State Sponsor of Terrorism on January 19, 1984, and it has retained its designation continuously since then. *See* U.S. Dep't of State, State Sponsors of Terrorism, *available at* https://www.state.gov/j/ct/list/c14151.htm. Syria has been designated a State Sponsor of Terrorism continuously since December 29, 1979. *See id.*

### 2. Each attack victim whose claims are at issue in this motion was, at the time of the attacks, either a U.S. national, a member of the armed forces, or a U.S. government employee or contractor

Plaintiffs fulfill the second element, as reflected by the "Section 1605A(a)(2)(A)(ii) Appendix" filed under seal as **Exhibit C**. This Appendix provides documentation that meets the requirements of 28 U.S.C. § 1605A(a)(2)(A)(ii) for each of the victims named in the Amended Complaint in the 33 attacks at issue in this motion: namely, that each "was, at the time the [attack] occurred—(I) a national of the United States [or] (II) a member of the armed forces; or (III) otherwise an employee of the Government of the United States, or an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment."

---

[3]     Section 1605A(a)(2) also requires the claimant to offer the foreign state an opportunity to arbitrate the claim if the act occurred within the foreign state against which the claim is brought. Such an offer of arbitration is not required in this case because the actions did not take place within Iran or Syria.

**3. Plaintiffs' claims are predicated on Defendants' "material support" for acts of extrajudicial killings.**

The FSIA's Terrorism Exception permits liability against designated State Sponsors of Terrorism for "the provision of material support or resources" for "act[s] ... of extrajudicial killing." 28 U.S.C. § 1605A(a)(1). Both Defendants in this case provided material support for "act[s] of ... extrajudicial killing" that resulted in Plaintiffs' deaths or injuries. *Id.* "Extrajudicial killing" is defined by reference to the Torture Victim Protection Act of 1991 ("TVPA"). *See* 28 U.S.C. § 1605A(h)(7). The TVPA provides that an "extra-judicial killing" is "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Pub. L. No. 102–256, § 3(a), 106 Stat. 73. "On its face, this definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 825.

The decision of the U.S. Courts of Appeals for the District of Columbia Circuit in *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024), has somewhat altered the landscape of how courts within this Circuit have viewed cases where complaints allege claims for individuals who were injured but not for individuals who were killed in a specific attack. In *Borochov*, the Court determined that the terrorism exception to the FSIA only applies in cases where there was a "completed killing." 94 F.4th at 1061. While courts within the D.C. Circuit had previously assigned liability in terrorism exception cases with material support was provided by a designated state sponsor of terrorism for an attempted extrajudicial killing, the D.C. Circuit held that this reasoning was "foreclosed by a full reading of the statutory text and context." *Id.* at 1063. This Court, in *Pautsch*, held the following:

> The text of the terrorism exception waives a foreign sovereign's immunity from suits for "*personal injury* or death that was caused by an act of … extrajudicial

killing." 28 U.S.C. § 1605A(a)(1) (emphasis added). The text, therefore, contemplates actions brought by a plaintiff who is injured by a terrorist attack that results in death, even if he himself is not the fatality. This tracks common sense, too, as a single "*act of*" extrajudicial killing can "quite obviously injure another." Indeed, Congress knows how to limit liability to the estate and family members of those who died – *viz.*, in the Torture Victim Protection Act, which supplies the definition of "extrajudicial killing" applicable in this context, *see* 28 U.S.C. § 1605A(h)(7), and limits relief to actions for "wrongful *death*." Pub. L. No. 102-256, §2(a)(1) (emphasis added).

This near-uniform interpretation of the relevant text is also consistent with *Borochov*. As Plaintiffs explain, the Circuit there repeatedly said that the underlying attack did not qualify as an extrajudicial killing, not because it did not result in the death of the *plaintiffs*, but because it did not cause the death of "anyone." *Borochov*, 94 F.4th at 1057, 1060-61. And when the court turned to the plaintiffs' submission that the perpetrator's death counted as the necessary killing, it did not dismiss the argument out of hand because it was the perpetrator and not the plaintiffs who died. *See Borochov*, 94 F.4th at 1062. It instead explained that the perpetrator's death at the hands of a bystander did not suffice both because the foreign sovereigns could not have "undertaken" or sponsored this killing and because this shooting was not the cause of the plaintiffs' injuries. *Id.*

The Court thus agrees with Plaintiffs that *Borochov* "implicitly confirms," or is at the very least consistent with, the foregoing interpretation of the terrorism exception.

*Pautsch v. Islamic Republic of Iran*, Case No. 20-cv-3859 (JEB), 2024 U.S. Dist. LEXIS 133054, at *10-*11 (D.D.C. July 29, 2024).

Each of the 33 attacks at issue in this motion satisfy the requirements in 28 U.S.C. § 1605A(a)(1) and this Court's prior interpretation of the D.C. Circuit's *Borochov* decision. The following attacks included individuals who were killed (with the name of those killed in parentheses):

1. August 2, 2004—Fallujah (Dean Pratt killed);

2. August 15, 2004—Fallujah (Jesus Cervantes-Barroso injured; CIDNE SIGACT identifies 1 Friend Killed in Action);

3. October 6, 2004—Near Fallujah (Jessica Cawvey killed);

4. October 30, 2004—Zaidon (John Lukac and Andrew Riedel killed);

5. November 9, 2004—Fallujah (Jesus Martinez injured; Abraham Simpson killed);

6. November 10, 2004—Fallujah (Jolan District) (Kenneth Distelhorst and William Silcox, Jr. injured; Erick Hodges killed);

7. November 10, 2004—Fallujah (Shark's Fin) (Justin Reppuhn killed);

8. November 11, 2004—Fallujah (Kyle Burns killed);

9. November 12, 2004—Fallujah (James Matteson killed);

10. November 14, 2004—Fallujah (Sook District) (Mason Fisher injured; George Payton killed);

11. November 14, 2004—Fallujah (Shuhada neighborhood) (Nicholas Ziolkowski killed);

12. November 16, 2004—Fallujah (Christopher Heflin killed; Jonathan Volz injured);

13. November 19, 2004—Fallujah (Jubail District) (Alexander Sargent injured; Phillip West, Joseph Welke, and Bradley Arms killed);

14. November 19, 2004—Fallujah (Nazzal District) (Demarkus Brown killed);

15. December 12, 2004—Fallujah (Nazzal District) (Jeffery Blanton killed);

16. December 12, 2004—Fallujah (Askari District) (Melvin Blazer, Jr., Jason Clairday, Ian Stewart, and Jeffrey Kirk killed);

17. December 14, 2004—Fallujah (Michael Anderson, Jr. killed);

18. November 11, 2004—MSR Michigan near Khalidiyah (Sean Huey killed);

19. December 5, 2004—Khalidiyah (Marvin Trost III killed);

20. May 20, 2004—Mosul (Paul Mardis, Jr. killed);

21. September 6, 2004—Mosul (Brandon Read killed);

22. October 13, 2004—Mosul (Charles Soltes, Jr. killed);

23. December 4, 2004—Mosul (David Mitts killed);

24. December 21, 2004—FOB Marez (Cory Hewitt, William Jacobsen, Jr., Robert Johnson, Nicholas Mason, Julian Melo, Lynn Poulin, Sr., and Darren VanKomen killed; Sean Crippen injured);

25. January 13, 2005—Mosul (Brian Mack killed);

26. February 16, 2005—Mosul (Adam Plumondore killed);

27. February 17, 2005—Tal Afar (Frank Hernandez killed);

28. April 23, 2005—Mosul (Anthony Davis, Jr. killed);

29. May 4, 2005—Mosul (Randy Collins killed);

30. May 22, 2005—Mosul (Aaron Seesan killed);

31. June 20, 2005—Tal Afar (Christopher Kilpatrick killed);

32. July 9, 2005—Tal Afar (Hoby Bradfield, Jr. killed); and

33. November 19, 2005—Mosul (Anthony Yost killed).

29

"Next, the court must determine whether the killings were 'deliberated,'" which "is simply one undertaken with careful consideration, not on a sudden impulse." *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 491 (D.D.C. 2021) (citing *Salzman v. Islamic Republic of Iran*, No. 172475 (RDM), 2019 U.S. Dist. LEXIS 163632, at \*41 (D.D.C. Sep. 25, 2019)). The Rayburn Report details how the attacks at issue were part of a deliberate campaign of attacks against U.S. and Coalition personnel in Iraq, perpetrated by AQI and its associated STGIs and supported by Defendants. *See* Rayburn Rep. at 4 ("The Iranian government knowingly and as a matter of state policy provided material support to Al Qaeda, Al Qaeda in Iraq (AQI), and other Sunni terrorist groups in Iraq (STGIs) to carry out attacks against U.S. troops and civilians during the U.S.-led Coalition military campaign in Iraq from 2003 to 2011."); 5 (same with Syrian government). Rather than belaboring the point, as set forth in Section III.B., *supra*, Col. Rayburn determined that each of the 33 attacks at issue in this motion were deliberated attacks by AQI and its affiliated STGIs with the support of Iran and Syria.

"Finally, there is no evidence that would suggest that the killings and attempted killings ... were authorized by a judgment of a regularly constituted court or were lawfully carried out under the authority of a foreign nation." *Lee*, 518 F. Supp. 3d at 492. The attacks therefore comprise acts of "extrajudicial killings" under the FSIA.

### 4. Defendants each provided material support or resources to AQI enabling it to carry out the 33 attacks at issue in this motion

To establish this element, "courts consider first, whether a particular terrorist group committed the terrorist act and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act." *Est. of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61 (GMH), 2022

U.S. Dist. LEXIS 234282, at *10 (D.D.C. Dec. 28, 2022) (citing *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008)).

The Rayburn Report establishes the first consideration by concluding that each of the attacks was perpetrated by AQI, or an STGI associated with or dominated by AQI. *See* Rayburn Rep. at 42-78.

With respect to the second consideration, material support or resources is defined under the FSIA as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel … and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1); *see also* 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" for the purposes of the FSIA to have the "meaning given that term in section 2339A of title 18"). Evidence found sufficient to demonstrate a foreign sovereign's material support of a terrorist organization varies, but "successful showings have generally focused on the foreign state's offer of haven to the terrorist group, provision of financing and weapons, assistance with recruitment, or motive to foment unrest in a particular area where the group is operating." *Parhamovich*, 2022 U.S. Dist. LEXIS 234282, at *11 (internal citation and quotation marks omitted).

While Col. Rayburn's report addresses the material support provided by Defendants Iran and Syria in detail, *see* Rayburn Rep. at 10-36, this Court previously found in the *Pautsch* case that through the expert report of Col. Rayburn in that case in which he made the same findings regarding Iranian and Syrian support for AQI and STGIs affiliated with AQI as he does in his report in this case, that "Plaintiffs have shown that Iran and Syria's provision of material support

31

to AQI and its associated STGIs caused their injuries." 2023 U.S. Dist. LEXIS 215577, at *6. The

Court found the following:

> As mentioned earlier, Rayburn concluded that Iran and Syria played a significant role in this [an April 10, 2009 SVBIED attack in Mosul], and similar attacks. *See id.* at 7-8. The specific suicide bomber responsible for the attack was recruited by an AQI facilitation network based in Syria and Iraq, which was set up under Syrian dictator Bashar al-Assad's authority and with the assistance of Syrian government officials and agencies. *See id.* at 49, 36-39. From 2003 onward, moreover, Iran gave material support to Sunni extremist groups to carry out attacks in Iraq, including against U.S. personnel. *See id.* at 22.
>
> Rayburn is far from alone in this judgment. The U.S. Treasury has noted that Iran's Ministry of Intelligence and Security provided money and weapons to AQI and negotiated prisoner releases of AQI operatives. *See* U.S. Dep't of Treasury, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012), https://perma.cc//97K2-D567. The Treasury also noted that a senior officer in the IRGC-QF sought to sponsor Sunni groups to carry out suicide bombings, including against U.S. troops. *See* U.S. Dep't of Treasury, *Treasury Designates Individuals, Entity Fueling Iraqi Insurgency* (Jan. 9, 2008), https://perma.cc/S23V-WCSA. The Court finds such evidence to be clearly persuasive.

*Id.* at *13-*14. Based on the findings by this Court in the *Pautsch* case, Plaintiffs submit that the

same findings should be applied in this related case based on the same expert findings regarding

Iranian and Syrian support for AQI and STGIs affiliated with AQI. This Court may take judicial

notice of these findings along with those issued in other cases both inside and outside this District.[4]

---

[4]    *See, e.g., Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193 (EGS)(ZMF), 2022 U.S. Dist. LEXIS 219188 (D.D.C. Sept. 26, 2022) (adopting report and recommendation that Iran provided financial support, logistical assistance, weaponry, and safe haven to AQI); *Parhamovich v. Syrian Arab Republic*, No. 17-cv-61 (GMH), 2022 U.S. Dist. LEXIS 234282, at *19 (D.D.C. Dec. 28, 2022) (finding "evidence that the Islamic Republic [of Iran] provided material support to the Zarqawi organization during the relevant time period more than sufficient at the default stage" and finding that Syria provide safe haven, training, and facilitated a pipeline of fighters into Iraq on behalf of AQI); *Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 39 (D.D.C. 2023) (finding "Plaintiffs and their expert have sufficiently alleged that Iran's leadership and its Quds Force supported various groups including … JTJ, [and] AQI … in many ways"); *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 75 (D.D.C. 2023) (finding "Iran provided AQI members with documents, identification cards, and passports to facilitate their movements" and "even negotiated the release of AQI operatives from prison"); *Espitia v. Islamic Republic of Iran*, No. 1:21-cv-123, 2022 U.S. Dist. LEXIS 108841, at *13 (S.D. Tex. June 16, 2022) (holding "[t]he United States and the United Nations have identified a long-standing partnership between Iran and al Qaeda that included harboring Zarqawi and other AQI operatives in a 'safe haven,' as well as providing funds, training, and weapons to al Qaeda operatives in various middle eastern countries, including Iraq"); *Maupin v. Syrian Arab Republic*, No. 17-cv-1213 (CKK), 2019 U.S. Dist. LEXIS

Iran's support for AQI was coordinated primarily through its IRGC-QF and its Ministry of Intelligence and Security ("MOIS"). *See* Rayburn Rep. at 10, 17, 19. Section 1605A(a)(1) requires the material support to have been provided "by an official, employee, or agent" of Iran, for which the IRGC, IRGC-QF, and MOIS qualify. *See Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 80-81 (D.D.C. 2017) (holding that "it is well-established by courts in this district that MOIS and IRGC are the functional equivalent of Iran, thus qualifying as 'foreign states' as defined by the FSIA"); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 55 (D.D.C. 2019) ("The Court is satisfied that the Qods Force is at least an agent of Iran, if not a part of the government such that individuals working for it would be officials or employees of Iran.").

In its designation of Iran's MOIS for supporting terrorist groups, the U.S. Department of Treasury noted that MOIS "provided money and weapons" to AQI, and "negotiated prisoner releases of AQI operatives." Rayburn Rep. at 17 (citing Press Release, U.S. Dep't of Treasury, "Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism" (Feb. 16, 2012)). The Treasury Department also designated a senior general officer in Iran's IRGC-QF for similar activities. The officer, Ahmed Foruzandeh, was described as having "provide[d] financial and material support for acts of violence against Coalition Forces and Iraqi Security Forces" to Sunni terrorists, in addition to delivering weapons to Iraq from Iran for such attacks by Sunni groups. *Id.* at 17-18 & n.20.

The conclusions related to Syria's support for AQI are further bolstered by the Rayburn Report, which describes how Syria supported AQI during the U.S.-led invasion of Iraq, motivated

---

237831 (D.D.C. Mar. 20, 2019) (finding that "Syria provided material support to the Zarqawi Terrorist Organization throughout the relevant time period—roughly 2002 through 2006. During this period, Syria lent support to a number of terrorist groups by, among other things, providing them safe haven, weaponry, financial support, and even allowing them to open headquarters within Syria"); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 36 (D.D.C. 2016) (finding that Syria "provided material support to Zarqawi and AQI, enabling them to perpetrate these attacks")

33

not only by its interest in undermining U.S. and Coalition forces there, but also to "gain leverage and political influence in the post-Saddam Iraq." Rayburn Rep. at 25. This has been Syria's goal historically, which it accomplishes by "sponsoring the militant opposition to each of Syria's neighboring governments," *id.* at 26, even when that support benefited a sect at odds with the Assad regime. *See id.* at 26-27. In fact, according to the Rayburn Report, "Syrian regime support to Al Qaeda in Iraq and similar STGIs terrorist groups was a high policy priority within the Assad regime, emanating from the highest levels of regime leadership. Bashar al-Assad was directly involved in formulating the policy and instructing Syrian government leaders and agencies on implementing the policy." *Id.* at 27. Assad even made his brother-in-law, General Assef Shawkat, the lead for executing the policy via Shawkat's Syrian Military Intelligence directorate, and several other Syrian government agencies also arranged support for AQI. *See id. See also id.* at 30 ("Beyond the intelligence agencies, Syrian ministries and civil administrations also received orders to help Syrians join the jihad in Iraq").

A former Syrian official reported to the Western press that thousands of fighters were given safe passage to cross from Syria into Iraq at the time of the U.S. invasion. *See id.* at 27. Furthermore, "[i]n a hearing before the Senate Armed Services Committee in 2003, then Deputy Secretary of Defense Paul Wolfowitz testified that several foreign fighters killed by U.S. forces in Iraq went there through Syria, and the entry permits on their passports said 'volunteer for jihad,' or 'to join the Arab volunteers,' indicating that Syria was well aware of the jihadi nature of these transient volunteer soldiers as they passed through Syrian borders." *Thuneibat*, 167 F. Supp. 3d at 29 (citing expert report). *See also id.* at 30 ("The State Department's 2005 Patterns of Global Terrorism publication concluded that Syria remained a 'facilitation hub for terrorists operating in Iraq.' In 2007, then-General David Petraeus echoed that Syria acts as 'critical support for the AQI insurgency in Iraq,'

34

and plays a 'pivotal role as the source of foreign fighters entering Iraq.'") (citing record and expert report); *Gates*, 580 F. Supp. 2d at 59 ("Plaintiffs presented expert witness testimony and testimony from an Iraqi countryman concerning Syria's assistance to Zarqawi and al-Qaeda in Iraq. From this evidence, certain conclusions are clear. Syria was the critical geographic entry point for Zarqawi's fighters into Iraq, and served as a 'logistical hub' for Zarqawi. Syria supported Zarqawi and his organization by: (1) facilitating the recruitment and training of Zarqawi's followers and their transportation into Iraq; (2) harboring and providing sanctuary to terrorists and their operational and logistical supply network; and (3) financing Zarqawi and his terrorist network in Iraq.") (citing expert testimony); *Doe v. Syrian Arab Republic*, No. 18-cv-66 (KBJ), 2020 U.S. Dist. LEXIS 167697, at *23 (D.D.C. July 27, 2020)("Beyond a generally permissive attitude toward the terrorist organization, the Syrian government was 'part of an operation to smuggle jihadist volunteers into Iraq from Syria after the 2003 invasion.'") (citing expert report).

Although many of these jihadists returned after the fall of Saddam Hussein, about 5,000 remained, and formed the foreign core of the Sunni terrorist groups operating in Iraq. *See* Rayburn Rep. at 28. These fighters included Sunni extremists released from Syrian jails for the purpose of fighting in Iraq, many of whom became important leaders and operatives in Sunni terrorist groups operating in Iraq, including AQI. *See id.* at 28-29. They were joined by the remnants of the Iraqi Baathist regime after Saddam fell from power, who Syria supported in mounting terrorist attacks against U.S. and Coalition forces. *See id.* at 30-31. Illustrating this point, the Treasury Department designated Fawzi Mutlaq al Rawi, whom Assad appointed to head the Iraqi branch of the Syrian Baath Party in 2003, for providing financial and material support to AQI. That support included the provision of $300,000, vehicle-borne improvised explosive devices, rifles, and suicide bombers. *See id.* at 31 & n.55 (citing Press Release, U.S. Treasury Dep't, "Treasury Designates Individuals

35

with Ties to Al Qaida, Former Regime" (Dec. 7, 2007)). Al-Rawi also met with senior AQI leaders in Iraq to discuss financing, unifying AQI forces, conducting airborne IED attacks against the U.S. Embassy, and concentrating attacks against the international zone. *See* Press Release.

Plaintiffs must also show that Defendants' material support or resources "caused" their personal injuries. 28 U.S.C. § 1605A(c). That requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered," *Owens*, 864 F.3d at 794, although the provision of material support does not need to "go directly for the specific act." *Id.* at 799. Because material support "is difficult to trace" and "is fungible," courts do not require either specific intent or direct traceability to establish the liability of material supporters of terrorism. *Id.* Instead, there need only be evidence that Defendants' actions were a "substantial factor in the sequence of events that led to the plaintiff[s'] injur[ies]," and that those injuries were "reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Id.* at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).

The Rayburn Report confirms that Defendants' material support or resources proximately caused the attacks at issue. Col. Rayburn undertook a detailed analysis of each attack, attributed each attack to AQI or its associated STGIs, and submitted proof—in addition to the judicially-noticed factual findings—of how Defendants, through material support or resources, supported AQI and its associated STGIs, and how the attacks were a foreseeable – and desired – result of this support. Central to Col. Rayburn's description of Iran's support for AQI is his explanation of the Iranian regime's goal of "harming the interests of the United States and its allies in the Middle East." Rayburn Rep. at 11. This goal focused the Iranian regime on Iraq after the U.S. and Coalition forces invaded Iraq to end the regime of Saddam Hussein, when "the Iranian regime sought to prevent the United States and its allies from establishing a friendly government in Iraq or from stabilizing the country on

terms favorable to the United States." *Id.* at 16. *See also id.* at 4 ("The Iranian regime's material support to Al Qaeda and other Sunni terrorist groups expanded significantly after the fall of the Saddam Hussein regime in 2003, when Khamenei and other senior Iranian leaders considered it imperative to prevent the United States and its allies from establishing a stable, pro-U.S. state in Iraq."). "Iranian regime leaders viewed the U.S. military presence and political influence in Iraq as a threat to Iranian regime interests, and they also considered Islamist militias and terrorist groups as assets or allies in thwarting U.S. objectives in the region." *Id.* at 16. To this end, Iran materially supported both Shi'a and Sunni extremist groups, including AQI, in carrying out attacks against U.S. and Coalition forces in Iraq. *See id.* at 16-17.

Similarly, Col. Rayburn described how the "Syrian regime considered these attacks to be in its interest not just to undermine the U.S.-led Coalition campaign in Iraq, but also to gain leverage and political influence in the post-Saddam Iraq." *Id.* at 25. *See also id.* at 5 ("Syrian ruler Bashar al-Assad and his regime adopted a policy of enabling AQI and other STGIs to conduct terrorist attacks in Iraq to cause the failure of the U.S.-led military campaign in Iraq and to gain regional political leverage in the post-Saddam Iraq."). Another benefit the Assad regime received in supporting these attacks was that it was able "to actively channel Syrian Sunni extremists' activities outward, against the regime's external enemies, rather than risk having those extremists turn inward against regime rule." *Id.* at 26.

According to the Rayburn Report, "the material support the governments of Iran and Syria provided to AQI and its associated STGIs was essential to these groups' terrorist operations, including their ability to conduct attacks in Iraq." *Id.* at 6. "AQI and its associated STGIs could not have operated effectively in Iraq without the logistical support, territorial safe haven, personnel recruitment, weapons, explosives, training, and other categories of support that the Iranian and

Syrian governments provided." *Id.* More specifically, "[w]ithout this indispensable Iranian and Syrian material support, it is highly unlikely AQI and its associated STGIs would have been able to conduct terrorist attacks on a sustainable basis in Iraq, including the attacks against U.S. forces and civilians" included in this case. *Id.* Accordingly, Plaintiffs have demonstrated that Defendants' material support and resources in support of AQI's terrorist activities caused their injuries.

### B. The Court possesses personal jurisdiction over both Iran and Syria

Federal district courts may exercise personal jurisdiction over a foreign state when: (1) the court has subject matter jurisdiction; and (2) the defendant is properly served. *See* 28 U.S.C. § 1330(b). The preceding section shows the basis for subject matter jurisdiction. The second element is also satisfied because Iran and Syria were each properly served.

The four methods of obtaining proper service in FSIA cases are set forth in 28 U.S.C. § 1608. *See* 28 U.S.C. § 1608(a)(1)–(4). Each must be attempted in descending order, but only to the extent feasible in a specific case or applicable to a specific defendant. *See id.* The first two methods—a "special arrangement for service between the plaintiff and foreign state" and "in accordance with applicable international convention"—do not apply here. Plaintiffs have no "special arrangement" for service with Iran or Syria, and neither Defendant is a party to any "international convention on service of judicial documents." *See Thuneibat*, 167 F. Supp. 3d at 37; *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017). Plaintiffs therefore proceeded with the next two steps, via mail pursuant to 28 U.S.C. § 1608(a)(3), and then diplomatic service via the U.S. Department of State as directed by 28 U.S.C. § 1608(a)(4). As described above in Section I, Plaintiffs successfully served Iran and Syria via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4) on May 7, 2024, and April 25, 2024, respectively. *See* ECF Nos. 19 and 20.

Thus, because this Court has subject-matter jurisdiction over this matter, *see supra,* Section IV.A., and since Plaintiffs fully complied with the service requirements of Section 1608(a), this Court has personal jurisdiction over Iran and Syria in this matter. *See* 28 U.S.C. § 1330(b).

## V.    THEORIES OF LIABILITY

"Having concluded that the Court possesses subject matter jurisdiction, little else is required to show that Plaintiffs are entitled to relief." *Fritz*, 320 F. Supp. 3d at 86. Plaintiffs may recover "economic damages, solatium, pain and suffering, and punitive damages" under the FSIA's private cause of action set forth in 28 U.S.C. § 1605A(c), and "[t]here is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity." *Id.* at 86–87 (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)). "[A] plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception: a foreign state is only liable to 'a national of the United States,' 'a member of the armed forces,' 'an employee [or contractor] of the [U.S.] Government ... acting within the scope of the employee's employment,' or 'the legal representative of' any such person." *Id.* at 87 (citing *Foley*, 249 F. Supp. 3d at 205).

Here, the elements of the § 1605A(c) cause of action are all met: (1) Defendants were each designated as State Sponsors of Terrorism at the time of the attacks and remain so designated today; (2) each of the Plaintiffs are U.S. citizens, a member of the armed forces, or a U.S. contractor; and (3) money damages are sought for injuries caused by the attacks.

### A.  Estates of Individuals who were killed

Plaintiffs' Amended Complaint states a claim for wrongful death for the estates of Plaintiffs who died in the attacks out of which their claims arise.  *See* ECF No. 9 at 344.  Under a wrongful-

39

death theory of liability, Plaintiffs have sought "compensatory damages, including physical injuries, extreme mental anguish, pain and suffering and any pecuniary loss (or loss of income to the estates and heirs), under federal common law or, where Plaintiffs are not U.S. nationals under 28 U.S.C. § 1605A(c)(1), the laws of the District of Columbia, Iraq, or the states of such Plaintiffs' primary residence." *Id.* at ¶2823. To the extent that the Court credits the evidence set forth in Col. Rayburn's report regarding the 33 attacks at issue in this motion—and specifically those involving estate claimants in this litigation—Plaintiffs submit that, like the Plaintiffs in *Pautsch*, they have sufficiently proven the validity of their wrongful-death theory of recovery against Defendants Iran and Syria.

### B. Immediate Family Members of those injured or killed in attacks

Plaintiffs' Amended Complaint also states a claim for "loss of solatium and intentional infliction of severe emotional distress" on behalf of the families of Plaintiffs identified in the Amended Complaint as injured or killed. *See id.* at 345. Plaintiffs assert they have suffered "severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe physical manifestations, as well as loss of solatium and other harms to be set forth to the trier of fact, under federal common law or, where Plaintiffs are not U.S. nationals under 28 U.S.C. § 1605A(c)(1), the laws of the District of Columbia, Iraq, or the states of such Plaintiffs' primary residence." *Id.* at ¶2827. This Court previously held in *Pautsch*:

> Under general principles of tort law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress," both to the victim and "to a member of such person's immediate family who is present at the time." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting *Restatement (Second) of Torts* § 46). Because "terrorism is sufficiently extreme and outrageous" and "intended to inflict severe emotional harm on even those not present at the site of the act," *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 400 (D.D.C. 2015), courts in this district have allowed immediate family members of terrorism victims to state a claim of IIED even if

40

they were not present at the site of the attack. *See, e.g.*, *id.* at 401. Plaintiffs have adequately alleged that they suffered severe emotional distress — namely, severe mental anguish, extreme emotional pain and suffering, and the loss of their family members' society, companionship, comfort, advice, and counsel. *See* Compl., ¶¶ 206, 223, 289. They, accordingly, have stated a valid theory of recovery for their IIED claims as to family members.

2023 U.S. Dist. LEXIS 215577, at *15.

The family-member Plaintiffs here with regard to the 33 attacks at issue in this motion assert they have also stated a valid theory of recovery in this litigation.

### C.  Individuals who sustained injuries but survived those injuries

In the Amended Complaint, Plaintiffs have asserted a generic claim for "personal injury." However, "Plaintiffs in § 1605A actions … must articulate the justification for such recovery, generally through the lens of civil tort liability." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 175-76 (D.D.C. 2010).  Survivors of the attacks at issue here—Plaintiffs Jesus Cervantes-Barroso, Jesus Martinez, Kenneth Distelhorst, William Silcox, Jr., Mason Fisher, Jonathan Volz, Alexander Sargent, and Sean Crippen—assert claims for assault, battery, and intentional infliction of emotional distress.

The *Restatement (Second) of Torts* § 13 would find Iran and Syria liable for battery if they intended to "cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact" and "a harmful contact with the person of the other directly or indirectly results."  Here, Iran and Syria intentionally provided material support to AQI and its affiliated STGIs specifically to cause harm to, among others, members of the Coalition Forces of whom all of the named Plaintiffs were a part.  Further, all of the survivor Plaintiffs at issue in these 33 attacks sustained harmful contacts in the attacks carried out by AQI or STGIs affiliated with AQI.  As courts have stated, "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 77

41

(D.D.C. 2010). Further, "bodily harm is any physical impairment of the condition of another's body, or physical pain or illness." *Restatement (Second) of Torts* § 15. Here, each of the survivor Plaintiffs have alleged physical impairment, physical pain, or illness as a result of the attacks at issue in this motion. Plaintiffs submit that battery presents a viable theory of liability in this case.

A lesser theory of liability exists in the tort of assault. The survivor Plaintiffs submit that the Defendants acted "intending to cause a harmful or offensive contact with … or an imminent apprehension of such a contact" with them that put them "in such imminent apprehension." *See Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 35 (D.D.C. 2018) (quoting *Restatement (Second) of Torts* § 21(1)). Here, beyond simply placing the survivor Plaintiffs in imminent apprehension of harm, the attacks carried out by AQI or STGIs affiliated with AQI caused actual physical harm. So, while the tort of assault may provide a viable theory of liability, in these cases, it would appear to be subsumed within the actual battery to these Plaintiffs that occurred.

Finally, the survivor Plaintiffs, like the family-member Plaintiffs, assert claims for intentional infliction of severe emotional distress. These claims would also arise pursuant to *Restatement (Second) of Torts* § 46(1) which states, "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." *See also Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 400 (D.D.C. 2015). Because this theory of liability combines both emotional harm and bodily harm, this theory of liability provides a more fulsome potential for recovery for pecuniary, physical, and emotional loss. And as this Court ruled in *Pautsch*, the survivor plaintiffs in that case stated a valid theory of recovery pursuant to the tort of intentional infliction of emotional distress.

### D.  Punitive Damages

Plaintiffs also seek punitive damages under 28 U.S.C. § 1605A(c), meant to "punish" and "deter" defendants' "outrageous behavior." *Abedini v. Gov't of the Islamic Republic of Iran*, 422 F. Supp. 3d 118, 140 (D.D.C. 2019).[5] This Court has awarded punitive damages in FSIA cases in amounts equal to the compensatory damages awarded. *See Pennington v. Islamic Republic of Iran*, No. 19-cv-796 (JEB), 2022 U.S. Dist. LEXIS 9529, at *18 (D.D.C. Jan. 19, 2022), *vacated on other grounds, motion granted by, judgment entered by*, 2022 U.S. Dist. LEXIS 238886 (D.D.C. May 3, 2022); *Abedini*, 422 F. Supp. 3d at 142. Given the prior stated reasoning in those cases, Plaintiffs respectfully request that the Court award punitive damages utilizing this Court's prior approach should it find Defendants liable for the attacks at issue and ultimately award compensatory damages to Plaintiffs in this case.

---

[5]    The Supreme Court in *Opati v. Republic of Sudan* made clear that punitive damages are not limited to attacks post-dating the 2008 enactment of 28 U.S.C. § 1605A.  *See* 140 S. Ct. at 1603.

43

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter default judgment against Defendants Iran and Syria as to liability for the 33 attacks that have been set forth in this motion. Consistent with the Court's instructions, Plaintiffs will file a Status Report with the Court to identify when they anticipate filing their motion for default judgment as to liability for a second wave of attacks.  Further, Plaintiffs and the Court will address the issue of damages should the Court grant Plaintiffs' motion for default judgment as to liability and whether to appoint a Special Master to address damages in the first instance or whether the Court will do on its own.

Dated:  October 11, 2024                                    Respectfully submitted,

**MOTLEY RICE LLC**


/s/ John M. Eubanks
John M. Eubanks (D.C. Dist. Ct. Bar No. SC0013)
28 Bridgeside Blvd.
Mount Pleasant, South Carolina 29464
Tel.: (843) 216-9000
Fax: (843) 216-9450

Gary Osen (D.C. Bar No. NJ009)
Dina Gielchinsky (D.C. Bar No. NJ011)
Ari Ungar (D.C. Bar No. NJ008)
Michael Radine (D.C. Bar No. NJ015)
Aaron Schlanger (D.C. Bar No. NJ007)
190 Moore Street, Suite 272
Hackensack, New Jersey 07601
Tel.: (201) 265-6400
Fax: (201) 265-0303

*Attorneys for Plaintiffs*