UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
------------------------------------------------------------------------x
RUBEN V. FLORES, *et al.*,                                              :
          Plaintiffs,                                     :
                                 :
      v.                                                            :
                                 :    **Case No. 22-cv-1512 (JEB)**
ISLAMIC REPUBLIC OF IRAN and SYRIAN ARAB    :
REPUBLIC,                                                              :
          Defendants.                                     :
------------------------------------------------------------------------

## PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AS TO LIABILITY FOR THIRD WAVE OF ATTACKS

Plaintiffs, by and through their attorneys, request that the Court enter judgment by default as to liability against Defendants Islamic Republic of Iran and the Syrian Arab Republic pursuant to Fed. R. Civ. P. 55(b). Plaintiffs seek the entry of default judgment as to liability in relation to 43 separate attacks included in Plaintiffs' Amended Complaint and assert that this grouping represents the third "wave" of attacks to be submitted to the Court seeking default judgment as to liability. In support of this request, Plaintiffs rely upon the law, facts, and arguments contained within Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for Default Judgment in addition to the expert reports and exhibits attached thereto.

Dated: February 26, 2025                Respectfully submitted,

**MOTLEY RICE LLC**

/s/ John M. Eubanks
John M. Eubanks (D.C. Dist. Ct. Bar No. SC0013)
28 Bridgeside Blvd.
Mount Pleasant, South Carolina 29464
Tel.: (843) 216-9000
Fax: (843) 216-9450

Gary Osen (D.C. Bar No. NJ009)
Dina Gielchinsky (D.C. Bar No. NJ011)

Ari Ungar (D.C. Bar No. NJ008)
Michael Radine (D.C. Bar No. NJ015)
Aaron Schlanger (D.C. Bar No. NJ007)
190 Moore Street, Suite 272
Hackensack, New Jersey 07601
Tel.: (201) 265-6400
Fax: (201) 265-0303

*Attorneys for Plaintiffs*

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

-------------------------------------------------------------------x

RUBEN V. FLORES, *et al.*,                                   :

        Plaintiffs,                                        :

                                       :

    v.                                                       :

                                       :   **Case No. 22-cv-1512 (JEB)**

ISLAMIC REPUBLIC OF IRAN and SYRIAN ARAB              :
REPUBLIC,                                                    :

        Defendants.                                       :

-------------------------------------------------------------------

### PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR DEFAULT JUDGMENT AS TO LIABILITY FOR THIRD WAVE OF ATTACKS

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ................................................................................................. iv

I.  PROCEDURAL HISTORY ...................................................................................... 2

II.  LEGAL STANDARD FOR DEFAULT JUDGMENT .................................................... 3

   A.  Plaintiffs' Burden of Proof .......................................................................... 3

   B.  Evidence ......................................................................................................... 4

III.  FACTUAL BASES FOR DETERMINING LIABILITY FOR THE 43 ATTACKS AT
    ISSUE IN THIS MOTION ...................................................................................... 8

   A.  Overview of AQI ........................................................................................... 8

   B.  Third-Wave Attacks Addressed by Plaintiffs' Expert ............................... 11

      1.  May 6, 2004, Attack in Baghdad, Iraq (Attack 12 in Amended Complaint) ....... 12

      2.  September 18, 2004, Attack in Baghdad, Iraq (Attack 23 in Amended Complaint)
         13

      3.  September 25, 2004, Attack in Taji, Iraq (Attack 24 in Amended Complaint) .. 13

      4.  October 7, 2004, Attack in Taji, Iraq (Attack 27 in Amended Complaint) ......... 14

      5.  November 6, 2004, Attack in Baghdad, Iraq (Attack 32 in Amended Complaint)
         14

      6.  January 10, 2005, Attack west of Baghdad, Iraq (Attack 58 in Amended
         Complaint) ........................................................................................................ 14

      7.  March 9, 2005, Attack in Baghdad, Iraq (Attack 64 in Amended Complaint) ... 15

      8.  March 19, 2005, Attack in Rasheed, Iraq (Attack 66 in Amended Complaint) .. 15

      9.  March 26, 2005, Attack in Baghdad, Iraq (Attack 67 in Amended Complaint) . 16

      10.  March 30, 2005, Attack north of Taji, Iraq (Attack 68 in Amended Complaint) 16

      11.  April 17, 2005, Attack in Baghdad, Iraq (Attack 71 in Amended Complaint) ... 16

      12.  April 29, 2005, Attack in Baghdad, Iraq (Attack 73 in Amended Complaint) ... 17

      13.  August 3, 2005, Attack in Baghdad, Iraq (Attack 91 in Amended Complaint) .. 17

      14.  October 10, 2005, Attack in Baghdad, Iraq (Attack 101 in Amended Complaint)
         18

      15.  November 20, 2005, Attack in Taji, Iraq (Attack 113 in Amended Complaint) . 18

      16.  February 2, 2006, Attack in Taji, Iraq (Attack 120 in Amended Complaint) .... 19

      17.  April 29, 2006, Attack in Radwaniyah, Iraq (Attack 134 in Amended Complaint)
         19

      18.  June 4, 2006, Attack near Taji, Iraq (Attack 139 in Amended Complaint) ........ 19

19. August 27, 2006, Attack in Baghdad, Iraq (Attack 151 in Amended Complaint) 20

20. October 2, 2006, Attack in Taji, Iraq (Attack 157 in Amended Complaint) ....... 20

21. November 21, 2006, Attack in Baghdad, Iraq (Attack 166 in Amended Complaint) 21

22. December 7, 2006, Attack in Baghdad, Iraq (Attack 170 in Amended Complaint) 21

23. December 28, 2006, Attack in Taji, Iraq (Attack 174 in Amended Complaint) . 22

24. January 20, 2007, Attack east of Baghdad, Iraq (Attack 176 in Amended Complaint) ..................................................................................................... 22

25. January 20, 2007, Attack in Baghdad, Iraq (Attack 177 in Amended Complaint) 22

26. April 12, 2007, Attack in Baghdad, Iraq (Attack 197 in Amended Complaint) . 23

27. May 2, 2007, Attack in Baghdad, Iraq (Attack 201 in Amended Complaint)..... 24

28. May 24, 2007, Attack in Baghdad, Iraq (Attack 207 in Amended Complaint)... 24

29. May 30, 2007, Attack in Baghdad, Iraq (Attack 210 in Amended Complaint)... 25

30. June 3, 2007, Attack in Baghdad, Iraq (Attack 214 in Amended Complaint) .... 25

31. June 18, 2007, Attack in Arab Jabour, Iraq (Attack 217 in Amended Complaint) 26

32. June 21, 2007, Attack in Baghdad, Iraq (Attack 219 in Amended Complaint) .. 26

33. July 1, 2007, Attack in Baghdad, Iraq (Attack 220 in Amended Complaint) ..... 27

34. July 1, 2007, Attack in Baghdad, Iraq (Attack 221 in Amended Complaint) ..... 27

35. July 18, 2007, Attack in Baghdad, Iraq (Attack 225 in Amended Complaint) ... 28

36. August 2, 2007, Attack in Baghdad, Iraq (Attack 227 in Amended Complaint) 28

37. August 11, 2007, Attack in Arab Jabour, Iraq (Attack 229 in Amended Complaint) ..................................................................................................... 29

38. September 4, 2007, Attack in Baghdad, Iraq (Attack 231 in Amended Complaint) 29

39. September 14, 2007, Attack in Arab Jabour, Iraq (Attack 235 in Amended Complaint) ..................................................................................................... 30

40. October 5, 2007, Attack in Baghdad, Iraq (Attack 238 in Amended Complaint) 30

41. January 19, 2008, Attack in Arab Jabour, Iraq (Attack 245 in Amended Complaint) ..................................................................................................... 31

42. March 22, 2008, Attack in Baghdad, Iraq (Attack 253 in Amended Complaint) 31

43. May 27, 2009, Attack in Baghdad, Iraq (Attack 275 in Amended Complaint)... 32

IV.     **PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF DEFAULT JUDGMENT AS TO LIABILITY FOR THE 43 ATTACKS AT ISSUE IN THE INSTANT MOTION** ................................................................................................ 32

    A.   **This Court Possesses Subject-Matter Jurisdiction Over the 39 Attacks** ................... 32

       1.   **Defendants were both designated as state sponsors of terrorism at the time of the attacks at issue in this motion, and they continue to be designated as such** ........ 33

       2.   **Each attack victim whose claims are at issue in this motion was, at the time of the attacks, either a U.S. national, a member of the armed forces, or a U.S. government employee or contractor** ........................................................................ 33

       3.   **Plaintiffs' claims are predicated on Defendants' "material support" for acts of extrajudicial killings.** ...................................................................................... 34

       4.   **Defendants each provided material support or resources to AQI enabling it to carry out the 43 attacks at issue in this motion** ................................................................ 38

    B.   **The Court possesses personal jurisdiction over both Iran and Syria** ........................... 45

V.     **THEORIES OF LIABILITY** ................................................................................ 46

    A.   **Estates of Individuals who were killed** .............................................................. 47

    B.   **Immediate Family Members of those injured or killed in attacks** ............................. 47

    C.   **Individuals who sustained injuries but survived those injuries** ................................. 48

    D.   **Punitive Damages** ....................................................................................... 50

VI.     **CONCLUSION** ............................................................................................ 50

**TABLE OF AUTHORITIES**

**Page(s)**

## Cases

*Abedini v. Gov't of the Islamic Republic of Iran*, 422 F. Supp. 3d 118 (D.D.C. 2019)............... 50

*Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1 (D.D.C. 2018) ......................................... 49

*All v. Islamic Republic of Iran*, No. 20-cv-622 (EGS) (ZMF), 2023 U.S. Dist. LEXIS 135097 (D.D.C. June 27, 2023) ...................................................................................................... 11

*Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024)................................. 34, 35

*Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64 (D.D.C. 2017)........................................... 46

*Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21 (D.D.C. 2023) ...................................... 40

*Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 U.S. Dist. LEXIS 127290 (D.D.C. July 19, 2022).................................................................................................... 11

*Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) .............................. 3

*Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71 (D.D.C. 2017)....................................... 40

*Doe v. Syrian Arab Republic*, No. 18-cv-66 (KBJ), 2020 U.S. Dist. LEXIS 167697 (D.D.C. July 27, 2020) ............................................................................................................................ 42

*Espitia v. Islamic Republic of Iran*, No. 21-cv-123, 2022 U.S. Dist. LEXIS 108841 (S.D. Tex. June 16, 2022) ......................................................................................................... 8, 9, 40

*Est. of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61 (GMH), 2022 U.S. Dist. LEXIS 234282 (D.D.C. Dec. 28, 2022) ................................................................................ 38, 39

*Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (D.D.C. 2009) .................. 48, 50

*Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138 (D.D.C. 2016).................................. 5

*Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186 (D.D.C. 2017) ........................................... 46

*Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48 (D.D.C. 2018)....................................... 5, 46

*Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33 (D.D.C. 2019)........................................... 4

*Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53 (D.D.C. 2008) ....................................... 38, 42

*Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044 (D.C. Cir. 2014) ............... 4

*Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019).................................... 40

*Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2021 U.S. Dist. LEXIS 7170 (D.D.C. Jan. 14, 2021)................................................................................................. 10

*Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475 (D.D.C. 2021)........................................ 37

*Maupin v. Syrian Arab Republic*, No. 17-cv-1213 (CKK), 2019 U.S. Dist. LEXIS 237831 (D.D.C. Mar. 20, 2019)............................................................................................... 40

*Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193 (EGS)(ZMF), 2022 U.S. Dist. LEXIS 219188 (D.D.C. Sept. 26, 2022) ................................................................................ 39

*Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)....................................................... 50

*Owens v. Republic of Sudan*, 826 F. Supp. 2d 128 (D.D.C. 2011) .................................... 3

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *vacated on other grounds sub nom., Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)............................................................. 4, 5, 34, 43

*Pautsch v. Islamic Republic of Iran*, Case No. 20-cv-3859 (JEB), 2023 U.S. Dist. LEXIS 215577 (D.D.C. Dec. 5, 2023) ................................................................................ passim

*Pautsch v. Islamic Republic of Iran*, Case No. 20-cv-3859 (JEB), 2024 U.S. Dist. LEXIS 133054 (D.D.C. July 29, 2024)................................................................................ 35, 50

*Pennington v. Islamic Republic of Iran*, No. 19-cv-796 (JEB), 2022 U.S. Dist. LEXIS 9529 (D.D.C. Jan. 19, 2022), *vacated on other grounds, motion granted by, judgment entered by*, 2022 U.S. Dist. LEXIS 238886 (D.D.C. May 3, 2022) ............................................................. 50

*Reed v. Islamic Republic of Iran*, 845 F. Supp.2d 204 (D.D.C. 2012) ............................................. 3

*Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163 (D.D.C. 2010) .................................... 48

*Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65 (D.D.C. 2023)..................................... 11, 40

*Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379 (D.D.C. 2015)..................................... 48, 50

*Rothstein v. UBS*, 708 F.3d 82 (2d Cir. 2013) ................................................................. 43

*Salzman v. Islamic Republic of Iran*, No. 172475 (RDM), 2019 U.S. Dist. LEXIS 163632 (D.D.C. Sep. 25, 2019)................................................................................ 37

*Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22 (D.D.C. 2016) .......................... 40, 42, 46

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010)..................................... 4, 49

*W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117 (D.D.C. 2019)....................................... 10

*Weinstein v. Islamic Republic of Iran*, 184 F. Supp. 2d 13 (D.D.C. 2002)....................................... 4

## Statutes

1608(a) ................................................................................................................ 46

18 U.S.C. § 2339A(b)(1).......................................................................................... 38

28 U.S.C. § 1330(b) ......................................................................................... 45, 46

28 U.S.C. § 1605A........................................................................................ 1, 48, 50

28 U.S.C. § 1605A(a) ......................................................................................... 33, 46

28 U.S.C. § 1605A(a)(1).................................................................................. 34, 35, 40

28 U.S.C. § 1605A(a)(2)............................................................................................ 33

28 U.S.C. § 1605A(a)(2)(A)(ii)................................................................................... 33

28 U.S.C. § 1605A(c) ............................................................................... 43, 46, 47, 50

28 U.S.C. § 1605A(c)(1) ................................................................................................ 47, 48

28 U.S.C. § 1605A(h)(3) ..................................................................................................... 38

28 U.S.C. § 1605A(h)(7) ..................................................................................................... 34

28 U.S.C. § 1608(a)(3) .................................................................................................... 2, 46

28 U.S.C. § 1608(a)(4) .................................................................................................... 2, 46

28 U.S.C. § 1608(d) ............................................................................................................... 2

28 U.S.C. § 1608(e) ...................................................................................................... 3, 4, 5

Torture Victim Protection Act of 1991, Pub. L. No. 102–256, 106 Stat. 73 ................................. 34

## Other Authorities

Fact Sheet, U.S. Dep't of State, "Designation of the Islamic Revolutionary Guard Corps" (Apr. 8, 2019) ........................................................................................................................ 8

Press Release, U.S. Dep't of Treasury, "Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism" (Feb. 16, 2012) .................. 41

Press Release, U.S. Treasury Dep't, "Treasury Designates Individuals with Ties to Al Qaida, Former Regime" (Dec. 7, 2007) ................................................................................... 43

Press Statement, U.S. Dep't of State, "Addition of Al-Manar to the Terrorist Exclusion List" (Dec. 28, 2004) ...................................................................................................................... 9

Press Statement, U.S. Dep't of State, "Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases" (Oct. 15, 2004) .................................................................. 9

*Restatement (Second) of Torts* § 13 ....................................................................................... 48

*Restatement (Second) of Torts* § 15 ....................................................................................... 49

*Restatement (Second) of Torts* § 21(1) .................................................................................... 49

*Restatement (Second) of Torts* § 46 ....................................................................................... 48

*Restatement (Second) of Torts* § 46(1) .................................................................................... 49

U.S. Dep't of State, State Sponsors of Terrorism, *available at* https://www.state.gov/j/ct/list/c14151.htm ........................................................................ 33

## Rules

Fed. R. Civ. P. 55(e) .............................................................................................................. 3

Fed. R. Evid. 703 ................................................................................................................... 5

This is a civil action brought pursuant to the Terrorism Exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A. The Amended Complaint in the instant case includes allegations related to 277 terrorist attacks that were perpetrated between 2003 and 2015. To allow the Court to address the attacks at issue in this case in a meaningful manner without addressing all of the attacks in a single motion, Plaintiffs' counsel and the Court agreed that Plaintiffs would seek default judgments by motion as to "approximately 25 or more attacks" per motion to allow both liability and damages to be sequenced appropriately over time for the terrorist attacks at issue in this case. In this motion, designated by Plaintiffs' counsel as the "second wave", Plaintiffs seek a determination of liability against Defendants the Islamic Republic of Iran ("Iran") and the Syrian Arab Republic ("Syria") for 43 attacks that took place from May 2004 through May 2009 in and around Baghdad, Iraq. As described in further detail below, the terrorist group responsible for each of these terrorist attacks is the U.S.-designated Foreign Terrorist Organization ("FTO") Al Qaeda in Iraq ("AQI")—including its predecessor organization Jama'at Al-Tawhid wa'al-Jihad—or another Sunni terrorist group in Iraq ("STGI") associated with or dominated by AQI, all of which were materially supported by Defendants Iran and Syria.

Plaintiffs respectfully move this Court to enter default judgment as to liability against Defendants based on the material support and resources they provided to AQI and associated STGIs, which enabled them to commit the 43 attacks at issue in this motion. In support of their motion, Plaintiffs proffer the sworn expert report of Colonel (Ret.) Joel Rayburn (the "Rayburn Report" or "Rayburn Rep."), attached as **Exhibit A**. Col. Rayburn has held several government posts that are highly relevant to the subject of this lawsuit. He is also the co-author of the two-volume Department of Defense history of the conflict in Iraq between 2003 and 2011. Plaintiffs also request that the Court take judicial notice of the findings and factual records in the many decisions both in and

outside of this District described herein that have awarded default judgement against Defendants for their material support to AQI and its associated STGIs.

## I.    PROCEDURAL HISTORY

Plaintiffs initially filed their Complaint against Defendants on May 29, 2022. ECF No. 1. A Notice of Designation of Relates Civil Cases Pending was filed on May 31, 2022 indicating that this case was related to *Pautsch, et al. v. Islamic Republic of Iran, et al.*, Case No. 20-cv-3859 (JEB). On November 21, 2022, Plaintiffs filed an Amended Complaint. ECF No. 9. Plaintiffs filed with the Court affidavits requesting foreign mailing of the Summons, Complaint, and Notice of Suit, along with a translation of each into Arabic for Syria and Farsi for Iran, upon both Defendants. ECF Nos. 11-14.

After receiving no response to the foreign mailing pursuant to 28 U.S.C. § 1608(a)(3), Plaintiffs then attempted service upon Iran and Syria via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). On November 29, 2023, Plaintiffs made a request to the Clerk of the Court by letter to assist in transmitting the service documents. ECF No. 17. The Clerk of the Court transmitted the service documents to the U.S. Department of State that same day via Federal Express. ECF No. 18. The documents were successfully transmitted to Iran and Syria respectively on May 7, 2024 and April 25, 2024, under cover of diplomatic note. ECF Nos. 19 and 20.

Pursuant to 28 U.S.C. § 1608(d), each Defendant's time to file an answer or other responsive pleading expired 60 days after successful transmission under cover of diplomatic note. Therefore, on July 25, 2024, Plaintiffs filed affidavits in support of default against Defendants. ECF No. 21. The Clerk of the Court entered its certificate of default as to each Defendant on July 26, 2024. ECF Nos. 22 and 23.

2

On October 11, 2024, Plaintiffs moved for default judgment as to liability for the first wave of 33 attacks that took place in 2004 in Fallujah, Iraq, and in 2004 and 2005 in Mosul, Iraq. On November 22, 2024, Plaintiffs moved for default judgment as to liability for the second wave of 39 attacks that took place between December 2003 and December 2005 in Anbar Province, Iraq. Plaintiffs now move for default judgment as to liability for the third wave of 43 attacks at issue in the Amended Complaint that took place in and around Baghdad, Iraq between May 2004 and May 2009.

## II.    LEGAL STANDARD FOR DEFAULT JUDGMENT

### A.  Plaintiffs' Burden of Proof

When default is sought under the FSIA, Plaintiffs are required to establish their claims "by evidence satisfactory to the court." 28 U.S.C. § 1608(e). "This 'satisfactory to the court' standard is identical to the standard for entry of default judgments against the United States in Federal Rule of Civil Procedure 55(e)," and "[i]n evaluating the plaintiffs' proof, the court may accept as true the plaintiffs' uncontroverted evidence." *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 268 (D.D.C. 2003) (internal citations and quotation marks omitted). However, even in the default scenario, "the court must determine that an exception to immunity applies and that the plaintiff has a sufficient legal and factual basis for his claims." *Pautsch v. Islamic Republic of Iran*, Case No. 20-cv-3859 (JEB), 2023 U.S. Dist. LEXIS 215577, at *5 (D.D.C. Dec. 5, 2023). Further, the Court has "a duty to scrutinize plaintiff's allegations" and should not "unquestioningly accept a complaint's unsupported allegations as true." *Reed v. Islamic Republic of Iran*, 845 F. Supp.2d 204, 211 (D.D.C. 2012).

"In FSIA default judgment proceedings, the plaintiffs may establish proof by affidavit." *Owens v. Republic of Sudan*, 826 F. Supp. 2d 128, 135 (D.D.C. 2011) (citing *Weinstein v. Islamic*

*Republic of Iran*, 184 F. Supp. 2d 13, 19 (D.D.C. 2002)). *See also Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (holding that this standard may be satisfied "through uncontroverted factual allegations, which are supported by . . . documentary and affidavit evidence") (internal citations and quotations omitted). Notably, the D.C. Circuit emphasized:

> While both § 1608(e) and Rule 55(d) give an unresponsive sovereign some protection against an unfounded default judgment, neither provision relieves the sovereign from the duty to defend cases. Moreover, § 1608(e) does not require the court to demand more or different evidence than it would ordinarily receive; indeed, the quantum and quality of evidence that might satisfy a court can be less than that normally required.

*Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (internal citations and quotations omitted), *vacated on other grounds sub nom.*, *Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020).

In short, the standard of Section 1608(e) is met "when the plaintiff shows her claim has some factual basis, even if she might not have prevailed in a contested proceeding." *Frost v. Islamic Republic of Iran*, 383 F. Supp. 3d 33, 44 (D.D.C. 2019) (internal citations and quotations omitted). The D.C. Court of Appeals in *Owens* observed: "This lenient standard is particularly appropriate for a FSIA terrorism case, for which firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Owens*, 864 F.3d at 785.

## B. Evidence

In step with the relaxed burden of proof under § 1608(e), "the district court also has an unusual degree of discretion over evidentiary rulings in a FSIA case against a defaulting state sponsor of terrorism," and appellate courts "have allowed plaintiffs to prove their claims using evidence that might not be admissible in a trial." *Owens*, 864 F.3d at 785 (citing *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1048-51 (D.C. Cir. 2014)) (noting "courts have the authority—indeed, we think, the obligation—to adjust evidentiary requirements to differing situations" and admitting affidavits in a FSIA default proceeding).

4

A district court's "broad discretion" in such cases "extends to the admission of expert testimony, which, even in the ordinary case, does not constitute an abuse of discretion merely because the factual bases for an expert's opinion are weak." *Id*. (internal citations and quotations omitted). In sum, "[s]ection 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion. This is part of the risk a sovereign runs when it does not appear and alert the court to evidentiary problems." *Id*. at 785-86.

Moreover, plaintiffs in FSIA cases frequently rely on expert testimony rather than primary evidence. As noted above, courts in this District "[r]ecogniz[e] that expert testimony is not only proper, but often sufficient, and even indispensable in 'terrorism cases ... because firsthand evidence of terrorist activities is difficult, if not impossible to obtain.'" *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 57 (D.D.C. 2018) (citing *Owens*, 864 F.3d at 787). Experts, in turn, may rely on evidence that might not otherwise be admissible in forming their opinions. *See* Fed. R. Evid. 703 ("If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."). *See also Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 175 (D.D.C. 2016) ("[I]n the terrorism context, experts' reliance on hearsay evidence is often critical.").

Accordingly, Plaintiffs proffer the sworn expert report of Colonel Joel Rayburn (Ret.), attached as **Exhibit A**. Certain public documents relied upon by Col. Rayburn in crafting his report are being filed as a Consolidated Appendix to his report. Other, more sensitive, materials used by Col. Rayburn to formulate his opinions on the specific attacks at issue are being filed with

5

Plaintiffs' motion to file certain documents under seal.  These documents are denoted as **Exhibit B**.

As reflected in the curriculum vitae appended to his report, Col. Rayburn has decades of experience relating to the conflict in Iraq, and the roles Iran and Syria played in it. From July 2018 to January 2021, Col. Rayburn was the U.S. Special Envoy for Syria. In that post, he oversaw U.S. diplomatic activities concerning Syria, supervised more than 100 diplomats and civil servants across the Middle East and Europe, and, from November 2020 to January 2021, served as U.S. chief of mission for Syria. Until November 2020, Col. Rayburn was also Deputy Assistant Secretary for Levant Affairs, responsible for implementing U.S. policy concerning Syria, Jordan, and Lebanon.

Before joining the State Department, Col. Rayburn served 26 years as a U.S. Army officer, with his final assignment as senior director for Iran, Iraq, Syria, and Lebanon on the National Security Council staff in 2017-2018. Commissioned from West Point in 1992, Col. Rayburn served in assignments in Europe, the Middle East, South Asia, and the United States, including several deployments to Iraq, Afghanistan, and Bosnia. As a field artillery officer, Col. Rayburn served in the 1st Armored Division from 1993-1996, during which he deployed to Kuwait as part of Operation Intrinsic Action and to Bosnia-Herzegovina as part of NATO's Implementation Force. He also served as a Balkans intelligence analyst at the EUCOM Joint Analysis Center at Royal Air Force (RAF) Molesworth in 1999-2000. Col. Rayburn then taught history at West Point from 2002-2005 and served as an advisor to General John Abizaid at U.S. Central Command (the Department of Defense's combatant command responsible for the Middle East) from 2005 to 2007. In 2007, he served on the Joint Strategic Assessment Team assembled by General David Petraeus and Ambassador Ryan Crocker in Baghdad.

From 2008 to 2011, he was a strategic intelligence advisor to General Petraeus in Iraq, Afghanistan, and the Persian Gulf region, with a focus on the activities and plans of the IRGC-Qods Force, Lebanese Hezbollah, and the Assad regime, as well as on the major Sunni terrorist groups active in the northern Middle East. From 2011 to 2012, Col. Rayburn was a senior military fellow at the Institute of National Strategic Studies. From 2013 to 2016, Col. Rayburn directed the Army's Operation Iraqi Freedom Study Group, where he led the writing of the Army's official history of the Iraq war and assembled operational lessons to be drawn from the conflict. In 2018, the group's work was published in the two-volume study *The U.S. Army in the Iraq War*, for which Col. Rayburn was co-author and editor. He holds an MA in History from Texas A&M University and an MS in Strategic Studies from the National War College.

He is the founder and director of the American Center for Levant Studies, a non-profit research organization that focuses on Middle East affairs. He is also a Senior Fellow at the Hudson Institute and a Visiting Fellow at the Hoover Institution. Previously, he served as Special Advisor for Middle East Affairs in the office of Senator Bill Hagerty (R-TN), assisting Senator Hagerty in foreign relations and national security affairs from January to July 2021.

In his report, Col. Rayburn describes his conclusions that AQI, or another STGI associated with AQI or dominated by it, was responsible for each of the 43 "third wave" attacks at issue in this motion. His report filed with the October 11, 2024 motion addressing the "first wave" of attacks further concluded that Defendants each provided material support to AQI or the STGI which enabled it to perpetrate the attacks. This memorandum will make frequent reference to Col. Rayburn's October 11, 2024 expert report that addressed specifically the support provided by Defendants Iran and Syria to AQI, including its founders, predecessors, successors, and affiliated organizations.

7

III.    **FACTUAL BASES FOR DETERMINING LIABILITY FOR THE 43 ATTACKS AT ISSUE IN THIS MOTION**

A.  **Overview of AQI**

After the United States invaded Afghanistan shortly after the September 11, 2001, attacks, Iran provided safe haven to several Al Qaeda leaders and prominent extremists, including Abu Musab Al-Zarqawi, a Jordanian-born Sunni extremist. *See* ECF No. 26-1 at 13-16.[1] *See also Espitia v. Islamic Republic of Iran*, No. 21-cv-123, 2022 U.S. Dist. LEXIS 108841, at \*4 (S.D. Tex. June 16, 2022) (finding these facts sufficiently established).

Zarqawi originally operated under the protection of Iran's Islamic Revolutionary Guard Corps ("IRGC") – Iran's special armed forces charged with defending its revolutionary regime, as opposed to its conventional military – and the IRGC's elite Qods Force ("IRGC-QF"), the IRGC's external operations force (the IRGC and IRGC-QF are designated FTOs[2]). *See* ECF No. 26-1 at 15-20. *See also Espitia*, 2022 U.S. Dist. LEXIS 108841, at \*4-5 (finding same). The time Zarqawi spent in Iran was crucial for rebuilding his network before relocating to Iraq. *See id.* at \*5. He was permitted by Iran to move back and forth across the Iran-Iraq border in 2001-2002 before settling in Iraq, where he became a leader of Sunni extremists and insurgent groups. *See* ECF No. 26-1 at 16; *Espitia*, 2022 U.S. Dist. LEXIS 108841, at \*5 (finding same).

Zarqawi consolidated those groups with his pre-existing terrorist group—Jamaat Tawhid wa al-Jihad ("JTJ"). *See* ECF No. 26-1 at 7, 21; *Espitia*, 2022 U.S. Dist. LEXIS 108841, at \*5. On

---

[1]    Plaintiffs incorporate by reference the expert report of Col. Rayburn filed on October 11, 2024 in conjunction with their motion for default judgment as to liability for the first wave of attacks that can be found at ECF No.26-1.

[2]    Fact Sheet, U.S. Dep't of State, "Designation of the Islamic Revolutionary Guard Corps" (Apr. 8, 2019),

*available at* https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/.

October 17, 2004, he swore allegiance to Osama bin Laden and Al Qaeda and renamed his organization Tanzim Qaidat al-Jihad fi Bilad al-Rafidayn—commonly referred to as Al Qaeda in Iraq, or AQI. *See* ECF No. 26-1 at 7, 16; *Espitia*, 2022 U.S. Dist. LEXIS 108841, at *5. Zarqawi served as the leader of AQI until his death in a U.S. military airstrike in June 2006. *See* ECF No. 26-1 at 7, 22.

AQI was the first Al Qaeda affiliate to be designated as an FTO by the United States. *See* ECF No. 26-1 at 16 n.18. Initially, JTJ was designated as an FTO by the U.S. Department of State on October 15, 2004. *See id.* (citing Press Statement, U.S. Dep't of State, "Foreign Terrorist Organization: Designation of Jama'at al-Tawhid wa'al-Jihad and Aliases" (Oct. 15, 2004)). In making this FTO designation, the State Department cited Zarqawi and JTJ's abduction and execution of American citizens as well as its campaign to foment civil war in Iraq. *See id.* On December 17, 2004, the State Department amended this FTO designation to reflect the fact that Zarqawi and JTJ had publicly declared their allegiance to Osama bin Laden and Al Qaeda in October 2004 and renamed themselves Al Qaeda in Iraq. *See id.* (citing Press Statement, U.S. Dep't of State, "Addition of Al-Manar to the Terrorist Exclusion List" (Dec. 28, 2004)). In this amendment, the State Department noted that Zarqawi and AQI had claimed responsibility for attacks against U.S. forces in Iraq as well as for numerous other terrorist attacks. *See id.*

The U.S. invaded Iraq in March 2003, and completed major combat operations and removed the Saddam Hussein regime by May. AQI presented a very serious threat to the post-2003 stability of Iraq, and combating AQI attacks was a focus for the U.S. military in the early years of the Iraqi conflict. *See Espitia*, 2022 U.S. Dist. LEXIS 108841, at *5 (citing expert report). According to a counterterrorism expert in that case, at the time, "the majority of the attacks against U.S. forces came from members of the Iraqi minority Sunni community and [AQI] in particular." *Id.* (citing expert

report) (internal quotation marks omitted). The STGIs, including AQI, focused their activity in western and northern Iraq and Baghdad. *See id.* In other regions (and times), terrorist groups associated with Iraq's Shi'a majority (which groups were also backed by Iran and were aimed at attacking U.S. forces), predominated. *See* ECF No. 26-1 at 5. *See also W.A. v. Islamic Republic of Iran*, 427 F. Supp. 3d 117, 125 (D.D.C. 2019) (referring to the "Shia South of Iraq") (citing Col. Rayburn's expert report); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2021 U.S. Dist. LEXIS 7170, at *207 (D.D.C. Jan. 14, 2021) (finding that a 2009 attack in the southern city of Basra using an explosively formed penetrator was committed by a Shi'a "Special Group" because, *inter alia*, the military record from the attack "indicates that Special Groups had increased freedom of movement in the region wherein the May 16, 2009 attack occurred").

As explained below, the primary terrorist groups operating in Iraq were Sunni groups associated with AQI and Shi'a groups openly associated with Iran—but both sets of terrorist groups received assistance from Iran and Syria. *See* ECF No. 26-1 at 16-17, 19-20, 26. As described in Section IV.A.4., *infra*, each Defendant provided material support to AQI and other STGIs to achieve its own objectives, including Iran's goal of "harming the interests of the United States and its allies in the Middle East," ECF No. 26-1 at 10-11, and "prevent[ing] the United States and its allies from establishing a friendly government in Iraq or from stabilizing the country on terms favorable to the United States." *Id.* at 16. Similarly, Syria's provision of material support was incentivized by its "its interest not just to undermine the U.S.-led Coalition campaign in Iraq, but also to gain leverage and political influence in the post-Saddam Iraq," *id.* at 25, as well as to "actively channel Syrian Sunni extremists' activities outward, against the regime's external enemies, rather than risk having those extremists turn inward against regime rule." *Id.* at 26.

10

### B. Third-Wave Attacks Addressed by Plaintiffs' Expert

The Plaintiffs included in the 43 third-wave attacks addressed in this motion were serving in Iraq as U.S. service members when they were injured or killed in attacks which took place between May 2004 and May 2009. Col. Rayburn assessed each attack and determined that they were perpetrated by AQI, or an STGI associated with or dominated by AQI.

In doing so, he relied on five types of evidence which can help attribute an attack to AQI or an associated STGI with a high degree of confidence. Evidence in these categories can be cross-referenced to support a finding of attribution, and not all are necessary to do so. These are:

1. Reliable claims of responsibility;

2. Investigative findings by government agencies;

3. The area of the attack;

4. The date of the attack; and

5. The tactics, techniques, and procedures ("TTP") of the attack.

*See* Ex. A at 4-7.

Courts have credited these methods in other cases, including as to AQI attacks. *See, e.g.*, *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 79 (D.D.C. 2023) ("Therefore, based on the time, types of weapons, sophistication of the attack, and the group controlling the region, [the plaintiffs' expert] concluded that only AQI could have been responsible."). *See also All v. Islamic Republic of Iran*, No. 20-cv-622 (EGS) (ZMF), 2023 U.S. Dist. LEXIS 135097, *12 (D.D.C. June 27, 2023) (same relating to AQI attacks); *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 U.S. Dist. LEXIS 127290, *4647 (D.D.C. July 19, 2022) (crediting expert attribution premised on the Taliban's "TTPs" and role as the "main group" in the area). Furthermore, this

11

Court in the *Pautsch* case has credited the specific methods employed by Col. Rayburn. *See Pautsch*, 2023 U.S. Dist. LEXIS 215577, at *6-*8.

The third wave of attacks being provided for the Court's adjudication as to liability lean heavily on the last three factors for attribution: location, time, and TTP of the attacks. As set forth in the Rayburn Report, the time period between 2004 and 2008 "was the height of the Sunni insurgency against the U.S.-led Coalition in Iraq" during which AQI sought to (and did) consolidate control of the Sunni insurgency. Ex. A at 8. Many of the attacks at issue in this motion took place either in AQI strongholds within Baghdad or in the "Baghdad belts" surrounding the city that provided access to the main routes into Baghdad to allow AQI to funnel weapons, bombs, and personnel into Baghdad to the fight the Coalition. *Id.* AQI also engaged in seeking to interfere with the political process within the new fledgling Iraqi government. *Id.* at 9. In 2007, U.S. forces engaged in a "surge" of troops within Iraq specifically to confront the threats posed by, primarily, AQI, and coupled with the "awakening" of Sunni Muslims throughout the country that spread as a backlash to AQI's repressive view of Islam, AQI's fight turned to desperation in much of Baghdad and its surrounding areas in 2008 and beyond. *Id.* at 9-10. Many of the attacks at issue here also took place along main Coalition supply routes into and out of Baghdad which AQI attacked with regularity to retain its ability to ensure access to Baghdad. *Id.* at 10. A summary of Col. Rayburn's findings on each attack is included below.

**1. May 6, 2004, Attack in Baghdad, Iraq (Attack 12 in Amended Complaint)**

On May 6, 2004, U.S. Army Staff Sergeant (SSG) Hesley Box, Jr. was manning Checkpoint 11 that allowed entry to the 14th of July Bridge leading to the Green Zone (protected international zone) in Baghdad when a small taxi was converted into a suicide vehicle-borne improvised explosive device (SVBIED) that detonated as the taxi approached the checkpoint. *See*

Ex. A at 10.  SSG Box was killed in the explosion. *Id.*  Col. Rayburn determined "to a high degree of professional confidence" that this attack was conducted by Abu Musab Al-Zarqawi's forces (who would soon become known as AQI) given that Zarqawi's forces were responsible for the "overwhelming majority of suicide bombings in Iraq" along with an explicit claim of responsibility by Zarqawi's organization, Jama'at al-Tawheed wa'al-Jihad. *Id.* at 11.

### 2. September 18, 2004, Attack in Baghdad, Iraq (Attack 23 in Amended Complaint)

U.S. Army Sergeant (SGT) Thomas Rosenbaum and the 4th Battalion, 5th Air Defense Artillery were responding to an SVBIED near the intersection of Iraqi Highway 1 and Route Irish in western Baghdad when their HMMWV was attacked with a second SVBIED resulting in SGT Rosenbaum's death.  *Id.*at 11. Like the attack on SSG Box, Col. Rayburn determined "to a high degree of professional confidence" that this attack was conducted by Abu Musab Al-Zarqawi's forces given that Zarqawi's forces were responsible for the "overwhelming majority of suicide bombings in Iraq" along with an explicit claim of responsibility for both of the SVBIEDs by Zarqawi's organization, Jama'at al-Tawheed wa'al-Jihad. *Id.* at 12.

### 3. September 25, 2004, Attack in Taji, Iraq (Attack 24 in Amended Complaint)

U.S. Army SGT David Johnson was killed in an IED attack on the HMMWV in which he was traveling north on MSR Tampa from Baghdad to Taji on September 25, 2004. *Id.*  Col. Rayburn found that Taji was a stronghold for Zarqawi's forces at the time, and Zarqawi's forces frequently targeted Coalition vehicles on this route with buried IEDs being a preferred TTP of Zarqawi's forces at the time.  *Id.* These factors supported Col. Rayburn's conclusion that an AQI predecessor or STGI associated with AQI was responsible for this attack. *Id.*

13

### 4. October 7, 2004, Attack in Taji, Iraq (Attack 27 in Amended Complaint)

On October 7, 2004, Army SGT Ronald Baker was killed when a vehicle-borne IED (VBIED) detonated on his medical supply convoy between Taji and Balad north of Baghdad. *Id.* at 13. The IED was determined to consist of five 130-mm artillery rounds and was remote-detonated. *Id.* Col. Rayburn determined that Zarqawi's forces (or an STGI associated with Zarqawi's forces) were responsible as the attack took place in a frequent attack zone for Zarqawi's group, and the use of a VBIED was a favored TTP of Zarqawi's forces. *Id.*

### 5. November 6, 2004, Attack in Baghdad, Iraq (Attack 32 in Amended Complaint)

U.S. Army Private Second Class (PV2) Justin Yoemans was killed by an SVBIED detonation in the vicinity of Checkpoint 541 on Route Irish in western Baghdad on November 6, 2004. *Id.* at 13-14. Col. Rayburn attributed this attack to AQI's predecessors based on Zarqawi's group conducting major attacks in Baghdad to thwart the Iraqi government, the area where the attack place was a common location for attacks carried out by Zarqawi's forces, the use of an SVBIED as a TTP was a prime indicator of Zarqawi's influence, and Zarqawi's forces claimed responsibility for the attack through their standard spokesperson, Abu Maysara Al-Iraqi. *Id.* at 14.

### 6. January 10, 2005, Attack west of Baghdad, Iraq (Attack 58 in Amended Complaint)

On January 10, 2005, a remote-detonated IED comprised of six to eight artillery rounds struck a Bradley Fighting Vehicle in the Radwaniyah area west of the Baghdad Airport catching the vehicle on fire and resulting in the death of U.S. Army SSG William Manuel. *Id.* at 14. Col. Rayburn attributed this attack to AQI because the area west of Baghdad between Anbar Province and the "Triangle of Death" in Babil Province was an AQI stronghold where AQI enjoyed freedom of movement to place IEDs to target Coalition vehicles and also the TTP of a buried IED fit the profile of AQI attacks in the area at that time. *Id.* at 15.

**7.  March 9, 2005, Attack in Baghdad, Iraq (Attack 64 in Amended Complaint)**

On March 9, 2005, an SVBIED attack was carried out against the Iraqi Ministry of Agriculture and the adjacent Al-Sadeer Hotel that housed DYNCORPS contractors supporting the operations of the Ministry of Agriculture. *Id.* Jerry Oldham, a DYNCORPS contractor, was injured in the attack in which at least one member of the Iraqi Police was killed. *Id.* As an initial point, this Court has previously found "a reasonable connection between Defendants' actions and the injuries Plaintiffs suffered" as it pertains to this attack. *See Pautsch v. Islamic Republic of Iran*, Case No. 20-cv-2859 (JEB), 2023 U.S. Dist. LEXIS 215577, at *8 (D.D.C. Dec. 5, 2023) (addressing causation for this attack involving surviving victims Wallace Byars, Dennis O'Malley, and Richard Vessell); *see also Pautsch v. Islamic Republic of Iran*, 2024 U.S. Dist. LEXIS 133054, at *17 (D.D.C. July 29, 2024) (entering default judgment on liability for intentional infliction of emotional distress for Byars, O'Malley, and Vessell).  Col. Rayburn determined that AQI perpetrated the attack, noting that the FTO "issued multiple statements on 9 March 2005 claiming responsibility for the attack," and that the attack bore "hallmarks of AQI's tactics at that time," specifying that the attack was "an early part of Zarqawi and AQI's spring 2005 car bomb offensive against the newly elected transitional government of Iraq." Ex. A at 15-16.

**8.  March 19, 2005, Attack in Rasheed, Iraq (Attack 66 in Amended Complaint)**

On March 19, 2005, an IED detonated on the driver's side of an M1114 HMMWV near Checkpoint 29 at the intersection of two major Coalition supply routes approximately 11 miles south of Baghdad killing U.S. Army SGT Jonathan Hughes due to "massive destruction to his head and brain" from shrapnel. *Id.* at 16-17.  Col. Rayburn determined that AQI carried out this attack "to a reasonable degree of professional confidence" because the area where the attack took place

15

within the "Triangle of Death" south of Baghdad was an AQI stronghold, and a large IED detonation on a Coalition target was a favored TTP of AQI at the time. *Id.* at 17.

### 9.    March 26, 2005, Attack in Baghdad, Iraq (Attack 67 in Amended Complaint)

U.S. Army SGT Lee Godbolt was killed immediately outside Camp Victory in western Baghdad when his HMMWV was attacked with an SVBIED. *Id.* Col. Rayburn attributes this attack to AQI "with a reasonable degree of professional confidence" because AQI was engaged in a car-bomb campaign at the time to disrupt the formation of the Iraqi government, and the location on the perimeter of Camp Victory was a frequent attack point for AQI because it maintained freedom of movement in the Sunni neighborhoods surrounding the camp, and the TTP of SVBIEDs  was a "signature tactic of AQI at that time, as AQI was responsible for the overwhelming majority of suicide attacks in the country." *Id.* at 17-18.

### 10. March 30, 2005, Attack north of Taji, Iraq (Attack 68 in Amended Complaint)

On March 30, 2005, U.S. Army Specialist (SPC) Eric Toth was killed a few miles north of Taji when his HMMWV—in which he was in the gunner position—was targeted by an SVBIED while traveling south on MSR Tampa. *Id.* at 18.  Col. Rayburn attributes this attack to AQI "with a reasonable degree of professional confidence" because AQI was engaged in a car-bomb campaign at the time to disrupt the formation of the Iraqi government, the attack location was the main north-south supply route through west Baghdad that was frequently targeted by AQI, and the TTP of SVBIEDs  was a "signature tactic of AQI at that time, as AQI was responsible for the overwhelming majority of suicide attacks in the country."  *Id.* at 18-19.

### 11. April 17, 2005, Attack in Baghdad, Iraq (Attack 71 in Amended Complaint)

A three-vehicle convoy of the U.S. Army's 170th Military Police Company, 504th Military Police Battalion, had its second vehicle attacked by an IED on Dora Expressway in the Dora

16

neighborhood in the southern part of Baghdad. *Id.* at 19.  Because air evacuation was not possible, U.S. Army Private First Class (PFC) Sam Huff died the following day after having to be ground-evacuated from the blast.  *Id.* Col. Rayburn found that this attack took place during a "large-scale bombing campaign in the Baghdad region" by AQI, the attack took place in the Sunni-majority neighborhood of Dora which was an AQI stronghold where AQI exercised freedom of movement and operations, and Col. Rayburn himself experienced being targeted with an AQI IED a few years later not far from where PFC Huff was critically injured. *Id.*

### 12. April 29, 2005, Attack in Baghdad, Iraq (Attack 73 in Amended Complaint)

U.S. Army PV2 Charles Cooper, Jr. was killed when his dismounted patrol was attacked with a roadside bomb in the Abu Ghraib neighborhood northwest of Baghdad and near the Baghdad Airport.  *Id.* at 20.  Col. Rayburn opined "with a reasonable degree of professional confidence" that this was likely part of AQI's large-scale bombing campaign in the Baghdad region to interfere with the new Iraqi government, it took place on a main expressway running between Baghdad and the Anbar Province where AQI frequently carried out attacks, and AQI had freedom of movement within the Sunni-majority Abu Ghraib neighborhood. *Id.*

### 13. August 3, 2005, Attack in Baghdad, Iraq (Attack 91 in Amended Complaint)

The U.S. Army's 648th Engineer Battalion was manning a checkpoint west of Baghdad between Radwaniyah and Zaidon on August 3, 2005 when a driver in a Kia Sephia detonated an SVBIED while approaching the checkpoint resulting in the deaths of SGT Jerry Ganey, Jr. and two other soldiers and wounding additional soldiers including John Lamie. *Id.* at 20-21.  Col. Rayburn opined "with a reasonable degree of professional confidence" that this was likely part of AQI's large-scale bombing campaign in the Baghdad region to interfere with the new Iraqi government, it took place in an area "connecting two major AQI support zones" where AQI also

had a stronghold, the TTP of SVBIEDs  was a "signature tactic of AQI at that time, as AQI was responsible for the overwhelming majority of suicide attacks in the country," and AQI specifically claimed responsibility for the attack. *Id.* at 21.

### 14. October 10, 2005, Attack in Baghdad, Iraq (Attack 101 in Amended Complaint)

On October 15, 2005, the U.S. Army's 1st Battalion, 184th Infantry Regiment was manning Checkpoint 12 limiting access from the west into the Green Zone in Baghdad when the checkpoint was attacked by an SVBIED comprised of 11 82-mm mortar rounds and 60 pounds of explosives resulting in the death of SSG Jerry Bonifacio, Jr. *Id.* at 22. Col. Rayburn attributes this attack to AQI "with a reasonable degree of professional confidence" because AQI was engaged in another large-scale bombing campaign in the fall of 2005 in Baghdad to disrupt the upcoming constitutional referendum, the attack location in the Sunni-majority Yarmouk neighborhood allowed AQI freedom of movement and was a frequent AQI operating zone, and the TTP of SVBIEDs  was a "signature tactic of AQI at that time, as AQI was responsible for the overwhelming majority of suicide attacks in the country." *Id.*

### 15. November 20, 2005, Attack in Taji, Iraq (Attack 113 in Amended Complaint)

SGT Dominic Sacco was shot and killed by a sniper on MSR Tampa approximately nine miles north of Taji on November 20, 2005.  *Id.* at 23. Col. Rayburn attributes this attack to AQI "to a reasonable degree of professional confidence" because Taji and its surrounding area was an AQI stronghold, MSR Tampa was a frequent site of AQI attacks on Coalition targets, and the use of a sniper indicated freedom of movement among the local population which AQI would have possessed in this area in this time period. *Id.*

**16. February 2, 2006, Attack in Taji, Iraq (Attack 120 in Amended Complaint)**

On February 2, 2006, the U.S. Army's Bravo Company, 1st Battalion, 66th Armor Regiment was subjected to a complex attack with a buried IED that sent a Bradley Fighting Vehicle airborne that landed on and killed Captain (CPT) Simon Cox, Jr., followed by small-arms fire directed at the convoy. *Id.* Col. Rayburn found that Taji was an AQI stronghold at the time, the TTP of a deep-buried IED coupled with small-arms fire in a complex attack indicated freedom of movement within the local population in addition to a known TTP of AQI, and deep-burying an IED required time and lack of interference indicating a greater level of control over the area which all indicate the attack was likely carried out by AQI or an STGI associated with AQI. *Id.* at 24.

**17. April 29, 2006, Attack in Radwaniyah, Iraq (Attack 134 in Amended Complaint)**

While dismounted from their vehicles, SGT Steve Sakoda was killed and PFC Joshua Hooker was injured when an IED detonated on the shoulder of the northbound lane of Route Yankees near the intersection with Iraqi Highway 1 in Radwaniyah on April 29, 2006. *Id.* Col. Rayburn attributed this attack to AQI because at the time, AQI dominated the Sunni insurgency in Iraq, the attack location was within an AQI stronghold between Anbar Province and the Triangle of Death, the emplacement required freedom of movement in the area, and an IED targeting a foot patrol was an AQI tactic employed against the Coalition at that time. *Id.* at 24-25.

**18. June 4, 2006, Attack near Taji, Iraq (Attack 139 in Amended Complaint)**

On June 4, 2006, an M1A2 Abrams tank was struck in the vicinity of the village of Abdul Latif al-Farras near Tarmiyah by a deep-buried, command-wire detonated IED comprised of three 152-mm artillery rounds, one 130-mm artillery round, and high explosives. *Id.* at 25. SGT Daniel Gionet had his legs blown off in the explosion and died before he could be evacuated to a combat hospital. *Id.* at 25-26. Col. Rayburn found that AQI held "near-total control over the Sunni

19

insurgency in that area at that time" and that another insurgent group, Jaysh al-Rashidin, claimed responsibility for the attack, but they would not have been able to conduct this attack in this area "without coordinating with or receiving support or direction from AQI" because of AQI's control and the need for freedom from outside pressure when planting a deep-buried IED. *Id.* at 26-27.

### 19. August 27, 2006, Attack in Baghdad, Iraq (Attack 151 in Amended Complaint)

On August 27, 2006, a four-vehicle Stryker patrol was traveling in the southern portion of Ghazaliyah neighborhood in northwest Baghdad when it struck an IED on what members of the platoon called the "Eastern Road of RPG Alley #1." *Id.* at 27.  Corporal Kenneth Cross was pinned underneath the Stryker when it rolled over on him, and the driver of the Stryker that was hit, SPC Daniel Dolan, died later in the combat hospital after being pinned in the vehicle.  *Id.* After the explosion, the platoon came under small-arms fire from the south.  *Id.* Col. Rayburn determined that Ghazaliyah was being used by AQI at this time as a base to conduct attacks on Coalition and Iraqi forces because, as a Sunni-majority neighborhood, AQI maintained freedom of movement in the community, AQI's TTP in the Ghazaliyah area was to target Coalition convoys passing through, and the strength of this IED to flip over a Stryker indicated it was a large IED which required even further freedom of movement that only AQI would have possessed in this area at the time. *Id.* at 28.

### 20. October 2, 2006, Attack in Taji, Iraq (Attack 157 in Amended Complaint)

Troop A, 7th Squadron, 10th Cavalry was patrolling on Route Fordyce en route to Taji when the lead HMMWV in the patrol was attacked with a deep-buried IED that launched the HMMWV approximately 20 meters to the northwest of the blast seat and breaking it into two pieces resulting in the death of four soldiers including SPC Santos Armijo and SSG James Ellis.  *Id.* at 28-29. Col. Rayburn states that Taji was an AQI stronghold at the time, the emplacement of such a massive,

20

deep-buried IED in the middle of a roadway required significant freedom of movement to avoid harassment from local authorities which was something only AQI could accomplish in this area at this time. *Id.* at 29.

### 21. November 21, 2006, Attack in Baghdad, Iraq (Attack 166 in Amended Complaint)

SSG Henry Kahalewai, the truck commander of a Stryker vehicle for A Troop, 1st Squadron, 14th Cavalry was seriously injured when an IED detonated on November 21, 2006 on Dora Expressway in the Dora neighborhood of Baghdad. *Id.* at 29-30.  SSG Kahalewai's injuries required significant medical intervention, but he died of his injuries at Brooke Army Medical Center in San Antonio, Texas on December 15, 2006 from the injuries he sustained. *Id.* at 30. Col. Rayburn found the following supporting his assertion that AQI was responsible for this attack: Dora was an AQI stronghold and operating base where AQI had freedom of movement to operate at the time; the Dora Expressway was a common location for AQI IED attacks on Coalition targets; and the vast majority of attacks emanating out of Dora in this time period were perpetrated by AQI or under AQI's guidance or control.  *Id.* at 30.

### 22. December 7, 2006, Attack in Baghdad, Iraq (Attack 170 in Amended Complaint)

SSG Kristofer Ciraso of Alpha Company, 1st Battalion, 5th Cavalry had dismounted from his patrol vehicle in the western portion of the Ameriyah neighborhood in western Baghdad to try to repair a barrier near the road when an IED was detonated causing his death during his transport to the combat hospital on December 7, 2006. *Id.* at 31.  Col. Rayburn determined that Ameriyah, like neighboring Ghazaliyah, was being contested by AQI at this time as a base to conduct attacks on Coalition and Iraqi forces because, as a Sunni-majority neighborhood, AQI maintained freedom of movement in the community, and AQI's TTP in the Ameriyah area was to target Coalition convoys passing through with IEDs.  *Id.*

21

**23. December 28, 2006, Attack in Taji, Iraq (Attack 174 in Amended Complaint)**

On December 28, 2006, U.S. Army SPC Luis Ayala sustained fatal injuries in an IED attack on his dismounted patrol on Route Cobra between Taji and Tarmiyah. *Id.* at 32. Col. Rayburn attributes this attack to AQI "to a reasonable degree of professional confidence" because the area between Taji and Tarmiyah was an AQI stronghold at the time from which AQI carried out IED attacks on Coalition convoys due to AQI's freedom of movement in this area. *Id*

**24. January 20, 2007, Attack east of Baghdad, Iraq (Attack 176 in Amended Complaint)**

On January 20, 2007, two Black Hawk helicopters were following a tactical route around the eastern side of Baghdad traveling from Taji to Camp Liberty in Baghdad when the tail helicopter was hit by a surface-to-air missile that caused the pilot to lose altitude and then the helicopter was struck with an RPG as it was close to the ground causing the entire helicopter to burst into flames and resulting in the death of SSG Darryl Booker, LTC David Canegata III. COL Paul Kelly, SFC Floyd Lake, Sr., CPL Victor Langarica, CPT Sean Lyerly, and six other soldiers on board the tail helicopter. *Id.* at 32-33. Col. Rayburn attributed this attack to AQI based on AQI's TTP at the time of studying the flight routes of Coalition aircraft and dispatching teams to shoot them down in addition to a claim of responsibility issued by AQI that it had deployed an anti-aircraft team from Buhriz in the Diyala Province to target Coalition aircraft and the details of the claim of responsibility mirrored the facts on the ground provided by the U.S. military in its after-action reports. *Id.* at 33-34.

**25. January 20, 2007, Attack in Baghdad, Iraq (Attack 177 in Amended Complaint)**

Second Platoon, Charlie Company, 1st Battalion, 26th Infantry was patrolling zones 18 and 19 in the Adhamiyah area of eastern Baghdad late in the evening of January 19, 2007 into the early-morning hours of January 20, 2007 when their lead M1151 HMMWV was struck by an IED

near the intersection of Route Remy and Route Vernon followed by small-arms fire and grenades being thrown from rooftops in front and behind the convoy. *Id.* at 34-35. The IED blew a hole in the floor of the HMMWV immediately behind the driver, PFC Ryan Hill, who sustained fatal injuries in the blast and was declared dead after being evacuated to the aid station nearby. *Id.* at 35. Col. Rayburn concurred with the military intelligence assessment that the attack was "likely conducted by an [AQI] cell operating in Adhamiyah" because it was a command-wire detonated IED comprised of large artillery shells, Adhamiyah served as an AQI stronghold in Baghdad at this time with AQI carrying out frequent attacks on Coalition targets in Adhamiyah, the deep-buried nature of the IED indicated freedom of movement in the area that was enjoyed by AQI at that time, and the complex attack with an IED followed by small-arms fire and grenades was a common AQI TTP at the time. *Id.* at 35-36.

### 26. April 12, 2007, Attack in Baghdad, Iraq (Attack 197 in Amended Complaint)

On April 12, 2007, Patrol Base Dog located approximately seven kilometers south of Baghdad was ambushed in a complex attack including small-arms fire from multiple locations south of the base that created a diversion while a truck loaded with hundreds of pounds of explosives barreled through the south gate and detonated as an SVBIED near the base's two main buildings. *Id.* at 36-37. After the explosion, the ambush continued for nearly an hour while the surviving soldiers kept the terrorists away despite numerous casualties within the base including CPL Cody Putman who was killed in the SVBIED blast. *Id.* at 37-38. Col. Rayburn cited to his own book on the U.S. Army in Iraq which found that "AQI struck the company sized outpost with a truck bomb loaded with 600 pounds of homemade explosives" while also stating that the Arab Jabour region south of Baghdad "had long served as a major AQI infiltration route into south Baghdad" and the attack on the patrol base was an attempt by AQI to stymie Coalition efforts

23

against AQI in the Arab Jabour area during the spring 2007 "surge" campaign. *Id.* at 38.  Col. Rayburn also determined that the complex attack of "combining a large ground assault and a massive suicide truck bombing, was a signature tactic employed by AQI." *Id.* at 38-39.

### 27. May 2, 2007, Attack in Baghdad, Iraq (Attack 201 in Amended Complaint)

On May 2, 2007, a six-vehicle convoy from the 4th Brigade Combat Team, 1st Infantry Division was conducting route-clearing operations in the Dora neighborhood in east Rashid district in southern Baghdad when the convoy was attacked with IED followed by small-arms and RPG fire resulting in the death of two soldiers including SPC Astor Sunsin-Pineda. *Id.* at 39.  Col. Rayburn found the following supporting his assertion that AQI was responsible for this attack: Dora was an AQI stronghold where AQI had freedom of movement to operate at the time, and the TTP of a complex attack using an IED followed by small-arms and RPG fire was a favored tactic of AQI in Dora at the time.  *Id.* at 40.

### 28. May 24, 2007, Attack in Baghdad, Iraq (Attack 207 in Amended Complaint)

On May 24, 2007, a convoy with the National Police Transition Team was struck with an IED 50 meters west of the intersection of Route Vernon and Route Fir in the western part of the Rashid District in southern Baghdad causing the vehicle to catch fire resulting in the death of two U.S. soldiers, including SSG Russell Shoemaker on their local interpreter. *Id.* at 41.  Col. Rayburn attributed this attack to AQI because AQI was contesting control of these neighborhoods in western Rashid at the time, and the use of "a large, buried IED detonated with the aid of aiming sticks was a tactic of the Sunni insurgency" at this time when Shi'a groups were turning more and more to explosively formed projectile IEDs in Baghdad. *Id.* at 41-42.

24

**29. May 30, 2007, Attack in Baghdad, Iraq (Attack 210 in Amended Complaint)**

On May 30, 2007, Charlie Company, 2d Battalion, 12th Infantry was conducting a night mission in the Masafee area of Dora in southern Baghdad when they were ambushed by automatic machine-gun fire when entering the courtyard of a house resulting in Lt. Nathan Stone being hit by enemy fire and SPC Matthew Baylis laying down suppression fire to allow for Stone to be extricated when Baylis was shot in the throat and leg as he tried to move away from the house after which the fighting continued for an extended period with SPC Baylis dying of his injuries. *Id.* at 42. Col. Rayburn found the following supporting his assertion that AQI was responsible for this attack: Dora was an AQI stronghold where AQI had freedom of movement to operate at the time, and the TTP of a small-arms fire ambush was typical of AQI at that time in Dora. *Id.* at 43.

**30. June 3, 2007, Attack in Baghdad, Iraq (Attack 214 in Amended Complaint)**

The second M1114 HMMWV in a four-vehicle patrol was attacked with a buried, "speed bump" IED with a crush-wire initiator in the early-morning hours of June 3, 2007 on the southern edge of the town of Abu Ghraib immediately north of the Baghdad Airport causing the HMMWV to be engulfed in a fire ball making it impossible to extricate SGT Kimel Watt who was killed in the blast and ensuing fire. *Id.* Col. Rayburn attributed this attack to AQI because Abu Ghraib was an area in which AQI was fighting to retain control and freedom of movement as the "awakening" movement was making its way from Anbar Province to Baghdad at the time, and "the TTP of a large buried IED was a favored tactic of AQI in eastern Anbar and Abu Ghraib and required the freedom of movement and time that only AQI would have enjoyed in the Abu Ghraib area." *Id.* at 42-43.

25

**31. June 18, 2007, Attack in Arab Jabour, Iraq (Attack 217 in Amended Complaint)**

On June 18, 2007, as part of Operation Marne Torch designed to clear the Arab Jabour region south of Baghdad of AQI terrorists who had operated with impunity from this area for an extended period of time, Company D, 1st Battalion, 30th Infantry was traveling in an M1A1 Abrams south of Arab Jabour near Route Chevy east of Hor Rajab (another AQI stronghold in the region) when the M1A1 was hit with a pressure-wire IED containing between 20 and 40 pounds of homemade explosives resulting in the death of PFC Larry Parks, Jr. who was in the gunner's turret of the Abrams tank. *Id.* at 44-46. Col. Rayburn attributed this attack to AQI because AQI was fighting to retain control of its strongholds in Arab Jabour and Hor Rajab, the TTP was consistent with AQI, and Coalition intelligence assessments were monitoring "AQI's presence in the area with great precision, often based on human intelligence provided by local Sunni residents." *Id.* at 46.

**32. June 21, 2007, Attack in Baghdad, Iraq (Attack 219 in Amended Complaint)**

On June 21, 2007, a large, deep-buried IED detonated on the lead Bradley Fighting Vehicle in a four-vehicle patrol from Charlie Company, 1st Battalion, 26th Infantry traveling north on Route Remy in the Adhamiyah section of eastern Baghdad. *Id.* at 46. The IED lifted the Bradley into the air and flipped it causing it to catch fire immediately and resulting in the death of SGT Ryan Wood, PFC Thomas Leemhuis, SGT Alphonso Montenegro II, PFC Anthony Hebert, and SPC Daniel Agami. *Id.* at 47. The explosion was followed by small-arms fire, an RPG attack on another HMMWV, and another IED attack on a first-responder vehicle in the vicinity. *Id.* Col. Rayburn attributed this attack to AQI because military intelligence was "tracking two Al-Qaeda in Iraq (AQI) cells operating in that area," the Islamic State of Iraq (another name for AQI) had claimed responsibility for the coordinated attack, Adhamiyah was an AQI stronghold where AQI launched

frequent attacks against Coalition targets, the size of the IED that was large enough to flip a Bradley was an AQI TTP, and the use of a complex and coordinated attack fit with the TTPs for AQI at that time. *Id.* at 48.

### 33. July 1, 2007, Attack in Baghdad, Iraq (Attack 220 in Amended Complaint)

On July 1, 2007, Bayonet Company, 1st Battalion, 38th Infantry came under small-arms fire while conducting a house-to-house clearing mission in mahalla 822 in Dora in southern Baghdad when CPL Victor Garcia was shot in the head and killed while following his commanding officer across the street. *Id.* at 49. Col. Rayburn found the following supporting his assertion that AQI was responsible for this attack: Dora was an AQI stronghold where AQI had freedom of movement to operate at the time, and the TTP of a small-arms fire attack on Coalition forces was typical of AQI at that time in Dora.  *Id.* at 43

### 34. July 1, 2007, Attack in Baghdad, Iraq (Attack 221 in Amended Complaint)

On July 1, 2007, 1st Platoon, Bravo Company, 2d Battalion, 12th Cavalry was ambushed with complex attack near Alpha Road in Ghazaliyah in northwest Baghdad with an IED that drew out soldiers to provide assistance followed by small-arms fire targeting the soldiers who came to provide assistance at the IED site and resulting in PFC Jonathan Rossi being shot in the head and killed. *Id.* at 50. Col. Rayburn found the following supporting his assertion that AQI was responsible for this attack: Ghazaliyah "was contested by a strong AQI or AQI-affiliated militant presence" from which it launched attacks on Coalition targets, AQI had freedom of movement in the Sunni-majority Ghazaliyah section of Baghdad, the TTP of a complex attack was an AQI favored tactic at the time, and military intelligence assessments specifically referenced the "open terrain … provides AQI an excellent engagement area and the abandoned homes provide the

27

elevated platforms necessary for debilitating top down shots and over-watch for IED triggermen."

*Id.*

### 35. July 18, 2007, Attack in Baghdad, Iraq (Attack 225 in Amended Complaint)

On July 18, 2007, 1st Platoon, Alpha Company, 1st Battalion, 26th Infantry was tasked with providing condolence payments for damages caused by the unit, and set out in zone 19 of Adhamiyah in eastern Baghdad in a five-vehicle convoy when the lead Bradley Fighting Vehicle struck a deep-buried IED causing the Bradley to flip over and catch fire followed by small-arms fire that hampered the recovery effort by the remainder of the convoy. *Id.* at 51. As other units arrived, they were met with small-arms and RPG fire, and all five occupants of the Bradley Fighting Vehicle—SFC Luis Gutierrez-Rosales, SPC Daniel Gomez, SPC Richard Gilmore III, SPC Zachary Clouser, and the unit's interpreter—were killed. *Id.* at 51-52. Col. Rayburn found that the circumstances of this attack "were almost identical to the 21 June 2007 attack in the same area", Adhamiyah was an AQI stronghold where AQI launched frequent attacks against Coalition targets, the size of the IED that was large enough to flip a Bradley was an AQI TTP, the use of a complex and coordinated attack fit with the TTPs for AQI at that time, and AQI claimed responsibility for the attack which included the fact that it was a Bradley that had been targeted. *Id.* at 52-53.

### 36. August 2, 2007, Attack in Baghdad, Iraq (Attack 227 in Amended Complaint)

On August 2, 2007, 1st Platoon, Alpha Company, 2d Brigade, 3d Infantry was conducting house searches in the Masafee area of Dora in southern Baghdad in a three-vehicle patrol when the lead Stryker vehicle was struck with a large IED that was buried in a storm drain next to the road resulting in the deaths of SSG Fernando Santos, SPC Eric Salinas, SPC Cristian Rojas-Gallego, and causing serious injuries to CPL Kevin Mowl who died of complications from his

injuries at the National Naval Medical Center in Bethesda, Maryland on February 25, 2008. *Id.* at 53-54. Col. Rayburn found the following supporting his assertion that AQI was responsible for this attack: Dora was an AQI stronghold where AQI had freedom of movement to operate at the time, deep-buried IEDs required freedom of movement that only AQI would have possessed in Dora at the time, and deep-buried IEDs were a favored TTP for AQI at that time.  *Id.* at 54.

**37. August 11, 2007, Attack in Arab Jabour, Iraq (Attack 229 in Amended Complaint)**

On August 11, 2007, 2d Platoon, Bravo Company, 1st Battalion, 30th Infantry was patrolling along the west bank of the Tigris River south of Patrol Base Murray when a sniper fired from a building hitting SPC William Edwards, a gunner in the lead vehicle. *Id.* at 55.  The platoon entered the building to locate the sniper, but the sniper attack was apparently a ruse to draw the soldiers into the building when the terrorists detonated explosives that turned the building into an HBIED resulting in the deaths of SPC Justin Penrod, SGT Andrew Lancaster, SGT Scott Kirkpatrick, and SSG William Scates.  *Id.* at 55-56.  Col. Rayburn attributes this attack to AQI because the "remaining cells of AQI were fighting to retain a foothold in the areas of Arab Jabour and Hor Rajab," AQI enjoyed a "persistent presence in the area" which was required for an attack like this, and "as the Coalition continued to press into AQI-dominated areas, a common TTP for AQI was for retreating insurgents to booby-trap buildings to create [HBIEDs] like the one used in this attack." *Id.* at 56.

**38. September 4, 2007, Attack in Baghdad, Iraq (Attack 231 in Amended Complaint)**

On September 4, 2007, SPC Rodney Johnson was killed when grenades were thrown at 2d Platoon, A Company, 1st Squadron, 4th Cavalry while conducting a dismounted patrol in the Masafee area of Dora in southern Baghdad. *Id.* Col. Rayburn found the following supporting his assertion that AQI was responsible for this attack: Dora was an AQI stronghold where AQI had

29

freedom of movement to operate at the time and "the TTP of grenades and small-arms fire required freedom of movement and a persistent presence in the attack area" which AQI solely possessed in Dora. *Id.* at 57.

### 39. September 14, 2007, Attack in Arab Jabour, Iraq (Attack 235 in Amended Complaint)

A detachment from Company B, 1st Battalion, 30th Infantry was dispatched on September 14, 2007 to clear the building and perimeter at a location slated for a new Patrol Base south of Arab Jabour that had previously experienced an attack on Coalition forces when an IED was set off on the northwest corner of the building killing SGT John Mele II and a local member of the Sons of Iraq militia. *Id.* at 58. Col. Rayburn attributes this attack to AQI because "Coalition assessments pertaining to this incident indicate that AQI was responsible," the "remaining cells of AQI were fighting to retain a foothold in the areas of Arab Jabour and Hor Rajab," and "the TTP of deliberately emplaced IEDs required freedom of movement and a persistent presence in the attack area, which AQI and no other militant group enjoyed at that time." *Id.* at 58-59.

### 40. October 5, 2007, Attack in Baghdad, Iraq (Attack 238 in Amended Complaint)

On October 5, 2007, India Company, 3d Squadron, 2d Stryker Cavalry Regiment was clearing buildings in the Hadar section of Dora in southern Baghdad when an HBIED detonated killing two soldiers—CPL Jason Marchand and SGT Joseph Milledge. *Id.* at 59. Col. Rayburn judged, "with a high degree of professional confidence," that AQI carried out this attack because at this time "AQI was fighting hard to retain control or a foothold in Dora" after surge campaign had begun to push AQI out of Dora, AQI was "booby-trapping buildings they anticipated Coalition troops and Iraqi Security Forces would be likely to enter on clearing patrols," and HBIEDs "were a signature tactic of AQI." *Id.* at 60.

### 41. January 19, 2008, Attack in Arab Jabour, Iraq (Attack 245 in Amended Complaint)

As part of Operation Marne Thunderbolt, a six-vehicle convoy with the 1st Battalion, 30th Infantry Regiment's engineer company was traveling north on Route Shelby in a mine-resistant ambush-protected (MRAP) vehicle when the second-to-last vehicle ran over a pressure plate detonating an IED that "blew the vehicle into the air and over on its side, killing Spec. Richard B. Burress, the gunner in the turret." *Id.* at 61.  Col. Rayburn attributes this attack to AQI because "Coalition assessments pertaining to this incident indicate that AQI was responsible," the "remaining cells of AQI were fighting to retain a foothold in the areas of Arab Jabour and Hor Rajab," he "personally visited the Hor Rajab area with Lieutenant Colonel Adgie multiple times at about the time of the attack and was aware of his battalion's intelligence assessment that the IED attacks in the area were being carried out by AQI," and "the TTP of such a large IED emplaced on a roadway would have required extensive freedom of movement and a persistent presence in the attack area, which AQI (and no other militant group) enjoyed in the area at that time." *Id.* at 60-61.

### 42. March 22, 2008, Attack in Baghdad, Iraq (Attack 253 in Amended Complaint)

The 1132 Military Police was traveling east on Route 76ers near the intersection of Route Kettle to the east of Taji north of Baghdad on March 22, 2008, when the last HMMWV in the convoy was attacked with a command-wire-detonated IED. *Id.* at 61.  The HMMWV caught fire killing three soldiers, including SPC David Stelmat, Jr., and two Iraqi interpreters. *Id.*  Col. Rayburn attributes this attack to AQI because this attack "followed a pattern of previous such attacks in the same area since January 2008" that the Coalition had attributed to AQI, the "area north of Baghdad from Taji north to Tarmiyah was a frequent AQI operating zone," the "TTP of the attack—a massive buried IED detonated by a command wire—match AQI's tactics in that area

31

at that time," and "by spring 2008, the vast majority of other insurgent groups in the Taji-Tarmiyah area had switched sides and joined the Sunni tribal Awakening against AQI." *Id.* at 63.

### 43. May 27, 2009, Attack in Baghdad, Iraq (Attack 275 in Amended Complaint)

During a joint dismounted patrol with the Iraqi Army along Route Michigan near the Abu Ghraib open-air market immediately north of the Baghdad Airport on May 27, 2009, 1st Platoon, Bravo Company, 2d Battalion, 112th Infantry was attacked with a small, remote-detonated, homemade directional IED resulting in the death of SPC Chad Edmundson. *Id.* at 63. Col. Rayburn concurs with the military intelligence assessment that this attack was "most likely the work of members of the Karbuli AQI Network" based on the "apparent disregard for civilian casualties" in addition to AQI comprising almost the entirety of the remaining elements of the Sunni insurgency by spring 2009, and "in the Abu Ghraib area AQI cells were conducting occasional attacks to attempt to regain a foothold after having lost control of the area to a large 'awakening' contingent led by local Sunni tribal leaders." *Id.* at 64.

## IV. PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF DEFAULT JUDGMENT AS TO LIABILITY FOR THE 43 ATTACKS AT ISSUE IN THE INSTANT MOTION

### A. This Court Possesses Subject-Matter Jurisdiction Over the 39 Attacks

The FSIA's Terrorism Exception confers jurisdiction against a foreign government if: (1) the claims are against a designated "State Sponsor of Terrorism"; (2) the "claimant or the victim" was, at the time of the attack, "a national of the United States," "a member of the armed forces," or a U.S. government employee or contractor; (3) money damages are sought for personal injury or death caused by an act of torture, extrajudicial killing, or hostage taking, or the material support of

32

such acts; and (4) the act, "or the provision of material support or resources for the act" is "engaged in by an official, employee, or agent of the foreign state." 28 U.S.C. § 1605A(a)(1)–(2).[3]

### 1. Defendants were both designated as state sponsors of terrorism at the time of the attacks at issue in this motion, and they continue to be designated as such

Regarding the first element, the Court may take judicial notice of each of Iran's and Syria's status as a designated State Sponsor of Terrorism, both when the cause of action arose and now. The State Department designated Iran a State Sponsor of Terrorism on January 19, 1984, and it has retained its designation continuously since then. *See* U.S. Dep't of State, State Sponsors of Terrorism, *available at* https://www.state.gov/j/ct/list/c14151.htm. Syria has been designated a State Sponsor of Terrorism continuously since December 29, 1979. *See id.*

### 2. Each attack victim whose claims are at issue in this motion was, at the time of the attacks, either a U.S. national, a member of the armed forces, or a U.S. government employee or contractor

Plaintiffs fulfill the second element, as reflected by the "Section 1605A(a)(2)(A)(ii) Appendix" filed under seal as **Exhibit C**. This Appendix provides documentation that meets the requirements of 28 U.S.C. § 1605A(a)(2)(A)(ii) for each of the victims named in the Amended Complaint in the 43 attacks at issue in this motion: namely, that each "was, at the time the [attack] occurred—(I) a national of the United States [or] (II) a member of the armed forces; or (III) otherwise an employee of the Government of the United States, or an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment."

---

[3] Section 1605A(a)(2) also requires the claimant to offer the foreign state an opportunity to arbitrate the claim if the act occurred within the foreign state against which the claim is brought. Such an offer of arbitration is not required in this case because the actions did not take place within Iran or Syria.

### 3. Plaintiffs' claims are predicated on Defendants' "material support" for acts of extrajudicial killings.

The FSIA's Terrorism Exception permits liability against designated State Sponsors of Terrorism for "the provision of material support or resources" for "act[s] ... of extrajudicial killing." 28 U.S.C. § 1605A(a)(1). Both Defendants in this case provided material support for "act[s] of ... extrajudicial killing" that resulted in Plaintiffs' deaths or injuries. *Id.* "Extrajudicial killing" is defined by reference to the Torture Victim Protection Act of 1991 ("TVPA"). *See* 28 U.S.C. § 1605A(h)(7). The TVPA provides that an "extra-judicial killing" is "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." Pub. L. No. 102–256, § 3(a), 106 Stat. 73. "On its face, this definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 825.

The decision of the U.S. Courts of Appeals for the District of Columbia Circuit in *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024), has somewhat altered the landscape of how courts within this Circuit have viewed cases where complaints allege claims for individuals who were injured but not for individuals who were killed in a specific attack. In *Borochov*, the Court determined that the terrorism exception to the FSIA only applies in cases where there was a "completed killing." 94 F.4th at 1061. While courts within the D.C. Circuit had previously assigned liability in terrorism exception cases with material support was provided by a designated state sponsor of terrorism for an attempted extrajudicial killing, the D.C. Circuit held that this reasoning was "foreclosed by a full reading of the statutory text and context." *Id.* at 1063. This Court, in *Pautsch*, held the following:

> The text of the terrorism exception waives a foreign sovereign's immunity from suits for "*personal injury* or death that was caused by an act of … extrajudicial

34

killing." 28 U.S.C. § 1605A(a)(1) (emphasis added). The text, therefore, contemplates actions brought by a plaintiff who is injured by a terrorist attack that results in death, even if he himself is not the fatality. This tracks common sense, too, as a single "*act of*" extrajudicial killing can "quite obviously injure another." Indeed, Congress knows how to limit liability to the estate and family members of those who died – *viz.*, in the Torture Victim Protection Act, which supplies the definition of "extrajudicial killing" applicable in this context, *see* 28 U.S.C. § 1605A(h)(7), and limits relief to actions for "wrongful *death*." Pub. L. No. 102-256, §2(a)(1) (emphasis added).

This near-uniform interpretation of the relevant text is also consistent with *Borochov*. As Plaintiffs explain, the Circuit there repeatedly said that the underlying attack did not qualify as an extrajudicial killing, not because it did not result in the death of the *plaintiffs*, but because it did not cause the death of "anyone." *Borochov*, 94 F.4th at 1057, 1060-61. And when the court turned to the plaintiffs' submission that the perpetrator's death counted as the necessary killing, it did not dismiss the argument out of hand because it was the perpetrator and not the plaintiffs who died. *See Borochov*, 94 F.4th at 1062. It instead explained that the perpetrator's death at the hands of a bystander did not suffice both because the foreign sovereigns could not have "undertaken" or sponsored this killing and because this shooting was not the cause of the plaintiffs' injuries. *Id.*

The Court thus agrees with Plaintiffs that *Borochov* "implicitly confirms," or is at the very least consistent with, the foregoing interpretation of the terrorism exception.

*Pautsch v. Islamic Republic of Iran*, Case No. 20-cv-3859 (JEB), 2024 U.S. Dist. LEXIS 133054, at *10-*11 (D.D.C. July 29, 2024).

Each of the 43 attacks at issue in this motion satisfy the requirements in 28 U.S.C. § 1605A(a)(1) and this Court's prior interpretation of the D.C. Circuit's *Borochov* decision. The following attacks included individuals who were killed (with the name of those killed in parentheses):

1. May 6, 2004 – Baghdad (Hesley Box, Jr. killed)
2. September 18, 2004 – Baghdad (Thomas Rosenbaum killed)
3. September 25, 2004 – Taji (David Johnson killed)
4. October 7, 2004 – Taji (Ronald Baker killed)
5. November 6, 2004 – Baghdad (Justin Yoemans killed)
6. January 10, 2005 – West of Baghdad (William Manuel killed)

7. March 9, 2005 – Baghdad (Jerry Oldham injured, Iraqi Police Officer killed)

8. March 19, 2005 – Rasheed (Jonathan Hughes killed)

9. March 26, 2005 – Baghdad (Lee Godbolt killed)

10. March 30, 2005 – North of Taji (Eric Toth killed)

11. April 17, 2005 – Baghdad (Sam Huff killed)

12. April 29, 2005 – Baghdad (Charles Cooper, Jr. killed)

13. August 3, 2005 – Baghdad (Jerry Ganey, Jr. killed and John Lamie injured)

14. October 10, 2005 – Baghdad (Jerry Bonifacio, Jr. killed)

15. November 20, 2005 – Taji (Dominic Sacco killed)

16. February 2, 2006 – Taji (Simon Cox, Jr. killed)

17. April 29, 2006 – Radwaniyah (Joshua Hooker injured, Sgt. Steve Sakoda killed)

18. June 4, 2006 – Taji (Daniel Gionet killed)

19. August 27, 2006 – Baghdad (Daniel Dolan killed)

20. October 2, 2006 – Taji (Santos Armijo and James Ellis killed)

21. November 21, 2006 – Baghdad (Henry Kahalewai killed)

22. December 7, 2006 – Baghdad (Kristofer Ciraso killed)

23. December 28, 2006 – Taji (Luis Ayala killed)

24. January 20, 2007 – East of Baghdad (Darryl Booker, David Canegata III, Paul Kelly, Floyd Lake, Sr., Victor Langarica, and Sean Lyerly killed)

25. January 20, 2007 – Baghdad (Ryan Hill killed)

26. April 12, 2007 – Baghdad (Cody Putman killed)

27. May 2, 2007 – Baghdad (Astor Sunsin-Pineda killed)

28. May 24, 2007 – Baghdad (Russell Shoemaker killed)

29. May 30, 2007 – Baghdad (Matthew Baylis killed)

30. June 3, 2007 – Baghdad (Kimel Watt killed)

31. June 18, 2007 – Arab Jabour (Larry Parks, Jr. killed)

32. June 21, 2007 – Baghdad (Daniel Agami, Thomas Leemhuis and Alphonso Montenegro II killed)

33. July 1, 2007 – Baghdad (Victor Garcia killed)

34. July 1, 2007 – Baghdad (Jonathan Rossi killed)

35. July 18, 2007 – Baghdad (Zachary Clouser and Richard Gilmore III killed)

36. August 2, 2007 – Baghdad (Kevin Mowl killed)

37. August 11, 2007 – Arab Jabour (Justin Penrod and William Scates killed)

38. September 4, 2007 – Baghdad (Rodney Johnson killed)

39. September 14, 2007 – Arab Jabour (John Mele II killed)

40. October 5, 2007 – Baghdad (Jason Marchand killed)

41. January 19, 2008 – Arab Jabour (Richard Burress killed)

42. March 22, 2008 – Baghdad (David Stelmat, Jr. killed)

43. May 27, 2009 – Baghdad (Chad Edmundson killed)

"Next, the court must determine whether the killings were 'deliberated,'" which "is simply one undertaken with careful consideration, not on a sudden impulse." *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 491 (D.D.C. 2021) (citing *Salzman v. Islamic Republic of Iran*, No. 172475 (RDM), 2019 U.S. Dist. LEXIS 163632, at *41 (D.D.C. Sep. 25, 2019)). The Rayburn Report details how the attacks at issue were part of a deliberate campaign of attacks against U.S. and Coalition personnel in Iraq, perpetrated by AQI and its associated STGIs and supported by Defendants. *See* ECF No. 26-1 at 4 ("The Iranian government knowingly and as a matter of state policy provided material support to Al Qaeda, Al Qaeda in Iraq (AQI), and other Sunni terrorist groups in Iraq (STGIs) to carry out attacks against U.S. troops and civilians during the U.S.-led Coalition military campaign in Iraq from 2003 to 2011."); 5 (same with Syrian government). Rather than belaboring the point, as set forth in Section III.B., *supra*, Col. Rayburn determined that each of the 39 attacks at issue in this motion were deliberated attacks by AQI and its affiliated STGIs with the support of Iran and Syria.

"Finally, there is no evidence that would suggest that the killings and attempted killings ... were authorized by a judgment of a regularly constituted court or were lawfully carried out under the authority of a foreign nation." *Lee*, 518 F. Supp. 3d at 492. The attacks therefore comprise acts of "extrajudicial killings" under the FSIA.

**4. Defendants each provided material support or resources to AQI enabling it to carry out the 43 attacks at issue in this motion**

To establish this element, "courts consider first, whether a particular terrorist group committed the terrorist act and second, whether the defendant foreign state generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act." *Est. of Parhamovich v. Syrian Arab Republic*, No. 17-cv-61 (GMH), 2022 U.S. Dist. LEXIS 234282, at \*10 (D.D.C. Dec. 28, 2022) (citing *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008)).

The Rayburn Report establishes the first consideration by concluding that each of the attacks was perpetrated by AQI, or an STGI associated with or dominated by AQI. *See* Ex. A at 9-56.

With respect to the second consideration, material support or resources is defined under the FSIA as:

> any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel … and transportation, except medicine or religious materials.

18 U.S.C. § 2339A(b)(1); *see also* 28 U.S.C. § 1605A(h)(3) (defining "material support or resources" for the purposes of the FSIA to have the "meaning given that term in section 2339A of title 18"). Evidence found sufficient to demonstrate a foreign sovereign's material support of a terrorist organization varies, but "successful showings have generally focused on the foreign state's offer of haven to the terrorist group, provision of financing and weapons, assistance with recruitment, or motive to foment unrest in a particular area where the group is operating." *Parhamovich*, 2022 U.S. Dist. LEXIS 234282, at \*11 (internal citation and quotation marks omitted).

38

While Col. Rayburn's report addresses the material support provided by Defendants Iran and Syria in detail, *see* ECF No. 26-1 at 10-36, this Court previously found in the *Pautsch* case that through the expert report of Col. Rayburn in that case in which he made the same findings regarding Iranian and Syrian support for AQI and STGIs affiliated with AQI as he does in his report in this case, that "Plaintiffs have shown that Iran and Syria's provision of material support to AQI and its associated STGIs caused their injuries." 2023 U.S. Dist. LEXIS 215577, at *6. The Court found the following:

> As mentioned earlier, Rayburn concluded that Iran and Syria played a significant role in this [an April 10, 2009 SVBIED attack in Mosul], and similar attacks. *See id.* at 7-8. The specific suicide bomber responsible for the attack was recruited by an AQI facilitation network based in Syria and Iraq, which was set up under Syrian dictator Bashar al-Assad's authority and with the assistance of Syrian government officials and agencies. *See id.* at 49, 36-39. From 2003 onward, moreover, Iran gave material support to Sunni extremist groups to carry out attacks in Iraq, including against U.S. personnel. *See id.* at 22.
>
> Rayburn is far from alone in this judgment. The U.S. Treasury has noted that Iran's Ministry of Intelligence and Security provided money and weapons to AQI and negotiated prisoner releases of AQI operatives. *See* U.S. Dep't of Treasury, *Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism* (Feb. 16, 2012), https://perma.cc//97K2-D567. The Treasury also noted that a senior officer in the IRGC-QF sought to sponsor Sunni groups to carry out suicide bombings, including against U.S. troops. *See* U.S. Dep't of Treasury, *Treasury Designates Individuals, Entity Fueling Iraqi Insurgency* (Jan. 9, 2008), https://perma.cc/S23V-WCSA. The Court finds such evidence to be clearly persuasive.

*Id.* at *13-*14. Based on the findings by this Court in the *Pautsch* case, Plaintiffs submit that the same findings should be applied in this related case based on the same expert findings regarding Iranian and Syrian support for AQI and STGIs affiliated with AQI. This Court may take judicial notice of these findings along with those issued in other cases both inside and outside this District.[4]

---

[4]    *See, e.g., Neiberger v. Islamic Republic of Iran*, No. 16-cv-2193 (EGS)(ZMF), 2022 U.S. Dist. LEXIS 219188 (D.D.C. Sept. 26, 2022) (adopting report and recommendation that Iran provided financial support, logistical assistance, weaponry, and safe haven to AQI); *Parhamovich*

Iran's support for AQI was coordinated primarily through its IRGC-QF and its Ministry of Intelligence and Security ("MOIS"). *See* ECF No. 26-1 at 10, 17, 19. Section 1605A(a)(1) requires the material support to have been provided "by an official, employee, or agent" of Iran, for which the IRGC, IRGC-QF, and MOIS qualify. *See Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 80-81 (D.D.C. 2017) (holding that "it is well-established by courts in this district that MOIS and IRGC are the functional equivalent of Iran, thus qualifying as 'foreign states' as defined by the FSIA"); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 55 (D.D.C. 2019) ("The Court is satisfied that the Qods Force is at least an agent of Iran, if not a part of the government such that individuals working for it would be officials or employees of Iran.").

In its designation of Iran's MOIS for supporting terrorist groups, the U.S. Department of Treasury noted that MOIS "provided money and weapons" to AQI, and "negotiated prisoner releases of AQI operatives." ECF No. 26-1 at 17 (citing Press Release, U.S. Dep't of Treasury,

---

*v. Syrian Arab Republic*, No. 17-cv-61 (GMH), 2022 U.S. Dist. LEXIS 234282, at \*19 (D.D.C. Dec. 28, 2022) (finding "evidence that the Islamic Republic [of Iran] provided material support to the Zarqawi organization during the relevant time period more than sufficient at the default stage" and finding that Syria provide safe haven, training, and facilitated a pipeline of fighters into Iraq on behalf of AQI); *Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 39 (D.D.C. 2023) (finding "Plaintiffs and their expert have sufficiently alleged that Iran's leadership and its Quds Force supported various groups including … JTJ, [and] AQI … in many ways"); *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 75 (D.D.C. 2023) (finding "Iran provided AQI members with documents, identification cards, and passports to facilitate their movements" and "even negotiated the release of AQI operatives from prison"); *Espitia v. Islamic Republic of Iran*, No. 1:21-cv-123, 2022 U.S. Dist. LEXIS 108841, at \*13 (S.D. Tex. June 16, 2022) (holding "[t]he United States and the United Nations have identified a long-standing partnership between Iran and al Qaeda that included harboring Zarqawi and other AQI operatives in a 'safe haven,' as well as providing funds, training, and weapons to al Qaeda operatives in various middle eastern countries, including Iraq"); *Maupin v. Syrian Arab Republic*, No. 17-cv-1213 (CKK), 2019 U.S. Dist. LEXIS 237831 (D.D.C. Mar. 20, 2019) (finding that "Syria provided material support to the Zarqawi Terrorist Organization throughout the relevant time period—roughly 2002 through 2006.  During this period, Syria lent support to a number of terrorist groups by, among other things, providing them safe haven, weaponry, financial support, and even allowing them to open headquarters within Syria"); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 36 (D.D.C. 2016) (finding that Syria "provided material support to Zarqawi and AQI, enabling them to perpetrate these attacks")

40

"Treasury Designates Iranian Ministry of Intelligence and Security for Human Rights Abuses and Support for Terrorism" (Feb. 16, 2012)). The Treasury Department also designated a senior general officer in Iran's IRGC-QF for similar activities. The officer, Ahmed Foruzandeh, was described as having "provide[d] financial and material support for acts of violence against Coalition Forces and Iraqi Security Forces" to Sunni terrorists, in addition to delivering weapons to Iraq from Iran for such attacks by Sunni groups. *Id.* at 17-18 & n.20.

The conclusions related to Syria's support for AQI are further bolstered by the Rayburn Report, which describes how Syria supported AQI during the U.S.-led invasion of Iraq, motivated not only by its interest in undermining U.S. and Coalition forces there, but also to "gain leverage and political influence in the post-Saddam Iraq." *Id.* at 25. This has been Syria's goal historically, which it accomplishes by "sponsoring the militant opposition to each of Syria's neighboring governments," *id.* at 26, even when that support benefited a sect at odds with the Assad regime. *See id.* at 26-27. In fact, according to the Rayburn Report, "Syrian regime support to Al Qaeda in Iraq and similar STGIs terrorist groups was a high policy priority within the Assad regime, emanating from the highest levels of regime leadership. Bashar al-Assad was directly involved in formulating the policy and instructing Syrian government leaders and agencies on implementing the policy." *Id.* at 27. Assad even made his brother-in-law, General Assef Shawkat, the lead for executing the policy via Shawkat's Syrian Military Intelligence directorate, and several other Syrian government agencies also arranged support for AQI. *See id. See also id.* at 30 ("Beyond the intelligence agencies, Syrian ministries and civil administrations also received orders to help Syrians join the jihad in Iraq").

A former Syrian official reported to the Western press that thousands of fighters were given safe passage to cross from Syria into Iraq at the time of the U.S. invasion. *See id.* at 27. Furthermore, "[i]n a hearing before the Senate Armed Services Committee in 2003, then Deputy Secretary of

41

Defense Paul Wolfowitz testified that several foreign fighters killed by U.S. forces in Iraq went there through Syria, and the entry permits on their passports said 'volunteer for jihad,' or 'to join the Arab volunteers,' indicating that Syria was well aware of the jihadi nature of these transient volunteer soldiers as they passed through Syrian borders." *Thuneibat*, 167 F. Supp. 3d at 29 (citing expert report). *See also id.* at 30 ("The State Department's 2005 Patterns of Global Terrorism publication concluded that Syria remained a 'facilitation hub for terrorists operating in Iraq.' In 2007, then-General David Petraeus echoed that Syria acts as 'critical support for the AQI insurgency in Iraq,' and plays a 'pivotal role as the source of foreign fighters entering Iraq.'") (citing record and expert report); *Gates*, 580 F. Supp. 2d at 59 ("Plaintiffs presented expert witness testimony and testimony from an Iraqi countryman concerning Syria's assistance to Zarqawi and al-Qaeda in Iraq. From this evidence, certain conclusions are clear. Syria was the critical geographic entry point for Zarqawi's fighters into Iraq, and served as a 'logistical hub' for Zarqawi. Syria supported Zarqawi and his organization by: (1) facilitating the recruitment and training of Zarqawi's followers and their transportation into Iraq; (2) harboring and providing sanctuary to terrorists and their operational and logistical supply network; and (3) financing Zarqawi and his terrorist network in Iraq.") (citing expert testimony); *Doe v. Syrian Arab Republic*, No. 18-cv-66 (KBJ), 2020 U.S. Dist. LEXIS 167697, at *23 (D.D.C. July 27, 2020)("Beyond a generally permissive attitude toward the terrorist organization, the Syrian government was 'part of an operation to smuggle jihadist volunteers into Iraq from Syria after the 2003 invasion.'") (citing expert report).

Although many of these jihadists returned after the fall of Saddam Hussein, about 5,000 remained, and formed the foreign core of the Sunni terrorist groups operating in Iraq. *See* ECF No. 26-1 at 28. These fighters included Sunni extremists released from Syrian jails for the purpose of fighting in Iraq, many of whom became important leaders and operatives in Sunni terrorist groups

42

operating in Iraq, including AQI. *See id.* at 28-29. They were joined by the remnants of the Iraqi Baathist regime after Saddam fell from power, who Syria supported in mounting terrorist attacks against U.S. and Coalition forces. *See id.* at 30-31. Illustrating this point, the Treasury Department designated Fawzi Mutlaq al Rawi, whom Assad appointed to head the Iraqi branch of the Syrian Baath Party in 2003, for providing financial and material support to AQI. That support included the provision of $300,000, vehicle-borne improvised explosive devices, rifles, and suicide bombers. *See id.* at 31 & n.55 (citing Press Release, U.S. Treasury Dep't, "Treasury Designates Individuals with Ties to Al Qaida, Former Regime" (Dec. 7, 2007)). Al-Rawi also met with senior AQI leaders in Iraq to discuss financing, unifying AQI forces, conducting airborne IED attacks against the U.S. Embassy, and concentrating attacks against the international zone. *See* Press Release.

Plaintiffs must also show that Defendants' material support or resources "caused" their personal injuries. 28 U.S.C. § 1605A(c). That requires "some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered," *Owens*, 864 F.3d at 794, although the provision of material support does not need to "go directly for the specific act." *Id.* at 799. Because material support "is difficult to trace" and "is fungible," courts do not require either specific intent or direct traceability to establish the liability of material supporters of terrorism. *Id.* Instead, there need only be evidence that Defendants' actions were a "substantial factor in the sequence of events that led to the plaintiff[s'] injur[ies]," and that those injuries were "reasonably foreseeable or anticipated as a natural consequence of the defendant's conduct." *Id.* at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)).

The Rayburn Report confirms that Defendants' material support or resources proximately caused the attacks at issue. Col. Rayburn undertook a detailed analysis of each attack, attributed each attack to AQI or its associated STGIs, and submitted proof—in addition to the judicially-noticed

43

factual findings—of how Defendants, through material support or resources, supported AQI and its associated STGIs, and how the attacks were a foreseeable – and desired – result of this support. Central to Col. Rayburn's description of Iran's support for AQI is his explanation of the Iranian regime's goal of "harming the interests of the United States and its allies in the Middle East." ECF No. 26-1 at 11. This goal focused the Iranian regime on Iraq after the U.S. and Coalition forces invaded Iraq to end the regime of Saddam Hussein, when "the Iranian regime sought to prevent the United States and its allies from establishing a friendly government in Iraq or from stabilizing the country on terms favorable to the United States." *Id.* at 16. *See also id.* at 4 ("The Iranian regime's material support to Al Qaeda and other Sunni terrorist groups expanded significantly after the fall of the Saddam Hussein regime in 2003, when Khamenei and other senior Iranian leaders considered it imperative to prevent the United States and its allies from establishing a stable, pro-U.S. state in Iraq."). "Iranian regime leaders viewed the U.S. military presence and political influence in Iraq as a threat to Iranian regime interests, and they also considered Islamist militias and terrorist groups as assets or allies in thwarting U.S. objectives in the region." *Id.* at 16. To this end, Iran materially supported both Shi'a and Sunni extremist groups, including AQI, in carrying out attacks against U.S. and Coalition forces in Iraq. *See id.* at 16-17.

Similarly, Col. Rayburn described how the "Syrian regime considered these attacks to be in its interest not just to undermine the U.S.-led Coalition campaign in Iraq, but also to gain leverage and political influence in the post-Saddam Iraq." *Id.* at 25. *See also id.* at 5 ("Syrian ruler Bashar al-Assad and his regime adopted a policy of enabling AQI and other STGIs to conduct terrorist attacks in Iraq to cause the failure of the U.S.-led military campaign in Iraq and to gain regional political leverage in the post-Saddam Iraq."). Another benefit the Assad regime received in supporting these attacks was that it was able "to actively channel Syrian Sunni extremists'

44

activities outward, against the regime's external enemies, rather than risk having those extremists turn inward against regime rule." *Id.* at 26.

According to the Rayburn Report, "the material support the governments of Iran and Syria provided to AQI and its associated STGIs was essential to these groups' terrorist operations, including their ability to conduct attacks in Iraq." *Id.* at 6. "AQI and its associated STGIs could not have operated effectively in Iraq without the logistical support, territorial safe haven, personnel recruitment, weapons, explosives, training, and other categories of support that the Iranian and Syrian governments provided." *Id.* More specifically, "[w]ithout this indispensable Iranian and Syrian material support, it is highly unlikely AQI and its associated STGIs would have been able to conduct terrorist attacks on a sustainable basis in Iraq, including the attacks against U.S. forces and civilians" included in this case. *Id.* Accordingly, Plaintiffs have demonstrated that Defendants' material support and resources in support of AQI's terrorist activities caused their injuries.

### B. The Court possesses personal jurisdiction over both Iran and Syria

Federal district courts may exercise personal jurisdiction over a foreign state when: (1) the court has subject matter jurisdiction; and (2) the defendant is properly served. *See* 28 U.S.C. § 1330(b). The preceding section shows the basis for subject matter jurisdiction. The second element is also satisfied because Iran and Syria were each properly served.

The four methods of obtaining proper service in FSIA cases are set forth in 28 U.S.C. § 1608. *See* 28 U.S.C. § 1608(a)(1)–(4). Each must be attempted in descending order, but only to the extent feasible in a specific case or applicable to a specific defendant. *See id.* The first two methods—a "special arrangement for service between the plaintiff and foreign state" and "in accordance with applicable international convention"—do not apply here. Plaintiffs have no "special arrangement" for service with Iran or Syria, and neither Defendant is a party to any "international convention on service

45

of judicial documents." *See Thuneibat*, 167 F. Supp. 3d at 37; *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 78 (D.D.C. 2017). Plaintiffs therefore proceeded with the next two steps, via mail pursuant to 28 U.S.C. § 1608(a)(3), and then diplomatic service via the U.S. Department of State as directed by 28 U.S.C. § 1608(a)(4). As described above in Section I, Plaintiffs successfully served Iran and Syria via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4) on May 7, 2024, and April 25, 2024, respectively. *See* ECF Nos. 19 and 20.

Thus, because this Court has subject-matter jurisdiction over this matter, *see supra,* Section IV.A., and since Plaintiffs fully complied with the service requirements of Section 1608(a), this Court has personal jurisdiction over Iran and Syria in this matter. *See* 28 U.S.C. § 1330(b).

## V.    THEORIES OF LIABILITY

"Having concluded that the Court possesses subject matter jurisdiction, little else is required to show that Plaintiffs are entitled to relief." *Fritz*, 320 F. Supp. 3d at 86. Plaintiffs may recover "economic damages, solatium, pain and suffering, and punitive damages" under the FSIA's private cause of action set forth in 28 U.S.C. § 1605A(c), and "[t]here is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity." *Id.* at 86–87 (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017)). "[A] plaintiff that offers proof sufficient to establish a waiver of foreign sovereign immunity under § 1605A(a) has also established entitlement to relief as a matter of federal law—with one minor exception: a foreign state is only liable to 'a national of the United States,' 'a member of the armed forces,' 'an employee [or contractor] of the [U.S.] Government ... acting within the scope of the employee's employment,' or 'the legal representative of' any such person." *Id.* at 87 (citing *Foley*, 249 F. Supp. 3d at 205).

46

Here, the elements of the § 1605A(c) cause of action are all met: (1) Defendants were each designated as State Sponsors of Terrorism at the time of the attacks and remain so designated today; (2) each of the Plaintiffs are U.S. citizens, a member of the armed forces, or a U.S. contractor; and (3) money damages are sought for injuries caused by the attacks.

### A. Estates of Individuals who were killed

Plaintiffs' Amended Complaint states a claim for wrongful death for the estates of Plaintiffs who died in the attacks out of which their claims arise. *See* ECF No. 9 at 344. Under a wrongful-death theory of liability, Plaintiffs have sought "compensatory damages, including physical injuries, extreme mental anguish, pain and suffering and any pecuniary loss (or loss of income to the estates and heirs), under federal common law or, where Plaintiffs are not U.S. nationals under 28 U.S.C. § 1605A(c)(1), the laws of the District of Columbia, Iraq, or the states of such Plaintiffs' primary residence." *Id.* at ¶2823. To the extent that the Court credits the evidence set forth in Col. Rayburn's report regarding the 43 attacks at issue in this motion—and specifically those involving estate claimants in this litigation—Plaintiffs submit that, like the Plaintiffs in *Pautsch*, they have sufficiently proven the validity of their wrongful-death theory of recovery against Defendants Iran and Syria.

### B. Immediate Family Members of those injured or killed in attacks

Plaintiffs' Amended Complaint also states a claim for "loss of solatium and intentional infliction of severe emotional distress" on behalf of the families of Plaintiffs identified in the Amended Complaint as injured or killed. *See id.* at 345. Plaintiffs assert they have suffered "severe emotional distress, extreme mental anguish, loss of sleep, loss of appetite, and other severe physical manifestations, as well as loss of solatium and other harms to be set forth to the trier of fact, under federal common law or, where Plaintiffs are not U.S. nationals under 28 U.S.C. §

47

1605A(c)(1), the laws of the District of Columbia, Iraq, or the states of such Plaintiffs' primary

residence." *Id.* at ¶2827.  This Court previously held in *Pautsch*:

> Under general principles of tort law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress," both to the victim and "to a member of such person's immediate family who is present at the time." *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting *Restatement (Second) of Torts* § 46). Because "terrorism is sufficiently extreme and outrageous" and "intended to inflict severe emotional harm on even those not present at the site of the act," *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 400 (D.D.C. 2015), courts in this district have allowed immediate family members of terrorism victims to state a claim of IIED even if they were not present at the site of the attack. *See, e.g.*, *id.* at 401. Plaintiffs have adequately alleged that they suffered severe emotional distress — namely, severe mental anguish, extreme emotional pain and suffering, and the loss of their family members' society, companionship, comfort, advice, and counsel. *See* Compl., ¶¶ 206, 223, 289. They, accordingly, have stated a valid theory of recovery for their IIED claims as to family members.

2023 U.S. Dist. LEXIS 215577, at *15.

The family-member Plaintiffs here with regard to the 43 attacks at issue in this motion

assert they have also stated a valid theory of recovery in this litigation.

## C.  Individuals who sustained injuries but survived those injuries

In the Amended Complaint, Plaintiffs have asserted a generic claim for "personal injury."

However, "Plaintiffs in § 1605A actions … must articulate the justification for such recovery,

generally through the lens of civil tort liability." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp.

2d 163, 175-76 (D.D.C. 2010).  Survivors of the attacks at issue here—Jerry Oldham (March 9,

2005 attack), John Lamie (August 3, 2005 attack), and Joshua Hooker (April 29, 2006 attack)—

assert claims for assault, battery, and intentional infliction of emotional distress.

The *Restatement (Second) of Torts* § 13 would find Iran and Syria liable for battery if they

intended to "cause a harmful or offensive contact with the person of the other or a third person, or

an imminent apprehension of such a contact" and "a harmful contact with the person of the other

48

directly or indirectly results."  Here, Iran and Syria intentionally provided material support to AQI and its affiliated STGIs specifically to cause harm to, among others, members of the Coalition Forces of whom all of the named Plaintiffs were a part.  Further, all of the survivor Plaintiffs at issue in these 43 attacks sustained harmful contacts in the attacks carried out by AQI or STGIs affiliated with AQI.  As courts have stated, "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear."  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 77 (D.D.C. 2010).  Further, "bodily harm is any physical impairment of the condition of another's body, or physical pain or illness." *Restatement (Second) of Torts* § 15.  Here, each of the survivor Plaintiffs have alleged physical impairment, physical pain, or illness as a result of the attacks at issue in this motion. Plaintiffs submit that battery presents a viable theory of liability in this case.

A lesser theory of liability exists in the tort of assault.  The survivor Plaintiffs submit that the Defendants acted "intending to cause a harmful or offensive contact with … or an imminent apprehension of such a contact" with them that put them "in such imminent apprehension."  *See Akins v. Islamic Republic of Iran*, 332 F. Supp. 3d 1, 35 (D.D.C. 2018) (quoting *Restatement (Second) of Torts* § 21(1)).  Here, beyond simply placing the survivor Plaintiffs in imminent apprehension of harm, the attacks carried out by AQI or STGIs affiliated with AQI caused actual physical harm.  So, while the tort of assault may provide a viable theory of liability, in these cases, it would appear to be subsumed within the actual battery to these Plaintiffs that occurred.

Finally, the survivor Plaintiffs, like the family-member Plaintiffs, assert claims for intentional infliction of severe emotional distress.  These claims would also arise pursuant to *Restatement (Second) of Torts* § 46(1) which states, "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  *See also*

*Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 26 (D.D.C. 2009); *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 400 (D.D.C. 2015).  Because this theory of liability combines both emotional harm and bodily harm, this theory of liability provides a more fulsome potential for recovery for pecuniary, physical, and emotional loss.  And as this Court ruled in *Pautsch*, the survivor plaintiffs in that case stated a valid theory of recovery pursuant to the tort of intentional infliction of emotional distress.

### D.  Punitive Damages

Plaintiffs also seek punitive damages under 28 U.S.C. § 1605A(c), meant to "punish" and "deter" defendants' "outrageous behavior." *Abedini v. Gov't of the Islamic Republic of Iran*, 422 F. Supp. 3d 118, 140 (D.D.C. 2019).[5] This Court has awarded punitive damages in FSIA cases in amounts equal to the compensatory damages awarded. *See Pennington v. Islamic Republic of Iran*, No. 19-cv-796 (JEB), 2022 U.S. Dist. LEXIS 9529, at *18 (D.D.C. Jan. 19, 2022), *vacated on other grounds, motion granted by, judgment entered by*, 2022 U.S. Dist. LEXIS 238886 (D.D.C. May 3, 2022); *Abedini*, 422 F. Supp. 3d at 142. Given the prior stated reasoning in those cases, Plaintiffs respectfully request that the Court award punitive damages utilizing this Court's prior approach should it find Defendants liable for the attacks at issue and ultimately award compensatory damages to Plaintiffs in this case.

### VI.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter default judgment against Defendants Iran and Syria as to liability for the 43 attacks that have been set forth in this motion. Consistent with the Court's instructions, Plaintiffs will file a Status Report with the

---

[5]    The Supreme Court in *Opati v. Republic of Sudan* made clear that punitive damages are not limited to attacks post-dating the 2008 enactment of 28 U.S.C. § 1605A.  *See* 140 S. Ct. at 1603.

Court to identify when they anticipate filing their motion for default judgment as to liability for a second wave of attacks.  Further, Plaintiffs and the Court will address the issue of damages should the Court grant Plaintiffs' motion for default judgment as to liability and whether to appoint a Special Master to address damages in the first instance or whether the Court will do so on its own.

Dated:  February 26, 2025                    Respectfully submitted,

**MOTLEY RICE LLC**

/s/ John M. Eubanks_____
John M. Eubanks (D.C. Dist. Ct. Bar No.
SC0013)
28 Bridgeside Blvd.
Mount Pleasant, South Carolina 29464
Tel.: (843) 216-9000
Fax: (843) 216-9450

Gary Osen (D.C. Bar No. NJ009)
Dina Gielchinsky (D.C. Bar No. NJ011)
Ari Ungar (D.C. Bar No. NJ008)
Michael Radine (D.C. Bar No. NJ015)
Aaron Schlanger (D.C. Bar No. NJ007)
190 Moore Street, Suite 272
Hackensack, New Jersey 07601
Tel.: (201) 265-6400
Fax: (201) 265-0303

*Attorneys for Plaintiffs*