UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

RUBEN FLORES, *et al.,*

     Plaintiffs,

        v.                         Civil Action No. 22-1512 (JEB)

ISLAMIC REPUBLIC OF IRAN, *et al.,*

     Defendants.

## MEMORANDUM OPINION

During the United States' military presence in Iraq between 2003 and 2015, Al-Qaeda in Iraq (AQI) and associated Sunni terrorist groups (STGIs) perpetrated numerous attacks against American servicemembers and civilians. Victims of those attacks, along with their estates and family members, have brought this action against the Islamic Republic of Iran and the Syrian Arab Republic under the terrorism exception to the Foreign Sovereign Immunities Act for these foreign states' material support to the terrorist groups responsible for the attacks. They seek compensatory and punitive damages for their physical, economic, and psychological injuries. Because Defendants have failed to appear, default has been entered. This case encompasses 277 attacks and over 1,000 Plaintiffs. For case-management reasons, Plaintiffs intend to file multiple, sequential motions for default judgment, each covering dozens of attacks. This Opinion assesses the first three Motions for Default Judgment, which ask the Court to find the foreign states liable for injuries caused by 115 distinct attacks. The Court grants the three Motions as to all Plaintiffs except for those whose claims are pending in other previously filed cases in this district.

I.    **Background**

Plaintiffs are U.S. nationals, along with their estates and members of their families, who were serving in Iraq as servicemembers or military contractors when they were injured or killed in terrorist attacks committed by AQI and associated STGIs in Iraq between 2003 and 2015.  See ECF No. 9 (Am. Compl.), ¶¶ 1–2, 223 (attack in 2003), 2811 (attack in 2015).  Ruben Flores, the lead Plaintiff, is the father of one such servicemember.  Id., ¶¶ 200–01, 204.  His son, Jonathan Ruben Flores, was killed in 2005 while stationed near Ramadi, when an improvised explosive device (IED) detonated near his vehicle.  Id., ¶ 201.  Ruben and his family members allege significant mental and emotional pain as a result of Jonathan's death.  Id., ¶ 209.  (On occasion, the Court refers to individuals by their first name for purposes of clarity and not out of any disrespect.)  Other Plaintiffs allege similar harm and also bring claims based on the killing or injury of U.S. military personnel in nearly 300 attacks in Iraq.  The bulk of the attacks occurred between 2004 and 2009.  See generally id., ¶¶ 200–2814.

Plaintiffs filed this suit against Iran and Syria on May 29, 2022, and filed an Amended Complaint nearly six months later.  See ECF Nos. 1 (Compl.); 9 (Am. Compl.).  They sought to serve each state by mailing copies of the summons, Amended Complaint, and notice of the suit to its respective head of the Ministry of Foreign Affairs.  See ECF Nos. 13 (Iran Mailing Req.); 14 (Syria Mailing Req.).  Seven months after unsuccessfully attempting to serve Defendants by mail, Plaintiffs sought service of process by transmitting the same documents to the U.S. State Department for further transfer to Defendants.  See ECF Nos. 16 (Aff. Foreign Mailing); 17 (Req. Clerk); 18 (Cert. Clerk).  State successfully sent the service documents to the Iranian and Syrian Ministries of Foreign Affairs on May 7, 2024, and April 25, 2024, respectively.  See ECF Nos. 19 (Iran Return of Service Executed); 20 (Syria Return of Service Executed).  Neither Iran

nor Syria answered the Complaint.  On July 25, 2024, Plaintiffs requested an entry of default

against Defendants.  See ECF No. 21 (Aff. Default).  The Clerk granted the request the next day.

See ECF Nos. 22 (Iran Entry of Default); 23 (Syria Entry of Default).

Next, Plaintiffs proposed submitting multiple motions for default judgment that

"group[ed] together similar attacks based on chronology [or] geographic location."  ECF No. 25

(Status Rep.) at 3.  The Court adopted Plaintiffs' proposal, see Minute Order of Sept. 11, 2024,

and Plaintiffs moved for default judgment as to liability for 33 of the attacks on October 11,

2024.  See ECF No. 26 (First Mot. Def. J.).  They have submitted two additional Motions for

Default Judgment as to liability: one on November 25, 2024, covering 39 attacks, and one on

February 26, 2025, covering 43 attacks.  See ECF Nos. 33 (Second Mot. Def. J.); 41 (Third Mot.

Def. J.).  Because each Motion implicates similar legal questions and involves some facts

common to multiple Plaintiffs, the Court will consider the three Motions together.

## II.    Legal Standard

Where a defendant is "totally unresponsive" to a summons, complaint, entry of default,

and motion for default judgment, a court may enter default judgment in favor of the plaintiff.

See Gutierrez v. Berg Contracting Inc., 2000 WL 331721, at *1 (D.D.C. Mar. 20, 2000) (quoting

Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980)).  But a plaintiff cannot rely solely on a

defendant's willful lack of response.  "Modern courts are . . . reluctant to enter and enforce

judgments unwarranted by the facts," Jackson, 636 F.2d at 835, and "a district court may still

deny an application for default judgment where the allegations of the complaint, even if true, are

legally insufficient to make out a claim."  Gutierrez, 2000 WL 331721, at *2 (citing Aldabe v.

Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980)).

In a suit brought under the FSIA, a plaintiff must "establish[] his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  The complaint must also allege facts sufficient to overcome the Act's "baseline principle of immunity for foreign states," Turkiye Halk Bankasi A.S. v. United States, 598 U.S. 264, 272 (2023), generally by invoking one of the FSIA's immunity exceptions codified in 28 U.S.C. §§ 1605–1605A.  See Weinstein v. Islamic Republic of Iran, 175 F. Supp. 2d 13, 19–20 (D.D.C. 2001) ("[D]efault judgments under the FSIA require additional findings than in the case of ordinary default judgments.").  The court should not "unquestioningly accept a complaint's unsupported allegations as true" and should "scrutinize [the] plaintiff's allegations" to ensure that they support both the exception to immunity and the legal and factual basis for the plaintiff's claims.  Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204, 211 (D.D.C. 2012).

## III.    Analysis

The Court is satisfied that Plaintiffs have cleared the FSIA's jurisdictional hurdles and established the foreign states' liability.  It addresses each in turn.

### A.    Subject-Matter Jurisdiction

Foreign states are generally immune from suit in federal court, subject to exceptions codified in the FSIA.  See 28 U.S.C. § 1604; see also Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 439 (1989) ("[T]he FSIA provides the sole basis for obtaining jurisdiction over a foreign state in federal court . . . .").  Relevant here is § 1605A, the so-called "terrorism exception" to the FSIA.  See Fraenkel v. Islamic Republic of Iran, 892 F.3d 348, 352 (D.C. Cir. 2018) (citing 28 U.S.C. § 1605A).  Under that exception, the Act abrogates a foreign state's sovereign immunity and provides federal courts with subject-matter jurisdiction over suits against such an entity where (1) "money damages are sought" (2) "against a foreign state for" (3)

4

"personal injury or death that" (4) "was caused" (5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1); see also Gration v. Islamic Republic of Iran, 2023 WL 5221955, at *22 (D.D.C. Aug. 15, 2023).

The first three criteria are easily met. First, Plaintiffs seek money damages. See Am. Compl. at 346. Second, Iran and Syria are foreign states. Third, Plaintiffs allege personal injury and death to servicemembers and military contractors or their family members. Id., ¶ 1. The fourth and fifth criteria require further elaboration.

1.    *Proximate Cause*

To fulfill § 1605A's exception to sovereign immunity, Plaintiffs must demonstrate that each of the foreign states proximately caused their harm — namely, that there is "some reasonable connection between the act or omission of [each Iran and Syria] and the damage which the plaintiff has suffered." Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1128 (D.C. Cir. 2004) (citation omitted). Proximate cause has two elements: Iran's and Syria's actions must have been "a substantial factor in the sequence of events leading to the injury," and "the injury must have been reasonably foreseeable or anticipated as a natural consequence" of those actions. Ben-Yishai v. Syrian Arab Republic, 642 F. Supp. 3d 110, 125 (D.D.C. 2022) (cleaned up).

To show proximate cause, Plaintiffs rely exclusively on a set of expert reports by Colonel (Ret.) Joel Rayburn, former U.S. Special Envoy for Syria and former Deputy Assistant Secretary of State for Near Eastern Affairs. See ECF Nos. 26-1, Exh. A (First Rayburn Report); 33-1, Exh. 1 (Second Rayburn Report); 41-1, Exh. 1 (Third Rayburn Report). The Court thus evaluates the

sufficiency of the Rayburn Reports in demonstrating that Iran and Syria's actions were a

substantial factor in the attacks at issue and that those attacks were reasonably foreseeable.

a.      Substantial Factor

Plaintiffs must show two things: 1) Iran and Syria each "generally provided material

support or resources to the terrorist organization which contributed to its ability to carry out the

terrorist act" at issue; and 2) the "particular terrorist group" did indeed "commit[] the terrorist

act." Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53, 67 (D.D.C. 2008). The Court first

considers whether Plaintiffs have demonstrated that Defendants provided AQI with sufficient

material support to enable those organizations to carry out their attacks. It then turns to whether

those attacks can be attributed to AQI. Because STGIs in the region "were either subordinate to,

affiliated with, or dominated by AQI," the material-support and attribution elements apply

equally to these groups. See First Rayburn Report at 7. Put differently, material support

provided to AQI would effectively constitute support to those affiliated or subordinate groups,

and attacks carried out by those groups could be properly attributed to AQI given their

operational integration. Cf. Pautsch v. Islamic Republic of Iran, 2023 WL 8433216, at *3

(D.D.C. Dec. 5, 2023) (treating AQI and associated STGIs as aligned for liability purposes

where STGIs were "associated with or under the dominant influence of AQI").

i.     *Material Support*

Material support under the FSIA terrorism exception encompasses broad categories of

assistance, including "any property, tangible or intangible," financial assistance, "expert advice,"

"weapons," or organizational aid like "safehouses" and "false documentation." 18 U.S.C.

§ 2339A(b)(1); see 28 U.S.C. § 1605A(h)(3) (referencing § 2339A for applicable definition of

material support). The support "need not 'go directly for the specific act' in order to have

6

proximately caused it." <u>Sibley v. Islamic Republic of Iran</u>, 2025 WL 1928036, at *10 (D.D.C. July 14, 2025) (quoting <u>Kilburn</u>, 376 F.3d at 1130). Instead, if a plaintiff can show that a state's material support allowed a terrorist organization to "grow its membership" and "develop its capabilities," thus enabling the organization to perpetrate more attacks, it can establish proximate cause. <u>Owens v. Republic of Sudan</u>, 864 F.3d 751, 797 (D.C. Cir. 2017). This Court has referred to a foreign state's role in supporting terrorist activities writ large as an "operational-capacity theory" of proximate cause. <u>Sibley</u>, 2025 WL 1928036, at *11.

Plaintiffs contend that prior findings by this Court and others in this district that Iran's support for AQI caused other attacks injuring different plaintiffs "should be applied in this related case." First Mot. Def. J. at 32. The Court may certainly take judicial notice of "evidence submitted in another case," but it cannot rely on prior proceedings "for the purpose of accepting the truth of the earlier court's findings and conclusions." <u>Baker v. Islamic Republic of Iran</u>, 2025 WL 2480075, at *5 (D.D.C. Aug. 28, 2025) (quoting <u>Sibley</u>, 2025 WL 1928036, at *15). That is the case even where other courts have found liability for some of the same attacks at issue in Plaintiffs' Motions. <u>See, e.g.</u>, ECF No. 46-1, Exh. 1 (Not. Similar Cases) at 4, 7 (notifying Court that certain attacks in this case were included in previously filed case, <u>Martino v. Islamic Republic of Iran</u>, No. 21-1808, and that <u>Martino</u> court issued default judgment as to liability for those attacks).

Plaintiffs nevertheless put forth sufficient evidence for the Court to conclude that Iran provided AQI with support that increased its overall ability to commit terrorist acts. Plaintiffs' expert cites a U.S. Treasury Press Release detailing how Iran funneled money, weapons, and documents like passports to AQI members. <u>See</u> First Rayburn Report at 17. The report further shows that Iran provided safe haven for Abu Musab al-Zarqawi, a terrorist leader who

"sheltered" in Iran before moving to Iraq to "establish a new base" for the group that would become AQI.  Id. at 16; see Owens, 864 F.3d at 797 (permitting group to "organize its terrorist enterprise in a stable safe haven" is substantial factor in group's later attacks).  Such evidence persuasively indicates that Iran provided tangible and intangible resources to AQI that significantly aided the organization's growth.  The Court is thus convinced that Iran's support enabled AQI to plan and execute more attacks of higher lethality against Americans.  For that reason, the Court finds that Plaintiffs have sufficiently demonstrated the causal link between Iran's support of AQI and AQI's ability to carry out attacks, including those at issue in this case.

Plaintiffs also offer evidence that Syria supported AQI during the years preceding the attacks against them.  Citing a Syrian official's account of the state's facilitation of terrorist fighters across the Syria-Iraq border, Rayburn credits Syria with enabling "the foreign core of the Sunni terrorist groups operating in Iraq."  First Rayburn Report at 28.  More concretely, Syria released "a large number of Sunni extremists from Syrian jails" in early 2003, many of whom "became important leaders and operatives in AQI and other STGIs."  Id.  The Rayburn Report relies on AQI documents to explain the "extensive terrorist facilitation network in Syria," id. at 31, which Syrian government officials enabled by overseeing "the formation of terrorist cells" in Syria and "help[ing] those cells cross into Iraq."  Id. at 33.  Syria's ample support of the personnel who would make up and lead AQI "increased the capacity" of AQI to "perpetrate attacks" such that this Court finds that Syria proximately caused any attacks attributable to AQI in the relevant time period.  Sibley, 2025 WL 1928036, at *11.

ii.    *Attribution*

Plaintiffs must also establish that AQI or its associated groups committed each of the attacks against them.  Their expert concluded with a "high degree of confidence" that AQI was

8

responsible for each specific attack.  <u>See</u> First Rayburn Report at 3.  He referred to five variables in evaluating the likelihood that AQI was responsible for all of them: claims of responsibility by AQI, investigative findings by government agencies, the area of the attack, the date of the attack, and the method of the attack.  <u>Id.</u> at 36.  After "considering these variables together," <u>id.</u> at 39, and cross-referencing known facts about where AQI was present in Iraq, its typical targets, and its usual practices for carrying out attacks, Rayburn concluded that it was "highly likely" that each could be attributed to AQI.  <u>Id.</u> at 40; <u>see also id.</u> at 37–39 (explaining persuasive variables like access to "signature weapons" that can indicate certain group's responsibility for an attack).

There are 115 attacks at issue across Plaintiffs' three Motions, each of which is detailed in Plaintiffs' briefing in support of their Motions and in their expert reports offered as evidence.  <u>See, e.g.</u>, First Mot. Def. J. at 12–25; First Rayburn Report at 42–78.  Rather than describe every attack, the Court has identified certain characteristics that, standing alone, are sufficient to show that an attack is likely attributable to AQI and which of the attacks at issue have that characteristic.  These overlap significantly with the aforementioned Rayburn variables.

(a)    Claims of Responsibility

The most straightforward characteristic that implicates AQI responsibility is the organization's claiming of responsibility for an attack.  When this occurs, the claim indicates with a "reasonable degree of accuracy" that the organization actually conducted the attack.  <u>See</u> First Rayburn Report at 37.  Courts in this district have relied on similar expert findings regarding claims of responsibility to trace the throughline from an attack to AQI to Iranian or Syrian support.  <u>Martino v. Islamic Republic of Iran</u>, 2025 WL 2107655, at *29 (D.D.C. July 23, 2025) (relying on AQI claim of responsibility to connect Iran to attack); <u>Thuneibat v. Syrian Arab Republic</u>, 167 F. Supp. 3d 22, 36 (D.D.C. 2016) (same for Syria).  As Rayburn explained,

"Terrorist groups sometimes made claims of responsibility following an attack to gain prestige and influence."  First Rayburn Report at 37.  Those claims carry particular evidentiary weight because "a group would face humiliation and a loss of credibility if [a] false attempt were to be exposed."  Id.  AQI's pattern of occasionally denying responsibility for other attacks further supports the reliability of its affirmative claims.  Id.

  For example, on May 6, 2004, U.S. Army Staff Sergeant Hesley Box, Jr., was manning a checkpoint on July Bridge in Baghdad when a small taxi loaded with explosives detonated, immediately killing him.  See Third Rayburn Report at 10.  Shortly thereafter, Jama'at al-Tawheed wa'al-Jihad (JTJ) — AQI's antecedent organization — issued a statement claiming responsibility for carrying out the detonation of the explosive device.  Id.  On August 3, 2005, Sergeant Jerry Ganey, Jr., and John Lamie were manning a checkpoint on a road into Baghdad when an approaching vehicle detonated, killing Ganey, injuring Lamie, and causing significant damage to an M113 armed personnel carrier.  Id. at 20.  The next day, AQI spokesman Abu Maysara Al-Iraqi issued a statement claiming responsibility for what he described as a successful "harvest" that targeted American soldiers and destroyed a personnel carrier.  Id. at 21.  In both instances, the Court can conclude with a high degree of likelihood that AQI was responsible for the attacks.

Rayburn's comprehensive analysis reveals extensive additional claims of responsibility similarly linking AQI and other STGIs to numerous attacks that inflicted American casualties throughout the conflict.  See First Rayburn Report at 67 (Ansar al-Sunna prepared video claiming responsibility for attack on Sean Crippen, Cory Hewitt, William Jacobsen, Jr., Robert Johnson, Nicholas Mason, Julian Melo, Lynn Poulin, Sr., and Darren VanKomen); Second Rayburn Report at 16 (JTJ issued communique claiming responsibility for attack matching

details of mortar attack on Trace Dossett and Ronald Ginther), 19 (AQI posted online statement claiming responsibility for attack on George Geer), 20–21 (AQI spokesman posted online statement that "Martyrdom Battalion" carried out attack on Andrew Bossert and Michael Franklin), 30 (AQI posted online statement claiming responsibility for attack in vicinity of one on Jonathan Flores and Chad Maynard), 33 (Ansar al-Sunna issued communique claiming responsibility for attack on Nathaniel Rock), 43 (AQI issued statement claiming responsibility for helicopter attack on Gerald Bloomfield II); Third Rayburn Report at 11 (chief spokesperson for JTJ issued statement claiming responsibility for attack on Thomas Rosenbaum), 13–14 (Abu Maysara Al Iraqi issued statement claiming responsibility for "martyrdom operation" attack on Justin Yoemans), 15 (AQI issued multiple statements for attack on Jerry Oldham), 25 (STGI claimed responsibility for IED attack on Daniel Gionet), 32 (AQI claimed responsibility and issued statement for attack on Darryl Booker, David Canegata III, Paul Kelly, Floyd Lake, Sr., Victor Langarica, and Sean Lyerly), 46–48 (Islamic State of Iraq issued claim of responsibility for coordinated "Dignity Plan" attack on Daniel Agami, Thomas, Leemhuis, and Alphonso Montenegro II), 51–52 (Islamic State of Iraq issued claim of responsibility for coordinated "Dignity Plan" attack on Zachary Clouser and Richard Gilmore III).

*(b)*    Sophisticated IEDs

Another strong indicia of AQI responsibility is the use of sophisticated IEDs, including vehicle-borne improvised explosive devices (VBIEDs).  Rayburn documents that AQI and other STGIs were among the only groups in Iraq that had the resources and training to construct massive IEDs.  See First Rayburn Report at 38–39.  AQI and other STGIs developed a signature weapon by packing IEDs in vehicles driven by suicide bombers to create suicide vehicle-borne

11

improvised explosive devices (SVBIEDs).  An attack with sophisticated IED use can thus likely be attributed to AQI.

Rayburn notes that "Zarqawi and his forces were the foremost employers of suicide terrorism in Iraq," making SVBIED attacks against U.S. forces a common AQI tactic.  Id. at 44; see also Kenneth Katzman, Cong. Rsch. Serv., RL32217, Al Qaeda in Iran: Assessment and Outside Links 10 (2008) (U.S. military spokesman in Iraq noting that AQI "was responsible for 80 to 90% of the suicide bombings in Iraq").  Planted IEDs were particularly useful for AQI cells to attack Coalition supply routes or prevent Coalition forces from accessing AQI centers of operations.  See Third Rayburn Report at 10.  Plaintiffs' expert connects AQI and STGIs to these devices by showing that they were the groups' preferred tactic, id., and by demonstrating that successful use of these weapons required the freedom of movement to implant explosives, which only AQI and its affiliates had.  Id. at 32.

The connection between AQI and various IEDs is well established.  Courts in this district have observed that "AQI's leadership [was] known to carry out vehicle-borne improvised explosive device ('VBIED') and SVBIED attacks."  Est. of Fishbeck v. Islamic Republic of Iran, 2024 WL 5375593, at *2 (D.D.C. Dec. 9, 2024); see also Fissler v. Islamic Republic of Iran, 2022 WL 4464873, at *3 (D.D.C. Sept. 26, 2022) (VBIED attacks are "a hallmark of Iranian involvement; Iranian proxies have committed substantially similar attacks across the Middle East.  Such assaults require extensive funding, explosive materials, technical acumen, and coordination.").  The Court is persuaded that attacks involving sophisticated IED use, either by using a vehicle to house the IED or by constructing a powerful enough IED to threaten armored military vehicles, were likely perpetrated by AQI or other STGIs.  See First Rayburn Report at 59 (Sean Huey), 65 (Charles Soltes, Jr.), 70 (Adam Plumondore), 72 (Anthony Davis, Jr.), 73

(Aaron Seesan); Second Rayburn Report at 10 (Jason Chappell), 21 (Charles Wells, Jr.) 25

(Jonathan Grant and Jourdan Grez), 31 (Veashna Muy), 53 (Keith Bennett); Third Rayburn

Report at 13 (Ronald Baker).

*(c)*    Investigative Findings

Official investigative findings of AQI responsibility from the military and government

agencies offer a third feature that, standing alone, can persuasively indicate AQI responsibility.

This Court has recognized the reliability and probative force of comparable investigative

conclusions, finding them "admissible and highly valuable . . . when they reflect official

investigations that touch on the attacks in question." Sibley, 2025 WL 1928036, at *5; see also

Cabrera v. Islamic Republic of Iran, 2022 WL 2817730, at *18 & n.18 (D.D.C. July 19, 2022)

(explaining that "[a]fter the death of an active-duty soldier, the U.S. Army typically conducts an

official investigation," the results of which often contain "the military chain of command's final

assessment of the facts and circumstances of the death" and therefore can "provide more than

enough information to attribute an attack to a particular terrorist group"); Karcher v. Islamic

Republic of Iran, 396 F. Supp. 3d 12, 37, 44–45 (D.D.C. 2019) (relying on forensic evidence

retrieved by military investigators to infer certain type of explosive device used); Fritz v. Islamic

Republic of Iran, 320 F. Supp. 3d 48, 59 & n.3 (D.D.C. 2018) (crediting military and government

reports); see also Owens, 864 F.3d at 792 (same).

A 2007 attack illustrates the value of subsequent military assessments.  On June 18, U.S.

Coalition units were preparing to conduct an operation in the Arab Jabour region south of

Baghdad when an M1A1 Abrams tank struck an IED.  See Third Rayburn Report at 44–45.

Private First Class Larry Parks, Jr., the gunner for the M1A1, died from craniofacial and lung

injuries sustained in the blast.  Id. at 44.  One military assessment connected attacks in the region

13

to AQI, observing that "there were zero Iraqi Police, Iraqi Army, or government structure in the area" and that the "combination of an all Sunni population, thick palm groves that concealed activity, and an absence of security forces created a sanctuary for [AQI]."  Id.  AQI had a particular interest in controlling various means of travel from Arab Jabour to Baghdad "to provide fighters and supplies to AQI cells inside Baghdad."  Id. at 45.  In another incident on September 14, 2007, an army platoon conducting area-clearance operations in preparation for Operation Marne II triggered an IED while inspecting a building, killing Sergeant John Mele II. Id. at 57.  A CENTCOM report described the operation's objective as "designed to defeat AQI extremists in Arab Jabour" through clearing operations that would disrupt AQI's efforts to rebuild the leadership and logistical infrastructure previously dismantled by U.S. forces.  Id.

Rayburn's analysis draws on additional military and intelligence reports to establish AQI and STGI responsibility for other attacks documented in this case.  See Third Rayburn Report at 35 (intelligence report finding AQI cell responsible for attack on Private First Class Ryan Hill), 55 (Coalition commander concluding AQI dominant threat in Arab Jabour attack on Specialist Justin Penrod and Staff Sergeant William Scates), 62 (military assessment concluding nature of IED attack on David Stelmat, Jr., suggested AQI responsibility), 63 (military intelligence assessment finding AQI responsibility for attack on Specialist Chad Edmundson based on IED analysis).

(d)    Geography and Timing

Perhaps the most important indicators grounding the expert's reports are timing and location.  Plaintiff's expert provides compelling evidence that AQI was responsible for several attacks because they occurred in areas where AQI or affiliated STGIs either exercised control or were in pursuit of a specific objective.  See generally First Rayburn Report at 37–38.  Rayburn's

14

accounts provide a detailed examination of specific operations, territorial dynamics, and temporal developments throughout the protracted Iraq war.  Rather than relying on conclusory labels, unsupported geographic assertions, or an arbitrary constellation of dates, his comprehensive treatment of the conflict's evolution provides the kind of evidence that enables courts to make informed determinations about complex insurgency dynamics.  Compare Sibley, 2025 WL 1928036, at *8 (declining to credit cursory and unsubstantiated references to "strongholds" to attribute attacks to Taliban and Iran), with Cabrera, 2022 WL 2817730, at *13–15  (accepting expert report providing granular district-level assessments of territorial control and explaining operational differences between insurgent groups).

　　　　Several of the attacks, for example, took place during the Second Battle of Fallujah, also known as "Operation Phantom Fury."  First Rayburn Report at 46–47.  Rayburn meticulously chronicles how Fallujah became "the epicenter of the Sunni insurgency in Iraq," id. at 40, from August to December 2004, and explains the sequential events that led to AQI's dominance in the city.  Id. at 40–42.  His analysis begins with a failed April 2004 Coalition operation, showing how the aborted mission created a power vacuum that Abu Musab al-Zarqawi and JTJ exploited by establishing Fallujah as their headquarters and primary base of operations.  Id. at 41.  The August 2004 Shi'a uprising by Moqtada al-Sadr's Jaysh al Mahdi militia strategically diverted Coalition resources away from Fallujah, allowing Zarqawi to further consolidate power.  Id. at 42.  Only after Coalition forces defeated Jaysh al Mahdi in late August could they redeploy troops to the Fallujah area and begin preparations for what would become Operation Phantom Fury.  Id. at 42–43.  As one U.S. official stated, "[C]atching Abu Musab al-Zarqawi, who was said to be operating in the city, was 'the highest priority.'"  Pablo Villa, U.S. Army, November, 2004 – Into the Hot Zone at the Second Battle of Fallujah (2019), https://perma.cc/V4A7-N75W.

Numerous individuals were killed or injured in AQI and STGI attacks spanning the lead-up to and execution of Operation Phantom Fury.  <u>See</u> First Rayburn Report at 42 (Dean Pratt), 43 (Jesus Cervantes-Barroso), 44 (Jesssica Cawvey), 45 (John Lukac and Andrew Riedel), 48 (Jesus Martinez, Kenneth Distelhorst, and William Silcox, Jr.), 49 (Justin Reppuhn), 50 (Kyle Burns), 51 (James Matteson and Mason Fisher), 52 (Nicholas Ziolkowski), 53 (Christopher Heflin, Jonathan Volz, and Alexander Sargent), 54 (Demarkus Brown), 55 (Jeffery Blanton, Melvin Blazer, Jr., Jason Clairday, Ian Stewart, and Jeffrey Kirk), 58 (Michael Anderson), 59 (Sean Huey), 61 (Marvin Trost III).

After Operation Phantom Fury, AQI "consolidated control of the Sunni insurgency" in certain areas of Anbar Province.  <u>See</u> Second Rayburn Report at 23.  Rayburn concludes, and the Court agrees, that AQI's dominance supports the conclusion that post-Operation Phantom Fury attacks in AQI-controlled areas were likely perpetrated by AQI.  <u>Id.</u> at 22 (Justin Hendrickson), 26 (Jonathan Smith), 27 (Casey Byers and Neil Prince), 28 (Terry Ball), 36 (William Evans), 38 (Thomas Byrd and Timothy Watkins).

Plaintiffs' expert report also links AQI to certain attacks based on its dominance in specific areas at particular times.  For example, Rayburn notes that in the fall of 2004 AQI was "the overwhelmingly dominant insurgent group operating in the Fallujah-Ramadi corridor," and "[a]ll the insurgent groups" in the corridor at that time "were either part of [AQI] or were operating in close coordination with it."  Second Rayburn Report at 17.  He thus concludes that attacks within the corridor during that time period were "highly likely" to have been carried out by AQI.  <u>Id.</u> (Joshua Titcomb).  He applies the same reasoning to other periods of complete or near-complete control by AQI.  <u>Id.</u> at 18 (Joseph Nolan), 23–24 (attack on Aaron Cepeda likely carried out by AQI or STGI Ansar al-Sunna because groups controlled area and "had entered

into an agreement to work together"), 29 (AQI likely responsible for attack on Joshua Klinger in Fallujah because it was "dominant insurgent force" and other insurgent group leaders had "pledged their allegiance" to AQI), 32 (Tricia Jameson and Clifton Mounce), 35–36 (AQI and an affiliated STGI had "near-complete control" over area where attack on William Wightman, Aaron Reed, David Kreuter, and Nicholas Bloem occurred), 37 (Shayne Cabino), 39 (Norman Anderson III), 40–41 (attack on Seamus Davey can be attributed to AQI when it took place within "an AQI 'state within a state'"), 45–46 (AQI responsibility for attack on Christopher McCrackin likely when area was "completely under AQI's control"), 47 (Nickolas Schiavoni), 50 (Miguel Terrazas), 55 (George Lutz II); First Rayburn Report at 64 (Paul Mardis, Jr.), 71 (attack on Frank Hernandez occurred in Tal Afar, where AQI had "held the city for months"), 73 (Randy Collins), 75 (Hoby Bradfield, Jr.).  In at least two instances, Rayburn points to the freedom of movement AQI leaders had within an area as evidence of its control.  See Second Rayburn Report at 42 (attack on Michael Hodshire), 55–56 (George Lutz II).

Beyond documenting specific campaigns or areas of control, Plaintiffs' expert report examines AQI and STGIs' overarching strategy to destabilize Iraq's then-nascent democratic institutions by carrying out attacks against Coalition forces.  His report demonstrates how these organizations pursued a coordinated strategy to control Baghdad — the seat of Iraq's emerging government — and create an "Islamic State of Iraq."  Third Rayburn Report at 8.  Insurgent groups pursued that strategy through distinct operational phases: preventing elections and government formation (2004–2005), disrupting parliamentary functions through car-bomb campaigns (spring 2005), attempting to derail constitutional referendums (fall 2005), and desperately defending territorial holdings against the surge offensive from Iraqi Security Forces and the Sunni tribal "awakening" movement (2007–2008).  Id. at 8–10.  Rather than treating

Baghdad as a monolithic target, Rayburn provides granular analysis of attacks in specific neighborhoods, explaining how geographic and temporal factors indicate AQI or other STGI responsibility for particular incidents.  His methodology also encompasses AQI's "belt" strategy, examining attacks in areas surrounding Baghdad that were designed to control key transportation routes and chokepoints, thereby isolating the capital and maximizing the insurgents' ability to disrupt both government operations and civilian life.  Id.

Within Baghdad, for example, Rayburn noted that Dora was a southwestern neighborhood that "transitioned from a mixed-sect neighborhood to a majority-Sunni neighborhood in a matter of months," which provided AQI with freedom of movement and support from the local population.  Id. at 30.  AQI's presence in Dora had become so pervasive that U.S. forces launched Operation Dragon Hammer to prevent the neighborhood from serving as a safe haven.  Id. at 53.  While less pronounced, Rayburn also explained that AQI and its affiliates seized control of two areas west of Baghdad — Ghazaliyah and its sister neighborhood, Ameriyah — establishing bases to conduct attacks against Coalition forces and Iraqi Security Forces.  Id. at 27–28, 31.  The many attacks that took place in these Sunni-controlled neighborhoods accordingly can reasonably be traced to AQI and other STGIs.  Id. at 19 (Sam Huff), 22 (Jerry Bonifacio, Jr.), 27 (Daniel Dolan), 29 (Henry Kahalewai), 31 (Kristofer Ciraso), 39 (Astor Sunsin-Pineda), 42 (Matthew Baylis), 49 (Victor Garcia), 50 (Jonathan Rossi), 53 (Kevin Mowl), 56 (Rodney Johnson), 59 (Jason Marchand).

AQI commanders also pursued a comprehensive strategy to isolate Baghdad by seizing control of the surrounding countryside and the primary transportation corridors leading into the capital from the north, west, and south "belts."  Id. at 8.  The most prominent of these was a northern zone between Taji and Tarmiyah, which controlled traffic from Baghdad to Tikrit and

Mosul.  Id.  Coalition forces depended on this critical supply corridor, making it a high-priority target for AQI attacks on U.S. troops.  See id. at 12 (David Johnson), 18 (Eric Toth), 23 (Dominic Sacco and Simon Cox, Jr.), 28 (Santos Armijo and James Ellis), 32 (Luis Ayala).

To the west, AQI controlled another belt by securing the highway corridors from Anbar into Baghdad, focusing on areas near the Baghdad airport such as Abu Ghraib and Radwaniyah. Id. at 8.  Rayburn highlighted the tactical value of controlling this area, noting that "AQI often tried to attack the Coalition's main supply and aviation routes leading into Baghdad, such as the highways and air routes connecting the Coalition's theater logistics base at Balad with its main headquarters base at Camp Victory (and the Baghdad airport)."  Id. at 10.  The necessity of using these transportation corridors for military logistics ensured a steady flow of American targets and made this belt a particularly deadly zone for Coalition personnel, as evidenced by the frequency of attacks in this area.  Id. at 14 (William Manuel), 17 (Lee Godbolt), 20 (Charles Cooper, Jr.), 24 (Joshua Hooker), 43 (Kimel Watt).

Finally, AQI's southern belt comprised Arab Jabour, Hor-Rajab, and the districts of northern Babil Province known to Coalition troops as the "triangle of death."  Id. at 8–9.  Arab Jabour held particular significance for AQI because the organization used it as a staging area to funnel resources and personnel into Baghdad, with military assessments noting that AQI sought to control various means of travel from Arab Jabour to Baghdad to "provide fighters and supplies to AQI cells inside Baghdad."  Id. at 45.  Rayburn explained that "[b]ecause of AQI's [] ability to operate in Arab Jabour and the surrounding region without interference for so long, it had created complex obstacle belts of deeply buried IEDs throughout the area."  Id.  Those obstacles, along with AQI's resolve to maintain control of this region, precipitated several attacks.  Id. at 16 (Jonathan Hughes), 36 (Cody Putman), 60 (Richard Burress).

In sum, Rayburn's report provides compelling evidence that attacks in areas where AQI or other STGIs either exercised control or were in pursuit of a specific objective can be linked to those organizations. His analyses go well beyond cursory territorial claims, tracing how AQI and STGIs systematically exploited power vacuums and documenting the organizations' territorial evolution across distinct operational phases. Given this detailed territorial and temporal analysis, the evidence sufficiently demonstrates that AQI and STGIs were likely behind the attacks at issue.

*(e)* Complex Attacks

The fifth characteristic that is highly indicative of AQI responsibility is a complex attack — that is, an attack with an explosive weapon like an IED "combined with small arms fire" delivered by individual combatants. See First Rayburn Report at 39. For example, one attack coordinated the use of small-arms fire to shoot an armored vehicle, thus forcing its passengers to get out, before detonating an IED. See Second Rayburn Report at 12–13 (describing attack on April 9, 2004, in Ramadi, Iraq). Executing this type of "sophisticated and strategically well-orchestrated" attack requires an "understanding of urban warfare," id. at 13; according to Rayburn, AQI and its affiliates had the requisite knowledge to carry out such an attack, where other insurgents in the region did not. Id.

Small-arms fire can also signal that a group has "an operating base in the vicinity" of the attack because individual combatants must be in place prior to the attack and have some freedom of movement in the area. Id. at 19. When a complex attack occurs where only AQI and its associated organizations have established an operating base, AQI's responsibility can be inferred. See, e.g., id. So, too, is AQI's responsibility more likely for an attack in its territory

when the attackers fire from multiple "well-prepared positions" and employ tactics that "could only be taken by a force that is in control" of the area.  Id. at 50.

Other courts have credited similar reasoning when finding complex attacks attributable to AQI.  See, e.g., Roth v. Islamic Republic of Iran, 651 F. Supp. 3d 65, 90 (D.D.C. 2023) (attributing attacks to AQI that were "so sophisticated that only AQI could have carried them out at the time because other militias were not yet operating with this level of strategy, accuracy, or coordination"); Martino, 2025 WL 2107655, at *29 (complex attacks indicate "sophistication," "experience," and a "well-resourced group" consistent with AQI responsibility).  Rayburn's definition of a complex attack as one integrating small-arms combat with explosives effectively narrows the universe of terrorist organizations that could be responsible for any particular act.  Compare First Rayburn Report at 39, with Sibley, 2025 WL 1928036, at *8 (refusing to credit reference to complex attack when expert "does not define what constitutes a 'complex' attack"). The Court thus finds that Plaintiffs have satisfactorily alleged AQI's responsibility for complex attacks implicated in the pending Motions.  See First Rayburn Report at 65 (Brandon Read), 66 (David Mitts), 69 (Brian Mack), 74 (Christopher Kilpatrick), 76 (Anthony Yost); Second Rayburn Report at 11 (Aric Barr; Eric Ayon), 14 (John Sims, Jr.), 18 (Stephen Benish), 48 (Donald McGlothlin and Joshua Ware), 51 (Neil Frustaglio), 54 (Michael McMullen).

*(f)*    Combination

Of the 115 attacks implicated in Plaintiffs' Motions, only two do not contain one of the five previously discussed characteristics indicative of AQI responsibility.  For those attacks, the Court considers the combination of attack characteristics and concludes that Plaintiffs have nonetheless satisfactorily demonstrated AQI's responsibility.

On December 28, 2003, an American servicemember was traveling in a vehicle when an IED detonated, causing head, arm, and shoulder injuries. See Second Rayburn Report at 9–10 (Ernesto Blanco). The attack occurred before AQI had consolidated control in certain areas of Anbar province, so location alone did not signal AQI responsibility. Compare id. at 10 (AQI leader was "increasing his targeting of U.S. troops" in area of 2003 attack), with id. at 20 (by January 2005 attack, AQI "dominated" insurgency and "had consolidated its control" in section of Anbar Province). Nor did the attack involve a vehicle-based IED, which would similarly have implicated AQI. See supra Section III.A.1.a.ii(b). The Court is persuaded, nevertheless, by Plaintiffs' expert's assessment that the 2003 attack was "highly likely" caused by AQI. See Second Rayburn Report at 10. The combination of: 1) the attack's timing shortly after an offensive campaign by AQI against the United States; 2) the use of an IED, which was common among other AQI attacks around that time; and 3) AQI's increasing presence in the geographic area of the attack sufficiently demonstrate a high likelihood of AQI responsibility. Id.

On May 24, 2007, another American soldier was killed when his vehicle struck an IED while driving through the Rashid District of Baghdad. See Third Rayburn Report at 40 (Russell Shoemaker). As Plaintiffs' expert concedes, control over this area was difficult to pinpoint. The western part of the district was dominated by Shi'a militias and the eastern part by AQI, but "a dividing line such as Route Jackson did not indicate that attacks happening to the east were conducted by AQI and to the west by Shi'a militias." Id. Rayburn, however, provides compelling evidence attributing the attack to AQI. While control was contested in the area, the attack still occurred within the East Rashid District, an area with a stronger AQI presence. Id. at 41. The attack, furthermore, involved a "large, buried IED." Id. That kind of IED was similar

to those used in other AQI attacks, while Shi'a groups at the time had started turning toward explosively formed penetrators as their weapon of choice.  Id.

In sum, Rayburn provides compelling circumstantial detail to connect the December 2003 and May 2007 attacks to AQI or other STGI activity.  These analyses, therefore, sufficiently demonstrate that AQI or an AQI-affiliated group was likely behind the attacks at issue.

          b.        Reasonably Foreseeable

Satisfied that Plaintiffs have demonstrated with a high degree of likelihood that AQI, enabled by Defendants' support, carried out the attacks against them, the Court turns to whether Defendants could have reasonably foreseen those attacks and their resulting injuries.  See Owens, 864 F.3d at 797 (even if foreign state's support was "significant factor," it did not proximately cause attack unless it was "reasonably foreseeable or anticipated as a natural consequence" of that support).  Plaintiffs need not show that Defendants could have anticipated the specific circumstances of each attack so long as the "broader context of [the foreign states'] actions" would "support[] an inference" that AQI and other groups had "terrorist aims."  Id.

Rayburn asserts that Iran predicted and desired AQI attacks against American servicemembers.  See First Rayburn Report at 11 (Iranian government "had a policy of supporting [AQI and other STGIs] as a means of harming the interests of the United States").  He points to evidence that Iranian government officials met with "senior Al Qaeda members" in an attempt to "cooperate against their mutual enemies," including the United States, as early as the 1990s.  Id. at 12.  Iran later proposed forming "a formal alliance against the United States," id. at 13, and "sought to prevent the United States and its allies from establishing a friendly government in Iraq" from the outset of the United States' 2003 military campaign.  Id. at 16.

Plaintiffs have sufficiently demonstrated that Iran anticipated that its support for AQI would lead to precisely the type of attacks against American servicemembers and civilians that took place.

Plaintiffs have similarly shown that the attacks that caused their injuries were a reasonably foreseeable consequence of Syria's support for AQI.  During the early 2000s, Syria maintained a "[d]eliberate [p]olicy" of supporting AQI and other STGIs "as part of a strategy to oppose the objectives of the United States."  Id. at 25.  Rayburn credibly asserts that Syria intentionally "released a large number of Sunni extremists from Syrian jails to allow them to fight in Iraq" against the United States.  Id. at 28.  The release was "part of [Syria's] decision to sponsor jihadis against" the United States.  Id.  Plaintiffs put forth evidence that Syria supported AQI's "extensive terrorist facilitation network" between 2003 and 2011 by enabling border crossings into Iraq, channeling funds to AQI, and providing AQI with resources designed to inflict widespread casualties, like car bombs and suicide bombers.  Id. at 31.  The Court finds that Syria would have reasonably foreseen that its support of AQI would prompt attacks against Americans in Iraq.

>            2.    *Extrajudicial Killing*

Even if Defendants proximately caused the attacks at issue, Plaintiffs can surmount the obstacle of sovereign immunity only if the deaths and injuries in their claims arose from "an act of . . . extrajudicial killing."  28 U.S.C. § 1605A(a)(1).  That hurdle is not difficult to clear for most claims.  Plaintiffs — servicemembers, military contractors, and their family members — each allege personal injury and death stemming from AQI or affiliated STGI attacks that resulted in the death of at least one Coalition forces member.  See First Mot. Def. J. at 28–29; Second Mot. Def. J. at 37–38; Third Mot. Def. J. at 35–37.  As to those who died, "if a soldier is killed in a terrorist [attack], her death is an extrajudicial killing."  Cabrera v. Islamic Republic of Iran,

2023 WL 1975091, at *11 (D.D.C. Jan. 27, 2023). As to those who were injured, the terrorism

exception "contemplates actions brought by a plaintiff who is injured by a terrorist attack that

results in death, even if he himself was not the fatality." Pautsch v. Islamic Republic of Iran,

2024 WL 3566132, at *4 (D.D.C. July 29, 2024); see also Burks v. Islamic Republic of Iran,

2022 WL 20588923, at *8 (D.D.C. Sep. 30, 2022) ("[C]ourts in this district have uniformly

concluded that [the terrorism exception] covers a claim for personal injury resulting from an

attack in which at least someone died, even if the particular plaintiff only suffered injuries.").

Even though all attacks resulted in at least one death, one claim calls for further

inspection. Jesus Cervantes-Barroso, a Marine, was deployed to Fallujah in 2004 in preparation

for Operation Phantom Fury. See First Rayburn Report at 43–44. On August 15, 2004,

Cervantes-Barroso was severely injured when a VBIED detonated near a traffic control point and

small-arms fire erupted. See First Mot. Def. J. at 12. While Cervantes-Barroso survived, Private

First Class Fernando Hannon was killed in the attack. Id. at 12 n.2. A Significant Activity

Report from the U.S. military, however, listed Hannon as a "friendly KIA." Id. In common

parlance, Hannon was killed by friendly fire during the attack.

The Court nevertheless finds that his killing qualifies as an extrajudicial killing that

supports Cervantes-Barroso's injury claim. "Extrajudicial killing" within the FSIA terrorism

exception takes its meaning from the Torture Victims Protection Act of 1991. See 28 U.S.C.

§ 1605A(h)(7). Under that statute, an extrajudicial killing is a "a deliberated killing not

authorized by a previous judgment pronounced by a regularly constituted court affording all the

judicial guarantees which are recognized as indispensable by civilized peoples." Id., § 1350

note. Three elements compose this definition: "(1) a killing; (2) that is deliberated; and (3) is not

authorized by a previous judgment pronounced by a regularly constituted court."  Owens, 864

F.3d  at 770.

The first element — that someone was killed — is satisfied.  As the Circuit recently

clarified in Borochov v. Islamic Republic of Iran, 94 F.4th 1053, 1061 (D.C. Cir. 2024), "The

word 'killing' refers to an action resulting in the death of another," requiring that someone

actually die rather than merely be injured or targeted.  Unlike that case, where "the perpetrator

did not kill anyone in the attack," id. at 1060, here an American soldier died because AQI

detonated a VBIED and initiated small-arms fire.  Hannon died during the AQI-initiated firefight

rather than through an attenuated chain of events where death occurred months later through

independent personal actions.  See Hansen v. Islamic Republic of Iran, 2024 WL 3026517, at *5

(D.D.C. June 17, 2024) (finding suicide committed 21 months after attack too remote from

causal chain).

The killing, moreover, was "deliberated" as required by § 1605A(h)(7).  See also id.,

§ 1350 note.  AQI acted with "studied consideration and purpose," Owens, 864 F.3d at 770

(quotation marks and citation omitted), by executing a "complex attack" — employing "multiple

weapons with phased operations" to kill Coalition forces.  Cabrera, 2022 WL 2817730, at *15;

see also First Rayburn Report at 11.  Hannon died within the lethal combat conditions that AQI

deliberately created.  His death occurred within and because of AQI's intended goal — combat

fatalities from coordinated IED and gunfire — not in "a manner very different from that

contemplated."  Cabrera, 2025 WL 1423739, at *10 (quotation marks and citation omitted).

Although his death unfortunately resulted from friendly fire, that kind of casualty is a reasonably

foreseeable consequence of the type of brutal attack designed to cause deaths and inspire terror.

Cf. Neiberger v. Islamic Republic of Iran, 2022 WL 17370239, at *9 n.9 (finding injuries remain

connected to terrorist attack even where caused indirectly, as "incidental injuries are a reasonably foreseeable consequence" of attack).

Last, Hannon's killing was "not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." 28 U.S.C. § 1350 note; id., § 1605A(h)(7). Courts have consistently found that terrorist attacks by groups like al-Qaeda against U.S. military forces lack any legal authorization. Foley v. Syrian Arab Republic, 249 F. Supp. 3d 186, 202 (D.D.C. 2017); Est. of Fouty v. Syrian Arab Republic, 743 F. Supp. 3d 118, 149–50 (D.D.C. 2024); Martino, 2025 WL 2107655, at *8. Hannon's death, accordingly, was an unlawful act committed by a terrorist organization operating outside any legal framework.

Section 1605A(h)(7) requires only a "deliberated killing," not that the deliberating party be the immediate cause of death. When AQI initiated its complex attack, it set in motion the lethal combat conditions that directly resulted in Hannon's death. The statutory elements are therefore satisfied: there was deliberation (AQI's planned assault through VBIED and small-arms fire), there was a killing in "the manner or a manner similar to that which was intended," Cabrera, 2025 WL 1423739, at *10, (Hannon's death during the ensuing firefight), and it was extrajudicial (lacking legal authorization). This constitutes an extrajudicial killing regardless of whether AQI's bullets or friendly fire delivered the fatal wounds.

### 3.   *Additional Conditions*

Even when a foreign state falls under the immunity exception, a court may hear a claim only if 1) "the foreign state was designated as a state sponsor of terrorism at the time" of the act; 2) the claimant is a U.S. national, military servicemember, or federal government employee or contractor; and 3) for cases that occurred within the defendant foreign state, "the claimant has

afforded the foreign state a reasonable opportunity to arbitrate the claim." 28 U.S.C.

§ 1605A(2)(A)(i)–(iii). Plaintiffs easily clear this bar. First, Syria and Iran have been designated

as state sponsors of terrorism since 1979 and 1984, respectively. See U.S. Dep't of State, Bureau

of Counterterrorism, State Sponsors of Terrorism, https://perma.cc/Y7M7-NY4S (list as of

September 2, 2025). Second, every victim was a U.S. national, military servicemember, or

government contractor at the time of the attacks. See Am. Compl., ¶ 1; see also Gration, 2023

WL 5221955, at *23 (if victim meets these criteria, element is satisfied). Finally, all of the

attacks occurred in Iraq, so the third condition does not apply. The Court thus concludes that

Congress has abrogated Iran and Syria's sovereign immunity for these attacks, and it has subject-

matter jurisdiction under 28 U.S.C. § 1605A.

      B.    Personal Jurisdiction

     The final threshold issue to address is personal jurisdiction. "Such jurisdiction over a

foreign state exists — as to every claim for relief over which district courts have subject-matter

jurisdiction — where service has been made under section 1608 of the FSIA." Pautsch, 2023

WL 8433216, at *4; see also 28 U.S.C. § 1330(b). Section 1608(a) provides four ranked

methods by which service may be made. As a first measure, the summons and complaint may be

delivered "in accordance with any special arrangement for service between the plaintiff and the

foreign state or political subdivision." 28 U.S.C. § 1608(a)(1). Second, and relatedly, service

may be effected "in accordance with an applicable international convention on service of judicial

documents." Id., § 1608(a)(2). In the absence of those kinds of agreements, plaintiffs must

attempt service through a third method, which involves sending the requisite documents "by any

form of mail requiring a signed receipt . . . to the head of the ministry of foreign affairs of the

foreign state concerned." Id., § 1608(a)(3). If that method also comes up short, plaintiffs may

pursue a fourth and final method: the Court Clerk may send the packet to the Secretary of State for transmittal "through diplomatic channels to the foreign state."  Id., § 1608(a)(4); see also Republic of Sudan v. Harrison, 587 U.S. 1, 4–5 (2019).

Plaintiffs have successfully navigated through the procedural maze and effected service on Iran and Syria.  The first two methods are inapplicable as the parties lack a special service arrangement and the United States is not a signatory to a service convention with either country. Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 77–78 (D.D.C. 2017); Fouty, 743 F. Supp. 3d at 154.  Proceeding to the third method, Plaintiffs mailed the relevant documents — along with translations of those documents — to Iran and Syria's foreign ministries in their home countries, but no signed receipt was forthcoming.  See ECF Nos. 11 (Iran Mailing Aff.); 12 (Syria Mailing Aff.).  Plaintiffs then attempted the fourth method and had the State Department transmit the documents to Iran's Ministry of Foreign Affairs through the Embassy of Switzerland on May 7, 2024, and to Syria's Ministry of Foreign Affairs through the Embassy of the Czech Republic on April 25, 2024.  See ECF Nos. 19 (Iran Return of Service Executed); 20 (Syria Return of Service Executed).  As a result, service on Defendants was finally effective as of those dates.  See 28 U.S.C. § 1608(c)(1) (service effective "as of the date of transmittal" of documents); Nikbin v. Islamic Republic of Iran, 471 F. Supp. 2d 53, 60 (D.D.C. 2007) (documents transmitted when delivered to defendant state's ministry of foreign affairs).

Mindful that it lacks the authority "to raise the FSIA terrorism exception's statute of limitations on behalf of an entirely absent defendant," Maalouf v. Islamic Republic of Iran, 923 F.3d 1095, 1112 (D.C. Cir. 2019), the Court sees no other procedural hurdles and proceeds onward to the merits.

C.    Liability

Section 1605A creates a private right of action for "personal injury or death," and it provides for damages such as "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c)(4). The Section, however, "does not set out guidance on the substantive bases for liability that determine plaintiffs' entitlement to damages." Pautsch, 2023 WL 8433216, at *5. Despite that silence, the D.C. Circuit has instructed that "a district court may rely on well-established statements of common law, found in state reporters, the Restatement of Torts, and other respected treatises" to determine liability under the FSIA. Fraenkel, 892 F.3d at 353; see also Ghodstinat v. Islamic Republic of Iran, 2025 WL 2222768, at *5–6 (D.D.C. Aug. 5, 2025) (applying "well-established principles of tort law," such as Restatement (Second) of Torts, to determine liability). Here, Plaintiffs assert claims for wrongful death, personal injury, and intentional infliction of severe emotional distress. See Am. Compl. at 343–45. The Court considers each theory in turn.

First, in seeking economic-loss damages, the estates of Plaintiffs killed in the AQI and STGI attacks sufficiently state a claim for wrongful death. Id. at 344. "It is axiomatic that acts of terrorism under section 1605A — including extrajudicial killing or material support thereof — are, by definition, wrongful." Shoham v. Islamic Republic of Iran, 2017 WL 2399454, at *18 (D.D.C. June 1, 2017). Accordingly, a plaintiff may recover for wrongful death "upon establishing that the defendants caused [the victim's] death." Braun v. Islamic Republic of Iran, 228 F. Supp. 3d 64, 79 (D.D.C. 2017) (citing Restatement (Second) of Torts § 925 (A.L.I. 1965)).

The decedents in the attacks were each killed by various means: direct fire, mortars, RPGs, and explosives such as planted IEDs, VBIEDs, and SVBIEDs. See, e.g., First Rayburn

Report at 43–45, 65, 70, 72; Second Rayburn Report at 10, 18–19, 22, 40, 55; Third Rayburn

Report at 10, 14, 39, 46–47, 60.  As detailed above, Plaintiffs' expert attributed each attack to

AQI or associated STGIs with at least a "reasonable degree of professional confidence," and in

many cases with a "high degree of professional confidence," or he found the attribution "highly

likely."  See, e.g., First Rayburn Report at 42; Second Rayburn Report at 11; Third Rayburn

Report at 39; supra, Section III.A.1.a.ii.  He also explained how Iran and Syria played a

significant role in providing AQI and STGIs the operational capacity to carry out these attacks.

See supra, Section III.A.1.a.i.  The Court thus concludes that Plaintiffs have sufficiently proven

the validity of their wrongful-death theory of recovery against Defendants.

Second, Plaintiffs who survived the terrorist attacks seek to recover damages for the

injuries they suffered.  See Am. Compl. at 343.  An allegation of "personal injury," alone, does

not provide a legal basis for liability.  Pautsch, 2023 WL 8433216, at *6.  Plaintiffs seeking to

recover under § 1605A, instead, "must articulate the justification for such recovery, generally

through the lens of civil tort liability."  Rimkus v. Islamic Republic of Iran, 750 F. Supp. 2d 163,

175–76 (D.D.C. 2010).  Here, the survivors ground their personal-injury claims in both assault

and battery.

Liability for assault arises when a defendant (1) "acts intending to cause a harmful or

offensive contact with the person of the other . . . or an imminent apprehension of such a

contact," and (2) "the other is thereby put in such imminent apprehension."  Restatement

(Second) of Torts § 21(1).  As to the first condition, "acts of terrorism are, by their very nature,

intended to harm and to terrify by instilling fear of further harm."  Murphy v. Islamic Republic

of Iran, 740 F. Supp. 2d 51, 73 (D.D.C. 2010).  It follows that if plaintiffs establish "that they

did, in fact, fear such harm because of the attack," a defendant may be liable for assault.  Id.  All

of the surviving Plaintiffs explain that they were placed "in imminent apprehension of harm" from the terrorist attacks they faced. See First Mot. Def. J. at 41; Second Mot. Def. J. at 51; Third Mot. Def. J. at 49. The Court finds that the nature of the attacks — all of which involved the direct use of SVBIEDs, IEDs, RPGs, mortar rounds, and machine-gun fire — reasonably placed Plaintiffs in imminent and extreme fear for their lives. See Am. Compl., ¶¶ 360–61; 508–09; 516–17; 522–23; 555–57; 586–87; 599–600; 708; 830–33; 918–19; 1082–83; 1282–83; 1454–55.

Liability for battery, conversely, requires an "inten[t] to cause a harmful or offensive contact . . . or an imminent apprehension of such a contact," and a harmful contact that "directly or indirectly results." Restatement (Second) of Torts § 13. Contact is deemed harmful when it results in "any physical impairment of the condition of another's body, or physical pain or illness." Id., § 15. Once more, Defendants' intent to cause harmful contact and immediate apprehension is evident: "[A]cts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." Valore v. Islamic Republic of Iran, 700 F. Supp. 2d 52, 76 (D.D.C. 2010). All but one Plaintiff assert that they suffered physical injuries from the terrorist attacks — including traumatic brain injuries, lacerations, migraines, shrapnel wounds, nerve damage, orthopedic trauma, and third-degree burns — establishing Defendants' liability for battery. See Am. Compl., ¶¶ 289, 362, 509, 517, 523, 587, 599, 710, 833, 919, 970 1083, 1283, 1455. Plaintiff Mason Fisher, by contrast, alleges only that he suffered PTSD following a series of IED and grenade attacks. Id., ¶¶ 555–57. To the extent that Fisher alleges only PTSD without explaining how he "suffered harmful physical contact," Defendants' liability in his case is best grounded in assault rather than battery. Ackley v. Islamic Republic of Iran, 2022 WL 3354720, at *46 (D.D.C. Aug. 12, 2022); see also Schooley v. Islamic Republic of Iran, 2019

WL 2717888, at *71 (D.D.C. June 27, 2019) (finding battery liability where "plaintiffs . . . were physically harmed" and finding assault liability where "plaintiffs . . . did not allege physical harm").

Finally, the family members of the victims injured or killed in the AQI or STGI attacks seek to recover damages for Defendants' intentional infliction of emotional distress. See Am. Compl. at 345. General principles of tort law provide that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress," both to the victim and "to a member of such person's immediate family who is present at the time." Est. of Heiser v. Islamic Republic of Iran, 659 F. Supp. 2d 20, 26 (D.D.C. 2009) (quoting Restatement (Second) of Torts § 46). Courts in this district have recognized that terrorism is "unique among the types of tortious activities in both its extreme methods and aims," as it is "intended to cause the highest degree of emotional distress, literally, terror." Id. at 27 (internal quotation marks omitted) (quoting Stethem v. Islamic Republic of Iran, 201 F. Supp. 2d 78, 89 (D.D.C. 2002)). In light of that singular quality, "immediate family members of terrorism victims may state a claim for IIED even if they were not present when the attack occurred." Doe v. Syrian Arab Republic, 2020 WL 5422844, at *14 (D.D.C. Sep. 10, 2020). While the family members need not be present, they must still be immediate family members — "spouses, parents, siblings, and children" — to support a claim for IIED. Est. of Parhamovich v. Syrian Arab Republic, 2022 WL 18071921, at *12 (D.D.C. Dec. 28, 2022). That limitation ensures that only those with sufficiently close relationships can establish the presumed compensable mental anguish from terrorist attacks on family members. See Sotloff v. Syrian Arab Republic, 2022 WL 22902285, at *20 (D.D.C. May 20, 2022) (explaining presumption for family members in direct lineal relationships).

All family members identically allege that they have experienced "severe mental anguish, extreme emotional pain and suffering," as well as loss of "society, companionship, comfort, advice, and counsel."  E.g., Am. Compl., ¶ 221.  Such allegations are sufficient to establish a claim for IIED.  Pautsch, 2023 WL 8433216, at *6 (finding "severe mental anguish, extreme emotional pain and suffering, and the loss of [] family members' society, companionship, comfort, advice, and counsel" as demonstrative of "severe emotional distress").  While close to all Plaintiffs are spouses, parents, siblings, or children of victims injured or killed in terrorist attacks, a handful are step relatives.  See Am. Compl., ¶¶ 234, 305–06, 356, 703, 910–11, 1218–20, 1828, 2073, 2107, 2649.  Immediate family may include such step relatives so long as they are "the 'functional equivalent' of an immediate family member to the extent that [those] individuals demonstrate a sufficiently close relationship to the victim."  Swinney v. Islamic Republic of Iran, 2025 WL 1547694, at *34 (D.D.C. May 30, 2025).  The Court holds this question in abeyance until damages briefing.

While the Court finds that Plaintiffs have sufficiently established their claims, it will deny the Motions for Default Judgment without prejudice as to certain Plaintiffs for improper claim-splitting.  See Hudson v. Am. Fed'n of Gov't Emps., 308 F. Supp. 3d 388, 394 (D.D.C. 2018) (party may not "bring two suits involving the same subject matter at the same time in the same court and against the same defendant") (internal quotation marks omitted).  Based on Plaintiffs' Notice of Similar Cases, it appears that some Plaintiffs filed their claims in other cases prior to commencing this action.  See Martino, No. 21-1808, ECF No. 15 (Am. Compl.), ¶¶ 473–76 (Sandra Cawvey, Kevin Cawvey, Sr., Joshua Cawvey, Kevin Cawvey, Jr.), 977–78 (Patricia A. Jameson, Robert M. Jameson), 1226–27 (Lisa Mack in her individual capacity and Ashley Mack), 1699 (David P. Schiavoni); Hartwick v. Islamic Republic of Iran, No. 18-1612, ECF No.

11 (Second Am. Compl.), ¶¶ 2922–23 (Alcides N. Bloem, individually and on behalf of the Estate of Nicholas W.B. Bloem). While the Court "has the discretion to control its docket by dismissing duplicative cases," it will deny the Motion for Default Judgment without prejudice as to the seemingly duplicative Plaintiffs at this time. Sweeney v. United States Parole Comm'n, 197 F. Supp. 3d 78, 80 (D.D.C. 2016) (alterations and quotation marks omitted). If those Plaintiffs are not in fact parties in a prior-filed suit, they may present evidence reflecting that in a renewed motion.

Finally, the Court notes that other Plaintiffs appear to be parties in separate cases filed after this action. "Where a plaintiff brings duplicative claims against the same defendant, the best course is to dismiss the claims in the new case as duplicative of the already-pending claims." Id. at 80 (alterations and quotation marks omitted). The Court thus directs counsel to promptly inform the judges in those subsequently filed cases that such claims are duplicative and should be withdrawn or dismissed.

## IV.    Conclusion

For these reasons, the Court will grant the three Motions for Default Judgment as to liability, except as to the following Plaintiffs: Sandra Cawvey, Kevin Cawvey, Sr., Joshua Cawvey, Kevin Cawvey, Jr., Patricia A. Jameson, Robert M. Jameson, Lisa Mack in her individual capacity, Ashley Mack, David P. Schiavoni, and Alcides N. Bloem, individually and on behalf of the Estate of Nicholas W.B. Bloem. A separate Order so stating will issue this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
Chief Judge

Date: September 24, 2025