UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RUBEN FLORES, *et al.*,<br><br>    Plaintiffs,<br><br>         v.<br><br>ISLAMIC REPUBLIC OF IRAN, *et al.*,<br><br>    Defendants. | Civil Action No. 22-1512 (JEB) |

## MEMORANDUM OPINION

Plaintiffs are U.S. servicemembers and military contractors who were injured or killed in terrorist attacks carried out in Iraq between 2003 and 2015, as well as their family members and estates. They bring this action against the Islamic Republic of Iran and the Syrian Arab Republic under the terrorism exception to the Foreign Sovereign Immunities Act, alleging that Defendants provided material support to Al-Qaeda in Iraq (AQI) and associated Sunni terrorist groups (STGIs), thereby facilitating the attacks at issue. Because Defendants have failed to appear, default has been entered. Plaintiffs sought and obtained default judgment as to liability for 115 of 288 attacks alleged in their Amended Complaint through three prior motions. They now move for default judgment as to liability for 37 additional attacks. Finding that Plaintiffs have established Defendants' responsibility for these attacks, the Court will grant their Motion.

**I.    Background**

The factual background of this case is set forth in detail in the Court's prior Opinion. Flores v. Islamic Republic of Iran, 2025 WL 2719429, at *1–2 (D.D.C. Sep. 24, 2025). Plaintiffs filed the current suit against Iran and Syria in May 2022 and properly served both Defendants.

1

Id. at *1.  Neither state answered the Complaint, and the Clerk entered default against Defendants at Plaintiffs' request in July 2024.  Id.

For case-management reasons, the Court previously authorized Plaintiffs to proceed through sequential default-judgment motions addressing subsets of attacks.  See Minute Order of Sep. 11, 2024.  They then submitted three Motions for Default Judgment as to liability, addressing a total of 115 attacks.  See ECF Nos. 26 (First Mot. Def. J.); 33 (Second Mot. Def. J.); 41 (Third Mot. Def. J.).  The Court granted those Motions except as to certain Plaintiffs whose claims were improperly split across multiple lawsuits.  Flores, 2025 WL 2719429, at *1, 16.  Plaintiffs now move for default judgment as to liability for 37 additional attacks.  See ECF No. 53 (Fourth Mot. Def. J.).

## II.   Legal Standard

Where a defendant is "totally unresponsive" to a summons, complaint, entry of default, and motion for default judgment, a court may enter default judgment in favor of the plaintiff.  See Gutierrez v. Berg Contracting Inc., 2000 WL 331721, at *1 (D.D.C. Mar. 20, 2000) (quoting Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980)).  But a plaintiff cannot rely solely on a defendant's willful lack of response.  "Modern courts are . . . reluctant to enter and enforce judgments unwarranted by the facts," Jackson, 636 F.2d at 835, and "a district court may still deny an application for default judgment where the allegations of the complaint, even if true, are legally insufficient to make out a claim."  Gutierrez, 2000 WL 331721, at *2 (citing Aldabe v. Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980)).

In a suit brought under the FSIA, a plaintiff must "establish[] his claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  The complaint must also allege facts sufficient to overcome the Act's "baseline principle of immunity for foreign states,"

Turkiye Halk Bankasi A.S. v. United States, 598 U.S. 264, 272 (2023), generally by invoking one of the FSIA's immunity exceptions codified in 28 U.S.C. §§ 1605–1605A. See Weinstein v. Islamic Republic of Iran, 175 F. Supp. 2d 13, 19–20 (D.D.C. 2001) ("[D]efault judgments under the FSIA require additional findings than in the case of ordinary default judgments."). The court should not "unquestioningly accept a complaint's unsupported allegations as true" and should "scrutinize [the] plaintiff's allegations" to ensure that they support both the exception to immunity and the legal and factual basis for the plaintiff's claims. Reed v. Islamic Republic of Iran, 845 F. Supp. 2d 204, 211 (D.D.C. 2012).

**III.    Analysis**

To succeed in their Motion, Plaintiffs are required to clear the FSIA's jurisdictional hurdles and to establish the foreign states' liability as to the additional attacks. As they rightly point out, the Court's prior Opinion established several non-attack-specific liability holdings that also govern here. See Fourth Mot. Def. J. at 10. The Court thus focuses here on the required attack-specific analysis and adopts its prior findings and conclusions where applicable.

A.    Subject-Matter Jurisdiction

Under 28 U.S.C. § 1605A, the so-called terrorism exception to the FSIA, a foreign state's immunity is abrogated and federal courts have subject-matter jurisdiction over suits against it where: 1) "money damages are sought" 2) "against a foreign state" 3) "for personal injury or death" 4) "that was caused" 5) "by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act." 28 U.S.C. § 1605A(a)(1); see also Gration v. Islamic Republic of Iran, 2023 WL 5221955, at *22 (D.D.C. Aug. 15, 2023).

As in the prior attacks considered, the first three criteria needed to abrogate a foreign state's sovereign immunity are "easily met" here: first, Plaintiffs seek money damages, see ECF No. 9 (Am. Compl.) at 346; second, Defendants Iran and Syria are foreign states; and third, Plaintiffs allege personal injury to and death of servicemembers and military contractors. Id., ¶ 1; see also Flores, 2025 WL 2719429, at *3. The last two require more analysis.

        1.     *Proximate Cause*

To prove causation under the FSIA's terrorism exception, a plaintiff must show that the foreign state's actions proximately caused the alleged injuries. Owens v. Republic of Sudan, 864 F.3d 751, 794 (D.C. Cir. 2017). In turn, that requires showing that Defendants' actions were "a substantial factor in the sequence of events leading to the injury," and "the injury must have been reasonably foreseeable or anticipated as a natural consequence" of those actions. Ben-Yishai v. Syrian Arab Republic, 642 F. Supp. 3d 110, 125 (D.D.C. 2022) (cleaned up). To satisfy the "substantial factor" requirement, Plaintiffs must show that: 1) Iran and Syria each "generally provided material support or resources to the terrorist organization which contributed to its ability to carry out the terrorist act" at issue; and 2) the "particular terrorist group" did indeed "commit[] the terrorist act." Gates v. Syrian Arab Republic, 580 F. Supp. 2d 53, 67 (D.D.C. 2008). To clear the bar for "reasonably foreseeable," Plaintiffs need not establish that Defendants foresaw the specific attacks at issue, only that Defendants knew or reasonably should have known — based on "the broader context of [their] conduct" — that AQI and affiliated groups had "terrorist aims" and posed a foreseeable threat to U.S. interests. Owens, 864 F.3d at 797–98.

The Court previously concluded that Iran and Syria provided AQI (and the STGIs through their affiliation with AQI) with support that increased its overall ability to commit

terrorist acts during the relevant time period, Flores, 2025 WL 2719429, at *4, and that Iran and Syria could have reasonably foreseen that their support of AQI would prompt attacks against Americans in Iraq. Id. at *11. The sole remaining question is whether Plaintiffs have adequately demonstrated that each of the additional 37 attacks at issue can be attributed to AQI or its associated groups.

Plaintiffs rely exclusively on the expert report submitted by Colonel (Ret.) Joel Rayburn, former U.S. Special Envoy for Syria and former Deputy Assistant Secretary of State for Near Eastern Affairs, and Colonel (Ret.) Frank Sobchak, Associate Professor in the Joint Military Operations Department at the U.S. Naval War College, to show that the additional attacks can be attributed to AQI or associated STGIs. See ECF No. 53-1 (Rayburn and Sobchak Report). These experts concluded that "it is highly likely that all of the 37 attacks. . . were carried out by AQI or other STGIs that were associated with or under the dominant influence of AQI." Id. at 9. The Court must now assess the reliability of such conclusions.

In evaluating attribution, the experts discussed the same five indicia used in prior expert reports submitted in this case: claims of responsibility by AQI; investigative findings by government agencies; the area of the attack; the date of the attack; and the tactics, techniques, and procedures (TTPs) of the attack. Id. at 6; Flores, 2025 WL 2719429, at *4. As Rayburn and Sobchak explain, however, while the first two indicia — claims of responsibility and official investigative findings — provide the most direct evidence of attribution, culpability may be established reliably even in their absence. See Rayburn and Sobchak Report at 9. Specifically, the experts opine that available evidence from the latter three indicia — namely, the location, timing, and TTPs of the attack — considered in combination could also support confident attribution of an attack to AQI or its affiliates if they demonstrate that: 1) the attack occurred in

5

an area that AQI controlled or in which it was able to operate to a significant degree; 2) the attack took place during a period when AQI exercised such control or influence in the area; and 3) the attack involved TTPs typically employed by AQI and its affiliates, such as rocket-propelled grenades, large improvised explosive devices (IEDs), suicide bombings, or complex, coordinated attacks. Id.

Applying this framework, Rayburn and Sobchak attributed 36 of the 37 attacks to AQI or its affiliates through a combination of location, timing, and AQI-signature TTPs. Id. at 13–86. For example, a number of attacks that took place in Babil Province between 2006 and 2007 were attributed to AQI based on the experts' assessment of those converging factors. Id. at 24 (Christopher Rose), 25 (Thomas Hewett), 26 (Christopher Brevard), 28 (Ryan Bishop), 32 (James McGuire, Jr.). These attacks occurred in or around Jurf al-Sakhr and neighboring areas within the Sunni-majority "Triangle of Death," a region that the experts identified as AQI's "most important operating zones" during that period, id. at 24, when AQI and Coalition Forces were "still engaged in the 'Battle of the Belts' to control the areas surrounding Baghdad." Id. at 27; see also id. at 33 (attack on Ronald Phillips, Jr. attributable to AQI based on location during "Battle of the Belts"). The methods of attack in these incidents further supported attribution to AQI. The experts remarked on the tactics used — booby-trapping of a house against Coalition troops and use of a roadside IED against a dismounted Coalition patrol — as being "typical of AQI operations at that point in the war." Id. at 25; see also id. at 26–27, 29, 33. Other attacks within the Babil province that were carried out with coordinated or well-resourced weaponry also bear indicia of AQI's or affiliated groups' involvement. Id. at 13 (Chance Phelps), 16 (Christopher Belchik), 18 (Brent Vroman), 20 (Wyatt Eisenhauer), 21 (George Draughn, Jr.), 22 (Johnnie Mason).

Similarly, Rayburn and Sobchak attributed several attacks that took place in the Baqubah area of Diyala Province in early to mid-2007 to AQI based on the converging factors of location, timing, and TTPs. Id. at 44 (Ryan Berg), 46 (Clarence Spencer), 55 (Jason Shaffer), 58 (Levi Hoover and Rodney McCandless), 61 (Anthony Ewing), 63 (William Crouch), 68 (Timothy Cole, Jr.). The experts explained that during this period, AQI, having rebranded as the Islamic State of Iraq, "repositioned many of its forces in and around Baqubah" and massed fighters in the Diyala region "to shift its tactics from hit-and-run and IED attacks to open force-on-force battles on the ground." Id. at 45. Each of these attacks occurred in areas where AQI exercised substantial operational freedom at the time and during a phase of the conflict in which AQI was the predominant Sunni insurgent actor in Diyala Province. Id. at 64–65 (noting in late 2006 and early 2007, "portions of Diyala, including Baqubah itself, fell fully under AQI control. AQI's control of the area was so complete that no other insurgent group was able to hold ground or operate independently in the area during that period."). AQI's consolidation in the pre-2007 time period also gave rise to an inference of its responsibility in other attacks in the Diyala province. See, e.g., id. at 40 (Cari Gasiewicz), 41 (Luis Santos). Attacks during and after 2007 also employed tactics and weapons systems characteristic of AQI operations during this period in this region, including the use of large, deep-buried IEDs, see, e.g., id. at 60, 65; coordinated complex attacks, id. at 62, 81 (Chad Groepper and Luke Runyan); and ground engagements in which AQI massed fighters to confront Coalition forces directly. Id. at 45, 57. The expert report specifically highlights sophisticated IED use in this region as a distinguishing feature of AQI and its affiliates because those weapons often require high levels of control over the area and resources that only those groups had. See, e.g., id. at 42 (Bradley Gruetzner and Mitchel Mutz), 48 (Branden Cummings), 50 (Brian Chevalier), 52 (Stephen Kowalczyk), 53 (Jason Nunez), 66 (Patrick

7

Marin), 70 (Jonathan Rivadeneira), 72 (Donald Valentine III and Nicholas Olson), 73 (Kevin Brown), 75 (Jonathan Dozier, Sean Gaul, and Christopher Sanders), 77 (Christopher West), 79 (Corey Spates), 82 (Phillip Anderson, Donald Burkett, and Torre Mallard), 84 (Jeremy Vrooman).

The Court finds the experts' method of attribution — relying on the combined indicia of location, timing, and TTPs — to be reliable. As with prior reports submitted in this case, this one provides a granular, attack-by-attack analysis grounded in the operational realities of the war. It examines attacks in specific neighborhoods and corridors, explains how geographic control and temporal context reflect AQI or AQI-aligned STGI dominance at the time of each incident, and links particular tactics and weapons systems to discrete phases of AQI's movements as the war progressed. These analyses sufficiently demonstrate that the 36 attacks at issue can be attributed to AQI or affiliated Sunni terrorist groups.

The only attack where the experts did not rely primarily on a combination of location, timing, and TTPs for attribution is one for which AQI explicitly claimed responsibility. In the early morning hours of May 12, 2007, two M1114HMMWVs were adjacent to Patrol Base Inchon near the east bank of the Euphrates River when AQI-affiliated insurgents assaulted the two positions and shot PFC Christopher Murphy, along with a few other soldiers. Id. at 30–31. AQI "immediately claimed responsibility for the incident." Id. at 31. The experts additionally point out that "the location of the attack in a major AQI operating zone within the Sunni-majority Triangle of Death also points to the culpability of AQI or an associated group." Rayburn and Sobchak Report at 31. Based on the explicit claim of responsibility by AQI, which "carr[ies] particular evidentiary weight because 'a group would face humiliation and a loss of credibility if [a] false attempt [to claim responsibility] were to be exposed,'" Flores, 2025 WL 2719429, at *5

(second alteration in original), and the location of the attack, the Court finds that the evidence sufficiently demonstrates that the attack that led to the death of PFC Murphy can be attributed to AQI.

Because Plaintiffs have demonstrated with a high degree of likelihood that AQI or affiliated STGIs, with the support of Defendants, carried out each of the 37 attacks at issue, they have successfully established proximate cause.

### 2. *Extrajudicial Killings*

Even if Defendants proximately caused the attacks at issue, Plaintiffs cannot surmount the obstacle of sovereign immunity unless the deaths and injuries in their claims arose from "an act of . . . extrajudicial killing." 28 U.S.C. § 1605A(a)(1). Plaintiffs — servicemembers, military contractors, and their family members — each allege personal injury and death stemming from the 37 attacks. Because all 37 attacks resulted in the death of at least one Coalition forces member at the hands of AQI or affiliated STGIs, see Fourth Mot. Def. J. at 15–52, they each constituted an act of extrajudicial killing. See Cabrera v. Islamic Republic of Iran, 2023 WL 1975091, at *11 (D.D.C. Jan. 27, 2023) ("[I]f a soldier is killed in a terrorist [attack], her death is an extrajudicial killing."); Burks v. Islamic Republic of Iran, 2022 WL 20588923, at *8 (D.D.C. Sep. 30, 2022) ("[C]ourts in this district have uniformly concluded that [the terrorism exception] covers a claim for personal injury resulting from an attack in which at least someone died, even if the particular plaintiff only suffered injuries.").

### 3. *Additional Conditions*

As was the case in their prior Motions, Plaintiffs have also satisfied the additional conditions required under 28 U.S.C. § 1605A(2)(A) to abrogate Iran and Syria's sovereign immunity in this case, Flores, 2025 WL 2719429, at *13, by sufficiently showing that these

nations have been designated as state sponsors of terrorism and that every victim was a U.S. national, military servicemember, or government contractor at the time of the attacks. See Am. Compl., ¶ 1; ECF No. 54-1, Exh. B (Standing Docs). It thus concludes that it has subject-matter jurisdiction under 28 U.S.C. § 1605A over the claims stemming from the 37 attacks at issue.

### B. Personal Jurisdiction

Where a court has subject-matter jurisdiction under the FSIA and service has been properly effected pursuant to 28 U.S.C. § 1608, personal jurisdiction over a foreign state follows automatically. See 28 U.S.C. § 1330(b); Pautsch v. Islamic Republic of Iran, 2023 WL 8433216, at *4 (D.D.C. Dec. 5, 2023). The Court has already determined that Defendants Iran and Syria were properly served in this action and failed to appear. Flores, 2025 WL 2719429, at *14. It thus adopts its earlier findings and again concludes that it has personal jurisdiction over both Defendants. Having determined that it possesses subject-matter and personal jurisdiction over the claims, the Court turns to liability.

### C. Liability

In its prior Opinion, the Court addressed the legal standards governing liability under § 1605A, including the availability of common-law causes of action and the elements required to establish them. Id., at *14–16. There, the Court endorsed Plaintiffs' theories of liability against Iran and Syria for: 1) wrongful death as to individuals killed in the attacks; 2) assault, battery, and intentional infliction of emotional distress as to individuals who survived the attacks in which they were involved; and 3) intentional infliction of emotional distress (IIED) as to the family members of victims injured or killed in AQI or affiliated STGI attacks. Id. Plaintiffs do not raise new categories of injuries arising from the additional attacks, so the Court's prior liability analysis applies with equal force to this subset of Plaintiffs. Specifically, for the three

10

surviving Plaintiffs here who seek damages based on the injuries they suffered in attacks, the Court finds that the nature of the attacks — all of which involved direct use of IEDs — reasonably placed Plaintiffs in imminent and extreme fear for their lives, thereby establishing Defendants' liability for assault. See Am. Compl., ¶¶ 1727–29; 2194–96; 2443–44; see also Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 73 (D.D.C. 2010) (Because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm," a defendant may be liable for assault if plaintiffs establish "that they did, in fact, fear such harm because of the attack."). These Plaintiffs further allege that they suffered physical injuries from the attacks — including loss of limbs, traumatic brain injury, burns, internal organ injuries, blood clots, and tinnitus, id., ¶¶ 1729–30; 1732; 2197; 2199; 2444; 2447 — which constitute the harmful contact that is required to establish Defendants' liability for battery. See Flores, 2025 WL 2719429, at *15 (explaining elements required to establish battery liability for surviving Plaintiffs). As it did last time, for certain Plaintiffs who are step relatives of the victims injured or killed in the attacks, the Court will determine whether they are "the 'functional equivalent' of an immediate family member" for purpose of their IIED claims at damages briefing. Id. at *16 (quoting Swinney v. Islamic Republic of Iran, 2025 WL 1547694, at *34 (D.D.C. May 30, 2025)). The Court accordingly finds that Defendants are liable under § 1605A(c) for the additional 37 attacks to the same extent and pursuant to the same theories recognized in the prior Opinion.

**IV.    Conclusion**

For these reasons, the Court will grant Plaintiffs' fourth Motion for Default Judgment as to liability. A separate Order so stating will issue this day.

Date: <u>January 27, 2026</u>

                     <u>/s/ *James E. Boasberg*</u>
                     JAMES E. BOASBERG
                     Chief Judge