UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---------------------------------------------------------------------------x

| | | |
|---|---|---|
| RUBEN V. FLORES, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | **Case No.: 22-cv-1512 (JEB)** |
| | : | |
| -against- | : | |
| | : | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | : | |
| | : | |
| Defendants. | : | |

---------------------------------------------------------------------------x

**SPECIAL MASTER JACK MCKAY'S REPORT AND RECOMMENDATION REGARDING DAMAGES FOR 31 PLAINTIFFS IDENTIFIED IN THE COURT'S ORDER OF SEPTEMBER 24, 2025**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..... iv

**INTRODUCTION** ..... 1

**I. PROCEDURAL BACKGROUND** ..... 1

**II. CATEGORIES OF CLAIMS AND PROPOSED DAMAGES FRAMEWORK** ..... 2

**A. Solatium Damages** ..... 2

**B. Punitive Damages** ..... 5

**III. THE 31 PLAINTIFFS' INJURIES** ..... 6

A. Paul Charles Mardis, Jr. – May 20, 2004, Attack – Mosul ..... 6

1. Solatium Claim Brought by SSgt. Mardis' Family Member ..... 7

a. Kacey Sturtz ..... 7

B. Charles Robert Soltes, Jr. – October 13, 2004, Attack – Mosul ..... 10

1. Solatium Claims Brought by Maj. Charles Robert Soltes, Jr.'s Surviving Family Members ..... 12

a. Sally H. Dang ..... 12

b. Ryan A. Soltes ..... 17

c. Brandan C. Soltes ..... 22

d. Robert H. Soltes ..... 26

C. Andrew Gerald Riedel – October 30, 2004 – Zaidon ..... 29

1. Solatium Claims Brought by LCpl Andrew Gerald Riedel Surviving Family Members ..... 30

a. Sherrin Graham ..... 30

b. Cayla Bell ..... 32

D. Kyle W. Burns – November 11, 2004 – Fallujah ..... 36

1. Solatium Claims Brought by LCpl Kyle W. Burns Surviving Family Members ..... 37

a. Jocelyn M. Burns ..... 37

b. Kristopher W. Burns ..... 42

E. Jeffery S. Blanton – December 12, 2004 – Fallujah ..... 45

1. Solatium Claims Brought by LCpl Jeffery S. Blanton's Surviving Family Member 47

a. Steven D. Blanton ..... 47

F. Melvin L. Blazer, Jr. – December 12, 2004 – Fallujah ..... 51

1. Solatium Claims Brought by SSgt. Melvin L. Blazer's Surviving Family Members 53

a. Dana Blazer-Wortham ..... 53

b. Alyssa Highley ..... 56

c. Erik Blazer ..... 60

G. Ian W. Stewart – December 12, 2004, Attack – Fallujah ..... 63

1. Solatium Claims Brought by Cpt. Ian Wesley Stewart's Surviving Family Members ..... 64

a. Dana Stewart Jr. ..... 64

b. Dawn Stewart ..... 66

H. Michael Dwayne Anderson, Jr. – December 14, 2004 – Fallujah ..... 70

1. Solatium Claims Brought by Cpt. Ian Wesley Stewart's Surviving Family Members ..... 71

a. Michael Anderson ..... 71

b. Angela Anderson ..... 75

c. Alexandria Anderson ..... 80

I. Adam Plumondore – February 16, 2005, Attack – Mosul ..... 84

1. Solatium Claims Brought by Sgt. Adam Plumondore's Surviving Family Members 85

a. Daniel J. Plumondore ..... 85

b. Elfriede H. Plumondore ..... 87

J. Frank B. Hernandez – February 17, 2005 – Tal Afar ..... 90

1. Solatium Claim Brought by Sgt. Hernandez's Family Member ... 91

a. Frank M. Hernandez ... 91

K. Anthony J. Davis, Jr., - April 23, 2005 – Mosul ... 93

1. Solatium Claims Brought by Sgt. Anthony J. Davis's Surviving Family Members ... 94

a. Michell D. Alikor ... 94

b. Ah'lania Davis ... 98

c. Aniya Davis ... 100

L. Aaron N. Seesan – May 22, 2005, Attack – Mosul ... 102

1. Solatium Claims Brought by 1LT Aaron N. Seesan's Surviving Family Members 103

a. Thomas M. Seesan ... 103

b. Chiquita M. Seesan ... 105

c. Rachel Schulze ... 108

d. Rebekah Stolar ... 110

M. Hoby F. Bradfield, Jr. – July 9, 2005 – Mosul ... 114

1. Solatium Claim Brought by SPC Bradfield's Family Member ... 115

a. Dianne Johnson Sterling ... 115

N. Anthony Ray Charles Yost – November 19, 2005, Attack – Mosul ... 119

1. Solatium Claims Brought by MSG Anthony Ray Charles Yost Surviving Family Members ... 120

a. Joann P. Yost ... 120

b. Anthony Yost ... 124

**CONCLUSION** ... 127

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Bathiard v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 72513 (D.D.C. Apr. 24, 2020) .. 127

*Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009) .... 3

*Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677 (D.D.C. Mar. 22, 2023) .... passim

*Bova v. Islamic Republic of Iran*, No. 15-cv-1074 (RCL), 2020 WL 2838582 (D.D.C. May 31, 2020) .... 4

*Cabrera v. Islamic Republic of Iran,* 2025 U.S. Dist. Lexis 94375 (D.D.C. May 16, 2025) 28, 102

*Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022) .... 79

*Est. of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37 (D.D.C. 2012) .... 4

*Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) .... 3

*Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (2009) .... 3

*Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236 (D.D.C. 2020) .... 2

*Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015) .... 3, 16, 21, 25

*Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20 (D.D.C. 2022) .... 3

*Fraenkel v. Islamic Republic of Iran,* 892 F.3d 348 (D.C. Cir. 2018) .... 17

*Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018) .... 79

*Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023) .... 2

*K.E.F.V. v. Islamic Republic of Iran*, 135 F.4th 988 (D.C. Cir. 2025) .... 28, 101

*Karcher v. Islamic Republic of Iran,* 2026 U.S. Dist. Lexis 13128 (D.D.C. Jan. 23, 2026) .... 28

*Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924 (D.D.C. Dec. 27, 2023) .... 79

*Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16 (D.D.C. 2022) .... 4

*Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57 (D.D.C. 2015) .......................................... 2

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51 (D.D.C. 2010)................................... 3, 4

*Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16 (D.D.C. 2011) .............................. passim

*Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44 (D.D.C. 2012) ....................................... 3

*Owens v Republic of Sudan*, 71 F. Supp. 3d 252 (D.D.C. 2014) ................................................... 3

*Pautsch v. Islamic Republic of Iran*, 2024 U.S. Dist. LEXIS 100426 (D.D.C. June 6, 2024) ....... 4

*Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859 (JEB), 2025 U.S. Dist. LEXIS 125115 (D.D.C. July 1, 2025) ........................................................................................................... 5, 6

*Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) ..................................... 3

*Roth v. Islamic Republic of Iran* 78 F. Supp. 3d 349 (D.D.C. 2015)......................................... 2, 3

*Thuneibat v. Syrian Arab Republic,* 167 F. Supp. 3d 22 (D.D.C. 2016) .............................. passim

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010) ............................... passim

*Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012) .......................................... 4

**Statutes**

28 U.S.C. § 1605A(a)(2)(A)(ii)(I) ......................................................................................... passim

28 U.S.C. § 1605A(c) ........................................................................................................... passim

## INTRODUCTION

Jack McKay, as Special Master, hereby submits the following Report and Recommendation regarding solatium damages sustained by 31 of the 510 Plaintiffs for whom the Court granted default judgment as to liability against the Defendants Islamic Republic of Iran and Syrian Arab Republic in its September 24, 2025 Memorandum Opinion and accompanying Order. *See* ECF Nos. 47 and 48. [1]

## I. PROCEDURAL BACKGROUND

On October 11, 2024, Plaintiffs filed their Motion for Default Judgment as to Liability for First Wave of Attacks, ECF No. 26, on behalf of Plaintiffs injured in 33 attacks. On November 22, 2024, Plaintiffs filed their Motion for Default Judgment as to Liability for Second Wave of Attacks, ECF No. 30, on behalf of Plaintiffs injured in an additional 39 attacks. On February 26, 2025, Plaintiffs filed their Motion for Default Judgment as to Liability for Third Wave of Attacks, ECF No. 41, on behalf of Plaintiffs injured in an additional 43 attacks. Default judgment as to liability was granted in favor of Plaintiffs on September 24, 2025, as to all 115 attacks for which default judgment had been sought. *See* ECF No. 47 (Order), ECF No. 48 (Memorandum Opinion).

On October 22, 2025, Plaintiffs moved to appoint five Special Masters—Jim Letten, Esq.; Jack McKay, Esq.; Professor Franklin D. Rosenblatt; Eric D. Green, Esq.; and Professor Stephen A. Saltzburg—to issue Reports and Recommendations ("R&Rs") for damages of Plaintiffs impacted by the Court's September 24, 2025, Order. *See* ECF No. 50. The Court granted this motion on October 27, 2025. ECF No. 52. Further, the Court issued an Administrative Plan Governing Five Special Masters stating, "[w]ithin six months of receiving damages submissions for Plaintiffs' claims, each Special Master shall submit Reports and Recommendations to the Court

---

[1] The Special Master has reviewed all of the exhibits provided to him by the Plaintiffs which are too voluminous to file on the docket. Plaintiffs have indicated that they will provide the exhibits to the Court upon request.

via ECF containing finding of fact and conclusions of law regarding each item of compensatory damages." ECF No. 52-1 at 4. This Report is submitted in accordance with that Order.

## II. CATEGORIES OF CLAIMS AND PROPOSED DAMAGES FRAMEWORK

Plaintiffs submitted proposed Findings of Fact and Conclusions of Law requesting damages for 31 immediate-family Plaintiffs whose loved ones were killed in various attacks traceable to Iran and Syria. All Plaintiffs are family members of U.S. military servicemen who were killed in action in attacks in Iraq addressed in the Court's September 24, 2025, Order. This Circuit follows a damages framework under Foreign Sovereign Immunities Act ("FSIA") cases.

To recover damages against Iran and Syria, Plaintiffs "must prove that the consequences of the [defendants'] conduct were reasonably certain (i.e., more likely than not) to occur and must prove the amount of damages by a reasonable estimate." *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955, at *29 (D.D.C. Aug. 15, 2023) (quoting *Roth v. Islamic Republic of Iran* 78 F. Supp. 3d 349, 402 (D.D.C. 2015)). Courts may rely on written declarations from family member claimants describing the attack's effect on him or her. *See, e.g., Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (D.D.C. 2015).

### A. Solatium Damages

Under the FSIA, a state sponsor of terrorism is responsible for intentional infliction of emotional distress, the resulting pain and suffering, and solatium of immediate family members of individuals killed in an attack for which a state sponsor of terrorism provided material support or resources. *See Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 245 (D.D.C. 2020); *Est. of Heiser*, 659 F. Supp. 2d at 27. In these scenarios, family members do not need to be present at the scene of the terrorist attack to recover under a theory of intentional infliction of emotional distress. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 80 (D.D.C. 2010); *Est. of Heiser v.*

*Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (2009); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015). Solatium damages seek to compensate family members for "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).

Courts in this Circuit generally follow established baseline awards for solatium claims of family members of victims who died in terrorist attacks. *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007). These baseline values are based on the application of general principles of tort law. *See Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012) (holding that courts assessing damages under the FSIA "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises"); *Est. of Heiser*, 659 F. Supp. 2d at 24. Applying these baseline values "help[s] ensure that similarly situated victims receive comparable awards." *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 36 (D.D.C. 2022).

Under this framework, relatives of deceased servicemen are generally awarded baseline damages amounts of $8 million for spouses, $5 million for children and parents, and $2.5 million for siblings. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010); *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 260 (D.D.C. 2006); *Owens v Republic of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014). However, these baseline awards are "not set in stone." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010).

Decisions to deviate from the baseline and award upward departures depend on various factors. See e.g. *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011) (factors such as "an especially close relationship between the plaintiff and decedent, particularly in

comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing"); *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 38 (D.D.C. 2022) (children who were minors when their parents died have been awarded $6.25 million); *Est. of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 43 (D.D.C. 2012) (upward departure was warranted where sister suffered a nervous breakdown that required medical treatment, and she was prescribed medication for approximately one year); *Murphy*, 740 F. Supp. 2d at 79 (noting that self-destructive behavior is "uniquely acute suffering warranting an upward departure"). Upward enhancements to the baseline values can range from approximately 20 to 100 percent depending on the individual plaintiff's circumstances. *See Bova v. Islamic Republic of Iran*, No. 15-cv-1074 (RCL), 2020 WL 2838582, at *9 (D.D.C. May 31, 2020) (awarding 20 percent enhancement where mother suffered "precipitous emotional decline due to the death of her son" and attempted suicide); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (finding severe mental distress arising from death warranted 25 percent enhancement); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40-41 (D.D.C. 2012) (awarding plaintiff 40 percent enhancement due to suffering from post-traumatic stress disorder, persistent grief, and depression coupled with decline in school grades and lack of motivation); *Oveissi*, 768 F. Supp. 2d at 29-30 (finding plaintiff's enduring trauma including depression, anger, and alcoholism following the victim's death warranted a 50 percent enhancement).

However, the duty to scrutinize a plaintiff's allegations does not disappear once liability has been found. *Pautsch v. Islamic Republic of Iran*, 2024 U.S. Dist. LEXIS 100426, at *7 (D.D.C. June 6, 2024). In order to preserve the integrity of the baseline award framework and to achieve

as far as possible the goal that those similarly situated should receive similar awards, variances from the baseline require proof of responses to the death of a loved one different than those for which baseline damages are typically awarded. *Id*. Upward adjustments require evidence of "particularly devastating and uniquely acute suffering," *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010), or of "aggravating circumstances" that exacerbate the survivor's grief. *Id.* at 79. Departures from the baseline awards "are usually relatively small absent circumstances that appreciably worsen a claimant's pain and suffering," *Fishbeck v. Islamic Republic of Iran*, 2024 WL 4119382 (D.D.C. 2024), quoting *Murphy*. If upward adjustments are too readily granted, the suffering of those who receive the baseline award is diminished.

**B. Punitive Damages**

In addition to solatium damages and prejudgment interest, Plaintiffs have also sought punitive damages which "serve to punish and deter the action which they [are] awarded." *Valore*, 700 F. Supp. 2d at 87. The terrorism exception to the FSIA specifically addresses the award of punitive damages. *See* 28 U.S.C. § 1605A(c). This Court has previously expressed a level of skepticism regarding the "actual deterrent effect of punitive damages" in *Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859 (JEB), 2025 U.S. Dist. LEXIS 125115, at *5 (D.D.C. July 1, 2025)[2]; however, this Court nevertheless found, "[g]Iven the reprehensibility of Defendants' actions, punishment beyond compensatory relief may aid not only to hold [Defendants] morally accountable but also to deter similar misconduct by the two nations in the future. *Id.* at *4. In *Pautsch*, this Court awarded punitive damages in an amount equal to compensatory damages. *Id.* at *6 (following other courts in this District that have awarded such requests in similar cases). Plaintiffs have requested the entry of punitive damages in the same manner as was entered in the

[2] This case was initially filed as a related case to the *Pautsch* case.

companion *Pautsch* case, and the Special Master recommends that the Court award punitive damages in the amount of compensatory damages that the Court assesses.

## III. THE 31 PLAINTIFFS' INJURIES

Described below are the 12 attacks for which this Court found Iran and Syria liable for the injuries Plaintiffs sustained due to the loss of their loved ones.[3]

### A. Paul Charles Mardis, Jr. – May 20, 2004, Attack – Mosul

On May 20, 2004, Staff Sergeant ("SSgt.") Paul Charles Mardis, Jr. was riding in the gun turret of an unarmored HMMWV in Mosul, Iraq, as a member of the U.S. Army's Fifth Special Forces Group out of Fort Campbell, Kentucky. *See* ECF No. 26-1 at 64. An IED detonated under the right side of the HMMWV causing injuries to SSgt. Mardis' [redacted][4] SSgt. Mardis was taken to Landstuhl Regional Medical Center in Landstuhl, Germany after which he was transferred to Walter Reed National Military Medical Center ("Walter Reed") in Washington, DC where, according to his Certificate of Death, he died from [redacted][5] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which SSgt. Mardis was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the May 20, 2004 attack in which SSgt. Paul Charles Mardis, Jr., was killed. *See* ECF Nos. 47, 48.

---

[3] Plaintiffs state that claims for conscious pain and suffering and economic loss for the estates of those who were killed—to the extent a claim for the estate has been asserted—will be included in a distinct Findings of Fact and Conclusions of Law to be submitted at a later date.

[4] Manatee County, "Gulf War Memorial: Army Staff Sergeant Paul C. Mardis, Jr.," located at https://www.mymanatee.org/connect/news-and-information/news-and-information/article-detail/veterans-services-division-posts/2025/02/05/gulf-war-memorial--army-staff-sergeant-paul-c-mardis--jr.

[5] Ex. 1, SSgt. Paul C. Mardis Jr., Certificate of Death.

SSgt. Mardis' wife, Kacey Sturtz is a plaintiff in this case. *See* ECF No. 9 at ¶¶ 325-330. Ms. Sturtz alleges severe mental anguish, extreme emotional pain and suffering, and loss of her husband's society, companionship, comfort, advice and counsel. *Id.* at ¶ 330. The following chart reflects the claim asserted by Kacey Sturtz in her individual capacity arising out of the May 20, 2004, attack as well as the evidence setting forth the bases of her claim. That evidence is provided as an exhibit to the accompanying Declaration of John M. Eubanks ("Eubanks Declaration").

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted**[6] | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Kacey Sturtz | SSgt. Paul Charles Mardis, Jr.'s surviving spouse. | Solatium claim $10 million | Declaration of Kacey Sturtz dated March 31, 2025, including copy of her proof of U.S. citizenship | 2 |

**1. Solatium Claim Brought by SSgt. Mardis' Family Member**

**a. Kacey Sturtz**[7]

Kacey Sturtz is the surviving spouse of SSgt. Paul Charles Mardis, Jr. Ms. Sturtz and SSgt. Mardis met at the age of twelve and spent the next few years strengthening their friendship and spending countless days together.[8] As childhood friends, they spent their time playing sports, attending bonfires, and hanging out with friends. Their lives were "intertwined" and the two "grew up together."[9] Tragically, after the death of SSgt. Mardis' parents, he moved to Florida to live with his sister during his senior year of high school.[10] The distance, however, did not diminish Ms. Sturtz's relationship with SSgt. Mardis. They remained close, and Ms. Sturtz even traveled to

[6] The values listed in these tables are those proposed by the Plaintiffs. The recommended values may differ from those sought by the Plaintiffs.

[7] Kacey Sturtz's United States passport and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 2, Declaration of Kacey Sturtz, dated March 31, 2025.

[8] *Id.* at ¶ 4.

[9] *Id.* at ¶¶ 4-5.

[10] *Id.* at ¶ 4.

watch SSgt. Mardis' football game and spent a cherished weekend with his family.[11] After SSgt. Mardis completed Survival, Evasion, Resistance, and Escape ("SERE") School, he married Ms. Sturtz, and the two began a new chapter in their lives that was "filled with dreams and plans for the future," including working on their new home, discussing hopes for children, and achieving their goals.[12]

While SSgt. Mardis was deployed in Iraq, Ms. Sturtz received a phone call from his unit informing her that SSgt. Mardis was involved in an accident and was seriously injured.[13] Ms. Sturtz went into a state of shock and disbelief. Even though she was disoriented, Ms. Sturtz traveled to Walter Reed National Military Medical Center.[14] She remained by his side for two months until he succumbed to his injuries on July 15, 2004. "Sharing the news of his passing with [their] family and friends was one of the hardest things [she] ever had to do" as "each phone call reopen[ed] the wound that his loss had created."[15] Ms. Sturtz explained that her heart ached not just for herself but for all who loved him.[16]

[redacted][19]

[11] *Id*. at ¶ 5.
[12] *Id*. at ¶ 5.
[13] *Id*. at ¶ 6.
[14] *Id*.
[15] *Id*.
[16] *Id*.
[17] *Id*. at ¶ 7.
[18] *Id*. at ¶ 9.
[19] *Id*. at ¶ 7.

[redacted][24]

Plaintiffs have requested an upward enhancement of 25% to Ms. Sturtz's claim based on the time she was by his side at Walter Reed National Military Medical Center for nearly two months between when he sustained his injuries and when he died, citing *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process). The Special Master notes that the plaintiffs in Bernhardt were exposed to repeated and detailed descriptions of the attack that led to the death of their family member.

The Special Master recommends that the Court approve an upward adjustment of 10% to Ms. Sturtz to reflect the nearly two months she had to spend at the side of a severely injured spouse. However, there is no evidence that Ms. Sturtz saw her husband suffer while at Walter Reed or that the hospital stay caused additional grief to Ms. Stutz beyond the loss of her husband and thus there

[20] *Id*. at ¶ 8.
[21] *Id*. at ¶ 5.
[22] *Id*. at ¶ 10.
[23] *Id*.
[24] *Id*. The

is no basis for a further deviation from the baseline award. The Special Master recommends that the Court award Ms. Sturtz $8.8 million in solatium damages.

### B. Charles Robert Soltes, Jr. – October 13, 2004, Attack – Mosul

On October 13, 2004, U.S. Army Major ("Maj.") Charles Robert Soltes, Jr.—who was serving as a preventive medicine officer with Bravo Company, 426th Civil Affairs Battalion—was riding in a convoy returning from meeting with Iraqi health officials at a hospital in Mosul, Iraq when his vehicle was attacked with a Suicide Vehicle-Borne Improvised Explosive Device ("SVBIED"). According to the findings from his autopsy, Maj. Stoltes died as a result of [redacted] when the vehicle in which he was riding was attacked by an IED.[25] [redacted][26] [redacted][27] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Maj. Soltes was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the October 13, 2004 attack in which Maj. Charles Robert Soltes, Jr., was killed. *See* ECF Nos. 47, 48.

Maj. Soltes' surviving spouse and three surviving children—Sally H. Dang, Ryan A. Soltes, Brandan C. Soltes, and Robert H. Soltes—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶

[25] Ex. 3, Autopsy Examination Report of Maj. Charles R. Soltes Jr., at p. 2.
[26] *Id*. at p. 4.
[27] *Id*. at p. 4.

458-467. The Plaintiffs allege that they have suffered severe mental anguish, extreme emotional pain and suffering, and loss of Maj. Soltes' society, companionship, comfort, advice and counsel. *Id.* ¶ 467. The following chart reflects the claims asserted by these four family members whose claims arise out of the October 13, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Sally H. Dang | Maj. Charles Robert Soltes, Jr.'s surviving spouse | Solatium claim $10 million | Declaration of Sally H. Dang dated December 10, 2024, including copy of her proof of U.S. citizenship | 4 |
| Ryan A. Soltes | Maj. Charles Robert Soltes, Jr.'s surviving child | Solatium claim $6.25 million | Declaration of Ryan Soltes dated December 10, 2024, including copy of his proof of U.S. citizenship | 5 |
| Brandan C. Soltes | Maj. Charles Robert Soltes, Jr.'s surviving child | Solatium claim $6.25 million | Declaration of Brandan Soltes dated December 10, 2024, including copy of his proof of U.S. citizenship | 6 |
| Robert H. Soltes | Maj. Charles Robert Soltes, Jr.'s surviving child | Solatium claim $5 million | Declaration of Robert Soltes dated December 10, 2024, including copy of his proof of U.S. citizenship | 7 |

**1. Solatium Claims Brought by Maj. Charles Robert Soltes, Jr.'s Surviving Family Members**

**a. Sally H. Dang[28]**

Sally Dang is the surviving spouse of Maj. Soltes.[29] The two met in 1990 on the first day of Optometry school in Boston at the New England College of Optometry.[30] Ms. Dang and Maj. Soltes had an instant connection and began dating in graduate school.[31] From the moment they met, the couple was inseparable and spent nearly every day together or communicating when they were apart.[32] Ms. Dang and Maj. Soltes often shared their "dreams and plans for [their] future, including the desire to expand [their] family and [their] shared passion for [their] own optometry practice."[33] The couple married in June 1994.[34] Together, they "navigated challenges of military life, from his active-duty assignments that took [them] from San Antonio, to South Korea, and eventually to West Point, NY."[35]

According to Ms. Dang, the family decided to move to California to pursue their careers in optometry, "a dream [they] had nurtured since [their] school days."[36] Ms. Dang and Maj. Soltes "worked tirelessly, often juggling multiple jobs, to build [their] practices from the ground up."[37] During these years, the couple welcomed two sons into the world.[38] They envisioned having four children and [redacted][39]

---

[28] Sally Dang's Certificate of Citizenship and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 4, Declaration of Sally H. Dang, dated December 10, 2024.
[29] *Id*. at ¶ 3.
[30] *Id*. at ¶ 4.
[31] *Id*.
[32] *Id*. at ¶ 5.
[33] *Id*.
[34] *Id*. at ¶ 4.
[35] *Id*.
[36] *Id*.
[37] *Id*.
[38] *Id*.
[39] *Id*. at ¶ 5.

During Maj. Soltes' deployment to Iraq, Ms. Dang was pregnant. She communicated with her husband every opportunity she could through emails, brief phone calls, and social media. Ms. Dang recalls their last phone call, just three weeks before Maj. Soltes death, which was painfully short. The couple planned for his return for the birth of their baby and "even discussed potential baby-names."[40] This ten-minute conversation would be the last time Ms. Dang ever heard her husband's voice, a memory that haunts her to this day.[41]

When Ms. Dang learned of her husband's death, she was in her car on a warm day when she was approached by a uniformed military officer who incorrectly addressed her as the wife of Major Charles Micheal Soltes.[42] Confused by the interaction, Ms. Dang corrected that her husband's middle name was Robert.[43] When Ms. Dang exited her vehicle, the officer proceeded to inform Ms. Dang that Maj. Soltes had died in an attack.[44] This conversation was interrupted by Ms. Dang's oldest son, Ryan, who overheard the devastating news of his father's death.[45] No Chaplain accompanied the officer, and the officer admitted to taking the assignment to inform Ms. Dang of her husband's death because it was on route to where the officer was headed and was convenient.[46] According to Ms. Dang, she felt that the delivery of the news that her husband had been killed "was shockingly unprofessional and lacked the respect and protocol one would expect in such a situation." [47] The officer came alone to the door and asked nine year-old Ryan to find his mother. When Ms. Dang arrived in her car, the office told her of the death of her husband but

[40] *Id*. at ¶ 5.
[41] *Id*.
[42] *Id*. at ¶ 7.
[43] *Id*. at ¶ 7.
[44] *Id*. at ¶ 7.
[45] *Id*. at ¶ 7.
[46] *Id*.
[47] *Id*. at ¶ 7.

bungled his name. This delivery of the death notice further compounded her grief at the sudden loss of Maj. Soltes.

Ms. Dang informed Maj. Soltes' parents of his death, "fearing they might receive the news in the same harsh manner."[48] That evening, her primary concern shifted to focusing on the emotional well-being of her sons above her own grief. Ms. Dang explained that the entire experience was surreal, marked by profound disbelief.[49] A couple of months later, Ms. Dang would deliver their youngest son, Robert.

For years, [redacted][52]

According to Ms. Dang, Maj. Soltes was an extraordinary father who approached parenting with patience and love that was palpable, always striving to set the best example.[53] Maj. Soltes taught his sons to have good manners, instilled a sense of responsibility, and nurtured their spirits.[54] The "devastating impact of his loss on [their] sons was immediate and profound."[55] [redacted]

---

[48] *Id*. at ¶ 7.
[49] *Id*. at ¶ 7.
[50] *Id*. at ¶ 8.
[51] *Id*. at ¶ 8.
[52] *Id*. at ¶ 8.
[53] *Id*. at ¶ 6.
[54] *Id*. at ¶ 6.
[55] *Id*. at ¶ 6.

[redacted][57]

Ms. Dang is the eldest of five siblings.[58] Prior to his death, Maj. Soltes maintained a strong relationship with Ms. Dang's family. [redacted][61]

[redacted][63]

[redacted]

---

[56] *Id*. at ¶ 8.
[57] *Id*. at ¶ 8.
[58] *Id*. at ¶ 10.
[59] *Id*. at ¶ 10.
[60] *Id*. at ¶ 10.
[61] *Id*. at ¶ 10.
[62] *Id*. at ¶ 4.
[63] *Id*. at ¶ 5.
[64] *Id*. at ¶ 9.
[65] *Id*. at ¶ 9.
[66] *Id*. at ¶ 9.

[redacted][68]

Ms. Dang described Maj. Soltes as not just her spouse but her "best friend," "confidante," and "business partner."[69] She recalled that he "was the most considerate, warm, thoughtful, and compassionate person [she] knew, always putting others before himself."[70] The shadow of Maj. Soltes death looms large over their family and is a burden that Ms. Dang carries individually and together with their children. Ms. Dang described that "the foundation upon which [their] lives were being built was shattered by his passing, leaving [them] to piece together a new existence from the ruins."[71]

Plaintiffs have requested an enhancement to the solatium damages award for Ms. Dang. They cite the "especially close relationship" between Ms. Dang and Maj. Soltes (including their joint business ventures) along with the circumstances of Ms. Dang's pregnancy at the time of the attack "which made the suffering particularly more acute or agonizing" and her treatment for anxiety through the VA and elsewhere to substantiate an upward enhancement of 25% of the baseline value, resulting in an award of $10 million for Sally H. Dang's solatium claim. Plaintiffs cite *Lelchook*, 2019 WL 4673849, at *6 (awarding a 25 percent upward departure to a family member who "lost her sense of place in the world"); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115, 118 (D.D.C. 2015) (awarding 25 percent upward departures to Kevin Shawn Rux's siblings and mother because "[e]vidence demonstrates that Kevin was the center of his family" and because they suffered emotional injuries including PTSD and persistent complex

[67] *Id*. at ¶ 9.
[68] *Id*. at ¶ 9.
[69] *Id*. at ¶ 4.
[70] *Id*.
[71] *Id*. at ¶ 11.

family members experienced "a general feeling of permanent loss or change caused by the decedent's absence").

The Special Master recommends that the Court approve the 25% enhancement and award $10 million to Ms. Dang. She was pregnant at the time of Maj. Soltes' death and had to handle alone the serious medical issues of that child in the midst of her grief. She also had to manage two young sons through the loss of an extraordinary father while readjusting her life to compensate for the loss not only of her spouse but also her business partner. The death notice process was deeply flawed, which undoubtedly enhanced Ms. Dang's sense of loss. *See Fraenkel v. Islamic Republic of Iran,* 892 F.3d 348, 357 (D.C. Cir. 2018) (court may consider how the claimant learned of the loss). Furthermore, the loss of Maj. Soltes was compounded by t[redacted]. An enhancement of 25% is appropriate considering all these factors.

**b. Ryan A. Soltes[72]**

Ryan A. Soltes ("Ryan") is the eldest son of Sally Dang and Maj. Charles Robert Soltes, Jr. According to Ryan, Maj. Soltes was "incredibly present, kind, playful, gentle, adventurous, hard-working, and fun."[73] Although Ryan was just ten years old when his father was killed, he has vivid memories of Maj. Soltes.[74] They spent time biking, hiking, playing sports, going to the beach, skiing, camping, fishing, watching cartoons, or simply enjoying each other's company.[75] Maj. Soltes was present for every school event, planned birthday parties, and had a special way of waking his children up in the mornings.[76] Ryan described his father as "fully present" despite his

---

[72] Ryan A. Soltes' Birth Certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 5, Declaration of Ryan A. Soltes, dated December 10, 2024.

[73] *Id*. at ¶ 4.

[74] *Id*.

[75] *Id*.

[76] *Id*.

busy schedule and always felt as though he was his father's top priority.[77] The letters in Maj. Soltes' journals to his children detail the love that he had for them.[78] This has been "a source of comfort and connection" allowing Ryan and his brother Robert "to understand his thoughts, his love, and his life philosophy even after his passing."[79]

The day Ryan learned of his father's death, he was anticipating a trip to the Discovery Science Museum with his family.[80] Ryan's excitement was abruptly shattered when a uniformed woman arrived at their doorstep, asking for his mother.[81] Moments later, Ms. Dang arrived and Ryan's aunt ushered him away from the door.[82] Ryan "couldn't shake the feeling that something was terribly wrong."[83] Even though Ryan was instructed to go upstairs, he lingered on the staircase and overheard the devastating news that his father had been killed in Iraq.[84] Ryan described that "in that moment, it felt as though [his] entire world had crumbled."[85] The man that was his superhero, best friend, and constant source of love and support was gone, leaving an insurmountable void.[86]

The aftermath of Maj. Soltes death was "a blur of pain and disbelief" for Ryan who was just one month shy of his tenth birthday.[87] As the oldest child, Ryan took on the responsibility of sharing the news with his younger brother Brandan, which was the hardest thing he ever had to do.[88] Brandan had a look of confusion and shock that mirrored Ryan's initial expression.[89] "In a

[77] *Id*. at ¶¶ 4, 5.
[78] *Id*. at ¶ 5.
[79] *Id*. at ¶ 4.
[80] *Id*.
[81] *Id*.
[82] *Id*.
[83] *Id*.
[84] *Id*.
[85] *Id*.
[86] *Id*.
[87] *Id*. at ¶¶ 4, 7.
[88] *Id*. at ¶ 7.
[89] *Id*.

moment of anger and grief, [Ryan] blurted out the harsh reality that [their] dad was never coming home."[90] The ripple effect of their loss spread quickly as each family member arrived at their home.[91] Each arrival brought a fresh wave of sorrow as they learned of Maj. Soltes' death which compounded Ryan's own grief.[92]

Maj. Soltes missed every milestone in Ryan's life after his death.[93] He missed every birthday from Ryan's tenth to upcoming 30th birthday, every graduation from elementary school through graduate school, every sporting event, every holiday, marriage, and the birth of Ryan's first child.[94] The absence of Maj. Soltes was particularly felt as Ryan was growing up and did not have his father there on occasions like parent career days.[95] Memorial Day and Maj. Soltes' birthday are especially difficult for Ryan.[96] [redacted][98]

Following his dad's death, [redacted]

---

[90] *Id*.
[91] *Id*.
[92] *Id*.
[93] *Id*.
[94] *Id*. at ¶¶ 5, 8.
[95] *Id*. at ¶ 8.
[96] *Id*.
[97] *Id*.
[98] *Id*.
[99] *Id*. at ¶ 9.
[100] *Id*.

[redacted][105]

[redacted][111]

---

[101] *Id.*
[102] *Id.*
[103] *Id.*
[104] *Id.*
[105] *Id.*
[106] *Id.* at ¶ 10.
[107] *Id.*
[108] *Id.*
[109] *Id.* at ¶ 7.
[110] *Id.* at ¶ 11.
[111] *Id.*

The emotional toll of Maj. Soltes death permeates the daily lives of Ryan and his family.[112] He explained that he has experienced immense [redacted][113] Ryan described that his father was the glue that held his family together and his absence has impacted his overall well-being and quality of life.[114]

Plaintiffs have requested an upward enhancement of 25% to Ryan's claims based on the close nature of his relationship with his father, his consistent reliance on counseling for his anxiety, and his anxiety-induced asthma that demonstrates an outward physical manifestation of the grief he has experienced at the loss of his father. They cite *Lelchook*, 2019 WL 4673849, at *6 (awarding a 25 percent upward departure to a family member who "lost her sense of place in the world"); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115, 118 (D.D.C. 2015) (awarding 25 percent upward departures to Kevin Shawn Rux's siblings and mother because "[e]vidence demonstrates that Kevin was the center of his family" and because they suffered emotional injuries including PTSD and persistent complex bereavement-related disorder); ); and *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence"). Plaintiffs have requested an enhancement of 25% of the baseline award resulting in an award of $6.25 million for Ryan A. Soltes' solatium claim.

The Special Master recommends that the Court award Ryan Soltes the baseline recovery of $5 million. Ryan has suffered the loss of a wonderful father, but has cited no aggravating circumstances that could warrant a departure from the baseline award. There is no evidence that

[112] *Id*. at ¶ 12.
[113] *Id*. at ¶ 11.
[114] *Id*.

his college asthma (commencing at least ten years after his father's death) was tied to his father's death.

**c. Brandan C. Soltes[115]**

Brandan C. Soltes ("Brandan") is the son of Maj. Soltes. According to Brandan, his father was his "a hero, a mentor, and [his] greatest supporter."[116] Although Maj. Soltes had a demanding schedule as a special Optometrist who also served his country abroad, he always made sure to stay connected with his family through letters.[117] Brandan described that his father had a unique way of showing his affection towards his children through the use of nicknames like "Yokes" and "Buddy."[118] One of Brandan's most cherished memories with his father is learning to ride his skateboard at the local skatepark. Through every fall, Maj. Soltes was there to pick Brandan up and encourage him, teaching him resilience and independence.[119] Maj. Soltes attended every soccer and tee-ball game and was Brandan's biggest cheerleader.[120] According to Brandan, his father had a "knack for turning ordinary moments into extraordinary memories."[121] "His playful chases around the house, teaching [Brandan] to ride a bike, and the gentle way he'd carry [Brandan] to bed when [he'd] feign sleep just to stay in his arms a little longer, are moments that [Brandan] hold[s] dear."

Brandan described his father as family man who fostered deep connections not only within their immediate family but also with extended family and friends.[122] Maj. Soltes shared a special

---

[115] Brandan C. Soltes' Birth Certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 6, Declaration of Brandan C. Soltes, dated December 10, 2024.

[116] *Id*. at ¶ 4.

[117] *Id*.

[118] *Id*.

[119] *Id*.

[120] *Id*. at ¶ 5.

[121] *Id*. at ¶ 4.

[122] *Id*. at ¶ 6.

bond with his mom's siblings, particularly with her younger sister, who was sixteen years younger than his mom. Brandan recalled that his dad was both a brother and father figure to his aunt.[123]

Brandan was looking forward to a fun day with his brother and friends the day he learned his father was killed.[124] He recalled feeling uneasy when a uniformed woman approaching their home. Soon after seeing her arrive, his brother Ryan went upstairs distressed, and that was the first sign that their lives were about to change forever.[125] Brandan explained that he was confused and will never forget the weight of his mother's words as she explained that his father had been killed in Iraq.[126] He was only seven years old at the time, and the reality of her words were "too vast for [his] young mind to fully grasp."[127] Yet, his mother's grief was "raw and unguarded" which "brought [him] to tears."[128]

Following the death of Maj. Soltes, returning to school for Brandan was awkward, and suddenly holidays such as Father's Day became very isolating.[129] The loss "was a tragedy that reshaped every aspect of [their] family life, plunging [them] into a struggle that was both emotional and practical."[130] His mother "suddenly a single parent, faced the daunting task of raising three children alone while managing a business she and [Maj. Soltes] had built together.[131] According to Brandan, after his father's death, his mother had to shoulder the financial burdens as their family business "crumbled with his death" resulting in the business being sold.[132] His mother "found herself in a relentless cycle of work" and Brandan came home "to a nanny instead of [his]

---

[123] *Id.*
[124] *Id.* at ¶ 7.
[125] *Id.*
[126] *Id.*
[127] *Id.*
[128] *Id.*
[129] *Id.* at ¶ 10.
[130] *Id.*
[131] *Id.*
[132] *Id.* at ¶ 8.

parents."[133] Brandan described that his mother did her best to be strong, but [redacted][134] Brandan's older brother, Ryan suddenly became the man of the house at just nine years old and had to be "a protector" for Brandan and their newborn brother.[135] The loss of Maj. Soltes "transformed [their] family dynamics, leaving a void where his presence, support, and partnership once stood."[136]

To navigate his grief, [redacted]

[133] *Id.*
[134] *Id.*
[135] *Id.* at ¶ 10.
[136] *Id.* at ¶ 8.
[137] *Id.* at ¶ 9.
[138] *Id.*
[139] *Id.*
[140] *Id.* at ¶ 5.
[141] *Id.* at ¶ 11.
[142] *Id.*
[143] *Id.*
[144] *Id.*

[redacted][145] He recalls that he spoke up for the first time at school and was eager to come home and share that with his father.[146] The death of Maj. Soltes robbed Brandan of his father's presence and he feels as though this stunted his personal development, leaving him to wonder how his life would be different with his father's guidance.[147] Brandan stated: "His deployment was supposed to be temporary, a brief interlude before returning to his family and the life he was building. Unfortunately, that return never happened, and we are left to grapple with the what-ifs and the void his absence has created."[148]

Plaintiffs have requested a 25% upward enhancement to Brandan's claims based on the close nature of his relationship with his father, his multiple decades of counseling, and the impact the loss has had on his ability to build and sustain relationships. They cite *Lelchook*, 2019 WL 4673849, at *6 (awarding a 25 percent upward departure to a family member who "lost her sense of place in the world"); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115, 118 (D.D.C. 2015) (awarding 25 percent upward departures to Kevin Shawn Rux's siblings and mother because "[e]evidence demonstrates that Kevin was the center of his family" and because they suffered emotional injuries including PTSD and persistent complex bereavement-related disorder); ); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence").

As in the case of his brother Ryan, the Special Master sees no basis for an enhancement and recommends that the Court award Brandan Soltes the baseline compensation of $5 million.

---

[145] *Id.*
[146] *Id.*
[147] *Id.*
[148] *Id.*

### d. Robert H. Soltes[149]

Robert H. Soltes ("Robert") is the youngest son of Maj. Soltes and was born on December 6, 2004—54 days after his father was killed.[150] Robert described that his arrival into the world was [redacted][151] According to Robert, [redacted][154]

Robert grew up with his mother and two older brothers, but the absence of his father lingered.[155] When he was eight years old, Robert's mother broke the news to him that his father was killed in Iraq.[156] Robert recalls that even at that age, he did not fully grasp the gravity of the situation.[157] Out of fear of the emotion it would bring up, Robert avoided delving too deep into the details.[158] It was not until he was older in high school when he began to ask more questions and seek to understand the circumstances of his father's death.[159] From his "birth, every milestone in [his] life, to just the simple day-to-day moments of growing up," Maj. Soltes was absent.[160] Robert often finds himself wondering who his father was and how much his father is reflected in

[149] Robert H. Soltes' Birth Certificate and declaration confirm that he is a U.S. citizen. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 7, Declaration of Robert H. Soltes, dated December 10, 2024.
[150] *Id.* at ¶¶ 3, 5, 9.
[151] *Id.* at ¶ 5.
[152] *Id.*
[153] *Id.* at ¶ 6.
[154] *Id.*
[155] *Id.* at ¶ 5.
[156] *Id.* at ¶ 4.
[157] *Id.*
[158] *Id.*
[159] *Id.*
[160] *Id.* at ¶ 5.

himself.[161] This is a source of "deep sadness" for Robert especially when he allows himself to think about what their relationship could have been like.[162] Losing his father before having the chance to even know him has caused Robert great emotional turmoil.[163] [redacted][164]

The loss of Maj. Soltes has not only affected Robert but has also "made life more challenging" for his mother.[165] Robert described that his mother was "thrust into the role of both mother and father" and had "the immense responsibility of being the sole provider and caregiver."[166] The loss of his father has also placed a great financial strain on his mother who carried a heavier burden to ensure their family had everything they needed.[167] Further, [redacted][168] The tragedy of Maj. Soltes' death has extended beyond their immediate family to their extended family and Maj. Soltes' circle of friends.[169] Through their sorrow, Robert's family has found a way to draw closer, "finding solace in shared memories and the bonds that tie [them] together."[170]

Robert described that his father's absence is "constant struggle" and that he "wishes for experiences that will never be."[171] This has shaped his "life in ways that are both seen and unseen."[172] Despite never having the opportunity to meet Maj. Soltes, Robert feels as though he

---

[161] *Id.*
[162] *Id.*
[163] *Id.* at ¶ 6.
[164] *Id.*
[165] *Id.* at ¶ 5.
[166] *Id.* at ¶ 7.
[167] *Id.*
[168] *Id.* at ¶ 8.
[169] *Id.*
[170] *Id.*
[171] *Id.* at ¶ 5.
[172] *Id.*

carries of piece of his father with him.[173] Although, it is difficult for Robert to express his feelings about a father he never knew.[174] The hardest part for Robert "is living with stories about him instead of memories with him."[175] "These stories, while precious, underscore the gap in [his] life where his [father's] presence should have been, a gap that stories alone cannot fill."[176]

The D.C. Circuit recently confirmed that a child who was *in utero* at the time of their parent's death in a terrorist attack (like the one in which Maj. Soltes was killed) "may seek solatium under the FSIA." *K.E.F.V. v. Islamic Republic of Iran*, 135 F.4th 988, 996 (D.C. Cir. 2025). While the D.C. Circuit conceded that a child who was *in utero* at the time of their parent's death might have reduced solatium damages because they might not experience "injury to their feelings," it did not mandate such a reduction. Given Robert H. Soltes' documented struggles—both physical and emotional—Plaintiffs have requested that the Court follow the baseline award of $5 million for Robert H. Soltes' solatium claim.

The Special Master recommends that the Court award Robert $2.5 million, 50% of the baseline award for a child. Because Ryan was born after his father's death, he necessarily has no memories of him and knows of his father only through the memories of others. It was not until high school that he explored the circumstances of his father's death. His sense of loss, though undoubtedly real, is vastly different than that of his brothers and that difference should be reflected in the award. This result is consistent with the outcomes in awards to other *in utero* plaintiffs. *See Karcher v. Islamic Republic of Iran,* 2026 U.S. Dist. Lexis 13128 (D.D.C. Jan. 23, 2026); *Cabrera v. Islamic Republic of Iran,* 2025 U.S. Dist. Lexis 94375 (D.D.C. May 16, 2025).

[173] *Id*. at ¶ 9.
[174] *Id*.
[175] *Id*.
[176] *Id*.

### C. Andrew Gerald Riedel – October 30, 2004 – Zaidon

On October 30, 2004, Lance Corporal ("LCpl.") Andrew G. Riedel—who was a Marine in B Company, 1st Battalion, 3d Marines—was traveling in a vehicle between Zaidon and Fallujah when his vehicle was hit by an SVBIED. *See* ECF No. 9 at ¶¶ 478-79; ECF No. 26-1 at 45-46. According to the Autopsy Examination Report, LCpl. Riedel [redacted][177] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Riedel was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the October 30, 2004 attack in which LCpl. Andrew Gerald Riedel was killed. *See* ECF Nos. 47, 48.

LCpl. Riedel's surviving parent, Sherrin Graham, and surviving sibling, Cayla Bell, are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 482-485. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of LCpl. Riedel's society, companionship, comfort, advice and counsel. *Id.* ¶ 485. The following chart reflects the claims asserted by these two family members whose claims arise out of the October 30, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Sherrin Graham | LCpl. Andrew G. Riedel's mother | Solatium claim $5 million | Declaration of Sherrin Graham dated February 26, 2026, including copy of her proof of U.S. citizenship | 9 |
| Cayla Bell | LCpl. Andrew G. Riedel's sister | Solatium claim $3.125 million | Declaration of Cayla Bell dated February 26, 2026, | 10 |

[177] Ex. 8, Autopsy Examination Report of Andrew G. Riedel.

| | | | | |
|---|---|---|---|---|
| | | | including copy of her proof of U.S. citizenship | |

**1. Solatium Claims Brought by LCpl Andrew Gerald Riedel Surviving Family Members**

**a. Sherrin Graham[178]**

Sherrin Graham ("Ms. Graham") is the mother of LCpl. Riedel.[179] LCpl. Riedel was the eldest child of Ms. Graham and "was the vibrant soul of our family, embodying a spirit that was larger than life itself."[180] Ms. Graham explained that she and LCpl. Riedel's father had difficulty conceiving.[181] Ms. Graham recalls when the nurse came into the room after Ms. Graham took a pregnancy test and said "congrats, you are pregnant!"[182] She was so shocked and excited.[183] The shared experiences Ms. Graham had with her son are moments she holds dear.[184] Time spent together taking trips to Disneyland and Universal Studios, playing cards, watching scary movies, and watching baseball and football games are deeply cherished.[185] Ms. Graham recalled the unforgettable photo shoot party for LCpl. Riedel's senior prom and his love for Halloween. They shared a special bond which remained strong even after he joined the Marines.[186]

The day Ms. Graham learned of her son's death, she saw a news reporting on the death of Marines in a roadside bomb attack, including members of LCpl. Riedel's Bravo company.[187] Her disbelief and hope that it was just a nightmare were crushed when she saw the government car and

---

[178] Sherrin Graham's Passport and declaration confirm that she is a U.S. citizen. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 9, Declaration of Sherrin Graham, dated February 26, 2026.

[179] *Id*. at ¶ 3.

[180] *Id*. at ¶ 4.

[181] *Id*

[182] *Id*.

[183] *Id*.

[184] *Id*. at ¶ 6.

[185] *Id*. at ¶ 5.

[186] *Id*. at ¶ 6.

[187] *Id*. at ¶ 8.

Marines at her doorstep, confirming the worst.[188] Ms. Graham recounted that her reaction was a range of emotions, "from hysterical laughter to profound grief," as she struggled to accept the reality of her son's death.[189]

According to Ms. Graham, [redacted][190] Ms. Graham found support in connecting with other Gold Star moms and in honoring her son's memory.[191] She participated in Memorial Day events and celebrated his birthday annually, finding a sense of purpose in these acts of remembrance.[192]

Ms. Graham described that the loss of her son has negatively impacted her relationships with others. [redacted][194]

According to Ms. Graham, "at 66, I find myself a shadow of the person I once was, enveloped in sadness and pain, distanced from family and wary of forming new attachments."[195] The loss has deprived her of witnessing LCpl. Riedel's "journey into adulthood, the family he dreamed of creating, and all the milestones [they] should have celebrated together."[196] Ms. Graham described that [redacted]

---

[188] *Id.*
[189] *Id.*
[190] *Id.* at ¶ 9.
[191] *Id.*
[192] *Id.*
[193] *Id.* at ¶ 11.
[194] *Id.*
[195] *Id.*
[196] *Id.* at ¶ 12.

[redacted][198] Her faith gives her strength yet Ms. Graham recognizes that there are certain emotions that she has boxed away.[199] Even though it is twenty years since LCpl. Riedel was killed; Ms. Graham is continuing her journey in confronting her emotions to begin the healing process.[200]

Plaintiffs have requested a baseline award of $5 million for Sherrin Graham's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**b. Cayla Bell[201]**

Cayla Bell ("Ms. Bell") is the sister of LCpl. Riedel.[202] Ms. Bell described her brother as her partner in crime, protector, and the mastermind behind all their mischievous adventures.[203] Growing up together with LCpl. Riedel meant that there "was an endless series of laughter, pranks, and moments that [Ms. Bell] now hold[s] dear."[204] They shared a love for comedy movies, and Ms. Bell recalls that her brother always managed to sneak in a horror film, much to her dismay. She recounted the legendary pranks they did together including locking their grandma out of the house and dancing in the doorway and accidentally turning their poodle, Sassy, to a vibrant shade of pink.[205] According to Ms. Bell, LCpl. Riedel had a knack for coming up with the most

[197] *Id.*
[198] *Id.*
[199] *Id.*
[200] *Id.*
[201] Cayla Bell's Passport and declaration confirm that she is a U.S. citizen. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 10, Declaration of Cayla Bell, dated February 26, 2026.
[202] *Id.* at ¶ 3.
[203] *Id.* at ¶ 4.
[204] *Id.*
[205] *Id.*

outrageous ideas for fun. She recalled the time they bungee-corded themselves together on rollerblades and went down a hill which Ms. Bell describes that "in hindsight, was as dangerous as it was hilarious."[206] These memories, these moments of pure joy and sibling camaraderie, are what she cherishes most about her brother. Their bond was one of "constant companionship and shared experiences."[207] Even after LCpl. Riedel joined the Marines, their connection remained unbroken—communicating as often as they could through letters and calls.[208]

Ms. Bell was at her father's house the day she found out about LCpl. Riedel's death. She recalled that her mother called, and her voice was "urgent and trembling" as she summoned them to her house.[209] The drive over was "surreal, punctuated by a flat tire that seemed like a cruel delay to the inevitable heartbreak awaiting [them]."[210] The moment Ms. Bell and her father saw the two Marines standing in her mother's living room, a "heavy silence fell over [them]."[211] Ms. Bell described that in that moment, "words were unnecessary; their presence alone conveyed the devastating news."[212] When her mother managed to articulate the words of LCpl. Riedel's passing, Ms. Bell ran to her closet where she "remained for hours, lost in grief and disbelief."[213]

[redacted][215] To address these issues, Ms. Bell has been working

[206] *Id.*
[207] *Id.* at ¶ 5.
[208] *Id.*
[209] *Id.* at ¶ 7.
[210] *Id.*
[211] *Id.*
[212] *Id.*
[213] *Id.*
[214] *Id.* at ¶ 8.
[215] *Id.*

with [redacted][216] [redacted][217] Beyond these costs, Ms. Bell explained that additional expenses arise from her desire to honor and remember him through attendance of various memorial events.[218] These expenditures place a financial strain on Ms. Bell.[219]

Ms. Bell described that her family grief manifests differently in each of them, but the impact is universally felt, during significant dates like LCpl. Riedel's birthday, Memorial Day, and the anniversary of his death.[220] Ms. Bell's response to this trauma has characterized by anger, withdrawal, and a lack of motivation which has strained her relationships with her husband and children.[221] According to Ms. Bell, [redacted][223]

According to Ms. Bell "each new life event—be it joyful or mundane—brings with it a poignant reminder of his absence, a silent echo of 'I wish you were here' or 'he would have loved this.'[224] Ms. Bell stated: "Words fall short of capturing the depth of anguish and heartache that now colors our everyday existence. The void left by my brother's death at 19, a life so brutally cut

---

[216] *Id.*

[217] *Id.* at ¶ 9.
[218] *Id.*
[219] *Id.*
[220] *Id.* at ¶ 10.
[221] *Id.*
[222] *Id.*
[223] *Id.*
[224] *Id.* at ¶ 11.

short, has irrevocably altered the fabric of our family but my life, leaving us to navigate a world forever dimmed by his absence."[225]

Plaintiffs have requested an upward enhancement to Ms. Bell's claims based on the close nature of her relationship with her brother and the physical toll that his loss has had on her since his death. They cite *Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *Thuneibat v. Syrian Arab Republic,* 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); and *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs have requested an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Cayla Bell's solatium damages.

The Special Master agrees with the request for an enhancement and recommends that the Court award $3 million to Ms. Bell, a 20% enhancement. There is evidence of a link between stress, such as Ms. Bell's grief over the loss of her brother, and [redacted] An enhancement is in order.

---

[225] *Id.*

**D. Kyle W. Burns – November 11, 2004 – Fallujah**

On November 11, 2004, Kyle W. Burns—who was serving in the U.S. Marines as a Lance Corporal ("LCpl.") with the 1st Light Armored Reconnaissance Battalion—was traveling with his unit in a Light Armored Vehicle in Fallujah, Iraq to meet with 1st Battalion when his vehicle was ambushed and struck with a Rocket-Propelled Grenade ("RPG"). *See* ECF No. 26-1 at 50. According to the casualty report, LCpl. Burns died [redacted][226] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Burns was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the November 11, 2004 attack in which LCpl. Kyle W. Burns was killed. *See* ECF Nos. 47, 48.

LCpl. Burns' mother, Jocelyn M. Burns, and brother, Kristopher W. Burns, are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 542-544. The plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and a loss of LCpl. Burns' society, companionship, comfort, advice and counsel. *Id*. at ¶ 544. The following chart reflects the claim asserted by Jocelyn M. Burns and Kristopher W. Burns in their individual capacity arising out of the November 11, 2004, attack as well as the evidence setting forth the bases of their claim. The evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Jocelyn M. Burns | LCpl Kyle W. Burns' mother | Solatium claim $6.25 million | Declaration of Jocelyn M. Burns dated November 7, 2025, including copy of her proof of U.S. citizenship | 12 |

[226] *See* Ex. 11, LCpl. Kyle C. Burns Report of Casualty.

| | | | | |
|---|---|---|---|---|
| Kristopher W. Burns | LCpl Kyle W. Burns' brother | Solatium claim $3.125 million | Declaration of Kristopher W. Burns dated November 5, 2025, including copy of his proof of U.S. citizenship | 13 |

**1. Solatium Claims Brought by LCpl Kyle W. Burns Surviving Family Members**

**a. Jocelyn M. Burns[227]**

Jocelyn M. Burns ("Ms. Burns") is the mother of LCpl. Burns and described her son as "the heart" of the family's home, adventures, and dreams."[228] He was courageous and valued fairness and family.[229] Ms. Burns recalls the moment LCpl. Burns decided to join the junior hockey league as a first grader, despite not knowing how to skate.[230] This decision by LCpl. Burns brought his family together leading them into a world of hockey where their weekends were "consumed with games and travel."[231] The family was "all-in as a hockey family" with Ms. Burns' husband as the referee, instructor, coordinator, and game scheduler, LCpl. Burns' brother Kristopher "("Kris") as a referee, and Ms. Burns as an avid hockey mom.[232] She described that it was not just about the game, but it was also about the "countless bonfires, the s'mores and scary stories, and silly contests that truly defined [their] family's bond."[233] In addition to having a close relationship with his immediate family, Ms. Burns described that LCpl. Burns was a great friend and close with his extended family.[234] His hockey teammates found a haven at the Burns' home to let out their

[227] Jocelyn Burns' Birth Certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 13, Declaration of Jocelyn Burns, dated November 7, 2025.
[228] *Id*. at ¶¶ 3-5.
[229] *Id*. at ¶¶ 8-9.
[230] *Id*. at ¶ 4.
[231]
[232]
[233]
[234]

rambunctious energy.[235] LCpl. Burns also spent two weeks each summer together with his cousins, aunts, uncles, and grandparents.[236]

According to Ms. Burns, LCpl. Burns was motivated to join the Marines after the September 11, 2001 terror attacks.[237] Following this desire to serve his country, LCpl. Burns joined the Marines and left for boot camp in June of 2002 after graduating high school that Spring.[238] After LCpl. Burns joined the Marines, he continued to spend time together with his family. Ms. Burns described how the family cherished the moments they could share, whether it was welcoming him home on leave, visiting grandparents, or spending quiet nights in a Las Vegas motel during a family wedding.[239]

On November 12, 2004, Major Steven Beck and his Sergeant arrived at Ms. Burns' home after midnight.[240] According to Ms. Burns, the sight of Marine uniforms through her front door's window "triggered an animalistic scream from [her], in [her] head saying 'go away, go the hell away.'"[241] As they entered, Ms. Burns was supported by her husband, Bob.[242] Both of them in disbelief repeatedly saying "no, no."[243] Ms. Burns called LCpl. Burns' brother, Kris, over after being asked about his whereabouts.[244] When Kris arrived, Major Beck explained that LCpl. Burns had been killed in an attack in Fallujah, Iraq on November 11, 2004.[245] "The initial shock was overwhelming," and Ms. Burns feared the worst about her son's condition after "hearing it was an

---

[235] *Id*. at ¶ 5.
[236] *Id*. at ¶ 8.
[237] *Id*. at ¶ 6.
[238] *Id*.
[239] *Id*. at ¶ 7.
[240] *Id*. at ¶ 10.
[241] *Id*.
[242] *Id*.
[243] *Id*.
[244] *Id*.
[245] *Id*.

explosion that took his life."[246] In the morning, Ms. Burns had the daunting task of sharing the news of her son's death with her siblings and LCpl. Burns' best friend, John Brooks.[247] She also had to inform their hockey community before they found out about LCpl. Burns' death on the news. [248]

[redacted][253]

The impact of LCpl. Burns' death had catastrophic consequences for their family. Ms. Burns stated that their family's well-being and quality of life is significantly deteriorated.[254] Friends have drifted away unable to comprehend the depth of their grief.[255] Kris was once vibrant and joyful but has succumbed to depression and reclusiveness.[256] [redacted]

---

[246] *Id*.
[247] *Id*.
[248] *Id*. at ¶ 10.
[249] *Id*. at ¶ 13.
[250] *Id*.
[251] *Id*.
[252] *Id*. at ¶ 11.
[253] *Id*. at ¶ 13.
[254] *Id*.
[255] *Id*.
[256] *Id*.

[redacted][257] [redacted][258] Before he died, Bob confessed to Ms. Burns that he did not want to forget his son, he just could not bear the pain.[259] According to Ms. Burns, [redacted][260] Now, in what should have been their golden years of retirement, Ms. Burns finds herself alone.[261] The tragedy of LCpl. Burns' death paradoxically strengthened Ms. Burns' bond with her son Kris, alienated her from extended family, and created [redacted][262] The loss of Bob has further compounded Ms. Burns' grief.

Ms. Burns longs for her son's presence and describes how his absence has left a "void in significant family milestones."[263] She often finds herself wondering how their lives would be if LCpl. Burns was still here.[264] She asks: "Would we have more grandchildren to spoil? Would family gatherings be filled with his laughter?"[265] "The profound sense of loss, the what-ifs, and the milestones missed are constant companions" in her daily life.[266] Ms. Burns described that the world "feels emptier without him."[267] [redacted] [redacted] [redacted][269] Twenty years have passed since the Burns family lost her son and the shadow of his absence "touches every aspect of

---

257 *Id.*
258 *Id.*
259 *Id.*
260 *Id.*
261 *Id.*
262 *Id.*
263 *Id.* at ¶ 7.
264 *Id.* at ¶ 12.
265 *Id.*
266 *Id.* at ¶ 14.
267 *Id.* at ¶ 13.
268 *Id.* at ¶ 14.
269 *Id.*

[their] lives."[270] Ms. Burns stated that she foresees the challenges that have "plagued" the family since LCpl. Burns' death to continue until she takes her "last breath."[271]

Plaintiffs have requested an upward enhancement to Ms. Burns' claims based on her reliance on anti-depressant medication until only recently, the destruction of her marriage, and the impact of losing not only her son but also her children's father as a result of LCpl. Burns' death. They cite *Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); and *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs have requested an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Jocelyn M. Burns' solatium claim.

The Special Master recommends that the Court award Ms. Burns the baseline award of $5 million. Only one factor is cited that could place Ms. Burns' circumstances outside the grief responses encompassed within the baseline damages—[redacted]

[270] *Id*. ha
[271] *Id*.

[redacted], there is insufficient evidence in the record to permit the Court to rely on [redacted] as the basis for an enhancement of an award to Ms. Burns.

**b. Kristopher W. Burns** [272]

Kristopher W. Burns ("Kris") is the brother of LCpl. Burns.[273] Kris explained that "growing up with [LCpl. Burns] was an experience filled with countless memories that [he] holds dear."[274] Kris recalls that the time spent with his brother was filled with adventure and mischief.[275] They were inseparable and often played video games, went boating, hunting, fishing, biking, going to the movies or even shooting arrows into the neighbor's garage.[276] Their annual hunting trips were a tradition and a special time that was just for the two of them to get away from the rest of the world.[277] Kris recalls that the last time he hugged his brother was at their grandmother's funeral, "a moment that now holds even more significance in [his] heart."[278]

According to Kris, he and his brother "shared a bond that remained unbroken through the years, staying in touch through every possible means, from phone calls to letters and text messages."[279] Kris described LCpl. Burns as a man with "a heart as big as his personality," "deeply loving," selfless, a protector, and someone "who stood up for what was right."[280] Kris recalled his brother's laughter and vibrant energy which made every moment with LCpl. Burns memorable.[281]

---

[272] Kristopher Burns' Birth Certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 13, Declaration of Kristopher Burns, dated November 5, 2025.

[273] *Id*. at ¶ 3.

[274] *Id*. at ¶ 4.

[275] *Id*. at ¶ 5.

[276] *Id*.

[277] *Id*. at ¶ 4.

[278] *Id*.

[279] *Id*. at ¶ 3.

[280] *Id*. at ¶ 6.

[281] *Id*.

Kris described that the day he found out about LCpl. Burns' death was the "darkest day of [his] life."[282] Upon waking in the morning, Kris had an unsettling feeling which was quickly followed by a call from his father, Robert Burns, urging him to come home.[283] When Kris arrived, he was met by Major Stephen Beck who delivered the devastating news that LCpl. Burns was killed in the Iraq War.[284] Kris recalls that the reality of Major Beck's words "felt like a nightmare." Kris was numb and unable to initially process the magnitude of the loss.[285]

After some time, [redacted][290]

The death of LCpl. Burns has "profoundly impacted [their] family in ways that are both deeply personal [to Kris] and collectively transformative" as their family dynamics "shifted significantly."[291] Kris went from "being a brother to an only child" which is a change that "reshaped [his] identity and [his] role within [the] family."[292] According to Kris, [redacted]

[282] *Id*. at ¶ 7.
[283] *Id*.
[284] *Id*.
[285] *Id*.
[286] *Id*. at ¶ 8.
[287] *Id*.
[288] *Id*.
[289] *Id*.
[290] *Id*.
[291] *Id*. at ¶ 10.
[292] *Id*.

[redacted] In contrast, Ms. Burns and Kris found solace in each other, which strengthened their bond.[294]

According to Kris, it took him a "decade to reach a place where anger no longer clouded the joy of holidays" though the pain of losing his brother still lingers, especially during activities like hunting which reminds him so vividly of LCpl. Burns.[295] The shadow of his brother's death "will forever linger" over their family and resonates especially during LCpl. Burn's birthday, the anniversary of his death, and Christmas, which remains a somber holiday.[296] The thought of Kris' children never being able to experience the joy of having LCpl. Burns as their uncle fills Kris with deep sadness because he knows his brother would have been an incredible figure in their lives.[297] The death of LCpl. Burns "fundamentally altered" Kris—it stripped him away from his "carefree spirit, leaving [him] dark, jaded, and consumed with anger."[298] Kris stated that "had it not been for the love and support of [his] wife, who has been [his] rock, guiding [him] back to a place of stability, [he] fear[s] [he] might have succumbed to despair and followed in [his] father's tragic footsteps.[299] LCpl. Burns' "absence has reshaped [their] family's existence" leaving a "lasting impact that continues to unfold with each passing day."[300]

Plaintiffs have requested an upward enhancement to Kristopher's claims based on the close nature of his relationship with his brother, the subsequent loss of his father, and [redacted]. They cite *Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process);

---

[293] *Id.*
[294] *Id.*
[295] *Id.*
[296] *Id.* at ¶ 11.
[297] *Id.*
[298] *Id.*
[299] *Id.*
[300] *Id.*

*id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); and *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs have requested an enhancement of 25% of his baseline award resulting in an award of $3.125 million for Kristopher W. Burns' solatium claim.

As in the case of LCpl Burns' mother, the Special Master believes [redacted] The Special Master recommends that the Court award Kristopher Burns a 10% enhancement of the baseline award to reflect this extreme response to his brother's death, resulting in an award o of $2.75 million.

**E. Jeffery S. Blanton – December 12, 2004 – Fallujah**

On December 12, 2004, LCpl. Jeffery S. Blanton, who was serving as a Marine in the Charlie Company, 1st Battalion, 3d Marines, was conducting a house-to-house pursuit, clearing buildings when insurgents fired shots from the second floor of a building. ECF No. 9 at ¶ 89; ECF

No. 26-1 at p. 55. According to the Report of Casualty, LCpl. Blanton died as a result "of a gunshot wound from enemy small arms fire while conducting combat operations during Operation Iraqi Freedom."[301] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Blanton was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the December 12, 2004 attack in which LCpl. Jeffery S. Blanton was killed. *See* ECF Nos. 47, 48.

LCpl. Blanton's father, Steven D. Blanton, is a Plaintiff in this case. *See* ECF No. 9 at ¶¶ 650-651. Mr. Blanton has suffered severe mental anguish, extreme emotional pain and suffering, and loss of LCpl. Blanton's society, companionship, comfort, advice and counsel. *Id.* ¶ 651. The following chart reflects the claims asserted by Mr. Blanton, whose claim arises out of the December 12, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Steven D.. Blanton | LCpl. Jeffery S. Blanton's father | Solatium claim $6.25 million | Declaration of Steven D. Blanton dated January 27, 2026, including copy of his proof of U.S. citizenship | 15 |

[301] *See* Ex. 14, LCpl. Jeffery S. Blanton Report of Casualty.

#### 1. Solatium Claims Brought by LCpl Jeffery S. Blanton's Surviving Family Member

##### a. Steven D. Blanton[302]

Steven D. Blanton ("Mr. Blanton") is the father of LCpl. Blanton.[303] From the age of 8, LCpl. Blanton came to live with Mr. Blanton and his stepmother, and they developed a close relationship.[304] Despite LCpl. Blanton's early academic challenges, he was resilient and worked tirelessly with his stepmother to bring himself up to grade level.[305] Mr. Blanton described that LCpl. Blanton began to flourish both academically and socially.[306] He excelled in Reserve Officers' Training Corps ("ROTC") program, mathematics, and in sports such as football and baseball.[307] According to Mr. Blanton, LCpl. Blanton cherished his relationships with his family and friends.[308] In addition to his stepmother, LCpl. Blanton had two stepbrothers who he grew up with and shared a close bond with.[309] He also had a tight-knit circle of friends, including his best friend, Robert Tucker, with whom he spent countless hours outdoors, fishing, and camping.[310] Watching LCpl. Blanton "grow, overcome obstacles, and ultimately become a successful Marine filled [Mr. Blanton] with immense pride."[311]

The day Mr. Blanton learned of his son's death, he saw a police car arrive outside of his home.[312] While initially Mr. Blanton was confused, it became clear when he saw a chaplain

[302] Steven D. Blanton's Birth Certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 15, Declaration of Steven D. Blanton, dated January 27, 2026.
[303] *Id*. at ¶ 3.
[304] *Id*. at ¶ 4.
[305] *Id*.
[306] *Id*.
[307] *Id*.
[308] *Id*. at ¶ 5.
[309] *Id*.
[310] *Id*.
[311] *Id*. at ¶ 4.
[312] *Id*. at ¶ 6.

accompanied by a member of the Salvation Army approach him on the driveway.[313] Before a word was spoken, Mr. Blanton knew his son had fallen in Iraq.[314] LCpl. Blanton's death caused Mr. Blanton overwhelming pain that has been constant since the day LCpl. Blanton died.[315] Mr. Blanton recalled that sharing the news of his son's death with friends, family, and LCpl. Blanton's ex-girlfriend was a heart-wrenching task that both spread anguish and brought them together in their shared loss.[316]

The dismantling of Mr. Blanton's life following his son's death has had significant consequences for him.[317] [redacted]

[313] *Id.*
[314] *Id.*
[315] *Id.*
[316] *Id.*
[317] *Id.*
[318] *Id.*
[319] *Id.* at ¶ 7.
[320] *Id.*
[321] *Id.*
[322] *Id.* at ¶ 8.
[323] *Id.*

[redacted][324]

Mr. Blanton described that he faced devastating financial loss after LCpl. Blanton died which turned the lives of their family upside down.[325] According to Mr. Blanton, "[w]e lost everything that we had worked tirelessly for over the years—our house, cars, boats, campers, and even our 401k vanished."[326] Mr. Blanton finds himself in a relentless struggle to reclaim what he's lost, but to no avail.[327] He once was fulfilled by working and was able to save for the future.[328] Now, he lives paycheck to paycheck, "devoid of a place [they] can truly call home."[329] Mr. Blanton described the financial burden as "a suffocating feeling, like being placed in a vice that tightens with every attempt to move forward."[330] "The relentless pressure has stripped away not just [their] material possessions, but also a piece of [their] spirit."[331]

The loss of LCpl. Blanton "cast a shadow over [their] family that seems almost impossible to escape from."[332] Mr. Blanton described LCpl. Blanton was his only biological child, so the hope for grandchildren from his son is shattered.[333] The passing of LCpl. Blanton did not only "mean the end of the Blanton lineage," but it also "shifted the very foundation" of their family.[334] Every celebration "is now tinged with the sorrow of his absence." Mr. Blanton explained that "[i]t's as though we're constantly reminded of what we've lost."[335] LCpl. Blanton's death has isolated them

---

[324] *Id.*
[325] *Id.* at ¶ 9.
[326] *Id.*
[327] *Id.*
[328] *Id.*
[329] *Id.*
[330] *Id.*
[331] *Id.*
[332] *Id.* at ¶ 10.
[333] *Id.*
[334] *Id.*
[335] *Id.*

from other family members leaving them "to contend with [their] grief in loneliness."[336] It has also created devastating consequences for LCpl. Blanton's stepbrothers. [redacted][338]

According to Mr. Blanton, the details of LCpl. Blanton's death haunt him to this day.[339] Despite the years passing, the pain feels as fresh as if it were yesterday."[340] "The expectation of living another two decades is overshadowed by the realization that these years will be tinged with regret, sorrow, and an unending yearning for the son [he] lost."[341]

Plaintiffs have requested an upward enhancement to Mr. Blanton's claims based on his continuing psychological care for the grief he endured in addition to the substance abuse and financial loss that also arose from his grief at losing his son. They cite *Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of

---

[336] *Id*.
[337] *Id*.
[338] *Id*.
[339] *Id*. at ¶ 6.
[340] *Id*.
[341] *Id*. at ¶ 11.

requiring medication, and she developed conditions including diabetes as a result of becoming less active); and *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs have requested an enhancement of 25% of his baseline award resulting in an award of $6.25 million for Steven D. Blanton's solatium claim.

[redacted] The unique factor in Mr. Blanton's claim is the loss of his job due to his grief ([redacted]) and the subsequent loss of all his assets. The job loss is documented in Mr. Blanton's declaration, but the loss of all assets is described only generally and without any link to the death of LCPL Blanton. The Special Master recommends that the Court award $5.5 million in damages to Mr. Blanton to recognize that [redacted] that cost himhis job, a 10% enhancement.

**F. Melvin L. Blazer, Jr. – December 12, 2004 – Fallujah**

On December 12, 2004, SSgt. Melvin L. Blazer was serving in the 5th Marines in the Kilo Company, 3d Battalion and was conducting security sweeps throughout Fallujah when his unit came under small-arms fire by insurgents. ECF No. 9 at ¶ 653; ECF No. 26-1 at 55-56. According to the findings of the Report of Casualty, SSgt. Blazer died as a result of [redacted][342] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which SSgt. Blazer was killed on October 11, 2024 (ECF No. 26), and on

[342] *See* Ex. 16 , SSgt. Melvin Leslie Blazer Jr., Report of Casualty.

September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the December 12, 2004 attack in which SSgt. Melvin L. Blazer, Jr., was killed. *See* ECF Nos. 47, 48.

SSgt. Blazer's surviving spouse and two surviving children—Dana Blazer-Wortham, Alyssa Highley, and Erik Blazer—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 655-659. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of SSgt. Blazer's society, companionship, comfort, advice and counsel. *Id.* ¶ 659. The following chart reflects the claims asserted by these three family members whose claims arise out of the December 12, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Dana Blazer-Wortham | SSgt. Melvin L. Blazer's surviving spouse | Solatium claim $8 million | Declaration of Dana Blazer-Wortham dated December 6, 2024, including copy of her proof of U.S. citizenship | 17 |
| Alyssa Highley | SSgt. Melvin L. Blazer's surviving child | Solatium claim $6.25 million | Declaration of Alyssa Highley dated December 6, 2024, including copy of her proof of U.S. citizenship | 18 |
| Erik Blazer | SSgt. Melvin L. Blazer's surviving child | Solatium claim $6.25 million | Declaration of Erik Blazer dated November 27, 2024, including copy of his proof of U.S. citizenship | 19 |

### 1. Solatium Claims Brought by SSgt. Melvin L. Blazer's Surviving Family Members

#### a. Dana Blazer-Wortham[343]

Dana Blazer-Wortham ("Dana") is the surviving spouse of SSgt. Blazer.[344] Since Dana was fifteen years old, SSgt. Blazer was her best friend. They shared countless memories cruising with friends, bowling, or cheering on the University of Oklahoma Sooners football team.[345] Their bond was built on shared interest and dreams—especially their love for old cars.[346] Dana described that their love story began in December of 1988 when they realized that being apart was no longer an option for them.[347] The couple married on August 19, 1989.[348] Together, Dana and SSgt. Blazer embraced life as a military family, especially during their relocation to Hawaii.[349] During this time, SSgt. Blazer was deployed to the first Gulf War and missed the birth of their first child, Alyssa.[350] SSgt. Blazer did not meet his daughter until she was six months old.[351] Despite the loss of time, SSgt. Blazer and Alyssa quickly became inseparable.[352] While in Hawaii, the couple welcomed a second child, Erik, into the world.[353] Their family cherished simple pleasures like beach days or exploring new places with each move.[354] Dana described that she and SSgt. Blazer remained in contact with each other despite the challenges of long-distance communication when he was deployed.[355] They often wrote to each other daily and shared dreams for their future, like retirement

---

[343] Dana Blazer-Wortham's Birth Certificate and declaration confirm that she is a U.S. citizen. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 17, Declaration of Dana Blazer-Wortham, dated December 6, 2024.
[344] *Id*. at ¶ 3.
[345] *Id*. at ¶ 5.
[346] *Id*.
[347] *Id*. at ¶ 4.
[348] *Id*.
[349] *Id*.
[350] *Id*.
[351] *Id*.
[352] *Id*.
[353] *Id*.
[354] *Id*.
[355] *Id*.

and vacations.[356] Dana counted down the days until she and SSgt. Blazer could be together again.[357] She stated that SSgt. Blazer "was [her] everything, and [their] life together, with all its ups and downs, was filled with love and shared adventures."[358]

During SSgt. Blazer's deployment in Iraq, Dana and their children were living on base in Camp Pendleton, California.[359] One night around 11:00 pm, Dana's phone rang, and a US Government number was displayed on the caller ID.[360] The call was from her casualty officer, First Sgt. Mark Hatley, asking for Dana to answer her front door.[361] The sight of the casualty officer and chaplain approaching her home "is an image that will forever haunt [her]."[362] Dana recounted that she knew immediately the gravity of their presence.[363] Overwhelmed with grief, she "fell to [her] knees, begging them to leave, unable to face the reality they were about to confirm."[364] Her "reaction was visceral"—she was so distraught that she "nearly became physically ill on the chaplain."[365] At the chaplain's insistence, Dana called her best friend Vicky and her husband over.[366] As she waited for them, she "faced the unimaginable task of telling [their] children."[367] Dana recalled that Alyssa told her mom that "her daddy had visited her to say goodbye."[368] Dana described that their lives were irrevocably changed and that their family was shattered by the cruel realities of war.[369]

---

[356] *Id.*
[357] *Id.*
[358] *Id.*
[359] *Id.* at ¶ 7.
[360] *Id.*
[361] *Id.*
[362] *Id.*
[363] *Id.*
[364] *Id.*
[365] *Id.*
[366] *Id.*
[367] *Id.*
[368] *Id.*
[369] *Id.*

Dana became widowed at thirty-four years old with the immense responsibility of raising two young children without support.[370] [redacted][375]

Prior to SSgt. Blazer's death, Dana was always present with their children.[376] After SSgt. Blazer's death, the family's financial situation underwent significant changes.[377] Dana was suddenly required to work and simultaneously go to school to receive qualifications for a career as a dental assistant to support their family.[378] This caused Aylssa to have to take on responsibilities "beyond her years" looking after her brother while her mother worked and went to school.[379] Dana feels as though this deprived Alyssa from her full experience in junior high.[380] While they were "financially responsible," Dana and their children faced profound financial hardship.[381]

---

[370] *Id*. at ¶ 10.
[371] *Id*.
[372] *Id*.
[373] *Id*.
[374] *Id*. at ¶ 8.
[375] *Id*.
[376] *Id*. at ¶ 9.
[377] *Id*.
[378] *Id*.
[379] *Id*.
[380] *Id*.
[381] *Id*.

Each day without SSgt. Blazer "is a reminder of the void his death has created."[382] "The long-term impact of his death is felt in every missed milestone—holidays, graduation ceremonies, [their] children's weddings, and the birth of [their] first granddaughter."[383] Christmas is especially a time filled with profound sorrow as well as the anniversary of SSgt. Blazer's passing and funeral.[384] Dana described that the "enduring pain of not having [SSgt. Blazer] with [them], of not being able to experience life's precious moments as a complete family, is a constant struggle that [they] carry" each day.[385]

Plaintiffs have requested a baseline award of $8 million for Dana Blazer-Wortham's solatium claim. The Special Master concurs and recommends that the Court award that amount.

**b. Alyssa Highley[386]**

Alyssa Highley ("Alyssa") is the oldest child of SSgt. Blazer.[387] Alyssa described that SSgt. Blazer was not just her father but "was a figure of strength, joy, and inspiration" in her life.[388] They bonded over countless competitive video gaming sessions and time spent with her father was filled with love and laughter.[389] Despite the distance SSgt. Blazer's military duties imposed, he was always present at Alyssa's band performances whenever he could make it.[390] This meant the world to her. Alyssa recalls that one of the fondest memories of SSgt. Blazer was when he surprised her with a Super Nintendo after returning from Japan.[391] She described that their adventure through

---

[382] *Id.* at ¶ 11.
[383] *Id.*
[384] *Id.*
[385] *Id.*
[386] Alyssa Highley's Birth Certificate and declaration confirm that she is a U.S. citizen. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 18, Declaration of Alyssa Highley, dated December 6, 2024.
[387] *Id.* at ¶ 3.
[388] *Id.* at ¶ 4.
[389] *Id.*
[390] *Id.*
[391] *Id.*

Yoshi's Island is a memory she will never forget.[392] From as far back as she can recall, SSgt. Blazer was an "integral part of [her] life", a "constant presence that shaped [her] world in countless ways."[393] When her father was not deployed, their home "buzzed with sounds of laughter, the flicker of sci-fi movies lighting up [their] living room, and the shared silence as [they] lost [themselves] in pages of the Batman comics.[394] Alyssa described her father as "more than just a parent;" he was her "mentor," "hero," and her "friend."[395]

Alyssa recounted the night she learned of her father's death at just fourteen years old on December 12, 2004.[396] Although it was late at night, Alyssa was unable to sleep and overheard the devastating news that the chaplain and casualty officer gave her mother—that her father was killed in an attack.[397] The loss of SSgt. Blazer left a void in Alyssa's heart.[398] In the days that followed, she withdrew from school and confided in two close friends of her father's death and their impending move.[399]

According to Alyssa, "every significant moment in [her] life has been overshadowed by his absence."[400] SSgt. Blazer was not there to teach her how to drive, to celebrate her graduations, to witness her first date, proms, to be a part of her wedding day, or for the birth of her child.[401] Holidays such as Christmas bring a sense of dread.[402] Overwhelmed by grief from losing her father, Alyssa recalled that she tore down their Christmas tree the year her father died—unable to bear

---

[392] *Id*.
[393] *Id*. at ¶ 5.
[394] *Id*.
[395] *Id*.
[396] *Id*. at ¶ 7.
[397] *Id*.
[398] *Id*.
[399] *Id*.
[400] *Id*. at ¶ 8.
[401] *Id*.
[402] *Id*.

the weight of the holiday without him.[403] It was not until recently, with the birth of her daughter, that she began to celebrate the holiday again.[404]

The death of SSgt. Blazer profoundly impacted the Blazer family, upending their dynamics and plunging Alyssa's younger brother into a deep depression.[405] Alyssa found herself assuming greater responsibilities at a young age to help her mother manage her brother's medical appointments and taking on roles that her father would have filled.[406] Although Alyssa was a child at the time of her father's death, she was acutely aware of the financial struggles that SSgt. Blazer's death brought.[407] She was raised in a home where her mother dedicated herself to being a full-time parent.[408] Suddenly, her mother was left to support the family while obtaining career training.[409] Alyssa recalled that the safety net of the life insurance and social security benefits was temporary, forcing her mom to step away from her role at home with her children.[410] The shift in their family's financial status was a stark reminder of the many ways in which her father's death impacted their lives.[411]

Alyssa described that their family's "overall well-being suffered" and she felt as though they were "abandoned by a world that professes to support our troops but often forgets the families left to bear the weight of their [loved one's] absence."[412] According to Alyssa, her grief was further compounded by the estrangement from her father's side of the family.[413] "The loss has not just been about missing one person; it's been about the unraveling of family ties, the hardening of

---

[403] *Id.*
[404] *Id.*
[405] *Id.* at ¶ 11.
[406] *Id.*
[407] *Id.* at ¶ 10.
[408] *Id.*
[409] *Id.*
[410] *Id.*
[411] *Id.*
[412] *Id.* at ¶ 11.
[413] *Id.*

hearts to cope with the pain, and the struggle to find a new normal without the cornerstone of [their] family."[414]

[redacted][416] The loss affects her view of the world and intertwines with her personal grief of global events and political discussion.[417] Alyssa is often triggered with the mention of wars abroad which reignites her fear and anxieties, making her relive the trauma of loss.[418] This leads her to question, whether history will repeat itself with her husband or her daughter? [419] She is often reminded that as the world moves on, the void of her father's absence remains.[420]

Plaintiffs have requested an upward enhancement to Alyssa's claims based on the close nature of her relationship with her father and the significant change in her life and her responsibilities within her home with her mother working outside the home and assisting her brother with his depression that has prevented her from truly finding peace following her father's death. They cite *Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,*

---

[414] *Id.*
[415] *Id.* at ¶ 12.
[416] *Id.*
[417] *Id.*
[418] *Id.*
[419] *Id.*
[420] *Id.*

167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); and *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Alyssa Highley's solatium claim.

The Special Master recommends that the Court award Alyssa Highley the benchmark award of $5 million. While Alyssa's teen years were dramatically affected by the loss of her father, there is nothing in her grief that would place her outside the circumstances contemplated by the baseline award.

**c. Erik Blazer[421]**

Erik Blazer ("Erik") is the son and youngest surviving child of SSgt. Blazer.[422] Erik aspired to be just like his father from a very young age.[423] He spent his time following SSgt. Blazer wherever he went—describing himself as his father's "shadow."[424] Erik described SSgt. Blazer as a hands-on father who was his mentor and best friend.[425] SSgt. Blazer taught Erik to "fish, shoot, and play" different sports.[426] While there are several moments with his father that were special, Erik is particularly fond of his time fishing with his father off a pier in Oceanside, California where

[421] Erik Blazer Birth Certificate and declaration confirm that he is a U.S. citizen. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 19, Declaration of Erik Blazer, dated November 27, 2024.

[422] *Id*. at ¶ 3.

[423] *Id*. at ¶ 4.

[424] *Id*. at ¶¶ 4-5.

[425] *Id*. at ¶ 4.

[426] *Id*.

they caught a lionfish—drawing attention from others around them.[427] He also recalled that SSgt. Blazer surprised him with the very bike his father rode as a child.[428] Together, they "took it apart, cleaned it, and greased its bearings."[429] This moment with his father is something that Erik treasures to this day.[430] Erik described his relationship with his father as "incredibly close" and that he seized every opportunity to be by SSgt. Blazer's side.[431] The untimely death of SSgt Blazer "robbed [Erik] of countless moments that [they] could have shared together."[432]

On December 12, 2004, a casualty officer and pastor arrived at his family's home late at night.[433] To Erik's heartbreak, they delivered the news that his father and best friend had been killed in Iraq.[434] The weight of the loss of SSgt. Blazer was like a gut punch to Erik, the finality of his death sinking in immediately.[435] The image of the chaplain and casualty officer at the door is a memory that haunts Erik.[436]

Since the loss of SSgt. Blazer, the trajectory of Erik's life has been irrevocably altered.[437] [redacted][439] As he grew older, Erik became cognizant of the financial repercussions of his father's death.[440] Holidays were once joyous and a time that the family would all gather.[441] Now, the relationships within the family are

---

427 *Id*.
428 *Id*.
429 *Id*.
430 *Id*.
431 *Id*. at ¶ 5.
432 *Id*. at ¶ 4.
433 *Id*. at ¶ 7.
434 *Id*.
435 *Id*.
436 *Id*.
437 *Id*. at ¶ 8.
438 *Id*. at ¶ 9.
439 *Id*.
440 *Id*. at ¶ 10.
441 *Id*. at ¶ 11.

distant.[442] Erik described that "what was once a tight-knit unit has deteriorated to a point where communication has all but ceased."[443]

Erik described that his father was the "cornerstone" of their family—the "glue" that kept them together.[444] He recalled that his father's laugh was infectious and that SSgt. Blazer had the ability to transform any moment into something memorable.[445] Missed life events such as the day he got his driver's license, marriage, and birth of his first child are marked by SSgt. Blazer's absence.[446] While his father was not physically present, Erik described that he remains "forever inspired" by the memories and lessons from his father.[447] According to Erik, the death of SSgt. Blazer is "profound" and a "life-altering loss."[448] Without SSgt. Blazer, "a vital piece of [their] family's heart and soul."[449]

Plaintiffs have requested an upward enhancement to Erik's claims based on the close nature of his relationship with his father and the continued treatment he is receiving by a therapist and psychiatrist for the loss of his father over 20 years ago. They cite *Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016)

[442] *Id.*
[443] *Id.*
[444] *Id.* at ¶ 6.
[445] *Id.*
[446] *Id.* at ¶¶ 5, 8.
[447] *Id.* at ¶ 5.
[448] *Id.* at ¶ 12.
[449] *Id.*

(awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); and *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an enhancement of 25% of his baseline award resulting in an award of $6.25 million for Erik Blazer's solatium claim.

The Special Master recommends that the Court award the baseline compensation of $5 million to Erik Blazer. The baseline award compensates for a close relationship to the service member, and continued therapy long after the loss is similar to the experience of others who have been awarded the baseline amount.

### G. Ian W. Stewart – December 12, 2004, Attack – Fallujah

On December 12, 2004, Marine Corporal ("Cpl.") Ian Wesley Stewart—who was serving with Melvin Blazer, Jr., in Kilo Company, 3d Battalion, 5th Marines—was conducting a security sweep throughout Fallujah when he was shot by a platoon-sized group of insurgents. ECF No. 9 at ¶¶ 667-670; ECF No. 26-1 at p. 55-57. According to the Autopsy Examination Report, Cpl. Stewart's death was caused by [redacted][450] He [redacted][451] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpl. Stewart was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a

---

[450] Ex. 20, Autopsy Examination Report of Cpl. Ian Wesley Stewart, at p. 2.
[451] *Id.* at p. 4.

Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the December 12, 2004 attack in which Cpl. Ian W. Stewart was killed. *See* ECF Nos. 47, 48.

Cpl. Stewart's surviving parents—Dana Stewart, Jr., and Dawn Stewart—are Plaintiffs in this case. See ECF No. 9 at ¶¶ 672-674. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of Cpl. Stewart's society, companionship, comfort, advice and counsel. *Id.* ¶ 674. The following chart reflects the claims asserted by these two family members whose claims arise out of the December 12, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Dana Stewart, Jr. | Cpt. Ian Wesley Stewart's father | Solatium claim $5 million | Declaration of Dana Stewart, Jr., dated December 8, 2025, including copy of his proof of U.S. citizenship | 21 |
| Dawn Stewart | Cpt. Ian Wesley Stewart's mother | Solatium claim $5 million | Declaration of Dawn Stewart, dated January 13, 2026, including copy of her proof of U.S. citizenship | 22 |

**1. Solatium Claims Brought by Cpt. Ian Wesley Stewart's Surviving Family Members**

**a. Dana Stewart Jr.[452]**

Dana Stewart ("Mr. Stewart") is the father of Cpl. Stewart.[453] Mr. Stewart described that Cpl. Stewart was not just his son but was his "little buddy."[454] He had the privilege of coaching

[452] Dana Stewart's Passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 21, Declaration of Dana Stewart Jr., dated December 8, 2025.

[453] *Id.* at ¶ 3.

[454] *Id.* at ¶ 5.

Cpl. Stewart's Little League teams which brought them closer.[455] From the moment his son could walk, he was "fascinated with cars and trucks, spending hours playing with them."[456] One of Mr. Stewart's fondest memories of his son was when Cpl. Stewart bought his first truck.[457] It was like a "rite of passage for him" and Mr. Stewart recalled the "excitement and pride in his eyes as he took the keys."[458] Growing up, Cpl. Stewart was involved in the church youth group where he formed close friendships.[459] When Cpl. Stewart told his parents that he wanted to join the Marines, Mr. Stewart had countless conversations on the pros and cons, understanding the sacrifices and the honor that came with such a commitment.[460] Mr. Stewart and Cpl. Stewart's mother supported the path he chose knowing that Cpl. Stewart's decision was not made lightly.[461]

The day that Mr. Stewart learned of his son's death, Marines arrived at the Christian camp where they lived and where Mr. Stewart worked.[462] While gathered in their home, Mr. Stewart and his wife were delivered the devastating news that their son had been killed.[463] Mr. Stewart's reaction to the news was a "visceral blend of disbelief, sorrow, and anger."[464] Sharing this with Cpl. Stewart's brother was devastating.[465] Together the family shed tears and leaned on each other.[466]

According to Mr. Stewart, the loss of Cpl. Stewart casts a shadow over the family.[467] [redacted] [468] [redacted]

[455] *Id.*
[456] *Id.*
[457] *Id.* at ¶ 4.
[458] *Id.*
[459] *Id.* at ¶ 7.
[460] *Id.* at ¶ 4.
[461] *Id.*
[462] *Id.* at ¶ 8.
[463] *Id.*
[464] *Id.*
[465] *Id.*
[466] *Id.*
[467] *Id.* at ¶ 11.
[468] *Id.* at ¶ 10.

[redacted] Mr. Stewart described that their family is forever changed, learning to go on, but unable to fully recover from the loss of Cpl. Stewart.[471]

[redacted]

Mr. Stewart stated, "[a]s we move forward, the memory of our son will continue to shape our lives, a bittersweet testament to the love we carry for him in our hearts."[474]

Plaintiffs have requested a baseline award of $5 million for Dana Stewart, Jr.'s solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**b. Dawn Stewart[475]**

Dawn Stewart ("Ms. Stewart") is the mother of Cpl. Stewart.[476] She described her son as a "vibrant soul" who brought "infectious energy" into their lives from the moment he was born.[477] Growing up, Cpl. Stewart enjoyed Hot Wheels, skateboards, cars, trucks, and sketching.[478] The family's faith brought them together, and attending church shaped Cpl. Stewart's character and work ethic.[479] Ms. Stewart holds onto the memories created with her son from vacations, hiking,

---

[469] *Id*. at ¶ 11.
[470] *Id*. at ¶ 12.
[471] *Id*. at ¶ 11.
[472] *Id*. at ¶ 9.
[473] *Id*. at ¶ 10.
[474] *Id*. at ¶ 13.
[475] Dawn Stewart's Birth Certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 22, Declaration of Dawn Stewart, dated January 13, 2026.
[476] *Id*. at ¶ 3.
[477] *Id*. at ¶ 4.
[478] *Id*.
[479] *Id*. at ¶ 7.

snowboarding, going to the movie theaters, visiting museums, or cheering at ballparks.[480] Cpl. Stewart was a young man who "valued his roots and the warmth of family gatherings."[481]

According to Ms. Stewart, Cpl. Stewart's decision to join the Marines was driven by his desire to one day serve in a police force.[482] When Cpl. Stewart departed for boot camp, Ms. Stewart recalled that she was filled with pride, worry, and unyielding hope for her son.[483] Ms. Stewart's relationship with Cpl. Stewart remained strong, and their conversations were filled with aspirations, fears, and mundane details of daily life.[484] Ms. Stewart recalls the final family day before her son's deployment and the excitement in Cpl. Stewart's voice about training soldiers.[485] While Cpl. Stewart was deployed, each phone call, email, and voicemail became a treasure.[486] Cpl. Stewart's journal later recovered from Fallujah is a "gift" that "offered a glimpse into his world, his thoughts, and the impact he hoped to make."[487]

The day Ms. Stewart found out about her son's death, she was working as a nurse at a pregnancy clinic.[488] Her world came crashing down when her husband, Dana Stewart, Jr., arrived and relayed the message of Cpl. Stewart's death.[489] She instinctively backed away, her mind refusing to accept the reality as she repeated "no, no, no" in a state of disbelief.[490] To her dismay, Ms. Stewart and her husband had to share this news with their younger son and daughter.[491] Ms. Stewart recalls that in the days that followed, friends, family, and their pastor gathered around

[480] *Id*. at ¶ 6.
[481] *Id*. at ¶ 11.
[482] *Id*. at ¶ 5.
[483] *Id*. at ¶ 8.
[484] *Id*.
[485] *Id*. at ¶ 9.
[486] *Id*. at ¶ 8.
[487] *Id*. at ¶ 9.
[488] *Id*. at ¶ 13.
[489] *Id*.
[490] *Id*.
[491] *Id*.

them offering their presence as a source of comfort.[492] With the assistance of an officer, the family made arrangements for Cpl. Stewart's services and burial.[493] Ms. Stewart was initially told that Cpl. Stewart's injuries were too severe for him to be viewed, but the family was able to make arrangements to allow the family final viewing.[494]

According to Ms. Stewart, "events [Cpl. Stewart] has missed and will continue to miss in [their] lives is a source of deep sorrow."[495] "Graduations, marriages, the birth of his nieces or nephews—each of these occasions is bittersweet, marked by the presence of his absence."[496] "The realization that he will never be part of these moments is a heavy burden that [they] carry with [them] daily."[497]

Ms. Stewart described that the loss has strained the dynamics within their family, as they each grapple with their grief in different ways.[498] [redacted][502]

[492] *Id.*
[493] *Id.*
[494] *Id.*
[495] *Id.* at ¶ 14.
[496] *Id.*
[497] *Id.*
[498] *Id.* at ¶ 15.
[499] *Id.* at ¶ 16.
[500] *Id.*
[501] *Id.*
[502] *Id.*

[redacted][507]

Their family was "once a cohesive unit" but due to Cpl. Stewart's death, they are now left to navigate "complex" and "strained relationships."[508] Their family's "overall well-being and quality of life have been deeply impacted," leaving Ms. Stewart and her husband to navigate a "dual existence"—one with their daughter and her family and the "profound sorrow" over their son's struggles.[509]

The absence of Cpl. Stewart's "laughter, his voice, and his presence at the dinner table is a constant reminder of what [they've] lost."[510] Ms. Stewart stated that, "we find ourselves in a constant battle to hold onto the memories of a time when our family was whole."[511] The family is left to "mourn not only the loss of [Cpl. Stewart] but the loss of the family unity [they] once knew."[512]

---

[503] *Id*. at ¶ 19.
[504] *Id*. at ¶ 20.
[505] *Id*.
[506] *Id*.
[507] *Id*. at ¶ 23.
[508] *Id*. at ¶ 17.
[509] *Id*. at ¶ 21.
[510] *Id*. at ¶ 15.
[511] *Id*. at ¶ 22.
[512] *Id*.

Plaintiffs have requested a baseline award of $5 million for Dawn Stewart's solatium claim. The Special Master concurs in this request and recommends that the Court enter an award in this amount..

**H. Michael Dwayne Anderson, Jr. – December 14, 2004 – Fallujah**

On December 14, 2004, Cpl. Michael Dwayne Anderson—who was serving as a Marine with Kilo Company, 3d Battalion, 5th Marines unit—was shot while conducting clearing operations in the Askari District of northeast Fallujah. ECF No. 9 at ¶¶ 697-700; ECF No. 26-1 at 58-59. After Cpl. Anderson was shot, members of his unit [redacted][513] [redacted] ECF No. 9 at ¶ 700. According to the autopsy report, Cpl. Anderson [redacted][514] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpl. Anderson was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the December 14, 2004 attack in which Cpl. Michael Dwayne Anderson, Jr., was killed. *See* ECF Nos. 47, 48.

Cpl. Anderson's surviving parent, stepparent, and sibling—Micheal Anderson, Angela Anderson, and Alexandria Anderson—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 702-703, 705-706. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of Cpl. Anderson's society, companionship, comfort, advice and counsel. *Id.* ¶ 706. The following chart reflects the claims asserted by these three family members whose claims

[513] Ex. 23, Email re Casualty Report of Cpl. Michael Dwayne Anderson.
[514] Ex. 24, Autopsy Examination Report of Cpl. Michael Dwayne Anderson.

arise out of the December 14, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Michael Anderson | Cpl. Michael Dwayne Anderson's father | Solatium claim $6.25 million | Declaration of Michael Anderson dated December 19, 2024, including copy of his proof of U.S. citizenship | 25 |
| Angela Anderson | Cpl. Michael Dwayne Anderson's stepmother | Solatium claim $5 million | Declaration of Angela Anderson dated December 19, 2024, including copy of her proof of U.S. citizenship | 26 |
| Alexandria Anderson | Cpl. Michael Dwayne Anderson's sister | Solatium claim $3.125 million | Declaration of Angela Anderson dated December 19, 2024, including copy of her proof of U.S. citizenship | 27 |

### 1. Solatium Claims Brought by Cpt. Ian Wesley Stewart's Surviving Family Members

#### a. Michael Anderson[515]

Michael Anderson ("Mr. Anderson") is the father of Cpl. Anderson. Mr. Anderson described that Cpl. Anderson was his first born, his namesake, and his best friend.[516] Cpl. Anderson was "always on the move, his spirit too wild and free for just one hobby."[517] "[Cpl. Anderson] rode skateboards, raced BMX bikes and motorcycles, and embraced the great outdoors with [Mr. Anderson] by his side."[518] According to Mr. Anderson, they were "inseparable, camping under the

[515] Michael Anderson's Passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 25, Declaration of Michael Anderson, dated December 19, 2024.

[516] *Id.* at ¶ 4.

[517] *Id.*

[518] *Id.*

stars, hunting, and simply enjoying each other's company."[519] Even after Cpl. Anderson joined the Marines, his trips "back to California were filled with the simple joys of attending concerts, enjoying BBQs, and even parachuting, making the most of every moment together."[520]

When Mr. Anderson learned of his son's death, it was a "regular day at work when two USMC Casualty Officers, a Captain and a 1st Sgt, approached [him] with the kind of gravity in their demeanor that immediately told [Mr. Anderson] something was terribly wrong."[521] When they informed him of Cpl. Anderson's death in the Iraq War, it "shattered [his] world into a million pieces."[522] "The weight of this news was crushing, leaving [Mr. Anderson] in a state of shock and disbelief."[523] Mr. Anderson stated that "[l]ife is not set up to bury your children."[524] Sharing this devastating loss with other family members was one of the "hardest things [he has] ever had to do," particularly with telling his wife and Cpl. Anderson's sister that Cpl. Anderson "would not be coming home."[525]

According to Mr. Anderson, the loss of his son changed him.[526] "The pain of his absence is constant, complicating [Mr. Anderson's] ability to connect with others."[527] [redacted]

---

[519] *Id.*
[520] *Id.* at ¶ 5.
[521] *Id.* at ¶ 7.
[522] *Id.*
[523] *Id.*
[524] *Id.*
[525] *Id.*
[526] *Id.* at ¶ 8.
[527] *Id.*
[528] *Id.*
[529] *Id.* at ¶ 9.
[530] *Id.*..

[redacted][532]

"The impact of [Cpl. Anderson's] absence extends beyond [Mr. Anderson's] personal struggles, affecting family milestones and celebrations."[533] He missed his younger sister's "high school and college graduations, significant events that [they] had always imagined he would be a part of."[534] The family's "attempts to find a 'new normal' are punctuated by the grief that comes with trying to move forward without him."[535] Mr. Anderson described that their "family's overall well-being and quality of life have been significantly affected, as [they] find solace in attending Gold Star Events."[536] "Since [Cpl. Anderson's] passing, there have been noticeable changes in [their] family dynamics; [redacted][537] [redacted][538] Mr. Anderson stated, "[o]ur family, once vibrant with [Cpl. Anderson's] presence, now clings to the memories of his love, his spirit, and the mark he left on each of us."[539] He described that the "pain of this loss is something that [they], as a family, carry with [them] every day, a reminder of the sacrifice [Cpl. Anderson] made."[540]

---

531 *Id*. at ¶ 8.
532 *Id*. at ¶ 9.
533 *Id*. at ¶ 8.
534 *Id*.
535 *Id*. at ¶ 10.
536 *Id*.
537 *Id*.
538 *Id*.
539 *Id*. at ¶ 6.
540 *Id*. at ¶ 7.

According to Mr. Anderson, their family has "felt the absence of [Cpl. Anderson] for the last twenty years, and it will continue long into the future."[541] They "always want to remember [Cpl. Anderson] and the sacrifice he made," and are proud of him.[542] They talk about him every day and visit his gravesite often.[543] Mr. Anderson described that they "miss [Cpl. Anderson] dearly, and there will always be an empty seat at the table for him."[544] "[Their] lives are forever changed by [Cpl. Anderson's] death."[545]

Plaintiffs have requested an upward enhancement to Mr. Anderson's claims based on the close nature of his relationship with his son, his subsequent reliance on sleeping medication and anxiety medications to offset his grief, and his experience of a medical event that was the culmination of the stress that his grief had caused him. They cite *Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); and *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members

---

541 *Id.* at ¶ 11.
542 *Id.*
543 *Id.*
544 *Id.*
545 *Id.*

experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Furthermore, Mr. Anderson is cognizant of the fact that his son did not die immediately but suffered between the onset of his injuries and his passing. Plaintiffs have requested an enhancement of 25% of his baseline award resulting in an award of $6.25 million for Michael Anderson's solatium claim.

The Special Master recommends that the Court award an enhancement of 10% of the baseline compensation of $5 million to Michael Anderson. Closeness of a family connection and [redacted] are compensated by the baseline award, and [redacted]. However, Mr. Anderson learned [redacted] This is an aggravating circumstance that merits an upward adjustment to $5.5 million.

**b. Angela Anderson**[546]

Angela Anderson ("Ms. Anderson") is the stepmother of Cpl. Anderson.[547] According to Ms. Anderson, she and Cpl. Anderson "became a family when [he] was 11 years old, and since that time, [Cpl. Anderson] was [her] son and an integral part of [her] life."[548] She had the "immense joy of not only being [Cpl. Anderson's] mom but also his friend."[549] There are "so many memories with [Cpl. Anderson], but the simple moments spent doing cannonballs in the pool or singing on the tractor, are so special to [her]."[550] "[They] cherished [their] time camping, jet skiing, dirt

---

[546] Angela Anderson's Passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 26, Declaration of Dana Stewart Jr., dated December 19, 2024.

[547] *Id*. at ¶ 3.

[548] *Id*. at ¶ 4.

[549] *Id*. at ¶ 5.

[550] *Id*. at ¶ 4.

biking, and enjoying weekend BBQs with family and friends."[551] "Special trips to Lake Tahoe, Sonoma, Monterey, and San Diego were highlights, as were the holidays."[552]

According to Ms. Anderson, "[e]ven as [Cpl. Anderson] grew and joined the USMC, [their] bond remained unbreakable."[553] Mr. and Ms. Anderson "took every opportunity to visit him or welcome him home, maintaining [their] connection through phone calls, letters, and care packages."[554] Ms. Anderson stated that "[t]o this day, his bedroom at home remains unchanged to preserve his memories."[555] She described their bond as a "beautiful blend of motherly love and friendship."[556] She is "forever grateful for the time [they] shared and the memories [they] created together."[557] Ms. Anderson stated that she "will always remember the times [they] shared, especially the last conversations before his tragic death in Iraq."[558] She recounted that their "final conversations were filled with promises of a return home, focusing on recovery and family time, especially with his sister Allie, who he was excited to see."[559]

"The moment [Ms. Anderson] learned about [Cpl. Anderson's] death was one of the most heart-wrenching experiences of [her] life."[560] "It began with a phone call from [her husband], who urgently told [her] to gather [their] daughter Allie and come home because he needed to talk to [them]."[561] "The gravity in his voice prepared [Ms. Anderson] for the worst, yet [she] was still not ready for the news that [Cpl. Anderson] had been killed in the Iraq War."[562] "Sharing this

---

[551] *Id.* at ¶ 5.
[552] *Id.*
[553] *Id.*
[554] *Id.*
[555] *Id.*
[556] *Id.*
[557] *Id.*
[558] *Id.* at ¶ 4.
[559] *Id.*
[560] *Id.* at ¶ 7.
[561] *Id.*
[562] *Id.*

unbearable news with others was one of the hardest things [she's] ever had to do."[563] "Informing [Cpl. Anderson's] girlfriend resulted in an outpour of grief so intense that she needed medical attention to cope with the shock."[564] Ms. Anderson recounted that she also "had to call [her] sister and [her] mom, asking them to come over, as [she] needed their support to navigate through this overwhelming sadness."[565]

Following the loss of her son, Ms. Anderson [redacted]

---

[563] *Id.*
[564] *Id.*
[565] *Id.*
[566] *Id.* at ¶ 8.
[567] *Id.*
[568] *Id.* at ¶¶ 8-9.
[569] *Id.* at ¶ 9.
[570] *Id.*
[571] *Id.*
[572] *Id.*
[573] *Id.* at ¶ 10.

[redacted]76

The death of Cpl. Anderson has also strained relationships with other family members, "some of whom believe [Mr. and Ms. Anderson] should have moved on by now."[577] Ms. Anderson explained: "the truth is we will never 'get over' Mike's death."[578] Ms. Anderson and her husband became "deeply involved with the CA Gold Star Family group, seeking solace in the company of those who understand [their] pain."[579] [redacted][582]

Ms. Anderson explain that "[d]espite the passage of 20 years, the pain of his absence feels as raw as if it happened yesterday."[583] "The loss of [Cpl. Anderson] has deeply affected [their] family's well-being, both physically and mentally, leaving [them] to navigate a world that feels significantly dimmer without his presence."[584] Ms. Anderson stated: "Mike fought for our freedom

---

574 *Id.*
575 *Id.* at ¶ 9.
576 *Id.*
577 *Id.* at ¶ 11.
578 *Id.*
579 *Id.*
580 *Id.*
581 *Id.*
582 *Id.*
583 *Id.* at ¶ 12.
584 *Id.* at ¶ 11.

and paid the highest price at the young age of 21, a reality that we, his family, live with every day. Our commitment to ensuring that his sacrifice is never forgotten is unwavering, but it comes at a cost. We have faced, and continue to face, sacrifices in every conceivable way as we carry this burden."[585]

While Ms. Anderson is not Cpl. Anderson's biological mother, the class of plaintiffs who may recover solatium damages "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members" despite not being legally or biologically related to the victim. *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730, at *42 (D.D.C. July 19, 2022). To establish this "functional equivalence" of a close family member, plaintiffs must show that they were "treated like" a victim's spouse, child, parent, or sibling. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (finding that stepsiblings recover functionally equivalent to siblings when they were "treated like" a brother or sister); *Oveissi* 768 F. Supp. 2d at 27 (holding that interactions between a stepparent and child "were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924, at *7 (D.D.C. Dec. 27, 2023) (finding a stepparent to be a functional equivalent of a parent notwithstanding an ongoing relationship between the victim and their biological parent because of the supplementary role played by the stepparent in the parental role).

Here, based on her declaration and the facts set forth above, Plaintiffs have argued that Ms. Anderson qualifies under the law as the functional equivalent of Cpl. Anderson's mother based on the fact that she was "treated like" Cpl. Anderson's parent, and her evident loss and grief resembles

[585] *Id*. at ¶ 12.

that of a biological parent. Following the baseline award, Plaintiffs have requested an award of $5 million for Angela Anderson's solatium claim.

The Special Master agrees that Ms. Anderson qualifies as a parent for the baseline compensation of $5 million but recommends a 10% upward adjustment to recognize that Ms. Anderson knew that her stepson [redacted] This factor supports an award of $5.5 million to Ms. Anderson.

#### c. Alexandria Anderson[586]

Alexandria Anderson ("Alexandria") is the sister of Cpl. Anderson.[587] Alexandria described her brother as her "caretaker" and "role model."[588] "Despite [their] sixteen-year age gap," Alexandria described their bond as "incredibly strong."[589] Her fondest memories with Cpl. Anderson are watching movies together.[590] Alexandria recalled that Cpl. Anderson "found joy in the little things, like the anticipation of [her] reaction to the MGM lion's roar."[591] She "would instinctively seek refuge in his arms, seeking comfort from the roaring lion on the screen."[592] Cpl. Anderson was a protector to Alexandria.[593] Alexandria described that "growing up, [her] time with [Cpl. Anderson] was filled with joy and laughter, especially when he was home from his deployments."

Although her time with Cpl. Anderson was limited while he was deployed, they often "stayed connected through care packages, where [she would] include personal mementos, hoping

---

[586] Alexandria Anderson's Passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 27, Declaration of Alexandria Anderson, dated December 19, 2024.

[587] *Id.* at ¶ 3.

[588] *Id*. at ¶ 4.

[589] *Id.*

[590] *Id.*

[591] *Id.*

[592] *Id.*

[593] Id.

to give him a piece of home."[594] When Cpl. Anderson was home, he often took Alexandria on drives around town in his truck. "After [Cpl. Anderson's] passing, sitting in his truck, she found "solace in the memories of those carefree moments [they] shared."[595] "Before his final deployment, [their] parents threw him a huge birthday party."[596] Alexandria recounted "a vivid memory, of him picking [her] up in the front yard to carry [her] back inside."[597] This moment is memorialized in a photograph she still keeps to this day.[598]

Alexandria was only five years old at the time Cpl. Anderson died.[599] The moment she learned of her brother's death is a blur, and her recollection is fragmented—"remembering overhearing [her] parents' conversation from the top of [their] stairs and another part gradually accepting it as reality over time."[600] "Initially, [she] was in denial, unable to comprehend how someone as invincible as [her] brother could fall victim to an enemy bullet."[601] "The presence of reporters at [their] home, seeking to capture [her] Christmas wish, led to a poignant moment where [she] asked for Santa to bring my brother home."[602] "It wasn't until [she] saw [Cpl. Anderson] lying in his casket at Calvary Temple Church that the truth fully hit [her]. That moment marked the beginning of a profound sense of loneliness and the realization that he was truly gone."[603] The process of coming to terms with Cpl. Anderson's death was a gradual and painful journey for Alexandria.[604]

---

[594] *Id*. at ¶ 5.
[595] *Id*.
[596] *Id*.
[597] *Id*.
[598] *Id*.
[599] *Id*. at ¶ 7.
[600] *Id*.
[601] *Id*.
[602] *Id*.
[603] *Id*.
[604] *Id*..

[redacted][608]

Alexandria explained that the death of Cpl. Anderson has profoundly affected their family.[609] "His death placed an immense strain on [her] parents' marriage.[610] "For college, [she] decided to move across the country to forge [her] own path.[611] Despite these efforts, the holiday season remains a particularly difficult time for [the] family and [Alexandria], as [Cpl. Anderson] died just over a week before Christmas."[612] "[She] constantly wonder[s] what could have been if [Cpl. Anderson] had come home, how different [her] future would have been.[613] "This loss [of Cpl. Anderson] has also affected [her] relationships with other family members and friends who, despite their best intentions, cannot fully comprehend [her] grief."

Alexandria describes that "[a]s [she] grow[s] older, the depth of this loss only seems to grow."[614] "[Cpl. Anderson] was 21 years old when he died, and the year [Alexandria] turned 21 was the most difficult year of [her] life.[615] "[She] was haunted by [her] brother's absence every

---

[605] *Id.* at ¶ 8.
[606] *Id.*
[607] *Id.*
[608] *Id.*
[609] *Id.* at ¶ 9.
[610] *Id.*
[611] *Id.*
[612] *Id.*
[613] *Id.*
[614] *Id.* at ¶ 10.
[615] *Id.*

day from [her] birthday to the day [she] turned 22.[616] Alexandria described that she "kept thinking about what he was doing when he was 21 and how his life was cut so short."[617] [redacted]

According to Alexandria, the death of Cpl. Anderson [redacted][621].

Alexandria stated that, "Michael was more than a brother; he was my protector, my guide, and the loss of his presence is a wound that will never fully heal."[622]

Plaintiffs have requested an upward enhancement to Alexandria's claims based on the close nature of her relationship with his brother and her subsequent battle with anxiety and depression as a result of losing her brother who she referred to as her "protector." *See Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of

---

[616] *Id.*
[617] *Id.*
[618] *Id.*
[619] *Id.*
[620] *Id.* at ¶ 11.
[621] *Id.*
[622] *Id.*

requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs have requested an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Alexandria Anderson's solatium claim.

The Special Master recommends that the Court enter the baseline award of 2.5 million. There is nothing in the record that permits the conclusion that Ms. Anderson experienced suffering beyond that of others who have received a baseline award.

**I. Adam Plumondore – February 16, 2005, Attack – Mosul**

On February 16, 2005, Sgt. Adam Plumondore—who was serving as a Sniper Team Leader for the Stryker Brigade Combat Team—was traveling with the Stryker convoy in Mosul, Iraq when a VBIED detonated near the vehicle in which he was traveling. ECF No. 9 at ¶ 799; ECF No. 26-1 at 70. Sgt. Plumondore suffered [redacted][623] According to the Autopsy Examination Report, Sgt. Plumondore [redacted][624] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Plumondore was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the February 16, 2005 attack in which Sgt. Adam Plumondore was killed. *See* ECF Nos. 47, 48.

[623] Ex. 28, Sgt. Adam Jay Plumondore Certificate of Death dated March 31, 2005.
[624] Ex. 29, at 6, Autopsy Examination Report of Adam Plumondore.

Sgt. Plumondore's surviving parents—Daniel J. Plumondore and Elfriede H. Plumondore—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 802-804. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of Sgt. Plumondore's society, companionship, comfort, advice and counsel. *Id.* ¶ 804. The following chart reflects the claims asserted by these two family members whose claims arise out of the February 16, 2025, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Daniel J. Plumondore | Sgt. Adam Plumondore's father | Solatium claim $5 million | Declaration of Daniel J. Plumondore dated January 7, 2025 including copy of his proof of U.S. citizenship | 30 |
| Elfriede H. Plumondore | Sgt. Adam Plumondore's mother | Solatium claim $5 million | Declaration of Elfriede H. Plumondore dated January 16, 2025, including copy of her proof of U.S. citizenship | 31 |

### 1. Solatium Claims Brought by Sgt. Adam Plumondore's Surviving Family Members

#### a. Daniel J. Plumondore[625]

Daniel J. Plumondore ("Mr. Plumondore") is the father of Sgt. Adam Jay Plumondore.[626] Mr. Plumondore described his relationship with Sgt. Plumondore as very close.[627] According to Mr. Plumondore, "throughout [Sgt. Plumondore's] life, [their] family was inseparable, cherishing

[625] Daniel J. Plumondore's Passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 30, Declaration of Daniel J. Plumondore, dated January 7, 2025.

[626] *Id.* at ¶ 3.

[627] *Id.* at ¶ 5.

every moment spent together."[628] Their adventures ranged from "hunting, fishing, and camping to more serene activities like boating, water skiing, and simply enjoying each other's company on the beach or in our backyard pool."[629] When he was not deployed, Sgt. Plumondore "made it a point to come home most weekends, and when he couldn't, [they] stayed connected through long phone conversations, sharing the minutiae of [their] daily lives and dreaming of future plans together, like building an airplane and pursuing a career in law enforcement."[630] According to Mr. Plumondore, his son was the kind of person whose presence "lit up the room, his amazing sense of humor and easygoing nature drawing people to him effortlessly."[631]

Mr. Plumondore recounted that "the news of [Sgt. Plumondore's] injury and subsequent death came as a devastating shock to [them]."[632] It began with an early morning phone call that vaguely informed [them] of [Sgt. Plumondore] being injured."[633] "With no further details provided, [Mr. Plumondore] proceeded to go to work, clinging to a thread of hope."[634] "However, a sense of dread overwhelmed [him] when [his] wife called later that morning, her voice prompting an immediate understanding that something was gravely wrong." "Racing home, consumed by a mix of hurt and anger, [Mr. Plumondore] questioned the fairness of such a tragedy."[635] His "worst fears were confirmed upon arriving home to find two military officers waiting to officially deliver the heartbreaking news of [Sgt. Plumondore's] death."[636] "In the aftermath, [Mr. and Ms. Plumondore] reached out to family and friends through phone calls to share the unbearable news,

---

[628] *Id.*
[629] *Id.*
[630] *Id.*
[631] *Id.* at ¶ 6.
[632] *Id.* at ¶ 7.
[633] *Id.*
[634] *Id.*
[635] *Id.*
[636] *Id.*

and as word spread, the media approached [them] for comments, further amplifying the echo of [their] loss."[637]

Mr. Plumondore described that "[t]he pain of knowing [he] will never see [his] son grow up, start his own family, or share in the joys and challenges of life is a burden [he] carr[ies]."[638] "With [Sgt. Plumondore's] burial, it felt as though a piece of each of [them] was laid to rest alongside him, leaving [them] to navigate a world that seems less bright, less full, without him."[639] According to Mr. Plumondore, "the continuing effects of [Sgt. Plumondore] absence are not just anticipated; they are lived daily, a constant struggle to reconcile our love for him with the pain of his loss."[640]

Plaintiffs have requested a baseline award of $5 million for Daniel J. Plumondore's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**b. Elfriede H. Plumondore[641]**

Elfriede H. Plumondore ("Ms. Plumondore") is the mother of Sgt. Plumondore.[642] Ms. Plumondore described their family as "close-knit" and they spent a lot of time together.[643] She attended concerts and plays, and enjoyed "exploring historical sites across Oregon, Washington, and beyond" with Sgt. Plumondore.[644] According to Ms. Plumondore, "[their] home was filled with laughter, love, and the shared excitement of planning future projects, like the light aircraft kit

---

[637] *Id*.
[638] *Id*. at ¶ 8.
[639] *Id*. at ¶ 9.
[640] *Id*.
[641] Elfriede H. Plumondore's Passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 31, Declaration of Elfriede H. Plumondore, dated January 16, 2025.
[642] *Id*. at ¶ 3.
[643] *Id*. at ¶ 4.
[644] *Id*.

we joked about building in the backyard."[645] The family "spent every possible moment together" from "sporting events, where [Mr. Plumondore] coached him from t-ball through baseball," to "family adventures like camping, fishing, and exploring the wonders of the Pacific Northwest."[646]

According to Ms. Plumondore, Sgt. Plumondore's "choice to be stationed close to home meant that weekends [was their] time to reconnect, to share stories around the campfire or over the phone when he was away."[647] "Even when deployed, [Sgt. Plumondore] made every effort to keep [their] connection alive, calling whenever he could, eager to share his day and hear about [their day]."[648] Ms. Plumondore recounted her last few conversations with her son "filled with talk of letters and packages sent his way (tragically, he never received his final 6-8 packages and 2-3 letters)."[649]

Initially, Ms. Plumondore was "informed by [Sgt. Plumondore's] unit that he had been injured and was receiving medical attention."[650] However, her "hope was shattered when two military officers appeared at [her] doorstep."[651] "As an Army brat, [she] immediately knew the gravity of their visit."[652] According to Ms. Plumondore, "[d]espite [her] attempts to stay composed, the confirmation of [her son] being killed in action in Iraq unleashed a torrent of grief that seemed to halt time itself."[653] Further compounding her grief, her son Ron was inconsolable after she shared the news of Cpl. Plumondore's death.[654] Informing her husband, without explicitly stating what happened to Cpl. Plumondore over the phone was also a challenge.[655]

---

[645] *Id.*
[646] *Id.* at ¶ 5.
[647] *Id.*
[648] *Id.*
[649] *Id.*
[650] *Id.* at ¶ 7.
[651] *Id.*
[652] *Id.*
[653] *Id.*
[654] *Id.*
[655] *Id.*

In the midst of their grief, Ms. Plumondore tried to maintain some semblance of hospitality to the soldiers who had traveled from Fort Lewis.[656] Ms. Plumondore explained that "[t]he pain of that day lingers, a constant reminder of the son [they] lost."[657] The process of sharing [Sgt. Plumondore's] death with family and friends was a blur of phone calls and tearful conversations, further amplified by the arrival of reporters seeking to cover the tragic news."[658] She described that "[t]hough it was an incredibly difficult to speak to them, [they] wanted to ensure Adam's story was told accurately."[659]

Since Sgt. Plumondore's death, the family has been enveloped in a profound sense of loss that manifests daily.[660] They keep his memory alive in their conversations and visit his gravesite 2-3 times per week.[661] According to Ms. Plumondore, her son's philosophy of "putting my game face on" has become a coping mechanism for her which has allowed her to navigate through life daily while masking her pain.[662] The loss of Sgt. Plumondore has paradoxically brought her closer to her son Ron.[663] Ms. Plumondore described that the shadow of grief "is unrelenting."[664] The "tears are a constant, and the void left in [their] hearts is one that nothing and no one but [Sgt. Plumondore] could ever fill."[665] Ms. Plumondore stated: "This journey through grief has taught us that it doesn't get easier with time; rather, we learn to live with the pain, to accommodate it into our daily lives. We've learned to be gentle with ourselves on the days when moving forward feels impossible."[666]

---

[656] *Id.*
[657] *Id.*
[658] *Id.*
[659] *Id.*
[660] *Id.* at ¶ 8.
[661] *Id.* at ¶ 7-8.
[662] *Id.* at ¶ 9.
[663] *Id.*
[664] *Id.* at ¶ 10.
[665] *Id.*
[666] *Id.*

Plaintiffs have requested a baseline award of $5 million for Elfriede Plumondore's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**J. Frank B. Hernandez – February 17, 2005 – Tal Afar**

On February 17, 205, Frank B. Hernandez—who was a Sergeant in the U.S. Army's C Troop, 2d Squadron, 14th Calvary Regiment—was heading back to FOB Falcon when his vehicle was struck by an IED. *See* ECF No. 9 at ¶¶ 806; ECF No. 26-1 at 71-72. According to his Certificate of Death. Sgt. Hernandez's cause of death was from [redacted][667] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Hernandez was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the February 17, 2005 attack in which Sgt. Frank B. Hernandez was killed. *See* ECF Nos. 47, 48.

Sgt. Frank B. Hernandez's surviving parent, Frank M. Hernandez, is a Plaintiff in this case. *See* ECF NO. 9 at ¶¶ 808-809. Mr. Hernandez has suffered severe mental anguish, extreme emotional pain and suffering, and loss of Sgt. Hernandez's society, companionship, comfort, advice and counsel. *Id*. at ¶ 809. The following chart reflects the claims asserted by Mr. Hernandez whose claims arose out of the February 17, 2005, attack, as well as the evidence setting forth the bases of his claim. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

[667] Ex. 32, Sgt. Frank B. Hernandez, Certificate of Death dated March 7, 2005.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Frank M. Hernandez | Sgt. Frank B. Hernandez's father | Solatium claim $5 million | Declaration of Frank Hernandez dated December 20, 2024, including copy of his proof of U.S. citizenship | 33 |

**1. Solatium Claim Brought by Sgt. Hernandez's Family Member**

**a. Frank M. Hernandez[668]**

Frank M. Hernandez ("Mr. Hernandez") is the father of Sgt. Frank B. Hernandez.[669] According to Mr. Hernandez, Sgt. Hernandez was the "kind of person who naturally drew others to him."[670] Their family was close and enjoyed spending time together.[671] Mr. Hernandez was Sgt. Hernandez's little league baseball coach and as he got older, they practiced together for his games, all the way through his time in high school.[672] They loved spending time outdoors together, fishing and talking about what was happening in each other's lives.[673] Thay also spent countless hours watching different sports games and movies together.[674]

Mr. Hernandez recalls the day a casualty officer arrived at his home and delivered the terrible news that Sgt. Hernandez had been killed in Iraq. He described that the "reality of his loss felt surreal" like a "nightmare" he couldn't wake from.[675] Mr. Hernandez had to make the heartbreaking calls to Sgt. Hernandez's brother and sister.[676] While the family was grappling with

[668] Frank M. Hernandez's Birth Certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 33, Declaration of Frank M. Hernandez, dated December 20, 2024.
[669] *Id*. at ¶ 3.
[670] *Id*. at ¶ 6.
[671] *Id*. at ¶¶ 4-6.
[672] *Id*. at ¶ 4.
[673] *Id*. at ¶¶ 4- 5.
[674] *Id*. at ¶ 5.
[675] *Id*. at ¶ 7.
[676] *Id*.

the loss of Sgt. Hernandez, their grief was amplified by the outreach of media outlets regarding Sgt. Hernandez's death.[677]

The family dynamics since Sgt. Hernandez's death have shifted and have led to a distance between them.[678] Each family member retreated into their own lives to deal with the pain in their own way.[679] Despite this, Mr. Hernandez stated that the tragedy of losing his son has also brought about a deeper appreciation for the moments they do share as a family.[680] Because they understand how fragile like can be, the family cherishes more the time they do spend together.[681]

According to Mr. Hernandez, the loss of Sgt. Hernandez is something he will carry with him for the rest of his life.[682] It is a burden that he has had to learn to bear, finding ways to cope with the pain.[683] The memories of his son are a source of comfort and a reminder of how incredible of a person Sgt. Hernandez was. Mr. Hernandez takes solace in knowing that his son was a "hero, someone who bravely fought for our country, understanding the risks involved."[684] According to Mr. Hernandez, "this pride in his courage and sacrifice is a beacon for [their] family, guiding [them] through the darkest times.[685]

Plaintiffs have requested a baseline award of $5 million for Frank M. Hernandez's solatium claim. The Special Master concurs in this request and recommends that the Court enter an order in this amount.

---

[677] *Id*.
[678] *Id*. at ¶ 8.
[679] *Id*.
[680] *Id*.
[681] *Id*.
[682] *Id*. at ¶ 9.
[683] *Id*.
[684] *Id*.
[685] *Id*.

**K. Anthony J. Davis, Jr., - April 23, 2005 – Mosul**

On April 23, 2005, Sgt. Anthony J. Davis ("Sgt. Davis")—who was serving as a Sergeant and Grenadier for his Stryker Brigade Combat Team in the U.S. Army's 1st Battalion, 24th Infantry Regiment—was traveling in Mosul, Iraq near the Yarmouk Traffic Circle when his vehicle was struck by an SVBIED. *See* ECF No. 9 at ¶ 886, ECF No. 26-1 at 72. According to the Certificate of Death, Sgt. Davis died [redacted][686] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Davis was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the April 23, 2005 attack in which Sgt. Anthony J. Davis, Jr., was killed. *See* ECF Nos. 47, 48.

Sgt. Davis's surviving spouse and two surviving children—Michell D. Alikor, Ah'lania Davis, and Aniya Davis (a/k/a "A.D.")—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 888-892. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of Sgt. Davis's society, companionship, comfort, advice and counsel. *Id.* ¶ 892. The following chart reflects the claims asserted by these three family members whose claims arise out of April 23, 2005, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Michell D. Alikor | Sgt. Anthony J. Davis's surviving spouse | Solatium claim $10 million | Declaration of Michell D. Alikor dated February 3, 2026, including copy of her proof of U.S. citizenship | 35 |

[686] Ex. 34, Certificate of Death of Sgt. Anthony J. Davis, Jr., dated April 23, 2005.

| | | | | |
|---|---|---|---|---|
| Ah'lania Davis | Sgt. Anthony J. Davis's surviving child | Solatium claim $5 million | Declaration of Ah'lania Davis dated November 24, 2024, including copy of her proof of U.S. citizenship | 36 |
| Aniya Davis ("A.D.") | Sgt. Anthony J. Davis's surviving child | Solatium claim $5 million | Declaration of Aniya Davis dated November 21, 2025, including copy of his proof of U.S. citizenship | 37 |

**1. Solatium Claims Brought by Sgt. Anthony J. Davis's Surviving Family Members**

**a. Michell D. Alikor**[687]

Michell D. Alikor ("Ms. Alikor") is the surviving spouse of Sgt. Davis.[688] Ms. Alikor and Sgt. Davis "were lucky enough to be one of the fairy tale stories of being childhood sweethearts and ending up a married couple."[689] Growing up with Sgt. Davis was filled with moments of enjoying his company. Ms. Alikor had endless conversations with Sgt. Davis and stated that "[n]o one understood me like Anthony."[690] Together the couple welcomed their first child, Ah'lania into the world. She recalled "holidays filled with home-cooked meals," they had "memorable visits to the natatorium," and often spent time at the park for gatherings of close family and friends.[691] During Sgt. Davis' deployment in Iraq, Ms. Alikor was pregnant with their second child. They had hoped to be together during the labor and birth of their second daughter; however, "fate had other plans, and she decided to make her entrance into the world late, leaving [Ms. Alikor] to face that moment alone" only a few months prior to Sgt. Davis' death.[692]

[687] Michell D. Alikor's Passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 35, Declaration of Michell D. Alikor, dated February 3, 2026.
[688] *Id.* at ¶ 3.
[689] *Id.* at ¶ 4.
[690] *Id.* at ¶ 6.
[691] *Id.* at ¶ 8.
[692] *Id.* at ¶ 5.

Tragically, a man dressed in green stood outside of Ms. Alikor's door, and before he even spoke, she understood the gravity of why he was there.[693] Ms. Alikor recounted that as the officer "relayed the information, a sense of devastation washed over [her]; it felt as though [her] world had come to an end."[694] She couldn't bear the thought of Sgt. Davis's mother facing the news of her son's death alone, so Ms. Alikor accompanied the officer to her mothers-in-law's house to share the unbearable truth.[695] Ms. Alikor explained that this was one of the most "heart-wrenching" experiences of her life.[696]

Ms. Alikor stated: "[T]the loss is immeasurable. He was my soul mate, my best friend, my provider, and my confidant. He was the head of our home, the one person who loved me unconditionally and whom I trusted completely."[697] Since her husband's death, [redacted][702]

The loss of Sgt. Davis has also significantly altered their family's financial landscape. Sgt. Davis was the primary provider prior to his death leaving Ms. Alikor solely responsible for the financial well-being of their home.[703] To do this, Ms. Alikor had to juggle work and education

693 *Id.* at ¶ 9.
694 *Id.*
695 *Id.*
696 *Id.*
697 *Id.* at ¶ 14.
698 *Id.*
699 *Id.*
700 *Id.* at ¶ 10.
701 *Id.*
702 *Id.* at ¶ 11.
703 *Id.* at ¶ 12.

simultaneously to replicate the stability that two incomes once afforded them.[704] This "balancing act" is both "physically and emotionally draining" for Ms.Alikor.[705]

According to Ms. Alikor, the death of Sgt. Davis has "shaken the very foundation of [their] family."[706] Ms. Alikor is now a single mother—a role [she] never envisioned for [herself], especially since [she] chose to have children with someone [she] believed would always be by [her] side.[707] Parenting has become a monumental struggle as [she] tr[ies] to fill the void left by him, attempting to be both the nurturing and the reasonable parent"—roles that were once his.[708] Her oldest daughter had to walk down the aisle without her father by her side, and her youngest daughter [redacted][709]

[redacted][710] The death of Sgt. Davis has left Ms. Alikor and her daughters to "navigate a future that feels uncertain and incomplete."[711] Ms. Alikor stated that, "the journey ahead is daunting, marked by challenges that we must face without him by our side, forever changed by his absence."[712]

Plaintiffs have requested an upward enhancement to Ms. Alikor's claims based on the close and enduring nature of her relationship with her husband, her knowledge that his death was not immediate, and the acute difficulties she has experienced after her husband's death in being a single parent, needing medication to treat her anxiety and depression, experiencing abandonment issues, and battling alopecia among many others. They cite *Bernhardt,* 2023 WL 2598677, at *16

---

[704] *Id*.
[705] *Id*. at ¶ 17.
[706] *Id*. at ¶ 13.
[707] *Id*. at ¶ 15.
[708] *Id*.
[709] *Id*. at ¶ 13.
[710] *Id*. at ¶ 17.
[711] *Id*.
[712] *Id*.

(awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs have requested an enhancement of 25% of her baseline award resulting in an award of $10 million for Michell D. Alikor's solatium claim

The Special Master concurs in this request. Ms. Alikor and Sgt. Davis had known each other since childhood. She delivered her second child shortly before Sgt. Davis' death, leaving her a widowed mother of two at twenty years old. [redacted] The Special Master recommends a 25% enhancement of the baseline award and an award of $10 million.

**b. Ah'lania Davis[713]**

Ah'lania Davis ("Ah'lania") is the eldest daughter of Sgt. Davis.[714] Although Ah'lania only had a few years with Sgt. Davis prior to his death, the memories she does have are held close to her heart.[715] She recalled that he had the ability to make even the simplest activities memorable.[716] Sgt. Davis made her feel protected and was her hero.[717] Her father was a "constant" presence in her life even when military service took him away from home.[718] While their everyday activities were simple, they were "everything" to Ah'lania.[719] She described her father as the "epitome of love and dedication."[720] Ah'lania stated that Sgt. Davis's love story with her mother "is one for the ages, having known each other since they were just 12 years old."[721] Ah'lania remembers the joy and excitement Sgt. Davis showed when he learned that her mother was expecting her sister.[722] She described that her father had a "cool demeanor and kind heart" and was loved by everyone who knew him.[723]

According to Ah'lania, the memory of the moment she learned of her father's death is hazy; yet, it has left a profound mark on her life.[724] She recalled her mother informing her that her father would not be coming home.[725] Sgt. Davis's death occurred just a few months shy of Ah'lania' s

[713] Ah'lania Davis's Birth Certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). See Ex. 36, Declaration of Ah'lania Davis, dated November 24, 2024.
[714] *Id*. at ¶ 3.
[715] *Id*. at ¶ 4.
[716] *Id*.
[717] *Id*.
[718] *Id*. at ¶ 5.
[719] *Id*.
[720] *Id*. at ¶ 6.
[721] *Id*. at ¶ 5.
[722] *Id*. at ¶ 6.
[723] *Id*.
[724] *Id*. at ¶ 7.
[725] *Id*.

fifth birthday.[726] Since the death of Sgt. Davis, her life has changed forever.[727] Milestones such as her high school graduation, college graduation, passing the licensing test for nursing, and her wedding day are bittersweet—her father's absence always looming over what is supposed to be a joyous occasion.[728]

According to Ah'lania, the death of Sgt. Davis profoundly impacted their family.[729] While she was young when her father died, Ah'lania felt the financial impact of her father's death.[730] The family no longer had Sgt. Davis's income to rely on which caused financial instability.[731] Ah'lania described that her mother was suddenly thrust into the role of a single mother at the age of 20 with two small children.[732] This "abrupt transition" demanded that her mother be resilient all while facing the tragedy of losing her partner, the love of her life, and father of her children.[733] Her younger sister never had the opportunity to meet Sgt. Davis and was unable to create memories with him.[734] Ah'lania described that the loss of Sgt. Davis [redacted], has reshaped their family structure, and the way they navigate life together now.[735] Their reality "starkly contrasts" the future her father had envisioned for them.[736]

Plaintiffs have requested a baseline award of $5 million for Ah'lania Davis's solatium claim. The Special Master concurs and recommends the Court enter an award in that amount.

[726] *Id*. at ¶ 5.
[727] *Id*. at ¶ 8.
[728] *Id*.
[729] *Id*. at ¶ 10.
[730] *Id*. at ¶ 9.
[731] *Id*.
[732] *Id*. at ¶ 10.
[733] *Id*.
[734] *Id*. at ¶ 11.
[735] *Id*. at ¶ 10.
[736] *Id*.

### c. Aniya Davis[737]

Aniya Davis ("Aniya") is the youngest daughter of Sgt. Davis. Aniya was born just a few months prior to the death of Sgt. Davis.[738] Due to his deployment and subsequent death, Sgt. Davis never had the opportunity to meet Aniya or watch her grow.[739] Aniya described that she has "no memories of him at all" and Sgt. Davis has missed every single moment of her life.[740] Sgt. Davis missed Aniya "attending school, picture day, school dances, graduations, marriages, and the entirety of [her] childhood."[741] Because she does not have any memories of her father, Aniya is left with a myriad of unanswered questions about who she is and how much of her personality is shaped by her father's absence.[742] This void has constantly made Aniya question every aspect of her identity.[743]

The death of Sgt. Davis has not only affected Aniya but has also made life significantly more challenging for her surviving parent by having to raise and provide for her alone.[744] [redacted][746] Sgt Davis's death has also impacted Aniya's relationship with her father's side of the family—leaving her to wonder how that could have been different if her father were still alive.[747]

---

[737] Aniya Davis ("A.D.") was a minor at the time the complaint was filed and has since turned eighteen years old. *See* ECF No. 9 at ¶ 890. Aniya Davis's Passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 37, Declaration of Aniya Davis, dated November 21, 2025.

[738] *Id*. at ¶ 4.

[739] *Id*. at ¶ 5.

[740] *Id*. at ¶¶ 6-7.

[741] *Id*. at ¶ 8.

[742] *Id*. at ¶ 9.

[743] *Id*. at ¶¶ 9, 14.

[744] *Id*. at ¶ 10.

[745] *Id*.

[746] *Id*. at ¶ 12.

[747] *Id*. at ¶ 14.

Aniya described that she has never gotten to experience her father's love and support.[748] This has caused Aniya to experience [redacted][750] Aniya explained that going through life without her father will continue to alter her life in ways she is unable to fully grasp.[751] Aniya stated: "I do not get to know him, get to know who I would have been because of him, or who he would have been because of me."[752] To Aniya, "[t]here is no way to grieve properly" when his death is all she's known.[753]

The D.C. Circuit recently confirmed that a child who was *in utero* at the time of their parent's death in a terrorist attack (like the one in which Maj. Soltes was killed) "may seek solatium under the FSIA." *K.E.F.V. v. Islamic Republic of Iran*, 135 F.4th 988, 996 (D.C. Cir. 2025). The Court further stated that there was "no rational basis to distinguish between" a child who was *in utero* at the time of their parent's death and a child who was born only a few months prior to their parent's death. *Id.* While the D.C. Circuit conceded that such children might have reduced solatium damages because they might not experience "injury to their feelings," it did not mandate such a reduction. Here, Aniya Davis has lived her entire life trying to understand who she is because she never knew her father and feeling abandoned and wondering what life would have been like had her father not been killed in Iraq. Plaintiffs have requested the baseline award of $5 million for Aniya Davis's solatium claim.

The Special Master recommends the Court apply a 30% discount to the baseline award of $5 million. Aniya was only a few months old at the time of her father's death and has no memory

[748] *Id*. at ¶ 10.
[749] *Id*. at ¶ 11.
[750] *Id*.
[751] *Id*. at ¶ 15.
[752] *Id*.
[753] *Id*.

of him.. Courts have recognized that a discount is appropriate where the child cannot have any memories of the parent. *Bathiard v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 72513, at *17 (D.D.C. Apr. 24, 2020).).

**L. Aaron N. Seesan – May 22, 2005, Attack – Mosul**

On May 22, 2005, 1st Lieutenant ("1LT") Aaron Seesan—who was serving in the Army with the 73d Engineer Battalion—was evacuating injured soldiers near Mosul, Iraq when his vehicle was struck by an IED. *See* ECF No. 9 at ¶¶ 968-969; ECF No. 26-1 at 73-74. The Autopsy Examination Report revealed that [redacted][754] "He was transported to the Army Medical Center in Landstuhl, Germany where he died."[755] According to the Certificate of Death, 1LT Seesan was [redacted][756] His cause of death is listed as [redacted][757] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which 1LT Seesan was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the May 22, 2005 attack in which 1LT Aaron N. Seesan was killed. *See* ECF Nos. 47, 48.

1LT Seesan's surviving parents and siblings—Thomas M. Seesan, Chiquita M. Seesan, Rachel Schulze, and Rebekah Stolar—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 972-977. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of 1LT Seesan's society, companionship, comfort, advice and counsel. *Id.* ¶ 977. The following chart reflects the claims asserted by these four family members whose claims arise out of the May 22,

[754] Ex. 38 at p. 4, Autopsy Examination Report of 1LT Aaron Seesan.
[755] *Id.* at p. 3.
[756] Ex. 39, Certificate of Death of 1LT Aaron N. Seesan dated June 16, 2005.
[757] *Id.*

2005, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Thomas M. Seesan | 1LT Aaron Seesan's father | Solatium claim $6.25 million | Declaration of Thomas M. Seesan dated December 19, 2024, including copy of his proof of U.S. citizenship | 40 |
| Chiquita M. Seesan | 1LT Aaron Seesan's mother | Solatium claim $6.25 million | Declaration of Chiquita M. Seesan dated April 2, 2025, including copy of her proof of U.S. citizenship | 41 |
| Rachel Schulze | 1LT Aaron Seesan's sister | Solatium claim $2.5 million | Declaration of Rachel Schulze dated May 21, 2025, including copy of her proof of U.S. citizenship | 42 |
| Rebekah Stolar | 1LT Aaron Seesan's sister | Solatium claim $3.125 million | Declaration of Rebekah Stolar dated November 14, 2025, including copy of her proof of U.S. citizenship | 43 |

### 1. Solatium Claims Brought by 1LT Aaron N. Seesan's Surviving Family Members

#### a. Thomas M. Seesan[758]

Thomas M. Seesan ("Mr. Seesan") is the father of 1LT Seesan.[759] Mr. Seesan described his son as an "integral" part of the family.[760] Their home is where countless memories were made.[761] Aaron participated in many sports growing up, and Mr. Seesan always enjoyed watching him

[758] Thomas M. Seesan's Birth Certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 40, Declaration of Thomas M. Seesan, dated December 19, 2024.

[759] *Id*. at ¶ 3.

[760] *Id*. at ¶ 5.

[761] *Id*. at ¶ 4.

during his games and practices.[762] Through 1LT Seesan's journey through the U.S. Merchant Marine Academy, Mr. Seesan was supportive of his son.[763] When 1LT Seesan was stationed in Fort Leonard Wood and Fort Lewis, Mr. Seesan traveled to visit his son where they explored new places near 1LT Seesan's assignment.[764] Mr. Seesan recalled the conversations he had with his son and the moments he visited him in person.[765] Mr. Seesan cherishes every second and reminisces on the times they spent together, and thinks of all the milestones he wished 1LT Seesan could have witnessed.[766]

Mr. Seesan stated, "The moment we learned of Aaron's death, I can only describe the feeling as devastation."[767] A representative from the Army arrived at the family's doorstep, delivering the heartbreaking news that 1LT Seesan had died.[768] Despite having braced themselves for the worst upon learning that 1LT Seesan was severely injured and suffered third-degree burns over eighty percent of his body, the reality of his son's death left Mr. Seesan devastated.[769]

Mr. Seesan described that "the void left by [1LT Seesan's] passing is one that will continue to resonate within [their] family for generations to come."[770] 1LT Seesan is "deeply missed" by his family and friends.[771] His memory kept alive "notably through the naming of three of [Mr. and Ms. Seesan's] grandchildren who proudly carry 'Aaron' as their middle name."[772] Additionally, two of 1LT Seesan's friends have chosen to name their sons after him.[773] According to Mr. Seesan,

[762] *Id*.
[763] *Id*. at ¶ 5.
[764] *Id*.
[765] *Id*.
[766] *Id*.
[767] *Id*. at ¶ 7.
[768] *Id*.
[769] *Id*.
[770] *Id*. at ¶ 9.
[771] *Id*.
[772] *Id*.
[773] *Id*.

this a testament to the profound effect 1LT Seesan had on their lives.[774] These acts of remembrance and honor speak volumes about the lasting legacy Aaron has left behind. Mr. Seesan stated, "[i]t is difficult to put into words how much I feel Aaron's absence, but I continue to carry his memory, along with my family, so he will never be forgotten."[775]

Plaintiffs have requested an upward enhancement to Mr. Seesan's claims based on the family learning first that [redacted] *See Oveissi*, 768 F. Supp. 2d at 26-27 (finding factors "pertinent to the determination of damage enhancements" to include "circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing). Plaintiffs have requested an enhancement of 25% of his baseline award resulting in an award of $6.25 million for Thomas M. Seesan's solatium claim.

The Special Master recommends a 20% enhancement, an award of $6 million.. LT Seesan [redacted] is a factor aggravating Mr. Sessan's grief.

**b. Chiquita M. Seesan[776]**

Chiquita M. Seesan ("Ms. Seesan") is the mother of 1LT Seesan.[777] According to Ms. Seesan, 1LT Seesan was an "incredible person," and she holds immense "pride" in her heart for him.[778] Ms. Seesan recalled moments together with her son "attending church, supporting him at his various events, or exploring new places on family vacations."[779] Ms. Seesan described that 1LT

[774] *Id.*
[775] *Id.*
[776] Chiquita M. Seesan's Passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 41, Declaration of Chiquita M. Seesan, dated April 1, 2025.
[777] *Id.* at ¶ 3.
[778] *Id.* at ¶ 4.
[779] *Id.* at ¶ 5.

Seesan's "pursuit of excellence was evident in everything he did."[780] "He embraced the most challenging academic paths, earning an honors diploma in high school, becoming an Eagle Scout, and shining in speech and debate, football, track, and the Academic Challenge Team."[781] At the Merchant Marine Academy, 1LT Seesan received an academic award and also served as the Honor Board Chairman.[782] Ms. Sessan was incredibly proud of her son.[783] One of her most treasured memories of 1LT Seesan is the trip they took to Olympic National Forest during his time at Fort Lewis.[784] Prior to his deployment, 1LT Seesan shared his Last Will and Testament with her and Mr. Seesan—something they thought they would never need.[785]

Ms. Seesan described that the injury and subsequent death of 1LT Seesan came as an unimaginable shock to her.[786] "Just hours after a phone call with him, an Army representative informed [Ms. Seesan] of the severe burns he had sustained, covering 80% of his body, and his urgent transport to the American Hospital in Landstuhl, Germany."[787] As a registered nurse, Ms. Sessan "immediately grasped the gravity of his condition," but she described that nothing could prepare her for the news that followed.[788] As Ms. Seesan and her husband anxiously awaited further instructions to travel to Germany, the next day, an Army representative arrived at their doorstep to deliver the devastating news of 1LT Seesan's passing.[789] "The disbelief and sorrow were overwhelming" for Ms. Seesan. Sharing the news of 1LT Seesan's death with his siblings was extremely difficult.[790]

---

[780] *Id*. at ¶ 5.
[781] *Id*. at ¶ 4.
[782] *Id*. at ¶ 4.
[783] *Id*. at ¶ 4.
[784] *Id*. at ¶ 5.
[785] *Id*. at ¶ 5.
[786] *Id*. at ¶ 7.
[787] *Id*. at ¶ 7.
[788] *Id*. at ¶ 7.
[789] *Id*. at ¶ 7.
[790] *Id*. at ¶ 7.

Since 1LT Seesan's passing, Ms. Sessan has established a "new normal," carrying her son close to her heart while trying to move forward with her life.[791] She continues to have conversations about her son and the activities they enjoyed as a family to keep his spirit alive, ensuring he remains an integral part of their family.[792] According to Ms. Seesan, 1LT Seesan's memory continues to bind their family together, shaping their lives and relationships in profound ways.[793] Three of Ms. Seesan's grandchildren bear 1LT Seesan's name as their middle name and two of 1LT Seesan's friends have named their sons after him. Additionally, 1LT Seesan's legacy continues through a scholarship fund established in his honor that is awarded to "high school seniors who embody the same spirit of academic and athletic excellence that [1LT Seesan] represented."[794] The Honor Board Room at the Merchant Marine Academy and a special award presented annually at the Academy is named after 1LT Seesan, and a coin he designed is given to each new cadet.[795] 1LT Seesan wrote the following poem called "Eulogy of the Common Soldier" while in high school:[796]

> All mortal beings, which God brought forth, die the same, man is not exempt. All will inevitably end as the dust from whence we came, it matters not of age. Do not mourn me if I should fall in a foreign land, think this of my passing. In a far off field a finer soil mixed with the foreign sand, a dust that is American. A dust that laughed, cried, and loved as an American, on this plot there shall be. A little piece of America, a patch for the free man, which no oppressor can take. From this soil grows grass shimmering a little greener, brilliant emerald ramparts. A Breeze whisping White Poppies with a scent a little sweeter, flowers towards Heaven. Mourn not my terrible death but celebrate my cause in life, viewed noble or not. I would have sacrificed and gave all that I had to give, not to make man good, but only to let the good man live.[797]

---

[791] *Id*. at ¶ 8.
[792] *Id*. at ¶ 8.
[793] *Id*. at ¶ 8.
[794] *Id*. at ¶ 9.
[795] *Id*. at ¶ 9.
[796] *Id*. at ¶ 9.
[797] 151 Cong. Rec. 134 (2005) (statement of Rep. Ralph Regula) https://www.govinfo.gov/content/pkg/CREC-2005-10-20/pdf/CREC-2005-10-20-pt1-PgE2149-5.pdf#page=1

Ms. Seesan described that her son's "memory is a constant, guiding presence" and inspires her to "live with the same courage, dedication, and love that he exemplified."[798]

Plaintiffs have requested an upward enhancement to Ms. Seesan's claims based on the family learning f[redacted] *See Oveissi*, 768 F. Supp. 2d at 26-27 (finding factors "pertinent to the determination of damage enhancements" to include "circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing). Plaintiffs have requested an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Chiquita M. Seesan.

For the reasons stated with respect to Mr. Sessan's solatium claim, the Special Master recommends an award of $6 million to Ms. Sessan.

**c. Rachel Schulze[799]**

Rachel Schulze is the sister of 1LT Seesan who was her "best friend" and "protector."[800] According to Ms. Schulze, "[f]rom the earliest days, playing in [their] backyard tree house to riding bikes around [their] neighborhood, [1LT Seesan] was always by [her] side."[801] Ms. Schulze recalled that her brother was there for the big milestones like her baptism, first communion, confirmation, and high school graduation."[802] She described 1LT Seesan as her biggest cheerleader

---

[798] Declaration of Chiquita Seesan at ¶ 9.

[799] Rachel Schulze's Passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 42, Declaration of Rachel Schulze, dated May 21, 2025.

[800] *Id*. at ¶¶ 3,4.

[801] *Id*. at ¶ 4.

[802] *Id*.

who supported her at every musical, dance recital, track meet, and chorus concert.[803] Growing up, they spent almost all their time together, "from water balloon battles to cheering on [their] beloved Massillon Tigers."[804] Their days were "filled with laughter, shared secrets, and countless adventures."[805] Even when life took them in different directions—"with Aaron deploying and [Ms. Schulze] heading off to the University of Dayton"—the siblings remained "close."[806] The ongoing communication with 1LT Seesan was "a lifeline"—they continued their tradition of trading jokes and funny stories.[807]

When Ms. Schulze was twenty years old, she was informed by her parents that her brother was killed.[808] She recalled the "overwhelming sense of grief that washed over [her]."[809] Each time she shared the news of 1LT Seesan's passing with friends and family, it was a reminder that she no longer would have her brother by her side.[810]

Following 1LT Seesan's death, the emotional bond between the family became strained while they each delt with grief in their own ways—trying to adapt to a life without 1LT Seesan.[811] [redacted][812] Ms. Schulze explained that the loss of 1LT Seesan is a wound that time is unable to heal.[813] His absence is felt at every milestone including Ms. Schulze's wedding, the birth of her children, and the birthdays and big family milestones of his nieces and nephews.[814]

---

[803] *Id.*.
[804] *Id.*.
[805] *Id.* at ¶ 5.
[806] *Id.*
[807] *Id.*
[808] *Id.* at ¶ 7.
[809] *Id.*
[810] *Id.*
[811] *Id.* at ¶ 9.
[812] *Id.*
[813] *Id.* at ¶ 10.
[814] *Id.*

"Each of these moments serves as a reminder of what [they] have lost."[815] Ms. Schulze stated: "As we move forward, Aaron's death will continue to be a profound presence in our lives. The impact of his death is not just a matter of past grief, it also shapes the way we celebrate, the way we mourn, and the way we come together, always aware of the person who should have been there with us."[816]

Plaintiffs have requested a baseline award of $2.5 million for Rachel Schulze's solatium claim. The Special Master recommends that the Court enter an award in this amount.

#### d. Rebekah Stolar[817]

Rebekah Stolar is the youngest sister of 1LT Seesan by twelve years.[818] According to Ms. Stolar, she and 1LT Seesan had a strong bond despite the age gap.[819] As her older brother, 1LT Seesan was always teaching Ms. Stolar something new, like crafting the perfect paper airplane or building Styrofoam boats, activities that, though simple, fostered a bond of creativity and learning between [them]."[820] She "cherished family vacations, attending church, and celebrating holidays together, where [1LT Seesan's] unique sense of humor always shone, bringing laughter and unity to [their] gatherings."[821] "As [1LT Seesan] pursued his education at the Merchant Marine Academy, [their] time together became even more sporadic, yet each homecoming was a celebration, especially after his graduation in 2003."[822] When 1LT Seesan graduated from the Academy, his interactions with Ms. Stolar were limited due to his military service; however, each phone call was "precious and filled with anticipation."[823]

---

[815] *Id*.
[816] *Id*.
[817] Rebekah Stolar's Passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 43, Declaration of Rebekah Stolar, dated November 14, 2025.
[818] *Id*. at ¶ 3.
[819] *Id*. at ¶ 4.
[820] *Id*. at ¶ 5.
[821] *Id*. at ¶ 4.
[822] *Id*. at ¶ 5.
[823] *Id*.

Ms. Stolar recalled that late one Friday evening, her parents received a phone call informing them that 1LT Seesan had been injured.[824] At this time, Ms. Stolar "was too young to fully comprehend," and she only received the vague details that her brother was in the hospital in Germany.[825] The next day she returned home from church and saw her older brother in the driveway. He explained the devastating news that 1LT Seesan had not survived.[826] Ms. Stolar described that "the shock was immediate, a visceral punch that left [her] running to the backyard to cry, overwhelmed by a grief that was too big for [her] young mind to fully grasp."[827] "At 11 years old, [Ms. Stolar] had clung to the hope that being in the hospital meant [her brother] would be okay, that he would come home."[828] Ms. Stolar stated that, "the realization that he wouldn't was a painful lesson in the fragility of life, a moment of loss so profound that the days that followed became a blur."[829]

Following 1LT Seesan's death, Ms. Stolar [redacted]

Ms. Stolar described that the loss of 1LT Seesan [redacted][832] [redacted]

[824] *Id.* at ¶ 7.
[825] *Id.*
[826] *Id.*
[827] *Id.*
[828] *Id.*
[829] *Id.*
[830] *Id.* at ¶ 8.
[831] *Id.*
[832] *Id.* at ¶ 9.

[redacted][835] Ms. Stolar described her brother as the "linchpin" that held the siblings together and without him, the connections between them have frayed.[836] Ms. Stolar recalled that in the wake of her brother's death, the overall well-being and quality of life of her family suffered. Her parents went through the unimaginable pain of losing a child. Ms. Stolar described that "[i]t's a loss that [she] believe[s] has aged them beyond their years, a silent thief of joy and longevity."[837] In the immediate aftermath of his death, Ms. Stolar found herself stepping into a caretaker role for her grieving parents—a role that she continues to navigate.[838] [redacted][839]

The death of 1LT Seesan has [redacted][840] Ms. Stolar described that the death of her brother while she was so young "has indelibly shaped [her] development and the very essence of who [she is] today.[841] Ms. Stolar stated: "The experience of losing him, along with the cascade of consequences that followed, has molded my perspectives, my relationships, and my approach to life. It's a profound impact that extends beyond the

833 *Id.*
834 *Id.*
835 *Id.*
836 *Id.*
837 *Id.*
838 *Id.*
839 *Id.*
840 *Id.* at ¶ 10.
841 *Id.*

immediate grief of loss, influencing every facet of my life and, by extension, the dynamics of our family as a whole."[842]

Plaintiffs have requested an upward enhancement to Ms. Stolar's claims based on the mental-health issues that have plagued her since her brother's death and the impact they have had on her life. They cite *Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs have requested an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Rebekah Stolar's solatium claim.

The Special Master recommends that the Court award Ms. Stolar the baseline award of $2.5 million. [redacted] experienced by those who have been given the baseline award.

---

t

**M. Hoby F. Bradfield, Jr. – July 9, 2005 – Mosul**

On July 9, 2025, Specialist ("SPC") Hoby F. Bradfield, Jr.—who was a Specialist and Combat Life Saver in the U.S. Army's G Troop, 2d Squadron, 3d Armored Cavalry Regiment—was on foot conducting a raid when he was hit with small arms fire. *See* ECF No. 9 at ¶ 1043; ECF 26-1 at 75-76. According to his Certificate of Death, SPC Bradfield died of a [redacted][843] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which SPC Bradfield was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the July 9, 2005 attack in which SPC Hoby F. Bradfield, Jr., was killed. *See* ECF Nos. 47, 48.

SPC Bradfield's surviving parent, Dianne Johnson Sterling ("Ms. Sterling") is a Plaintiff in this case. *See* ECF No. 9 at ¶¶ 1045-1046. Ms. Sterling suffered severe mental anguish, extreme emotional pain and suffering, and loss of SPC Bradfield's society, companionship, comfort, advice and counsel. *Id.* ¶ 1046. The following chart reflects the claims asserted by Ms. Sterling whose claim arose out of the July 9, 2005, attack, as well as the evidence setting forth the bases of her claim. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Dianne Johnson Sterling | SPC Hoby F. Bradfield, Jr.'s mother | Solatium claim $6.25 million | Declaration of Dianne Johnson Sterling dated March 31, 2025, including copy of her proof of U.S. citizenship | 45 |

[843] Ex. 44, Certificate of Death of Hoby F. Bradfield, Jr., dated July 9, 2005.

**1. Solatium Claim Brought by SPC Bradfield's Family Member**

**a. Dianne Johnson Sterling**[844]

Dianne Sterling is the mother of SPC Bradfield.[845] According to Ms. Sterling, her son, SPC Bradfield was born just four days before her birthday—making him feel like a birthday present to her.[846] She cherishes every milestone, "from his first steps to his first vote."[847] They spent countless moments together, shopping, baking Christmas cookies, cooking, and arts and crafts.[848] Their trips to places like New York City, deepened his love for art.[849] In addition to the close relationship he had with Ms. Sterling, SPC Bradfield also had a strong relationship with his brothers and stepfather.[850]

Ms. Sterling described that SPC Sterling had a "heart of gold" and always helped out of the goodness of his heart—especially when it came to children and the elderly.[851] "Ms. Sterling recalled that her son showered her with love and kindness, always ensuring to hold her hand or open doors for her whenever they were out.[852] SPC Bradfield also had a humorous side—requesting items like pink flamingo patio lights or glow-in-the-dark Dracula teeth to be shipped from home while he was deployed which brought "light-hearted moments to his unit."[853] Ms. Sterling recalled how her son's letters would always remind her of how much he loved her along

---

[844] Dianne Johnson Sterling's Birth Certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 45, Declaration of Dianne Johnson Sterling, dated March 31, 2025.
[845] *Id*. at ¶ 3.
[846] *Id*. at ¶ 4.
[847] *Id*. at ¶ 6.
[848] *Id*.
[849] *Id*.
[850] *Id*. at ¶ 5.
[851] *Id*. at ¶ 4.
[852] *Id*.
[853] *Id*. at ¶ 5.

with a request to take care of each other.[854] "The promise of reuniting after his second tour remains unfulfilled."[855]

According to Ms. Sterling, she was home one day making breakfast when her son Chris called requesting that his mother sit down.[856] The moment she heard SPC Bradfield's name, her "heart sank; disbelief and denial took over as [she] struggled to accept that [her] son was gone."[857] Silence followed—she was unable to "speak or make a sound."[858] The way she found out about her son's death was "jarring" as she had the expectation that the military would inform her directly.[859] Ms. Sterling was left to subsequently call around searching for answers.[860] After reaching someone at the base in Colorado Springs, Ms. Sterling was informed that SPC Bradfield had survived a gunshot wound only to be killed by an IED while being transported.[861] The realization that her son's death is classified as a homicide adds another layer of anguish to her grief.[862] Ms. Sterling felt immense guilt and sorrow in her inability to save her son—especially with her background as a first responder.[863]

Following SPC Bradfield's death, [redacted]

[854] *Id.*
[855] *Id.*
[856] *Id.* at ¶ 8.
[857] *Id.*
[858] *Id.*
[859] *Id.*
[860] *Id.*
[861] *Id.*
[862] *Id.*
[863] *Id.*
[864] *Id.* at ¶ 9.
[865] *Id.*

[redacted][869]

SPC Bradfield has a daughter who is now nineteen years old and has grown up without knowing her father—knowing him only through stories and photographs.[870] She visits her father's grave seeking a connection she'll never truly have.[871] Ms. Sterling described that her relationships with family and friends have suffered because [redacted][872] [redacted][873] Ms. Sterling has lost her "father, aunt, and mother in quick succession" but is unable to properly mourn or process their deaths.[874] Ms. Sterling stated: "Buried in Arlington, his grave is a stark reminder of the sacrifice he made, yet I find no solace there. Hoby's memory lives on in his daughter, [], who bears his likeness and spirit. Sharing stories and photos is all we can do to bridge the gap between the past and a future he was unjustly denied."[875]

---

[866] *Id*.
[867] *Id*.
[868] *Id*.
[869] *Id*.
[870] *Id*. at ¶ 10.
[871] *Id*. at ¶ 11.
[872] *Id*. at ¶ 10.
[873] *Id*.
[874] *Id*.
[875] *Id*. at ¶ 11.

Plaintiffs have requested an upward enhancement to Ms. Sterling's claims based on her mental-health issues and eating disorder that arose following her son's death. They cite *Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs have requested an enhancement of 25% of his baseline award resulting in an award of $6.25 million for Dianne Johnson Sterling's solatium claim.

The Special Master recommends that the Court award solatium damages of $6 million to Ms. Sterling, a 20% upward adjustment. Notice to Ms. Sterling of her son's death was mishandled, and when she learned the details, she found [redacted]. Ms. Sterling was [redacted] An upward adjustment is appropriate to reflect these experiences that are beyond those contemplated by the baseline award framework.

**N. Anthony Ray Charles Yost – November 19, 2005, Attack – Mosul**

On November 19, 2005, Master Sergeant ("MSG") Anthony Ray Charles Yost—who was serving in the U.S. Army's 3d Battalion, 3d Special Forces Group—was conducting cordon and search operations in Mosul, Iraq when an explosion from a hidden demolition charge engulfed the house. *See* ECF No. 9 at ¶ 1254; ECF No. 26-1 at 76-77. According to the Autopsy Examination Report, the [redacted][876] MSG Anthony Ray Charles Yost [redacted][877] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which MSG Yost was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the November 19, 2005 attack in which MSG Anthony Ray Charles Yost was killed. *See* ECF Nos. 47, 48.

MSG Yost's surviving spouse, Joann Patricia Yost, and surviving son, Anthony Ray Charles Yost, are Plaintiffs in this action. *See* ECF No. 9 at ¶¶ 1256-1259. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of SPC Yost's society, companionship, comfort, advice and counsel. *Id.* ¶ 1259. The following chart reflects the claims asserted by these two family members whose claims arise out of the November 19, 2005,

[876] Ex. 46 at p. 8, Autopsy Examination Report of MSG Anthony Ray Charles Yost.
[877] *Id.*

attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Joann Patricia Yost | MSG Anthony Ray Charles Yost's surviving spouse | Solatium claim $10 million | Declaration of Joann Patricia Yost, dated December 8, 2025, including copy of her proof of U.S. citizenship | 47 |
| Anthony Ray Charles Yost | MSG Anthony Ray Charles Yost's surviving child | Solatium claim $5 million | Declaration of Anthony Ray Charles Yost, dated November 24, 2024, including copy of his proof of U.S. citizenship | 48 |

**1. Solatium Claims Brought by MSG Anthony Ray Charles Yost Surviving Family Members**

**a. Joann P. Yost[878]**

Joann P. Yost ("Ms. Yost") is the surviving spouse of MSG Yost.[879] Ms. Yost described MSG Yost as" the absolute love of [her] life, [her] soulmate, and [her] best friend."[880] She recalled the day she met him at a gym where the "chance encounter led to a lunch date, which blossomed into a beautiful, lifelong partnership."[881] Ms. Yost and MSG Yost had a blended family with children from previous marriages and their son Anthony James ("AJ").[882] MSG Yost was a "devoted and hands-on father, whose nightly routine of tucking [their] son AJ into bed and rocking

[878] Joann Patricia Yost's Birth Certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 47, Declaration of Joann Patricia Yost, dated December 8, 2025.
[879] *Id*. at ¶ 3.
[880] *Id*. at ¶ 4.
[881] *Id*. at ¶ 4.
[882] *Id*. at ¶ 6.

him to sleep."[883] According to Ms. Yost, their home was " filled with love, significant events like buying [their] first home, celebrating [their] son's first birthday, and planning for the future, including the possibility of expanding [their] family." MSG Yost also had a close relationship with her father.[884] Their days were filled with plans for their home, future business, and the well-being of their family.[885] According to Ms. Yost, MSG Yost had aspirations to retire from the military and continue his work as a contracted civilian with the hope to make the Fayetteville area their permanent home for the benefit of their business and family life.[886] Their "plans to grow old together, to witness and celebrate all of life's milestones, were tragically cut short."[887]

The day Ms. Yost learned about MSG Yost's death, she was planning on attending a baby shower.[888] When Ms. Yost answered a knock at her door, she initially expected to see her neighbor or the babysitter.[889] Her world came crashing down when she was greeted by "the solemn faces of four men, three in uniform, standing at [her] doorstep."[890] Ms. Yost described that "the sight of them, especially knowing one was [MSG Yost's] good friend and now [her] casualty assistance officer, immediately filled [her] with dread."[891] "The formalities of their dress uniforms and the presence of a medical bag only heightened the sense of foreboding."[892] She recalled that they asked her to sit down, and when they began to speak the words "we regret to inform you," her world shattered.[893] Holding her two-year-old son, she was "overwhelmed with a torrent of emotions—

[883] *Id*. at ¶ 8.
[884] *Id*. at ¶ 6.
[885] *Id*. at ¶ 7.
[886] *Id*. at ¶ 7.
[887] *Id*. at ¶ 8.
[888] *Id*. at ¶ 10.
[889] *Id*. at ¶ 10.
[890] *Id*. at ¶ 10.
[891] *Id*. at ¶ 10.
[892] *Id*. at ¶ 10.
[893] *Id*. at ¶ 10.

despair, confusion, and an unbearable sense of loss."[894] Overwhelmed with grief, Ms. Yost recalls everyone from the baby shower showing up at her home.[895]

Following the death of MSG Yost, even the simplest tasks became monumental, and sleep was "elusive." Ms. Yost longed for someone to wake her from the "nightmare." She stated, "the day Tony died was the day a part of me died with him, leaving me to navigate a future without my husband, my best friend, and the father of my child." According to Ms. Yost, [redacted][898]

In addition to the emotional turmoil she experienced, Ms. Yost was faced with "significant financial upheaval."[899] Ms. Yost had to transition from the stability of two incomes to relying solely on her own.[900] She described that the support from her parents became a "crucial lifeline, helping [them to] navigate through the toughest times when making ends meet was a daily struggle."[901] "Sacrifices became a part of our routine, as luxuries like family vacations had to be set aside in favor of basic necessities." [902]

According to Ms. Yost, their family has never been the same.[903] [redacted][904] Ms. Yost stated: "My

---

[894] *Id*. at ¶ 10.
[895] *Id*. at ¶ 11.
[896] *Id*. at ¶ 11.
[897] *Id*. at ¶ 11.
[898] *Id*. at ¶ 11.
[899] *Id*. at ¶ 13.
[900] *Id*. at ¶ 13.
[901] *Id*. at ¶ 13.
[902] *Id*. at ¶ 13.
[903] *Id*. at ¶ 15.
[904] *Id*. at ¶ 15.

oldest son lost not just a stepfather but a mentor and friend, my father lost his best friend, and my youngest, AJ, lost the guiding hand of a father who dreamt of teaching him about life's milestones."[905] Ms. Yost described that the responsibility of holding their family together has fallen squarely on her shoulders, pushing her into a relentless mode of survival where she's had to navigate life's challenges without her partner by her side.[906] Her oldest son and father have had to step in to provide guidance and support to her son AJ in an attempt to fill the immense gap left by his father.[907] Yet, "the void in my son's heart, the longing for his father's love, is a wound that may never fully heal."[908] The impact of MSG Yost's death [redacted][910]

Ms. Yost "envisioned growing old with [MSG Yost], sharing in the joys of retirement and watching our grandchildren grow."[911] These dreams have been irrevocably altered.[912] Ms. Yost stated: "Watching others celebrate reunions and milestones, knowing we were denied our future with Tony, is a constant source of pain. Our lives are forever altered, and we've had to find a way to move forward, redesigning our dreams and aspirations around a gaping absence."[913]

Plaintiffs have requested an upward enhancement to Ms.Yost's claims based on the decline of her mental health requiring medication and the fact that she was left with a two-year-old son that she would need to raise on her own following her husband's death. They cite *Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a

---

[905] *Id*. at ¶ 15.
[906] *Id*. at ¶ 14.
[907] *Id*. at ¶ 15.
[908] *Id*. at ¶ 16.
[909] *Id*. at ¶ 17.
[910] *Id*. at ¶ 17.
[911] *Id*. at ¶ 16.
[912] *Id*. at ¶ 16.
[913] *Id*. at ¶ 17.

"drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); and *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs have requested an enhancement of 25% of her baseline award resulting in an award of $10 million for Joann P. Yost's solatium claim.

The Special Master recommends that the Court award a 10% enhancement of the solatium award for Ms. Yost, resulting in an award of $8.8 million to reflect the fact that while Ms. Yost experienced consequences similar to those who have received a baseline award of $8 million, she was left with a young child to raise, a factor complicating her grief and readjustment.

**b. Anthony Yost[914]**

Anthony Yost is the youngest son of MSG Yost and was just two years old at the time of his father's death.[915] Despite living with MSG Yost for a brief period, the stories Mr. Yost is told

[914] Anthony Ray Charles Yost's Birth Certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 48, Declaration of Anthony Ray Charles Yost, dated December 8, 2025.

[915] *Id.* at ¶ 3.

about their relationship is something he clings to.[916] People have shared with Mr. Yost just how much of an amazing father MSG Yost was and how his father never wanted to leave his side.[917]

Mr. Yost explained that he's had to navigate through life's significant moments without his father's guidance on his first date, advice on buying his first car, pride in his academic achievements, and support as he steps into adulthood.[918] MSG Yost missed the milestones from Mr. Yost's preschool graduation to his first report card, high school graduation, and even his mom beating cancer.[919] "He won't be there for my college graduation, my first drink at 21, my wedding, or the birth of my children." Mr. Yost clings to the emails that MSG Yost sent to his mother checking in on how he was doing while deployed and giving him endearing nicknames like "Budda Budduh" or his "Bear Cub."[920]

According to Ms. Yost, growing up without a father always felt confusing to him, and he recalls the jealousy he felt toward other families that had both parents.[921] Mr. Yost's earliest memory of questioning his father's absence was around the age of 4 or 5, when the sight of complete families on TV prompted him to ask his mom, "Do I have a dad?"[922] Due to his age, Mr. Yost was unable to grasp the reality of his father's death in the Iraq War.[923] When Mr. Yost turned eighteen years old, MSG Yost's team member, "Chucky" received approval from his mother to share the details of MSG Yost's death.[924] According to Mr. Yost, that conversation was one of the hardest moments of his life as he tried to maintain his composure while a storm of tears threatened

[916] *Id*. at ¶ 4.
[917] *Id*.
[918] *Id*.
[919] *Id*. at ¶ 8.
[920] *Id*. at ¶ 5.
[921] *Id*. at ¶ 7.
[922] *Id*.
[923] *Id*.
[924] *Id*.

to break free.[925] After Mr. Yost learned about how his father was killed, "the dam of pent-up emotions finally burst" and he cried for hours in his mother's arms over the loss of a man he "never got to know."[926]

The death of MSG Yost has also caused their family's financial situation to drastically change.[927] Mr. Yost recalls that his mother had to work three jobs to keep them afloat as the sole provider.[928] He was aware that there were times when his mother would skip meals to ensure that he had enough to eat.[929] Mr. Yost described that his mother's commitment to their well-being despite the financial hardship was both "inspiring and heart-wrenching to witness."[930] The death of MSG Yost has also fractured relationships with family, leaving Mr. Yost to only consider his mother and her parents as his true family.[931]

Mr. Yost and his mother no longer celebrate the holidays because MSG Yost used to come home to celebrate and they are now "stark reminders" of what they've lost.[932] Mr. Yost described that living without any memories of MSG Yost has been "excruciating." He stated, "I hate that I can't recall the warmth of his embrace or the sound of his voice."[933]

Plaintiffs have requested the baseline award for a child of $5 million for Anthony Ray Charles Yost's solatium claim.

The Special Master recommends that the Court apply a 20% discount to the baseline award to Anthony Yost. Anthony was only two years old when his father died and did not learn his father was killed in Iraq until Anthony was 18. While Anthony has cited the impact of his life of having

---

[925] *Id.*
[926] *Id.*
[927] *Id.* at ¶ 8.
[928] *Id.*
[929] *Id.*
[930] *Id.* at ¶ 9.
[931] *Id.* at ¶ 10.
[932] *Id.*
[933] *Id.* at ¶ 3.

no father around, he has no memories of his father that are his own. In the case of plaintiffs who were toddlers at the time of the parent's death, courts distinguish between those with memories of the parent and those without. *Bathiard v. Islamic Republic of Iran*, 2020 U.S. Dist. LEXIS 72513, at *17 (D.D.C. Apr. 24, 2020). A 20% reduction reflects those important differences in grief. The Special Master recommends an award of $4 million to Anthony Yost.

## CONCLUSION

For the reasons stated above and the analysis set forth, the Special Master recommend that the Court enter final judgments for each Plaintiff's solatium damages and punitive damages as set forth below:

| Plaintiff | Relation to Victim | Date of Attack | Recommended Solatium Damages | Punitive Damages |
|---|---|---|---|---|
| Kacey Sturtz | Spouse | 5/20/2004 | $8,800,000.00 | $8,800,000.00 |
| Sally H. Dang | Spouse | 10/13/2004 | $10,000,000.00 | $10,000,000.00 |
| Ryan A. Soltes | Child | 10/13/2004 | $ 5.000,000.00 | $ 5.000,000.00 |
| Brandan C. Soltes | Child | 10/13/2004 | $ 5,000,000.00 | $ 5,000,000.00 |
| Robert H. Soltes | Child | 10/13/2004 | $ 2,500,000.00 | $ 2,500,000.00 |
| Sherrin Graham | Parent | 10/30/2004 | $ 5,000,000.00 | $ 5,000,000.00 |
| Cayla Bell | Sibling | 10/30/2004 | $ 3,000,000.00 | $ 3,000,000.00 |
| Jocelyn M. Burns | Parent | 11/11/2004 | $ 5,000,000.00 | $5,000,000.00 |
| Kristopher W. Burns | Sibling | 11/11/2004 | $ 2,750,000.00 | $ 2,750,000.00 |
| Steven D. Blanton | Parent | 12/12/2004 | $ 5,500,000.00 | $ 5,500,000.00 |
| Dana Blazer-Wortham | Spouse | 12/12/2004 | $ 8,000,000.00 | $ 8,000,000.00 |
| Alyssa Highley | Child | 12/12/2004 | $ 5,000,000.00 | $ 5,000,000.00 |
| Erik Blazer | Child | 12/12/2004 | $ 5,000,000.00 | $ 5,000,000.00 |
| Dana Stewart, Jr. | Parent | 12/12/2004 | $ 5,000,000.00 | $ 5,000,000.00 |

| | | | | |
|---|---|---|---|---|
| Dawn Stewart | Parent | 12/12/2004 | $ 5,000,000.00 | $ 5,000,000.00 |
| Michael Anderson | Parent | 12/14/2004 | $ 5,500,000.00 | $ 5,500,000.00 |
| Angela Anderson | Step-Parent | 12/14/2004 | $ 5,500,000.00 | $ 5,500,000.00 |
| Alexandria Anderson | Sibling | 12/14/2004 | $ 2,500,000.00 | $2,500,000.00 |
| Daniel J. Plumondore | Parent | 2/16/2005 | $ 5,000,000.00 | $ 5,000,000.00 |
| Elfriede H. Plumondore | Parent | 2/16/2005 | $ 5,000,000.00 | $ 5,000,000.00 |
| Frank M. Hernandez | Parent | 2/17/2005 | $ 5,000,000.00 | $ 5,000,000.00 |
| Michell D. Alikor | Spouse | 4/23/2005 | $10,000,000.00 | $10,000,000.00 |
| Ah'lania Davis | Child | 4/23/2005 | $ 5,000,000.00 | $ 5,000,000.00 |
| Aniya Davis | Child | 4/23/2005 | $3,500,000.00 | $ 3,500,000.00 |
| Thomas M. Seesan | Parent | 5/22/2005 | $ 6,000,000.00 | $ 6,000,000.00 |
| Chiquita M. Seesan | Parent | 5/22/2005 | $ 6,000,000.00 | $ 6,000,000.00 |
| Rachel Schulze | Sibling | 5/22/2005 | $ 2,500,000.00 | $ 2,500,000.00 |
| Rebekah Stolar | Sibling | 5/22/2005 | $2,500,000.00 | $ 2,500,000.00 |
| Dianne Johnson Sterling | Parent | 7/9/2005 | $ 6,000,000.00 | $ 6,000,000.00 |
| Joann Patricia Yost | Spouse | 11/19/2005 | $8,800,000.00 | $8,800,000.000 |
| Anthony Ray Charles Yost | Child | 11/19/2005 | $ 4,000,000.00 | $ 4,000,000.00 |

Respectfully submitted,

By /s/ Jack McKay
Jack McKay (DC Bar No. 159335)
Special Master
2829 Connecticut Avenue NW Apt. 811
Washington, D.C. 20008

Dated: April 29, 2026