UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RUBEN V. FLORES, *et al.*, Plaintiffs, -against- ISLAMIC REPUBLIC OF IRAN, *et al.*, Defendant. | : | **Case No.: 22-cv-1512 (JEB)** |

**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING DAMAGES FOR 64 IMMEDIATE FAMILY MEMBER PLAINTIFFS IDENTIFIED IN THE COURT'S SEPTEMBER 24, 2025, ORDER**

# TABLE OF CONTENTS


INTRODUCTION ........ 1

I. PROCEDURAL BACKGROUND ........ 1

II. CATEGORIES OF CLAIMS AND PROPOSED DAMAGES FRAMEWORK ........ 2

A. Solatium Damages ........ 3

B. Punitive Damages ........ 5

III. THE 64 PLAINTIFFS' INJURIES ........ 5

A. ARIC J. BARR – APRIL 3, 2004, ATTACK – HIT, IRAQ ........ 6

1. Lisa Barr ........ 7

2. Aaron Barr ........ 9

3. Anthony Barr ........ 11

4. Alexandra Barr ........ 13

B. DAVID W. JOHNSON – SEPTEMBER 25, 2004, ATTACK – BAGHDAD, IRAQ ........ 15

1. Michelle DeFord ........ 16

2. Richard Johnson ........ 19

3. Randall Johnson ........ 21

4. Joie Libbey ........ 23

C. RONALD W. BAKER – OCTOBER 7, 2004, ATTACK – TAJI, IRAQ ........ 24

1. Joanne Baker ........ 26

2. Alexis Baker ........ 28

3. Carrylon Baker ........ 31

4. Anthony Wayne Baker ........ 32

5. Chris Baker ........ 33

D. JAMES C. MATTESON – NOVEMBER 12, 2004, ATTACK – FALLUJAH ........ 35

1. James L. Matteson ........ 36

2. Joyce Moran ........ 38

3. Hope Matteson ........ 41

4. Micaela R. Matteson ........ 42

E. JONATHAN A. HUGHES – MARCH 19, 2005, ATTACK – BAGHDAD ........ 44

1. Sara Hughes ........ 45

F. RANDY D. COLLINS – MAY 4, 2005, ATTACK – MOSUL ........................ 47
1. Roxanne Collins ........................ 49
2. Kevin Frazier, Jr. ........................ 53
3. Estate of Margarette Miller ........................ 55
4. Louis Rainey, Jr. ........................ 56
5. Moses L. Collins, Jr. ........................ 58
6. Teresia Collins ........................ 59
7. Gretta Collins-Williams ........................ 61
G. CASEY BYERS – JUNE 11, 2005, ATTACK – TAQADDUM ........................ 63
1. William Byers ........................ 64
2. Ann Byers ........................ 67
3. Hailey Maxwell ........................ 69
H. NATHANIEL ROCK – AUGUST 1, 2005, ATTACK – BARWANAH ........................ 72
1. Timothy Rock ........................ 74
2. Adriana Rock ........................ 76
3. Jared Rock ........................ 77
I. TIMOTHY DEE WATKINS – OCTOBER 15, 2005, ATTACK – RAMADI ........................ 79
1. Terri Watkins ........................ 81
2. Robbie Watkins ........................ 83
3. Rachel Watkins ........................ 85
4. Rebekah Helmadollar ........................ 87
5. Jonathan Watkins ........................ 89
6. Thomas Watkins ........................ 91
J. NORMAN W. ANDERSON III – OCTOBER 19, 2005, ATTACK – SADAH ........................ 93
1. Robyn Anderson ........................ 94
2. Norman Anderson, Jr. ........................ 96
3. Brooke Anderson ........................ 98
K. GERALD BLOOMFIELD II – NOVEMBER 2, 2005, ATTACK – RAMADI ........................ 100
1. Shirley Spears ........................ 102
2. Thomas Bloomfield ........................ 104

3. **Kathleen Kerch** .......... 106
4. **Paula Wallace** .......... 109
5. **Ronald Spears** .......... 111
6. **Jeffrey Spears** .......... 113
L. **MIGUEL TERRAZAS – NOVEMBER 19, 2005, ATTACK – HADITHAH** .......... 116
1. **Martin Terrazas, Sr.** .......... 118
2. **George B. Terrazas** .......... 121
3. **Martin Terrazas, Jr.** .......... 124
4. **Vanessa Terrazas-McKay** .......... 126
5. **Melissa Terrazas** .......... 130
6. **Andres Terrazas** .......... 133
M. **DOMINIC JOSEPH SACCO – NOVEMBER 20, 2005, ATTACK – TAJI** 134
1. **Brandy Sacco** .......... 136
2. **Anthony Sacco** .......... 139
3. **Diane Sacco** .......... 142
4. **William J. Sacco** .......... 145
5. **Lisa Livingston** .......... 147
N. **KEITH A. BENNETT – DECEMBER 11, 2005, ATTACK – RAMADI** .......... 149
1. **Carolyn Miller** .......... 150
2. **Tina Daley** .......... 152
O. **SANTOS RAYMOND ARMIJO – OCTOBER 2, 2006, ATTACK – TAJI** 154
1. **Faustina Armijo** .......... 155
2. **Alfonso Luna** .......... 159
P. **KEVIN SCOTT MOWL – AUGUST 2, 2007, ATTACK – BAGHDAD** .......... 161
1. **Harold Mowl, Jr.** .......... 163
2. **Mary Mowl** .......... 166
3. **Carlene Stahlnecker** .......... 168
**CONCLUSION** .......... 171

# TABLE OF AUTHORITIES

## Cases

*Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009) ........ 3

*Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677 (D.D.C. Mar. 22, 2023) ........ passim

*Bova v. Islamic Republic of Iran*, No. 15-cv-1074 (RCL), 2020 WL 2838582 (D.D.C. May 31, 2020) ........ 4

*Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2024 U.S. Dist. LEXIS 34785 (D.D.C. Feb. 29, 2024) ........ 72

*Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2025 U.S. Dist. LEXIS 94375 (D.D.C. May 16, 2025) ........ 72

*Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022) ........ 54, 113, 115, 123

*Est. of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37 (D.D.C. 2012) ........ 4

*Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) ........ 4

*Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (2009) ........ 3

*Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236 (D.D.C. 2020) ........ 3

*Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015) ........ 3

*Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20 (D.D.C. 2022) ........ 4

*Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018) ........ 54, 113, 115, 123

*Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023) ........ 2

*K.E.F.V. v. Islamic Republic of Iran,* 135 F.4th 988 (D.C. Cir. 2025) ........ 71

*Karcher v. Islamic Republic of Iran*, No. 16-cv-00232 (CKK), 2026 U.S. Dist. LEXIS 13128 (D.D.C. Jan. 23, 2026) ........ 72

*Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924 (D.D.C. Dec. 27, 2023) ........ 54, 113, 116, 124

*Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16 (D.D.C. 2022) ........ 4

*Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57 (D.D.C. 2015) ........ 3

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51 (D.D.C. 2010) ........ 4, 79

*Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16 (D.D.C. 2011) ........ passim

*Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44 (D.D.C. 2012) ........ 3

*Owens v Republic of Sudan*, 71 F. Supp. 3d 252 (D.D.C. 2014) .................................................... 4

*Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859 (JEB), 2025 U.S. Dist. LEXIS 125115 (D.D.C. July 1, 2025) .......................................................................................................... 5

*Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) ........................................................................................ 71

*Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) ..................................... 3

*Roth v. Islamic Republic of Iran* 78 F. Supp. 3d 349 (D.D.C. 2015)......................................... 2, 3

*Stearns v. Islamic Republic of Iran*, Case No. 1:17-cv-131-RCL, 2022 WL 4764905 (D.D.C. Oct. 3, 2022)............................................................................................................................ 1

*Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22 (D.D.C. 2016) ............................... passim

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010) ................................ passim

*Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012) ............................... 5, 47, 52

**Statutes**

28 U.S.C. § 1605A(a)(2)(A)(ii)(I) ........................................................................... passim

28 U.S.C. § 1605A(c) .......................................................................................... passim

## INTRODUCTION

The Special Master respectfully submits his Report and Recommendations Regarding Damages as to the injuries sustained by 64 of the 510 Plaintiffs for whom the Court granted default judgment as to liability against the Defendants Islamic Republic of Iran ("Iran") and Syrian Arab Republic ("Syria") in its September 24, 2025, Order and Memorandum Opinion. The Order and Memorandum Opinion entered on September 24, 2025 are attached to the Declaration of John M. Eubanks ("Eubanks Declaration") as Exhibit 1.[1]

## I. PROCEDURAL BACKGROUND

On October 11, 2024, Plaintiffs filed their Motion for Default Judgment as to Liability for First Wave of Attacks, ECF No. 26, on behalf of Plaintiffs injured in 33 attacks. On November 22, 2024, Plaintiffs filed their Motion for Default Judgment as to Liability for Second Wave of Attacks, ECF No. 33, on behalf of Plaintiffs injured in an additional 39 attacks. On February 26, 2025, Plaintiffs filed their Motion for Default Judgment as to Liability for Third Wave of Attacks, ECF No. 41, on behalf of Plaintiffs injured in an additional 43 attacks. Default judgment as to liability was granted in favor of Plaintiffs on September 24, 2025, as to all 115 attacks for which default judgment had been sought. *See* Ex. 1.

On October 22, 2025, Plaintiffs moved to appoint five Special Masters—Jim Letten, Esq.; Jack McKay, Esq.; Professor Franklin D. Rosenblatt; Eric D. Green, Esq.; and mesum—to issue Reports and Recommendations ("R&Rs") for damages of Plaintiffs impacted by the Court's September 24, 2025, Order. *See* ECF No. 50. The Court granted this motion on October 27, 2025. ECF No. 52. Further, the Court issued an Administrative Plan Governing Five Special Masters stating, "[w]ithin six months of receiving damages submissions for Plaintiffs' claims, each Special

[1] I have reviewed all of the exhibits provided to me by the Plaintiffs. They are too voluminous to file on the docket, and Plaintiffs have indicated to me that they will provide the exhibits to the Court upon request.

Master shall submit Reports and Recommendations to the Court via ECF containing findings of fact and conclusions of law regarding each item of compensatory damages." ECF No. 52-1 at 4.

On March 16, 2026, Plaintiffs submitted their First Proposed Findings of Fact and Conclusions of Law Regarding Damages for 31 Immediate Family Member Plaintiffs Identified in the Court's September 24, 2025, Order to Special Master Jack McKay. On April 2, 2026, Plaintiffs submitted their Second Proposed Findings of Fact and Conclusions of Law Regarding Damages for 34 Immediate Family Member Plaintiffs Identified in the Court's September 24, 2025, Order to Special Master Franklin Rosenblatt.

## II. CATEGORIES OF CLAIMS AND PROPOSED DAMAGES FRAMEWORK

Plaintiffs have submitted to me their third Proposed Findings of Fact and Conclusions of Law Regarding Damages for 64 Immediate Family Member Plaintiffs Identified in the Court's September 24, 2025. They have requested damages for 64 immediate-family Plaintiffs whose loved ones were killed in various attacks traceable to Iran and Syria that were part of the first, second, and third wave of attacks for which they sought liability. All Plaintiffs are family members of U.S. military servicemen who were killed in action by the attacks in Iraq addressed in the Court's September 24, 2025, Order. This Circuit follows a damages framework under Foreign Sovereign Immunities Act ("FSIA") cases.

To recover damages against Iran and Syria, Plaintiffs "must prove that the consequences of the [defendants'] conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955, at *29 (D.D.C. Aug. 15, 2023) (quoting *Roth v. Islamic Republic of Iran* 78 F. Supp. 3d 349, 402 (D.D.C. 2015)). Courts may rely on written declarations

from family member claimants describing the attack's effect on him or her. *See, e.g., Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (D.D.C. 2015).

**A. Solatium Damages**

Under the FSIA, a state sponsor of terrorism is responsible for intentional infliction of emotional distress, the resulting pain and suffering, and solatium of immediate family members of individuals killed in an attack for which a state sponsor of terrorism provided material support or resources. *See Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 245 (D.D.C. 2020). In these scenarios, family members do not need to be present at the scene of the terrorist attack to recover under a theory of intentional infliction of emotional distress. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 80 (D.D.C. 2010); *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (2009); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015). Solatium damages seek to compensate family members for "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).

Courts in this Circuit generally follow established baseline awards for solatium claims of family members of victims who died in terrorist attacks. *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007). These baseline values are based on the application of general principles of tort law. *See Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012) (holding that courts assessing damages under the FSIA "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises"); *Est. of Heiser*, 659 F. Supp. 2d at 24. Applying these baseline values

"help[s] ensure that similarly situated victims receive comparable awards." *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 36 (D.D.C. 2022).

Under this framework, relatives of deceased servicemen are generally awarded baseline damages amounts of $8 million for spouses, $5 million for children and parents, and $2.5 million for siblings. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010); *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 269 (D.D.C. 2006); *Owens v Republic of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014). However, these baseline awards are "not set in stone." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010).

Decisions to deviate from the baseline and award upward departures depend on various factors. See e.g. *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26-27 (D.D.C. 2011) (factors such as "an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing"); *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 38 (D.D.C. 2022) (children who were minors when their parents died have been awarded $6.25 million); *Est. of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 43 (D.D.C. 2012) (upward departure was warranted where sister suffered a nervous breakdown that required medical treatment, and she was prescribed medication for approximately one year); *Murphy*, 740 F. Supp. 2d at 79 (noting that self-destructive behavior is "uniquely acute suffering warranting an upward departure"). Upward enhancements to the baseline values can range from approximately 20 to 100 percent depending on the individual plaintiff's circumstances. *See Bova v. Islamic Republic of Iran*, No. 15-cv-1074 (RCL), 2020 WL 2838582, at *9 (D.D.C. May 31, 2020) (awarding 20 percent enhancement where mother suffered

"precipitous emotional decline due to the death of her son" and attempted suicide); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (finding severe mental distress arising from death warranted 25 percent enhancement); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40-41 (D.D.C. 2012) (awarding plaintiff 40 percent enhancement due to suffering from post-traumatic stress disorder, persistent grief, and depression coupled with decline in school grades and lack of motivation); *Oveissi*, 768 F. Supp. 2d at 29-30 (finding plaintiff's enduring trauma including depression, anger, and alcoholism following the victim's death warranted a 50 percent enhancement).

**B. Punitive Damages**

In addition to solatium damages, Plaintiffs also seek punitive damages which "serve to punish and deter the action which they [are] awarded." *Valore*, 700 F. Supp. 2d at 87. The terrorism exception to the FSIA specifically addresses the award of punitive damages. *See* 28 U.S.C. § 1605A(c). This Court has previously expressed a level of skepticism regarding the "actual deterrent effect of punitive damages" in *Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859 (JEB), 2025 U.S. Dist. LEXIS 125115, at *5 (D.D.C. July 1, 2025)[2]; however, this Court nevertheless found, "[g]iven the reprehensibility of Defendants' actions, punishment beyond compensatory relief may aid not only to hold [Defendants] morally accountable but also to deter similar misconduct by the two nations in the future." *Id.* at *4. In *Pautsch*, this Court awarded punitive damages in an amount equal to compensatory damages. *Id.* at *6 (following other courts in this District that have awarded such requests in similar cases). Plaintiffs have requested the entry of punitive damages in the same manner as was entered in the companion *Pautsch* case.

**III. THE 64 PLAINTIFFS' INJURIES**

[2] This case was initially filed as a related case to the *Pautsch* case.

Plaintiffs describe below 16 of the attacks for which this Court found Iran and Syria liable as well as the injuries Plaintiffs sustained due to the loss of their loved ones.[3]

**A. ARIC J. BARR – APRIL 3, 2004, ATTACK – HIT, IRAQ**

On April 3, 2004, Lance Corporal ("LCpl.") Aric J. Barr was serving in the 2d Battalion, 7th Marines in the vicinity of Hit, Iraq. *See* ECF No. 9 at ¶ 244. LCpl. Barr was killed when his unit was attacked with an IED and small-arms fire. *See* ECF No. 9 at ¶¶ 244-245; Ex. 3 (ECF No. 33-1) at 11. According to the autopsy report, LCpl. Barr died of a [redacted][4] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Barr was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the April 2, 2004 attack in which LCpl. Aric J. Barr was killed. *See* Ex. 1.

LCpl. Barr's surviving mother, two brothers, and sister—Lisa Barr, Aaron Barr, Anthony Barr, and Alexandra Barr—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 243-252. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of LCpl. Barr's society, companionship, comfort, advice and counsel. *Id*. at ¶ 252. The following chart reflects the claims asserted by these three family members in their individual capacities arising out of the April 3, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

---

[3] Plaintiffs have indicated that claims for economic loss for the estates of those who were killed—to the extent a claim for the estate has been asserted—will be included in a distinct Findings of Fact and Conclusions of Law to be submitted at a later date.

[4] Ex. 5, Autopsy Examination Report for LCpl. Aric J. Barr.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Lisa Barr | LCpl. Aric J. Barr's mother | Solatium claim $5 million | Declaration of Lisa Barr, dated January 16, 2025, including copy of her proof of U.S. citizenship | 6 |
| Aaron Barr | LCpl. Aric J. Barr's brother | Solatium claim $3.125 million | Declaration of Aaron Barr, dated February 12, 2025, including copy of his proof of U.S. citizenship | 7 |
| Anthony Barr | LCpl. Aric J. Barr's brother | Solatium claim $3.125 million | Declaration of Anthony Barr, dated January 16, 2025, including copy of his proof of U.S. citizenship | 8 |
| Alexandra Barr | LCpl. Aric J. Barr's sister | Solatium claim $3.125 million | Declaration of Alexandra Barr, dated January 18, 2025, including copy of her proof of U.S. citizenship | 9 |

**1. Lisa Barr[5]**

Lisa Barr is the mother of LCpl. Aric Barr. *See* Ex. 6 at ¶ 3. Lisa described her son as her "pride and joy." *Id*. at ¶ 4. Aric was intelligent and hardworking graduating with honors from high school. *Id*. Aric had a great sense of humor and was family oriented. *Id*. She recalled the moments she spent with her son fishing, camping and cheering him on at his little league games. *Id*. at ¶ 5. When Aric joined the Marines, Lisa kept in touch with her son through calls on the weekend. *Id*. Their relationship remained strong despite the physical distance between them. *Id*.

The day Lisa learned of her son's death, she was at home when casualty officers arrived at her door to deliver the devastating news that her child had been killed in Iraq. *Id*. at ¶ 6. Lisa

[5] Lisa Barr's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 6, Declaration of Lisa Barr, dated January 16, 2025.

described feeling a torrent of emotions—grief, disbelief and a profound sense of loss that is indescribable. *Id*. Coming to terms with her son's death has been a deeply personal and painful journey for Lisa. *Id*. She is left with questions, regrets, and a longing for just one moment with her son. *Id*.

According to Lisa, the lives of everyone in the family have been irrevocably altered by Aric's death. *Id*. at ¶ 7. The weight of Aric's death is something that they carry with them every day which takes an immense emotional toll. *Id*. [redacted]

[redacted]

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Lisa Barr's solatium claim.

**2. Aaron Barr**[6]

Aaron Barr is the brother of LCpl. Aric Barr. *See* Ex. 7 at ¶ 3. Growing up together, Aaron and Aric did everything together—playing sports, fishing, video games, camping with their family, and countless adventures. *Id*. at ¶ 4, 5. Their bond was strengthened not only by their shared childhood but also by their service in the United States Marine Corps. *Id*. at ¶ 4. Aaron recalled seeing Aric and their older brother Anthony graduate boot camp at Marine Corps Recruit Depot ("MCRD") in Parris Island, SC in March of 2001. *Id*. at ¶ 5. While Aric attended the School of Infantry at Camp Geiger in Jacksonville, NC, Aaron spent weekends with Aric and Anthony before their duties took them to opposite ends of the country. *Id*. The last time Aaron was together with Aric was Christmas of 2003 which is one of his lasting memories of his brother. *Id*. at ¶ 4.

While in South Korea, Aaron was summoned by his 1st Sgt who delivered the news that his brother Aric had been killed in Iraq. *Id*. at ¶ 6. Due to the difficulty in tracking down his unit, Aaron received the news of Aric's passing two days after it happened. *Id*. Aaron recalled his brother Anthony picking him up at the airport when he returned home. *Id*. He was the last one to arrive at his parents' house, but the moment he saw his little sister, he broke down. *Id*. The reality of Aric's death began to hit him. *Id*.

To cope with the loss of Aric, [redacted]

[6] Aaron Barr's United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 7, Declaration of Aaron Barr, dated February 12, 2025.

[redacted]

Plaintiffs respectfully request an upward enhancement to Aaron Barr's claims based on the close nature of his relationship with his brother, the fact that notice of his brother's death was delayed due to his own military service, [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active.

Plaintiffs have requested, and I recommend, that the Court award an upward enhancement of 25% of the baseline award resulting in an award of $3.125 million for Aaron Barr's solatium claim

**3. Anthony Barr**[7]

Anthony Barr is the brother of LCpl. Aric Barr. *See* Ex. 8 at ¶ 3. Anthony described that each day with Aric growing up was an adventure. The brothers spent time fishing, biking, hiking, vacationing, and playing sports. *Id*. at ¶ 5. Aric's presence was a constant source of joy and comfort for Anthony. *Id*. at ¶ 6. He recalls his brother's laughter, silent companionship, and supportive conversations. *Id.* Anthony described that his relationship with Aric strengthened as they both enlisted in the Marine Corps and underwent the rigors of training side by side. *Id*. at ¶ 4. Each weekend, Anthony and Aric escaped to their brother Aaron's place. *Id*. When their military service took them to different locations, Anthony and Aric made a point to communicate at least weekly and spent time together at home in Pittsburgh. *Id*. at ¶ 5. Aric was an important piece of their family. *Id*. at ¶ 6. Growing up, and even in the years leading up to his untimely death, Aric was always there. *Id*.

In the early morning of April 4, 2004, Anthony was approached by his detachment commander while on a humanitarian mission in Haiti. *Id*. at ¶ 7. When the commander asked whether Anthony had a brother Aric who was serving in Iraq, he was immediately filled with a sense of dread. *Id*. The words that followed informing him that Aric was killed in an attack gave way to a profound sense of anger and devastation. *Id*. "The realization that life as we knew it had been altered forever, that our family dynamic would never be the same, was overwhelming." *Id*.

[7] Anthony Barr's United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 8, Declaration of Anthony Barr, dated January 16, 2025.

Following Aric's death, [redacted]

The impact of Aric's death is present in Anthony's daily life. *Id*. at ¶ 10. The period between April 3rd and Memorial Day is especially difficult for Anthony and his family. *Id.* Anthony described that his life is forever altered by this tragedy. *Id*. [redacted]

Plaintiffs have requested an upward enhancement to Anthony Barr's claims based on his psychological care for the grief he endured due to his brother's death, [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding

Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active.

Plaintiffs have requested, I recommend, that the Court award an enhancement of 25% of his baseline award resulting in an award of $3.125 million for Anthony Barr's solatium claim.

**4. Alexandra Barr**[8]

Alexandra Barr is the sister of LCpl. Aric Barr and youngest child in the family. *See* Ex. 9 at ¶¶ 3, 4. Alexandra recalls how growing up in the same house with her brother allowed them to enjoy simple, everyday moments, that now, in hindsight, feel incredibly precious. *Id*. at ¶ 5. They played hide and seek, went on family camping trips, and took an annual summer trip to the Kennywood amusement park in West Mifflin, Pennsylvania. *Id*. A core memory that now brings Alexandra laughter and sorrow is when Aric would charge her money to watch him play video games when she was around 7 or 8 years old. *Id*. at ¶ 4. In hindsight, Alexandra understands that it was not the "coolest" thing to have her around when Aric played video games with his friends, but these moments were filled with laughter—memories that she deeply treasures. *Id*. When Aric joined the Marine Corps, Alexandra continued to communicate with her brother, catching up on everything from new video game releases, her experiences in school, and her first tattoo. *Id*. at ¶ 5.

Alexandra recalled being awoken by a loud knock at the door of her parents' home. *Id*. at ¶ 6. When she went to the door, she was met by two Marines dressed in blues standing in their living room with her father who went to get her mother. *Id*. Together they sat on the couch as one

[8] Alexandra Barr's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 9, Declaration of Alexandra Barr, dated January 18, 2025.

of the Marines introduced himself and delivered the news that her brother had been killed in action. *Id*. Alexandra's reaction was immediate as she screamed in denial and ran out of the house. *Id*. Following her brother's death, [redacted]

The loss of Aric has impacted every aspect of her family's life. *Id*. at ¶ 9. Alexandra described that [redacted]

Plaintiffs have requested an upward enhancement to Alexandra Barr's claims based on the close nature of her relationship with her brother, [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse,"

she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active.

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of the baseline award resulting in an award of $3.125 million for Alexandra Barr's solatium damage.

### B. DAVID W. JOHNSON – SEPTEMBER 25, 2004, ATTACK – BAGHDAD, IRAQ

On September 25, 2004, Sergeant (Sgt.) David W. Johnson was serving in the United States Army's HHC, 2d Battalion, 162d Infantry, when a vehicle he was traveling in with his unit in Taji, Iraq was struck by an IED. ECF No. 9 at ¶ 403; Ex. 4 (ECF No. 41-1) at 12. Sgt. Johnson was killed by a [redacted][9] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Johnson was killed on February 26, 2025 (ECF No. 41), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the September 25, 2004 attack in which Sgt. David Wayne Johnson was killed. *See* Ex. 1.

Sgt. Johnson's parents and siblings—Michelle DeFord, Richard Johnson, Randall Johnson, and Joie Libbey—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 402-412. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Sgt. Johnson's society, companionship, comfort, advice, and counsel. *Id*. at ¶ 412. The following chart reflects the claims asserted by Michelle DeFord, Richard Johnson, Randall Johnson, and Joie Libbey in their individual capacities arising out of the September 25, 2004, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

[9] Ex. 10, Casualty Report from Casualty Operations regarding Sgt. David W. Johanson.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Michelle DeFord | Sgt. David Wayne Johnson's mother | Solatium claim $6.25 million | Declaration of Michelle DeFord, dated February 24, 2026, including copy of her proof of U.S. citizenship | 11 |
| Richard Johnson | Sgt. David Wayne Johnson's father | Solatium claim $5 million | Declaration of Randall Johnson, dated March 13, 2026, including copy of his proof of U.S. citizenship | 12 |
| Randall Johnson | Sgt. David Wayne Johnson's brother | Solatium claim $2.5 million | Declaration of Richard Johnson, dated February 25, 2026, including copy of his proof of U.S. citizenship | 13 |
| Joie Libbey | Sgt. David Wayne Johnson's sister | Solatium claim $2.5 million | Evidence Declaration of Joie Libbey, dated February 25, 2026, including copy of her proof of U.S. citizenship | 14 |

**1. Michelle DeFord[10]**

Michelle DeFord is the mother of Sgt. David W. Johnson. *See* Ex. 11 at ¶ 3. Michelle described her son David as the light of the family and the heart and soul of their family farm. *Id.* at ¶ 4. He had a great sense of humor and was always kind. His mother explained that days spent together on the farm were filled with "laughter, shared dreams," and the conversations they had were the kind that "only occur when hearts are open and hands are busy. *Id*. Their days were filled

[10] Michelle DeFord's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 11, Declaration of Michelle DeFord, dated February 24, 2026.

with sports, camping, fishing, cross-country skiing, and caring for their animals on the farm. *Id*. at ¶ 5. As he grew older, David's relationship with his mother grew stronger. *Id*. at ¶ 5. She recalled the weekly phone calls they had where David would share everything from his job searches, latest culinary experiments, and how proud he was of the family's herb nursery. *Id*. David was a great friend as demonstrated by the loyalty and joy shared between him and his best friend, who is also named David ("Davy") and his girlfriend, Brion. *Id*. at ¶ 6. According to Michelle, David's presence made everything "brighter" and "more meaningful"—he was irreplaceable. *Id*. at ¶ 4. He was her friend, confidant, and source of immense pride. *Id*. at ¶ 5.

Michelle was alone at home when Army representatives arrived at her doorstep. *Id*. at ¶ 7. When they informed her that her son David had been killed in Iraq she was engulfed in a profound sense of disbelief. *Id*. Prior to his death, David called his mother every Monday morning sharing his experiences and reassuring her of his safety. *Id*. It was not until Michelle's phone failed to ring for a month on each Monday that the stark reality of David's death began to set in. *Id*. She experienced an indescribable period of grief, and shock. This was the most horrible time in her life. *Id*. [redacted]

Losing David has been devastating for his family and has paradoxically unified and divided them. *Id*. at ¶ 9. [redacted] As Michelle and her husband grow older, the absence of David's presence, care, and laughter are felt more acutely. *Id*. at ¶ 10. His death has profoundly changed the future they envisioned for themselves. *Id*.

Today, Michelle and the family honor David in small ways such as setting a place for him at holiday meals and celebrating his birthday with a beer left untouched. *Id*. at ¶ 4. David's absence is felt by his family in every celebration and achievement. *Id*. at ¶ 5. [redacted]

Plaintiffs requested an upward enhancement to Michelle DeFord's claims based on the close nature of her relationship with her son and [redacted] *See Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); id. (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to

the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders").

Plaintiffs have requested, and I recommend, that the Court award her an enhancement of 25% of the baseline award resulting in an award of $6.25 million for Michelle DeFord's solatium damages.

**2. Richard Johnson[11]**

Richard Johnson is the father of Sgt. David Wayne Johnson—his first-born child. *See* Ex. 12 at ¶ 3. Richard described that from the moment David was born, he was the light of their lives and a true blessing from God. *Id*. at ¶ 5. David was his "best friend" and "fishing buddy." *Id*. at ¶ 4. Their bond was built on shared interests such as music and mechanics. *Id*. They shared several moments together on regular fishing and hunting trips. *Id*. at ¶ 4. Richard recalls how David would not consider a fishing trip to be complete without a Whopper from Burger King. *Id*. This memory always brings a smile to Richard's face. *Id*. As David grew older, he remained close to his father reaching out to confide in him and seek his father's advice. Id. at ¶ 5. Prior to his death, David and Richard were working on David's Chevy Blazer and had plans to finish making repairs together, but David was deployed before they could complete their project. *Id*. at ¶ 4. The Blazer remains next to Richard's shop, a poignant reminder of what they shared and what was left unfinished. *Id*.

The day Richard learned of his son's death, he was home when the doorbell rang. Three military men stood at his front door and delivered the news that David was killed in Iraq. *Id*. at ¶

[11] Richard Johnson's Oregon birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 12, Declaration of Richard Johnson, dated February 25, 2026.

7. Learning of his son's death was a devastating blow that words fail to capture the depth of his despair. *Id*. He felt as if his heart had been ripped out. *Id*. "He did not deserve such a fate; no one does." *Id*. Sharing the news with family and friends, especially his youngest son, was a nightmare. *Id*.

[redacted]

Following the death of David, Richard became overly protective of his son Randy, who was also in the military. *Id*. at ¶ 10. Finding solace in each other's company, Richard and Randy have grown closer amidst their shared grief. *Id*. Richard described that he was angry with comments that were received from other members of the family after David's death. *Id*. The family's overall wellbeing and relationship with one another have been altered. *Id*.

Richard explained that he faced many trials since his son's passing, and each time, he wants to pick up the phone and share the news with David, he is reminded of the unbearable truth that David's not here. *Id*. at ¶ 4. "David was the piece of my heart that I can never get back, leaving a void that nothing can fill." *Id*. Each holiday, birthday, and anniversary are bittersweet as he strives to continue to celebrate life but is reminded of his son's absence. *Id*. at ¶ 11. [redacted]

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Richard Johnson's solatium claim.

**3. Randall Johnson[12]**

Randall Johson is the younger brother of David Wayne Johnson. *See* Ex. 13 at ¶ 3. Randall described his brother as a companion in the truest sense. *Id*. at ¶ 4. They did everything together including playing sports, working on cars, hunting and fishing. *Id*. at ¶ 4, 6. In addition to these hobbies, the brothers shared a love for music and the military. *Id*. at ¶ 4. The brothers exchanged advice, stories, and updates in each other's lives. *Id*. David was in Randall's wedding and expressed a desire to be a part of Randall's children's lives. *Id*. Despite David's deployment, the brothers kept in touch. *Id*. One memory that stands out to Randall is David's persistent request for pictures of his newborn son that David was not yet able to meet due to his deployment. *Id*. Randall sent David a care package filled with photos and a heartfelt letter, unbeknownst to him that would be their last exchange. *Id*. The discovery of these items in David's personal belongings after his death brought Randall a mix of sorrow and solace, knowing that his brother was able to see his son. *Id*. David was not only Randall's brother but his best friend. *Id*. at ¶ 5.

The day Randall learned of his brother's death he was finishing a shift at the Crescent Fire Department when he received a call from his father. *Id*. at ¶ 7. When his father relayed the unimaginable news that David was killed in Iraq, Randall was overwhelmed with devastation, anger, and grief as he processed that he had just lost his brother. Sharing the tragic news with his wife and assisting the Army in locating his mother so they could inform her of David's death was heart wrenching. *Id*.

[12] Randall Johnson's Oregon birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 13, Declaration of Randall Johnson, dated February 25, 2026.

Following David's death, [redacted] Randall and his father have relied on one another, finding solace in each other's company. *Id*. However, [redacted] The anniversary of his brother's death is a stark reminder of what he's lost. *Id*.

Randall stated that the effects of David's death will continue to be felt by his family. *Id*. at ¶ 11. His son never had the opportunity to know his uncle "missing out on the bond that could have enriched his life immeasurably." *Id*. Randall mourns his brother and the future memories and milestones they will never get to share. *Id*. [redacted] David was more than my only brother and his loss is a constant shadow over the future we should have had together. The impact of his death is a relentless reminder of the precious moments and potential that were stolen from us, leaving a lasting imprint on our lives. *Id*.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Randall Johnson solatium claim.

**4. Joie Libbey[13]**

Joie Libbey is the youngest sibling of David Johnson. *See* Ex. 14 at ¶ 3. Despite the age gap, Joie and David had a special relationship. *Id*. at ¶ 4. Joie recalled how David introduced her to bands like Alice in Chains and created her love for music. *Id*. David always made small moments feel significant and always spoiled his little sister always; for example, David always gave Joie sweets like gummy worms. *Id*. One of Joie's most cherished memories of her big brother was the night he bought his dream car, a Chevy Blazer. *Id*. That night, David woke Joie up to show her the stereo and speakers he installed in the car. She recalled David's excitement and how he shared that moment with her. *Id*.

Joie and David continued to maintain a close relationship with one another, even when David moved to his own apartment. *Id*. at ¶ 5. Joie would skip school just to spend time with David while he worked at the Sunshine Café in downtown Portland. *Id*. David prepared lunch for Joie, and their day was filled with laughter and conversations. *Id*. When David's shift concluded, the siblings went to David's apartment to listen to music. According to Joie, David was a "cool" older brother who was protective of her. *Id*. at ¶¶ 4, 5. As they grew older, Joie and David had weekly phone calls and visited each other frequently. *Id*. at ¶ 5.

The day Joie learned of her brother's death, she received an urgent call from her mother's neighbor urging her to come over as soon as possible. *Id*. at ¶ 7. When she arrived, her mother removed the sunglasses from her face and broke the news that David had been killed in Iraq. *Id*.

[13] Joie Libbey's Oregon birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 14, Declaration of Joie Libbey, dated February 25, 2026.

Joie's reaction was immediate as she screamed "no, not David" and collapsed to the floor. *Id*. Just days before his death, David left Joie a voicemail wishing her a happy birthday and stating that he would be home in six months. *Id*.

Since the loss of David, Joie has experienced a sense of emptiness and longing for her brother who once brought laughter and light-heartedness to her life. *Id*. at ¶ 9. Joie recounted how her brother would jokingly stick his fingers in the clam dip every Christmas, claiming it as his own. *Id*. at ¶ 6. Holidays that were once filled with playful moments with David are now bittersweet as his absence is acutely felt. *Id*. at ¶ 10. Over the last twenty years, Joie bought clam dip for Christmas in memory of her brother. *Id*. at ¶ 10. David's death has also impacted family dynamics. *Id*. at ¶ 9. Joie has developed a closer relationship with her parents through their shared grief. *Id*. [redacted]

According to Joie, David had a unique way of making each moment special with his stories and thoughtful gifts. *Id*. at ¶ 10. [redacted]

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Joie Libbey's solatium claim.

### C. RONALD W. BAKER – OCTOBER 7, 2004, ATTACK – TAJI, IRAQ

On October 7, 2004, Sgt. Ronald W. Baker was serving in the United States Army National Guard in Taji Iraq when he was attacked with a vehicle-borne improvised explosive device ("VBIED"). ECF No. 9 at ¶ 440-441; Ex. 4 at 13. Sgt. Baker sustained severe injuries to [redacted]

[redacted][15] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Baker was killed on February 26, 2025 (ECF No. 41), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the October 7, 2004 attack in which Sgt. Ronald W. Baker was killed. *See* ECF Nos. 47, 48.

Sgt. Baker's surviving wife, daughter, parents, and brother—Joanne Baker, Alexis Baker, Carrylon Baker, Anthony Wayne Baker, and Chris Baker—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 439-449. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of Sgt. Baker's society, companionship, comfort, advice and counsel. *Id.* ¶ 449. The following chart reflects the claims asserted by Joanne Baker, Alexis Baker, Carrylon Baker, Anthony Wayne Baker, and Chris Baker in their individual capacities arising out of the October 7, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Joanne Baker | Sgt. Ronald W. Baker's wife | Solatium claim $10 million | Declaration of Joanne Baker, dated January 27, 2026, including copy of her proof of U.S. citizenship | 16 |
| Alexis Baker | Sgt. Ronald W. Baker's daughter | Solatium claim $6.25 million | Declaration of Alexis Baker, dated January 23, 2026, including copy of her proof of U.S. citizenship | 17 |

[14] *See* Ex. 15 at 4, Autopsy Examination Report of Sgt. Ronald W. Baker.
[15] *Id.*

| | | | | |
|---|---|---|---|---|
| Carrylon Baker | Sgt. Ronald W. Baker's mother | Solatium claim $5 million | Declaration of Carrylon Baker, dated February 5, 2026, including copy of her proof of U.S. citizenship | 18 |
| Anthony Wayne Baker | Sgt. Ronald W. Baker's father | Solatium claim $5 million | Declaration of Wayne Baker, dated February 5, 2026, including copy of his proof of U.S. citizenship | 19 |
| Chris Baker | Sgt. Ronald W. Baker's brother | Solatium claim $2.5 million | Declaration of Chris Baker, dated February 5, 2026, including copy of his proof of U.S. citizenship | 20 |

**1. Joanne Baker**[16]

Joanne Baker is the surviving spouse of Sgt. Ronald W. Baker ("Ron"). *See* Ex. 16 at ¶ 3. From the moment Joanne met Ron at age twenty-three, they were inseparable spending every day together. *Id*. at ¶ 5. Joanne recalls spending precious moments with Ron caring for their daughter Alexis and taking family float trips. *Id*. Over their decade long journey together, Joanne and Ron overcame the challenges of being young parents and celebrated each other's achievements. *Id*. at ¶ 4. When Ron was deployed, phone calls became a lifeline for Joanne. *Id*. She recalled the call she had with Ron, where he delivered the joyful news that he would be returning home for their daughter's birthday. *Id*. Receiving this news brought Joanne relief amongst her increased anxiety and fear of Ron's safety during his deployment. *Id*.

The very next day, Joanne returned to work from lunch when she was called into her boss' office. *Id*. at ¶ 7. Military personnel delivered the heart-shattering news that her husband had been severely injured in Iraq. *Id*. Joanne recalls going into a state of shock, throwing her shoes in a futile attempt to reject the reality that Ron was gone. *Id*. She was so distraught that her coworkers had

[16] Joanne Baker's U.S. Department of State Certification of Birth Abroad and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 16, Declaration of Joanne Baker, dated January 27, 2026.

to drive her home. *Id*. Once she arrived, Joanne received a call from the doctor in Iraq informing her that Ron was dying. *Id*. Joanne screamed and ran to her parents' house crying out that her husband was dying. *Id*. When Ron's death was confirmed, Joanne was shattered. *Id*.

In the wake of losing her husband, [redacted]

According to Joanne, [redacted]

Joanne explains that [redacted]

[redacted]

Plaintiffs have requested an upward enhancement to Joanne Baker's claims based on her close and enduring relationship with her husband, [redacted]

*See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active.

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of her baseline award resulting in an award of $10 million for Joanne Baker's solatium claim.

**2. Alexis Baker**[17]

Alexis Baker is the daughter and only child of Sgt. Ronald W. Baker. *See* Ex. 17 at ¶ 3. According to Alexis, her father was her hero who defied expectations and was an exemplary man. *Id*. at ¶ 4. Despite his stoic exterior, her father was playful and made every moment spent with him

[17] Alexis Baker's birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 17, Declaration of Alexis Baker, dated January 23, 2026.

precious. *Id*. Alexis recalled when her father returned from basic training and was hesitant to show her his shaved head knowing how much she adored his full head of hair that resembled hers. *Id*. Alexis and her father spent every day together when he was home from work. *Id*. at ¶ 5. She recounted their visits to her grandparents' home, running errands, and her father attending her dance classes. *Id*. When her father was away from home due to work, she looked forward to his calls. *Id*. at ¶ 6.

When Alexis was just six years old, she learned of her father's death when her mother broke the news to her after returning from Germany where she said her final goodbyes. *Id*. at ¶ 8. Alexis recalls that due to her age, the gravity of her mother's words were too immense to fully comprehend. *Id*. As she grew older, the news that her father had died slipped in conversations with teachers inadvertently, but with time, she learned to zealously guard this part of her life. It became something she avoided to evade the discomfort and the inevitable awkwardness that followed these conversations. *Id*.

Due to the death of her father, [redacted] Significant milestones were missed such as graduations. *Id*. at ¶ 10. Prior to his deployment, Sgt. Baker drafted a letter to his daughter for her high school graduation. *Id*. However, the letter could not compensate for his physical absence. *Id*. [redacted]

[redacted] Coping through emotional detachment is a reminder of how deeply her father's absence has affected her mental health and outlook on life. *Id*.

Plaintiffs have requested an upward enhancement to Alexis Baker's claims based on her [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active.

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Alexis Baker's solatium claim.

**3. Carrylon Baker[18]**

Carrylon Baker is the mother of Sgt. Ronald W. Baker—her second oldest child. *See* Ex. 18 at ¶ 3, 4. Carrylon described her son as a great person and a beacon of joy and kindness in the lives of those around him. *Id*. at ¶ 4. He was caring and had an ability to find humor in any situation always ready with a simple joke that would make everyone laugh, regardless of the circumstances. *Id*. Her most fond memories of her son are filled with laughter, his jokes, and the warmth of his kindness. *Id*. Their days were filled with countless shared experiences, such as watching him fish, hunt, and play baseball. *Id*. at ¶ 5. Carrylon stated that, "He meant the world to me." She remained in constant communication with her son whether it was over the phone or in person. *Id*.

The day Carrylon learned of her son's death, she was surrounded by her husband and his wife as Sgt. Baker's unit shared the news that he was killed in Iraq. *Id*. at ¶ 6. Carrylon recounted how there was no gentle lead-in, only the stark reality that he was gone. *Id*. While she knew her son had been injured, Carrylon had no idea that his injuries might be fatal, leaving her in a sense of shock. *Id*.

Since her son's death, [redacted] *Id*. at ¶ 8. Carrylon described her son as someone who was not only a wonderful husband, father, and son, but an important member of their family. *Id*. at ¶ 9. His absence has forced them to reevaluate their relationships with each other, drawing them closer, as they understand that any moment could be their last. *Id*. The family has had to adapt to a life without his presence, laughter, and joy he

[18] Carrylon Baker's Arkansas birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 18, Declaration of Carrylon Baker, dated February 5, 2026.

brought to every occasion. *Id*. Carrylon explained that they will never have a holiday where he is present again, like those we had when he was with us. *Id*. Her son's legacy reminds her of the importance of family and the value of cherishing every moment together. *Id*.

According to Carrylon, [redacted] "Our family has lost a pillar of strength and love, and navigating the future without his guidance and presence will undoubtedly continue to challenge us. We will go to our grave knowing that Ron was a great man and father." *Id*.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Carrylon Baker's solatium claim.

**4. Anthony Wayne Baker[19]**

Anthony Wayne ("Wayne") Baker is the father of Sgt. Ronald W. Baker. *See* Ex. 19 at ¶ 3. According to Wayne, from the earliest days of his son's childhood, they were inseparable, spending every possible moment outdoors, hunting, fishing, playing sports, and cooking outside. *Id*. at ¶ 5. Wayne recalled one particular hunting trip where his son turned to him and said "Pops, I will miss you." *Id*. at ¶ 4. The weight of his son's gaze while making this statement is something that replays in Wayne's mind. *Id*. Anthony described his son as a "happy-go-lucky" kid who never missed an opportunity to help others. *Id*. at ¶ 6. "To everyone who had the privilege of knowing him, his ability to uplift and assist, to make each day brighter for those around him, defined his relationships and left an indelible mark on the hearts of his family and friends." *Id*.

[19] Anthony Wayne Baker's Arkansas birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 19, Declaration of Wayne Baker, dated February 5, 2026.

Wayne described the day that he learned of his son's death started out as an ordinary day until he received a call from a Regions Bank employee that shattered his world forever, informing him that Ron had been hit in Iraq. *Id*. at ¶ 7. The news was unexpected, leaving him in a state of shock because no one had prepared him for the possibility that Ron's injuries could be fatal. *Id*. Wayne recalled being plunged into grief immediately. *Id*.

According to Wayne, Ron's death deeply impacted every facet of his life and the lives of each family member. *Id*. at ¶ 10. Through the years, [redacted]

Wayne believes that God had a greater need for Ron which brings him a semblance of peace, offering a perspective that helps us cope with the profound loss. *Id*. at ¶ 12. "Ron's memory will forever be a beacon of light for our family, guiding us through the darkness of grief towards a future where we honor his life by embodying the virtues he lived by." *Id*.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Anthony Wayne Baker's solatium claim.

**5. Chris Baker[20]**

Chris Baker is the brother of Sgt. Ronald W. Baker. *See* Ex. 20 at ¶ 3. Chris described his older brother Ron as his best friend and partner in crime. *Id*. at ¶ 4. Ron was his support system

[20] Chris Baker's Arkansas birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 20, Declaration of Chris Baker, dated February 5, 2026.

and true companion "through thick and thin." *Id*. Chris and Ron spent every single day together growing up spending time by water fishing or trekking through the woods on hunting expeditions. *Id*. As the brothers grew older, life took them on different paths but they communicated with each other weekly. *Id* at ¶ 5. According to Chris, Ron was a central figure in their family. *Id*. at ¶ 6. "His presence was a source of comfort and joy for most of my childhood and young adult life, and his absence echoes deeply." *Id*.

The day Chris learned of his brother's death, he received a phone call from his parents. *Id*. at ¶ 7. When they informed him that Ron was killed in Iraq, the weight of their words felt like a physical blow to Chris, leaving him in disbelief and anger. *Id*. Chris remembered feeling an overwhelming sense of injustice and repeatedly questioned "why." *Id*. He felt intense anger towards the circumstances of Ron's death, particularly due to his stance on the conflict in Iraq. *Id*. This has created a deep-seated resentment for Chris as he bears the personal cost of the war through the loss of his brother. *Id*. at ¶ 11.

Ron attempts to express love openly and frequently, especially since his brother passed. *Id*. at ¶ 10. Holidays and special occasions are bittersweet. *Id*. at ¶ 10. The family remembers and honors Ron, ensuring he is still a part of the celebrations in some way. *Id*. Chris described how difficult birthdays and holidays are, particularly for his mother. *Id*. at ¶ 11. The loss of his brother has brought the family closer as they cling to each other a little tighter. *Id*. at ¶ 10.

According to Chris, Ron's presence is sorely missed in every laughter, gathering, and even in the quiet moments. *Id*. at ¶ 11. Ron's absence echoes deeply. *Id*. at ¶ 6. "He will always be my brother, and I strive to always remember him." *Id*. at ¶ 11.

Plaintiffs have requested, and I recommend that the Court award the baseline amount of $2.5 million for Chris Baker's solatium claim.

### D. JAMES C. MATTESON – NOVEMBER 12, 2004, ATTACK – FALLUJAH

On November 12, 2004, Sgt. James C. Matteson was serving as a scout in Task Force 2-2 in the U.S. Army when he was struck by a rocket-propelled grenade ("RPG") while providing suppression fire following an ambush on his unit in Fallujah, Iraq. *See* ECF No. 9 at ¶ 546; Ex. 2 (ECF No. 26-1) at 51. Sgt. Matteson died from a [redacted][21] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Matteson was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the January 24, 2004 attack in which Sgt. James C. Matteson was killed. *See* ECF Nos. 47, 48.

Sgt. Matteson's surviving parents and two siblings—James L. Matteson, Joyce Moran, Hope Matteson, and Micaela R. Matteson—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 545-553. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of Sgt. Matteson's society, companionship, comfort, advice and counsel. *Id.* ¶ 553. The following chart reflects the claims asserted by these two family members in their individual capacities arising out of the November 12, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| James L. Matteson | Sgt. James C. Matteson's father | Solatium claim $5 million | Declaration of James L. Matteson, dated December 6, 2025, including copy of his proof of U.S. citizenship | 22 |

[21] *See* Ex. 21, Report of Casualty of Sgt. James C. Matteson.

| | | | | |
|---|---|---|---|---|
| Joyce Moran | Sgt. James C. Matteson's mother | Solatium claim $6.25 million | Declaration of Joyce Moran, dated March 20, 2026, including copy of her proof of U.S. citizenship | 23 |
| Hope Matteson | Sgt. James C. Matteson's sister | Solatium claim $3.125 million | Declaration of Hope Matteson-Andrews, dated December 11, 2024, including copy of her proof of U.S. citizenship | 24 |
| Micaela R. Matteson | Sgt. James C. Matteson's sister | Solatium claim $2.5 million | Declaration of Micaela Matteson, dated April 1, 2025, including copy of her proof of U.S. citizenship | 25 |

**1. James L. Matteson[22]**

James Matteson is the father of Sgt. James C. Matteson ("J.C."). *See* Ex. 22 at ¶ 3. James recalled that he knew his life changed forever the moment J.C. took his first breath. *Id*. at ¶ 4. Raising J.C. as a single father until his stepmother joined the family when J.C. was twelve, is one of the greatest joys of his life. *Id*. at ¶¶ 4, 5. James bonded with his son with their love for the outdoors. *Id*. at ¶ 4. Together they went fishing, camping, and hiking. These activities brought them "closer to each other and to God." *Id*. James recalls how J.C. shared his dreams including his aspiration to get married and have five children. *Id*. J.C. was a "beautiful soul" and had an "infectious smile." *Id*.

These are memories that James holds dear. *Id*. J.C. continued the family's tradition of military service and joined the Army. *Id*. at ¶ 5. While J.C. was on leave, James visited him in Ft.

[22] James L. Matteson's New York birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 22, James L. Matteson, dated December 6, 2025.

Knox to attend his graduation and explore together. *Id*. Through their conversations, they reminisced on past adventures, J.C.'s military experiences in Egypt, Bosnia, and Iraq, and his camaraderie with his fellow soldiers. *Id*. at ¶ 5. James described J.C. as not just his son but his best friend. *Id*. J.C. was also a caretaker, mentor and friend to his siblings. *Id*. at ¶ 6. James recounted how J.C. would spoil his siblings with gifts and experiences whenever he was home from leave. *Id*. J.C.'s legacy of "love, kindness, and joy" continues to live in the hearts of his family. *Id*.

The day James received the news of his son's death, an Army captain arrived at his home. *Id*. at ¶ 7. As they sat at the kitchen table, he delivered the devastating news that on November 12th, at approximately 7:13 a.m. Fallujah, Iraq time, his son [redacted] *Id*. James recalled that the words felt surreal and it was as if his "heart had been ripped out." *Id*. This left him to "bear the weight of the world" on his shoulders." *Id*. He called J.C.'s sister Hope, who was stationed in Ft. Hood at the time to relay the tragic news. *Id*. During that devastating time, James relied heavily on his wife Janice who was his "rock through this unimaginable tragedy." *Id*.

Since the loss of J.C., he's been missed in every milestone—"imagining him coming home alive, getting married, having the five kids he always dreamed of, and joining in on family holidays, camping trips, fishing, and hunting." *Id*. at ¶ 8. James is left to wonder about all of the possibilities that his son's future could have had. *Id*. He constantly asks himself "what if?" The belief that a parent should never outlive their child is a harsh reality he lives with every day. *Id*. James tries to find peace in the belief that God had a greater purpose for his son, though his heart wishes J.C. were still here. *Id*. [redacted]

[redacted]

According to James, he finds solace in the belief that one day he will reunite with his son in heaven, but the pain of his absence still lingers. *Id*. at ¶ 12. "The day we lost J.C. remains the darkest day of our lives, a moment that forever altered our existence. It's a profound loss that has reshaped our family, teaching us the true meaning of strength and resilience in the face of unimaginable grief." *Id*.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for James L. Matteson's solatium claim.

**2. Joyce Moran[23]**

Joyce Moran is the mother of Sgt. James L. Matteson. *See* Ex. 23 at ¶ 3, 4. Joyce described her son as a "protector" and a "kind soul" who always stood up for others. Id. at ¶ 4. Over the years, they created countless memories together. *Id*. Joyce recalled the time she and James set traps using boxes and mushrooms as bait to capture imaginary elves. *Id*. Halloween was always celebrated with creativity. *Id*. at ¶ 5. They carved pumpkins and crafted costumes. *Id*. One Halloween, Joyce dressed James as a mummy, only for him to be spooked by someone who was also dressed as a mummy. *Id*. Their time spent on beach outings, sledding, ice skating, hiking,

[23] Joyce Moran's New York birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 23, Declaration of Joyce Moran, dated March 20, 2026.

visiting Disney World, and playing Risk are memories that Joyce keeps close to her heart. *Id*. at ¶ 4. She enjoyed watching her son excel in football and wrestling. *Id*. After her son joined the military, they remained in communication with one another. *Id*. at ¶ 5. The last time Joyce saw her son, they had a spaghetti dinner together. *Id*. This memory is marked by profound sorrow as she never imagined this would be the last time she saw her son. *Id*. at ¶ 4.

Joyce received the news of her son's death as she was on her way back to work and was intercepted by two soldiers and her ex-husband. *Id*. at ¶ 6. They delivered the devastating news to Joyce as she sat in her car—a space that suddenly felt too small to contain her immense grief. *Id*. Joyce's initial reaction was disbelief as her son had been so close to coming home, with plans to marry and start a family. *Id*. However, these dreams were cruelly snatched away, and Joyce was left numb, struggling to process the reality that he would never return. *Id*. The finality of the news was a blow from which Joyce is still recovering. *Id*.

Losing James in Iraq pushed Joyce to the point [redacted]

The loss of James has profoundly impacted their family. *Id*. at ¶ 9. According to Joyce, [redacted]

[redacted]

[redacted]

Plaintiffs have requested an upward enhancement to Joyce Moran's claims based on her [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active.

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Joyce Moran's solatium claim.

### 3. Hope Matteson[24]

Hope Matteson is the sister and Irish twin of Sgt. James C. Matteson—born just one year and a day before her brother. Ex. 24 at ¶ 4. James was her "other half" as every aspect of their lives were intertwined, from wrestling in school to serving in the military side by side in Germany. *Id*. They were inseparable. *Id*. at ¶ 5. Hope and James had a remarkable connection and spent countless hours talking and laughing. *Id*. She described her brother as a person who always put others before himself and constantly tried to put a smile on someone's face. *Id*. at ¶ 6. "His kindness, his laughter, and his unwavering support are deeply missed by all who had the privilege of knowing him." *Id*.

Hope was visiting her mother-in-law when she received a call from her father informing her that James had been killed in Iraq. *Id*. at ¶ 7. The immediate shock and disbelief left Hope feeling a mixture of numbness and overwhelming grief. *Id*. [redacted]

The grief and loss that Hope experienced changed her outlook on life. *Id*. at ¶ 11. She explained [redacted]

Plaintiffs have requested an upward enhancement to Hope Matteson's claims based on her, close nature of her relationship with her brother and the loss of her "Irish twin", [redacted]

[24] Hope Matteson's New York birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 24, Declaration of Hope Matteson-Andrews, dated December 11, 2024.

[redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active.

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Hope Matteson's solatium claim.

**4. Micaela R. Matteson[25]**

Micaela Matteson is the sister of Sgt. James C. Matteson. *See* Ex. 25 at ¶ 3. Despite their 18-year age gap, J.C. made Micaela's childhood special. *Id*. at ¶ 5. She remembers her big brother taking her on walks in the park, wandering around the lighthouse, strolling along the lake, playing at the playground, and creating imaginative games in the pool along with their brothers Nick and Brandon. *Id*. at ¶ 4. When J.C. made trips home, the family attended the rodeo and county fair during the summer and came together for cookouts. *Id*. at ¶ 4, 6. Wanting to spend every minute

[25] Micaela R. Matteson's New York birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 25, Declaration of Micaela R. Matteson, dated April 1, 2025.

with J.C., Micaela, Nick, and Brandon would often playfully compete for J.C.'s attention. *Id*. at ¶ 6.

When Micaela was just five years old, she remembers a vehicle approaching her home and men in suits coming to the door. Miceala and her brothers were hurried into another room, but the children were listening at the door when they overheard the men give their mother and father the devastating news that their big brother, J.C. had passed. *Id*. at ¶ 7. In disbelief, they whispered among themselves, unable to accept it as reality. Id. Micaela recalls her father being in shock and how the days that followed were a blur. *Id*. Support was received by their small town, including from Micaela's peers in kindergarten, who gave their condolences. *Id*. School counselors took special care of Micaela and her brothers teaching them about the stages of grief and ensuing they understood the permanence of J.C.'s death. *Id*. During the funeral, five-year-old Micaela attempted to lighten the mood by handing out tissues and sharing with attendees what she learned about grief. *Id*. Attending a funeral of a sibling was a defining moment for Michaela. *Id*. At such a young age, she began to grasp the impact of loss and the importance of remembering and honoring the people she loved. *Id*.

The death of J.C. has shaped Micaela's childhood in ways she never imagined. *Id*. at ¶ 9. [redacted]

The loss of J.C. also reshaped Micaela's family and left a lasting mark. *Id*. at ¶ 9. According to Micaela, [redacted]

[redacted]

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Micaela Matteson's solatium claim.

**E. JONATHAN A. HUGHES – MARCH 19, 2005, ATTACK – BAGHDAD**

On March 19, 2005, Sgt. Jonathan A. Hughes was serving in the U.S. Army in Baghdad, Iraq when an IED detonated near his Humvee. *See* ECF No. 9 at ¶ 846; Ex. 4 at 16-17. According to the Report of Casualty, Sgt. Hughes died from a [redacted][26] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Hughes was killed on February 26, 2025 (ECF No. 41), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the March 19, 2005 attack in which Sgt. Jonathan A. Hughes was killed. *See* Ex. 1.

Sgt. Hughes' surviving wife, Sara Hughes, is a Plaintiff in this case. *See* ECF No. 9 at ¶¶ 845-849. The Plaintiff has suffered severe mental anguish, extreme emotional pain and suffering, and loss of Sgt. Hughes' society, companionship, comfort, advice, and counsel. *Id.* at ¶ 849. The following chart reflects the claims asserted by Sara Hughes in her individual capacity arising out

[26] *See* Ex. 26, Report of Casualty of Sgt. Jonathan A. Hughes.

of the March 19, 2005, attack as well as the evidence setting forth the bases of his claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Sara Hughes | Sgt. Jonathan A. Hughes' wife | Solatium claim $12 million | Declaration of Sara Hughes, dated February 3, 2026, including copy of her proof of U.S. citizenship | 27 |

**1. Sara Hughes**[27]

Sara Hughes is the surviving spouse of Sgt. Jonathan A. Hughes. *See* Ex. 27 at ¶ 3. Sara and Jonathan met during her junior year and Jonathan's sophomore year and quickly became high school sweethearts. *Id*. at ¶ 4. Jonathan introduced Sara to hunting and fishing, activities that were dear to him. *Id*. Sara recalled the first time Jonathan convinced her to go squirrel hunting. *Id*. The couple married in April 2003 and welcomed their son Peyton Hughes in June 2004. *Id*. Sara described their home as the epicenter of joy, where Jonathan's culinary skills with wild game turned their gatherings into the biggest parties. *Id*. Sara and Jonathn shared passions and dreams and built a life together side by side. *Id*. at ¶ 5. They created a home filled with love, laughter, and cared for their newborn child, who Jonathan spent every moment with before he was deployed. *Id*. Even during his deployment, Jonathan stayed in contact with Sara, and they spoke as often as they could. *Id*.

The day Sara learned of her husband's death, she was at her home with her mother who was visiting when a casualty assistant officer arrived at her front door. *Id*. at ¶ 6. The shock was

[27] Sara Hughes's birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). See Ex. 27, Declaration of Sara Hughes, dated February 3, 2026.

so overwhelming that Sara passed out and had to be taken to the hospital for observation. *Id*. Their son was only eight months old at the time. *Id*. at ¶ 4.

Sara's grief was so profound [redacted]

The ripple effects of Jonathan's death have permeated every aspect of Sara's family life. *Id*. at ¶ 10. [redacted]

Sara explained that Jonathan's death robbed her of the chance to experience many of life's milestones together including watching their child grow, and all the family milestones they had dreamt of sharing. *Id*. at ¶ 5. Sara stated that the death of Jonathan is the worst thing she has ever experienced. *Id*. at ¶ 11. This loss is further compounded by [redacted]

Plaintiffs have requested an upward enhancement to Sara Hughes' claims based on the close nature of her relationship with her husband, [redacted] *See Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40-41 (D.D.C. 2012) (awarding plaintiff 40 percent enhancement due to suffering from post-traumatic stress disorder, persistent grief, and depression coupled with decline in school grades and lack of motivation); *Oveissi*, 768 F. Supp. 2d at 29-30 (finding plaintiff's enduring trauma including depression, anger, and alcoholism following the victim's death warranted a 50 percent enhancement).

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 50% of her baseline award resulting in an award of $12 million for Sara Hughes' solatium damages.

**F. RANDY D. COLLINS – MAY 4, 2005, ATTACK – MOSUL**

On May 4, 2005, SFC Randy D. Collins was serving in the U.S. Army in Mosul, Iraq when his Army base was attacked by mortar fire. *See* ECF No. 9 at ¶ 905-906; Ex. 2 at 73. SFC Collins was [redacted]

[redacted] on May 24, 2005.[28] *Id*. Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which SFC Collins was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the May 4, 2005 attack in which SFC Randy Collins was killed. *See* Ex. 1.

SFC Collins' surviving wife, stepson, stepbrother, mother, brother, and two sisters—Roxanne Collins, Kevin Frazier, Jr., Louis Rainey, Jr., Moses L. Collins, Jr., Margarette Miller, Teresia Collins, and Gretta Collins-Williams—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 904-916. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of SFC Collins' society, companionship, comfort, advice, and counsel. *Id*. at ¶ 916. The following chart reflects the claims asserted by Roxanne Collins, Kevin Frazier, Jr., Louis Rainey, Jr., Moses L. Collins, Jr., Margarette Miller, Teresia Collins, and Gretta Collins-Williams in their individual capacities arising out of the May 4, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Roxanne Collins | SFC Randy Collins' wife | Solatium claim $12 million | Declaration of Roxanne Collins, dated January 28, 2025, including copy of her proof of U.S. citizenship | 29 |
| Kevin Frazier, Jr. | SFC Randy Collins' stepson | Solatium claim $5 million | Declaration of Kevin Frazier, dated February 4, 2025, including copy of his proof of U.S. citizenship | 30 |

[28] *See* Ex. 28, Report of Casualty of SFC Randy Collins.

| | | | | |
|---|---|---|---|---|
| Estate of Margarette Miller | SFC Randy Collins' mother | Solatium claim $5 million | Declaration of the Estate of Margarette Miller, dated March 23, 2026, including copy of her proof of U.S. citizenship | 31 |
| Louis Rainey, Jr. | SFC Randy Collins' stepbrother | Solatium claim $2.5 million | Declaration of Louis Rainey, dated January 9, 2025, including copy of his proof of U.S. citizenship | 32 |
| Moses L. Collins, Jr. | SFC Randy Collins' brother | Solatium claim $2.5 million | Declaration of Moses Collins, dated January 17, 2025, including copy of his proof of U.S. citizenship | 33 |
| Teresia Collins | SFC Randy Collins' sister | Solatium claim $2.5 million | Declaration of Teresia Collins, dated January 6, 2025, including copy of her proof of U.S. citizenship | 34 |
| Gretta Collins-Williams | SFC Randy Collins' sister | Solatium claim $2.5 million | Declaration of Gretta Collins, dated January 20, 2026, including copy of her proof of U.S. citizenship | 35 |

**1. Roxanne Collins**[29]

Roxanne Collins is the surviving spouse of SFC Randy D. Collins. *See* Ex. 29 at ¶ 3. Roxanne described Randy as her rock, motivator and the heart of our family. *Id*. at ¶ 4. They met during a deployment at Camp Bondsteel Kosovo and formed an unbreakable bond. *Id*. Spending up to 18 hours a day together, Randy and Roxanne connected on an emotional level and shared

[29] Roxanne Collins's birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 29, Declaration of Roxanne Collins, dated January 28, 2025.

their dreams and plans for the future. *Id*. at ¶ 5. They became inseparable. *Id*. Randy was a dedicated individual and inspired Roxanne to be her best. *Id*. In addition to his love and support for Roxanne, Randy extended his warmth and generosity to his friends and extended family. *Id*. at ¶ 6. In the wake of the death of their mutual friend Kiesha, Randy was a source of strength and compassion. *Id*. He was the heart and soul of the family, always ready with a joke, helping hand, or word of encouragement. *Id*. The death of Randy robbed Roxanne of countless milestones and dreams they planned to experience together. *Id*. at ¶ 5.

Roxanne recalled the day she received the news of her husband's injury while deployed in Iraq. *Id*. at ¶ 7. She was summoned to the Commander's office and informed that Randy had been gravely injured. *Id*. Roxanne explained that the weight of the Commander's words was crushing, but nothing compared to the agony she experienced in the days that followed. *Id*. Over the next 20 harrowing days, Roxanne sat by her husband's bedside in Bethesda, MD, clinging to hope and praying for a miracle that would never come. *Id*. News of Randy's death was delivered to Roxanne by a Chaplain and the physician at the hospital. *Id*. The finality of his death was a moment that was so surreal to Roxanne that she described feeling as though time itself had stopped. *Id*. To compound her grief, Roxanne made the devastating call to their family and friends informing them of Randy's death. *Id*. "The pain of those conversations, of hearing the heartbreak and disbelief in their voices, is something that will stay with me forever." *Id*. "Sharing the news of Randy's death was one of the hardest things I've ever had to do, a task no spouse should ever have to endure." *Id*.

Following the death of her husband, [redacted]

[redacted]

In addition to experiencing psychological and emotional stress, [redacted]

Roxanne described that the death of Randy has profoundly impacted every facet of their family's life, casting a long shadow over our emotional, financial, and social well-being. *Id*. at ¶ 11. [redacted] The family's quality of life has significantly deteriorated, and they have not been able to enjoy simple pleasures like trips or vacations. *Id*. According to Roxanne, [redacted]

[redacted]

Roxanne explained that the death of her husband his has left a void that is palpable, especially on significant dates such as, October 7th, Randy's birthday. *Id*. at ¶ 12. [redacted]

Plaintiffs have requested an upward enhancement to Roxanne Collins's claims based on the nightmare scenario she had to live through between May 4, 2005, when SFC Collins was injured and his death on May 24, 2005; [redacted] *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40-41 (D.D.C. 2012) (awarding plaintiff 40 percent enhancement due to suffering from post-traumatic stress disorder, persistent grief, and depression coupled with decline in school grades and lack of motivation); *Oveissi*, 768 F. Supp. 2d at 29-30 (finding plaintiff's enduring trauma including depression, anger, and alcoholism following the victim's death warranted a 50 percent enhancement).

Plaintiffs have requested, and I recommend, that the Court award an extraordinary enhancement of 50% of her baseline award resulting in an award of $12 million for Roxanne Collins' solatium damages.

**2. Kevin Frazier, Jr.[30]**

Kevin Frazier is the stepson of Randy D. Collins. *See* Ex. 30 at ¶ 3. According to Kevin, Randy was a "true father figure" who filled his life with laughter, learning, and love. *Id.* at ¶ 4. Kevin holds onto memories with Randy close to his heart. *Id*. One memorable moment occurred when the family took a trip to Las Vegas when Kevin was seven years old. *Id*. He vividly remembers Randy "teaching" him how to swim by playfully throwing him into the pool, only to jump in after, laughing, and then showing him the ropes. *Id*. Other memories with Randy include racing to build Legos to see who could complete a set the fastest. *Id*. "[H]e taught me invaluable lessons about life, kindness, and perseverance." *Id*. at ¶ 5. Randy was there for Kevin "practically every day, after returning home from school and work." *Id*. Randy always helped Kevin with his homework, took him outside to adventure, and played video games with him. *Id*. Kevin felt the warmth and guidance of a father figure from Randy. *Id*.

Kevin learned of Randy's death through his mother who shared the devastating news. *Id*. at ¶ 7. At just nine years old, Kevin saw the sorrow and loss that enveloped his family. *Id*. In the wake of Randy's death, Kevin found himself taking on more responsibilities around the house, helping to fill the gap left by his death. *Id*. at ¶ 11. According to Kevin, [redacted] Randy's absence was felt during key moments of Kevin's life, including his high school and college graduations, along with many events and programs during his high school years. *Id*. at ¶ 8.

Beyond these missed events, the loss of Randy has impacted the family's day-to-day life. *Id*. [redacted]

[30] Kevin Frazier's birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 30, Declaration of Kevin Frazier, dated February 4, 2025.

[redacted]

While Kevin is not Randy's biological son, the class of plaintiffs who may recover solatium damages "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members" despite not being legally or biologically related to the victim. *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730, at *42 (D.D.C. July 19, 2022). To establish this "functional equivalence" of a close family member, plaintiffs must show that they were "treated like" a victim's spouse, child, parent, or sibling. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (finding that stepsiblings recover functionally equivalent to siblings when they were "treated like" a brother or sister); *Oveissi* 768 F. Supp. 2d at 27 (holding that interactions between a stepparent and child "were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924, at *7 (D.D.C. Dec. 27, 2023) (finding a stepparent to be a functional equivalent of a parent notwithstanding an ongoing relationship between the victim and their biological parent because of the supplementary role played by the stepparent in the parental role).

Here, based on his declaration and the facts set forth above, it appears that Kevin Frazier, Jr. qualifies under the law as the functional equivalent of SFC Randy D. Collins' son based on the fact that he was "treated like" SFC Collins' son (they lived in the same home, SFC Collins

mentored and cared for Kevin as if he were his son), and his evident loss and grief resembles that of a biological child.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Kevin Frazier, Jr.'s solatium claim.

### 3. Estate of Margarette Miller[31]

Margarette Miller was the mother of SFC Randy D. Collins. *See* Ex. 31 at ¶ 5. Margarette passed away on February 13, 2022, and her son, Moses Collins, Jr., was named as the Executor of her estate in her Last Will and Testament. *Id.* at Ex. A. "Randy was Margarette's curious child—he liked to the things that were the most dangerous, even when you said not to. *Id*. at ¶ 6. "Margarette instilled in [Randy] that God was the most important thing in life." *Id.* Margarette worked nights at a café when Randy was growing up so she could be there with him throughout the day. *Id*. at ¶ 7. Celebrating Randy's birthday and the holidays was something Margarette looked forward to every year. *Id*. "Randy would call to speak to [Margarette] whenever he could while he was deployed out of the states, but it was always special when he could come home to visit." *Id.* at ¶ 8.

Margarette was always weary of receiving calls from the military, fearing that they would inform her that something terrible had happened to her son. *Id*. at ¶ 9. She received news of his injuries and his being transported back to the United States from Randy's wife, Roxanne. *Id.* She relied on her Christian faith and prayer during this time only to learn of his death in another phone call from Roxanne twenty days later. *Id.*

[31] Margarette Miller's death certificate and declaration confirm that she was a U.S. citizen, and was so at the time of the attack. Her estate is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex.31, Declaration of Estate of Margarette Miller, dated March 23, 2026.

Margarette "relied on God to guide her through the pain and reality that Randy would never be coming home." *Id.* at ¶ 10. [redacted]

Following Randy's death, Margarette cherished each of her children even more than she did before. *Id.* at ¶ 12. [redacted]

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for the Estate of Margarette Miller's solatium claim.

**4. Louis Rainey, Jr.**[32]

Louis Rainey, Jr. is the brother of Randy D. Collins. *See* Ex. 32 at ¶ 3. According to Louis, Randy was his mentor, guide, and a father figure after their father passed away. *Id*. at ¶ 4. Randy taught Louis how to tie his shoes, play sports, drive, and taught him lessons such as facing fears and carrying himself with pride. *Id*. Randy shaped his journey into manhood. *Id*. One of Louis' most cherished memories of Randy is when he provided comfort after their dad's passing by taking Louis to Magic Mountain. *Id*. As Louis grew older, Randy took him under his wing while in New

[32] Louis Rainey's California birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 32, Declaration of Louis Rainey, dated January 9, 2025.

York by integrating him into his military life and helping Louis secure a job. *Id*. When Louis started a family, Randy adored his nephews and took every opportunity to spend time with them even giving them rides and his motorcycle and playing games. *Id*. at ¶ 5. Randy also entrusted Louis with caring for his daughter for weeks. *Id*. Louis described that Randy's role in his life and the lives of his children was profound. *Id*.

Louis recalled the call he received from his mother informing him that Randy was severely injured. *Id*. at ¶ 7. Hearing about Randy's injury was one of the hardest moments of his life. Louis learned that his brother had been [redacted] and transferred to Germany for medical treatment. *Id*. Louis could not stop crying. *Id*. When his mother and brother went to visit Randy when he was brought back to the U.S, the reality hit Louis even harder. *Id*. He learned that Randy [redacted] *Id*. He was given a flicker of hope as his mother described how Randy reacted when she spoke to him. *Id*. However, this hope was short lived as Randy passed away from his injuries leaving his family shattered and overwhelmed with grief. *Id*.

Following Randy's death, Louis navigated through these tough times, constantly reminded of the difference his brother's support made in his life and the lives of the family. *Id*. at ¶ 9. The family was once close but have become distant. *Id*. Louis is left to grapple with the new reality of his brother's absence while holding onto the precious memories shared with him. *Id*. The untimely death of Randy has been a devastating blow to Louis—one that words can scarcely describe. *Id*. at ¶ 10. "It's a heartache that resonates deeply, not just within our family, but as a shared sorrow with anyone who has endured a similar loss." *Id*. According to Louis, "Randy's memory and the impact of his loss will forever influence our lives, shaping our family's story with a blend of sorrow and love." *Id.* at ¶ 10.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Louis Rainey's solatium claim.

**5. Moses L. Collins, Jr.**[33]

Moses L. Collins, Jr., is the brother of SFC Randy D. Collins. *See* Ex. 33 at ¶ 3. As the younger brother, Randy was often babysat by Moses, which allowed him to witness Randy's childhood and young adulthood first-hand. *Id*. at ¶ 5. Moses described that their family's strong church-going tradition nurtured Randy's love for singing. *Id*. At an early age, Randy developed a passion and talent for singing, even participating in the youth choir. *Id*. One of the most significant moments with Randy occurred when he stood up to vouch for Moses's character in front of the entire congregation while Moses was being considered for the role of pastor. *Id*. at ¶ 4. Moses described that receiving his brother's endorsement meant the world to him, and he looked forward to Randy's return home to join the family church. *Id*. However, this dream was tragically unfulfilled. *Id*. Another memorable moment Moses had with his brother is the Thanksgiving celebration the family had in 2004 prior to Randy's deployment. *Id*. Louis recounted that it was a joyous occasion that was filled with love. *Id*. Louis cherishes the time he shared with his brother. *Id*. He described that even when Randy joined the Army, their bond remained strong, and the brothers seized every opportunity to visit one another whenever possible. *Id*. During these visits, they enjoyed their mother's cooking and the thrill of amusement parks. *Id*. at ¶5.

The day Moses learned of his brother's injury, he returned home from Bible Study on a Tuesday night when he received a call from Randy's wife, Roxanne Collins. *Id*. at ¶ 7. This left him distraught as he struggled to accept the reality of the situation. *Id*. Moses began to pray for his

[33] Moses L. Collins, Jr.'s United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex.33, Declaration of Moses Collins, dated January 17, 2025.

brother's recovery and for all the other soldiers affected by the war. The family gathered, clinging to hope as they anxiously awaited further news. *Id*. When Moses received the tragic news of his brother's passing, he experienced [redacted] *Id*. at ¶ 9.

Following Randy's death, Moses took on a commitment to support his niece as if she were his own child by ensuring that her needs are met. *Id*. at ¶ 10. The loss of his brother has profoundly impacted the family. *Id*. at ¶ 11. Knowing that his brother will never return has caused deep pain. *Id*. [redacted] Randy's absence during their many family gatherings means that what should be moments of joy are overshadowed by the loss they've experienced. *Id*. Moses explained that he can never replace the love and guidance his brother would have given his niece. *Id*. [redacted] According to Moses, this tragedy has underscored the value of time and cherishing every moment with your loved ones. *Id*.

The absence of Randy is constant and acutely felt at every family gathering, holiday, and milestone. *Id*. at ¶ 12. Moses explained that the journey towards recovering from his brother's death is lifelong. *Id*.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Moses Collins's solatium claim.

**6. Teresia Collins[34]**

Teresia Collins is the sister of SFC Randy D. Collins. *See* Ex. 34 at ¶ 3. According to Teresia, she and Randy shared a birth month which meant that birthday celebrations were

[34] Teresia Collins's Missouri birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 34, Declaration of Teresia Collins, dated January 6, 2025.

celebrated together. *Id*. at ¶ 4. Their paths were intertwined by attending the same church and schools growing up. *Id*. The siblings were inseparable whether they were singing in the church choir, playing sports, skating and riding bikes. *Id.* at ¶5. Their family gatherings were always memorable as everyone enjoyed good food and great company. *Id*. Like many of Randy's family members, the Thanksgiving everyone spent together prior to Randy's deployment is cherished deeply. *Id*. Teresia described her brother as her hero because he was always by her side ready to support and protect her. *Id*. at ¶ 4. His bravery was evident from a very young age which continued into adulthood. *Id*. When Randy joined the military and deployed, Teresia and her brother stayed connected with their conversations becoming more meaningful. *Id*. at ¶ 5. Prior to his death, Randy called Teresia twice, leaving her a voicemail. *Id*. at ¶4. Teresia agonizes over the missed opportunity to speak with her brother. *Id*. Not having the chance to call her brother back still haunts her till this day. *Id*.

Teresia recalls the night she learned of her brother's death. *Id*. at ¶ 7. It was around 12:30 a.m. when her husband picked her up from work and broke the news that something terrible happened to Randy. *Id*. When Teresia called her mother, she was instructed to bring her family to her mother's home. *Id*. Once they arrived, Teresia's mother and siblings gathered around them as they relayed the heartbreaking news that Randy had died from the attack. *Id*. Prior to learning of her brother's death, Teresia and her family were planning to travel to the hospital where Randy was being treated for his injuries. *Id*. This news shattered her, and she was utterly devastated. *Id*. In the days that followed, the family was supported by church members, friends, extended family, and the community. *Id*.

Following the death of her brother, [redacted]

[redacted]

Teresia described Randy as the problem-solver in the family because he was the person they all turned to in times of trouble. *Id*. at ¶ 10. Without him, the family is left without his wise counsel. *Id*. Randy was an integral part of their family and provided them with a sense of unity and strength. *Id*. The senseless death of her brother has left Teresia with many unanswered questions, and she is reminded of the importance of holding your family close. *Id*.

Each passing October, the month of their birthdays, brings a renewed sense of loss. *Id*. at ¶ 11. Teresia described that it serves as a poignant reminder of the life they should be celebrating together. *Id*. She described feeling a profound sense of injustice that further compounds her grief. *Id*. For Teresia, it's not just the loss of her brother's presence that she mourns, but also the manner of his passing thousands of miles away from home in a war with senseless violence. *Id*.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Teresia Collins' solatium claim.

**7. Gretta Collins-Williams[35]**

Gretta Collins-Williams is the sister of SFC Randy D. Collins. *See* Ex. 35 at ¶ 3. Growing up together, Gretta and Randy shared everything—the same school, buses, clothes, shoes, and jewelry. *Id*. at ¶ 5. He was her partner in every sense. *Id*. Gretta's first car was a Nissan Sentra, and Randy was the first person she allowed to drive her car. *Id*. It was no surprise that Randy later bought a Nissan following in his sister's footsteps. *Id*. The Collins family was close-knit and

[35] Gretta Collins-Williams's Missouri birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 35, Declaration of Gretta Collins, dated January 20, 2026.

deeply devoted to church and participated by singing in the sunshine band, attending vacation Bible school, and participating in all other church activities. *Id*. at ¶ 6.

Randy shared a special bond with his siblings. *Id*. They often recreated church at home with Randy creating makeshift drums, Gretta as the MC, Teresia singing, and their mother delivering messages about obedience and faith. *Id*. Gretta described that moments like this built the foundation of the family's strong bond. *Id*. She described her brother as someone who was incredibly generous and never expected anything in return. *Id*. at ¶ 5. Once Gretta mentioned that she needed to replace her refrigerator, and Randy took it upon himself to purchase a new one for her not accepting repayment. *Id*. Even as adults, Gretta and Randy remained close. Randy would often ride his motorcycle to her house in Long Beach, California where they would attend church or just catch up. *Id*. In the early '90s, Randy considered leaving the military. *Id*. at ¶ 4. Gretta recalls that she reminded him of his reasons for joining. *Id*. Taking her advice to heart, Randy re-enlisted in the military. *Id*.

The day Gretta learned of her brother's injury, she was leaving church when her older brother, Moses, informed her that Randy had been injured in Iraq. *Id*. at ¶ 7. Initially, Gretta clung to a sliver of hope that Randy would recover. *Id*. Subsequently learning of his death left a void in her life. *Id*. Since his passing, Randy is missed at every birthday, school days, homecoming games, church, and holidays. *Id*. at ¶ 9. Veterans Day is a reminder of Randy's death and often brings Gretta to tears. *Id.* Even after nineteen years, Randy's is constantly on Gretta's mind. *Id*. The loss [redacted] Gretta described Randy as the backbone of the family [redacted]

Gretta explained that prior to Randy's death, she had comfort in knowing that she could call her

brother during difficult times. *Id* at ¶ 8. She lost her go-to person who could always make her laugh even if she was in pain. *Id* at ¶ 9.

The death of Randy has left a void that time cannot heal. *Id* at ¶ 10. According to Gretta, Randy had plans to retire early and begin a new career. *Id*. However, these plans were cruelly cut short. *Id*. "The war took away a 'good one,' someone who had so much more to give, and our family was just getting ready to celebrate his achievements and look forward to a future that will now never be. *Id*.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Gretta Collins-Williams' solatium claim.

**G. CASEY BYERS – JUNE 11, 2005, ATTACK – TAQADDUM**

On June 11, 2005, Spc. Casey Byers was serving in the U.S. National Guard in Taqaddum, Iraq when his vehicle was struck by an IED. *See* ECF No. 9 at ¶ 992; Ex. 3 at 27-28. Spc. Byers and another member of the B Company, 224th Engineer Battalion were killed in the attack. *Id*. Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Spc. Byers was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the June 11, 2005 attack in which Spc. Casey Byers was killed. *See* Ex. 1.

Spc. Byers' surviving parents and daughter—William Byers, Ann Byers, and Hailey Maxwell[36]—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 991-999.[37] The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Casey Byers' society,

---

[36] Hailey Maxwell's claim was initially filed when she was a minor. She has attained the age of majority since this case was filed and is pursuing her claims in her own right.

[37] Jennifer Scheitler, Spc. Byers' sister, has chosen not to pursue her claim, and Plaintiffs have indicated they will be dismissing her claims in the near future.

companionship, comfort, advice, and counsel. *Id.* at ¶ 1075. The following chart reflects the claims asserted by William Byers, Ann Byers, and Hailey Maxwell in their individual capacities arising out of the June 11, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| William Byers | Spc. Casey Byers' father | Solatium claim $6.25 million | Declaration of William Byers, dated January 13, 2025, including copy of his proof of U.S. citizenship | 36 |
| Ann Byers | Spc. Casey Byers' mother | Solatium claim $6.25 million | Declaration of Ann Byers, dated January 13, 2025, including copy of her proof of U.S. citizenship | 37 |
| Hailey Maxwell | Spc. Casey Byers' daughter | Solatium claim $5 million | Declaration of Hailey Maxwell, dated January 13, 2025, including copy of her proof of U.S. citizenship | 38 |

**1. William Byers**[38]

William Byers is the father of Spc. Casey Byers. *See* Ex. 36 at ¶ 3. According to William, his son was a "red-headed bundle of energy" whose vibrant soul brought life into every room he entered. *Id*. at ¶ 4. He recalled teaching Casey to play football and baseball. *Id*. Casey excelled in athletics and represented the state in track and field. *Id*. This was a source of immense pride for William. *Id*. Moments together during their annual trip to the Dominican Republic, watching

[38] William Byers' United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 36, Declaration of William Byers, dated January 13, 2025.

movies, camping, swimming, and building their coin collection are core memories for William with his son. *Id*. at ¶ 4, 5. Throughout the years, William maintained a close relationship with his son. *Id*. at ¶ 5. Visiting him in college and when he joined the military. *Id*. William described Casey as fearless, curious, and adventurous. *Id*. at ¶ 4. "Casey's vibrant spirit and unwavering presence are profoundly missed in every facet of life." *Id*. at ¶ 5.

On Sunday, June 12, 2005, at 6:00 a.m., military personnel arrived at his doorstep informing William and his wife Ann, that their son had died. *Id*. at ¶ 7. William explained that just 45 minutes before his death, Casey had called his mother to share his acceptance of his fate and his wish for his parents to fulfill 10 specific promises after he was gone. *Id*. When they received official notification of Casey's death, they were left in a state of profound grief and shock. Id. William recalled that it was a mix of deep sorrow and anger. *Id*. During the intensity of the moment, these emotions were directed at the messengers of this tragic news. *Id*. Years later, William apologized to these individuals, who understood the depth of William and Ann's love for Casey and the intense pain they felt when they received the news. *Id*. [redacted]

[redacted]

[redacted]

[redacted] Although it has been 19 years since William lost his son, there is "not a single day" that passes without Casey crossing his mind. *Id*. "Holidays, his birthday, and the anniversary of his death are particularly difficult, each year rekindling the sorrow and reviving the anguish of that fateful day." *Id*. The pain of losing Casey is always present "especially during moments of national pride or remembrance, when the sound of the national anthem or a gun salute can unexpectedly bring [him] to tears." *Id.*

Plaintiffs have requested an upward enhancement to William Byers' claims based on his [redacted] *See Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); id. (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *Thuneibat*, 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86

(granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders").

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of his baseline award resulting in an award of $6.25 million for William Byers' solatium claim.

### 2. Ann Byers[39]

Ann Byers is the mother of Spc. Casey Byers. *See* Ex. 37 at ¶ 3. Ann described her "Big Red" who was a "whirlwind of energy and creativity, with his red hair, freckles, and an unstoppable spirit." *Id*. at ¶ 4. Casey was always the life of the party. *Id.* "[H]is humor and charisma [drew] people to him like moths to a flame." *Id*. Ann recalled how Casey had a photographic memory and passion for invention. *Id*. According to Ann, when Casey was just six years old, he decided to concoct a "bomb" in the basement, near the gas furnace. Ann described that with a mixture that could only spell disaster, she found him just in time. *Id*. Following this incident, more items were added to the growing list of things Casey was not allowed to do or touch that was plastered on their refrigerator. *Id*. Casey was clever and full of adventures. *Id*. Ann shared several memories with her son including their time camping, playing games, participating in outdoor sports, and vacationing in the Dominican Republic. *Id*. at ¶ 5. As Casey grew older, he always made time for family with daily calls when the opportunity permitted. *Id*.

The night prior to his death, Casey called Ann sharing a premonition he had of his fate and instructed Ann on his final wishes, including taking care of his daughter Hailey. *Id*. at ¶ 7. True to his prediction, soldiers appeared at Ann's doorstep and delivered the terrible news that Casey was

---

[39] Ann Byers's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 37, Declaration of Ann Byers, dated January 13, 2025.

killed in Iraq. *Id*. Ann explained that she was overwhelmed with grief and lashed out at the soldiers. *Id*. Years later, Ann apologized to the soldiers and acknowledged the difficulty of their task in notifying them of Casey's death. *Id*. Soon after Casey's death, [redacted] Trying to be strong, Ann took on the role of being the rock for their family during the darkest period of their lives. *Id*.

[redacted]

The death of Casey severely impacted the mental and physical health of the family. *Id*. at ¶ 10. [redacted]

Nineteen years on, the pain remains a constant companion, with days still lost to tears and mourning. *Id*. at ¶ 10. "The loss of Casey is an ever-present void in our lives, a constant reminder

of the sacrifice he made and the future he was denied." *Id*. at ¶ 11. "The loss, indeed, never goes away; it evolves, becomes a part of us, and defines our understanding of sacrifice, love, and resilience." *Id*.

Plaintiffs have requested an upward enhancement to Ann Byers' claims based on [redacted] *See Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); id. (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *Thuneibat*, 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders").

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Ann Byers's solatium claim.

**3. Hailey Maxwell[40]**

Hailey Maxwell is the daughter of Spc. Casey Byers. *See* Ex. 38 at ¶ 2. Hailey was just six months old when her father died and was born while he was serving in Iraq. *Id*. at ¶ 4. Hailey's

[40] Hailey Maxwell's birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 38, Declaration of Hailey Maxwell, dated January 13, 2025.

adoptive mom and grandmother, Ann Byers, relayed to Hailey that she shared pictures and videos of her with Casey while he was deployed. *Id*. Among his belongings sent back after his tragic death was a teddy bear engraved with both their names. *Id*. Her father also downloaded every episode of Teenage Mutant Ninja Turtles, his favorite television show, with plans to share them with her. *Id*.

Despite never having the opportunity to meet her father, Hailey has felt the void left by his absence throughout her entire life. *Id*. at ¶ 5. Hailey longs for the bond she could have shared with her father and wonders what her life would be like if he were by her side to provide his guidance and love. *Id*. Significant milestones, such as her graduation, were celebrated in her father's absence. *Id*. These moments like this are tinged by sadness during what should be joyous occasions. *Id*. Hailey's desire to explore a connection with her father is left unfulfilled. *Id*.

As Hailey grew older, her family shared the details of the day her father died. *Id*. ¶ 6. This news painted a picture for Hailey of utter grief and loss. *Id*. She experienced both a mix of sadness for the father she never had the change to know and pride for her service and sacrifice. *Id*. Still, never having felt her father's hug, hearing his voice while reading a bedtime story, or being rocked to sleep in his arms are a series of missed opportunities for Hailey that have caused her pain. *Id*. ¶ 7. Simple joys like watching movies together, sharing popcorn, attending father-daughter dances, learning to drive under his guidance, celebrating her graduation, and having her father at her wedding are all experiences Hailey has been deprived of. *Id*. Hailey is left feeling lost, angry, and constantly imagining what these milestones would be like with her father by her side. *Id*.

Learning about her father through stories and videos brings Hailey a mix of joy and sorrow. *Id*. [redacted] According to Hailey, she

[redacted]

The death of her father has created tension in the family and shifted dynamic significantly. *Id*. at ¶ 9. [redacted]

Now that Hailey is married and became a mother, she holds onto the teddy bear her father gave her and the cartoon videos he collected which she plans to share with her child. *Id*. at ¶ 9. "I am committed to ensuring his legacy lives on, to share the stories of his courage, kindness, and the love he had for us, even though he never had the chance to express it in person. My children will grow up knowing their grandfather not just as a soldier who died in service but as a great man whose life, though tragically cut short, was filled with honor and a deep sense of duty." *Id*. at ¶ 10.

Some courts in this District have discounted the solatium award for children who were in utero or simply very young when they lost a parent. On April 29, 2025, the D.C. Circuit Court of Appeals issued a decision in *K.E.F.V. v. Islamic Republic of Iran*, holding that a child who was *in utero* at the time of her father's attack has standing to recover solatium damages. *See* 135 F.4th 988, 996 (D.C. Cir. 2025). Following this decision, the district court in *Cabrera v. Islamic Republic of Iran* awarded *in utero* plaintiffs 50% of the baseline awards for children set forth in *Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25, 52 (D.D.C. 2007) (awarding $5 million for the child of a deceased servicemember, and $2.5 million for the child of a surviving servicemember). *See*

*Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2025 U.S. Dist. LEXIS 94375, at *63 (D.D.C. May 16, 2025) (awarding $1.25 million to a child *in utero* at the time her father was injured in an attack) (citing *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2024 U.S. Dist. LEXIS 34785, at *24 n.2 (D.D.C. Feb. 29, 2024)) (anticipating that if the Court of Appeals held that *in utero* plaintiffs had standing, it would award a child *in utero* at the time her father was killed in an attack $2.5 million). The court in *Karcher v. Islamic Republic of Iran* followed this framework for one *in utero* plaintiff whose father was killed in an attack, *see* No. 16-cv-00232 (CKK), 2026 U.S. Dist. LEXIS 13128, at *13-14 (D.D.C. Jan. 23, 2026) (awarding $2.5 million), but awarded a significant upward departure of $7.5 million to a plaintiff *in utero* while her father was killed in an attack, accounting for how "[her] father's death set in motion a chain of events that destroyed her mother and left her orphaned at age 16." *Id.* at *12 (alterations in original) (citations omitted).

I believe that the chain of events in Hailey's case demonstrates that the loss of her father had an enormous detrimental effect on her life. Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Hailey Maxwell's solatium claim.

### H. NATHANIEL ROCK – AUGUST 1, 2005, ATTACK – BARWANAH

On August 1, 2005, Sgt. Nathaniel Rock was serving in the U.S. Marine Corps east of Haditha, Iraq when his unit was ambushed, and Sgt. Rock was struck by small arms fire. *See* ECF No. 9 at ¶ 1067; Ex. 3 at 33-34. According to his Certificate of Death, Sgt. Rock died of a [redacted][41] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Rock was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion

[41] *See* Ex. 39, Certificate of death of Sgt. Nathaniel Rock.

assessing liability against Iran and Syria for *inter alia* the August 1, 2005, attack in which Sgt. Nathaniel Rock was killed. *See* Ex. 1.

Sgt. Rock's surviving parents and sibling—Timothy Rock, Adriana Rock, and Jared Rock—are plaintiffs in this case.[42] *See* ECF No. 9 at ¶¶ 1066-1075. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Nathaniel Rock's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1075. The following chart reflects the claims asserted by Timothy Rock, Adriana Rock, and Jared Rock in their individual capacities arising out of the August 1, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Timothy Rock | Sgt. Nathaniel Rock's father | Solatium claim $5 million | Declaration of Timothy Rock, dated March 17, 2026, including copy of his proof of U.S. citizenship | 40 |
| Adriana Rock | Sgt. Nathaniel Rock's mother | Solatium claim $5 million | Declaration of Adriana Rock, dated March 17, 2026, including copy of her proof of U.S. citizenship | 41 |
| Jared Rock | Sgt. Nathaniel Rock's brother | Solatium claim $3.125 million | Declaration of Jared Rock, dated March 31, 2025, including copy of his proof of U.S. citizenship | 42 |

[42] Plaintiffs have indicated that Sgt. Rock's sisters, Tara Rock and Nicole Stewart, will be included in a subsequent submission for their solatium claims arising from their brother's death.

**1. Timothy Rock**[43]

Timothy Rock is the father of Sgt. Nathaniel Shae Rock. *See* Ex. 40 at ¶ 3. Timothy described Nate as the greatest gift of his life. *Id*. at ¶ 4. From the moment he held his son in his arms, Timothy bonded with his son. *Id*. He was there for each milestone from watching his son take his first steps across the living room floor, his first communion, and during his graduation. *Id*. Everyday moments with Nate such as family dinners, laughter in the kitchen, quiet talks, and holidays together are equally cherished by Timothy. *Id*. at ¶ 5. Timothy described his son as someone who was selfless, courageous, and carried himself with a sense of responsibility. *Id*. *Id*. at ¶ 4. He recalled the moment his son ran into a home to save a man's life during a fire when he served as a police officer. *Id*. Nate stepped forward without hesitation when someone was in danger. *Id*. "He was extraordinary not just for the heroic things he did, but for the kind, loving son he was every single day." *Id*. at ¶ 5.

The day Timothy learned of his son's death, he was in the backyard of his home building a deck for Nate's welcome home party as he eagerly anticipated Nate's return from the War. *Id*. at ¶ 8. Timothy pictured his son walking around to the back yard and seeing his familiar smile as he welcomed him home. *Id*. He wanted everything to be perfect for him. *Id*. Timothy heard what he described as a blood-curdling scream from his wife that he will never forget as long as he lives. *Id*. He described her scream as something primal and deeper than fear. *Id*. Timonthy dropped everything and ran to the house to find his wife at the front door. *Id*. He recalled that her face was drained of all color as her world collapsed. Timothy stated "[i]n that instant, before a single word was fully spoken, I knew. Our son—our Nate—was gone." *Id*. The horror of making the calls to

[43] Timothy Rock's United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 40, Declaration of Timothy Rock, dated March 17, 2026.

Nate's siblings informing them of his death was devastating. "It was a pain so heavy I could hardly breathe." *Id*. Timothy described that the day they learned of Nate's death split their lives into two parts—before and after. "Nothing has ever been the same. *Id*.

The loss of Nate has "shattered" the family in ways that words cannot explain. *Id*. at ¶ 9. [redacted] He explained that he believed in his son's future because Nate believed in it. *Id*. He is left questioning what might have been if his son were still alive. Timothy's questions surrounding the future his son could have had are left unanswered. *Id*.

According to Timothy, the death of his son at age twenty-six [redacted]

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Timothy Rock's solatium claim.

**2. Adriana Rock[44]**

Adriana Rock is the mother of Sgt. Nathaniel Shae Rock. *See* Ex. 41 at ¶ 3. Adriana described Nate as someone who was remarkable, adventurous, fearless, and full of spirit. *Id*. at ¶ 5. Raising Nate and watching him grow into a man of courage and character is a source of pride for Adriana. *Id*. at ¶ 4. He loved to hunt, fish, and spend quality time with his family and friends. *Id*. at ¶ 5. She supported her son and celebrated each of his achievements as if they were her own. *Id*. at ¶ 4. Similarly, she was always there to help Nate navigate any lows in his life. *Id*. at ¶ 5. When Nate joined the military and took his first tour, Adriana was proud of her son but also fearful for his safety. *Id*. at ¶ 4. When Nate returned home from his first deployment, she was incredibly grateful to have her son back in her arms. *Id*.

The day Adriana learned of her son's death, she was at home when there was an unexpected knock at the door. *Id*. at ¶ 6. When she answered it and saw a Marine sergeant, a local police officer, and her priest with solemn faces, she knew without them having to utter a word that her son was gone. *Id*. She recalled that a chilling instinct gripped her as she screamed for her husband. *Id*. In an instant, her world shattered as the weight of that truth set in. Adriana was unable to speak or move and felt as though she could not breathe. *Id*. From that moment on, Adriana was paralyzed by sorrow and consumed by grief. *Id*. She described that life as she knew it ended, and nothing would ever feel whole again. *Id*.

Following the death of her son, [redacted] Due to the untimely death of Nate, he has missed the births of four nieces and nephews, three great-nieces and nephews, his siblings' weddings and other

[44] Adriana Rock's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 41, Declaration of Adriana Rock, dated March 17, 2026.

monumental moments that should have been filled with his laughter and presence. *Id.* [redacted]

Adriana explained that the loss of her son is something she will carry for the rest of her life. *Id.* at ¶ 8. "We will never truly get over it; we have to learn to live with it." *Id.* "The toll it has taken on our family is beyond words — every single day is marked by Nate's death, and his memory lingers in every moment, every thought, every breath, and every heartbeat." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Adriana Rock's solatium claim.

**3. Jared Rock**[45]

Jared Rock is the brother of Sgt. Nathaniel Shae Rock. *See* Ex. 42 at ¶ 3. Growing up together, the brothers shared many of the same experiences. *Id.* at ¶ 4. Their days were spent together lifting weights and hunting. *Id.* at ¶ 5. They attended the same bartending school and police academy. *Id.* at ¶ 4. After completing the academy, they both served as officers in the Martins Ferry Police Department. *Id.* In the three years prior to his death, Jared and Nate spent nearly every day together. *Id.* at ¶ 5. During this time, their bond deepened as they began to understand each other on a level that Jared explained, few siblings do. *Id.* Jared cherishes the

[45] Jared Rock's Ohio birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 42, Declaration of Jared Rock, dated March 31, 2025.

moments he spent with his brother side by side as they learned, grew, and served their community together. *Id*. at ¶ 4.

Jared received the news of his brother's death while he was at home and received a knock at the door from Marines. *Id*. at ¶ 7. When they informed him that his brother was killed in Iraq, Jared experienced a mix of disbelief, sorrow, and a profound sense of loss. From that day, Jared's life was never the same. *Id*.

Following Nate's death, [redacted] According to Jared, as the sole surviving brother and the youngest sibling, he felt as though he had to bear the weight of responsibility to protect and provide help and relief to his family in a way he never anticipated. *Id*. at ¶ 10. The tragic death of his brother has taught him a hard lesson that life can change in an instant. *Id*. at ¶ 11. Milestones such as graduations, marriages, and the joy of welcoming a first child are bittersweet as the family navigates them without Nate's presence. *Id*. at ¶ 5.

The finality of his brother's death has left a void in Jared's daily life. *Id*. at ¶ 11. [redacted]

Plaintiffs respectfully request an upward enhancement of Jared Rock's claims based on his [redacted]

[redacted]

[redacted]

*See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010).

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of his baseline award resulting in an award of $3.125 million for Jared Rock's solatium claim.

## I. TIMOTHY DEE WATKINS – OCTOBER 15, 2005, ATTACK – RAMADI

On October 15, 2005, the U.S. Army's Task Force 2-69 AR was conducting operations near Ramadi, Iraq when an M2A2 Bradley Fighting Vehicle struck a deep-buried IED approximately eight kilometers east of Ramadi that detached the turret of the Bradley and caused a "catastrophic fire." *See* ECF No. 9 at ¶¶ 1166, 1172; Ex. 3 at 38-39. The blast resulted in the death of five soldiers including Spc. Thomas Byrd and Spc. Timothy Dee Watkins. Ex. 3 at 38. Spc. Watkins' death was caused by [redacted][46] Plaintiffs filed a motion seeking

[46] Ex. 43, Certificate of Death (Overseas) for Timothy Dee Watkins.

default judgment as to liability against Iran and Syria for the attack in which Spc. Watkins was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the October 15, 2005 attack in which Spc. Timothy Dee Watkins was killed. *See* Ex. 1.

Spc. Watkins' surviving parents and siblings—Terri Watkins, Robbie Watkins, Rachel Watkins, Rebekah Helmadollar, Jonathan Watkins, and Thomas Watkins—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1171-1180. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Timothy Dee Watkins' society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1180. The following chart reflects the claims asserted by Terri Watkins, Robbie Watkins, Rachel Watkins, Rebekah Helmadollar, Jonathan Watkins, and Thomas Watkins in their individual capacities arising out of the October 15, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Terri Watkins | Spc. Timothy Dee Watkins' mother | Solatium claim $5 million | Declaration of Terri Watkins, dated February 26, 2026, including copy of her proof of U.S. citizenship | 44 |
| Robbie Watkins | Spc. Timothy Dee Watkins' father | Solatium claim $5 million | Declaration of Robbie Watkins, dated February 5, 2026, including copy of his proof of U.S. citizenship | 45 |
| Rachel Watkins | Spc. Timothy Dee Watkins' sister | Solatium claim $2.5 million | Declaration of Rachel Watkins, dated February 10, 2026, including copy of her proof of U.S. citizenship | 46 |

| | | | | |
|---|---|---|---|---|
| Rebekah Helmadollar | Spc. Timothy Dee Watkins' sister | Solatium claim $2.5 million | Declaration of Rebekah Helmadollar, dated February 20, 2026, including copy of her proof of U.S. citizenship | 47 |
| Jonathan Watkins | Spc. Timothy Dee Watkins' brother | Solatium claim $2.5 million | Declaration of Jonathan Watkins, dated February 5, 2026, including copy of his proof of U.S. citizenship | 48 |
| Thomas Watkins | Spc. Timothy Dee Watkins' brother | Solatium claim $2.5 million | Declaration of Thomas Watkins, dated February 19, 2026, including copy of his proof of U.S. citizenship | 49 |

**1. Terri Watkins**[47]

Terri Watkins is the mother of Timothy Dee Watkins. *See* Ex. 44 at ¶ 3. Terri had an exceptionally close and enduring mother–son relationship with Timothy, marked by daily shared experiences, faith-based routines, and deep emotional connection. "My first born boy was the light of our lives, embodying a spirit that was both vibrant and deeply connected to his family and his faith." *Id.* at ¶ 4. She homeschooled Timothy, worked alongside him on fundraising for conventions and mission trips, and maintained a consistent family tradition of shared dinners. *Id.* at ¶ 5. Their bond was reinforced through daily Bible reading and sustained through frequent, meaningful conversations even after Timothy left home for military service. *Id.* These interactions included discussions of family matters, relationships, and faith, reflecting a relationship of mutual respect, trust, and affection. *Id.*

[47] Terri Watkins' U.S. passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 44, Declaration of Terri Watkins, dated February 26, 2026.

Timothy played a central role in the family beyond his relationship with Terri. *Id.* at ¶ 6. "He was a beacon of love and guidance for his four younger siblings, embodying the role of a good big brother with a grace and patience that was truly admirable." *Id.* Timothy had a knack for bringing people together through shared activities such as games, movies, hiking, and church involvement. *Id.*

Terri recounts the moment she learned of Timothy's death as a defining and devastating event. *Id.* at ¶ 7. On the evening of October 15, 2005, an Army Captain and an Army Chaplain arrived at her home and informed her that her son had been killed in Iraq. *Id.* There was no indication that his injuries were survivable making the news immediate and final. *Id.* The family gathered together to process the loss, and she later had to relay the news to extended family and friends, each conversation compounding the emotional pain. *Id.*

Since Timothy's death, [redacted] "rely[ing] on the Lord through these trials." *Id.* at ¶8. Timothy's death has also resulted in a [redacted]

Time has not healed this loss, and the "shadow of Timothy's passing will forever linger over our family." *Id.* at ¶ 11. "While we may find moments of joy and continue to create new memories, there will always be a space where he should have been, a silence where his laughter should have filled." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Terri Watkins' solatium claim.

**2. Robbie Watkins[48]**

Robbie Watkins is the father of Timothy Dee Watkins. *See* Ex. 45 at ¶ 3. Robbie and his son shared a deeply meaningful and affectionate father–son relationship characterized by shared faith, family traditions, and mutual respect. He recounts Timothy's final visit home in August 2005 as a powerful reflection of their bond and Timothy's close connection with the entire family, particularly his parents and four younger siblings. *Id.* at ¶ 4.That visit was marked by joy, laughter, and togetherness, memories that now underscore the magnitude of the loss. *Id.*

Robbie's relationship with Timothy was reinforced through consistent family rituals, including daily prayer and Bible reading, shared family dinners, and vacations. *Id.* at ¶ 5. These experiences fostered unity and a strong moral foundation rooted in faith and service. *Id.* Even after Timothy left home and military duties took him far away, father and son maintained regular contact through weekly phone calls in which they discussed faith, family matters, and mutual support. *Id.*

As the firstborn child, Timothy "naturally assumed the role of a guiding light and friend to his siblings, fostering a closeness that was evidence in every aspect of their lives together." *Id.* at ¶ 6. Timothy's relationships extended beyond the family to friends from college, church, and Christian camps, reflecting his consistent care for others and his ability to maintain meaningful bonds. *Id.* His character—defined by kindness, humor, diligence, and a strong work ethic—left a lasting impression on all who knew him. *Id.*

[48] Robbie Watkins' U.S. passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 45, Declaration of Robbie Watkins, dated February 5, 2026.

Robbie recounts with vivid clarity the events of October 15, 2005, when an Army Captain and an Army Chaplain arrived at the family home to inform them that Timothy had been killed in Iraq. *Id.* at ¶ 7. The notification occurred in the evening, with the entire family gathered together, marking a moment that permanently altered their lives. Mr. Watkins describes the devastation of learning that Timothy was killed instantly when the Bradley Fighting Vehicle he was riding in was struck by an improvised explosive device during combat maneuvers in Ramadi, Iraq. Communicating this news to extended family and friends was an additional source of intense emotional pain. *Id.*

Despite the severity of his grief, [redacted] *Id.* at ¶ 9.

"The loss of Timothy on our family has brought grief as our constant companion, reshaping the dynamic of our family." *Id.* at ¶ 10. [redacted]

Family dynamics have also evolved in Timothy's absence, particularly as his siblings have grown, married, and started families of their own. *Id*. Timothy would have been an uncle to multiple nieces and nephews, a role now permanently unrealized. *Id.* "The shadow of loss cast by our beloved Tim's passing seems destined to linger over our family, subtly marking every joyous occasion, achievement, and milestone with a poignant reminder of his absence." *Id.* at ¶ 11. While Timothy "harbored a passion for aviation," he nevertheless held an "evolving vision of serving as

a chaplain, to offer spiritual guidance and support" to his fellow soldiers. *Id.* The "unfulfilled potential and the impact he aspired to make, particularly in nurturing the spiritual well-being of his comrades, adds another layer to our grief." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Robbie Watkins' solatium claim.

**3. Rachel Watkins[49]**

Rachel Watkins is the sister of Timothy Dee Watkins. *See* Ex. 46 at ¶ 3. Rachel described her brother as her "best friend, my confidant, and the person whose honesty I valued above all others." *Id.* at ¶ 4. Rachel and Timothy grew up only 21 months apart, attended the same small school, were in the same class due to grouped grades, and served together in church. *Id.* at ¶ 5. Their childhood and adolescence were marked by daily shared activities such as playing basketball, riding bikes, and spending leisure time together, reinforcing their closeness.

As they matured, their bond deepened rather than diminished, despite life taking them in different directions. Particularly meaningful shared memories from growing up included working together at a summer camp where Timothy's leadership and compassion were evident and admired. *Id.* at ¶ 4. Their final summer at camp and their last visit together before Timothy returned to Iraq served as emotionally significant moments for Rachel, underscoring the depth of their connection and the sense of finality she now associates with those memories. *Id.*

While their relationship began with ordinary sibling rivalry, it evolved into a deep and enduring bond during their college years and adulthood. *Id.* They shared extensive written correspondence during Timothy's deployment to Iraq, exchanging emails that addressed family

[49] Rachel Watkins' California birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 46, Declaration of Rachel Watkins, dated February 10, 2026.

dynamics, personal decisions, and emotional support. *Id.* While their communications while Timothy was deployed may have been limited, "each time he came home, it was as if no time had passed" allowing them to reconnect. *Id.* at ¶ 6. "My brother was more than just a sibling; he was a cornerstone of my life, and his memory continues to inspire me every day." *Id.*

Timothy had a profound influence on her life and personal development. She describes him as someone who consistently encouraged others to grow, challenge themselves, and embrace life fully. *Id.* at ¶ 7. His support and example were instrumental in giving her the confidence to move to China independently, reflecting the lasting impact of his guidance and encouragement. *Id.* Timothy was deeply relational and intentional, preferring quality time through conversation, shared activities, music, and everyday companionship, and his extroverted nature, humor, and genuine interest in others made him a central and irreplaceable presence within the family and among friends. *Id.*

The night Rachel learned of Timothy's death was a traumatic and unforgettable event. *Id.* at ¶ 8. She recalls the late-night knock on the door, the presence of a chaplain and a young woman, and the immediate sense of dread that preceded the official notification. *Id.* Rachel's "initial reaction was one of shock, followed by an overwhelming grief as the reality of his loss sank in." *Id.* The experience of repeatedly sharing the news with others compounded her emotional suffering. *Id.* This traumatic memory has remained vivid over time, and the emotional impact of that night persists as a haunting reminder of the loss and its lasting effects. *Id.*

In the years following her brother's death, [redacted]

[redacted]

The loss of her brother was fundamentally emotional rather than financial. The family's grief stemmed from the absence of Timothy's presence, love, and laughter, rather than from any material hardship. *Id.* at ¶ 10. [redacted] At the same time, she notes that the shared tragedy brought the family closer together, prompting greater intentionality in spending time together and strengthening emotional bonds. *Id.* The passage of time has not diminished the impact of Timothy's death. *Id.* at ¶ 12. Nearly two decades later, the loss remains profound, and the family remains committed to preserving Timothy's memory and ensuring that future generations understand who he was, the values he lived by, and the sacrifice he made. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Rachel Watkins' solatium claim.

**4. Rebekah Helmadollar[50]**

Rebekah Helmadollar is the sister Timothy Dee Watkins. *See* Ex. 47 at ¶ 3. Rebekah describes Timothy as her "big brother" and the eldest sibling in the family, emphasizing the depth and emotional significance of their relationship. *Id.* at ¶ 4. "I remember our last family picture, the last hug we shared, which I didn't know then would be our final one, the last Christmas gift he gave me, a little stuffed snowman, and our last one-on-one conversation is a memory I replay over and over." *Id.* Growing up with Timothy involved daily companionship and shared experiences

[50] Rebekah Helmadollar's U.S passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 47, Declaration of Rebekah Helmadollar, dated February 20, 2026.

that shaped her childhood including recreational activities such as playing tennis, camping, beach outings, evening games, and family trips. *Id.* at ¶ 5. "He wasn't just my brother; he was my co-adventurer, my protector, and at time, my co-babysitter alongside our older sister." *Id.*

As Timothy grew older and his responsibilities increased due to college, camp ministry, and military service, their time together became less frequent. *Id.* Nevertheless, Rebekah describes how she cherished every opportunity to be with him when he was home and sought his attention and approval. *Id.* Timothy's voice would have served as a guiding influence throughout her teenage years and adulthood, offering wisdom and support during key life milestones. *Id.* His absence is acutely felt at significant events such as graduations and other moments where a big brother's encouragement would have been especially meaningful. *Id.*

Timothy was a person defined by kindness, respect, faith, and service, and his relationships with friends and loved ones were reflective of these characters and values. *Id.* at ¶ 6. Timothy's aspirations to serve others, including his desire to become a chaplain, reflected his deep faith and commitment to supporting those around him. *Id.* Through these relationships, Timothy served as a moral and emotional anchor within the family. *Id.*

Rebekah stated that the world "stood still" when she and her family learned of Timothy's death. *Id.* at ¶ 7. An Army Captain and Chaplain arrived at the family home and delivered the devastating announcement that Timothy had been killed in action. *Id.* The family was gathered together and confronted with the immediate and final nature of the loss, with no hope that Timothy would return. *Id.* [redacted]

Rebekah was not made aware of how Timothy's death may have affected the family's financial situation, as her parents did not discuss such matters with the children, and this lack of

information created an undercurrent of uncertainty and concern, adding another layer of emotional strain as she grappled with the broader consequences of her brother's death. *Id.* at ¶ 8. The loss had a deeply personal and collective effect on the family. *Id.* at ¶ 9. At the time of his death, Rebekah was only 14 years old and relied heavily on her parents for emotional support as the family worked together to navigate their grief. *Id.* While the family's roles did not change structurally, the shared grief ultimately strengthened family bonds, fostering resilience, unity, and a renewed commitment to one another. *Id.* at ¶¶ 9-10.

Timothy's death remains a defining moment for the family and continues to shape their lives. *Id.* at ¶ 10. Each family member carries unique grief, and Timothy's absence is felt not only emotionally but also in tangible moments where his guidance or perspective could have influenced life decisions. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Rebekah Helmadollar's solatium claim.

**5. Jonathan Watkins**[51]

Jonathan Watkins is the younger brother of Timothy Dee Watkins. *See* Ex. 48 at ¶ 3. Jonathan saw Timothy as "my hero, my role model, and the epitome of what I aspired to become." *Id.* at ¶ 4. Jonathan noted specific childhood memories illustrating Timothy's generosity, humor, and warmth, including the day Timothy paid for Jonathan to play an arcade racing game, or when they held wrestling matches at home, and Jonathan running into Timothy's "arms for the biggest hug I could muster every time he came home." *Id.* at ¶¶ 4-5. Because Jonathan was 14 years

---

[51] Jonathan Watkins' U.S passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 48, Declaration of Jonathan Watkins, dated February 5, 2026.

younger than Timothy, he recalled following his oldest brother around every time he came home from college. *Id.* at ¶ 6.

As they grew older, the bond between the brothers deepened rather than diminished with Timothy's visits home from college, military service, and Bible college as highlights of Jonathan's childhood and adolescence. *Id.* "Living with Tim, even for short periods, was a privilege that allowed me to witness firsthand the kind of man he was – kind, generous, and always putting others before himself." *Id.* Timothy held strong relationships with family, friends, church members, and his girlfriend, Nellie, and Jonathan recalled how Timothy had arranged for flowers to be delivered to Nellie on the day he was killed. *Id.* at ¶ 7.

Jonathan was at home doing homework the evening when an Army Chaplain and his assistant delivered the news that Timothy had been killed. *Id.* at ¶ 8. "After they left, our family was engulfed in grief, clinging to each other as my father took on the heartbreaking task of informing other family members;" however, "the memory of that night, the feeling of loss and the sound of my father's voice as he made those calls, stays distinctly with me." *Id.*

Following Timothy's death, [redacted]

Timothy's absence is especially painful during birthdays, holidays, and family milestones, where his presence is deeply missed. *Id.* at ¶ 11. "I recently welcomed a daughter into the world, and the realization that Tim will never meet her, that she will never know the joy of having him as an

uncle, is heartbreaking." *Id.* Jonathan admits that he was "ill-equipped to handle" his brother's loss as he was only 11 years old at the time, but the shared sorrow within his family has allowed them to "[find] a new closeness." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Jonathan Watkins' solatium claim.

**6. Thomas Watkins[52]**

Thomas Watkins is the brother of Timothy Dee Watkins. *See* Ex. 49 at ¶ 3. Thomas described his brother Timothy as "the kind of person who brought adventure and excitement into every moment we shared." *Id.* at ¶ 4. When Timothy was away, Thomas would count the days until he would come home. *Id.* A specific memory of their last "adventure" together was when the brothers encountered a rattlesnake, and Timothy killed it to keep his brother safe. *Id.* Growing up, Thomas and Timothy shared a room which "meant that every day was an opportunity for a new adventure." *Id.* at ¶ 5.

Even as life took them in different directions, they remained in frequent contact through regular phone conversations in which they shared daily life, personal goals, and hopes for the future. *Id.* Timothy's visits home were consistently the highlights of Thomas' year, providing opportunities to reconnect and continue building shared memories. *Id.*

"My brother was the glue that held our family together, that extended beyond just us to his best friend, Paul, and his serious girlfriend, Nelly." *Id.* at ¶ 6. The family had countless outings and adventures including trips to Joshua Tree National Park, barbecuing, rock climbing, and family days at the beach that provided "just of snippet of the kind of person he was." *Id.*

[52] Thomas Watkins' U.S passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 49, Declaration of Thomas Watkins, dated February 19, 2026.

The night Thomas learned of his brother's death was "an ordinary evening" until the "news of my brother's death was delivered with a gravity that immediately sank into my heart." *Id.* at ¶ 7. In an effort to cope with the immediate shock and surge of adrenaline, Thomas "retreated to the living room and began doing pushups, pull-ups, and crunches, anything to try and burn off the energy coursing through me." *Id.*

In the years following Timothy's death, [redacted]

The effect of the loss on his family "has brought us closer in some respects, [redacted]

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Thomas Watkins' solatium claim.

### J. NORMAN W. ANDERSON III – OCTOBER 19, 2005, ATTACK – SADAH

As part of counterinsurgency approach of protecting the local population in Sadah, Iraq, on October 19, 2005, Kilo Company, 3d Battalion 6th Marines conducted a foot patrol in Sadah when a vehicle pulled out of alley in front of the patrol and began accelerating toward the patrol. *See* ECF No. 9 at ¶ 1189; Ex. 3 at 39-40. LCpl. Norman W. Anderson III was the point person in the patrol and began firing into the windshield of the vehicle causing it swerve away from the patrol prior to detonating as an SVBIED resulting in LCpl. Anderson's death while saving the lives of the remaining Marines in the patrol. Ex. 3 at 40. According to the Casualty Report issued following the attack, LCpl. Anderson's death was caused by [redacted][53] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Anderson was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the October 19, 2005 attack in which LCpl. Norman W. Anderson III was killed. *See* ECF Nos. 47, 48.

LCpl. Anderson's surviving parents and sister—Robyn Anderson, Norman Anderson, Jr., and Brooke Anderson—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1188-1195. The plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Norman W. Anderson III's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1195. The following chart reflects the claims asserted by Robyn Anderson, Norman Anderson, Jr., and Brooke Anderson in their individual capacities arising out of the October 19, 2005, attack as well as the

[53] Ex. 50, Casualty Report-H-Deceased-Anderson, N.W.-2DMARDIV, dated October 19, 2005.

evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Robyn Anderson | LCpl. Norman W. Anderson III's mother | Solatium claim $5 million | Declaration of Robyn Anderson, dated January 16, 2026, including copy of her proof of U.S. citizenship | 51 |
| Norman Anderson, Jr. | LCpl. Norman W. Anderson III's father | Solatium claim $5 million | Declaration of Norman Anderson, Jr., dated February 15, 2026, including copy of his proof of U.S. citizenship | 52 |
| Brooke Anderson | LCpl. Norman W. Anderson III's sister | Solatium claim $3.125 million | Declaration of Brooke Anderson, dated January 30, 2025, including copy of her proof of U.S. citizenship | 53 |

**1. Robyn Anderson[54]**

Robyn Anderson is the mother of Norman W. Anderson, III, whom she identifies as "Norm." *See* Ex. 51 at ¶ 3. Robyn referred to Norm as "the embodiment of courage, compassion, and commitment, both in his personal life and during his service with the Marine Corps." *Id.* at ¶4. This was demonstrated in his leadership playing football, to standing up for others, to his role as a godfather to his nephew, and his meritorious promotions within the Marine Corps. *Id.* Robyn noted that Norm married his high school sweetheart three weeks before deployment as evidence of his loving and devoted nature. *Id.*

[54] Robyn Anderson's U.S passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 51, Declaration of Robyn Anderson, dated January 16, 2026.

Robyn was intertwined in Norm's life from an early age: being a "mom helper" for his sports teams, teaching Sunday school, Boy Scouts, school events, and church. *Id.* at ¶ 5. Even as his Marine Corps commitments took him away from home, they maintained a close connection through frequent phone calls and letters, sharing daily details as well as hopes and dreams. *Id.* His absence in milestone events magnifies the hole his loss has created. *Id.*

Robyn describes her son as having a broad capacity for love and deep connections, including a close relationship with his wife, Victoria, which she describes as a bond formed over many years and characterized by mutual respect and affection. *Id.* at ¶ 6. He was also a devoted friend who shared adventures such as fishing, hunting, and sports with friends. *Id.* Norm cherished time outdoors and time with family, including frequent visits and shared experiences with his grandparents. *Id.*

Robyn has been caring for her grandson on the day she learned of Norm's death, and as she returned home, she saw her husband pacing on the front porch. *Id.* at ¶ 7. His embrace of her and tears signaled the devastating news that their son was gone. *Id.* Robyn's "reaction was visceral, a mix of denial and devastation, as I ran and sought refuge in the bushes, hoping against hope that if I couldn't be found, perhaps the news wouldn't be real." *Id.* Her husband became her rock during this time because Robyn withdrew in the days after learning the news. *Id.*

Norm's death "cast a long shadow over our family." *Id.* at ¶ 8. [redacted]

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Robyn Anderson's solatium claim.

**2. Norman Anderson, Jr.**[55]

Norman Anderson is the father of Norman W. Anderson III. *See* Ex. 52 at ¶ 3. Mr. Anderson states that his son was not only his child but also "a companion, a friend with whom I shared an unbreakable bond." *Id.* at ¶ 4. His own law-enforcement and military background, including service with the 1st Battalion Rangers (Airborne), Green Berets, and a long-range surveillance unit, fascinated his son. *Id.* His son asked "endless questions" about his military life and accompanied him to work on a few occasions. *Id.* Mr. Anderson holds onto memories of their shared passion for football and "witnessing his journey from a curious child to a passionate young man." *Id.*

From childhood through his son's final years, they "seized every moment" to be together and frequently engaged in deep conversations, including discussions about his son's military experiences when those matters were not classified. *Id.* at ¶ 5. During the three years leading up to his son's death, he and his wife visited him often at Camp Lejeune putting their son and other members of his unit up in a hotel while they went fishing or engaging in other activities that their son or his friends enjoyed. *Id.* These visits helped deepen the connection between father and son "rooted in the simple pleasures of companionship and the great outdoors." *Id.*

Mr. Anderson describes his son as someone who made others feel valued and understood demonstrating a genuine interest in the lives and passions of others around him. *Id.* at ¶ 6. His son was also always ready with a helping hand, a keen eye, or his inquisitive nature when Mr. Anderson

[55] Norman Anderson, Jr.'s U.S passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 52, Declaration of Norman Anderson, Jr., dated February 15, 2026.

was "embroiled" in a project or endeavor. *Id.* His son thrived in the company of family members, and his outgoing nature kept conversations active at gatherings, whether the discussion was complex or lighthearted. *Id.* He states that his son's death left a silence where his voice and engagement once filled family spaces. *Id.*

Mr. Anderson learned of his son's death after returning from work and hearing a vehicle pull into his driveway with two Marines inside. *Id.* at ¶ 7. "In that moment, I collapsed, overwhelmed by a sense of dread so intense it felt as though I was seeing things." *Id.* Initially, he could not bring himself to answer the door. *Id.* When the news was conveyed, he felt weak and sick, and he called his wife repeatedly and could not convey the news over the phone. *Id.* "When she arrived home, I had to tell her that our son, Norm, was gone. The feeling of loss was so profound, it felt as though a part of me had been ripped away." *Id.*

The day they lost their son was "unequivocally the worst day of our lives," and the aftermath has cast a lingering shadow over the family. *Id.* at ¶ 8. [redacted] At family gatherings, his son's absence is evident, and the family speaks about him, reminiscing about shared experiences and the person he was. *Id.* Mr. Anderson specifically identifies as a source of profound sorrow the fact that his son will not be able to raise a family and pass on his values, love, and spirit to another generation. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Norman Anderson Jr.'s solatium claim.

### 3. Brooke Anderson[56]

Brooke Anderson is the sister of Norman W. Anderson III. *See* Ex. 53 at ¶ 3. "We were more than just siblings; we were a team destined to be the future pillars of our family." *Id.* at ¶ 4. Although she was younger, Norman consistently made her feel protected and safe. *Id.* His death deprived her of anticipated milestones and a shared future, including family gatherings and the opportunity to watch their children grow up together. *Id.* She cherishes being a part of Norman's wedding day prior to his deployment. *Id.* Brooke and her partner had planned for her brother and his wife to live with them and their new baby until the couple found their own place, and they prepared a special area in their home for them. *Id.* "[T]he thought of having to live most of my life without him is a reality I'm still trying to come to terms with." *Id.*

During their childhood, Brooke and Norman were inseparable, spending time together daily, exploring the countryside where they grew up, and participating in close-knit family routines such as dinners, movie nights, and game nights. *Id.* at ¶ 5. Their bond strengthened with age. Norman would hang out at Brooke's apartment, and when Brooke was pregnant and bought a house, Norman and his fiancée "became a constant presence in our lives." *Id.* She looked forward to their families growing together, but "his death shattered that future." *Id.*

Brooke described Norman as "the kind of person whose presence was felt deeply by everyone he knew." *Id.* at ¶ 6. One of Norman's friends still finds it too painful to come to their family home. *Id.* "Norm was the epitome of a people person; he never met a stranger, and his friends and family were his world." *Id.* Norman consistently offered help or support without hesitation. *Id.*

---

[56] Brooke Anderson's Maryland birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 53, Declaration of Brooke Anderson, dated January 30, 2025.

The day the family learned of Norman's death, Brooke had just returned home after cleaning her sister-in-law's house, and her mother, who had been watching her son, had just left. *Id.* at ¶ 7. She saw that she missed a call from her father—who rarely uses the phone—and she was immediately filled with dread. *Id.* When she returned her father's call, he told her, "He's gone honey. Norm's gone." *Id.* She begged him to "take it back," and, after learning it was an IED, she screamed for her partner who put her to bed because she was overwhelmed with grief. *Id.*

After her brother's death, [redacted] Brooke notes that the impact of her brother's death is permanent, that the pain does not go away, and that she continues to mourn both her brother and the life her family expected to have with him, including ordinary and celebratory moments such as cookouts, recitals, sports games, birthdays, holidays, and summer trips. *Id.* at ¶ 12. Losing him at a young age, just as he

was starting his own family, and "having him return to us in pieces," is a trauma she cannot fully capture in words, and she lost a part of herself when she lost her brother. *Id.*

Plaintiffs have requested an upward enhancement of Ms. Anderson's claims based on her [redacted] *Id*. at ¶ 8. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active.

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Brooke Anderson's solatium claim.

### K. GERALD BLOOMFIELD II – NOVEMBER 2, 2005, ATTACK – RAMADI

On November 2, 2005, an AH-1W Super Cobra helicopter was downed northeast of Ramadi, Iraq killing the pilot, Maj. Gerald Bloomfield II, and co-pilot, Capt. Michael Martino. ECF No. 9 at ¶ 1211; Ex. 3 at 43-44. Al-Qaeda in Iraq took responsibility for the attack the following day through a statement issued by its media spokesman Abu Maysara Al-Iraqi. Ex. 3 at

44. Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Maj. Bloomfield was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the November 2, 2005 attack in which Maj. Gerald Bloomfield II was killed. *See* ECF Nos. 47, 48.

Maj. Bloomfield's mother, siblings, stepfather, and stepsiblings—Shirley Spears, Thomas Bloomfield, Kathleen Kerch, Paula Wallace, Ronald Spears, Jeffrey Spears, and Carol Spears—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1210-1221. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Gerald Bloomfield II's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1221. The following chart reflects the claims asserted by Shirley Spears, Thomas Bloomfield, Kathleen Kerch, Paula Wallace, Ronald Spears, Jeffrey Spears, and Carol Spears in their individual capacities arising out of the November 2, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Shirley Spears | Maj. Gerald Bloomfield II's mother | Solatium claim $5 million | Declaration of Shirley Spears, dated January 23, 2026, including copy of her proof of U.S. citizenship | 54 |
| Thomas Bloomfield | Maj. Gerald Bloomfield II's brother | Solatium claim $3.125 million | Declaration of Thomas Bloomfield, dated November 21, 2025, including copy of his proof of U.S. citizenship | 55 |
| Kathleen Kerch | Maj. Gerald Bloomfield II's sister | Solatium claim $3.125 million | Declaration of Kathleen Kerch, dated January 31, 2025, including copy of | 56 |

| | | | | |
|---|---|---|---|---|
| | | | her proof of U.S. citizenship | |
| Paula Wallace | Maj. Gerald Bloomfield II's sister | Solatium claim $2.5 million | Declaration of Paula Wallace, dated April 16, 2026, including copy of her proof of U.S citizenship | 57 |
| Ronald Spears | Maj. Gerald Bloomfield II's stepfather | Solatium claim $5 million | Declaration of Ronald Spears, dated January 23, 2026, including copy of his proof of U.S. citizenship | 58 |
| Jeffrey Spears | Maj. Gerald Bloomfield II's stepbrother | Solatium claim $2.5 million | Declaration of Jeffrey Spears, dated January 23, 2026, including copy of his proof of U.S. citizenship | 59 |

**1. Shirley Spears[57]**

Shirley Spears is the mother of Maj. Gerald Bloomfield II. *See* Ex. 54 at ¶ 3. Shirley divorced Gerald's father in 1976, and Gerald "instinctively took on the role of being my biggest help." *Id.* at ¶ 4. While Shirley worked full-time while raising four children, Gerald would assist her with household chores and other items to assist her in maintaining a loving home environment for their family. *Id.* "He wasn't just my son; he was my helper, my strength, and a wonderful human being whose presence made our family complete." *Id.* Despite limited financial resources, their family life was rich in shared experiences and emotional closeness, and after Shirley remarried in 1982, they would travel for family camping trips, fishing excursions, road trips through several states, and annual Christmas camping trips to the Florida Keys. *Id.* at ¶ 5. These

[57] Shirley Spears' Michigan birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 54, Declaration of Shirley Spears, dated January 23, 2026.

shared experiences included a family trip to Disneyland that she describes as "a dream come true." *Id.*

In the three years preceding his death, Shirley would speak with her son frequently when he was in the United States, discussing his experiences in the war, his flying duties, and the realities of military service. *Id.* at ¶ 6. "Our bond was one of deep love, mutual respect, and an unspoken understanding that, no matter where life took us, we were always there for each other." *Id.* Gerald was also a central figure within a close-knit extended family. He spent extensive time with cousins, aunts, uncles, and siblings, participated in family gatherings, and was deeply loved by all members of the family. *Id.* at ¶ 7. His childhood and adulthood were marked by shared holidays, birthdays, and celebrations. *Id.*

Shirley was in Florida in a hardware store when her phone rang, and her daughter informed her that Gerald had been killed. *Id.* at ¶ 8. She describes the moment as disorienting and surreal, stating that "the world around me seemed to stop." *Id.* "In that moment, and in the days that followed, I was enveloped by a profound sadness, a sense of loss that words can scarcely describe." *Id.*

Following her son's death, Shirley [redacted]

Although Shirley did not experience an immediate, conventional financial loss, her son's death resulted [redacted]

[redacted] While her losses were not financial, "the absence of his support for a future safeguarded by his kindness transcends monetary value." *Id.* While the loss of her son has created a sense of incompleteness in the family, it has also helped to strengthen the family's bonds as they have pulled closer together to find solace in their collective memories of Gerald. *Id.* at ¶ 11.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Shirley Spears' solatium claim.

**2. Thomas Bloomfield[58]**

Thomas Bloomfield is the brother of Gerald Bloomfield II. *See* Ex. 55 at ¶ 3. Thomas and Gerald shared a deep and meaningful bond as brothers. *Id.* at ¶ 4. Prior to Gerald's death, they were actively working together on restoring Gerald's cabin, an undertaking that strengthened their bond through shared time, labor, and conversation where they shared "stories, dreams, and laughter." *Id.* One of Thomas' favorite memories is the final weekend he spent with Gerald in Michigan before Gerald's deployment. That weekend, free from work and obligations, they focused simply on being together and enjoying each other's company. *Id.* at ¶ 5.

Being only 15 months apart in age, Thomas and Gerald were inseparable and spent most of their childhood together, attended the same events, and even worked the same job. *Id.* at ¶ 6. Gerald even helped Thomas secure his first apartment in the same building where Gerald lived. *Id.* Although their adult lives became busy, prior to Gerald's death, they would speak approximately twice per month, and these conversations were filled with excitement and future plans. *Id.* at ¶ 7.

[58] Thomas Bloomfield's U.S. passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 55, Declaration of Thomas Bloomfield, dated November 21, 2025.

They discussed bow hunting together, Gerald's anticipated retirement from the Marine Corps, his plans for a second home in Michigan, and his desire to start a new business. *Id.*

Thomas was at work at Naylor Motors in Ann Arbor, Michigan, when he received a call from his sister informing him of Gerald's death. *Id.* at ¶ 8. Thomas was "completely devastated" upon hearing her words and unable to remain at work due to overwhelming grief. *Id.* In the aftermath, he bore the emotional burden of informing family members and longtime friends of Gerald's death, a process that intensified the pain by making the loss undeniably real. *Id.*

Since Gerald's death, [redacted]

Gerald's death has also had devastating consequences for the family as a whole. Gerald was not only his brother, but his mentor, best friend, and a central figure who held the family together. *Id.* at ¶ 11. His absence has [redacted] and left the family without Gerald's guidance as they navigated responsibilities such as supporting two single sisters and caring for aging parents. *Id.* While the family eventually grew closer, the loss caused lasting changes to family dynamics and roles. *Id.* at ¶ 12. As the oldest brother, Gerald had carried significant responsibilities, many of which have since shifted to Thomas, requiring difficult adjustments as the family attempted to create a new sense of normal without him. *Id.*

Plaintiffs have requested an upward enhancement of Mr. Bloomfield's claims based on his [redacted]

[redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active).

Although Thomas's [redacted] is not as detailed as is the case with some Plaintiffs, a fair reading of his Declaration is that [redacted] which provides some explanation for his overwhelming emotional injuries and [redacted]

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of his baseline award resulting in an award of $3.125 million for Thomas Bloomfield's solatium claim.

### 3. Kathleen Kerch[59]

Kathleen Kerch is the sister of Gerald Bloomfield II. *See* Ex. 56 at ¶ 3. Kathleen and Gerald had an "unbreakable bond" that developed through years of growing up together and was further strengthened when they lived together during her college years. *Id.* at ¶ 4. Gerald "was not just

[59] Kathleen Kerch's U.S. passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 56, Declaration of Kathleen Kerch, dated January 31, 2025.

my older brother; he was my mentor, my protector, and my closest friend." *Id.* Growing up, the four biological siblings—Kathleen, Gerald, Thomas Bloomfield, and Paula Bloomfield Wallace—had special connection built on love and respect. *Id.* at ¶ 5. Kathleen and Gerald attended the same college allowing them to develop a closeness while providing each other with support during that time period. *Id.* at ¶ 6. In college, they developed "countless memories, from late-night study sessions to shared meals where we talked about our dreams and aspirations." *Id.* at ¶ 7. Immediately after he graduated college, Gerald joined the U.S. Marine Corps which "brought him a sense of purpose and pride." *Id.* at ¶ 8.

Kathleen learned of her brother's death during an ordinary phone conversation with Gerald's wife, when his wife received the devastating news. *Id.* at ¶ 9. "The world as I knew it shattered in an instant, plunging me into a deep depression that lasted for about a year and a half." *Id.* Kathleen bore the burden of sharing the news with her family—calling her mother and stepmother and later going in person to her father's workplace to inform him, struggling to find words sufficient to convey the magnitude of the loss. *Id.* at ¶ 10.

Gerald was "the glue that held us together in many ways" with a unique ability to make each family member feel valued and loved. *Id.* at ¶ 11. Family gatherings prior to his death were often held at his lake house and were defined by laughter, shared stories, and a sense of connection that strengthened familial bonds. *Id.* These vacations were deeply cherished, and Gerald's presence made them unforgettable. *Id.* His absence has deprived the family of Gerald's unconditional and all-encompassing love. *Id.*

Following Gerald's death, Kathleen's life changed profoundly. [redacted]

[redacted] she sought additional outlets to cope with her grief such as running marathons, an endeavor that gave her a renewed sense of purpose and a meaningful way to honor her brother's memory. *Id.* Through these efforts, she raised money for the Semper Fi Fund, supporting others affected by similar losses. *Id.*

Gerald's death irrevocably altered the fabric of Kathleen's family. *Id.* at ¶ 14. The devastation shook the foundation of the family, even as shared grief ultimately drew them closer together. *Id.* At the same time, Gerald's absence shifted family dynamics, leading to [redacted] *Id.* at ¶ 15. These changes reflected the family's ongoing effort to adapt to a world without him. *Id.* Losing Gerald "just sucks and will always suck, a sentiment that, while blunt, captures the endless nature of our grief." *Id.* at ¶ 16.

Plaintiffs have requested an upward enhancement of Ms. Kerch's claims based on her [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and

incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010).

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Kathleen Kerch's solatium claim.

#### 4. Paula Wallace[60]

Paula Wallace is the sister of Gerald Bloomfield II. *See* Ex. 57 at ¶ 3. Paula's bond with Gerald—whom she affectionately called "Ger"—was extraordinarily close and began even before his birth. *Id.* at ¶¶ 4, 5. Their relationship grew through childhood and into adulthood, including a period when they lived together as college roommates. *Id.* at ¶ 4. Sharing daily life strengthened their connection, and their relationship was one defined by constant companionship, shared experiences, laughter, and mutual support. *Id.*

Growing up, Paula spent nearly every day with her brother, forming what she describes as an unbreakable bond. *Id.* at ¶ 5. In the three years leading up to Gerald's death, their relationship deepened further, particularly during Paula's difficult divorce. *Id.* During this period, Gerald became her "rock," providing emotional support, reassurance, and practical help. *Id.* Their frequent conversations—both in person and by phone—were a source of comfort and stability, reflecting a relationship that Paula characterizes as not merely familial, but a profound friendship. *Id.*

[60] Paula Wallace's United States Passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 57, Declaration of Paula Wallace, dated April 16, 2026.

Gerald also had strong and meaningful relationships throughout their family and broader circle of friends. *Id.* at ¶ 6. He was widely regarded as a role model whose influence extended beyond simple presence. *Id.* Gerald was someone who consistently offered guidance, shared wisdom, and provided encouragement to those around him, leaving a lasting legacy of strength and care. *Id.*

The circumstances under which Paul learned of Gerald's death were uniquely traumatic. *Id.* at ¶ 7. While on her way to work, she heard a news broadcast that led her to immediately fear the worst. *Id.* Within thirty minutes, she received confirmation from her sister that Gerald had been killed. *Id.* A friend drove her to her father's home, where her siblings gathered shortly before military representatives arrived to formally deliver the news. *Id.* Much of this period is blurred by shock and grief, and sharing the news with other family members and friends was devastating and disorienting. *Id.*

Following Gerald's death, [redacted]

[redacted]

Gerald's death fundamentally altered Paula's family's well-being and quality of life. *Id.* at ¶ 10. While the family has drawn closer in some ways through shared grief, relationships have also changed as each individual navigates loss differently. *Id.* Family roles and dynamics shifted significantly, and [redacted] *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Paula Wallace's solatium claim.

**5. Ronald Spears[61]**

Ronald Spears is the step-father of Gerald Bloomfield II. *See* Ex. 58 at ¶ 3. "Gerald was more than a stepson to me; he was a beacon of light that transformed from a troubled young boy seeking attention into a remarkable man I proudly considered my own son." *Id.* at ¶ 4. Their bond deepened significantly over time, particularly when Gerald invited Mr. Spears to pin his Wings on him at Flight School graduation, a moment that symbolized both Gerald's achievements and the profound relationship they shared. *Id.* Having lived together after Mr. Spears married Gerald's mother, Mr. Spears witnessed Gerald's growth firsthand and saw him overcome early family challenges to excel in college and serve with distinction in the Marine Corps. *Id.* at ¶ 4.

Gerald was an integral part of the Spears family, and Mr. Spears recounts years of shared family experiences that remain deeply meaningful such as a family tradition of camping in the Florida Keys between Christmas and New Year's, a time Mr. Spears describes as filled with "joy, bonding, and adventure." *Id.* at ¶ 5. Although contact with Gerald diminished in the three years prior to his death, those formative years and memories remained central to Mr. Spears, and

[61] Ronald Spears' Illinois birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 58, Declaration of Ronald Spears, dated January 23, 2026.

Gerald's absence is especially felt during family milestones when his presence would have brought joy and celebration. *Id.*

Mr. Spears learned of Gerald's death while in Florida on a routine shopping outing, when he received an unexpected call from Gerald's sister, Kate. *Id.* at ¶ 6. The words she spoke were initially "incomprehensible;" he simply could not believe Gerald had been killed. *Id.* The shock left him numb and struggling to accept the reality of Gerald's death. *Id.* Sharing the devastating news with extended family and others by phone was a painful burden, and the disbelief and sorrow of that day remain with him permanently. *Id.*

Despite experiencing profound grief and emotional turmoil following Gerald's death, [redacted]

The loss cast a long shadow over the family, one that went largely unspoken for six years. *Id.* at ¶ 9. [redacted] Family dynamics shifted significantly, including the physical and emotional distance created when Gerald's son moved to California, further altering family roles and relationships. *Id.* at ¶ 9. Although the family has learned to adapt and establish a new normal, the undercurrent of Gerald's absence continues. *Id.* at ¶ 10. As Mr. Spears explains, "we will always miss him," and Gerald's memory and legacy continue to shape the family's heart and spirit in enduring ways. *Id.*

While Mr. Spears is not Gerald's biological father, the class of plaintiffs who may recover solatium damages "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members" despite not being legally or biologically related to the victim. *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730, at *42 (D.D.C. July 19, 2022). To establish this "functional equivalence" of a close family member, plaintiffs must show that they were "treated like" a victim's spouse, child, parent, or sibling. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (finding that stepsiblings recover functionally equivalent to siblings when they were "treated like" a brother or sister); *Oveissi* 768 F. Supp. 2d at 27 (holding that interactions between a stepparent and child "were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924, at *7 (D.D.C. Dec. 27, 2023) (finding a stepparent to be a functional equivalent of a parent notwithstanding an ongoing relationship between the victim and their biological parent because of the supplementary role played by the stepparent in the parental role).

Here, based on his declaration and the facts set forth above, it appears that Mr. Spears qualifies under the law as the functional equivalent of Maj. Bloomfield's father based on the fact that he was "treated like" Maj. Bloomfield's parent, and his evident loss and grief resembles that of a biological parent.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount ofard of $5 million for Ronald Spears' solatium claim.

#### 6. Jeffrey Spears[62]

[62] Jeffrey Spears' Michigan birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 59, Declaration of Jeffrey Spears, dated January 23, 2026.

Jeffrey Spears is the step-brother of Gerald Bloomfield II. *See* Ex. 59 at ¶ 3. "Gerald was more than just a stepbrother to me; he was a lifelong friend whose companionship developed easily being the same age." *Id.* at ¶ 4. After their parents married, the two blended seamlessly into each other's lives, sharing friends and experiences throughout adolescence. *Id.* Jeffrey recalls countless shared teenage adventures, including bike rides into town and explorations along railroad tracks, experiences that laid the foundation for a bond that continued into adulthood. *Id.* Even as their lives moved into separate branches of the military, their connection endured. *Id.* Mr. Spears recounts a visit to Gerald and his wife during an unexpected port call in San Diego, recalling an evening of laughter in a hot tub that "encapsulates the joy and simplicity of our relationship." *Id.*

Jeffrey and Gerald lived in the same household in Fowlerville beginning the summer between ninth and tenth grades. *Id.* at ¶ 5. This period marked the start of a relationship that Jeffrey describes as more akin to full brothers than step-siblings. *Id.* Their day-to-day lives were closely intertwined. *Id.* As adults, Gerald's commitment to the Marine Corps limited the frequency of their in-person interactions, but they remained connected through phone conversations in which they shared stories, aspirations, and ongoing frustrations. *Id.* Despite physical distance, the bond formed during their formative years remained intact, and since Gerald's death, Jeffrey states that he has deeply missed simply spending time in Gerald's company. *Id.*

Jeffrey learned of Gerald's death while at a friend's house, when his father called to deliver the news that Gerald had been killed in action. *Id.* at ¶ 6. "The shock and sorrow of that moment are hard to articulate; it was a loss that seemed to momentarily stop the world." *Id.* In the days that followed, Jeffrey struggled with an intense need not to be alone and sought comfort in the presence of others who could understand the magnitude of the loss. *Id.* Informing his mother and friends of Gerald's death was a painful process, with each conversation reopening the wound. *Id.* Jeffrey and

his family attended Gerald's military funeral at Arlington National Cemetery, a somber and unanticipated final goodbye. *Id.*

[redacted] Gerald's absence has profoundly altered the family dynamic. *Id.* at ¶ 8. Family gatherings are now marked by an underlying sadness, and Gerald's once-dominant presence in activities and discussions is noticeably missing. *Id.* Although the family continues to enjoy each other's company, they remain acutely aware of Gerald's absence, and the roles within the family have shifted in an effort to compensate for what can never truly be replaced. *Id.* [redacted] "Gerald was a vital part of my life, especially once it became intertwined with his, and his absence will continue to be felt deeply." *Id.*

While Jeffrey is not Gerald's biological brother, the class of plaintiffs who may recover solatium damages "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members" despite not being legally or biologically related to the victim. *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730, at *42 (D.D.C. July 19, 2022). To establish this "functional equivalence" of a close family member, plaintiffs must show that they were "treated like" a victim's spouse, child, parent, or sibling. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (finding that stepsiblings recover functionally equivalent to siblings when they were "treated like" a brother or sister); *Oveissi* 768 F. Supp. 2d at 27 (holding that interactions between a stepparent and child "were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924, at *7 (D.D.C. Dec. 27, 2023) (finding a stepparent to be a functional equivalent of

a parent notwithstanding an ongoing relationship between the victim and their biological parent because of the supplementary role played by the stepparent in the parental role).

Here, based on his declaration and the facts set forth above, it appears that Jeffrey qualifies under the law as the functional equivalent of Maj. Bloomfield's brother based on the fact that he was "treated like" Maj. Bloomfield's brother, and his evident loss and grief resembles that of a biological sibling.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Jeffrey Spears' solatium claim.

### L. MIGUEL TERRAZAS – NOVEMBER 19, 2005, ATTACK – HADITHAH

On November 19, 2005, 1st Squad, 3d Platoon, Kilo Company, 3d Battalion, 1st Marines was traveling in a four-vehicle convoy on Route Chestnut in Haditha, Iraq when the fourth vehicle, a D1158 Highback HMMWV, struck an IED killing the driver LCpl. Miguel Terrazas. *See* ECF No. 9 at ¶ 1261; Ex. 3 at 50-51. The Casualty Report issued in the field noted the cause of death for LCpl. Terrazas as [redacted][63] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Terrazas was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the November 19, 2005 attack in which LCpl. Miguel Terrazas was killed. *See* ECF Nos. 47, 48.

LCpl. Terrazas' father, grandfather, and siblings—Martin Terrazas, Sr., George Terrazas, Martin Terrazas, Jr., Vanessa Terrazas-McKay, Melissa Terrazas, and Andres Terrazas—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1260-1270. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Miguel Terrazas' society,

[63] Ex. 60, Field Casualty Report No. V3105640 for LCpl. Miguel Terrazas.

companionship, comfort, advice, and counsel. *Id.* at ¶ 1270. The following chart reflects the claims asserted by Martin Terrazas, Sr., George Terrazas, Martin Terrazas, Jr., Vanessa Terrazas-McKay, Melissa Terrazas, and Andres Terrazas in their individual capacities arising out of the November 19, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Martin Terrazas, Sr. | LCpl. Miguel Terrazas' father | Solatium claim $6.25 million | Declaration of Martin Terrazas, dated January 29, 2026, including copy of his proof of U.S. citizenship | 61 |
| George Terrazas | LCpl. Miguel Terrazas' grandfather | Solatium claim $5 million | Declaration of George B. Terrazas, dated February 24, 2026, including copy of his proof of U.S. citizenship | 62 |
| Martin Terrazas, Jr. | LCpl. Miguel Terrazas' brother | Solatium claim $2.5 million | Declaration of Martin Terrazas, Jr., dated February 3, 2026, including copy of his proof of U.S. citizenship | 63 |
| Vanessa Terrazas-McKay | LCpl. Miguel Terrazas' sister | Solatium claim $3.125 million | Declaration of Vanessa Terrazas-McKay, dated February 3, 2026, including copy of her proof of U.S. citizenship | 64 |
| Melissa Terrazas | LCpl. Miguel Terrazas' sister | Solatium claim $3.125 million | Declaration of Melissa Terrazas, dated January 29, 2026, including copy of her proof of U.S. citizenship | 65 |
| Andres Terrazas | LCpl. Miguel | Solatium claim $2.5 million | Declaration of Andres Terrazas, dated January 29, 2026, including copy | 66 |

| | | | | |
|---|---|---|---|---|
| | Terrazas' brother | | of his proof of U.S. citizenship | |

#### 1. Martin Terrazas, Sr.[64]

Martin Terrazas, Sr. is the father of Miguel Terrazas. *See* Ex. 61 at ¶ 3. Miguel was Martin's "adventure buddy, my pride, and the source of countless cherished memories." *Id.* at ¶ 4. Their relationship was defined by constant shared experiences that bonded them deeply such as spending weekends riding four-wheelers in the red sand hills, fishing and camping at Caballo Lake, attending Miguel's school functions and football games, and taking trips to the shooting range. *Id.* at ¶¶ 4, 5. Martin taught Miguel to ride his Harley-Davidson motorcycle and later gave it to him after Miguel returned from boot camp as a rite of passage symbolizing his pride in his son. *Id.* at ¶ 4. Together they once witnessed a fatal accident after a late-night snack run and immediately stopped to help, later serving as witnesses in court—an experience Martin cites as reflecting the values of responsibility and courage he instilled in Miguel. *Id.* These activities were not merely hobbies, but life lessons that embodied love and the father–son bond. *Id.*

Their bond continued even as Miguel's Marine Corps service took him far from home. *Id.* at ¶ 5. Miguel frequently surprised his father when on leave and maintained constant contact by phone from overseas. *Id.* Martin told Miguel to call "any time, any hour," and those calls were his lifeline. *Id.* They spoke about daily life, Miguel's deployment, and their shared future dreams, including plans to enter law enforcement together. *Id.* Miguel's absence is acutely felt in the milestones he will never reach, including his twenty-first birthday, which they planned to celebrate together in Las Vegas. *Id.* at ¶ 5. Miguel was deeply loved by friends and extended family and was

[64] Martin Terrazas, Sr.'s Texas birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 61, Declaration of Martin Terrazas, dated January 29, 2026.

at the center of social gatherings and celebrations. *Id.* at ¶ 6. His presence brought joy and laughter to simple activities such as movies, dinners, cookouts, and birthday parties. *Id.*

Martin learned of his son's death at home when a Marine captain and staff sergeant came to his door and asked to speak inside. *Id.* at ¶ 7. They informed Martin that Miguel had been killed in action that morning, and Martin was overcome with disbelief and grief, unable to speak, flooded with memories, and physically struggling to walk as his "world shattered." *Id.* As the details of Miguel's death were explained, the reality of his loss deepened into lifelong devastation. *Id.* Sharing the news with family was excruciating. *Id.* Martin first called his father but could not speak beyond saying his son's name, which his father immediately understood. *Id.* This moment of shared grief marked one of the most painful experiences of his life. *Id.* "The pain of that day, the loss of my hero, my son Miguel, is a burden I carry with me always. He was my hero, and I love him deeply." *Id.*

Following Miguel's death, Martin's life was fundamentally altered. *Id.* at ¶ 8. [redacted]

Miguel's death occurred near the holiday season and shortly before his December 10 birthday, thus permanently altering how the family experiences Thanksgiving, Christmas, New

Year's, and Miguel's birthday. *Id.* at ¶ 10. What were once joyful occasions are now marked by mourning. *Id.* [redacted] "As I look to the future, I hold onto a sliver of hope for healing and finding a way forward, yet I am acutely aware that the sadness and hardship brought about by my son Miguel's death will continue to be a significant part of our lives." *Id.* at ¶ 11.

Plaintiffs have requested an upward enhancement of Mr. Terrazas' claims based on his [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active.

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of his baseline award resulting in an award of $6.25 million for Martin Terrazas Sr.'s solatium claim.

### 2. George B. Terrazas[65]

George B. Terrazas is the grandfather of Miguel Terrazas. *See* Ex. 62 at ¶ 3. Miguel "was a beacon of joy and strength in our close-knit family." *Id.* at ¶ 4. From Miguel's earliest years, George and his wife played an active and significant role in raising Miguel, stepping in to support their teenage son, Martin, and becoming daily caregivers. *Id.* Their bond was built through constant shared experiences, including daily school pickups, attending church together as a devout Roman Catholic family, and never missing Miguel's football games. *Id.* These experiences made Miguel feel "more like a son" to them than a grandson. *Id.* They shared in his successes and even in life's missteps, such as a memorable "little fender bender," reinforcing a household built on respect, understanding, and guidance. *Id.* Even during Miguel's deployments, their bond remained strong. George recalls frequent phone calls filled with laughter, shared jokes, and discussions of football, which kept their connection alive despite the distance. *Id.* Miguel displayed generosity and compassion even while deployed, sharing candies and gum his grandparents sent him with local children in Iraq. *Id.*

Miguel was a constant presence in George's daily life, having lived with him while growing up and worked alongside him in the family business, Ben's Tacos, through Miguel's high school years. *Id.* at ¶ 5. Sundays during football season were especially meaningful, as they bonded over their shared love of the Kansas City Chiefs and Dallas Cowboys. *Id.* Even after Miguel joined the United States Marine Corps, they spent hours on the phone, particularly during football season, discussing games and life. *Id.* Miguel's last visit home was deeply significant; he treated his

[65] George Terrazas' U.S. Certificate of Citizenship (showing he became a citizen of the United States on June 23, 1940) and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 62, Declaration of George B. Terrazas, dated February 24, 2026.

grandparents to dinner, a gesture George recalls as reflecting Miguel's generosity and maturity. *Id.*

Miguel was deeply embedded within a loving and supportive family network that included his father Martin, his brothers Martin Jr. and Andres, and his sisters Vanessa and Melissa. *Id.* at ¶ 6. He highlights the particularly strong bond between Miguel and Martin Jr., who served as a mentor and protector, teaching Miguel to ride a motorcycle and shielding him from bullying when Miguel was smaller as a child. *Id.* Their shared activities, from sporting events to simple meals together, were expressions of a profound sibling bond. *Id.*

George learned of Miguel's death while traveling with his wife to Las Vegas for a family vacation. *Id.* at ¶ 7. As they passed through Phoenix, Arizona, his son Martin called with the devastating news that Miguel had been killed. *Id.* The moment was "all-consuming," instantly transforming joy into grief and forcing them to turn around and return to El Paso. *Id.* The drive back was filled with tears and disbelief, an ordeal he describes as leaving "a permanent scar on our close-knit family." *Id.* Sharing the news with other children, particularly those living out of town, was excruciating and compounded the pain of the loss. *Id.*

Following Miguel's death, George sought solace within his immediate family. *Id.* at ¶ 8. He could not bear anything that might dull his memories of Miguel, wanting instead to keep his spirit alive. *Id.* Early conversations with his wife—who has since passed—and his children served as his primary source of support. *Id.* Over time, his children have remained his main source of comfort, and frequent family conversations have helped them endure the loss together. *Id.* [redacted]

[redacted]

The emotional impact of Miguel's death on the family has been profound and lasting. *Id.* at ¶ 10. [redacted] The loss has reshaped emotional, financial, and relational aspects of the family, creating ongoing challenges in communication and mutual support. *Id.* at ¶ 11. Miguel's death is a permanent reality that continues to define and alter their family in profound and lasting ways. *Id.*

While George is not Martin's biological father, the class of plaintiffs who may recover solatium damages "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members" despite not being legally or biologically related to the victim. *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730, at *42 (D.D.C. July 19, 2022). To establish this "functional equivalence" of a close family member, plaintiffs must show that they were "treated like" a victim's spouse, child, parent, or sibling. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (finding that stepsiblings recover functionally equivalent to siblings when they were "treated like" a brother or sister); *Oveissi* 768 F. Supp. 2d at 27 (holding that interactions between a stepparent and child "were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924, at *7 (D.D.C. Dec. 27, 2023) (finding a stepparent to be a functional equivalent of

a parent notwithstanding an ongoing relationship between the victim and their biological parent because of the supplementary role played by the stepparent in the parental role).

George B. Terrazas explained in his Declaration the parental role he and his wife played in the life of LCpl. Terrazas:

> Miguel was not just my grandson; he was a beacon of joy and strength in our close-knit family. From the moment he entered this world, my wife and I played a significant role in his upbringing, stepping in to support my son, Martin, in raising him as he was still just a teenager. Our bond with Miguel was rooted in countless shared moments—from daily school pickups to attending church together as a devout Roman Catholic family. These experiences deepened our connection, *making him feel more like a son to us*. Ex. 2 at ¶ 4 (emphasis added).

> Growing up, Miguel was not just my grandson; *he was a constant presence in our lives, living with us and weaving himself into our daily routines.* From the early days of school pickups to working side by side at our family business, Ben's Tacos, through his high school years, our lives were intertwined. *Id*. at 5 (emphasis added).

Here, based on his declaration and the facts set forth above, it appears that George B. Terrazas qualifies under the law as the functional equivalent of LCpl. Terrazas' father based on the fact that George and his wife were "treated like" LCpl. Terrazas' parents because of the fact that Miguel's father was only a teenager and LCpl. Terrazas lived with George and his wife.[66] In addition, George's evident loss and grief resembles that of a biological parent.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for George B. Terrazas' solatium claim.

### 3. Martin Terrazas, Jr.[67]

[66] Although one cannot ascertain anything about LCpl. Terrazas's mother from George's Declaration, the Declaration of his grand-daughter Vanessa Terrazas-McKay, Ex. 64 at ¶ 4 states: "Growing up in a border town with a broken home and a mother who was an addict, life threw its harshest realities at us." Assuming that this accurately describes their mother, it also explains why George and his wife were called up to perform parental duties.

[67] Martin Terrazas, Jr.'s Texas birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 63, Declaration of Martin Terrazas, Jr., dated February 3, 2026.

Martin Terrazas, Jr. is the brother of Miguel Terrazas. *See* Ex. 63 at ¶ 3. Aside from being his sibling, Miguel was Martin's "confidant and a source of endless support." *Id.* at ¶ 4. Their relationship was defined by shared dreams and mutual understanding, including plans to buy Harley motorcycles and ride together once Miguel returned home. *Id.* Their conversations reflected a deep sibling bond and optimism for the future, and "living without him has been an unimaginable adjustment," as every memory and plan now carries the weight of Miguel's absence. *Id.* Growing up, the brothers did everything together, supporting one another through life's highs and lows and embodying what Martin describes as the essence of sibling connection. *Id.* at ¶ 5.

Even as they grew older and physical distance separated them, their bond remained unbreakable. *Id.* In the three years prior to Miguel's death, many of their conversations centered on Martin's deep concern for his brother's safety, as the thought of Miguel being far away and out of reach was "unbearable." *Id.* Despite this fear, their relationship strengthened, rooted in constant care for each other's well-being. *Id.* Miguel joined the service with a selfless purpose of protecting and providing for the family. *Id.* at ¶ 6. Miguel's sense of responsibility defined his character, and he served not only as a brother but as "a pillar of strength and a beacon of guidance" for family members. *Id.* Miguel consistently looked out for the safety and welfare of those he loved, creating a sense of security through his presence that is now deeply missed. *Id.*

After Miguel was killed, Martin first sensed something was wrong while at the family taco shop, noting unusual behavior from his aunt before being asked to go to his grandparents' home. *Id.* at ¶ 7. When his father arrived, the look in his eyes immediately conveyed that something tragic had happened to Miguel. *Id.* "The realization brought on the worst feeling I've ever experienced," marked by the unbearable thought of never seeing or hugging his little brother again after a lifetime together. *Id.* Whenever he is asked about Miguel, he can only respond that "he is a hero." *Id.*

Miguel's death also resulted in significant financial harm to the family. *Id.* at ¶ 8. The family business, once a stable and proud source of livelihood, declined and ultimately failed after Miguel's passing. *Id.* Miguel's loss meant not only the absence of his labor but also the loss of his dedication, spirit, and role as "a key pillar of support." *Id.* [redacted] The emotional consequences of Miguel's death continue to affect the entire family. *Id.* at ¶ 9. Martin describes an [redacted] Martin now feels the burden of serving as a pillar of strength for the family, praying for resilience and wisdom to endure the ongoing grief. *Id.* The family is living under "a dark cloud that refuses to dissipate," with the loss shaping daily life and outlook. *Id.* at ¶ 10.

Plaintiffs have requested, and I recommend, that the Court ward the baseline amount of $2.5 million for Martin Terrazas, Jr.'s solatium claim.

**4. Vanessa Terrazas-McKay[68]**

Vanessa Terrazas-McKay is the sister of Miguel Terrazas. *See* Ex. 64 at ¶ 3. Miguel—whom Vanessa affectionately called "Mikey"—was far more than her older brother. *Id.* at ¶ 4. He was "my protector, my confidant, and my guiding light" throughout a childhood marked by instability, poverty, and trauma. *Id.* Growing up in a border town with a broken home and an addicted mother, Vanessa describes Mikey, along with their brother Martin, as standing together

[68] Vanessa Terrazas-McKay's Texas birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 64, Declaration of Vanessa Terrazas-McKay, dated February 3, 2026.

"as three warriors against the world." *Id.* Despite exposure to dangerous situations and physical abuse at home, Mikey's resilience and protective nature provided her safety and hope. *Id.*

Mikey's decision to join the Marines was emotionally complex for Vanessa because she understood it as a path toward a better future, but she also felt abandoned by the person who had always protected her. *Id.* During his deployments, his letters and calls from Iraq became her emotional lifeline, filled with reassurance, encouragement, and promises that "everything would be okay." *Id.* His visits home provided her with a sense of joy and security that no one else could replicate. *Id.* Their final hug before his second deployment was powerful and foreboding, a moment whose emotional weight she still feels. *Id.* Mikey did not return from that deployment, having been killed by an IED in Haditha, Iraq, on November 19, 2005. *Id.* She describes his loss as "losing a part of my soul." *Id.* Despite the darkness of their upbringing, their shared memories were filled with laughter and joy, from playing "war" in the desert to working side by side at the family business, Ben's Tacos. *Id.* Mikey was her defender against bullies, her partner in mischief, and the person who taught her resilience through "tough love." *Id.* His encouragement to persevere and pursue education laid the foundation for her adult life. *Id.*

Growing up, Vanessa and Mikey were inseparable, maintaining their bond even during long separations caused by military service. *Id.* at ¶ 5. They wrote frequently, and she cherished the times he picked her up from school or called from Iraq despite the time difference. *Id.* His calls, filled with laughter, tears, and comfort, were highlights of her days, and his voice telling her not to cry remains vivid in her memory. *Id.* Their relationship was a friendship "no distance or circumstance could weaken." *Id.* Mikey's relationships throughout the family reflected the same loyalty, humor, and integrity including his especially close bond with their brother Martin. *Id.* at ¶ 6. Mikey was fully present and genuine with everyone he loved. *Id.*

She remembers precisely how she learned of Mikey's death. *Id.* at ¶ 7. After being urged to go to her grandparents' home, known as "the Nottingham," she recognized something was wrong upon seeing her father and uncle. *Id.* Before words were spoken, the sorrow in her father's eyes confirmed her fear. *Id.* Her plea—"not Mikey, dad, not Mikey"—was met with confirmation that Mikey had been killed in Iraq. *Id.* She describes collapsing to her knees as her heart dropped, followed by months of isolation and compounded trauma caused by delays in returning his body for burial. *Id.*

Since Mikey's death, Vanessa's life "has never been the same." *Id.* at ¶ 8. She withdrew into solitude, rarely speaking about his death except when directly asked, while the burden of notifications fell on her father. *Id.* The public broadcast of his death and reactions from extended family deepened her isolation rather than easing it. *Id.* The loss has profoundly impacted her mental health, stating that it "has deeply wounded my heart and soul to the point of no return." *Id.*

In the aftermath, [redacted]

Mikey's death irrevocably altered every member of the family. *Id.* at ¶ 11. [redacted]

The family eventually relied on her grandparents' home as a place of refuge and shared mourning. *Id.* [redacted]

Plaintiffs have requested an upward enhancement of Ms. Terrazas-McKay's claims based on her [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active).

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Vanessa Terrazas-McKay's solatium claim.

### 5. Melissa Terrazas[69]

Melissa Terrazas is the sister of Miguel Terrazas. *See* Ex. 65 at ¶ 3. Miguel—whom Melissa called "Mike"—was far more than a sibling, he was "my protector, my confidant, and the source of my most cherished memories." *Id.* at ¶ 4. Despite his outward toughness as a football player, Miguel embodied kindness, humor, and gentleness. *Id.* As a shy, bookish child, she was under Mike's constant protection, stating that "under Mike's wing, I was untouchable." *Id.* No one bullied her because they knew she was Mike's sister. *Id.* Their daily walks to the bus stop were filled with conversations about dreams and their meanings, and Mike's ability to listen with "genuine interest and compassion" made her feel deeply heard and valued. *Id.* One of the most significant moments in their relationship occurred when Melissa ran away from home at sixteen. *Id.* Mike knew exactly where to find her, brought her home, and gave her life advice during the car ride that she continues to carry with her. *Id.* She also recounted a seemingly ordinary day in which Mike reluctantly took her along on errands that unexpectedly became a memorable adventure filled with laughter, music, a sunset stop, and a meal at Burger King that made her feel "incredibly special." *Id.* at ¶ 4. Mike had a unique gift for turning ordinary moments into extraordinary memories. *Id.*

Growing up with Mike was "an adventure filled with laughter, creativity, and understanding." *Id.* at ¶ 5. They spent their childhood outdoors inventing games, playing baseball, racing four-wheelers, and challenging each other with daring jumps and wheelies. *Id.* Mike introduced her to video games, including *The Legend of Zelda*, patiently helping her through parts she was too afraid to face. *Id.* While Mike served in the Marines, they remained close through

[69] Melissa Terrazas' California birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 65, Declaration of Melissa Terrazas, dated January 29, 2026.

letters filled with humor and everyday details, and after his return from war, they continued sharing dreams, going on shopping trips, and taking long drives together. *Id.* Mike was a central figure within the family, a reality that became clear when she was tasked with writing his eulogy. *Id.* at ¶ 6. As she gathered stories from family members, each memory—funny, silly, or sentimental—revealed the depth of Mike's influence. *Id.* Although the written collection was later misplaced in her grief, the process itself revealed how profoundly Mike had touched everyone's lives. *Id.* His presence was so loved that visits were celebrated with his favorite foods wherever he went, and he joked that he needed to limit his visits so he could still fit into his uniform. *Id.*

Melissa recalls in vivid detail the day she learned of Mike's death. *Id.* at ¶ 7. After a normal teenage night out, she awoke to shouting that she initially believed was about breaking curfew. *Id.* She was unprepared for the request to meet her father in his room, where he told her—through tears—that Mike had been killed. *Id.* She describes her world collapsing, overcome by shock and disbelief, and fainting from grief. *Id.* When she regained consciousness, her sorrow felt inescapable. *Id.* Left alone while her father notified others, she wandered into the surrounding desert without telling anyone, lost, silent, and inconsolable, until she was eventually found. *Id.* Though Mike's death was widely reported in the news, sparing her from having to inform others, retelling his story to her son years later continually reopens the wound. *Id.*

Since Mike's death, [redacted]

[redacted]

Holidays, particularly Thanksgiving—which falls close to the anniversary of his death—have become painful reminders rather than celebrations. *Id.* at ¶ 11. [redacted]

Plaintiffs have requested an upward enhancement of Ms. Terrazas' claims based on her [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active.

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Melissa Terrazas' solatium claim.

### 6. Andres Terrazas[70]

Andres Terrazas is the brother of Miguel Terrazas. *See* Ex. 66 at ¶ 3. Andres' older brother, whom he knew as "Mike," was far more than a sibling, but rather "a mentor, a friend, and a source of endless support and fun." *Id.* at ¶ 4. Mike played a pivotal role in shaping his character, teaching him values of respect, integrity, confidence, and good manners, and guiding him through the challenges of growing up. *Id.* Andres recalls that their bond was so strong that Mike could "almost read my mind," always knowing when to encourage him or offer guidance. *Id.* Their relationship was filled with shared adventures, laughter, and constant support, from scavenging for fireworks to being present during difficult moments. *Id.* Growing up, nearly every day became an adventure; whether it was playing basketball, exploring stores, playing video games, skateboarding, or rollerblading together. *Id.* at ¶ 5.

When Mike joined the Marine Corps, his physical absence did not weaken their bond. *Id.* He made constant efforts to stay connected, including surprising Andres for his birthday after his first deployment, a moment Andres recalls as deeply emotional. *Id.* Before Mike's second deployment, they shared serious conversations about the realities of war and Mike's hopes that Andres would stand by their father and older brother if something happened to him. *Id.* Their final goodbye at the airport was tearful and unforgettable. *Id.* Mike was a person guided by unwavering devotion to "God and family" who treated every family member with respect, showing particular reverence to elders while remaining open, loving, and expressive with siblings. *Id.* at ¶ 6. Family holidays, especially Thanksgiving and Christmas, were times when family members gathered at their grandparents' home, and Mike's presence deepened the sense of unity and warmth. *Id.*

---

[70] Andres Terrazas' Texas birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 66, Declaration of Andres Terrazas, dated January 29, 2026.

Andres learned of his brother's death during what was meant to be a Thanksgiving vacation with his grandparents in 2005. *Id.* at ¶ 7. While traveling through Arizona, his grandfather received the call informing them that Miguel had been killed in Iraq. *Id.* Overcome with emotion, his grandparents struggled to deliver the news, and Andres saw his grandfather cry for the first time. *Id.* Initially in disbelief and hoping it was a mistake, the return trip to El Paso was silent and heavy with grief. *Id.* Being only thirteen at the time, Andres was shielded from notifying others, as the news quickly spread through the school and community. *Id.*

Following Mike's death, the family endured not only emotional devastation but also significant financial hardship. *Id.* at ¶ 8. Although he did not fully understand the situation as a child, the consequences became apparent over time, [redacted] While the family remains close, there is often reluctance to speak openly about Mike because doing so brings overwhelming pain and tears. *Id.* at ¶ 9. Andres has felt the absence of a role model, noting that although his brother Martin Jr. is present, adult responsibilities leave Andres feeling isolated at times, "akin to an only child." *Id.* As the family moves forward, Mike's death will remain a central and defining reality of their lives. *Id.* at ¶ 10.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Andres Terrazas' solatium claim.

**M. DOMINIC JOSEPH SACCO – NOVEMBER 20, 2005, ATTACK – TAJI**

On November 20, 2005, Tank Commander Sgt. Dominic Sacco was traveling with Alpha Company, 1st Battalion, 13th Armor approximately nine miles north of Taji, Iraq when he was shot and killed by a sniper. ECF No. 9 at ¶ 1272; Ex. 4 at 23. According to his autopsy report, [redacted]

[redacted]

[redacted][71] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Sacco was killed on February 26, 2025 (ECF No. 41), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the November 20, 2005 attack in which Sgt. Dominic Joseph Sacco was killed. *See* ECF Nos. 47, 48.

Sgt. Sacco's surviving wife, child, parents, and sister—Brandy Sacco, Anthony Sacco,[72] Diane Sacco, William Sacco, and Lisa Livingston—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1271-1280. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Dominic Joseph Sacco's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1280. The following chart reflects the claims asserted by Brandy Sacco, Anthony Sacco, Diane Sacco, William Sacco, and Lisa Livingston in their individual capacities arising out of the November 20, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Brandy Sacco | Sgt. Dominic Joseph Sacco's wife | Solatium claim $10 million | Declaration of Brandy Sacco, dated February 24, 2026, including copy of proof of her U.S. citizenship | 68 |
| Anthony Sacco | Sgt. Dominic Joseph Sacco's son | Solatium claim $5 million | Declaration of Anthony Sacco, dated February 26, 2026, including copy of proof of his U.S. citizenship | 69 |

[71] Ex. 67, Autopsy Examination Report for Sacco, Dominic Joseph, dated January 3, 2005.
[72] Anthony Sacco's claim was initially filed when he was a minor. He has attained the age of majority since this case was filed and is pursuing his claims in his own right.

| | | | | |
|---|---|---|---|---|
| Diane Sacco | Sgt. Dominic Joseph Sacco's mother | Solatium claim $6.25 million | Declaration of Diane Sacco, dated February 26, 2026, including copy of proof of her U.S. citizenship | 70 |
| William J. Sacco | Sgt. Dominic Joseph Sacco's father | Solatium claim $5 million | Declaration of William J. Sacco, dated February 26, 2026, including copy of proof of his U.S. citizenship | 71 |
| Lisa Livingston | Sgt. Dominic Joseph Sacco's sister | Solatium claim $2.5 million | Declaration of Lisa Livingston, dated February 24, 2026, including copy of proof of her U.S. citizenship | 72 |

**1. Brandy Sacco**[73]

Brandy Sacco is the wife of Dominic Joseph Sacco. *See* Ex. 68 at ¶ 3. Dominic was "my best friend, my soul mate," and a devoted stepfather to Brandy's daughter. *Id.* at ¶ 4. They met in Manhattan, Kansas, and quickly formed a committed relationship rooted in mutual love, respect, and shared family life. *Id.* Dominic embraced Brandy's daughter as his own and provided a level of unconditional love that became foundational to their household. *Id.* In August 2005, Brandy gave birth to their son Anthony. *Id.* Dominic was able to return home in September for seventeen days to meet his newborn child, a period filled with "joy, love, and laughter." *Id.* During this time, Dominic fully assumed his role as a devoted father, and living with him made their home a place of warmth and stability where "every day with him was a cherished memory." *Id.*

[73] Brandy Sacco's Kansas birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 68, Declaration of Brandy Sacco, dated February 24, 2026.

Their marriage was characterized by constant companionship and emotional closeness. *Id.* at ¶ 5. When he was not deployed, they spent nearly all their time together, describing themselves as inseparable. *Id.* Dominic raised Brandy's daughter with the same care and love as if she were his own and was actively engaged in physical activities and sports with fellow soldiers and with the children. *Id.* Even when deployments separated them, they maintained contact whenever possible, sustaining their bond across long distances. *Id.* Dominic's absence following his death remains deeply felt during milestones he never saw, including graduations and significant moments in their son's life. *Id.* Dominic also maintained close relationships with his parents and sister despite living in another state. *Id.* at ¶ 6. He called them frequently and prioritized visits whenever possible, including trips to Florida to see his parents and hosting his sister in Kansas. *Id.* Holidays were especially meaningful to Dominic, as they brought extended family together and reflected the value he placed on familial connection. *Id.*

Brandy learned of Dominic's death when a Casualty Assistance Officer and a Chaplain came to her home and delivered the news in person. *Id.* at ¶ 7. The news was physically overwhelming, leaving her hysterical and almost causing her to fall down the stairs. *Id.* The pain was so intense it was difficult to breathe, and the realization her husband had been taken from her and their children was unbearable. *Id.* Despite being advised not to do so, Brandy personally informed Dominic's parents of his death, describing that phone call as "the hardest thing I've ever had to do." *Id.*

Following Dominic's death, [redacted]

[redacted]

The loss of Dominic also resulted in significant financial hardship. *Id.* at ¶ 10. As the family's primary breadwinner, [redacted]

In the years following Dominic's death, Brandy struggled to function as a young widow and mother of two. *Id.* at ¶ 11. [redacted] Dominic remains irreplaceable, and their son has grown up without a father while also losing his mother [redacted] *Id.* at ¶ 12.

Plaintiffs have requested an upward enhancement of Ms. Sacco's claims based on her [redacted]

[redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active.

Plaintiffs have requested, and I recommend, that the Court award her an enhancement of 25% of her baseline award resulting in an award of $10 million for Brandy Sacco's solatium claim.

**2. Anthony Sacco[74]**

Anthony Sacco is the son of Dominic Joseph Sacco. *See* Ex. 69 at ¶ 3. His father was killed in an attack in Iraq when he was only three months old, depriving him of the opportunity to know his father personally. *Id.* at ¶ 4. Although he has no direct memories of Dominic, his father's presence has nonetheless been a constant part of his life through stories shared by family members and loved ones. *Id.* Those stories describe a man devoted to his family, hardworking, loving, and someone Anthony states he "would have been proud to call Dad." *Id.* Because his father died when he was an infant, Anthony explains that they never had the chance to create memories together. *Id.*

[74] Anthony Sacco's U.S. passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 69, Declaration of Anthony Sacco, dated February 26, 2026.

at ¶ 5. He has often imagined what their relationship might have been like and explains that Dominic's absence was felt at every major milestone in his life, including his graduation. *Id.*

Anthony learned who his father was almost entirely through the accounts of others. *Id.* at ¶ 6. From what he has been told, Dominic was loving and devoted as a husband, protective and encouraging as a brother, respectful and caring as a son, and someone who had "an amazing ability to make people happy and brighten up their day." *Id.* Although he never witnessed these interactions firsthand, the consistent descriptions have shaped his understanding of his father's character and deepened his sense of loss. *Id.* Growing up with the knowledge that his father was killed in action in Iraq was a constant presence in Anthony's life. *Id.* at ¶ 7. He does not recall a single defining moment when he learned of his father's death as this information was likely shared with him when he was very young. *Id.*

Anthony's father's absence affected every stage of his life, from early childhood through adolescence and into adulthood. *Id.* at ¶ 8. He missed having his father present for "every significant event you could imagine," including his entire childhood and his graduation. *Id.* [redacted]

The loss has had lasting effects on his mental and physical well-being. *Id.* [redacted]

[redacted]

His father's death also caused significant financial changes in his life and within his family. *Id.* at ¶ 10. [redacted] These financial hardships underscore the far-reaching consequences of his father's death beyond the emotional loss. *Id.*

Dominic's death altered every member of the family. *Id.* at ¶ 11. His mother lost her partner, his aunt lost her brother, and his grandparents endured the pain of outliving their son. *Id.* [redacted] the ripple effects of Dominic's death remain evident nearly two decades later. *Id.* As time has passed, while some immediate disruptions have lessened, the pain of his father's absence remains constant, particularly during November, the month Dominic was killed. *Id,* at ¶ 12. Although Anthony has encountered positive male role models, none can replace the guidance, support, and love of his own father. *Id.* The realization that he might have been "a better version of myself" if his father were still here continues to weigh heavily on him, and his father's death remains a defining and enduring loss in his life. *Id.*

Although his father died when Anthony was too young to remember him, Plaintiffs nevertheless have requested, and I recommend, that the Court award a baseline damages amount of $5 million for Anthony Sacco's solatium claim. He has lived without a father throughout his

life, he has [redacted] In short, in some circumstances it might be reasonable for a court may to determine that an analysis of all relevant circumstances supports a reduction in a solatium claim made by a child who was not cognizant of a parent at the time the parent died. But I do not believe that the circumstances support a reduction for Anthony whose father's death [redacted] In many respects Anthony's father's death has resonated to this day with negative impacts that have rippled through Anthony's lifetime and that augur against any downward departure on his claim.

**3. Diane Sacco[75]**

Diane Sacco is the mother of Dominic Joseph Sacco. *See* Ex 70 at ¶ 3. Dominic was Diane's second child and only son, and he held a uniquely special place in her family. *Id.* at ¶ 4. Although his deployment was a difficult period, Dominic made consistent efforts to remain emotionally present, calling frequently and ensuring that distance never weakened their bond. *Id.* These phone calls were "our lifeline," and remain among her most cherished memories of him. *Id.*

From Dominic's childhood through adulthood, their bond was deep and unbroken. *Id.* at ¶ 5. She and her family were actively involved in every aspect of his life, from watching him play as a child to cheering him on in little league games. *Id.* This closeness continued as Dominic grew older, including during his military service, when he continued to call home regularly. *Id.* Visits between Florida and Kansas were particularly meaningful, providing rare opportunities to spend time together in person. *Id.*

[75] Diane Sacco's U.S. passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 70, Declaration of Diane Sacco, dated February 26, 2026.

Dominic's relationship with her and the rest of the family was rooted in love, trust, and respect. *Id.* at ¶ 6. Dominic regularly sought her advice on personal matters, decisions after graduation, and conflicts in his marriage, reflecting both maturity and reliance on family guidance. *Id.* His love of sports was a defining feature of his personality, serving as a means of connection with friends and family alike. *Id.* The decision by his military base to name a softball complex after him posthumously reflected the impact he had on those around him. *Id.*

Diane learned of Dominic's death when she received a phone call from her daughter-in-law and immediately began screaming upon hearing the news. *Id.* at ¶ 7. Much of what followed is blurred by shock and grief, and she relies on family members to recount details of that evening. *Id.* Army representatives arrived at her home later that night, and her family considered taking her to the hospital due to the severity of her reaction. *Id.* She cried uncontrollably from the moment she was informed until late that night, and she received a medical injection to help her sleep. *Id.* The wake and funeral remain fragmented memories, as she was prescribed Valium to cope with the overwhelming grief. *Id.* Even after nineteen years, the pain of losing Dominic "feels as acute as it did that day." *Id.*

Following Dominic's death, [redacted]

[redacted]

The loss of her son profoundly altered her family's well-being and quality of life. *Id.* at ¶ 10. His absence is especially painful during birthdays, holidays, and when witnessing his son's achievements—moments he should have shared. *Id.* Dominic's death also precipitated significant changes in family roles and responsibilities. *Id.* [redacted]

The impact of losing her only son is permanent and unrelenting. *Id.* at ¶ 11. The finality of his absence is a source of constant sorrow. *Id.* Even years later, she finds herself overwhelmed by grief, imagining the life Dominic might have led, the person he would have become, and the future that was taken from him. *Id.* She explains that her life and the lives of her family members have been irrevocably changed, and that the pain of Dominic's absence remains a constant presence shaping their daily existence. *Id.*

Plaintiffs have requested an upward enhancement of Diane Sacco's solatium award. While the grief she suffered at the loss of her only son was significant, [redacted]

Even before the adoption, [redacted]

[redacted]

These additional responsibilities further emphasize the loss Diane sustained from her son's death.

Plaintiffs have requested, and I recommend, that the Court award a 25% upward enhancement of Diane Sacco's solatium claim for a value of $6.25 million.

**4. William J. Sacco[76]**

William J. Sacco is the father of Dominic Joseph Sacco. *See* Ex. 71 at ¶ 3. William and Dominic had a close and enduring father–son bond formed through years of shared daily life and routine experiences. *Id.* at ¶ 4. He taught Dominic how to swim, played catch together, worked on cars, and did yard work side by side—moments that combined ordinary family life with meaningful life lessons. *Id.* Even as Dominic grew older and his military responsibilities took him far from home, their relationship remained strong and consistent. *Id.* They spoke weekly while Dominic was stationed on base and maintained contact during his deployment in Iraq whenever possible. *Id.*

[76] William J. Sacco's U.S. passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 71, Declaration of William J. Sacco, dated February 26, 2026.

Dominic was a person with an open heart and exceptional capacity for love. *Id.* at ¶ 5. Dominic's immediate and unconditional embrace of his wife's daughter as his own was a reflection of his character and kindness. *Id.* Dominic also remained devoted to maintaining close relationships with family and friends, consistently prioritizing time with loved ones whenever he was home, despite the demands of military service. *Id.*

William learned of his son's death while at home with his wife when they received a phone call from their daughter-in-law who delivered the devastating news that Dominic had been killed in Iraq. *Id.* at ¶ 6. William's wife was screaming and collapsed to the floor in despair, and he rushed to her side. *Id.* When he heard the news, it felt as though "all the air had been sucked out" of him, and he fell to his knees. *Id.* Their daughter then undertook the painful responsibility of informing other family members. *Id.*

Following Dominic's death, the family experienced a change in financial circumstances with complex emotional implications. *Id.* at ¶ 7. Their grandson's college education became fully funded as a result of Dominic's death, a development William describes as deeply bittersweet. *Id.* While the provision offered reassurance and opportunity for the future, it simultaneously underscored the cost at which that support came and served as a constant reminder of Dominic's absence. *Id.* Dominic's loss created a profound void in the family's daily life. *Id.* at ¶ 8. Where the family was once bonded by shared joy, their interactions are now marked by a collective sense of sorrow. *Id.* At the same time, the family has become more intentional about caring for one another, motivated by a desire to honor Dominic's memory through connection and mutual support. *Id.* The long-term impact of Dominic's death is permanent and enduring. *Id.* at ¶ 9. The "empty chair at our table" during holidays and special occasions serves as a constant and painful reminder that Dominic is no longer present. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for William J. Sacco's solatium claim.

**5. Lisa Livingston**[77]

Lisa Livingston is the sister of Dominic Joseph Sacco. *See* Ex. 72 at ¶ 3. Lisa describes Dominic as far more than a younger brother, explaining that he was her only sibling and a central, irreplaceable part of her life. *Id.* at ¶ 4. Growing up, they were inseparable, sharing daily life and remaining close until adulthood separated them for college and military service. *Id.* Despite distance, they made it a point to spend every Christmas together. *Id.* One of the most meaningful moments in their relationship occurred shortly after Dominic became a father. *Id.* His son, Anthony, was born only three months before Dominic was killed in Iraq, and Lisa took time off work to visit Kansas and meet her newborn nephew. *Id.* The visit was bittersweet—filled with joy over the new life entering the family yet overshadowed by the knowledge that Dominic would soon return overseas. *Id.* Photographs from that visit capture the only moments Anthony would ever share with his father. *Id.*

Throughout adulthood, Lisa and Dominic remained emotionally close even when deployments limited in-person contact. *Id.* at ¶ 5. During the three years leading up to his death, Dominic's service in Iraq meant that important events were shared through phone calls and videos rather than in person. *Id.* Dominic missed her wedding in 2003 due to deployment, forcing him to experience the moment only through video. *Id.* Conversely, she recalls a cherished period following the events of September 11, when Dominic was grounded and stayed with her instead of returning to base, providing unexpected and meaningful time together. *Id.*

[77] Lisa Livingston's New York birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 72, Declaration of Lisa Livingston, dated February 24, 2026.

Dominic was devoted to family, particularly the profound love he had for his newborn son, Anthony. *Id.* at ¶ 6. Although their time together was tragically short, Dominic was filled with pride and love as a new father and would have cherished witnessing his son's milestones. *Id.* Dominic was also the center of family gatherings, described as the life of barbecues and celebrations, bringing joy and laughter wherever he went. *Id.*

Lisa learned of her brother's death while at work on a weekend where her aunt informed her in person at her parents' request. *Id.* at ¶ 7. Her aunt asked her to sit down at her workplace and quietly told her that Dominic had been killed. *Id.* Lisa immediately broke down in tears, overwhelmed not only by the loss of her brother but also by the fact that it occurred nearly one year after her husband had died suddenly. *Id.* She spent the remainder of the day in solitude at her cousin's home, with her aunt staying overnight to support her. *Id.* With Thanksgiving approaching, Lisa changed her travel plans from Florida to Kansas in order to attend Dominic's funeral and be with her sister-in-law, nephew, and parents. *Id.* Sharing the news of her brother's death with others was emotionally unbearable. *Id.* Her aunt notified extended family, while Lisa informed her workplace and close friends that she was incapable of working. *Id.*

Following Dominic's death, [redacted]

Dominic's death also resulted in significant financial consequences for her family. *Id.* at ¶ 9. [redacted]

[redacted]

Following Dominic's death, Lisa moved to Florida to be closer to her parents and nephew. *Id.* at ¶ 10. [redacted] Lisa's relationship with her nephew has become one of profound love and devotion, treating him as her own child, particularly given her inability to have children and the fact that he is the living legacy of her brother. *Id.* Although the family was already close, Dominic's death further intensified their bond, uniting them in shared grief while permanently altering their roles and responsibilities. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Lisa Livingston's solatium claim.

### N. KEITH A. BENNETT – DECEMBER 11, 2005, ATTACK – RAMADI

On December 11, 2005, the U.S. Army's 28th Military Police Company was conducting a vehicle check point near the Iraqi Highway Police Station 6 to the west of Camp Ramadi when a maroon Opel vehicle approached the check point and then detonated an SVBIED as SSgt. Keith A. Bennett was approaching the vehicle. ECF No. 9 at ¶ 1287; Ex. 3 at 53-54. As noted in graphic detail in his autopsy report, SSgt. Bennett's body was [redacted][78] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which SSgt. Bennett was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion

[78] Ex. 73, Autopsy Report for Bennett, Keith A. dated February 1, 2006.

assessing liability against Iran and Syria for *inter alia* the December 11, 2005 attack in which SSgt. Keith A. Bennett was killed. *See* ECF Nos. 47, 48.

SSgt. Bennett's surviving mother and sister—Carolyn Miller and Tina Daley—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1286-1292. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Keith A. Bennett's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1292. The following chart reflects the claims asserted by Carolyn Miller and Tina Daley in their individual capacities arising out of the December 11, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Carolyn Miller | SSgt. Keith A. Bennett's mother | Solatium claim $5 million | Declaration of Carolyn Miller, dated February 17, 2026, including copy of proof of her U.S. citizenship | 74 |
| Tina Daley | SSgt. Keith A. Bennett's sister | Solatium claim $2.5 million | Declaration of Tina Daly, dated November 5, 2025, including copy of proof of her U.S. citizenship | 75 |

### 1. Carolyn Miller[79]

Carolyn Miller is the mother of Keith A. Bennett. *See* Ex. 74 at ¶ 3. Carolyn describes Keith as her beloved son with whom she shared a close, loving, and caring life in their home. *Id.*

[79] Carolyn Miller's Maryland birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 74, Declaration of Carolyn Miller, dated February 17, 2026.

at ¶ 4. Keith was deeply motivated and committed to achieving his goals, and she witnessed many of his milestones, including graduating from high school, completing boot camp in Alabama, and attending York Technical Institute. *Id.* One of the most profound moments in their relationship occurred when Keith supported her through a heart attack on May 22, 1993. *Id.* Despite his fear and worry, he demonstrated strength and resilience while remaining by her side, an experience that reinforced his devotion to family and left a lasting impression on her. *Id.*

Carolyn watched Keith grow up day by day and took joy in his development as a child and young adult. *Id.* at ¶ 5. She especially enjoyed watching him ride a Kawasaki motorcycle and taking him to karate classes. *Id.* There was nothing she and her family would not have done for him, and providing for and loving him wholeheartedly was central to their role as parents. *Id.* "Keith was a remarkable person who had a natural ability to connect with everyone he met." *Id.* at ¶ 6. He treated everyone with respect and kindness and was admired for his character. *Id.* Keith shared especially close relationships with his sister, Tina, and his cousin Jerry, spending time with friends and family and creating lasting memories. *Id.* His bond with Jerry was rooted in their shared love of Ford vehicles, a connection reflected in Keith's decision to leave his prized Ford pickup to Jerry and his Mustang to Tina in his will. *Id.*

Carolyn learned of Keith's death in Iraq when a chaplain and another military representative came to her home while she was still in bed. *Id.* at ¶ 7. She was overcome with shock and sadness upon hearing the news, the grief was unbearable, and the weight of the loss was crushing. *Id.* She and her husband, Tom, held each other while they cried, and she invited extended family to their home so that others could grieve with them. *Id.*

Following Keith's death, Carolyn relied on her faith for strength and comfort rather than seeking professional counseling or medical treatment, praying daily and drawing solace from

spiritual connections. *Id.* at ¶ 8. Her faith was her primary source of healing. *Id.* [redacted]

The family was also fortunate not to experience disruptions to their financial security as a result of his death. *Id.* at ¶ 10.

Carolyn, her husband Tom, and her daughter Tina frequently visit Keith's grave to honor his memory. *Id.* at ¶ 11. Although their relationships with one another have not been damaged, she states that they cannot think of Keith without tears. *Id.* Carolyn also noted positive shifts in family dynamics, including the joy of welcoming grandchildren Owen and Olivia into their lives through Tina, which has served as a reminder of Keith and the enduring legacy of love he left behind. *Id.* As a Gold Star family, Carolyn and her family find solace in the annual memorial service held by the 28th Infantry Division at their shrine in Boalsburg, Pennsylvania. *Id.* at ¶ 12. This continued recognition honors Keith's sacrifice, keeps his memory alive, and serves as a reminder of the legacy he left behind. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Carolyn Miller's solatium claim.

**2. Tina Daley[80]**

Tina Daley is the older sister of Keith A. Bennett. *See* Ex. 75 at ¶ 3. Keith was Tina's only sibling, and they shared an exceptionally close bond from childhood into adulthood. *Id.* at ¶ 4. Raised by their grandmother and single mother, Tina was naturally protective of her younger brother, and their relationship developed into one marked by deep trust, loyalty, and mutual

[80] Tina Daley's Maryland birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 75, Declaration of Tina Daley, dated November 5, 2025.

dependence. *Id.* at ¶¶ 4–5. Their bond was unbreakable, and Keith was an integral part of her life. *Id.* at ¶ 5. As adults, Tina and Keith remained closely connected, speaking at least every other day and sharing the same circle of friends. *Id.* at ¶ 6. They discussed their jobs, relationships, and daily lives, functioning not only as siblings but as best friends. *Id.* One of the most meaningful moments of their relationship occurred at Tina's wedding, when Keith walked her down the aisle. *Id.* at ¶ 7. This moment was emblematic of Keith's role in Tina's life—not just as a brother, but as a guardian, confidant, and constant source of support. *Id.*

Their family was tightly knit, a closeness further strengthened after her mother remarried in 1987. *Id.* at ¶ 8. Keith was central to family life, from shared vacations and annual Fourth of July celebrations to quiet moments at home watching movies together. *Id.* His relationship with their mother and stepfather was marked by respect and affection, and his presence brought joy and warmth to every family gathering. *Id.*

Tina recalls her mother calling her at home around 9:00pm to deliver the news that Keith had been killed in Iraq. *Id.* at ¶ 9. Tina felt immediate devastation and shock as the permanence of the loss began to sink in. *Id.* Her husband supported her during this moment, and Tina undertook the painful task of notifying other family members and friends, reliving the loss with each phone call. *Id.*

Following Keith's death, [redacted]

Although Keith's death caused immense sorrow, it also drew the family closer together. *Id.* at ¶ 13. In shared grief, they leaned on one another for support and became more united in honoring Keith's memory and legacy. *Id.* Maintaining his memory has become a central source of resilience and

unity within the family. *Id.* Keith's absence is felt most strongly during family milestones and gatherings, which highlight not only what was lost but all that Keith should have been present to experience. *Id.* at ¶ 14. Living without him remains an ongoing emotional burden and that his death fundamentally changed their lives. *Id.* at ¶¶ 14–15.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Tina Daley's solatium claim.

### O. SANTOS RAYMOND ARMIJO[81] – OCTOBER 2, 2006, ATTACK – TAJI

On October 2, 2006, Troop A, 7th Squadron, 10th Cavalry was patrolling on Route Fordyce near Taji, Iraq, when the lead M1114 HMMWV in the patrol struck a deep-buried IED that lifted the HMMWV into the air where it landed nearly 20 meters away from the blast site. ECF No. 9 at ¶ 1654, Ex. 4 at 28-29. Conflicting reports noted that the IED contained either 50 pounds or 500 pounds of explosives, but the blast killed four soldiers including Spc. Santos Armijo and SSgt. James Ellis. Ex. 4 at 29. The autopsy report for Spc. Armijo stated that his cause of death was [redacted][82]

Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Spc. Armijo was killed on February 26, 2025 (ECF No. 41), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the October 2, 2006 attack in which Spc. Santos Raymond Armijo was killed. *See* ECF Nos. 47, 48.

[81] The Amended Complaint in this case incorrectly lists Mr. Armijo's name as "Raymond S. Armijo"; however, his name is Santos Raymond Armijo which is accurately reflected in Ex. 76.

[82] Ex. 76, Final Autopsy Report of Armijo, Santos Raymond at 3.

Spc. Armijo's surviving mother and brother—Faustina Armijo and Alfonso Luna—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1653-1658. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Santos Raymond Armijo's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1658. The following chart reflects the claims asserted by Faustina Armijo and Alfonso Luna in their individual capacities arising out of the October 2, 2006 attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Faustina Armijo | Spc. Santos Raymond Armijo's mother | Solatium claim $6.25 million | Declaration of Faustina Armijo, dated January 16, 2026, including copy of proof of her U.S. citizenship | 77 |
| Alfonso Luna | Spc. Santos Raymond Armijo's brother | Solatium claim $3.125 million | Declaration of Alfonso Luna, dated January 15, 2026, including copy of proof of his U.S. citizenship | 78 |

**1. Faustina Armijo**[83]

Faustina Armijo is the mother of Santos Raymond Armijo. *See* Ex. 77 at ¶ 3. Faustina describes her relationship with Santos, her firstborn child, as extraordinarily close and deeply loving. *Id.* at ¶ 4. Every visit home he made was a celebration centered on family gatherings, barbecues, shared traditions, and constant laughter. *Id.* Santos cherished time with his family, participating fully in conversations, church services, and family stories, and Faustina recalls being

[83] Faustina Armijo's North Carolina birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 77, Declaration of Faustina Armijo, dated January 16, 2026.

deeply attentive to his recounting of life overseas. *Id.* Their relationship was marked by frequent affirmations of love, gratitude, and reassurance, including his repeated promises that he would always take care of her. *Id.*

From Santos' earliest years, Faustina was intimately involved in every aspect of his life. *Id.* at ¶ 5. She volunteered at his school, supported his activities, enrolled him in sports, and shared daily routines such as school drop-offs and picking up his friends. *Id.* She taught him to drive for prom, enrolled him in baseball, and served as his confidante on all subjects. *Id.* Santos, in turn, proudly referred to her as his "ride or die" and included her in his adventures, including teaching her to roller skate. *Id.* They "truly did everything together," and this closeness defined their bond. *Id.*

In the three years leading up to Santos's death, distance did not diminish their relationship. *Id.* at ¶ 6. Santos called whenever he could, and Faustina's workplace arranged her breaks specifically so she could speak with him. *Id.* Their conversations ranged from daily check-ins to deeper discussions about family and future plans with Santos consistently expressing concern for her well-being. *Id.* Their final conversations were filled with anticipation of his return home and plans for future milestones, including birthdays and purchasing a car together. *Id.* at ¶ 7. She maintained constant communication through bi-weekly letters and monthly care packages, thoughtfully tailored to Santos and his fellow service members. *Id.* His hugs, kisses, and verbal expressions of love are deeply missed, and their bond endured beyond time and distance. *Id.*

Santos was deeply devoted to his entire family. *Id.* at ¶ 8. Faustina recalls his consultation with her regarding an engagement ring for his girlfriend as an expression of his thoughtful nature. *Id.* He shared especially strong relationships with his siblings and grandmother and thrived at

family gatherings, ensuring meaningful one-on-one time with each loved one. *Id.* Santos was the emotional center of family events, bringing joy, connection, and attention to everyone present. *Id.*

Faustina was at work when the military contacted her and sent two service members later in person to deliver the news that Santos had been killed in Iraq. *Id.* at ¶ 9. She collapsed to her knees, screaming and crying uncontrollably, and being supported physically by her employer as she was moved into a conference room. *Id.* She was haunted by the thought that her son died alone and that she was not present in his final moments, a feeling that continues to weigh heavily on her. *Id.* The act of informing Santos's siblings and extended family required removing them from school and confronting the loss publicly while she herself could barely stand or speak. *Id.* The days following the notice were marked by shock, inability to eat, and emotional paralysis. *Id.*

Following Santos's death, [redacted]

The death of her son also caused significant financial hardship. *Id.* at ¶ 12. As a single mother, [redacted]

The impact of Santos' death on the family was devastating and compounded. *Id.* at ¶ 13. The loss fundamentally altered family celebrations, which are now marked by guilt and sorrow rather than joy. *Id.* The intensity of the grief [redacted] The family's well-being and quality of life have been irrevocably changed. *Id.* In addition, Faustina's relationships and family dynamics have suffered, as [redacted] Family traditions have permanently changed; holidays once celebrated at home are now marked by decorating her son's grave. *Id.* at ¶ 15. Santos was "the heartbeat" of the family, and his loss shattered its foundation. *Id.* Not a day passes without thinking of him, missing his laughter, or grieving the life that was taken. *Id.*

Plaintiffs have requested an upward enhancement of Ms. Armijo's claims based on her [redacted][84] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45,

[84] Although she does not mention [redacted] in her Declaration, the Declaration of her other son, Alfonso Luna, [redacted] Ex. 78 at ¶ 9.

53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active.

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Faustina Armijo's solatium claim.

**2. Alfonso Luna[85]**

Alfonso Luna is the brother of Santos Raymond Armijo. *See* Ex. 78 at ¶ 3. Alfonso describes Santos as far more than an older brother, explaining that he was "my hero, my role model, and my best friend." *Id.* at ¶ 4. Raised in a single-parent household following the absence of their father, Santos assumed the role of mentor and father figure in Alfonso's life. *Id.* at ¶¶ 4, 7. From an early age, Alfonso admired Santos and aspired to follow in his footsteps, including Santos' path into military service. *Id.* at ¶ 4. Santos taught him life lessons with patience and humor, and their shared childhood memories—particularly moments of laughter, such as Santos' infectious reaction when Alfonso failed his driver's test—remain deeply cherished. *Id.*

The brothers were inseparable growing up and spent nearly every day together engaged in simple activities such as riding bikes, exploring their neighborhood, visiting local restaurants, and swimming. *Id.* at ¶ 5. Alfonso recalls swimming as their favorite activity, one that symbolized their closeness and carefree bond. *Id.* Even after Santos joined the service, distance did not diminish their relationship. Santos regularly called home and shared stories of his experiences abroad, bringing the outside world into their family's daily life. *Id.* at ¶ 6. Santos was a guiding presence

[85] Alfonso Luna's U.S. passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 78, Declaration of Alfonso Luna, dated January 15, 2026.

for Alfonso who compensated for the absence of a father. *Id.* at ¶ 7. Santos instilled in him values of responsibility, education, and integrity, and warned him about the dangers of drugs. *Id.* Santos' guidance shaped Alfonso's aspirations and worldview and strongly influenced his decision to join the service. *Id.* Within the broader family, Santos was the emotional center of gatherings, using humor, dancing, and constant laughter to bring joy to everyone present. *Id.* at ¶ 7.

Alfonso was at home doing homework when he learned of his brother's death. *Id.* at ¶ 8. He was told to come downstairs and speak with his mother, and he immediately sensed that something was wrong. *Id.* When he learned that Santos—with whom he had spoken not long before and who was expected to return home—had been killed in Iraq, the shock was overwhelming. *Id.* Alfonso collapsed to the floor, overcome by grief and anger, and the news fundamentally changed him. *Id.* He was unable to bring himself to share the news with others, leaving that task to his mother. *Id.*

Following his brother's death, Alfonso's life deteriorated dramatically. *Id.* at ¶ 9. Before the loss, [redacted]

Santos' death also caused serious financial hardship for the family. *Id.* at ¶ 10. [redacted]

The long-term impact of Santos's death on their family has been profound and lasting. *Id.* at ¶¶ 11–12. Family gatherings lost their warmth and joy, [redacted] Santos' absence left Alfonso without the father figure who had guided him through life. *Id.* Each holiday, birthday, and anniversary of his brother's death reopens the wound of loss. *Id.* at ¶ 12.

Plaintiffs have requested an upward enhancement of Mr. Luna's claims based on [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active.

Plaintiffs have requested, and I recommend that the Court award an enhancement of 25% of his baseline award resulting in an award of $3.125 million for Alfonso Luna's solatium claim.

**P. KEVIN SCOTT MOWL – AUGUST 2, 2007, ATTACK – BAGHDAD**

On August 2, 2007, 1st Platoon, Alpha Company, 2d Brigade, 3d Infantry was conducting a three-vehicle patrol in the Masafee neighborhood of Dora in southern Baghdad when the lead Stryker vehicle was hit with an IED buried in a storm drain next to the road. ECF No. 9 at ¶ 2319;

Ex. 4 at 53-54. Killed in the immediate aftermath of the blast were SSgt. Fernando Santos, Spc. Eric Salinas, and Spc. Cristian Rojas-Gallego. Ex. 4 at 54. Cpl. Kevin Scott Mowl sustained a [redacted] requiring his evacuation first to Balad, Iraq, then to Landstuhl, Germany, and finally to the National Naval Medical Center in Bethesda, Maryland, where he died from complications from his injuries on February 25, 2008. *Id.* Cpl. Mowl's autopsy report opined:

> [redacted][86]

Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpl. Mowl sustained subsequently fatal injuries on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the August 2, 2007 attack in which Cpl. Kevin Scott Mowl obtained injuries that subsequently led to his death in February 2008. *See* ECF Nos. 47, 48.

Cpl. Mowl's surviving parents and sister—Harold Mowl, Jr., Mary Mowl, and Carlene Stahlnecker—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 2318-2327. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Kevin Scott Mowl's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 2327. The following chart reflects the claims asserted by Harold Mowl, Jr., Mary Mowl, and Carlene Stahlnecker in their individual

[86] Ex. 79, Final Autopsy Report for Mowl, Kevin Scott, dated July 24, 2008 at 13.

capacities arising out of the August 2, 2007, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Harold Mowl, Jr. | Cpl. Kevin Scott Mowl's father | Solatium claim $6.25 million | Declaration of Harold Mowl, Jr., dated February 24, 2026, including copy of proof of his U.S. citizenship | 80 |
| Mary Mowl | Cpl. Kevin Scott Mowl's mother | Solatium claim $6.25 million | Declaration of Mary Mowl, dated March 13, 2026, including copy of proof of her U.S. citizenship | 81 |
| Carlene Stahlnecker | Cpl. Kevin Scott Mowl's sister | Solatium claim $3.125 million | Declaration of Carlene Stahlnecker, dated February 26, 2026, including copy of proof of her U.S. citizenship | 82 |

**1. Harold Mowl, Jr.**[87]

Harold Mowl, Jr. is the father of Kevin Scott Mowl. *See* Ex. 80 at ¶ 3. Kevin was "the embodiment of courage, adventure, and love" and a central figure in their family life. *Id.* at ¶ 4. Raised in a close and supportive household in Pennsylvania, Kevin was deeply loved by Harold, his wife, and Kevin's sister, Carlene. *Id.* From an early age, Kevin exhibited a strong zest for life, earning a black belt in karate, riding bicycles, and developing a particular pride in his bright yellow Toyota Celica. *Id.* His curiosity and love of exploration led him to travel internationally, including to Indonesia and Japan, experiences that reflected his adventurous spirit and intellectual curiosity.

[87] Harold Mowl. Jr.'s U.S. passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 80, Declaration of Harold Mowl, Jr., dated February 24, 2026.

*Id.* Kevin's academic and personal development progressed through schools in Pittsford, New York, the Valley Forge Military Academy, and SUNY Alfred State, before he ultimately found his calling in military service. *Id.* He joined the United States Army in August 2004 and served as a Specialist with distinction. *Id.* His responsibilities included serving as a Stryker vehicle driver, SAW gunner, and radio operator. *Id.*

Kevin possessed exceptional language abilities, including fluency in American Sign Language, which was his first language and a skill he proudly shared with fellow soldiers. *Id.* Kevin also demonstrated aptitude in learning Arabic and showed promise for further linguistic study, underscoring his intelligence and adaptability. *Id.* Kevin's deployment to Iraq was undertaken with bravery and commitment, and he served in both Mosul and Baghdad during his time in Iraq. *Id.* On August 2, 2007, Kevin sustained grievous injuries in Iraq but continued to fight his injuries for several months before ultimately passing away, a period Harold describes as marked by Kevin's extraordinary determination and resilience. *Id.*

Throughout Kevin's upbringing and adulthood, Harold and Kevin shared a close and enduring bond. *Id.* at ¶ 5. Family life was defined by daily interactions, shared experiences, and a constant presence in one another's lives. *Id.* Even when Kevin's path took him to Washington State and later to Iraq, the family maintained strong connections through frequent communication, particularly during the growth of email and internet access. *Id.* Despite distance, the emotional closeness between father and son never waned. *Id.* Kevin's absence is especially painful during the milestones they had envisioned sharing together, including graduations, weddings, and new beginnings. *Id.*

Kevin was someone who delighted in sharing his passions with others, whether teaching American Sign Language, recounting his travels, or enjoying simple moments at home. *Id.* at ¶ 6.

Kevin's enthusiasm for life and ability to form deep connections left a lasting impression on everyone he encountered. *Id.*

Being present with Kevin in his final moments was an experience of profound heartbreak for Harold. *Id.* at ¶ 7. The family remained by Kevin's side as they came to understand that his service-related injuries would not allow him to continue living. *Id.* Sharing the news of Kevin's passing required the support of extended family, friends, and a broader community, including through personal conversations and online updates. *Id.* A USA Today article later described the family's experience during this period as "a long goodbye," a phrase that captured the emotional reality of watching Kevin fight for months before his death. *Id.*

The loss of Kevin has left a permanent hole within the family. *Id.* at ¶ 8. Harold's daughter must now live without her brother, and each day brings reflections on the life Kevin might have lived, the accomplishments he could have achieved, and the joy he would have continued to bring. *Id.* Kevin's absence is constant and palpable. *Id.* The pain of losing Kevin is an ongoing process that Harold anticipates will persist indefinitely. *Id.* at ¶ 9. In Kevin's memory and to honor his passions for learning, language, and travel, Harold and his wife established the Kevin Mowl Travel Abroad Program at the Rochester School for the Deaf and the Kevin Mowl Endowed Scholarship Fund at the National Technical Institute for the Deaf at Rochester Institute of Technology. *Id.* While these efforts continue Kevin's legacy, they exist alongside enduring grief for the beloved son, brother, and hero whose life was lived with purpose and passion but cut tragically short. *Id.*

Plaintiffs have requested an upward enhancement of Mr. Mowl's claims based on his son's "long goodbye" and the fact that the family was at Kevin's bedside for months between when he sustained his injuries on October 2, 2007 to when he ultimately passed away at the National Naval Medical Center in Bethesda, Maryland on February 25, 2008. *See Bernhardt v. Islamic Republic*

*of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process.

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of his baseline award resulting in an award of $6.25 million for Harold Mowl, Jr.'s solatium claim.

**2. Mary Mowl[88]**

Mary Mowl is the mother of Kevin Scott Mowl. *See* Ex. 81 at ¶ 3. Kevin was Mary's only son and a central light in her life. *Id.* at ¶ 4. Their relationship was exceptionally close, marked by constant companionship and shared activities throughout his childhood and young adulthood. *Id.* They spent time playing games such as Battleship, building Lego sets together, and simply enjoying each other's presence. *Id.* Kevin was energetic and curious, often riding his bicycle, practicing karate—where he earned a black belt—and developing a strong passion for cars, particularly his bright yellow 1995 Toyota Celica. *Id.* His adventurous spirit led him to travel internationally to Japan and Indonesia after high school, experiences that reflected his curiosity and independence. *Id.*

Kevin's academic and professional journey took him from schools in Pittsford, New York, to Valley Forge Military Academy and SUNY Alfred State before he joined the United States Army in August 2004. *Id.* Kevin served as a Specialist and held multiple roles, including Stryker vehicle driver, SAW gunner, and radio operator. *Id.* What distinguished Kevin, she explains, was his fluency in American Sign Language, his first language, which he proudly shared with fellow

[88] Mary Mowl's U.S. passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 81, Declaration of Mary Mowl, dated March 13, 2026.

soldiers. *Id.* Kevin's absence continues to prompt daily reflection on who he might have become had his life not been cut short. *Id.*

Kevin was a deeply cherished member of a small but close-knit family. *Id.* at ¶ 5. While Kevin was stationed at Fort Lewis in Washington State, she and her husband visited him several times and maintained regular communication through letters, care packages, and electronic messaging. *Id.* Due to Mary's deafness, communication often occurred through AIM messaging when internet access was available, or through letters when Kevin was deployed to Iraq. *Id.* These letters became a critical lifeline, sustaining their bond despite the distance. *Id.* Kevin's absence is felt daily, as she and her husband now spend time with their daughter and grandchildren while imagining how much larger and fuller their family life would be if Kevin were still alive. *Id.*

Mary learned of Kevin's injuries after returning from a trip and finding a note instructing them to contact the Army, immediately filling them with dread. *Id.* at ¶ 6. The following day was marked by frantic communication with medical personnel at Landstuhl Medical Center in Germany and arrangements to travel to Washington, DC, where Kevin was transferred to the National Naval Medical Center. *Id.* This period was one of intense fear, uncertainty, and emotional anguish. *Id.* Their daughter, Carlene, joined them in Washington, DC, to support the family as they confronted the seriousness of Kevin's condition. *Id.*

Since Kevin's death, her family has lived in a near-constant state of reflection and mourning. *Id.* at ¶ 7. His absence has permanently altered how they perceive their family's future, replacing anticipated growth—including the possibility of Kevin's own children—with imagined possibilities and unfulfilled milestones. *Id.* Despite this loss, the bond between herself, her husband, their daughter, and her family remains intact, sustained through resilience and mutual support. *Id.*

Mary's grief is intertwined with enduring pride in Kevin's life and legacy. *Id.*at ¶ 8. Although Kevin passed away in 2008, his presence continues to influence the family through his example, his service, and the initiatives created in his honor, including the Kevin Mowl Travel Abroad Program and the Kevin Mowl Endowed Scholarship Fund. *Id.* These programs serve as living tributes to Kevin's passions for language, travel, and learning. *Id.* Documenting Kevin's life in family history is not only a record of his achievements, but an effort to preserve the essence of a beloved son whose influence continues to echo through the lives he touched. *Id.*

Plaintiffs have requested an upward enhancement of Ms. Mowl's claims based on her son's "long goodbye" and the fact that the family was at Kevin's bedside for months between when he sustained his injuries on October 2, 2007 to when he ultimately passed away at the National Naval Medical Center in Bethesda, Maryland on February 25, 2008. *See Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process).

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Mary Mowl's solatium claim.

**3. Carlene Stahlnecker**[89]

Carlene Stahlnecker is the sister of Kevin Scott Mowl. *See* Ex. 82 at ¶ 3. Kevin was Carlene's only sibling and far more than a brother, but rather as "a beacon of happiness and wit" and a central source of joy in her life. *Id.* at ¶ 4. As adults, their sibling relationship deepened into a close friendship marked by laughter, intellectual connection, and emotional support. *Id.* She

[89] Carlene Stahlnecker's U.S. passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 82, Declaration of Carlene Stahlnecker, dated February 26, 2026.

recalls frequent phone calls during his deployment, including fond memories of playful Trivial Pursuit challenges, where Kevin's intelligence and humor consistently shone through. *Id.* These conversations sustained their bond while Kevin was overseas, and Carlene eagerly anticipated the end of his deployment so she could visit him at Fort Lewis and create additional memories together. *Id.*

Carlene and Kevin shared a typical childhood before adulthood led them temporarily to different locations. *Id.* at ¶ 5. Despite living in different cities—Kevin at Fort Lewis and Carlene in Boston and later New York City—their relationship grew stronger. *Id.* She recalls moments together, including an especially memorable winter day exploring Boston's Freedom Trail, highlighting their enduring connection. *Id.* Frequent phone calls became central to their relationship, during which Kevin offered humor, encouragement, and thoughtful conversation about life, dreams, and plans after deployment. *Id.* Kevin's absence from future milestones—such as her wedding and the birth of her children—is deeply painful, as his presence would have been a source of strength and celebration. *Id.*

Kevin possessed exceptional warmth and charisma that extended beyond their sibling relationship to include parents, extended family, and a wide circle of friends. *Id.* at ¶ 6. Kevin had an innate ability to light up rooms and draw people toward him with his genuine personality. *Id.* Family dinners, shared travel, and social gatherings were enriched by Kevin's presence, and his friendships mirrored the closeness he maintained with family. *Id.*

When Carlene learned of Kevin's critical injuries, her life was altered permanently. *Id.* at ¶ 7. As Kevin fought for his life in the ICU at the National Naval Medical Center, she made regular trips to be with him, visiting nearly every other weekend. *Id.* She was present at the hospital when Kevin died on February 25, 2008, an experience she describes as overwhelmingly devastating. *Id.*

Leading up to his death, the family relied on a CaringBridge website to share updates and eventually convey the tragic news, supplemented by personal phone calls to those closest to them. *Id.* Sharing news of Kevin's passing was profoundly painful and emotionally exhausting. *Id.*

The loss of Kevin has had lasting consequences for Carlene's family life. *Id.* at ¶ 8. Her husband and twin daughters will never know Kevin personally and must rely on stories and memories to understand who he was, a reality she finds deeply sorrowful. *Id.* Kevin's presence would have added immeasurable warmth and joy to their lives, and his absence has diminished the family's overall well-being and quality of life. *Id.* At the same time, the tragedy strengthened Carlene's bond with her parents, as shared grief brought them closer and reinforced their mutual reliance on one another. *Id.*

Kevin's death will continue to shape her family's future. *Id.* at ¶ 9. As her parents age, responsibilities that would have been shared with Kevin—emotional support, caregiving decisions, and shared burdens—now rest solely with her. *Id.* This anticipated responsibility underscores Kevin's absence in moments where his wisdom and support should have been present. *Id.*

Plaintiffs have requested an upward enhancement of Ms. Stahlnecker's claims based on her brother's "long goodbye" and the fact that the family was at Kevin's bedside for months between when he sustained his injuries on October 2, 2007 to when he ultimately passed away at the National Naval Medical Center in Bethesda, Maryland on February 25, 2008. *See Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process.

Plaintiffs have requested, and I recommend, that the Court award an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Carlene Stahlnecker's solatium claim.

## CONCLUSION

For the reasons stated above and the analysis set forth, I recommend that the Court approve the following awards for Plaintiffs' solatium claims and recommend that the Court enter final judgments for each Plaintiff's solatium damages and punitive damages as set forth below:

| Plaintiff | Victim | Relation to Victim | Date of Attack | Recommended Solatium Damages | Recommended Punitive Damages |
|---|---|---|---|---|---|
| Lisa Barr | LCpl. Aric J. Barr | Mother | 4/3/2004 | $5,000,000.00 | $5,000,000.00 |
| Aaron Barr | LCpl. Aric J. Barr | Brother | 4/3/2004 | $3,125,000.00 | $3,125,000.00 |
| Anthony Barr | LCpl. Aric J. Barr | Brother | 4/3/2004 | $3,125,000.00 | $3,125,000.00 |
| Alexandra Barr | LCpl. Aric J. Barr | Sister | 4/3/2004 | $3,125,000.00 | $3,125,000.00 |
| Michelle DeFord | Sgt. David Wayne Johnson | Mother | 9/25/2004 | $6,250,000.00 | $6,250,000.00 |
| Richard Johnson | Sgt. David Wayne Johnson | Father | 9/25/2004 | $5,000,000.00 | $5,000,000.00 |
| Randall Johnson | Sgt. David Wayne Johnson | Brother | 9/25/2004 | $2,500,000.00 | $2,500,000.00 |
| Joie Libbey | Sgt. David Wayne Johnson | Sister | 9/25/2004 | $2,500,000.00 | $2,500,000.00 |
| Joanne Baker | Sgt. Ronald W. Baker | Wife | 10/7/2004 | $10,000,000.00 | $10,000,000.00 |
| Alexis Baker | Sgt. Ronald W. Baker | Daughter | 10/7/2004 | $6,250,000.00 | $6,250,000.00 |
| Carrylon Baker | Sgt. Ronald W. Baker | Mother | 10/7/2004 | $5,000,000.00 | $5,000,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| Anthony Wayne Baker | Sgt. Ronald W. Baker | Father | 10/7/2004 | $5,000,000.00 | $5,000,000.00 |
| Chris Baker | Sgt. Ronald W. Baker | Brother | 10/7/2004 | $2,500,000.00 | $2,500,000.00 |
| James L. Matteson | Sgt. James C. Matteson | Father | 11/12/2004 | $5,000,000.00 | $5,000,000.00 |
| Joyce Moran | Sgt. James C. Matteson | Mother | 11/12/2004 | $6,250,000.00 | $6,250,000.00 |
| Hope Matteson | Sgt. James C. Matteson | Sister | 11/12/2004 | $3,125,000.00 | $3,125,000.00 |
| Micaela R. Matteson | Sgt. James C. Matteson | Sister | 11/12/2004 | $2,500,000.00 | $2,500,000.00 |
| Sara Hughes | Sgt. Jonathan A. Hughes | Wife | 3/19/2005 | $12,000,000.00 | $12,000,000.00 |
| Roxanne Collins | SFC Randy Collins | Wife | 5/4/2005 | $12,000,000.00 | $12,000,000.00 |
| Kevin Frazier, Jr. | SFC Randy Collins | Stepson | 5/4/2005 | $5,000,000.00 | $5,000,000.00 |
| Estate of Margarette Miller | SFC Randy Collins | Mother | 5/4/2005 | $5,000,000.00 | $5,000,000.00 |
| Louis Rainey, Jr. | SFC Randy Collins | Stepbrother | 5/4/2005 | $5,000,000.00 | $5,000,000.00 |
| Moses L. Collins, Jr. | SFC Randy Collins | Brother | 5/4/2005 | $2,500,000.00 | $2,500,000.00 |
| Teresia Collins | SFC Randy Collins | Sister | 5/4/2005 | $2,500,000.00 | $2,500,000.00 |
| Gretta Collins-Williams | SFC Randy Collins | Sister | 5/4/2005 | $2,500,000.00 | $2,500,000.00 |
| William Byers | Spc. Casey Byers | Father | 6/11/2005 | $6,250,000.00 | $6,250,000.00 |
| Ann Byers | Spc. Casey Byers | Mother | 6/11/2005 | $6,250,000.00 | $6,250,000.00 |
| Hailey Maxwell | Spc. Casey Byers | Daughter | 6/11/2005 | $5,000,000.00 | $5,000,000.00 |
| Timothy Rock | Sgt. Nathaniel Rock | Father | 8/1/2005 | $5,000,000.00 | $5,000,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| Adriana Rock | Sgt. Nathaniel Rock | Mother | 8/1/2005 | $5,000,000.00 | $5,000,000.00 |
| Jared Rock | Sgt. Nathaniel Rock | Brother | 8/1/2005 | $3,125,000.00 | $3,125,000.00 |
| Terri Watkins | Spc. Timothy Dee Watkins | Mother | 10/15/2005 | $5,000,000.00 | $5,000,000.00 |
| Robbie Watkins | Spc. Timothy Dee Watkins | Father | 10/15/2005 | $5,000,000.00 | $5,000,000.00 |
| Rachel Watkins | Spc. Timothy Dee Watkins | Sister | 10/15/2005 | $2,500,000.00 | $2,500,000.00 |
| Rebekah Helmadollar | Spc. Timothy Dee Watkins | Sister | 10/15/2005 | $2,500,000.00 | $2,500,000.00 |
| Jonathan Watkins | Spc. Timothy Dee Watkins | Brother | 10/15/2005 | $2,500,000.00 | $2,500,000.00 |
| Thomas Watkins | Spc. Timothy Dee Watkins | Brother | 10/15/2005 | $2,500,000.00 | $2,500,000.00 |
| Robyn Anderson | LCpl. Norman W. Anderson III | Mother | 10/19/2005 | $5,000,000.00 | $5,000,000.00 |
| Norman Anderson, Jr. | LCpl. Norman W. Anderson III | Father | 10/19/2005 | $5,000,000.00 | $5,000,000.00 |
| Brooke Anderson | LCpl. Norman W. Anderson III | Sister | 10/19/2005 | $3,125,000.00 | $3,125,000.00 |
| Shirley Spears | Maj. Gerald Bloomfield II | Mother | 11/2/2005 | $5,000,000.00 | $5,000,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| Thomas Bloomfield | Maj. Gerald Bloomfield II | Brother | 11/2/2005 | $3,125,000.00 | $3,125,000.00 |
| Kathleen Kerch | Maj. Gerald Bloomfield II | Sister | 11/2/2005 | $3,125,000.00 | $3,125,000.00 |
| Paula Wallace | Maj. Gerald Bloomfield II | Sister | 11/2/2005 | $2,500,000.00 | $2,500,000.00 |
| Ronald Spears | Maj. Gerald Bloomfield II | Stepfather | 11/2/2005 | $5,000,000.00 | $5,000,000.00 |
| Jeffrey Spears | Maj. Gerald Bloomfield II | Stepbrother | 11/2/2005 | $2,500,000.00 | $2,500,000.00 |
| Martin Terrazas, Sr. | LCpl. Miguel Terrazas | Father | 11/19/2005 | $6,250,000.00 | $6,250,000.00 |
| George Terrazas | LCpl. Miguel Terrazas | Grandfather | 11/19/2005 | $5,000,000.00 | $5,000,000.00 |
| Martin Terrazas, Jr. | LCpl. Miguel Terrazas | Brother | 11/19/2005 | $2,500,000.00 | $2,500,000.00 |
| Vanessa Terrazas-McKay | LCpl. Miguel Terrazas | Sister | 11/19/2005 | $3,125,000.00 | $3,125,000.00 |
| Melissa Terrazas | LCpl. Miguel Terrazas | Sister | 11/19/2005 | $3,125,000.00 | $3,125,000.00 |
| Andres Terrazas | LCpl. Miguel Terrazas | Brother | 11/19/2005 | $2,500,000.00 | $2,500,000.00 |
| Brandy Sacco | Sgt. Dominic Joseph Sacco | Wife | 11/20/2005 | $10,000,000.00 | $10,000,000.00 |
| Anthony Sacco | Sgt. Dominic Joseph Sacco | Son | 11/20/2005 | $5,000,000.00 | $5,000,000.00 |
| Diane Sacco | Sgt. Dominic Joseph Sacco | Mother | 11/20/2005 | $6,250,000.00 | $6,250,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| William Sacco | Sgt. Dominic Joseph Sacco | Father | 11/20/2005 | $5,000,000.00 | $5,000,000.00 |
| Lisa Livingston | Sgt. Dominic Joseph Sacco | Sister | 11/20/2005 | $2,500,000.00 | $2,500,000.00 |
| Carolyn Miller | SSgt. Keith A. Bennett | Mother | 12/11/2005 | $5,000,000.00 | $5,000,000.00 |
| Tina Daley | SSgt. Keith A. Bennett | Sister | 12/11/2005 | $2,500,000.00 | $2,500,000.00 |
| Faustina Armijo | Spc. Santos Raymond Armijo | Mother | 10/2/2006 | $6,250,000.00 | $6,250,000.00 |
| Alfonso Luna | Spc. Santos Raymond Armijo | Brother | 10/2/2006 | $3,125,000.00 | $3,125,000.00 |
| Harold Mowl, Jr. | Cpl. Kevin Scott Mowl | Father | 8/2/2007 | $6,250,000.00 | $6,250,000.00 |
| Mary Mowl | Cpl. Kevin Scott Mowl | Mother | 8/2/2007 | $6,250,000.00 | $6,250,000.00 |
| Carlene Stahlnecker | Cpl. Kevin Scott Mowl | Sister | 8/2/2007 | $3,125,000.00 | $3,125,000.00 |

Dated: April 29, 2026

Respectfully submitted,

/s/Stephen A. Saltzburg
Special Master