UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RUBEN V. FLORES, *et al.*, | : | |
| Plaintiffs, | : | **Case No.: 22-cv-1512 (JEB)** |
| -against- | : | |
| ISLAMIC REPUBLIC OF IRAN, | : | |
| Defendant. | : | |

**SPECIAL MASTER FRANKLIN ROSENBLATT'S REPORT AND RECOMMENDATIONS REGARDING DAMAGES FOR 34 IMMEDIATE FAMILY MEMBER PLAINTIFFS IDENTIFIED IN THE COURT'S SEPTEMBER 24, 2025, ORDER**

# TABLE OF CONTENTS


INTRODUCTION ........ 1

I. PROCEDURAL BACKGROUND ........ 1

II. CATEGORIES OF CLAIMS AND PROPOSED DAMAGES FRAMEWORK ........ 2

A. Solatium Damages ........ 2

B. Punitive Damages ........ 5

III. THE 34 PLAINTIFFS' INJURIES ........ 5

A. JASON K. CHAPPELL – JANUARY 24, 2004, ATTACK – KHALIDIYAH ........ 5

1. Gail L. Farnsworth ........ 7
2. Mitchell Farnsworth ........ 9
3. Lisa R. Farnsworth ........ 11

B. ERIC A. AYON – APRIL 9, 2004, ATTACK – RAMADI ........ 13

1. Maria A. Ayon ........ 14
2. Cynthia Ayon ........ 17

C. TRACE W. DOSSETT – MAY 2, 2004, ATTACK – CAMP FALLUJAH ........ 19

1. Angela Kay Dossett ........ 20
2. Cassidee Lee-Ann Dossett ........ 24
3. Raimee Kay Dossett ........ 27

D. JOSEPH MICHEAL NOLAN – NOVEMBER 18, 2004, ATTACK – NORTH OF FALLUJAH ........ 29

1. Joseph P. Nolan ........ 30
2. Matthew J. Nolan ........ 32

E. STEPHEN C. BENISH – NOVEMBER 28, 2004, ATTACK – RAMADI ........ 34

1. Stephen J. Benish ........ 35

F. GEORGE R. GEER-JANUARY 17, 2005, ATTACK – RAMADI ........ 36

1. Harold R. Geer ........ 37
2. Hope Stroud ........ 39

G. MICHAEL W. FRANKLIN – MARCH 7, 2005, ATTACK – RAMADI ........ 40

1. William P. Franklin ........ 41
2. Tina M. Franklin ........ 43
3. Janelle Kelley ........ 46

H. JOURDAN L. GREZ – MAY 11, 2005, ATTACK – KARABILAH ........ 49

1. **Andrea Grez** ..... **51**
2. **Aric Grez** ..... **52**
3. **Colin Lovell** ..... **54**

**I. TERRY W. BALL, JR. – JUNE 12, 2005, ATTACK – AL KARMAH** ..... **55**

1. **Jennifer Ball** ..... **58**
2. **Ethan Ball** ..... **63**
3. **Riley Ball** ..... **65**
4. **Gavin Ball** ..... **67**
5. **Terry W. Ball, Sr.** ..... **70**
6. **Melissa Ball** ..... **70**

**J. CLIFTON B. MOUNCE – JULY 14, 2005, ATTACK – TREBIL** ..... **72**

1. **Tiffany Mounce-Jones** ..... **73**

**K. WILLIAM LEE EVANS – SEPTEMBER 19, 2005, ATTACK – RAMADI** ..... **75**

1. **Billie Evans** ..... **76**

**L. THOMAS H. BYRD – OCTOBER 15, 2005, ATTACK – RAMADI** ..... **78**

1. **Julia Fatovich** ..... **79**
2. **Michael Byrd** ..... **81**

**M. SEAMUS M. DAVEY – OCTOBER 21, 2005, ATTACK – ALBU HYATT** ..... **84**

1. **Derek Davey** ..... **86**
2. **Austin Byrd** ..... **87**
3. **Shiloh Mackey** ..... **89**
4. **Brittany Bedernik** ..... **91**

**N. MICHAEL HODSHIRE – OCTOBER 29, 2005, ATTACK – NASSER WAS SALAAM** ..... **94**

1. **Tarry Fikel** ..... **95**

**CONCLUSION** ..... **97**

# TABLE OF AUTHORITIES

**Cases**

*Belkin v. Islamic Republic of Iran*,
667 F. Supp. 2d 8 (D.D.C. 2009) .......... 3

*Bernhardt v. Islamic Republic of Iran*,
No. 18-cv-2739 (TJK), 2023 WL 2598677 (D.D.C. Mar. 22, 2023) .......... passim

*Blais v. Islamic Republic of Iran*,
459 F. Supp. 2d 40 (D.D.C. 2006) .......... 62

*Bova v. Islamic Republic of Iran*,
No. 15-cv-1074 (RCL), 2020 WL 2838582 (D.D.C. May 31, 2020) .......... 4

*Cabrera v. Islamic Republic of Iran*,
No. 19-cv-3835 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022) .......... 10

*Elahi v. Islamic Republic of Iran*,
124 F. Supp. 2d 97 (D.D.C. 2000) .......... 16

*Est. of Brown v. Islamic Republic of Iran*,
872 F. Supp. 2d 37 (D.D.C. 2012) .......... 4

*Est. of Heiser v. Islamic Republic of Iran*,
466 F. Supp. 2d 229 (D.D.C. 2006) .......... 3

*Est. of Heiser v. Islamic Republic of Iran*,
659 F. Supp. 2d 20 (D.D.C. 2009) .......... 2, 3

*Ewan v. Islamic Republic of Iran*,
466 F. Supp. 3d 236 (D.D.C. 2020) .......... 2

*Flanagan v. Islamic Republic of Iran*,
87 F. Supp. 3d 93 (D.D.C. 2015) .......... 3

*Flatow v. Islamic Republic of Iran*,
999 F. Supp. 1 (D.D.C. 1998) .......... 16

*Force v. Islamic Republic of Iran*,
617 F. Supp. 3d 20 (D.D.C. 2022) .......... 3

*Fritz v. Islamic Republic of Iran*,
324 F. Supp. 3d 54 (D.D.C. 2018) .......... 10

*Gration v. Islamic Republic of Iran*,
No. 21-cv-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023) .......... 2

*Haim v. Islamic Republic of Iran*,
425 F. Supp. 2d 56 (D.D.C. 2006) .......... 62

*Hamen v. Islamic Republic of Iran*,
407 F. Supp. 3d 1 (D.D.C. 2019) .......... passim

*Karcher v. Islamic Republic of Iran*,
No. 16-cv-232 (CKK), 2023 WL 8934924 (D.D.C. Dec. 27, 2023) ..................................... 10

*Lelchook v. Syrian Arab Republic*,
No. 16-cv-1550 (RC), 2019 U.S. Dist. LEXIS 163642 (D.D.C. Sept. 25, 2019).................. 16

*Mark v. Islamic Republic of Iran*,
626 F. Supp. 3d 16 (D.D.C. 2022)........................................................................................ 4

*Moradi v. Islamic Republic of Iran*,
77 F. Supp. 3d 57 (D.D.C. 2015).......................................................................................... 2

*Murphy v. Islamic Republic of Iran*,
740 F. Supp. 2d 51 (D.D.C. 2010)..................................................................................... 3, 4

*Oveissi v. Islamic Republic of Iran*,
768 F. Supp. 2d 16 (D.D.C. 2011)............................................................................. 4, 10, 62

*Oveissi v. Islamic Republic of Iran*,
879 F. Supp. 2d 44 (D.D.C. 2012)........................................................................................ 3

*Owens v Republic of Sudan*,
71 F. Supp. 3d 252 (D.D.C. 2014)........................................................................................ 3

*Pautsch v. Islamic Republic of Iran*,
No. 20-cv-3859 (JEB), 2025 U.S. Dist. LEXIS 125115 (D.D.C. July 1, 2025)....................... 5

*Peterson v. Islamic Republic of Iran*,
515 F. Supp. 2d 25 (D.D.C. 2007)........................................................................................ 3

*Roth v. Islamic Republic of Iran*,
78 F. Supp. 3d 349 (D.D.C. 2015).................................................................................... 2, 3

*Thuneibat v. Syrian Arab Republic*,
167 F. Supp. 3d 22 (D.D.C. 2016)................................................................................ passim

*Valore v. Islamic Republic of Iran*,
700 F. Supp. 2d 52 (D.D.C. 2010)................................................................................ passim

*Wultz v. Islamic Republic of Iran*,
864 F. Supp. 2d 24 (D.D.C. 2012)........................................................................................ 4

**Statutes**

28 U.S.C. § 1605A(a)(2)(A)(ii)(I) .................................................................................. passim

28 U.S.C. § 1605A(c) ...................................................................................................... passim

# INTRODUCTION

Special Master Franklin Rosenblatt submits this Report and Recommendations regarding damages as to the injuries sustained by 34 of the 510 plaintiffs for whom the Court granted default judgment as to liability against the Defendants Islamic Republic of Iran and Syrian Arab Republic, pursuant to the Court's Order and Memorandum Opinion entered on September 24, 2025.[1]

## I. PROCEDURAL BACKGROUND

On October 11, 2024, Plaintiffs filed their Motion for Default Judgment as to Liability for First Wave of Attacks, ECF No. 26, on behalf of Plaintiffs injured in 33 attacks. On November 22, 2024, Plaintiffs filed their Motion for Default Judgment as to Liability for Second Wave of Attacks, ECF No. 33, on behalf of Plaintiffs injured in an additional 39 attacks. On February 26, 2025, Plaintiffs filed their Motion for Default Judgment as to Liability for Third Wave of Attacks, ECF No. 41, on behalf of Plaintiffs injured in an additional 43 attacks. Default judgment as to liability was granted in favor of Plaintiffs on September 24, 2025, as to all 115 attacks for which default judgment had been sought.

On October 22, 2025, Plaintiffs moved to appoint five Special Masters—Jim Letten, Esq.; Jack McKay, Esq.; Professor Franklin D. Rosenblatt; Eric D. Green, Esq.; and Professor Stephen A. Saltzburg—to issue Reports and Recommendations ("R&Rs") for damages of Plaintiffs impacted by the Court's September 24, 2025, Order. *See* ECF No. 50. The Court granted this motion on October 27, 2025. ECF No. 52. Further, the Court issued an Administrative Plan Governing Five Special Masters stating, "[w]ithin six months of receiving damages submissions for Plaintiffs' claims, each Special Master shall submit Reports and Recommendations to the Court

---

[1] The Special Master has reviewed all of the exhibits provided to him by the Plaintiffs which are too voluminous to file on the docket. Plaintiffs have indicated that they will provide the exhibits to the Court upon request.

via ECF containing findings of fact and conclusions of law regarding each item of compensatory damages." ECF No. 52-1 at 4.

## II. CATEGORIES OF CLAIMS AND PROPOSED DAMAGES FRAMEWORK

Plaintiffs submit this Proposed Findings of Fact and Conclusions of Law requesting damages for 34 immediate-family Plaintiffs whose loved ones were killed in various attacks traceable to Iran and Syria that were part of the "second wave" of attacks for which they sought liability. *See* ECF No. 33. All Plaintiffs are family members of U.S. military servicemen who were killed in action by the attacks in Iraq addressed in the Court's September 24, 2025, Order. This Circuit follows a damages framework under Foreign Sovereign Immunities Act ("FSIA") cases.

To recover damages against Iran and Syria, Plaintiffs "must prove that the consequences of the [defendants'] conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955, at *29 (D.D.C. Aug. 15, 2023) (quoting *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 349, 402 (D.D.C. 2015)). Courts may rely on written declaration from family member claimants describing the attack's effect on him or her. *See, e.g., Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (D.D.C. 2015).

### A. Solatium Damages

Under the FSIA, a state sponsor of terrorism is responsible for intentional infliction of emotional distress, the resulting pain and suffering, and solatium of immediate family members of individuals killed in an attack for which a state sponsor of terrorism provided material support or resources. *See Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 245 (D.D.C. 2020); *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (D.D.C. 2009). In these scenarios, family members do not need to be present at the scene of the terrorist attack to recover under a

theory of intentional infliction of emotional distress. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 80 (D.D.C. 2010); *Est. of Heiser*, 659 F. Supp. 2d at 27; *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015). Solatium damages seek to compensate family members for "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).

Courts in this Circuit generally follow established baseline awards for solatium claims of family members of victims who died in terrorist attacks. *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007). These baseline values are based on the application of general principles of tort law. *See Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012) (holding that courts assessing damages under the FSIA "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises"); *Est. of Heiser*, 659 F. Supp. 2d at 24. Applying these baseline values "help[s] ensure that similarly situated victims receive comparable awards." *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 36 (D.D.C. 2022).

Under this framework, relatives of deceased servicemen are generally awarded baseline damages amounts of $8 million for spouses, $5 million for children and parents, and $2.5 million for siblings. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010); *Est. of Heiser*, 466 F. Supp. 2d at 260 (D.D.C. 2006); *Owens v. Republic of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014). However, these baseline awards are "not set in stone." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010).

Decisions to deviate from the baseline and award upward departures depend on various factors. *See e.g.*, *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011) (factors such as "an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing"); *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 38 (D.D.C. 2022) (children who were minors when their parents died have been awarded $6.25 million); *Est. of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 43 (D.D.C. 2012) (upward departure was warranted where sister suffered a nervous breakdown that required medical treatment, and she was prescribed medication for approximately one year); *Murphy*, 740 F. Supp. 2d at 79 (noting that self-destructive behavior is "uniquely acute suffering warranting an upward departure"). Upward enhancements to the baseline values can range from approximately 20 to 100 percent depending on the individual plaintiff's circumstances. *See Bova v. Islamic Republic of Iran*, No. 15-cv-1074 (RCL), 2020 WL 2838582, at *9 (D.D.C. May 31, 2020) (awarding 20 percent enhancement where mother suffered "precipitous emotional decline due to the death of her son" and attempted suicide); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (finding severe mental distress arising from death warranted 25 percent enhancement); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40-41 (D.D.C. 2012) (awarding plaintiff 40 percent enhancement due to suffering from post-traumatic stress disorder, persistent grief, and depression coupled with decline in school grades and lack of motivation); *Oveissi*, 768 F. Supp. 2d at 29-30 (finding plaintiff's enduring trauma including depression, anger, and alcoholism following the victim's death warranted a 50 percent enhancement).

**B. Punitive Damages**

In addition to solatium damages, Plaintiffs also seek punitive damages which "serve to punish and deter the action which they [are] awarded." *Valore*, 700 F. Supp. 2d at 87. The terrorism exception to the FSIA specifically addresses the award of punitive damages. *See* 28 U.S.C. § 1605A(c). This Court has previously expressed a level of skepticism regarding the "actual deterrent effect of punitive damages" in *Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859 (JEB), 2025 U.S. Dist. LEXIS 125115, at *5 (D.D.C. July 1, 2025)[2]; however, this Court nevertheless found, "[g]iven the reprehensibility of Defendants' actions, punishment beyond compensatory relief may aid not only to hold [Defendants] morally accountable but also to deter similar misconduct by the two nations in the future. *Id.* at *4. In *Pautsch*, this Court awarded punitive damages in an amount equal to compensatory damages. *Id.* at *6 (following other courts in this District that have awarded such requests in similar cases). Plaintiffs here request the entry of punitive damages in the same manner as was entered in the companion *Pautsch* case.

**III. THE 34 PLAINTIFFS' INJURIES**

Plaintiffs describe below 14 of the attacks for which this Court found Iran and Syria liable as well as the injuries Plaintiffs sustained due to the loss of their loved ones.[3]

**A. JASON K. CHAPPELL – JANUARY 24, 2004, ATTACK – KHALIDIYAH**

On January 24, 2004, Army Spc. Jason K. Chappell was serving in the B Company, 1st Battallion, 9th Cavalry in Khalidiyah, Iraq when a vehicle-borne improvised explosive device ("VBIED") detonated north of the Khalidiyah Bridge where Spc. Chappell was traveling with his unit. *See* ECF No. 9 at ¶ 231; Ex. 2 (ECF No. 33-1) at 10-11. Spc. Chappell and two other

[2] This case was initially filed as a related case to the *Pautsch* case.

[3] Claims for economic loss for the estates of those who were killed—to the extent a claim for the estate has been asserted—will be included in a distinct Findings of Fact and Conclusions of Law to be submitted at a later date.

servicemembers in his unit died as a result of the attack.[4] *Id*. Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Spc. Chappell was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the January 24, 2004 attack in which Spc. Jason K. Chappell was killed. *See* ECF Nos. 47, 48.

Spc. Chappell's surviving parents and sibling—Gail L. Farnsworth, Mitchell Farnsworth, and Lisa R. Farnsworth—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 230-236. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of Spc. Chappell's society, companionship, comfort, advice and counsel. *Id.* ¶ 236. The following chart reflects the claims asserted by these three family members in their individual capacities arising out of the January 24, 2004, attack, as well as the evidence setting forth the basis of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted**[5] | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Gail L. Farnsworth | Spc. Jason K. Chappell's mother | Solatium claim $6.25 million | Declaration of Gail L. Farnsworth, dated December 25, 2025, including copy of her proof of U.S. citizenship | 4 |
| Mitchell Farnsworth | Spc. Jason K. Chappell's stepfather | Solatium claim $5 million | Declaration of Mitchell Farnsworth, dated September 26, 2025, including copy of his proof of U.S. citizenship | 5 |

[4] Ex. 3, Report of Casualty for Spc. Jason K. Chappell, dated January 24, 2004.

[5] The values listed in these tables are those proposed by the Plaintiffs. The recommended values may differ from those sought by the Plaintiffs.

| | | | | |
|---|---|---|---|---|
| Lisa R. Farnsworth | Spc. Jason K. Chappell's sister | Solatium claim $3.125 million | Declaration of Lisa R. Farnsworth, dated February 26, 2025, including copy of her proof of U.S. citizenship | 6 |

**1. Gail L. Farnsworth[6]**

Gail Farnsworth is the mother of Jason K. Chappell. *See* Ex. 4 at ¶ 3. Gail vividly recalled Jason's birth, which was marked by both joy and fear after he was diagnosed with respiratory distress and congenital heart disease and transferred to another hospital for potential emergency treatment. *Id.* at ¶ 4. Doctors later determined that the procedure was unnecessary because Jason's condition resolved on its own, an outcome described as highly unusual, leading the family to refer to him as their "miracle baby." *Id.* Gail described raising Jason as one of the greatest joys of her life. *Id.* at ¶ 5. She described Jason as smart, funny, and deeply driven, excelling academically as a mostly straight-A student, participating in Academic Decathlon for four years, and earning numerous awards, with his family attending competitions to support him. *Id.* at ¶ 6. Gail also recalled Jason's participation in drama, where at the end of each show, Jason removed his hat and took a bow at the curtain. *Id.* Gail captured this moment in *Romeo and Juliet* where Jason played Juliet's father. *Id.* This video brings her joy to watch but is also a reminder of what she's lost. *Id.*

After high school, Jason attended college briefly before deciding to enlist in the Army. *Id.* at ¶ 7. Gail warned him not to make a rash decision, but Jason was resolute and enlisted the same day. *Id.* The day Gail learned of her son's death, she recalled suddenly feeling overwhelmed and deciding to visit her parents' house. *Id.* at ¶ 8. When she returned home, there was a military

[6] Gail L. Farnsworth's Birth Certificate and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 4, Declaration of Gail L. Farnsworth, dated December 25, 2025.

vehicle parked outside. *Id.* When officials came inside the house, they informed her that Jason had been killed in Iraq. *Id.* Gail initially denied the reality, stating repeatedly, "oh my God," and remained in shock. *Id.* The military officials gave Gail the harrowing details of her son's death—[redacted] *Id.*

Jason's death upended Gail's life. *Id.* at ¶ 9. [redacted]

[redacted]

Plaintiffs requested an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Gail L. Farnsworth's solatium claim, but the Special Master finds a baseline award more appropriate in this situation. This is because there is no mention in Gail's affidavit of her continued relationship with Jason Chappell into adulthood and after deployment. While the

Special Master does not diminish the grief that Gail L. Farnsworth feels in accordance with the loss of her son, this loss is not factually similar to the previous cases that warrant an upward departure and is more akin to the baseline grief of a parent losing their child.

### 2. Mitchell Farnsworth[7]

Mitchell Farnsworth is the stepfather of Jason K. Chappell. *See* Ex. 5 at ¶ 3. Mitchell married Gail when Jason was nine years old and treated Jason as his own son. *Id.* at ¶ 4. Mitchell loved Jason and described being his stepfather as one of the greatest joys of his life. *Id.* Mitchell bonded closely with Jason over sports, particularly basketball, and through annual family traditions such as attending fairs, demolition derbies, monster truck rallies, races, and concerts. *Id.* Mitchell described Jason as a dedicated and talented student, participating in Academic Decathlon throughout high school and earning numerous medals, as well as performing in school plays, including *Romeo and Juliet*. *Id.* at ¶ 5. Mitchell emphasized Jason's strong work ethic, athleticism, and willingness to help at home without complaint. *Id.* Mitchell and Jason remained close even after Jason joined the Army. *Id.* Mitchell recalled one visit he and Gail had with Jason when he was stationed in Fort Benning, and Jason was reluctant for his parents to leave. *Id.* Mitchell remained in frequent contact with Jason throughout his service. *Id.*

Mitchell and Gail were visiting Gail's parents and decided to go to the movies. *Id.* at ¶ 7. As they returned home, they saw a military vehicle parked outside the house. *Id.* As reality began to set in, Gail repeatedly said, "oh my God." *Id.* Mitchell described that when they were informed that Jason had been killed while deployed in Iraq, their world was "crushed." *Id.*

---

[7] Mitchell Farnsworth's Florida birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 5, Declaration of Mitchell Farnsworth, dated September 26, 2025.

Following Jason's death, Mitchell assumed responsibility for notifying family and friends because Gail was too heartbroken to do so. *Id.* at ¶ 8. [redacted]

While Mitchell is not Jason's biological father, the class of plaintiffs who may recover solatium damages "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members" despite not being legally or biologically related to the victim. *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730, at *42 (D.D.C. July 19, 2022). To establish this "functional equivalence" of a close family member, plaintiffs must show that they were "treated like" a victim's spouse, child, parent, or sibling. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (finding that stepsiblings recover functionally equivalent to siblings when they were "treated like" a brother or sister); *Oveissi,* 768 F. Supp. 2d at 27 (holding that interactions between a stepparent and child "were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924, at *7 (D.D.C. Dec. 27, 2023) (finding a stepparent to be a functional equivalent of a parent notwithstanding an ongoing relationship between the victim and their biological parent because of the supplementary role played by the stepparent in the parental role).

Here, based on his declaration and the facts set forth above, Plaintiffs submit that Mr. Farnsworth qualifies under the law as the functional equivalent of Spc. Chappell's father based on

the fact that he was "treated like" Spc. Chappell's parent, and his evident loss and grief resembles that of a biological parent. Following the baseline standard, Plaintiffs requested an award of $5 million for Mitchell Farnsworth's solatium claim. The Special Master agrees that a baseline award is appropriate for Mitchell Farnsworth's solatium claim.

### 3. Lisa R. Farnsworth[8]

Lisa Farnsworth ("Lisa") is the sister of Jason K. Chappell. *See* Ex. 6 at ¶ 3. According to Lisa, Jason was her hero, mentor, and closest friend. *Id.* at ¶ 4. She recalled how Jason used to pick her up from school and taught her how to play video games and draw. *Id.* Lisa described the sibling rivalry between her and Jason and how everything was a competition between the two of them. *Id.* at ¶ 4. They shared countless memories together from family dinners, church activities, or attending Jason's Academic Decathlon events and drama performances. *Id.* at ¶¶ 4-6. As they grew older, Lisa and Jason remained closely connected through calls and letters, even living just across the driveway from one another at one point. *Id.* at ¶ 5. Lisa recalled Jason's unexpected homecoming after joining the military, which moved her to tears. *Id.* at ¶ 6. Seeing her brother walk through the door unannounced "was like welcoming a hero back home." *Id.*

The day Lisa learned of Jason's death, she was returning home after watching a movie with her parents. *Id.* at ¶ 7. She recalled that the day felt off when earlier that day her father mentioned a news headline about soldiers killed in Iraq. *Id.* When the family returned home, the sight of a car parked in front of the driveway hinted that something was amiss. *Id.* When two men approached the family with a solemn demeanor, Lisa's heart sank. *Id.* Lisa was escorted in the house by her

[8] Lisa R. Farnsworth's Birth Certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 6, Declaration of Lisa R. Farnsworth, dated February 26, 2025.

mother where she overheard the men tell her parents that Jason had been killed. *Id.* Lisa was left overwhelmed, confused, and unable to fully grasp the finality of his death. *Id.*

[redacted]

Plaintiffs requested an upward enhancement to Lisa's claims based on [redacted]. See *Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Lisa Farnsworth's solatium claim. The Special Master agrees that

a 25% enhancement of the baseline award is appropriate because of the [redacted] which follows the precedent for an upward departure set by *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1 (D.D.C. 2019).

**B. ERIC A. AYON – APRIL 9, 2004, ATTACK – RAMADI**

On April 9, 2004, Private First Class ("PFC") Eric A. Ayon was serving in the U.S. Marine Corps in Anbar Province, Iraq, in the vicinity of Ramadi, Iraq. *See* ECF No. 9 at ¶¶ 254. PFC Ayon was checking on a disabled truck for other members of his unit when he was struck and killed by an IED. *See* Ex. 2 at 13. According to his death certificate, PFC Ayon's cause of death was a [redacted][9] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Spc. Chappell was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the January 24, 2004 attack in which Spc. Jason K. Chappell was killed. *See* ECF Nos. 47, 48.

PFC Ayon's mother, Maria A. Ayon and sister, Cynthia Ayon, are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 253-259. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of PFC Ayon's society, companionship, comfort, advice, and counsel. *Id*. at ¶ 259. The following chart reflects the claims asserted by Maria A. Ayon and Cynthia Ayon in their individual capacities arising out of the April 9, 2004, attack as well as the evidence setting forth the basis of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

---

[9] Ex. 7, Certificate of Death (Overseas) for PFC Eric Alonso Ayon.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Maria A. Ayon | PFC Eric A. Ayon's, mother. | Solatium claim $6.25 million | Declaration of Maria A. Ayon dated January 23, 2025, including copy of her proof of U.S. citizenship | 8 |
| Cynthia Ayon | PFC Eric A. Ayon's, sister. | Solatium claim $3.125 million | Declaration of Cynthia Ayon dated January 23, 2025, including copy of her proof of U.S. citizenship | 9 |

**1. Maria A. Ayon**[10]

Maria A. Ayon is the mother of Eric A. Ayon, who was her first-born child and only son. *See* Ex. 8 at ¶ 3-4. Maria and Eric shared a close relationship and often "shared dreams, fears, and laughter." *Id.* at ¶ 4. They communicated daily and confided in each other "sharing every aspect of [their] lives." *Id.* She recalls that as a child, Eric was happy and competitive as he played baseball. *Id.* Eric had "a remarkable ability to lighten the mood with his humor." *Id.*

According to Maria, Eric was an amazing son, brother, father, and uncle. *Id.* at ¶ 13. She described her son as selfless as "he was always the first to lend a hand, making sure everyone around him was taken care of." *Id.* at ¶ 4. He was a mentor to his son and a devoted father. *Id.* at ¶ 6. Eric created many memories with his son going to the movies and amusement parks. *Id.* He was a positive role model to his sisters. *Id.* "Despite a nine-year age gap, he and [his sister] Jazmine shared a close bond." *Id.* Eric's sister Cynthia was "his partner in childhood mischief," and their sibling rivalry blossomed into an unbreakable bond in adulthood." *Id.* As the older brother to two

[10] Maria A. Ayon's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 8, Declaration of Maria A. Ayon, dated January 23, 2025.

sisters, he "embod[ied[ the role of the protective big brother." *Id.* Eric also treated his niece "with the same love and care as his own son." *Id.* He was family-oriented and loved by those who knew him. *Id.* at ¶¶ 5-6.

Maria learned of her son's death after returning home one day to a uniformed officer. *Id.* at ¶ 7. Initially, she was uplifted by the sight of the officer because she mistook him for her son. *Id.* As she approached the house and entered into the living room, she was "confronted with the reality that [her] son was never coming home." *Id.* [redacted]

[redacted]

Plaintiffs requested an upward enhancement to Ms. Ayon's claims based on [redacted] *See Lelchook v. Syrian Arab Republic*, No. 16-cv-1550 (RC), 2019 U.S. Dist. LEXIS 163642, at *14 (D.D.C. Sept. 25, 2019) (awarding a 25 percent upward departure to a family member who "lost her sense of place in the world"); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence"). Plaintiffs requested an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Maria's solatium claim; however, the Special Master finds a baseline award more appropriate. The relationship between Maria and Eric Ayon appears to be that of an average relationship between mother and son apart from the severe financial loss that accompanied his death. A claim for solatium refers to the "mental anguish, bereavement and grief resulting from the fact of decedent's death[.]" *Elahi v. Islamic Republic of Iran*, 124 F. Supp. 2d 97, 109 (D.D.C. 2000), quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30 (D.D.C. 1998). As such, solatium claims do not include damages for financial losses; rather, these losses would be more appropriate in an economic damages award or compensatory award. *Id*. However, Maria Ayon has only requested a solatium award and a punitive damages award. Because there is no economic damages award sought, the financial losses of Maria Ayon as a result of Eric Ayon's death may not be considered for a damages amount.

**2. Cynthia Ayon[11]**

Cynthia Ayon is the sister of Eric A. Ayon. *See* Ex. 9 at ¶ 3. Cynthia described her relationship with Eric as "very close" as he was her "go-to person for advice" and "was the only person [she] could always count on." *Id.* at ¶ 4. She has fond memories of her and her brother "turning [their] living room into a makeshift water park" and of him walking her home from school. *Id.* at ¶ 7. Eric was "the epitome of a caring brother" and was her "partner in crime." *Id.* He had a "sense of humor [that] brought light and laughter" to his family's lives. *Id.* at ¶ 6. As a single mother, Eric was pivotal in assisting Cynthia in raising her daughter and treated her as his own. *Id.* at ¶ 5. According to Cynthia, her relationship with her brother remained constant, even after he joined the military. *Id.* at ¶ 8.

Cynthia spoke with Eric on the phone the day he was killed. *Id.* at ¶ 11. She recalled that he was excited and confided in her that he "might be coming home early" if he is sent on a "special mission." *Id.* Excited about the possibility of returning soon, Eric told Cynthia that she could be the one to pick him up so they could surprise their mom. *Id.* Eric assured his sister that he would do everything he could to stay safe, "but if Marines show up at the house dressed in Blues, it's not good" and that she had to be "strong and there for [their] mom." *Id.* Cythia described that some of the last words that Eric said to her were, "I love you little sister, don't ever forget!" *Id.*

To her horror, Cynthia was home with her daughter and father when there was a knock on the door. *Id.* at ¶ 12. Cynthia answered the door, and the first thing she saw was a young man dressed in Blues, and her brother's words of warning hit her. *Id.* She was in shock as he entered into their living room. *Id.* When her father asked who was at the door, she "tried to respond, but

[11] Cynthia Ayon's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 9, Declaration of Cynthia Ayon, dated January 23, 2025.

no words came out." *Id.* When she was finally able to speak, she could only say Wiwi (her nickname for her brother) was gone. *Id.* [redacted]

Within hours of receiving the news of her brother's death, their home was surrounded by news reporters, family and friends. *Id.* at ¶ 13. Cynthia felt responsible to protect her mother, Eric's son, and her daughter. *Id.* She tried to keep it all together as she had to be the one to explain Eric's death to her daughter and try to contact her nephew. *Id.* [redacted]

The absence of Eric has reshaped their family dynamics. [redacted]

Eric's death "has robbed us of future memories." *Id.* at ¶ 8. Eric "was a vital part of [their] lives." *Id.* at ¶ 18. Losing Eric "has not only taken away a beloved family member but has also dismantled the very fabric of [their] family unity." *Id.* "The loss of such an important piece of [their] family has irrevocably changed [them]." *Id.*

Plaintiffs requested an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Cynthia Ayon's solatium claim; however, the Special Master finds a baseline award more appropriate. The relationship between Cynthia and her brother appears to be that of a relationship between brother and sister that is synonymous with other baseline sibling awards, apart from the severe financial loss that accompanied his death. However, as noted above in Maria Ayon's claim, a loss of financial support may not be taken into account when determining if an upward departure of a solatium claim is warranted. Because this factor may not be assessed in the solatium claim, a baseline award is more appropriate for Cynthia Ayon's solatium claim.

**C. TRACE W. DOSSETT – MAY 2, 2004, ATTACK – CAMP FALLUJAH**

On May 2, 2004, Petty Officer Second Class ("PO2") Trace W. Dossett was serving in the United States Navy Reserves in Camp Fallujah, Iraq when the base was struck with a mortar attack. *See* ECF No. 9 at ¶ 293; Ex. 2 at 16-17. According to the report of casualty, PO2 Dossett died as a result of the injuries he sustained in the attack.[12] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which PO2 Dossett was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the May 2, 2004 attack in which PO2 Trace W. Dossett was killed. *See* ECF Nos. 47, 48.

[12] Ex. 10, Report of Casualty for PO2 Trace W. Dossett, dated May 3, 2004.

PO2 Dossett's surviving wife and children—Angela Kay Dossett, Cassidee Lee-Ann Dossett, and Raimee Kay Dossett—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 292-299. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of PO2 Dossett's society, companionship, comfort, advice and counsel. *Id.* ¶ 299. The following chart reflects the claims asserted by these four family members in their individual capacities arising out of the May 2, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Angela Kay Dossett | PO2 Trace W. Dossett's surviving spouse | Solatium claim $10 million | Declaration of Angela Kay Dossett, dated April 1, 2025, including copy of her proof of U.S. citizenship | 11 |
| Cassidee Lee-Ann Dossett | PO2 Trace W. Dossett's surviving child | Solatium claim $6.25 million | Declaration of Cassidee Lee-Ann Dossett, dated March 31, 2025, including copy of her proof of U.S. citizenship | 12 |
| Raimee Kay Dossett | PO2 Trace W. Dossett's surviving child | Solatium claim $6.25 million | Declaration of Raimee Kay Dossett, dated November 4, 2025, including copy of her proof of U.S. citizenship | 13 |

**1. Angela Kay Dossett[13]**

Angela Dossett is the spouse of Trace W. Dossett. *See* Ex. 11 at ¶ 3. Angela and Trace met in 1991. *Id.* at ¶ 4. She described Trace as her soulmate, best friend, and life partner. *Id.* Together,

[13] Angela Kay Dossett's United States Passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 11, Declaration of Angela Kay Dossett, dated April 1, 2025.

they built a loving family with their two daughters, who were five and nine years old at the time of his death. *Id.* Trace was a devoted husband, loyal provider, and deeply engaged father who referred to his family affectionately as "his girls," and who participated fully in every aspect of his daughters' lives. *Id.* His wit, intelligence, and kindness extended beyond the immediate family, and his absence has left an irreplaceable void in their daily lives. *Id.*

The day Angela received the news of Trace's death, her father and stepmother were at her home to assist her with moving into a new house. *Id.* at ¶ 6. She received a call from Trace's Aunt Kay who broke the devastating news that Trace was killed in Iraq. *Id.* Trace's aunt explained to Angela that everyone in his family in Iowa knew. *Id.* Angela was devastated and heartbroken that no one reached out to her. *Id.* Six hours later, a casualty officer arrived at her home in Jacksonville, Florida. *Id.* By this time, she was already engulfed in the reality of her worst nightmare. *Id.* Faced with an unbearable task, Angela's father gently told her daughters that their daddy was now in heaven. *Id.* Angela's emotions were a "mix of devastation, anger, and disbelief." *Id.* The way she learned of her husband's death was traumatic and further compounded her grief. *Id.*

[redacted]

[redacted]

Prior to his deployment, Trace promised their daughters he would return home soon—[redacted]

Plaintiffs requested an upward enhancement to Ms. Dossett's claims based on [redacted] *See Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id*. (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id*. (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat*, 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs requested an enhancement of 25% of her baseline award resulting in an award of $10 million for Angela Kay Dossett's solatium claim; however, the Special Master finds a baseline award to be more appropriate. Angela Kay Dossett's [redacted] While the Special Master commends Angela Dossett [redacted] the Special Master finds that these circumstances more closely align with a baseline award. Plaintiff additionally mentioned *Fraenkel* in which Judge Lamberth addressed how a claimant learned of the loss can be a factor in determining solatium.

*Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 357 (D.C. Cir. 2018). While this is certainly a factor that may be determined, there is no current precedent upon which an upward departure may be based on this factor alone. While the circumstances surrounding Angela's notification are extremely unfortunate—gut-wrenching, even—the notification manner alone is not sufficient to award an upward departure as it is not attributable to the defendant's conduct. A solatium claim is often compared to a claim for intentional infliction of emotional distress. In torts cases including negligence, the liability for an action caused by a later party may only be attributed to the original defendant if the later action was reasonably foreseeable. *See generally, Harvey v. District of Columbia*, 798 F.3d 1042 (D.C. Cir. 2015). While Iran and Syria are liable for Angela's loss and the emotional distress that was caused as a result, Iran and Syria did not have any influence or input into Angela's notification of her loss. The U.S. military was responsible for this. As such, the Special Master finds that a baseline award is warranted by the circumstances.

**2. Cassidee Lee-Ann Dossett[14]**

Cassidee Lee-Ann Dossett is the eldest daughter of Trace W. Dossett. *See* Ex. 12 at ¶ 3. According to Cassidee, Trace was a loving and devoted parent who was not only her dad but her closest friend and hero. *Id.* at ¶ 4. Cassidee recalled a childhood filled with affection and shared activities, including playing with Barbies, biking, swimming, watching movies, and spending time together at home, where her father was a central presence. *Id.* She recounted that their home was always filled with love and happiness, with her father at the center of it all. Cassidee explained that Trace had a profound impact on extended family, friends, and community. *Id.* at ¶ 5. Cassidee noted that more than 1,000 people attended his funeral, reflecting the depth of his impact. *Id.*

[14] Cassidee Lee-Ann Dossett's United States Passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 12, Declaration of Cassidee Lee-Ann Dossett, dated March 31, 2025.

Cassidee's world changed on May 2, 2004—a mere 30 days after Trace's deployment began. *Id.* at ¶ 6. She was just nine years old at the time, coming home from school when she was met with tears and sorrow enveloping her family. *Id.* According to Cassidee, when she was told that her father had been killed in action, the ground seemed to give way beneath her feet as she struggled to grasp the reality that her father and "hero, would never walk through [their] door again." *Id.* She described the shock, fear, and anxiety that followed, explaining that his death permanently altered her worldview and sense of security. *Id.*

[redacted]

[redacted]

[redacted]

[redacted]

Plaintiffs requested an upward enhancement to Cassidee's claims based on [redacted] *See Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id*. (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *Thuneibat*, 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Cassidee Lee-Ann Dossett's solatium claim. The Special Master agrees that a 25% enhancement of Cassidee Lee-Ann Dossett's baseline award is appropriate because of [redacted]

[redacted] evidence that Cassidee Lee-Ann Dossett experienced more extreme effects of the loss of her loved one, which follows the precedent for an upward departure set by *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1 (D.D.C. 2019).

### 3. Raimee Kay Dossett[15]

Raimee Kay Dossett ("Raimee") is the youngest daughter of Trace W. Dossett. *See* Ex. 13 at ¶ 3. She was only five years old when her father was killed in Iraq. *Id.* at ¶ 4. She is left with only fragmented memories supplemented by stories shared by her mother, sister, and others. *Id.* Raimee recalls small but meaningful moments, such as making her father tuna salad sandwiches for her lunch. *Id.* She remembers saying goodbye to her father before his deployment, which marked the last time she ever saw him. *Id.* Living with her father for those five years, though brief, formed a foundation of love she continues to cherish. *Id.* at ¶ 5.

Because of her age at the time, Raimee's memory of learning of her father's death is fragmented—a blend of what might have been real and what she was told over the years. *Id.* at ¶ 6. She remembers her mother and servicemen at their doorstep and the anguish on her mother's face that day. *Id.* [redacted]

[15] Raimee Kay Dossett's Birth Certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 13, Declaration of Raimee Kay Dossett, dated November 4, 2025.

[redacted]

Following her father's death, [redacted]

Plaintiffs requested an upward enhancement to Raimee's claims based on [redacted] *See Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id*. (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *Thuneibat*, 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86

(granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Raimee Kay Dossett's solatium claim. The Special Master agrees that a 25% enhancement of the baseline award is appropriate because of [redacted] as a result of the death of Trace Dossett. [redacted] evidences that Raimee Kay Dossett experienced more extreme effects of the loss of her loved one, which follows the precedent for an upward departure set by *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1 (D.D.C. 2019).

### D. JOSEPH MICHEAL NOLAN – NOVEMBER 18, 2004, ATTACK – NORTH OF FALLUJAH

On November 18, 2004, Sergeant ("Sgt.") Joseph M. Nolan was serving in the United States Army's 1st Battalion, 5th Cavalry when a vehicle he was traveling in with his unit north of Fallujah, Iraq was struck by an IED. *See* ECF No. 9 at ¶ 591; Ex. 2 at 18. Sgt. Nolan was killed by the [redacted] four and a half hours after the attack.[16] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Nolan was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the November 18, 2004 attack in which Sgt. Joseph Michael Nolan was killed. *See* ECF Nos. 47, 48.

Sgt. Nolan's surviving parent and sibling—Joseph P. Nolan and Matthew J. Nolan—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 590-597. The Plaintiffs have suffered severe mental

[16] Ex. 14, Certificate of Death (Overseas) of SGT Joseph M. Nolan.

anguish, extreme emotional pain and suffering, and loss of Sgt. Nolan's society, companionship, comfort, advice and counsel. *Id.* ¶ 597. The following chart reflects the claims asserted by these two family members in their individual capacities arising out of the November 18, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Joseph P. Nolan | Joseph M. Nolan's father | Solatium claim $5 million | Declaration of Joseph P. Nolan dated November 13, 2025, including copy of his proof of U.S. citizenship | 15 |
| Matthew J. Nolan | Joseph M. Nolan's brother | Solatium claim $3.125 million | Declaration of Matthew J. Nolan dated November 7, 2025, including copy of his proof of U.S. citizenship | 16 |

**1. Joseph P. Nolan[17]**

Joseph Nolan ("Mr. Nolan") is the father of Sgt. Joseph Michael Nolan. *See* Ex. 15 at ¶ 3. Mr. Nolan explained that his wife, Joseph's mother, passed away approximately twelve years before Joseph's death, leaving him to raise their three children, Matthew, Joseph, and Martha, as a single parent, with Joseph as the middle child. *Id.* at ¶ 4. Mr. Nolan recalled raising Joseph and watching him graduate. *Id.* at ¶ 5. After high school, Joseph and his brother Matthew ("Matt") attended college together at St. Joseph's University in Philadelphia, where they were able to spend their college years together. *Id.* Mr. Nolan described Joseph as talented with a love of languages.

[17] Joseph P. Nolan's United States Passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 15, Declaration of Joseph P. Nolan dated November 13, 2025.

*Id.* at ¶ 6. Joseph became an Arabic linguist in the Army and studied Japanese for four years in college—showcasing his passion for learning and connecting with others from different cultures. *Id.* When Joseph joined the Army, Mr. Nolan visited him in California and Texas and recalls playing golf with his son at Fort Hood in 2003. Mr. Nolan wishes that he could still play golf with Joseph. *Id.* at ¶ 7. Even when Jospeh was deployed, he called his father on Saturday mornings so they could speak. *Id.*

In November 2004, Mr. Nolan was in Rome, Italy with his son Matt and daughter Martha. *Id.* at ¶ 8. During Thanksgiving, he was visiting his sister-in-law's house in Philadelphia when a casualty officer arrived at her home and delivered the devastating news that Joseph had been killed in the Iraq War. *Id.* Mr. Nolan did not learn of his son's death until seven days after he passed away. *Id.* He took on the devastating task of informing other family members of Joseph's death. *Id.*

According to Mr. Nolan, [redacted]

Mr. Nolan has dedicated himself to supporting veterans' groups in Connecticut and supporting Gold Star families including spearheading the effort to create the Gold Star Family license plate in Connecticut. *Id.* at ¶ 10. To honor Joseph's memory, his family organized a golf tournament in his name for ten years and established a scholarship trust fund at St. Joseph's University. *Id.*

Three years ago, Mr. Nolan made the decision to have Joseph's remains moved to the Arlington National Cemetery. *Id.* at ¶ 13. This decision is one that felt both significant and somber

for Mr. Nolan. *Id.* While Mr. Nolan understands that he cannot bring Joseph back, he has dedicated much of his life to preserving the memory and honoring Joseph's legacy along with that of other fallen heroes. *Id.* at ¶ 14. "My son's absence will always be felt profoundly by my family, but my commitment to remembering him and those like him brings a sense of purpose in the midst of loss." *Id.*

Following the baseline standard, Plaintiffs requested an award of $5 million for Jospeh P. Nolan's Solatium claim. The Special Master agrees that a baseline award is appropriate for Joseph P. Nolan's Solatium claim.

**2. Matthew J. Nolan[18]**

Matthew Nolan ("Matthew") is the brother of Joseph Michael Nolan. *See* Ex. 16 at ¶ 3. Matthew described Joseph as not only his brother but his closest friend, explaining that they spent their first eighteen years growing up together and then remained together during Joseph's four years of college. *Id.* at ¶ 4. Their bond was forged through shared experiences, including college life and travel, and living together was a continuation of that closeness. *Id.* at ¶ 5. Matthew and his brother were inseparable and remained in contact with each other, even when Joseph joined the Army. *Id.* at ¶ 6. He cherishes the memories they created and the lessons that Joseph taught him. *Id.* at ¶ 5.

Matthew recalled the day that the members of the Army delivered the devastating news of his brother's death. *Id.* at ¶ 9. "You do not forget the moment you are told your brother, who you spent your whole life with, is gone." *Id.* The weight of Joseph's death on Matthew felt unbearable. *Id.* at ¶ 10. To cope with his grief, Matthew [redacted]

[18] Matthew J. Nolan's United States Passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 16, Declaration of Matthew J. Nolan dated November 7, 2025.

[redacted] As he moves forward, the memories of Joseph and the love he shared with him remain with him. *Id.*

Plaintiffs requested an upward enhancement to Matthew's claims based on [redacted] due to the grief of losing his brother. *See Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id*. (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *Thuneibat*, 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an upward enhancement of 25% of his baseline award resulting in an award of $3.125 million for Matthew J. Nolan's solatium claim. The Special Master agrees that a 25% enhancement of the baseline award is appropriate because of [redacted] Matthew endured as a result of the death of Joseph Nolan. [redacted] evidences that Matthew J. Nolan experienced more extreme effects of the loss of his loved one, which follows the precedent for an upward departure set by *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1 (D.D.C. 2019).

### E. STEPHEN C. BENISH – NOVEMBER 28, 2004, ATTACK – RAMADI

On November 28, 2004, PFC Stephen C. Benish, was serving in the United States Army in Ramadi, Iraq, when his unit came under enemy fire. *See* ECF No. 9 at ¶ 619; Ex. 2 at 18-19. PFC Benish was [redacted] *Id*. Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which PFC Benish was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the November 28, 2004 attack in which PFC Stephen C. Benish was killed. *See* ECF Nos. 47, 48.

PFC Benish's father, Stephen J. Benish, is a Plaintiff in this case. See ECF No. 9 at ¶¶ 618-623. The Plaintiff has suffered severe mental anguish, extreme emotional pain and suffering, and loss of PFC Benish's society, companionship, comfort, advice, and counsel. *Id*. at ¶ 623. The following chart reflects the claims asserted by Stephen J. Benish in his individual capacity arising out of the November 28, 2004, attack as well as the evidence setting forth the bases of his claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Stephen J. Benish | PFC Stephen C. Benish's father | Solatium claim $5 million | Declaration of Stephen J. Benish dated May 8, 2025, including copy of his proof of U.S. citizenship | 17 |

**1. Stephen J. Benish**[19]

Stephen J. Benish is the father of PFC Stephen C. Benish—his only child. *See* Ex. 17 at ¶ 3. According to Mr. Benish, his son was his pride and joy. *Id.* at ¶ 4. He watched his son evolve from a curious boy into a "remarkable man who accomplished so much in his life such as graduating high school, technical school, becoming a skilled electrician, and fulfilling his dream of being a firefighter." *Id.* Mr. Benish is immensely proud of his son and cherishes the lifelong memories they created together including their project of rebuilding a '79 Nova. *Id.* They enjoyed camping and taking fishing trips together. *Id.* Mr. Benish described his son as "an all-American guy" who was deeply loved by his sister, high school sweetheart who he planned to marry after his service, and his buddies that he worked with him at the fire station prior to joining the Army. *Id.* at ¶ 5. Mr. Benish holds onto the memories of his son's laughter and the bond they had. *Id.* at ¶ 4.

One quiet Sunday morning, someone knocked at his door at 10:30 a.m. As he opened the door, his heart sank at the sight of the two chaplains standing solemnly before him. *Id.* at ¶ 6. Mr. Benish recounted the desperate hope lingering in his voice as he pleaded for news of an injury. Instead, they delivered the life-altering news that his son had been killed in action. *Id.* Mr. Benish recalled that the word "killed" echoed in his mind—a painful reality that he was unprepared to accept. *Id.*

Due to the loss of PFC Benish, [redacted]

[19] Stephen J. Benish's Birth Certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 17, Declaration of Stephen J. Benish dated May 8, 2025.

[redacted]

Following the baseline standard, Plaintiffs requested an award of $5 million for Stephen J. Benish's solatium claim. The Special Master agrees that a baseline award is appropriate for Stephen J. Benish's solatium claim.

**F. GEORGE R. GEER-JANUARY 17, 2005, ATTACK – RAMADI**

On January 17, 2005, PFC George R. Geer was serving in the United States Army in Ramadi, Iraq when an IED detonated near his position while on a foot patrol at an American compound. *See* ECF No. 9 at ¶ 791; Ex. 2 at 19-20. According to his Certificate of Death, PFC Geer died hours after a [redacted][20] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which PFC Geer was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the January 17, 2005 attack in which PFC George R. Geer was killed. *See* ECF Nos. 47, 48.

PFC Geer's father and sister—Harold R. Geer and Hope Stroud—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 789-797. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of PFC Geer's society, companionship, comfort, advice, and counsel. *Id*. at ¶ 797. The following chart reflects the claims asserted by Harold R. Geer and Hope Stroud in their individual capacities arising out of the January 17, 2005 attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

[20] Ex. 18, Certificate of Death (Overseas) of PFC George R. Geer.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Harold R. Geer | PFC George R. Geer's father | Solatium claim $5 million | Declaration of Harold R. Geer dated January 1, 2025, including copy of his proof of U.S. citizenship | 19 |
| Hope Stroud | PFC George R. Geer's sister. | Solatium claim $2.5 million | Declaration of Hope Stroud dated April 17, 2025, including copy of her proof of U.S. citizenship | 20 |

### 1. Harold R. Geer[21]

Harold R. Geer is the father of George R. Geer. *See* Ex. 19 at ¶ 3. Harold's son was the type of person who would take the shirt off his back. *Id.* at ¶ 5. George was kind and had the ability to make everyone around him feel special. *Id.* George always put his family and friends first. *Id.* at ¶ 4. Harold shared many memories with his son—from travels across the United States in his semi-truck to hunting. *Id.* Harold described his son as someone who was adventurous and willing to try anything new including skiing, dancing, karaoke, and horseback riding in the mountains. *Id.* at ¶ 5. His "presence was a source of happiness and warmth." *Id.*

Harold "would not wish on anyone" the moment he learned about his son's death. *Id.* at ¶ 6. The local National Guard and Army liaison came to Harold's house and stood on his front porch with their faces somber as they delivered the news that his son had been killed in Iraq. *Id.* Harold

[21] Harold R. Geer's Birth Certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 19, Declaration of Harold R. Geer dated January 1, 2025.

recalled that the most heart-wrenching thing he had to do was share this news with George's sister and mother telling them they just lost a brother and son. *Id.*

George was the second son that Harold has had to bury, leaving behind one surviving child—his daughter. *Id.* at ¶ 8. [redacted]

George's death marked the end of the Geer family name's lineage, as George was the 14th generation and the last male heir to bear the name. *Id.* Despite two decades since George was killed, Harold feels his presence every day in every conversation as if he were still with him. *Id.* at ¶ 9. "We grapple with the reality of never seeing his future unfold, of never meeting his children or grandchildren, and of never witnessing the man he would have become. This loss is a burden we carry daily." *Id.*

Following the baseline standard, Plaintiffs requested an award of $5 million for Harold R. Geer's solatium claim. The Special Master agrees that a baseline award for Harold R. Greer's solatium claim is appropriate.

### 2. Hope Stroud[22]

Hope Stroud is the sister of George R. Geer—her youngest brother. *See* Ex. 20 at ¶ 3. George was "an exceptional human being" who loved life and his country. *Id.* at ¶ 4. He exuded a "vibrancy and patriotism" that made him loved by everyone who had the fortune to cross paths with him. *Id.* Hope described that it wasn't so much about what they were doing, as it was simply about being together. *Id.* at ¶ 5. She recalled several adventures with her brother including skiing, hiking up challenging trails, reveling in the thrill of speed on ATVs, discovering new destinations on their travels, and watching movies surrounded by their friends and family. *Id.* at ¶ 4. Among their future adventures they had planned was a downhill ski trip that they eagerly looked forward to that was cruelly snatched away from them. *Id.*

One day, Hope received an urgent call from her father while she was at work, instructing her to come home immediately. *Id.* at ¶ 6. The moment she walked through the door, the grim reality hit her as she was greeted by her family and service members who were holding a flag for her parents. *Id.* "It was the worst day of my life." *Id.*

The loss of her brother has deeply impacted their family in ways that are indescribable. *Id.* at ¶ 8. They each navigate life without him every day while striving to honor his memory. *Id.* George's absence left a gaping hole in their lives, yet it has also brought them closer together as they lean on each other for support. *Id.* [redacted]

[22] Hope Stroud's Birth Certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 20, Declaration of Hope Stroud dated April 17, 2025.

[redacted]

Following the baseline standard, Plaintiffs requested an award of $2.5 million for Hope Stroud's solatium claim. The Special Master agrees that a baseline award for Hope Stroud's solatium claim is appropriate.

**G. MICHAEL W. FRANKLIN – MARCH 7, 2005, ATTACK – RAMADI**

On March 7, 2005, Spc. Michael W. Franklin—who was serving in the United States Army in Ramadi, Iraq—was conducting screening activities at a checkpoint near the College of Agriculture in eastern Ramadi when the driver of a disabled vehicle detonated nearly 500 pounds of explosives he had hidden in the car, killing Spc. Franklin and U.S. Army Sgt Andrew Bossert. *See* ECF No. 9 at ¶¶ 812-813; 822; Ex. 2 at 20-21. According to the Report of Casualty, SPC Franklin died of [redacted][23] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Spc. Franklin was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the March 7, 2005 attack in which Spc. Michael W. Franklin was killed. *See* ECF Nos. 47, 48.

Spc. Franklin's father, mother, and sister—William P. Franklin, Tina M. Franklin, and Janelle Kelley—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 820-828. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Spc. Franklin's society, companionship, comfort, advice, and counsel. *Id*. at ¶ 828. The following chart reflects the claims asserted by William P. Franklin, Tina M. Franklin, and Janelle Kelley in their individual capacities

[23] Ex. 21, Report of Casualty of Spc. Michael W. Franklin.

arising out of the March 7, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| William P. Franklin | SPC Michael W. Franklin's father | Solatium claim $5 million | Declaration of William P. Franklin, dated May 12, 2025, including copy of his proof of U.S. citizenship | 22 |
| Tina M. Franklin | SPC Michael W. Franklin's mother | Solatium claim $6.25 million | Declaration of Tina M. Franklin, dated May 13, 2025, including copy of her proof of U.S. citizenship | 23 |
| Janelle Kelley | SPC Michael W. Franklin's sister | Solatium claim $3.125 million | Declaration of Janelle Kelley, dated May 14, 2025, including copy of her proof of U.S. citizenship | 24 |

### 1. William P. Franklin[24]

William P. Franklin is the father of Michael W. Franklin. *See* Ex. 22 at ¶ 3. From the age of four years old when he first met Michael, Michael had a profound impact on William's life. *Id.* at ¶ 4. William married Michael's mother and adopted Michael and his sister. *Id.* William recalled the day Michael was the ring-bearer at their wedding where Michael showcased his conscientious and earnest nature, even as a young boy. *Id.* William recalled several memories with Michael including family walks, bicycle rides, exploring the neighborhoods and trails of Western

[24] William P. Franklin's Birth Certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 22, Declaration of William P. Franklin, dated May 12, 2025.

Pennsylvania, picking blueberries together at their home in Coudersport, Pennsylvania, visiting Niagara Falls, and experiencing the awe of being surrounded by a herd of buffalo in Custer State Park in the Black Hills of South Dakota. *Id.* at ¶ 5. William and Michael shared an interest in amateur astronomy which brought them closer, especially during the school science fair project on the solar system where Michael earned a ribbon. *Id.* at ¶ 4. Michael's first charter fishing trip on Lake Ontario where he caught a couple of big salmon despite being small for his age was also one of William's cherished memories. *Id.*

On the afternoon of March 8, 2005, William was at work in the Potter County, Pennsylvania, Recorder's Office, when he received a visit from Officer Brian Phelps with the Sweden Valley Police who informed him that he was needed at home for an urgent matter. *Id.* at ¶ 7. Upon arriving home, the sight of a white van with government plates and an Army officer waiting inside immediately filled William with dread. *Id.* The officer broke the devastating news that Michael and three others had been killed in an attack. *Id.* The immediate shock and sorrow in the moment felt overwhelming. *Id.* William had the task of sharing the terrible news with his wife, Tina, who was working three hours away at the time. *Id.* While he was reluctant to share the news with her over the phone, Tina's intuition told her that something was terribly wrong, and William relayed the news to his wife who then had to make the treacherous trip back home in a snowstorm. *Id.*

Michael's death has profoundly impacted their family leaving an irreplaceable void in their lives. *Id.* at ¶ 8. Michael's death not only meant the loss of his beloved son but also marked the end of the Franklin name being carried forward on William's side of the family. *Id.* This realization has been a source of deep sorrow for William, underscoring the permanence of the loss. *Id.* [redacted]

[redacted]

Michael's death continues to shape the lives of the family each day. *Id.* at ¶ 8. During holidays, the family is acutely aware of his absence leaving them to wonder about the milestones Michael never reached such as marriage or fatherhood. *Id.* [redacted]

Following the baseline standard, Plaintiffs requested an award of $5 million for William P. Franklin's solatium claim. The Special Master agrees that a baseline award for William P. Franklin's solatium claim is appropriate.

**2. Tina M. Franklin[25]**

Tina M. Franklin is the mother of Michael W. Franklin. *See* Ex. 23 at ¶ 3. Michael was the light of Tina's life from the moment he was born. *Id.* at ¶ 4. He was her first born and only son, and their bond was unbreakable. As a stay-at-home mom, she dedicated every moment to nurturing Michael and enjoying his company. *Id.* She recalled the countless shared adventures with her son, from learning new things to playing and joking around. *Id.* Tina described Michael's relationship with his sister, who was born just a year after him, as incredibly special. *Id.* She also explained the Michael embraced her husband Bill as his father and loved him. *Id.* From a very early age, Tina knew that Michael aspired to be a soldier like his Uncle Mike. *Id.* It was evident in his playful antics. *Id.* She recounted how Michael and his sister turned their home into an imaginary parachute jump, after their Uncle Mike. *Id.* Feathers flew everywhere as they leapt from the dresser onto the

---

[25] Tina M. Franklin's United States Passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 23, Declaration of Tina M. Franklin, dated May 13, 2025.

pillows below. *Id.* Tina cherishes her memories with Michael including when they played games, cooked, participated in charity events, or when Tina attended Michael's football games. *Id.* at ¶ 4.

The day she learned of her son's death was the darkest day of Tina's life. *Id.* at ¶ 7. She was away for work, staying in a hotel, when she woke up with an inexplicable sense of dread. *Id.* She recalled something feeling terribly wrong which prompted her to call her husband, Bill, to ask about Michael. *Id.* Her husband's silence was deafening, and when he finally spoke, her worst fears were confirmed. *Id.* Her son had been killed. *Id.* The drive home was the longest and most harrowing journey of her life made worse by the snow and her disorientation after receiving the news. *Id.* Despite her pleas, the State Police was unable to escort her. *Id.* She found herself lost, both physically and emotionally, until her husband guided her home over the phone. *Id.* The moment she arrived home, she was overwhelmed due to the chaos of media at their doorstep. *Id.* All Tina wanted was to escape the nightmare that had become her reality. *Id.* To further compound her grief, the agonizing wait for her son's body to be returned was a period of limbo that she stated she "wouldn't wish on anyone." *Id.*

Following the death of her son, [redacted]

[redacted]

[redacted]

Plaintiffs requested an upward enhancement to Ms. Franklin's claims based on the close nature of her relationship with her son, [redacted] that the loss has had on her since her son's death [redacted] *See Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); id. (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related

affective disorders"). Plaintiffs request an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Tina M. Franklin's solatium damages. The Special Master agrees that a 25% enhancement of the baseline award is appropriate because of [redacted] that Tina endured as a result of the death of Michael W. Franklin. [redacted] evidence that Tina M. Franklin experienced more extreme effects of the loss of her loved one, which follows the precedent for an upward departure set by *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1 (D.D.C. 2019).

**3. Janelle Kelley[26]**

Janelle Kelley is the younger sister of Michael W. Franklin by eleven months. *See* Ex. 24 at ¶ 3. Janelle and Michael were inseparable, and there is not a single memory that Michael is not a part of. *Id.* at ¶ 5. She recalled how they spent their time at their grandmother's blueberry farm, where early mornings they picked berries and then splashed in a kiddie pool by afternoon. *Id.* at ¶ 6. Their frequent moves around the country meant that they relied on each other for trust and companionship. *Id.* Janelle idolized her brother and wanted to be just like him—wearing his clothes and cutting her hair to mirror his image. *Id.* at ¶ 5. She referred to herself as Michael's cheerleader, supporting him at every baseball and football game. *Id.* Janelle nicknamed her brother "Rudy" after the 1993 film. *Id.*

Michael was not just a sibling but was her best friend. *Id.* at ¶ 4. She recalled the frequent calls from Michael when he was deployed while she was pregnant. *Id.* She remembers how Michael's laughter was contagious and could light up the room. *Id.* They shared countless memories together, but Janelle especially recalls the time she was hit by a golf ball while trying to

[26] Janelle Kelley's United States Passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 24, Declaration of Janelle Kelley, dated May 14, 2025.

be just like Michael. *Id.* Even after Michael joined the military, she remained close with her brother, describing the conversations between the two of them as a lifeline. *Id.* at ¶ 5.

Janelle was at her apartment when she received a call from her mother whose voice was breaking in sobs. *Id.* at ¶ 7. She felt her world collapse as she dropped down to her knees in disbelief. *Id.* Janelle arranged for her neighbor to watch her son as she drove to her grandmother's house to meet with her parents. *Id.* She was greeted by two soldiers whose presence was soft and compassionate as they explained to her about the attack that took her brother's life. *Id.* Picking up her brother's body from the airport on her birthday was "surreal" and heartbreaking. *Id.* at ¶ 4.

Janelle has experienced significant loss in her life, which has further compounded her grief of losing her brother. [redacted]

Following Michael's death, [redacted]

[redacted] Family gatherings and Sunday dinners have ceased. *Id.* The family's inability to speak openly about Michael has been painful for Janelle. *Id.*

The day Michael died, a part of her died with him. *Id.* at ¶ 4. She always envisioned her brother being the godfather to her children because she knew he would embrace them with the same love and dedication he applied in every other aspect in his life. *Id.* at ¶ 6. Janelle described that the love she had for her brother ran deep like the sea. *Id.* at ¶ 4. To memorialize this, she got a tattoo of ocean waves on her leg. *Id.* [redacted]

Plaintiffs requested an upward enhancement to Ms. Kelley's claims based on the close nature of her relationship with her brother, [redacted] *See Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); id. (awarding Mary

Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Janelle Kelley's solatium damages. The Special Master agrees that a 25% enhancement of the baseline award is appropriate because of [redacted] as a result of the death of Michael W. Franklin. [redacted] evidence that Janelle Kelley experienced more extreme effects of the loss of her loved one, which follows the precedent for an upward departure set by *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1 (D.D.C. 2019).

**H. JOURDAN L. GREZ – MAY 11, 2005, ATTACK – KARABILAH**

In May 2025, the U.S. Marines launched Operation Matador as a "response to the rise of AQI activity in western Anbar Province for the purpose of eliminating insurgents and foreign fighters in the Jazeera desert north of the Euphrates River near the Syrian border." *See* Ex. 2 at 25. On May 11, 2005, Lima Company, 3d Battalion, 25th Marines traveling in an Amphibious Assault Vehicle struck a triple-stacked landmine approximately eight miles from the Syrian border in Karabilah, Iraq resulting in the death of LCpl. Jourdan L. Grez who was stuck in the vehicle when it caught fire. *Id.*; *see also* ECF No. 9 at ¶¶ 938, 951-952. According to the results of his Autopsy Examination Report, LCpl. Grez died of [redacted]

[redacted][27] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Grez was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the May 11, 2005 attack in which LCpl. Jourdan L. Grez was killed. *See* ECF Nos. 47, 48.

LCpl. Grez's mother, brother, and son—Andrea Grez, Aric Grez, and Colin Lovell—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 950-958. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Jourdan L. Grez's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 958. The following chart reflects the claims asserted by Andrea Grez, Aric Grez, and Colin Lovell in their individual capacities arising out of the May 11, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Andrea Grez | LCpl. Jourdan L. Grez's mother | Solatium claim $5 million | Declaration of Andrea Grez dated May 15, 2025, including copy of her proof of U.S. citizenship | 26 |
| Aric Grez | LCpl. Jourdan L. Grez's brother | Solatium claim $2.5 million | Declaration of Aric Grez dated May 23, 2025, including copy of his proof of U.S. citizenship | 27 |

[27] Ex. 25, Autopsy Examination Report of LCpl. Jourdan L. Grez, at pp. 2, 3.

| | | | | |
|---|---|---|---|---|
| Colin Lovell | LCpl. Jourdan L. Grez's son | Solatium claim $5 million | Declaration of Colin Lovell dated May 13, 2025, including copy of his proof of U.S. citizenship | 28 |

### 1. Andrea Grez[28]

Andrea Grez is the mother of the decedent, Jourdan L. Grez. *See* Ex. 26 at ¶ 3. Ms. Grez described Jourdan, the youngest of her three sons, as holding a special place in their family and being a source of pride from a young age. *Id.* at ¶ 4. She recounted his journey from a student at James Madison University to a Marine Reservist, noting that his character was shaped by compassion, resilience, and a strong commitment to helping others. *Id*. She described a defining event in his youth—surviving a serious car accident as a teenager and losing a close friend—which profoundly affected him and inspired him to become a Junior EMT, dedicating several years to serving his community before attending college. *Id*.

Ms. Grez explained that her family functioned as a close-knit team, sharing activities such as swimming, travel, and regular communication, including weekly conversations while Jourdan was away at college. *Id.* at ¶ 5. In the years leading up to his deployment, their discussions increasingly focused on his aspirations, including his commitment to fatherhood and determination to provide for his son. *Id*. She stated that Jourdan's death left an absence at significant family milestones, including graduations, marriages, and the growth of his child. *Id*.

Ms. Grez learned of her son's death on May 11, 2005 while finishing a routine workday when her husband received an urgent call from a Marine asking when they would both be home. *Id*. at ¶ 7. Having been briefed previously on what such a visit would signify, they understood the

[28] Andrea Grez's United States passport and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 26, Declaration of Andrea Grez, dated May 15, 2025.

meaning of Marines arriving at their door in Dress Blues. *Id*. She described the moment as numbing and explained that sharing the news with family and with her grandson's mother was especially painful, as it meant acknowledging that her grandchild would grow up without his father. *Id.*

Ms. Grez stated that her son's death caused lasting emotional and financial consequences for her family. *Id.* at ¶¶ 8–10. She explained that [redacted]

Following the baseline standard, Plaintiffs requested an award of $5 million for Andrea Grez's solatium claim. The Special Master agrees that a baseline award is appropriate for Andrea Grez's solatium claim.

#### 2. Aric Grez[29]

Aric Grez is the older brother of the decedent, Jourdan L. Grez. *See* Ex. 27 at ¶ 3. Aric described Jourdan as not only his younger brother but also one of his closest friends, explaining that despite being only a few years apart, they shared a strong bond rooted in shared experiences and mutual affection. *Id.* at ¶ 4. He recounted childhood rivalry that reflected closeness rather than animosity and noted that their relationship extended into adulthood, including attending college together and living together for a period of time. *Id.*

[29] Aric Grez's United States passport and declaration confirm that he is a U.S. citizen and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 27, Declaration of Aric Grez, dated May 23, 2025.

Aric explained that even when distance separated them, their connection remained constant through daily texts, weekly phone calls, and shared interests such as attending concerts together. *Id.* at ¶ 5. He described Jourdan as deeply loving, loyal, and devoted to family, especially after becoming a father. *Id.* at ¶ 6. Aric stated that seeing Jourdan as a father revealed a new depth to his character and underscored the magnitude of the loss caused by his death. *Id.*

Aric learned of his brother's death while working a night shift waiting tables at a restaurant in Washington, DC, initially ignoring repeated calls until he stepped outside and was told that Jourdan had been killed in Iraq. *Id.* at ¶ 7. He was "paralyzed" with shock, and he had to leave work because he could not speak. *Id.* The next day, Aric gathered with family to await formal identification and making calls to Jourdan's friends. *Id.* This period was surreal and marked by disbelief and overwhelming grief. *Id.*

Aric stated that his brother's death fundamentally altered his life, [redacted]

Following the baseline award, Plaintiffs requested an award of $2.5 million for Aric Grez's solatium claim. The Special Master, however, finds a 25% enhancement of the baseline award more appropriate because of [redacted] Aric endured as a result of Jourdan L. Grez's death. [redacted] evidences that Aric Grez experienced more extreme effects of the loss of his loved one, which follows the precedent for an upward departure set by *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1 (D.D.C. 2019). This enhancement is further necessary for

purposes of uniformity and consistency amongst plaintiffs suffering from prolonged substance abuse as a result of their loved one's death.

### 3. Colin Lovell[30]

Colin Lovell is the son of the decedent, Jourdan L. Grez. *See* Ex. 28 at ¶ 3. Colin was under the age of two when his father was killed in Iraq, so he has no personal memories of Jourdan and has had to construct an understanding of his father through photographs, videos, and stories shared by others. *Id.* at ¶ 4. "Each story, each photograph, and every video is a precious piece of him that I hold deal, allowing me to feel a connection to the father I never had the chance to know." *Id.* These items have allowed him to understand the type of person his father was and to feel closer to him. *Id*.

Colin has seen photos of his father and him from when he was very young and says "[t]hey show a love that is profound." *Id.* at ¶ 5. The photographs show the love that existed between them—even if he cannot remember because he was so young. *Id.* Jourdan's "death [redacted]

Learning about his father's death is not something Colin remembers personally, but his mother has since recounted to him the "details of where she was or how she felt telling me when I was older are blurred by the overwhelming sense of loss that overshadows such specifics." *Id.* at ¶ 6. As he grew older, the magnitude of the loss became increasingly clear. *Id.*

---

[30] Colin Lovell's United States passport and declaration confirm that he is a U.S. citizen and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 28, Declaration of Colin Lovell, dated May 13, 2025.

Colin explained that the absence of his father affected both him and his mother, forcing them to assume additional responsibilities and navigate life without a paternal figure. Id. at ¶¶ 7–9. [redacted]

Following the baseline standard, Plaintiffs requested an award of $5 million for Colin Lovell's solatium claim. The Special Master, however, finds a downward departure of 25% from the baseline award to be more appropriate. This is because the young age of Colin Lovell at the time of his father's death left Colin with no memories of his father, which points to an attenuation of the relationship. Further, there are no extreme results from the loss of his father, such as substance abuse or loss of abilities, that would call for an increase of this award to the baseline award. As such, Special Master recommends a downward departure of 25% from a baseline claim.

**I. TERRY W. BALL, JR. – JUNE 12, 2005, ATTACK – AL KARMAH**

Gunnery Sergeant ("GySgt.") Terry W. Ball, Jr. was serving as a convoy commander for a pre-dawn mission in the vicinity of Karmah, Iraq when he spotted a suspicious item in the road during a sandstorm that he went to investigate when it detonated "sending shrapnel into GySgt Ball's left thigh and severing his femoral artery" and causing his death on August 5, 2005 at the National Naval Medical Center in Bethesda, Maryland. *See* ECF No. 9 at ¶¶ 1010-1011; Ex. 2 at 28-29. According to his Autopsy Report, GySgt. Ball:

[redacted][31]

Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which GySgt. Ball was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the June 12, 2005 attack that caused the subsequent death of GySgt. Terry W. Ball, Jr. *See* ECF Nos. 47, 48.

GySgt. Terry W. Ball, Jr.'s spouse, children, father, and sister—Jennifer Ball, Ethan Ball, Riley Ball, Gavin Ball, Terry Ball, Sr., and Melissa Ball—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1009-1020. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Terry Wayne Ball, Jr.'s society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1020. The following chart reflects the claims asserted by Jennifer Ball, Ethan Ball, Riley Ball, Gavin Ball, Terry Ball, Sr., and Melissa Ball in their individual capacities arising out of the June 12, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

[31] Ex. 29, Autopsy Examination Report for Terry Wayne Ball, Jr., dated Oct. 5, 2005 at 1.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Jennifer Ball | GySgt. Terry W. Ball, Jr.'s spouse | Solatium claim $12 million | Declaration of Jennifer Ball dated February 4, 2025, including copy of her proof of U.S. citizenship | 30 |
| Ethan Ball | GySgt. Terry W. Ball, Jr.'s son | Solatium claim $5 million | Declaration of Ethan Ball dated February 11, 2025, including copy of his proof of U.S. citizenship | 31 |
| Riley Ball | GySgt. Terry W. Ball, Jr.'s daughter | Solatium claim $6.25 million | Declaration of Riley Ball dated March 19, 2026, including copy of her proof of U.S. citizenship | 32 |
| Gavin Ball | GySgt. Terry W. Ball, Jr.'s son | Solatium claim $6.25 million | Declaration of Gavin Ball dated March 5, 2026, including copy of his proof of U.S. citizenship | 33 |
| Terry Ball, Sr. | GySgt. Terry W. Ball, Jr.'s father | Solatium claim $5 million | Declaration of Terry Ball, Sr. dated January 25, 2025, including copy of his proof of U.S. citizenship | 34 |
| Melissa Ball | GySgt. Terry W. Ball, Jr.'s sister | Solatium claim $2.5 million | Declaration of Melissa Ball, dated January 21, 2025, including copy of her proof of U.S. citizenship | 35 |

**1. Jennifer Ball[32]**

Jennifer Ball is the surviving spouse of Terry Wayne Ball, Jr., and the mother of their three children. *See* Ex. 30 at ¶¶ 3-4. Terry "was my best friend, my rock, and the love of my life." *Id.* at ¶ 4. They met while Jennifer was in college working parttime at a bar that Terry frequented as a U.S. Marine. *Id.* They had an immediate connection, and "Terry and I were inseparable and lived in three states and two countries together." *Id.* As an example of how they grew into adults with each other, Jennifer stated, "[o]ur commitment to each other was symbolized by the purchase of a washer and dryer, a moment Terry remarked made everything 'real' because we now had 'stuff' together." *Id.* at ¶ 5. "[T]here wasn't a day that went by that we didn't connect in some way." *Id.* "Our little family was our universe, and we navigated the joys and challenges of life as true partners, both in our marriage and as co-leaders of our family." *Id.*

As a couple, they brought structure (Terry) and spontaneity (Jennifer) both to their marriage and in their parenting. *Id.* at ¶ 6. Terry loved fishing and live music, and he shared these loves with their children and would take their oldest son every Sunday to get a haircut and share a croissant. *Id.* After he died, "our daughter refus[ed] to learn to ride her bike without training wheels because he had promised to teach her." *Id.* Their younger son was only one year old when his father died, so he has been forced to "borrow[] memories from his older siblings until he was old enough to understand that none of the memories were his own." *Id.*

Jennifer described her husband as follows:

> Terry was a man whose life was deeply intertwined with those he loved, especially his children, family, and friends. Our family was the epicenter of his world, with every weekend meticulously planned to ensure quality time was spent together. From our cherished date nights to our ritualistic Saturday shopping trips, and the boys' haircut outings that invariably led to adventures at the aquarium, movies, zoo,

[32] Jennifer Ball's New Jersey birth certificate and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 30, Declaration of Jennifer Ball, dated February 4, 2025.

> park, beach, or fishing, Terry made sure that our lives were filled with moments of joy and togetherness…. His love for the outdoors brought us countless memories of camping at the beach, tubing on the lake with the kids, enjoying a beer and fishing with friends, or going to see live bands.

*Id.* at ¶ 15. Terry was also a man who quietly made a difference—whether provided a cot to a Chaplain with back pain or replacing the coffee machine in the surgical center—in the lives of those around him. *Id.* at ¶ 7. Jennifer spoke with Terry five days before he was injured, and his last words were "It's just you and me kid, we stick together, that's how all this stays together." *Id.* at ¶ 8.

She learned of his injury through a phone call while traveling with her children and sister-in-law and was told that he had been hit in the eye. *Id.* at ¶ 9. She only later learned that he had been hit in the thigh and not the eye and that Terry [redacted] *Id.* Not knowing whether he would survive during her transit, Jennifer "navigated airports and foreign cities" in tears to reach Germany where Marines met her in Hamburg and took her to the Fisher House in Landstuhl. *Id.* at ¶¶ 10-11. Because of his condition, Terry was being treated approximately an hour away from Landstuhl, and Jennifer would have to travel an hour each way to see him for approximately a one-hour window each day for approximately five or six weeks. *Id.* at ¶ 11. When Terry was medevaced from Germany to Bethesda, Jennifer "rode in the cargo net of the medevac with Terry and used wool blankets to keep warm." *Id.* During that flight, [redacted] *Id.*

"[E]very day brought about new challenges. He remained in Bethesda for two weeks and [redacted] *Id.* at ¶ 12. Terry would lay with open, but empty and hollow eyes, until approximately a week before he died, "Terry woke up and recognized me for the first time since his injury. I remember how confused he was by my presence.

With a scared expression, Terry attempted to say my name but was unable to because he had a breathing tube. [redacted] *Id.*

[redacted]

*Id.* Jennifer's brother went with her to tell her children that their father had died. *Id.* Their oldest son was seven years old and sensed the worst, but upon hearing the news, Jennifer "watched his world shatter, and he began to cry." *Id.* at ¶ 14. Their five-year-old daughter refused to come into the room because she feared the news. *Id.* Jennifer "overheard her [daughter] telling her one-year old brother that Dad loved him, but he couldn't come home anymore." *Id.*

Jennifer [redacted] Jennifer summed up her family's situation like this:

> [redacted]

[redacted]

*Id.* at ¶ 18.

Plaintiffs requested an upward enhancement to Jennifer Ball's claims based on the nightmare scenario she had to live through between June 12, 2005 when GySgt. Ball was injured and his death on August 5, 2005; her "drawn out and incredibly difficult" grieving process; her [redacted] following her husband's death. *See Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); id. (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs requested an extraordinary enhancement of 50% of her baseline award resulting in an award of $12 million for Jennifer Ball's solatium damages based on the reasons set forth above and the harrowing period during which her husband teetered between life and death with her by his side between June 12, 2005 and August 5, 2005. The Special Master, however, finds an enhancement of 40% of the baseline award to be more appropriate in the circumstances. The Special Master agrees that the commonly awarded 25%

upward departure is insufficient for the circumstances that Jennifer had to endure leading up to her husband's death including [redacted] These circumstances are much more extreme than those that are commonly awarded a 25% upward departure, including that in which a 25% increase was deemed appropriate when the widow saw a graphic photograph of her husband after she had been notified of his death, as that widow did not sit next to her husband as he was dying. *Bernhardt v. Islamic Republic of Iran*, Civil Action No. 18-2739 (TJK), 2023 U.S. Dist. LEXIS 48073 (D.D.C. Mar. 22, 2023). The Special Master also notes that 50% upward departures are seldom given and only in the most extreme of circumstances. *See, e.g., Oveissi*, 768 F. Supp. 2d at 30 (finding 50% upward deviation from the *Heiser* baseline warranted because minor plaintiff was forced to go into hiding with armed guards after his grandfather's death); *Valore*, 700 F. Supp. 2d at 84 (finding 50% upward departure from analogous baseline appropriate to compensate a *victim* who sustained severe injuries). This Court has awarded 40% upward departures in the past when a family member had to act as a caretaker for their injured service member. *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 75 (D.D.C. 2006); *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 60 (D.D.C. 2006). Additionally, *Haim* gives the further parameters in deciding awards for family members of service members that have been attacked: that those with a deceased family member will typically receive more than those whose family member survived and that families of hostage or captivity victims are also typically awarded greater damages than are the families of victims of a single attack. With Jennifer Ball losing her husband in a single attack, these factors seem to even out to make a 40% upward departure appropriate under the circumstances.

**2. Ethan Ball[33]**

Ethan Ball is the youngest son of Terry Wayne Ball, Jr. *See* Ex. 31 at ¶ 3. Ethan was just over one year old when his father was killed, leaving him without firsthand memories of his father and instead reliant on stories shared by family members to understand who his father was and the role he played in their lives. *Id*. at ¶¶ 4, 9. Ethan described his father as "larger than life," a devoted Marine whose presence has been carried forward through shared stories, imagined moments, and borrowed memories that Ethan holds onto as a way to cope with his loss. *Id.* at ¶ 4. These include memories of fishing on the lake, family traditions, and time spent together before deployment—moments that became foundational to Ethan's understanding of his father despite his young age. *Id.* at ¶¶ 4–5.

Ethan explained that his father was actively involved in his children's lives prior to deployment, picking them up from daycare, riding bikes, playing with them, and establishing meaningful routines and traditions. *Id.* at ¶ 5. While deployed, his father remained present through phone calls and videos whenever possible, reinforcing the bond he worked to maintain with his children despite the distance. *Id.* Ethan stated that his father's absence has been felt at every milestone, from childhood achievements to life events, leaving a persistent void. *Id.* at ¶¶ 5, 9.

Although Ethan was too young to understand his father's death at the time it occurred, he has been told how his mother broke the news to each sibling individually, marking the beginning of profound instability within the family. *Id.* at ¶ 9. "From the joy of scoring my first goal to the simple pride of losing a tooth, his absence is a constant shadow over moments both monumental and mundane. He missed every birthday, holiday, football game, hockey game, proms,

[33] Ethan Ball's Consular Report of Birth Abroad and declaration confirm that he is a U.S. citizen and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 31, Declaration of Ethan Ball, dated February 11, 2025.

homecomings, first homerun, touchdown, tackle, goal, fight, devastating day and joyous day." *Id.* As he grew older, [redacted]

Ethan further described [redacted]

Ethan stated that his own life path has been permanently altered. *Id.* at ¶ 14. [redacted]

Plaintiffs requested a baseline award; however, the Special Master finds that because of the lack of memories and attenuated relationship between Ethan and Terry Ball, a downward departure of 25% is more appropriate. Unlike his siblings, who both received upward departures due to [redacted] that stemmed from the death of their father, Ethan's main complaint of consequences other than having to live without the presence of his father was

[redacted] As such, the Special Master recommends a 25% downward departure.

### 3. Riley Ball[34]

Riley Ball is the daughter of Terry Wayne Ball, Jr. *See* Ex. 32 at ¶ 3. She described her father as her hero, best friend, and the most important person in her life. *Id.* at ¶ 4. "Being his only little girl, he always treated me like I was his world, and I would call him my 'sucker' because in his eyes, I could do no wrong." *Id.* "Some of my fondest memories were just the simple joys of being with him—singing Linkin Park in the car, swimming in the ocean while we lived in Japan, or laughing together while watching Fear Factor every week." *Id.* When Terry was home, they would spend significant time together, and Riley would tell him, "I am happy to have my porcupine back" because his shaved head felt spikey to her. *Id.* at ¶ 5. When he was home, he tried to make memories with his family, and when he was deployed, he made sure never to forget birthdays and to write letters that she still cherishes. *Id.* "I was his little girl, the one he always cherished and loved unconditionally, and I knew he would never do anything to hurt me." *Id.* She remembers her father "cultivat[ing] strong bonds with both immediate and extended family members," but his relationship with Riley's mother was "palpable, and it was always clear how deeply connected they were." *Id.* at ¶ 6.

Riley learned about her father's death after she had visited him in the hospital where she "saw him covered in wires and tubes, unable to talk, which was horrifying." *Id.* at ¶ 7. When her mother broke the news of his death, "the moment hit me like a brick wall" and "I was in shock and denial because of how young I was." *Id.* "His death came after he volunteered for a deployment

[34] Riley Ball's North Carolina birth certificate and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 32, Declaration of Riley Ball, dated March 19, 2026.

he wasn't supposed to take, ultimately losing his life during Operation Iraqi Freedom." *Id.* [redacted]

[redacted]

*Id.* at ¶ 10.

She explained that the loss fundamentally altered her family and continues to affect every aspect of her life. *Id.* at ¶¶ 12–13. "We struggled to hold onto relationships with extended family and lost touch with the military roots that he cherished because revisiting those memories felt unbearable…. [N]one of us knew how to navigate a new life without him." *Id.* at ¶ 12. [redacted]

Plaintiffs requested an upward enhancement to Riley Ball's claims based on [redacted]

[redacted] *See Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); id. (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Riley Ball's solatium damages. The Special Master agrees that a 25% enhancement of the baseline award is appropriate because of [redacted] that Riley endured as a result of the death of Terry Wayne Ball. [redacted] evidence that Riley Ball experienced more extreme effects of the loss of her loved one, which follows the precedent for an upward departure set by *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1 (D.D.C. 2019).

**4. Gavin Ball[35]**

Gavin Ball is the oldest son of Terry Wayne Ball, Jr. *See* Ex. 33 at ¶ 3. He described his father as his best friend, mentor, and greatest supporter, with whom he shared daily activities such

[35] Gavin Ball's South Carolina birth certificate and declaration confirm that he is a U.S. citizen and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 33, Declaration of Gavin Ball, dated March 5, 2026.

as "early morning runs, watching the Bears and Raiders play football, t-ball games, to fishing trips that became our cherished tradition" and their Sunday weekly haircuts together. *Id*. at ¶ 4. Terry "was the person I didn't want to disappoint and strived to make proud. Losing him has altered my life forever." *Id.*

Gavin spoke with his father every day prior to deployment and whenever possible while his father was in Iraq. *Id.* at ¶ 5. He expected his father to return home and for life to continue as usual. *Id*.

Gavin learned of his father's death while visiting family in New Jersey when his mother delivered the devastating news. *Id.* at ¶ 6. "Just days before, I had visited him" and had been "reassured earlier that my dad's injuries from a roadside bomb were not fatal and that he had a challenging recovery ahead." *Id.* He described feeling [redacted] *Id.*

Following his father's death, [redacted]

[redacted]

Plaintiffs requested an upward enhancement to Gavin Ball's claims based on his [redacted] *See Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); id. (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an enhancement of 25% of his baseline award resulting in an award of $6.25 million for Gavin Ball's solatium damages. The Special Master agrees that a 25% enhancement of the baseline award is appropriate because of [redacted] that Gavin endured as a result of the death of Terry Wayne Ball. This [redacted] evidences that Gavin Ball experienced more extreme effects of the loss of his loved one, which follows the precedent for an upward departure set by *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1 (D.D.C. 2019).

### 5. Terry W. Ball, Sr.[36]

Terry W. Ball, Sr. is the father of Terry Wayne Ball, Jr. *See* Ex. 34 at ¶ 3. He described a close and loving relationship with his son throughout childhood and adulthood, sharing memories of fishing, attending sporting events, and playing sports together. *Id.* at ¶ 4. Despite his son's military service and frequent deployments, they remained in consistent communication, speaking at least once a month whenever his son was not overseas. *Id.*

Mr. Ball learned of his son's death when two Marines arrived at his home and informed him and his wife that their son had died from injuries sustained in Iraq. *Id.* at ¶ 5. He described the shock as overwhelming, stating that it felt as though the ground had been pulled from beneath them, leaving them in disbelief and profound sorrow. *Id.* "There was no preparation for this outcome." *Id.* [redacted]

The impact of this loss continues to resonate, particularly during holidays, which now serve as reminders of his son's absence. *Id.* at ¶ 8.

Following the baseline standard, Plaintiffs requested an award of $5 million for Terry W. Ball, Sr.'s solatium claim. The Special Master agrees that a baseline award is appropriate for Terry W. Ball, Sr.'s solatium claim.

### 6. Melissa Ball[37]

---

[36] Terry Ball, Sr.'s Illinois driver's license and declaration confirm that he is a U.S. citizen and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 34, Declaration of Terry Ball, Sr., dated January 25, 2025.

[37] Melissa Ball's Illinois birth certificate and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 35, Declaration of Melissa Ball, dated January 21, 2025.

Melissa Ball is the sister of Terry Wayne Ball, Jr., and his only sibling. *See* Ex. 35 at ¶¶ 3-4. She described their bond as incredibly special and recalled fond memories from childhood that grew stronger as they aged. *Id*. at ¶ 4. Melissa said that her brother's "decision to join the Marines was significantly influenced" by his cousin Jeff. *Id.* at ¶ 5. Melissa explained that her brother deeply valued family and made it a priority to spend time with loved ones whenever he was home on leave. *Id*. at ¶ 6. She recalled enjoying time together during those visits. *Id*.

Terry had held Melissa's daughter the last time they saw each other, but while he was hospitalized, she did not visit "because I couldn't bear seeing him that way." *Id.* at ¶ 8. Melissa learned of her brother's death while at her parents' home holding her newborn baby when two men in military uniforms arrived. *Id.* at ¶ 7. She overheard the conversation informing her mother of her brother's death and immediately cried out, ran from the house, and began hyperventilating, feeling as though she could not breathe. *Id*. She described the shock and disbelief as paralyzing and said that "was the worst day of my life." *Id*.

Terry's death profoundly impacted the family, including [redacted]

Melissa described [redacted]

Following the baseline standard, Plaintiffs requested an award of $2.5 million for Melissa Ball's solatium claim. The Special Master agrees that a baseline award for Melissa Ball's solatium claim is appropriate.

### J. CLIFTON B. MOUNCE – JULY 14, 2005, ATTACK – TREBIL

On July 14, 2005, Cpl. Clifton Mounce was riding in an up-armored MTVR HMMWV near Trebil, Iraq, when his HMMWV struck an IED that overturned the vehicle and engulfed it in flames. ECF No. 9 at ¶¶ 1056; Ex. 2 at 32-33. His death certificate listed the cause of his death as [redacted][38] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpl. Mounce was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the July 14, 2005 attack in which Cpl. Clifton B. Mounce was killed. *See* ECF Nos. 47, 48.

Cpl. Clifton B. Mounce's spouse, Tiffany Mounce-Jones, is a plaintiff in this case. *See* ECF No. 9 at ¶¶ 1055-1060. The Plaintiff suffered severe mental anguish, extreme emotional pain and suffering, and loss of Clifton B. Mounce's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1060. The following chart reflects the claims asserted by Tiffany Mounce-Jones in her individual capacities arising out of the July 14, 2005, attack as well as the evidence setting forth the bases of her claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Tiffany Mounce-Jones | Cpl. Clifton B. Mounce's spouse | Solatium claim $8 million | Declaration of Tiffany Mounce-Jones dated January 29, 2026, including copy of her proof of U.S. citizenship | 37 |

[38] Ex. 36, Certificate of Death (Overseas) for Clifton Blake Mounce.

### 1. Tiffany Mounce-Jones[39]

Tiffany Mounce-Jones is the wife of the Clifton B. ("Blake") Mounce. *See* Ex. 37 at ¶ 3. Tiffany described Blake as her husband, best friend, adventure partner, and the love of her life. *Id.* at ¶ 4. She stated that they met during their junior year of high school through a mutual friend and became inseparable from that point forward, sharing a relationship marked by laughter, love, and constant companionship. *Id*. Before Blake's deployment to Iraq, they traveled to Mississippi to spend time with friends and family, a trip she described as emblematic of their life together, filled with deep conversations, shared laughter, and the simple joy of being together. *Id*.

From the age of sixteen, Tiffany and Blake spent nearly all of their time together, attending his football and baseball games and sharing daily life. *Id*. at ¶ 5. As Blake joined the Marines and was stationed in locations including Japan and Iraq, their relationship shifted to long hours on the phone. *Id*. Blake never missed an opportunity to call her, and each conversation served as a lifeline during periods of separation. *Id*. Despite the distance their bond continued to grow stronger. *Id*. Tiffany feels Blake's absence during milestones and moments where his presence would have brought joy and celebration, and she deeply wishes he could have shared in the milestones still to come. *Id.*

Tiffany described Blake's relationships with his family as exceptionally close and loving. *Id.* at ¶ 6. He shared a strong bond with his mother and two younger brothers, and he extended that same love to her two younger sisters, embracing them as his own and becoming the older brother they never had. *Id*. Whenever Blake was home on leave, he made it a priority to spend meaningful time with family and friends, creating memories filled with laughter and shared stories. *Id*. His

[39] Tiffany Mounce-Jones' Tennessee birth certificate and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 37, Declaration of Tiffany Mounce-Jones, dated January 29, 2026.

presence brought a sense of completeness to family gatherings, a presence that is now deeply missed. *Id.*

Tiffany learned of Blake's death while on her way home, when she received a call from Blake's father asking to speak with her. *Id.* at ¶ 7. Initially believing the call concerned a family matter, she soon felt a sense of foreboding and asked her mother to stay with her. *Id.* Seeing her father-in-law arrive accompanied by two Marines confirmed her worst fears before any words were spoken. *Id.* She described her reaction as immediate and overwhelming, stating that she screamed, cried, and struggled to accept the reality that Blake, her husband and soulmate, was gone. *Id*. The remainder of the day passed in a haze of grief, and the following morning, seeing her home filled with people, underscored the permanence of her loss. *Id*. Her parents initially assisted with notifying others, and the support of the small-town community provided some comfort during this devastating time. *Id*.

Following Blake's death, [redacted]

Blake's death also caused significant financial hardship. *Id*. at ¶ 9. [redacted]

Blake's death profoundly affected her family dynamics. *Id*. at ¶ 10. [redacted] Blake was the heart of the family and the person who

brought joy and unity, requiring the family to adapt to new roles in his absence. *Id*. His death casts a permanent shadow over her family. *Id*. at ¶ 11.

She thinks of Blake every day, and the family continues to wonder what their lives might have been had he survived. *Id*. She keeps Blake's memory alive, particularly for his nieces and nephews, by sharing stories of his warmth and love so that his legacy endures. *Id*. Blake was not only her husband, but also her best friend, soulmate, and high school sweetheart, and her love and longing for him will never diminish. *Id.*

Following the baseline standard, Plaintiffs requested an award of $8 million for Tiffany Mounce-Jones' solatium claim. The Special Master agrees that a baseline award for Tiffany Mounce-Jones' solatium claim is appropriate.

**K. WILLIAM LEE EVANS – SEPTEMBER 19, 2005, ATTACK – RAMADI**

On September 19, 2005, the U.S. Army's B Company, 1st Battalion, 109th Infrantry Regiment was traveling in a two-vehicle convoy when an M2A2 Bradley Fighting Vehicle struck an IED comprised on eight artillery rounds in the Al-Jazeera area north of Ramadi. Ex. 2 at 36. Spc. William Lee Evans sustained [redacted] *Id.* at 36-37.[40] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Spc. Evans was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the September 19, 2005 attack in which Spc. William Lee Evans was killed. *See* ECF Nos. 47, 48.

[40] Ex. 38, Certificate of Death (Overseas) for William Lee Evans.

Spc. Evans' father, Billie Evans, is a plaintiff in this case. *See* ECF No. 9 at ¶¶ 1145-1149. Plaintiff Billie Evans suffered severe mental anguish, extreme emotional pain and suffering, and loss of William Lee Evans' society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1149. The following chart reflects the claims asserted by Billie Lee Evans in his individual capacity arising out of the September 19, 2005, attack as well as the evidence setting forth the bases of his claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Billie Evans | Spc. William Lee Evans' father | Solatium claim $5 million | Declaration of Billie Evans dated January 8, 2025, including copy of his proof of U.S. citizenship | 39 |

**1. Billie Evans[41]**

Billie Evans is the father of the decedent, Spc. William Lee Evans. *See* Ex. 39, at ¶ 3. Billie described his son as a young man who possessed an extraordinary enthusiasm for life from an early age, whether through spending time outdoors hunting, capturing nature through photography, or participating actively in school events. *Id.* at ¶ 4. He explained that William balanced his passions with responsibility, working while attending college, and ultimately choosing to serve his country, a decision Billie described as a testament to his son's bravery, selflessness, and character. *Id.*

Billie maintained a close and enduring relationship with his son throughout William's childhood and into adulthood. *Id.* at ¶ 5. They had countless shared moments, including attending ball games together and spending long hours hunting in the woods. *Id.* Even when William's

---

[41] Billie Evans' Florida birth certificate and declaration confirm that he is a U.S. citizen and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 39, Declaration of Billie Evans, dated January 8, 2025.

travels took him far from home, they remained closely connected through extended phone calls and visits whenever possible. *Id.*

Learning of his son's death was the darkest day of Billie's life. *Id.* at ¶ 6. Two Army officers arrived at his home and informed him that William had been killed leaving him with "the stark, painful reality of his loss." *Id.* Sharing this news with the rest of his family was one of his most painful tasks, but he undertook this responsibility quickly to spare them from learning of the loss through other means. *Id.*

Following his son's death, [redacted]

William's death profoundly altered the structure and stability of his family. *Id.* at ¶ 8. [redacted]

The loss of William "is a wound that will always leave a scar." *Id.* at ¶ 9. He stated that [redacted]

Following the baseline standard, Plaintiffs requested an award of $5 million for Billie Evans' solatium claim. The Special Master agrees that a baseline award for Billie Evans' solatium claim is appropriate.

## L. THOMAS H. BYRD – OCTOBER 15, 2005, ATTACK – RAMADI

On October 15, 2005, a deep-buried IED detonated on an M2A2 Bradley Fighting Vehicle operated by the U.S. Army's Task Force 2-69 AR near Ramadi, Iraq that detached the turret from the vehicle and caused a subsequent catastrophic fire. Ex. 2 at 38. Five soldiers were killed in the attack including Spc. Thomas H. Byrd who died of [redacted][42] *Id.* Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Spc. Byrd was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the October 15, 2005 attack in which Spc. Thomas H. Byrd was killed. *See* ECF Nos. 47, 48.

Spc. Byrd's mother and brother—Julia Fatovich (previously Byrd) and Michael Byrd—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1165-1170. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Thomas H. Byrd's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1170. The following chart reflects the claims asserted by Julia Fatovich and Michael Byrd in their individual capacities arising out of the October 15, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Julia Fatovich | Spc. Thomas H. Byrd's mother | Solatium claim $6.25 million | Declaration of Julia Fatovich dated March 31, 2025, including copy of her proof of U.S. citizenship | 41 |
| Michael Byrd | Spc. Thomas H. Byrd's brother | Solatium claim $3.125 million | Declaration of Michael Byrd dated March 31, 2025, including copy of | 42 |

[42] Ex. 40, Report of Casualty for Thomas Harold Byrd.

| | | | | |
|---|---|---|---|---|
| | | | his proof of U.S. citizenship | |

1. **Julia Fatovich**[43]

Julia Fatovich is the mother of the decedent, Thomas H. Byrd. *See* Ex. 41 at ¶ 3. She described an exceptionally close relationship with her son, recalling the joy of watching him grow, play sports, and spend time with family and friends. *Id.* at ¶¶ 4–5. Julia stated that even as her son grew older, they spoke frequently on the phone to share the details of their daily lives, conversations she now misses deeply. *Id.* at ¶ 4. She remembers family traditions such as nightly dinners and memories defined by her son's playful spirit, love of surprises, and affectionate gestures, including giving her a thimble after learning it symbolized a mother's love. *Id.* at ¶¶ 5–6. Despite the distance created by boot camp and his service in Iraq, their bond remained strong through phone calls, visits, and shared milestones, including trips to California after his graduation and attending his boot camp graduation. *Id.* at ¶ 5.

Julia described Thomas as deeply connected to his extended family, particularly his grandmother and great-grandfather, and as someone who cherished family gatherings and friendships alike. *Id.* at ¶ 6. Thomas "was the life of family functions, demonstrating the importance he placed on family ties." *Id.*

Julia learned of Thomas' death when she noticed vehicle pulling into her driveway while she was attending a neighbor's party. *Id.* at ¶ 7. The two soldiers were accompanied by her daughter-in-law's family, and "[t]he realization that he had been killed in the Iraq War lest us in a

[43] Julia Fatovich's Florida birth certificate and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 41, Declaration of Julia Fatovich, dated March 31, 2025.

state of shock and disbelief." *Id.* Julia told her mother about Thomas' death, and "informing others of our loss was a painful experience, compounding all the grief we already felt." *Id.*

Julia [redacted]

Plaintiffs requested an upward enhancement to Julia Fatovich's claims based on her close and enduring relationship with her son, [redacted] as a result of her son's death. *See Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward

departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an enhancement of 25% of her baseline award resulting in an award of $6.25 million for Julia Fatovich's solatium claim. The Special Master agrees that a 25% enhancement of the baseline award is appropriate because of [redacted] that Julia endured as a result of the death of Thomas H. Byrd. The extreme results of [redacted] evidence that Julia Fatovich experienced more extreme effects of the loss of her loved one, which follows the precedent for an upward departure set by *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1 (D.D.C. 2019).

**2. Michael Byrd[44]**

Michael Byrd is the younger brother of the decedent, Thomas H. Byrd. *See* Ex. 42 at ¶ 3. He described his brother as his hero, recalling a relationship defined by humor, shared adventures, and a deep bond that persisted throughout their lives. *Id.* at ¶¶ 4–5. Michael recounted childhood

[44] Michael Byrd's Arizona Birth Certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 42, Declaration of Michael Byrd, dated March 31, 2025.

memories marked by playful mischief, public antics, and shared activities such as golfing, video games, and vacations, experiences that shaped his outlook on life and reinforced the closeness of their relationship. *Id.* Despite their six-year age difference and Thomas' military service, they consistently made time for one another, celebrating milestones such as graduations, holidays, and their last Christmas together. *Id.* at ¶ 5. Thomas was a central figure in their family, always present for gatherings and holidays, and his absence has left a profound void in significant life events he will never witness. *Id.* at ¶¶ 5–6.

Michael learned of his brother's death after he noticed a car pull up to his house while he was at a neighbor's house for dinner. *Id.* at ¶ 7. Michael knew who the military personnel were and why they were there even before they spoke causing him to collapse to his knees in overwhelming grief. *Id.*

[redacted]

[redacted]

[redacted]

[redacted]

Plaintiffs requested an upward enhancement to Michael Byrd's claims based on his close and enduring relationship with his brother Thomas, his [redacted] *See Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an enhancement of 25% of his baseline award resulting in an award of $3.125 million for Michael Byrd's solatium claim. The Special Master agrees that a 25% enhancement of the baseline award is appropriate because of [redacted] that Michael endured as a result of the death of

Thomas H. Byrd. [redacted] evidences that Michael Byrd experienced more extreme effects of the loss of his loved one, which follows the precedent for an upward departure set by *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1 (D.D.C. 2019).

**M. SEAMUS M. DAVEY – OCTOBER 21, 2005, ATTACK – ALBU HYATT**

In October 2005, Operation River Gate was conducted to dislodge AQI from the areas of Hadithah, Barwanah, and "other surrounding areas including Albu Hyatt" because of AQI's creation of a "state within a state" in and around Hadithah. Ex. 2 at 40-41. On October 21, 2005, the U.S. Marines Team 2, 7th Platoon, 2d Force Reconnaissance Company conducted a cordon and search operation in Albu Hyatt to "kill or capture suspected insurgents", and Cpl. Seamus M. Davey and two other members of his team sought to clear a room when they were ambushed by three insurgents who opened fire resulting in Cpl. Davey's death. *Id.* at 41. The Summary of Action accompanying Cpl. Davey's Bronze Star medal with Combat Distinguishing Device stated, [redacted][45] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpl. Davey was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the October 21, 2005 attack in which Cpl. Seamus M. Davey was killed. *See* ECF Nos. 47, 48.

[45] Ex. 43, Summary of Action accompanying Bronze Star medal with Combat Distinguishing Device for Seamus M. Davey.

Cpl. Davey's father and three sisters—Derek Davey, Austin Byrd, Shiloh Mackey, and Brittany Bedernik—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1196-1204. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Seamus M. Davey's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1204. The following chart reflects the claims asserted by Derek Davey, Austin Byrd, Shiloh Mackey, and Brittany Bedernik in their individual capacities arising out of the October 21, 2005 attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Derek Davey | Cpl. Seamus M. Davey's father | Solatium claim $5 million | Declaration of Derek Davey dated January 15, 2025, including copy of his proof of U.S. citizenship | 44 |
| Austin Byrd | Cpl. Seamus M. Davey's sister | Solatium claim $2.5 million | Declaration of Austin Byrd dated January 15, 2025, including copy of her proof of U.S. citizenship | 45 |
| Shiloh Mackey | Cpl. Seamus M. Davey's sister | Solatium claim $3.125 million | Declaration of Shiloh Mackey dated January 15, 2025, including copy of her proof of U.S. citizenship | 46 |
| Brittany Bedernik | Cpl. Seamus M. Davey's sister | Solatium claim $3.125 million | Declaration of Brittany Bedernik dated January 15, 2025, including copy of her proof of U.S. citizenship | 47 |

**1. Derek Davey[46]**

Derek Davey is the father of the decedent, Seamus M. Davey. *See* Ex. 44 at ¶ 3. He described Seamus as the heart of their family and his firstborn son, whose birth coincided with his own service as a Marine officer and his wife's career as a neonatal nurse. *Id.* at ¶ 4. Despite the demands and separations of military life, Derek's family remained closely bonded and deeply involved in every aspect of Seamus's upbringing, including his academics, athletics, faith, and community involvement. *Id.* Seamus excelled in sports and academics, volunteered to tutor and coach, and ultimately chose to join the Marine Corps, reflecting a strong sense of duty and service that defined his character. *Id.* at ¶¶ 4–6. Growing up, Seamus was involved in camping, hiking, fishing, Scouts, and church activities with his family. *Id.* at ¶ 5. "We seized every opportunity to be together, whether it was during his visits home, my trips to California, or our memorable cross-country drive when Seamus was promoted to Corporal in the USMC." *Id.* The family also supported Seamus in his application to the New York Fire Department. *Id.* Seamus "held a deep respect for his teachers, coaches, and a particular pastor at our church, all of whom recognized him as a well-mannered, helpful, and eminent figure in our town." *Id.* at ¶ 6.

Derek learned of his son's death on October 21, 2005, while he working in Washington, D.C., "[w]hen two Marine Gunnery Sergeants, a Sergeant, and a Navy Chaplain appeared at the door that evening." *Id.* at ¶ 7. "The solemn silence and downcast eyes of the Marines before me spoke volumes before words ever did." *Id.* "The days that followed were a blur of grief and confusion marked by a challenging journey back to New York to be with my family, who had already been informed of our tragic loss." *Id.*

[46] Derek Davey's passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 44, Declaration of Derek Davey, dated January 15, 2025.

In the aftermath, [redacted]

Derek notes that Seamus' death permanently altered his family's emotional and financial stability. *Id.* at ¶¶ 9–11. Despite family milestones and the growth of grandchildren who carry Seamus' name, Derek opines on the life his son might have had and the impact he could have made on others, and he turns to Marine colleagues and friends to provide "a measure of solace" at the loss of his son. *Id.* at ¶ 11.

Following the baseline standard, Plaintiffs requested an award of $5 million for Derek Davey's solatium claim. The Special Master agrees that a baseline award for Derek Davey's solatium claim is appropriate.

**2. Austin Byrd**[47]

Austin Byrd is the younger sister of the decedent, Seamus M. Davey. *See* Ex. 45 at ¶ 3. She described Seamus as "my guardian, my confidant, and my greatest supporter" with the two of them "being the bookends of [their] family as the oldest and youngest of four" siblings. *Id.* at ¶ 4. Austin noted how she and her brother "found ways to stay connected" including Seamus flying Austin to San Diego for "a trip that remains one of my most cherished memories." *Id.* Austin grew up idolizing her brother, and every time he left for his military service, he would make sure to give her a hug. *Id.* at ¶ 5. She recalled that her last conversation with her brother "ended with an

[47] Austin Byrd's passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 45, Declaration of Austin Byrd, dated January 15, 2025.

exchange of 'I love you.'" *Id.* Seamus touched lives within his family and without: developing a friendship with a German exchange student who became like a member of the family; "indirectly leading another of his sisters to her future husband at his friend's wedding"; "coaching, playing, or attending various sports events, sharing his passion with those around him"; and simply living a life that made every moment count. *Id.* at ¶ 6.

Austin learned of her brother's death when a neighbor requested her to leave school early allegedly because her mother was sick "only to find the front door wide open and a scene of despair inside." *Id.* at ¶ 7. The family was initially told that Seamus died in an IED attack only to learn later that he was killed in an ambush. *Id.* Because her father was out of town, the family tried to keep the news from him until he "could be informed properly." *Id.* "The day Seamus died was the day a part of me died with him." *Id.*

After Seamus's death, [redacted]

[redacted]

[redacted]

Following the baseline standard, Plaintiffs requested an award of $2.5 million for Austin Byrd's solatium claim. The Special Master agrees that a baseline award for Austin Byrd's solatium claim is appropriate.

**3. Shiloh Mackey[48]**

Shiloh Mackey is the younger sister of Seamus M. Davey by 11 months—his "Irish twin." *See* Ex. 46 at ¶ 3. They were inseparable growing up with Seamus playing the same protector role that he played with their youngest sibling, Austin. *Id.* at ¶ 4. After Seamus joined the Marine Corps, "he made it his mission to keep a watchful eye over my sisters and me, regardless of the distance his service imposed between us." *Id.* He went out of his way to be in contact—even if not in person—for important events in their lives. *Id.* Even when Seamus was in the military and Shiloh was in college, "[w]e made it a point to communicate every other week, cherishing the moments we could spend together during breaks from service in Iraq and military training." *Id.* at ¶ 5. "He had a genuine interest in my well-being and ambitions, always encouraging and advising me as only a big brother could." *Id.* "His commitment to staying in touch, regardless of his location or the circumstances, meant that he was never truly far from us. Seamus's love and devotion to our family were evident in everything he did." *Id.* at ¶ 6.

Shiloh learned of her brother's death on a Friday evening when her husband delivered the news after she returned from work. *Id.* at ¶ 7. She described the moment as the darkest day of her life, marked by disbelief, sorrow, and the heavy burden of knowing other family members were

[48] Shiloh Mackey's North Carolina birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 46, Declaration of Shiloh Mackey, dated January 15, 2025.

already grieving. *Id.* "I discovered that I was among the last in my family to be informed, a decision made to spare me the pain for as long as possible." *Id.* [redacted]

Shiloh [redacted]

Plaintiffs requested an upward enhancement to Shiloh Mackey's claims based on her close and enduring relationship with her brother (including their closeness in age), her [redacted] following Seamus' death. *See Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her

family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an enhancement of 25% of her baseline award resulting in an award of $3.25 million for Shiloh Mackey's solatium claim. The Special Master agrees that a 25% enhancement of the baseline award is appropriate because of [redacted] that Shiloh endured as a result of the death of Seamus M. Davey. [redacted] evidences that Shiloh Mackey experienced more extreme effects of the loss of her loved one, which follows the precedent for an upward departure set by *Hamen v. Islamic Republic of Iran*, 407 F. Supp. 3d 1 (D.D.C. 2019).

**4. Brittany Bedernik[49]**

Brittany Bedernik is the sister of the decedent, Seamus M. Davey. *See* Ex. 47 at ¶ 3. She described Seamus as her protector, confidante, and closest sibling, explaining that they shared an exceptionally strong bond from childhood through adulthood. *Id*. at ¶ 4. They were only two-and-a-half years separated in age, so they played sports together and were "part of the same friend groups" growing up. *Id.* Even after Seamus moved from New York to California, they remained in frequent contact by traveling together both domestically and internationally. *Id.*

---

[49] Brittany Bedernik's North Carolina birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 47, Declaration of Brittany Bedernik, dated January 15, 2025.

In the years preceding his death, Brittany and Seamus would make "it a point to connect at least once a week." *Id.* at ¶ 5. Brittany recalled shared traditions, travel, and family milestones, including holidays that celebrated their Scottish and Irish heritage, and noted that Seamus's presence brought joy and cohesion to every family gathering. *Id.* at ¶¶ 5–6. They would talk of their respect for each other's careers: Seamus in the military and Brittany as a Special Education teacher. *Id.* at ¶ 5. Aside from maintaining strong relationships with his sisters and parents, "Seamus's passion for lacrosse and coaching allowed him to touch the lives of many young athletes, who looked up to him and cherished their time with him." *Id.* at ¶ 6. Brittany even named her firstborn child after her brother. *Id.*

Brittany learned of her brother's death when a man in dress blues appeared at her family's home. *Id.* at ¶ 7. She described reacting in panic and disbelief, initially hiding before the reality of Seamus's death became undeniable. *Id.* She recalled the shock of watching her mother receive the news and the overwhelming grief that followed, as well as the community's outpouring of support in the immediate aftermath. *Id.*

Following Seamus's death, [redacted]

[redacted]

[redacted]

Plaintiffs requested an upward enhancement to Brittany Bedernik's claims based on her close and enduring relationship with her brother, her [redacted] following Seamus' death. *See Bernhardt,* 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *id.* (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *id.* (awarding Santina Cartisser a 25 percent upward departure because of the "breakdown of her family without [her deceased brother] to 'keep [them] together'" and the depth of emotional pain she experienced from her brother's loss); *Thuneibat,* 167 F. Supp. 3d at 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore,* 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an enhancement of 25% of her baseline award resulting in an award of $3.25 million for Brittany Bedernik's solatium claim. The Special Master, however, finds a baseline award to be more appropriate for Brittany Bedernik's solatium claim. This is because of the clear distinction that Brittany made in her affidavit stating

that [redacted] As such, the Special Master finds that a baseline award is more in line with current precedent.

### N. MICHAEL HODSHIRE – OCTOBER 29, 2005, ATTACK – NASSER WAS SALAAM

On October 29, 2005, Sgt. Michael Hodshire was a front right passenger in an M1123 HMMWV with Echo Company, 2d Battalion, 2d Marines in the vicinity of the village of Zaidon, Iraq when an IED consisting of a 120-mm projectile struck his HMMWV. ECF No. 9 at ¶ 1206; Ex. 2 at 42-43. Sgt. Hodshire's Autopsy Report states that he [redacted][50] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Hodshire was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the October 29, 2005 attack in which Sgt. Michael Hodshire was killed. *See* ECF Nos. 47, 48.

Sgt. Hodshire's mother, Tarry Fikel, is a plaintiff in this case. *See* ECF No. 9 at ¶¶ 1205-1209. The Plaintiff suffered severe mental anguish, extreme emotional pain and suffering, and loss of Michael Hodshire's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1209. The following chart reflects the claims asserted by Tarry Fikel in her individual capacity arising out of the October 29, 2005 attack as well as the evidence setting forth the bases of her claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

[50] Ex. 48, Final Autopsy Examination Report of Michael P. Hodshire, dated November 21, 2005, at 3.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Tarry Fikel | Sgt. Michael Hodshire's mother | Solatium claim $5 million | Declaration of Tarry Fikel dated January 21, 2025, including copy of her proof of U.S. citizenship | 49 |

**1. Tarry Fikel[51]**

Tarry Fikel is the mother of the decedent, Sgt. Michael Paul Hodshire. *See* Ex. 49 at ¶ 3. Ms. Fikel described her son as the light of her life and stated that their relationship was marked by mutual love, closeness, and consistent communication, even during his military service in dangerous circumstances. *Id.* at ¶ 4. He never missed opportunities to reach out to his family, and their phone calls often included reflections on his childhood and discussions of future memories they hoped to share. *Id.* Ms. Fikel recalled Michael's surprise visits to the pizza shop where she worked, which she described as highlights of her life, and noted his playful sense of humor, including dressing in his sister's prom dress to make the family laugh. *Id.* From a young age, her son demonstrated a strong desire to help others, whether by attempting to wait tables at the pizza shop or assisting around the house. *Id.*

As a single mother, Ms. Fikel's children were her world, and she and her son shared many cherished experiences throughout his life. *Id.* at ¶ 5. She described creating memories together through everyday activities such as making pizzas, roasting marshmallows, playing card games, and attending family gatherings, as well as special outings to Cedar Point and the zoo. *Id.* Even while he was deployed, their bond remained strong through brief but meaningful calls from the

[51] Tarry Fikel's Ohio birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 49, Declaration of Tarry Fikel, dated January 21, 2025.

battlefield, during which they discussed her love for him and practical details such as items to include in care packages. *Id*. She described his visit home with his sons, Thomas and Andrew, as especially meaningful and recalled their final hug and his reassurance to her, stating, "Don't worry about me, mom, my boys got my back, and I got theirs." *Id*.

Ms. Fikel described her son's relationships with extended family as deeply loving and loyal. *Id*. at ¶ 6. His sisters, Kimberly and Kamie, were central to his life and future plans, including a vision he shared with Kimberly of raising their families side by side on shared land. *Id*. She also described his close relationships with his grandparents, whom he visited regularly to share stories of his travels, experiences, and the cultures he encountered, allowing them to feel connected to his journey. *Id*.

Ms. Fikel learned of her son's death while alone in her apartment in Montpelier, Ohio, when two Marines in formal dress arrived at her door and informed her that her son had been killed in action. *Id*. at ¶ 7. There was no warning or preparation, and she was told unequivocally that his injuries were fatal. *Id*. In disbelief, she briefly shut the door on the Marines in an attempt to escape the reality of the news. *Id*. She then undertook the painful responsibility of notifying her family, including her daughters, extended relatives, and friends, explaining that each phone call repeated the trauma and spread the grief throughout her family and community. *Id*.

Following her son's death, [redacted]

[redacted]

Holidays, birthdays, Father's Day, and other occasions now intensify the sense of loss. *Id*. at ¶ 9. [redacted]

She is constantly reminded of her son's absence, and this absence will continue to shape her family's future. *Id*. at ¶ 10. She described ongoing thoughts about what he might be doing now, the joy of his surprise visits, and the moments he would have shared with his children, who are now learning about him through stories, photographs, and memories. *Id*. She honors her son's memory by continuing his legacy through a sub sandwich he loved, donating proceeds from its sale to a local veterans' organization when working her food truck. *Id*. She remains committed to honoring her son, Michael, and preserving his memory. *Id*.

Following the baseline standard, Plaintiffs requested an award of $5 million for Tarry Fikel's solatium claim. The Special Master agrees that a baseline award for Tarry Fikel's solatium claim is appropriate in these circumstances.

## CONCLUSION

For the reasons stated above and the analysis set forth, the Special Master recommends approval of the following awards for Plaintiffs' solatium claims and recommends that the Court enter final judgments for each Plaintiff's solatium damages and punitive damages as set forth below:

| Plaintiff | Victim | Relation to Victim | Date of Attack | Recommended Solatium Damages | Recommended Punitive Damages |
|---|---|---|---|---|---|
| Gail L. Farnsworth | Spc. Jason K. Chappell | Mother | 1/24/2004 | $5,000,000.00 | $5,000,000.00 |
| Mitchell Farnsworth | Spc. Jason K. Chappell | Step-Father | 1/24/2004 | $5,000,000.00 | $5,000,000.00 |
| Lisa R. Farnsworth | Spc. Jason K. Chappell | Sister | 1/24/2004 | $3,125,000.00 | $3,125,000.00 |
| Maria A. Ayon | PFC Eric A. Ayon | Mother | 4/9/2004 | $5,000,000.00 | $5,000,000.00 |
| Cynthia Ayon | PFC Eric A. Ayon | Sister | 4/9/2004 | $2,500,000.00 | $2,500,000.00 |
| Angela Kay Dossett | PO2 Trace W. Dossett | Wife | 5/2/2004 | $8,000,000.00 | $8,000,000.00 |
| Cassidee Lee-Ann Dossett | PO2 Trace W. Dossett | Daughter | 5/2/2004 | $6,250,000.00 | $6,250,000.00 |
| Raimee Kay Dossett | PO2 Trace W. Dossett | Daughter | 5/2/2004 | $6,250,000.00 | $6,250,000.00 |
| Joseph P. Nolan | Sgt. Joseph Michael Nolan | Father | 11/18/2004 | $5,000,000.00 | $5,000,000.00 |
| Matthew J. Nolan | Sgt. Joseph Michael Nolan | Brother | 11/18/2004 | $3,125,000.00 | $3,125,000.00 |
| Stephen J. Benish | PFC Stephen C. Benish | Father | 11/28/2004 | $5,000,000.00 | $5,000,000.00 |
| Harold R. Geer | PFC George R. Geer | Father | 1/17/2005 | $5,000,000.00 | $5,000,000.00 |
| Hope Stroud | PFC George R. Geer | Sister | 1/17/2005 | $2,500,000.00 | $2,500,000.00 |
| William P. Franklin | Spc. Michael W. Franklin | Father | 3/7/2005 | $5,000,000.00 | $5,000,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| Tina M. Franklin | Spc. Michael W. Franklin | Mother | 3/7/2005 | $6,250,000.00 | $6,250,000.00 |
| Janelle Kelley | Michael W. Franklin | Sister | 3/7/2005 | $3,125,000.00 | $3,125,000.00 |
| Andrea Grez | LCpl. Jourdan L. Grez | Mother | 5/11/2005 | $5,000,000.00 | $5,000,000.00 |
| Aric Grez | LCpl. Jourdan L. Grez | Brother | 5/11/2005 | $3,125,000.00 | $3,125,000.00 |
| Colin Lovell | LCpl. Jourdan L. Grez | Son | 5/11/2005 | $3,750,000.00 | $3,750,000.00 |
| Jennifer Ball | GySgt. Terry W. Ball, Jr. | Wife | 6/12/2005 | $11,200,000.00 | $11,200,000.00 |
| Ethan Ball | GySgt. Terry W. Ball, Jr. | Son | 6/12/2005 | $3,750,000.00 | $3,750,000.00 |
| Riley Ball | GySgt. Terry W. Ball, Jr. | Daughter | 6/12/2005 | $6,250,000.00 | $6,250,000.00 |
| Gavin Ball | GySgt. Terry W. Ball, Jr. | Son | 6/12/2005 | $6,250,000.00 | $6,250,000.00 |
| Terry Ball, Sr. | GySgt. Terry W. Ball, Jr. | Father | 6/12/2005 | $5,000,000.00 | $5,000,000.00 |
| Melissa Ball | GySgt. Terry W. Ball, Jr. | Sister | 6/12/2005 | $2,500,000.00 | $2,500,000.00 |
| Tiffany Mounce-Jones | Cpl. Clifton B. Mounce | Wife | 7/14/2005 | $8,000,000.00 | $8,000,000.00 |
| Billie Jones | Spc. William Lee Evans | Father | 9/19/2005 | $5,000,000.00 | $5,000,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| Julia Fatovich | Spc. Thomas H. Byrd | Mother | 10/15/2005 | $6,250,000.00 | $6,250,000.00 |
| Michael Byrd | Spc. Thomas H. Byrd | Brother | 10/15/2005 | $3,125,000.00 | $3,125,000.00 |
| Derek Davey | Cpl. Seamus M. Davey | Father | 10/21/2005 | $5,000,000.00 | $5,000,000.00 |
| Austin Byrd | Cpl. Seamus M. Davey | Sister | 10/21/2005 | $2,500,000.00 | $2,500,000.00 |
| Shiloh Mackey | Cpl. Seamus M. Davey | Sister | 10/21/2005 | $3,125,000.00 | $3,125,000.00 |
| Brittany Bedernik | Cpl. Seamus M. Davey | Sister | 10/21/2005 | $2,500,000.00 | $2,500,000.00 |
| Tarry Fikel | Sgt. Michael Hodshire | Mother | 10/29/2005 | $5,000,000.00 | $5,000,000.00 |

Dated: May 12, 2026

Respectfully submitted,

By: */s/ Franklin D. Rosenblatt*
Franklin D. Rosenblatt
151 E. James H. Meredith Drive
Jackson, MS 39201

*Special Master*