UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| RUBEN V. FLORES, *et al.*, | : | |
| Plaintiffs, | : | **Case No.: 22-cv-1512 (JEB)** |
| -against- | : | |
| ISLAMIC REPUBLIC OF IRAN, *et al.*, | : | |
| Defendant. | : | |

**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING DAMAGES FOR 56 IMMEDIATE FAMILY MEMBER PLAINTIFFS IDENTIFIED IN THE COURT'S SEPTEMBER 24, 2025, AND JANUARY 27, 2026, ORDERS**

# TABLE OF CONTENTS


INTRODUCTION .......... 6

I. PROCEDURAL BACKGROUND .......... 6

II. CATEGORIES OF CLAIMS AND PROPOSED DAMAGES FRAMEWORK .......... 7

A. Solatium Damages .......... 8

B. Punitive Damages .......... 10

III. THE 56 PLAINTIFFS' INJURIES .......... 11

A. CHRISTOPHER BELCHIK – AUGUST 22, 2004, ATTACK – MAHMUDIYAH .......... 11

1. Mary LaGarce .......... 13

2. Lynn Lenker .......... 15

3. James Lenker .......... 17

4. Brian Belchik .......... 20

1. Julie Prats .......... 22

B. BRANDON READ – SEPTEMBER 6, 2004, ATTACK – MOSUL .......... 26

1. Robin K. Read .......... 27

C. LEE GODBOLT – MARCH 26, 2005, ATTACK – BAGHDAD .......... 28

1. Denise E. Godbolt .......... 29

2. Charley Godbolt .......... 31

D. CHARLES COOPER, JR. – APRIL 29, 2005, ATTACK – BAGHDAD .......... 33

1. Charles Cooper, Sr. .......... 35

2. Steven Cooper .......... 37

3. Jennifer Morrison .......... 38

4. Laverne Cooper .......... 40

5. David Cooper, Sr. .......... 41

6. Danielle Skinner .......... 43

E. JOSHUA KLINGER – JUNE 14, 2005 – FALLUJAH, IRAQ .......... 45

1. Philip Klinger .......... 46

2. Sharon Klinger .......... 48

3. Alison Elphick .......... 50

4. Seth Klinger .......... 52

F. JONATHAN FLORES – JUNE 15, 2005, ATTACK – RAMADI .......... 54

1. Ruben Flores ........ 56
2. Delia Flores ........ 58
3. Melony Flores ........ 60
4. Jason Flores ........ 61
5. Joshua Flores ........ 63
6. Timothy Alvarez ........ 66

G. CHAD MAYNARD – JUNE 15, 2005, ATTACK – RAMADI ........ 67
1. Rebecca Maynard ........ 69
2. Gene Maynard ........ 71
3. Cynthia Smith ........ 73
4. Lisa Ware ........ 75
5. Jeremiah Maynard ........ 78
6. Jacob Maynard ........ 81
7. Breanne Maynard ........ 84

H. DAVID KREUTER – AUGUST 3, 2005, ATTACK – BARWANAH ........ 86
1. Kenneth Kreuter ........ 87
2. Patricia Murray ........ 89
3. Laura Kreuter ........ 91

I. GEORGE R. DRAUGHN, JR. – SEPTEMBER 1, 2005 ATTACK – YUSUFIYAH ........ 94
1. George Draughn, Sr. ........ 95
2. Stephanie Barfield ........ 96
3. Charlene Swenson ........ 98
4. Lessie White ........ 99

J. JAMES D. ELLIS – OCTOBER 2, 2006 ATTACK – TAJI ........ 101
1. Ulrica Ellis ........ 102
2. Ja'Niayah Ellis ........ 105

K. DARRYL BOOKER – JANUARY 20, 2007, ATTACK – BAGHDAD ........ 107
1. Myrtle Booker ........ 108
2. Derica Booker ........ 110
3. Maria Loney ........ 112
4. Andre Booker ........ 114
5. Norman Loney, Jr. ........ 115

L. BRIAN CHEVALIER – MARCH 14, 2007 ATTACK – MUFREK ............ 117
1. June Worbington ............ 118
M. RYAN BISHOP – APRIL 14, 2007, ATTACK – YUSUFIYAH ............ 120
1. Melanie Hopley ............ 121
N. CHRISTOPHER WEST – FEBRUARY 4, 2008, ATTACK – MUQDADIYAH ............ 123
1. John West ............ 125
2. Cameron West ............ 127
3. Lauren West ............ 130
O. RONALD PHILLIPS, JR. – SEPTEMBER 25, 2008, ATTACK – BAHABAN ............ 132
1. Ronald Phillips, Sr. ............ 134
2. Wanda Phillips ............ 137
3. Troy Phillips ............ 139
4. Devrick Phillips ............ 140
5. Destinee Phillips ............ 142
6. Jaalen Phillips ............ 144
CONCLUSION ............ 147

# TABLE OF AUTHORITIES

**Cases**

*Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009) ........................................... 8

*Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677 (D.D.C. Mar. 22, 2023)........................................................................................................................ 10

*Bova v. Islamic Republic of Iran*, No. 15-cv-1074 (RCL), 2020 WL 2838582 (D.D.C. May 31, 2020)........................................................................................................................ 10

*Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022)........................................................................................................................ 19

*Est. of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37 (D.D.C. 2012) ............................. 9

*Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) ........................... 9

*Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (2009)...................................... 8, 9

*Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236 (D.D.C. 2020) ........................................ 8

*Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015)...................................... 8

*Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20 (D.D.C. 2022)........................................... 9

*Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018) ......................................... 19

*Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023)........................................................................................................................ 8

*Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924 (D.D.C. Dec. 27, 2023)........................................................................................................................ 19

*Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16 (D.D.C. 2022)............................................ 9

*Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57 (D.D.C. 2015) .......................................... 8

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51 (D.D.C. 2010)........................................ 9

*Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16 (D.D.C. 2011) ........................... 9, 10, 19

*Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44 (D.D.C. 2012) ....................................... 9

*Owens v Republic of Sudan*, 71 F. Supp. 3d 252 (D.D.C. 2014) .................................................... 9

*Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859 (JEB), 2025 U.S. Dist. LEXIS 125115 (D.D.C. July 1, 2025) ........................................................................................... 10, 11

*Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) ..................................... 8

*Roth v. Islamic Republic of Iran* 78 F. Supp. 3d 349 (D.D.C. 2015)......................................... 8, 9

*Stearns v. Islamic Republic of Iran*, Case No. 1:17-cv-131-RCL, 2022 WL 4764905 (D.D.C. Oct. 3, 2022)........................................................................................................................ 6

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010) .............................. 8, 9, 10

*Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012) ........................................ 10

**Statutes**

28 U.S.C. § 1605A(a)(2)(A)(ii)(I) ........................................................................... passim

28 U.S.C. § 1605A(c) ........................................................................................... passim

## INTRODUCTION

In this Report and Recommendations, I recommend Findings of Fact and Conclusions of Law Regarding Damages as to the injuries sustained by 36 of the 510 Plaintiffs for whom the Court granted default judgment as to liability against the Defendants Islamic Republic of Iran and Syrian Arab Republic in its September 24, 2025, Order, and 20 of the 135 Plaintiffs for whom the Court granted default judgment as to liability against the Defendants Islamic Republic of Iran and Syrian Arab Republic in its January 27, 2026, Order. The Order and Memorandum Opinion entered on September 24, 2025 are attached to the Declaration of John M. Eubanks ("Eubanks Declaration") as Exhibit 1. The Order and Memorandum Opinion entered on January 27, 2026 are attached to the Eubanks Declaration as Exhibit 2. [1]

## I. PROCEDURAL BACKGROUND

On October 11, 2024, Plaintiffs filed their Motion for Default Judgment as to Liability for First Wave of Attacks, ECF No. 26, on behalf of Plaintiffs injured in 33 attacks. On November 22, 2024, Plaintiffs filed their Motion for Default Judgment as to Liability for Second Wave of Attacks, ECF No. 33, on behalf of Plaintiffs injured in an additional 39 attacks. On February 26, 2025, Plaintiffs filed their Motion for Default Judgment as to Liability for Third Wave of Attacks, ECF No. 41, on behalf of Plaintiffs injured in an additional 43 attacks. The Court granted judgment as to liability in favor of Plaintiffs on September 24, 2025, as to all 115 attacks for which default judgment had been sought. *See* Ex. 1.

On October 22, 2025, Plaintiffs moved to appoint five Special Masters—Jim Letten, Esq.; Jack McKay, Esq.; Professor Franklin D. Rosenblatt; Eric D. Green, Esq.; and me —to issue Reports and Recommendations ("R&Rs") for damages of Plaintiffs impacted by the Court's

[1] The Special Master has reviewed all of the exhibits provided to him by the Plaintiffs which are too voluminous to file on the docket. Plaintiffs have indicated that they will provide the exhibits to the Court upon request.

September 24, 2025, Order. *See* ECF No. 50. The Court granted this motion on October 27, 2025. ECF No. 52. Further, the Court issued an Administrative Plan Governing Five Special Masters stating, "[w]ithin six months of receiving damages submissions for Plaintiffs' claims, each Special Master shall submit Reports and Recommendations to the Court via ECF containing findings of fact and conclusions of law regarding each item of compensatory damages." ECF No. 52-1 at 4.

On November 5, 2025, Plaintiffs filed their Motion for Default Judgment as to Liability for Fourth Wave of Attacks, ECF No. 53, on behalf of Plaintiffs injured in 37 attacks in Babil Province and Diyala Province. The Court granted a default judgment as to liability in favor of Plaintiffs on January 27, 2026, as to all 37 attacks for which default judgment had been sought. *See* Ex. 2.

On April 30, 2026, Plaintiffs moved the Court for a modification to the Administrative Plan Governing Five Special Masters to permit them to address damages for those Plaintiffs whose claims were addressed in the Court's January 27, 2026 Order granting default judgment as to liability for an additional 37 attacks. *See* ECF No. 62. By Minute Order, the Court granted Plaintiffs' requested modification to the Administrative Plan Governing Five Special Masters. *See* Minute Order dated May 1, 2026.

## II. CATEGORIES OF CLAIMS AND PROPOSED DAMAGES FRAMEWORK

This R&R addresses the Plaintiffs' request for damages for 56 immediate-family Plaintiffs whose loved ones were killed in various attacks traceable to Iran and Syria that were part of the first four waves of attacks for which liability has been entered by the Court. All Plaintiffs are family members of U.S. military servicemen who were killed in action by the attacks in Iraq addressed in the Court's September 24, 2025, Order and the Court's January 27, 2026, Order. This Circuit follows a damages framework under Foreign Sovereign Immunities Act ("FSIA") cases.

To recover damages against Iran and Syria, Plaintiffs "must prove that the consequences of the [defendants'] conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955, at *29 (D.D.C. Aug. 15, 2023) (quoting *Roth v. Islamic Republic of Iran* 78 F. Supp. 3d 349, 402 (D.D.C. 2015)). Courts may rely on written declaration from family member claimants describing the attack's effect on him or her. *See, e.g., Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (D.D.C. 2015).

**A. Solatium Damages**

Under the FSIA, a state sponsor of terrorism is responsible for intentional infliction of emotional distress, the resulting pain and suffering, and solatium of immediate family members of individuals killed in an attack for which a state sponsor of terrorism provided material support or resources. *See Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 245 (D.D.C. 2020); *Est. of Heiser*, 659 F. Supp. 2d at 27. In these scenarios, family members do not need to be present at the scene of the terrorist attack to recover under a theory of intentional infliction of emotional distress. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 80 (D.D.C. 2010); *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (2009); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015). Solatium damages seek to compensate family members for "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).

Courts in this Circuit generally follow established baseline awards for solatium claims of family members of victims who died in terrorist attacks. *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007). These baseline values are based on the application of general

principles of tort law. *See Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012) (holding that courts assessing damages under the FSIA "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises"); *Est. of Heiser*, 659 F. Supp. 2d at 24. Applying these baseline values "help[s] ensure that similarly situated victims receive comparable awards." *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 36 (D.D.C. 2022).

Under this framework, relatives of deceased servicemen are generally awarded baseline damages amounts of $8 million for spouses, $5 million for children and parents, and $2.5 million for siblings. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010); *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 260 (D.D.C. 2006); *Owens v Republic of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014). However, these baseline awards are "not set in stone." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010).

Decisions to deviate from the baseline and award upward departures depend on various factors. See e.g. *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011) (factors such as "an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing"); *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 38 (D.D.C. 2022) (children who were minors when their parents died have been awarded $6.25 million); *Est. of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37, 43 (D.D.C. 2012) (upward departure was warranted where sister suffered a nervous breakdown that required medical treatment, and she was prescribed medication for approximately one year); *Murphy*, 740 F. Supp. 2d at 79 (noting that self-destructive behavior is "uniquely acute

suffering warranting an upward departure"). Upward enhancements to the baseline values can range from approximately 20 to 100 percent depending on the individual plaintiff's circumstances. *See Bova v. Islamic Republic of Iran*, No. 15-cv-1074 (RCL), 2020 WL 2838582, at *9 (D.D.C. May 31, 2020) (awarding 20 percent enhancement where mother suffered "precipitous emotional decline due to the death of her son" and attempted suicide); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (finding severe mental distress arising from death warranted 25 percent enhancement); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40-41 (D.D.C. 2012) (awarding plaintiff 40 percent enhancement due to suffering from post-traumatic stress disorder, persistent grief, and depression coupled with decline in school grades and lack of motivation); *Oveissi*, 768 F. Supp. 2d at 29-30 (finding plaintiff's enduring trauma including depression, anger, and alcoholism following the victim's death warranted a 50 percent enhancement).

**B. Punitive Damages**

In addition to solatium damages and prejudgment interest, Plaintiffs also seek punitive damages which "serve to punish and deter the action which they [are] awarded." *Valore*, 700 F. Supp. 2d at 87. The terrorism exception to the FSIA specifically addresses the award of punitive damages. *See* 28 U.S.C. § 1605A(c). This Court has previously expressed a level of skepticism regarding the "actual deterrent effect of punitive damages" in *Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859 (JEB), 2025 U.S. Dist. LEXIS 125115, at *5 (D.D.C. July 1, 2025)[2]; however, this Court nevertheless found, "[g]iven the reprehensibility of Defendants' actions, punishment beyond compensatory relief may aid not only to hold [Defendants] morally accountable but also to deter similar misconduct by the two nations in the future. *Id.* at *4. In *Pautsch*, this Court

[2] This case was initially filed as a related case to the *Pautsch* case.

awarded punitive damages in an amount equal to compensatory damages. *Id.* at *6 (following other courts in this District that have awarded such requests in similar cases). Plaintiffs here request the entry of punitive damages in the same manner as was entered in the companion *Pautsch* case.

## III. THE 56 PLAINTIFFS' INJURIES

Plaintiffs describe below 14 of the attacks for which this Court found Iran and Syria liable as well as the injuries Plaintiffs sustained due to the loss of their loved ones.[3]

### A. CHRISTOPHER BELCHIK – AUGUST 22, 2004, ATTACK – MAHMUDIYAH

On the evening of August 21, 2004 into the early-morning hours of August 22, 2004, E Company, 2d Platoon, 2d Battalion, 2d Marines was patrolling various areas in and around Latifiyah and Mahmudiyah when a powerful IED destroyed an M1114 HMMWV in the patrol traveling north on Alternate Supply Route Jackson. Ex. 6 at 16. The blast resulted in the death of Cpl. Christopher Belchik. *Id.*; *see also* ECF No. 9 at ¶ 376. Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpl. Belchik was killed on November 5, 2025 (ECF No. 53), and on January 27, 2026, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the August 22, 2004 attack in which Cpl. Christopher Belchik was killed. *See* Ex. 2.

Cpl. Belchik's wife, mother, stepfather, and siblings—Mary LaGarce, Lynn Lenker, James Lenker, Brian Belchik, and Julie Prats—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 375-383. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of Cpl. Belchik's society, companionship, comfort, advice and counsel. *Id.* ¶ 383. The following

[3] Plaintiffs have indicated that claims for economic loss for the estates of those who were killed—to the extent a claim for the estate has been asserted—will be included in a distinct Proposed Findings of Fact and Conclusions of Law to be submitted at a later date.

chart reflects the claims asserted by Mary LaGarce, Lynn Lenker, James Lenker, Brian Belchik, and Julie Prats in their individual capacities arising out of the August 22, 2004, attack, as well as the evidence setting forth the bases of those claims.[4] That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Mary LaGarce | Cpl. Christopher Belchik's wife | Solatium claim $8 million | Declaration of May LaGarce, dated April 22, 2026, including copy of her proof of U.S. citizenship | 7 |
| Lynn Lenker | Cpl Christopher Belchik's mother | Solatium claim $5 million | Declaration of Lynn Lenker, dated April 27, 2026, including copy of her proof of U.S. citizenship | 8 |
| James Lenker | Cpl. Christopher Belchik's stepfather | Solatium claim $5 million | Declaration of James Lenker, dated April 27, 2026, including copy of his proof of U.S. citizenship | 9 |
| Brian Belchik | Cpl. Christopher Belchik's brother | Solatium claim $2.5 million | Declaration of Brian Belchik, dated April 29, 2026, including copy of his proof of U.S. citizenship | 10 |
| Julie Prats | Cpl. Christopher Belchik's sister | Solatium claim $3.125 million | Declaration of Julie Prats, dated April 30, 2026, including copy of her proof of U.S. citizenship | 11 |

[4] Each chart in this R&R reflects the Plaintiffs' requested solatium award. In three instances where Plaintiffs have requested an upward enhancement -- Charley Godbolt, David Cooper, and Breanne Maynard -- I do not believe that the upward enhancement is warranted. I explain my reasoning, *infra*, but I have not changed the summary charts contained herein until the Conclusion. So each summary chart contains the Plaintiffs' requests even where my recommendations differ from those requests. In the Conclusion, the summary chart contains my recommendations for all 56 Plaintiffs.

**1. Mary LaGarce[5]**

Mary LaGarce is the wife of Christopher Belchik. See Ex. 7 at ¶ 3. Chris was not only Mary's husband but also her "best friend," and their relationship, which began in 1995 while she was a high-school senior, was defined by deep friendship, mutual encouragement, and unwavering support. *Id.* at ¶ 4. Before Chris was killed, they invested fully in their relationship and future. *Id.* They strengthened their bond through shared hobbies and adventures, including golf, where Chris was "an exceptional golfer" who became her "dedicated coach," and through education, where he supported her college studies. *Id.* They treasured family life, spending time with nieces and nephews and dreaming of "the children we would someday have of our own." *Id.* They purchased a home in their hometown—situated across from their church and a Catholic school—and envisioned "walking our children to school someday," a future that was never realized. *Id.* Even during deployment, they maintained emotional closeness through tangible expressions of faith and love: Chris carried her photo in his Kevlar, while she wore "a bracelet with a cross he made for me" as they prayed for one another despite the distance. *Id.* They "built a loving home together" that was their "sanctuary" and a physical embodiment of the life they were creating. *Id.*

Chris was deeply connected to his extended family and community cultivating close friendships, treating many friends "like family," and being affectionately known as "Uncle Chris" to friends' children. *Id.* at ¶ 5. His relationship with his mother was "especially profound," marked by deep respect and heartfelt conversations, and he shared a close bond with his stepfather through shared interests like golf and movies. *Id.* As the youngest sibling, Chris was cherished by his older

[5] Mary LaGarce's Illinois birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 7, Declaration of Mary LaGarce, dated April 22, 2026.

brother and sister, and his relationships within the family were filled with humor, shared interests, and affection. *Id.*

Mary recalls that on August 22, 2004, a lieutenant colonel and staff sergeant came to her home to deliver the notification of Chris' death, but when they discovered she was at her parents' house, they followed to inform her there. *Id.* at ¶ 6. Seeing the Marines walking onto her parents' porch, she "immediately knew," and her father—himself a Marine veteran—understood the gravity of the moment. *Id.* Inside the home, the officers told her that Chris had been killed by an IED, and she recounts sobbing uncontrollably as her mother held her, "unable to process the unbearable loss." *Id.*

Chris' loss caused significant financial disruption. *Id.* at ¶ 8. At the time of his death, they had "just bought a house" and were in the middle of restoring it, creating additional strain. *Id.* Although the Marine Corps and dependent benefits provided essential assistance and functioned as "a lifeline," this support "was not equivalent to his pay," and Mary had "heavily relied on his income" even though she was employed. *Id.*

The loss of Chris altered Mary's life and family in every possible way. *Id.* at ¶ 9. It meant losing "my best friend, my partner, and the future we had dreamed of together," including plans for children and building a shared life, leaving her "scared to navigate a life I never imagined." *Id.* His parents, siblings, and extended family also lost daily laughter and joy, and although they have supported one another, the family's dynamics "inevitably shifted" over time. *Id.* [redacted]

[redacted]

Plaintiffs have requested, and I recommend, that the Court award the baseline award, of $8 million for Mary LaGarce's solatium claim.

**2. Lynn Lenker[6]**

Lynn Lenker is the mother of Christopher Belchik. *See* Ex. 8 at ¶ 3. Chris was her youngest child, "the baby of our family," and their bond was profound from birth, evolving from his dependence on her as a child into a relationship in which he became her "confidant and protector" as an adult. *Id.* at ¶ 4. Chris was deeply attuned to her well-being, particularly during moments of vulnerability such as when she was diagnosed with Multiple Sclerosis around the time of his first deployment, and he consistently shared both "his worries and triumphs" with her. *Id.*

Chris' personality and presence were a constant source of joy. *Id.* Chris had a "larger-than-life personality" and "incredible sense of humor that could brighten even the darkest days." *Id.* Their relationship was enriched by countless shared memories—family adventures, humorous mishaps, quiet moments like collecting shells on the beach, and profound milestones such as his wedding to Mary—all of which are "forever etched in my heart." *Id.* Chris' determination to become a Marine, including shedding weight and rebuilding confidence, filled her with pride, as did moments like bootcamp graduation and seeing him in uniform. *Id.* Her memories of him calling her "Mamasan," teasing her with movie lines, and performing card tricks remain vivid reminders of his warmth and vitality. *Id.* Chris was intensely devoted to family and friends and treasured relationships with his siblings Brian and Julie, his stepfather Jim—especially

[6] Lynn Lenker's Illinois birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 8, Declaration of Lynn Lenker, dated April 27, 2026.

through their shared love of golf—and his close friends, particularly Donnie, whom he regarded as a brother. *Id.* at ¶¶ 4–5. Chris' friendships often mirrored family relationships, extending affection to friends' spouses and children, many of whom called him "Uncle Chris." *Id.* at ¶ 5.

Lynn learned of Chris' death when two Marines arrived at her home shortly after she and her husband returned from church, where the congregation had been praying for Chris' safety, unaware he had already been killed. *Id.* at ¶ 6. When she realized why the Marines were there, she began screaming "No, no, no," unable to accept the reality, before hearing the words that "shattered my world": "Ma'am, I regret to inform you that your son, Christopher Ward Belchik, has been killed in combat." *Id.* She recalls falling to the floor, unable to breathe, overwhelmed by disbelief, especially because she had spoken to Chris just days earlier, and they were making plans for his return home. *Id.* Sharing the news with her children and extended family compounded the trauma. *Id.* [redacted] The experience of bringing Chris home was equally devastating. Seeing his flag-draped casket, she remembers thinking, "My son is in there, my baby is in there." *Id.* At the same time, the public honors—saluting workers, flag-lined streets, overwhelming attendance at his funeral, and the naming of a roadway as the Cpl. Chris Belchik Memorial Expressway—underscored both his heroism and the unbearable personal loss. *Id.*

Following her son's death, [redacted]

[redacted]

The emotional and relational consequences have been pervasive and enduring. *Id.* at ¶ 9. Chris's absence is felt acutely at family gatherings, where "his chair remains empty," and through daily reminders such as cooking his favorite foods or passing the home he shared with Mary. *Id.* Her family has reorganized around honoring his memory through parades, grave decorations, balloon releases, and maintaining memorial displays, adjusting to a "new normal" centered on keeping his legacy alive. *Id.* Life since Chris' death has been permanently divided into "before Chris died" and "after Chris died." *Id.* at ¶ 10. Though honoring Chris provides moments of comfort, it also highlights "everything we've lost," and his absence continues to color ordinary moments and celebrations alike. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Lynn Lenker's solatium claim.

**3. James Lenker[7]**

James Lenker is the stepfather of Christopher Belchik. *See* Ex. 9 at ¶ 3. Christopher entered James' life at age twelve, after he married Christopher's mother, and quickly became "the kind of son any man would be proud to call their own." *Id.* at ¶ 4. From that point forward, they shared daily life and formative experiences together, including hunting, fishing, golf, and flying lessons, all of which strengthened their relationship and created lasting memories. *Id.* James recounts

[7] James Lenker's Pennsylvania birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 9, Declaration of James Lenker, dated April 27, 2026.

moments of shared joy, such as the day he made his only hole-in-one on the golf course and Christopher's excitement "surpassed mine by far," as well as teaching him to drive in the woods when he "could barely reach the pedals," moments that brought "so much laughter and joy" into their lives. *Id.* "Losing him has left an ache that still lingers all these years later, as though a part of me went with him when he passed." *Id.*

James' relationship with Christopher was defined by constant involvement and mentorship. *Id.* at ¶ 5. "We did everything together," describing a relationship that was "totally loving and enjoyable." *Id.* Even while Christopher was deployed overseas, they spoke "almost every other day at least," including through video calls that helped maintain their closeness despite the distance. *Id.* Christopher lived with him, and they shared "many important moments together," forming a bond that James characterizes as "incredibly strong." *Id.* James further describes Christopher as a loving, generous young man whose warmth extended to friends and children alike. *Id.* at ¶ 6. He observed Christopher grow into "a fine young man and loving son," with friends who were "like family to him" and relationships that were "extremely close." *Id.* He recalls Christopher's joy in playing with children, giving them his full energy until "they were worn out." *Id.*

He recalls when Marines arrived at their door, at first mistaken for Christopher's friends, until the reality became clear. *Id.* at ¶ 7. Upon hearing the news, he immediately called his wife to the door, and she "collapsed to the floor." *Id.* James was "utterly devastated" and "it was a day that will stay with us forever," adding that it remains "incredibly difficult to talk about to this day." *Id.* Sharing the devastating news involved calling family members who then came to the house to grieve together. *Id.*

Following Christopher's death, [redacted] "The death of our son has left a huge and unimaginable void in our family," one that is "hard to comprehend and accept." *Id.* [redacted] Christopher's absence continues to "cast a shadow over our daily lives and interactions," and the void left behind is something they "struggle to navigate." *Id.* at ¶ 11.

While James Lenker is not Christopher Belchik's biological father, the class of plaintiffs who may recover solatium damages "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members" despite not being legally or biologically related to the victim. *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730, at *42 (D.D.C. July 19, 2022). To establish this "functional equivalence" of a close family member, plaintiffs must show that they were "treated like" a victim's spouse, child, parent, or sibling. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (finding that stepsiblings recover functionally equivalent to siblings when they were "treated like" a brother or sister); *Oveissi* 768 F. Supp. 2d at 27 (holding that interactions between a stepparent and child "were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924, at *7 (D.D.C. Dec. 27, 2023) (finding a stepparent to be a functional equivalent of a parent notwithstanding an ongoing relationship between the victim and

their biological parent because of the supplementary role played by the stepparent in the parental role).

Here, based on his declaration and the facts set forth above, I believe that James Lenker qualifies under the law as the functional equivalent of Cpl. Christopher Belchik's father based on the depth of their relationship, their shared affinity for golf, their constant contact even when Christopher was deployed, and his reference to Christopher as "our son." He was "treated like" Cpl. Belchik's father, and his evident loss and grief resembles that of a biological father.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for James Lenker's solatium claim.

**4. Brian Belchik[8]**

Brian Belchik is the older brother of Christopher Belchik. *See* Ex. 10 at ¶ 3. Christopher was "not only my sibling but my best friend," and their closeness was reflected in how they confided in one another, laughed together, and brought "joy and strength to our family" despite not living under the same roof. *Id.* at ¶ 4. Brian recounts a lifelong relationship defined by guidance, shared work, and constant involvement. *Id.* at ¶ 5. As the older brother, he took pride in mentoring Christopher—helping him find jobs, working alongside him twice, and offering advice throughout Christopher's transition into adulthood and eventual enlistment in the Marines. *Id.* Christopher was deeply involved in Brian's family life, serving as "a wonderful uncle to my kids" and a trusted babysitter who consistently showed devotion and reliability. *Id.* Brian emphasizes their continued closeness in the years before Christopher's death, noting that they stayed in frequent contact and spoke "just days before he was killed in Iraq." *Id.*

[8] Brian Belchik's United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 10, Declaration of Brian Belchik, dated April 29, 2026.

Christopher was a selfless and deeply loving person whose impact extended well beyond the immediate family. *Id.* at ¶ 6. Christopher's marriage to Mary, with Brian serving as best man, remains "a cherished memory," illustrating Christopher's "deep capacity for love and commitment." *Id.* Christopher repeatedly placed others' needs before his own, sacrificing social opportunities to care for Brian's children and forming bonds so meaningful that "the marines he led in Iraq call me randomly … expressing their emotions 22 years later." *Id.* Physical reminders of Christopher's life, such as his motorcycle kept in Brian's garage, serve as tangible symbols of the love and presence that were lost. *Id.*

He learned of Christopher's death in Iraq when he was working at Lowe's, standing "specifically in the insulation aisle," and he received a call from his stepfather informing him of Christopher's death, forcing him to step outside to regain composure. *Id.* at ¶ 7. Later at his mother's house, he encountered the Marines in person and undertook the agonizing responsibility of informing others, including his pregnant wife, his father—whom he heard cry "for the first time in my life"—his children, and Christopher's friends. *Id.*

The emotional consequences of Christopher's death have been pervasive and lasting. *Id.* at ¶ 8. "The death of my little brother has changed my life in every way imaginable" as Christopher's absence caused Brian to abandon activities he once loved, including giving up golf for 15 years because it reminded him too strongly of his brother. *Id.* He describes his heart as "completely broken," feeling the loss "every single day." *Id.* Although Brian did not seek professional psychological counseling or medical treatment, he suffered emotional injuries and grief arising from Christopher's death. *Id.* at ¶ 9. Financially, he explains that Christopher's death influenced significant choices, including withdrawing funds from his 401(k) to purchase and restore a motorcycle in Christopher's honor—an expense he "would not have had the ability to make …

outside of my retirement funds." *Id.* at ¶ 10. He plans to ride the motorcycle in tribute on August 22, 2026, illustrating how his brother's memory continues to guide his actions. *Id.*

Brian recounts the pride and honor the family feels alongside crushing grief, noting that Christopher "never got the chance to be a father" and was killed suddenly "blown up in his vehicle … after helping people in Iraq," without any chance to realize danger or defend himself. *Id.* at ¶ 11. The family grieves and commemorates him in different ways, from grave-side rituals to restoring and displaying his motorcycle, but all reflect the same unresolved loss. *Id.* For the rest of his life, Brian will dedicate time and work to honoring Christopher and other military members, having made it his mission to ensure "my brother is never forgotten." *Id.* at ¶ 12. Though his family remains close and supportive of one another, he concludes unequivocally that "none of our lives will ever be the same," as Christopher's death reshaped their lives in ways they could never have imagined and continues to guide how they live each day. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Brian Belchik's solatium claim.

**1. Julie Prats[9]**

Julie Prats is the older sister of Christopher Belchik. *See* Ex. 11 at ¶ 3. From the moment Christopher came home from the hospital, Julie felt as though "he was my own baby," recalling vivid early memories of holding him and marveling at his presence. *Id.* at ¶ 4. Throughout childhood and into adulthood, they developed a relationship of mutual care and protection, particularly during difficult periods such as their mother's illness, when Julie assumed caregiving responsibilities and their bond deepened into one in which they became "each other's protector

[9] Julie Prats' Illinois birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 11, Declaration of Julie Prats, dated April 30, 2026.

and confidant." *Id.* She describes Christopher's perseverance—passing his GED and joining the Marines despite obstacles—as heroic, stating that "he was my hero many times over." *Id.*

Julie and Christopher spent their early years playing outdoors in their neighborhood, riding bikes and skateboards, building friendships with cousins and neighborhood children, and enjoying creative activities indoors. *Id.* at ¶ 5. Sundays were marked by family rituals, including Disney movies, popcorn, and dinners at their grandparents' home. *Id.* As they grew older, their closeness continued through shared living arrangements, frequent outings, and mutual support, including cheering him on during football, trips to Six Flags and pizza nights, and regular visits to the golf driving range. *Id.* Even when Christopher moved away, their connection endured through calls, letters, and care packages while he was stationed in Iraq or North Carolina. *Id.* They shared "an irreplaceable bond," and his presence shaped "the best parts of my childhood and much of my young adulthood." *Id.*

Christopher was "the heart of our family and extended community," someone who treated everyone as family and demonstrated his care through constant acts of service, protection, and generosity. *Id.* at ¶ 6. His love extended to grandparents, aunts, uncles, cousins, nieces, nephews, and her daughter Kelsy, whom he "absolutely adored." *Id.* His signature warmth included "the best bear hugs" and a smile that "lit up the room." *Id.* Christopher's funeral underscored the depth of his impact. *Id.* at ¶ 7. Marine brothers spoke of Christopher "saving their lives and protecting them like he protected me all our lives," and his character as a protector and giver was repeatedly affirmed by those who served alongside him. *Id.* Christopher loved his wife Mary deeply and invested fully in her and her family, cherishing every moment of life with intention, joy, and humor. *Id.*

On a hot Sunday in Massachusetts, during a family cookout, she received a phone call from her mother, who said, "Honey, we lost Christopher." *Id.* at ¶ 8. Upon hearing those words, Julie pulled away, threw the phone, and "crawl[ed] on the kitchen floor, screaming in anguish for hours." *Id.* That night, and in the days that followed, she describes waking repeatedly "sobbing and screaming again as the reality of losing Christopher consumed me." *Id.* In the aftermath, [redacted]

The emotional consequences for her family were profound and enduring. *Id.* at ¶ 12. [redacted] Her husband and daughter have told her that "the day we lost Christopher was also the day they lost me," reflecting how deeply her grief consumed her. *Id.* She felt as though she was living "without a limb or half of my being" and that time itself fractured into "before Christopher's death or after." *Id.* [redacted]

[redacted]

Finally, Ms. Prats explains that Christopher's death continues to haunt her in ways that time has not healed. *Id.* at ¶ 13. The circumstances of his death, [redacted] remain a constant source of trauma. *Id.* "Time doesn't heal these wounds; it is a labyrinth of sorrow I will walk until my last breath," and "my love and loss for him is eternal." *Id.* at ¶ 13.

Plaintiffs have requested an upward enhancement for Julie Prats' claim based on [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active).

Given the extreme physical and emotional suffering Julie endured, Plaintiffs' requested enhancement of 25% of the baseline award seems reasonable and consistent with prior awards, and I therefore recommend that the Court award $3.125 million for Julie Prats' solatium claim.

**B. BRANDON READ – SEPTEMBER 6, 2004, ATTACK – MOSUL**

On September 6, 2004, Sgt. Brandon Read was serving in the U.S. Army when an IED was detonated near the vehicle he was traveling in with his unit. *See* ECF No. 9 at ¶¶ 385-387; Ex. 3 (ECF No. 26) at 65. Sgt. Read was killed in the attack. *Id.* According to the Autopsy Examination Report, Sgt. Read [redacted][10] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Read was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the September 6, 2004 attack in which Sgt. Brandon Read was killed. *See* Ex. 1.

Sgt. Read's surviving mother, Robin K. Read, is a Plaintiff in this action. *See* ECF No. 9 at ¶¶ 389-392. The Plaintiff suffered severe mental anguish, extreme emotional pain and suffering, and loss of Brandon Read's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 392. The following chart reflects the claims asserted by Robin K. Read in her individual capacity arising out of the September 6, 2004, attack as well as the evidence setting forth the bases of her claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Robin K. Read | Sgt. Brandon Read's mother | Solatium claim $5 million | Declaration of Robin K. Read, dated March 31, 2025, including copy of her proof of U.S. citizenship | 13 |

[10] Ex. 12, Final Autopsy Examination Report for Read, Brandon Michael, dated September 9, 2004.

**1. Robin K. Read[11]**

Robin K. Read is the mother of Brandon M. Read. *See* Ex. 13 at ¶ 3. His presence was a constant source of joy in Robin's life. *Id.* at ¶ 4. The two were incredibly close, even working at the same place for a time and creating mutual friends. *Id.* Brandon was a "social butterfly" and had the innate ability to make friends wherever he went. *Id.* Brandon was adventurous and loved being outdoors. *Id.* at ¶ 5. He enjoyed biking, swimming, and camping. *Id.* However, Brandon simultaneously had a fascination with computers, movies, and junk food. *Id.* While Brandon was growing up, his father was active duty which required frequent moves. *Id.* As they arrived in a new town, Robin and Brandon leaned on each other for support as they adjusted. *Id.* It never took Brandon long to make new friends no matter where they lived. *Id.* Brandon followed in his father's footsteps and joined the military. *Id.* Despite his service, Brandon stayed in communication with his mother, even writing letters during basic training. *Id.*

The day Robin learned of her son's death, she was visited by two casualty officers at her home. *Id.* at ¶ 7. When they delivered the news that her son was killed in Iraq, Robin was in shock. She immediately called Brandon's father and brother informing them of the heartbreaking news. *Id.* Sharing this news with family, friends, and former colleagues of Brandon was devastating for Robin. *Id.*

Brandon's death has caused Robin to experience uncontrollable grief. Simple reminders such as a song on the radio can trigger tears. *Id.* at ¶ 9. Despite the pain experienced by Robin and the family, they often find ways to honor his memory through participation in memorial events such as the annual memorial motorcycle rides, golf tournaments, and Wreaths Across America. *Id.*

---

[11] Robin K. Read's birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 13, Declaration of Robin K. Read, dated March 31, 2025.

Brandon's legacy is also recognized through the dedication of the Sgt. Brandon M. Read U.S. Army Reserve building and the Sgt. Read Lane Memorial Highway. *Id.* While Robin takes pride in these events and dedications, they can be emotionally taxing and create a financial strain to attend. *Id.* at ¶¶ 8-9. Despite this, the ceremonies and dedications have become a crucial part of her healing process. *Id.* at ¶ 9.

Even though 20 years have passed since Brandon's death, his friends from school and work continue to reach out to Robin. *Id.* at ¶ 6. Brandon's best friend from high school named his son after Brandon as a tribute, a poignant example of his lasting influence. *Id.* There is not a single day that has passed since the day he died that Robin does not think about her son. *Id.* at ¶ 10. On the 20th anniversary of his death, approximately 30 friends, family, and members of his unit gathered in Arlington to honor Brandon's memory. *Id.* Over the years, Brandon's fellow servicemembers grappled with survivor's guilt. *Id.* "Hearing their stories, their struggles, and their wishes that things could have been different is heart-wrenching." *Id.* "It's a stark reminder of the ripple effects of loss, not just within our family but among all who knew and loved Brandon." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Robin K. Read's solatium claim.

**C. LEE GODBOLT – MARCH 26, 2005, ATTACK – BAGHDAD**

On March 26, 2005, Sgt. Lee Godbolt was serving in the Alpha Company, 1st Battalion, 156th Armor Regiment of the U.S. Army National Guard in Baghdad, Iraq. *See* ECF No. 9 at ¶ 851; Ex. 4 (ECF No. 41-1) at 17-18. Sgt. Godbolt was killed when a SVBIED detonated near his vehicle. *Id*. According to the autopsy report, Sgt. Godbolt died of [redacted][12] Plaintiffs filed a

[12] Ex. 14, Autopsy Examination Report for Godbolt, Lee M., dated April 5, 2005.

motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Godbolt was killed on February 26, 2025 (ECF No. 41), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the March 26, 2005 attack in which Sgt. Lee Godbolt was killed. *See* Ex. 1.

Sgt. Godbolt's surviving mother and brother—Denise Godbolt and Charley Godbolt—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 853-855. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Sgt. Godbolt's society, companionship, comfort, advice and counsel. *Id*. at ¶ 855. The following chart reflects the claims asserted by Denise Godbolt and Charley Godbolt in their individual capacities arising out of the March 26, 2005, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Denise Godbolt | Sgt. Lee Godbolt's mother | Solatium claim $5 million | Declaration of Denise E. Godbolt, dated April 21, 2026, including copy of her proof of U.S. citizenship | 15 |
| Charley Godbolt | Sgt. Lee Godbolt's brother | Solatium claim $3.125 million | Declaration of Charley Godbolt, dated April 28, 2026, including copy of his proof of U.S. citizenship | 16 |

**1. Denise E. Godbolt**[13]

Denise E. Godbolt is the mother of Lee Godbolt. *See* Ex. 15 at ¶ 3. Lee is Denise's youngest son whose presence was a constant source of "joy and comfort." *Id*. at 4. Following the September

[13] Denise Godbolt's Louisiana birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 15, Declaration of Denise Godbolt, dated April 21, 2026.

11th terrorist attacks, Lee became determined to protect the people of the United States and serve his country. *Id*. at ¶ 6. In addition to his bravery, Lee was empathetic and kind. *Id*. at ¶ 5. During his deployment, he requested that his mother send clothes and shoes to the children who had lost their parents in the war. *Id*. Denise described the unique connection she had with her son. *Id*. at ¶ 4. When she became gravely ill, Lee encouraged Denise to fight and recover. *Id*. Denise recalled that her son told her, "I can't live without you. *Id*. Now, Denise is left with the unimaginable task of living without her son in a cruel twist of fate. *Id*.

Lee was always punctual with his calls from Iraq, and his mother knew when to expect to hear from her son. *Id*. at ¶ 7. On the morning of his death, Denise did not receive a call from her son, and a sense of overwhelming dread settled over her. *Id*. The next morning, Denise was awoken by a knock at the door. *Id*. When she answered the door, she saw two men in military attire standing solemnly on her doorstep. *Id*. Denise recounted how the presence of the men confirmed her worst fears. *Id*. She instantly closed the door and ran to her son's room hoping that their presence was just a terrible dream. *Id*. As she peered out the doorway and saw the men still standing outside, Denise knew her son was gone. *Id*. She was left in a state of inconsolable grief and cried for four days straight causing her to suffer from an excruciating headache. *Id*.

[redacted]

[redacted]

Although time moves forward, Denise finds herself trapped in a cycle of grief. *Id*. at ¶ 11. Each day she is reminded of her son's death. *Id*. Seemingly mundane occurrences, such as the arrival of mail, reignite the pain and hurt, causing Denise to experience grief as though her son was just taken from her. *Id*. Denise often questions "why" her son was killed—a question that haunts her till this day. *Id*. She described that the death of her son shapes her existence and colors her perspective of the world. *Id*. "I miss him every single day, and I will miss him for the rest of my life." *Id*.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Denise Godbolt's solatium claim.

**2. Charley Godbolt[14]**

Charley Godbolt is the brother of Lee Godbolt. *See* Ex. 16 at ¶ 3. Lee was a beacon of pride for the entire family. *Id*. at ¶ 4. Charley deeply admired his brother for his decision to join the military. *Id*. at ¶ 4. Lee was brave, dedicated, and responsible. *Id*. Growing up together in New Orleans, Charley and Lee's relationship was forged by their love of sports and faith. *Id*. at ¶¶ 5, 6. The brothers remained close throughout their lives, even when life took them in different directions with Charley attending college and Lee joining the military. *Id*. at ¶5.

Charley was attending college when he received a call from his mother informing him that his brother was killed in Iraq. *Id*. at ¶ 7. In disbelief, Charley dropped the phone and was unable to process the reality that was crashing down around him. *Id*. Following the devastating loss of

[14] Charley Godbolt's Louisiana birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 16, Declaration of Charley Godbolt, dated April 28, 2026.

his brother, [redacted]

Lee's death has caused the family to become more guarded and protective of one another. *Id*. at ¶ 11. Having family serving in the military was once a source of pride but is now overshadowed by fear and apprehension. *Id*. The family relies heavily on each other for mutual support to navigate their grief. *Id*. Charley is always reminded of his brother's absence, and the loss is something that continues to impact his life. *Id*. at ¶ 12. Plans have been altered or abandoned altogether due to Lee's death. *Id*. Charley described that he is forever changed by his brother's death and he strives to move forward by remembering his brother's spirit and kindness. *Id*. Lee is "truly missed, gone too soon, but never forgotten." *Id*.

Plaintiffs have requested an upward enhancement of Charley Godbolt's claims based on his [redacted] They rely on the same cases relied upon for an upward departure for Julie Prats, supra. See *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively

socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active).

Paragraph 8 of his declaration contains all of the information regarding Charley Godbolt's [redacted]

[redacted]

Although I appreciate that Charley Godbolt [redacted], I do not believe that he has demonstrated the same kind of unusual harm that warrants a 25% upward adjustment. Accordingly, I recommend that the Court award the baseline amount of $2.5 million for Charley Godbolt's solatium claim.

**D. CHARLES COOPER, JR. – APRIL 29, 2005, ATTACK – BAGHDAD**

On April 29, 2005, PFC Charles Cooper, Jr. was serving in the 2d Battalion, 14th Infantry in the U.S. Army in Baghdad, Iraq when an IED was detonated near his dismounted patrol. *See* ECF No. 9 at ¶ 894; ECF No. 41-1 at 20. PFC Cooper was killed in the attack. *Id.* According to his death certificate, PFC Cooper died due to [redacted][15] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which PFC Cooper was killed on February 26, 2025 (ECF No. 41), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the April 29, 2005 attack in which PFC Charles Cooper, Jr. was killed. *See* Ex. 1.

[15] *See* Ex. 17, Certificate of Death (Overseas) for Cooper, Jr., Charles Steven.

PFC Cooper's surviving father, brothers, and sisters—Charles Cooper, Sr., Steven Cooper, Jennifer Morrison, Laverne Cooper, David Cooper, Sr., and Danielle Skinner [f/k/a "Danielle Stinebiser"]—are Plaintiffs in this action. *See* ECF No. 9 at ¶¶ 896-903. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Charles Cooper, Jr.'s society, companionship, comfort, advice, and counsel. *Id.* at ¶ 903. The following chart reflects the claims asserted by Charles Cooper, Sr., Steven Cooper, Jennifer Morrison, Laverne Cooper, David Cooper, Sr., and Danielle Skinner in their individual capacities arising out of the April 29, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Charles Cooper, Sr. | PFC Charles Cooper, Jr.'s father | Solatium claim $5 million | Declaration of Charles Cooper, Sr., dated April 14, 2026, including copy of his proof of U.S. citizenship | 18 |
| Steven Cooper | PFC Charles Cooper, Jr.'s brother | Solatium claim $2.5 million | Declaration of Steven Cooper, dated April 24, 2026, including copy of his proof of U.S. citizenship | 19 |
| Jennifer Morrison | PFC Charles Cooper, Jr.'s half-sister | Solatium claim $500 thousand | Declaration of Jennifer Morrison, dated April 21, 2026, including copy of her proof of U.S. citizenship | 20 |
| Laverne Cooper | PFC Charles Cooper, Jr.'s brother | Solatium claim $2.5 million | Declaration of Laverne Cooper, dated April 3, 2026, including copy of his proof of U.S. citizenship | 21 |
| David Cooper, Sr. | PFC Charles Cooper, Jr.'s brother | Solatium claim $3.125 million | Declaration of David Cooper, Sr., dated April 3, 2026, including copy of his proof of U.S. citizenship | 22 |

| | | | | |
|---|---|---|---|---|
| Danielle Skinner | PFC Charles Cooper, Jr.'s sister | Solatium claim $2.5 million | Declaration of Danielle Skinner, dated April 7, 2026, including copy of her proof of U.S. citizenship | 23 |

### 1. Charles Cooper, Sr.[16]

Charles Cooper, Sr. ("Mr. Cooper") is the father of Charles Cooper, Jr. ("Charles"). *See* Ex. 18 at ¶3. Mr. Cooper and his son, Charles, spent countless hours together as a family. *Id.* at ¶ 5. Because he raised his children in the country, there were endless things to do. *Id.* The family often went swimming, fishing, hunting, going to Falconer Park, visiting their grandparents, or simply playing in the rain. *Id.* When time got away from the kids as they were outside playing, Mr. Cooper would ring the school bell three times, alerting them that it was time to come home. *Id.* at ¶ 5. The family often cooked meals together. *Id.* at ¶ 6. Moments in the kitchen and doing after-school pickups are cherished memories Mr. Cooper has of his son. *Id.* at ¶¶ 4, 6. When Charles grew older, Mr. Cooper still spent quality time with his son. *Id.* at ¶ 5. During one of his deployments, Charles came home and brought his fellow servicemen with him to share the weekend with Mr. Cooper. *Id.* at ¶ 6. Charles was described by his father as a person whose warmth, humor, and love for sharing meals made him a cornerstone of the family. *Id.* at ¶ 6.

Prior to his deployment in Iraq, Charles warned his father that you never want servicemembers in uniform to show up at the house because they will only be there to deliver terrible news. *Id.* at ¶ 7. Mr. Cooper received one of these visits from soldiers who informed him that his son had been injured. *Id.* When Mr. Cooper spoke with his son after his injury, he was

[16] Charles Cooper, Sr.'s New York birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 18, Declaration of Charles Cooper, Sr., dated April 14, 2026.

insistent that he wanted to remain in Iraq to keep serving his country. *Id.* Mr. Cooper did not expect to receive another visit from soldiers, this time delivering more devastating news. *Id.*

The day Mr. Cooper learned of his son's death, he came home around 9:00 p.m. when three soldiers were waiting for him. *Id.* at ¶ 7. They informed him that his son and one of his friends were killed in an IED attack. *Id.* Mr. Cooper recalled that everything went downhill from that moment on. *Id.* It felt as though his world "stopped turning." *Id.* During that time, Mr. Cooper spent a lot of time together with family and friends who were supportive. *Id.*

Following the death of his son, Mr. Cooper sought solace in speaking with others including Vietnam veterans and friends who had endured similar experiences. *Id.* at ¶ 8. He also speaks with Dave Christy from Jordan Funeral Home who provided not just professional guidance but also emotional support. *Id.* Mr. Cooper still reaches out to Mr. Christy today. *Id.* Despite these efforts, Mr. Cooper often finds himself crying remembering his son. *Id.* During the immediate aftermath, Mr. Cooper took a couple of weeks off to process and confront the passing of his son. *Id.* at ¶ 9. The death of Charles has deeply impacted the family. *Id.* at ¶ 10. He remains the center of their conversations, and they often share memories of their time together. *Id.* While the family is determined to keep moving forward, his presence is always felt and will never be forgotten. *Id.*

After losing Charles, Mr. Cooper encountered strange coincidences that remind him of his son. *Id.* at ¶ 11. Three of the medical personnel treating him in Jamestown, New York knew Charles and treated him after he was injured in Iraq. *Id.* Mr. Cooper is also still friends with a man who recruited Charles and knew him since the 10th grade. *Id.* After Charles died, the recruiter got a tattoo of Charles' face because he was the first soldier the recruiter ever lost. *Id.* When they are together, they spend their time talking about Charles. *Id.*

Mr. Cooper carries the memory of his son close to his heart and the absence of Charles is deeply felt in the moments the family shares together. *Id.* at ¶ 12. According to Mr. Cooper, he purposely chose his son's memorial to be close to the road. *Id.* Often times when people see him cleaning up the memorial site, they honk and give him a wave. *Id.* I always make sure his memorial has five flags on it at all times." *Id.* "He will always be missed but never forgotten, as his legacy lives on in our love and recollections of him." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Charles S. Cooper, Sr.'s solatium claim.

**2. Steven Cooper[17]**

Steven Cooper is the oldest brother of Charles Cooper, Jr. *See* Ex. 19 at ¶ 3. They spent every moment of their childhood together. *Id.* at ¶ 4. Holidays including Christmas and Thanksgiving were especially cherished. *Id.* at ¶ 5. Shared memories of hunting and fishing with their father remain some of Steven's fondest memories of his brother. *Id.* One deeply special milestone was introducing Charles to his two young sons as they were born. *Id.* These moments are unforgettable. *Id.* After Steven graduated and got married, he made sure to visit Charles regularly at their dad's house. *Id.* at ¶ 4. They continued making memories together going fishing, hunting, and sharing stories. *Id.* Steven described their bond as unshakable. *Id.* at ¶ 5. Charles was not only his youngest brother but also one of his best friends. *Id.*

Steven was at work when he received a call from his father, informing him that his brother Charles had been killed in Iraq. *Id.* at ¶ 7. He immediately left work and rushed to his father's home where the family came together to mourn and support one another. *Id.* They cried daily and

[17] Steven Cooper's New York birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 19, Declaration of Steven Cooper, dated April 24, 2026.

grappled with the anger over the circumstances of his brother's death. *Id.* At the same time, they shared laughter by reminiscing about his life and all the silly things he used to do. *Id.*

Not a day goes by that Steven does not think about his brother. *Id.* at ¶ 8. Steven mourns his brother's absence, and it pains him to know that his children will never experience the joy of having Charles as their uncle. *Id.* at ¶ 9. They only know him through shared stories and through research they've done to learn about him. *Id.* The loss of Charles has brought Steven closer to his father and brothers. *Id.* They try to keep his memory alive by sharing photos and maintaining close ties with one another. *Id.* Despite the passage of time, there are countless reminders of his brother's absence. *Id.* at ¶ 10. "I miss Charles dearly and have missed him so much these last 21 years." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Steven Cooper's solatium claim.

**3. Jennifer Morrison[18]**

Jennifer Morrison is the half-sister of Charles Cooper, Jr. *See* Ex. 20 at ¶ 3. Jennifer and Charles shared the same father. *Id.* at ¶ 4. Jennifer's mother and father separated when she was very young. *Id.* As a young child, Jennifer often visited with her father and her brother Charles. *Id.* She described that they had a typical sibling relationship during the time spent at their dad's house. *Id.* Jennifer felt lucky to be surrounded by all of her brothers at that early age. *Id.* They did everything with one another and built a connection that lasted until Jennifer was about seven years old. *Id.* Growing up with parents who were separated caused Jennifer's relationship with her father's side of the family, including Charles, to drift. *Id.* She no longer visited her father's home at seven years old and Jennifer lived halfway across the United States from her brother. *Id.* Life

[18] Jennifer Morrison's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 20, Declaration of Jennifer Morrison, dated April 21, 2026.

took them in two different directions, and Jennifer did not have a relationship with Charles after she left her father's home. *Id.*

Jennifer found out about Charles's death when her brother called her while she was at work. *Id.* at ¶ 5. The news was incredibly painful for Jennifer to hear. *Id.* She became overwhelmed by the grief and stepped outside to cry and reflect. *Id.* Jennifer grieved for the lost opportunity to build a deeper relationship with Charles. *Id.* Because she lived the furthest from home, Jennifer believes she was the last to find out about her brother's death. *Id.* Her family was on the east coast so she was unable to meet with them during this heartbreaking time. *Id.*

The tragedy of her brother's death has led Jennifer to seek better connections with other family members, including her half-siblings and father. *Id.* at ¶ 7. She has re-examined her relationships with family and values them more deeply. *Id.* The emotional toll has reshaped how the family bonds and the way they cope and come together. *Id.* While Jennifer is not as connected with her family, she is saddened by how the loss of Charles has impacted them. *Id.* at ¶¶ 7-8.

As a half-sibling, Jennifer is "presumed to recover at the same level as full-blood siblings[.]" *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014); *see also Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 38 (D.D.C. 2022) (finding that half-siblings plaintiffs were "the functional equivalent of [the decedent's] siblings"). Jennifer and Charles share the same father and grew up regularly visiting each other until Jennifer was about seven years old.

Because of this lengthy time of separation and lack of contact, Plaintiffs have requested, and I recommend, that the Court award a downward departure of 80% for an award of $500,000 for Jennifer Morrison's solatium claim in recognition of the loss of opportunity to connect with her brother. This sum also recognizes that Jennifer suffers indirectly from the loss of Charles because of the impact his death has had on their father and Jennifer's family relationships.

**4. Laverne Cooper[19]**

Laverne Cooper is the brother of Charles Cooper, Jr. *See* Ex. 21 at ¶ 3. Because they were only 11 months apart in age, Laverne and Charles "lived more like twins than just brothers." *Id.* at ¶ 5. The brothers did everything together including fishing, hunting, playing sports, swimming, and biking. *Id.* at ¶ 4. "You name it, we did it." *Id.* at ¶ 5. Laverne explained that growing up so close and having someone to do everything with was one of the best parts of his childhood. *Id.* He treasures every holiday, fishing trip, and meal he's shared with Charles. *Id.* at ¶ 4. Simply being in the presence of his brother made Laverne experience pure happiness. *Id.*

The day Laverne learned of his brother's death, he received a phone call from his father informing him that Charles was killed in an attack. *Id.* at ¶ 7. Laverne recalled feeling overwhelmed by shock and profound sadness. *Id.* The days after receiving the news were "incredibly challenging." *Id.* at ¶ 9. [redacted]

Laverne often wonders about what could have been. *Id.* at ¶ 11. He has eight kids who never had the chance to get to know Charles and experience having him as an uncle. *Id.* It hurts Laverne to think that Charles only met one of his children briefly. *Id.* Laverne is heartbroken knowing that Charles never had the opportunity to have children of his own to carry on his legacy. *Id.* Charles was described as a wonderful person who was full of potential. *Id.* Laverne is devastated that his brother never had the opportunity to live his life fully or experience family in the way he would have cherished. *Id.* Charles was such an important member of the family, and his death has left a missing piece that is impossible to fill. *Id.* at ¶ 10. "There was such a strong

[19] Laverne Cooper's New York birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 21, Declaration of Laverne Cooper, dated April 3, 2026.

bond between us that I've never had a best friend since and don't imagine I ever will." *Id.* at ¶ 4. "I miss him deeply every day." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Laverne Cooper's solatium claim.

**5. David Cooper, Sr.[20]**

David Cooper, Sr. is the brother of Charles Cooper, Jr. *See* Ex. 22 at ¶ 3. Charles was the baby in a close-knit family and was also the baby out of three brothers. *Id.* at ¶ 4. Growing up together, David and Charles walked to and from school every day and spent their time enjoying every outdoor activity imaginable. *Id.* The brothers enjoyed going swimming in the creek, fishing, camping, hunting, and playing football. *Id.* Even as they got older, David and Charles always hung out together. *Id.* When Charles attended bootcamp, he remained in contact with David. *Id.* at ¶ 5. Once he entered active duty, the brothers spent as much time together as they could. *Id.* Charles would even borrow David's clothes to wear to see his girlfriend, Ashely. *Id.* David described Charles as someone who always brought joy and laughter into every interaction. *Id.* at ¶ 6. His presence made each activity feel special and unforgettable. *Id.*

The day David learned of his brother's death, he arrived at his Uncle Danny's house and saw that he was crying. *Id.* at ¶ 7. His uncle told him that his mother called and shared the devastating news that Charles had been killed in action in Iraq. *Id.* Initially David did not believe that his brother died. *Id.* He sped home to find that half of the family was gathered. *Id.* The sight of his dad crying hysterically confirmed the terrible reality. *Id.* David described that the shock of

[20] David Cooper, Sr.'s New York birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 22, Declaration of David Cooper, Sr., dated April 3, 2026.

his brother's death lingered for days and the grief became overwhelming when they picked up his body from the airport and took him to the funeral home. *Id.*

Following the death of his brother, [redacted] The death of Charles has also been indescribably difficult for their family. *Id.* at ¶ 10. [redacted] The joy of family gatherings, such as birthday parties, has faded. *Id.* The loss has taken a serious toll on the family, and they lean on each other, cherishing every moment together and never taking each other for granted. *Id.* On dates such as his birthday, Veterans Day, and Memorial Day, the family gathers at his brother's headstone which always contains flags. *Id.*

The death of Charles has changed David's outlook on life and relationships by making him deeply appreciate his family. *Id.* at ¶ 11. David never takes anything for granted and now finds himself valuing the time and connections he has with loved ones in ways he never did before. *Id*. "Almost 21 years later and not a day goes by that I don't think about my baby brother." *Id.* "I miss him deeply, and I cherish all the memories of the childhood we shared." *Id*.

Plaintiffs have requested an upward enhancement of 25% of his baseline award resulting in an award of $3.125 million for David Cooper's solatium claim based on the close nature of his relationship with his brother and [redacted] They rely on the same cases that I found warranted an upward departure for Julie Prats, page 26, *supra*. .*See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate

attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active).

The entirety of support for an upward enhancement is contained in paragraphs 8 and 9 of David's declaration:

> [redacted]

Without intending to minimize the impact of Charles' death on David, I do not believe that the case is made for a 25% upward enhancement, and I recommend that the Court award the baseline amount of $2.5 million for David Cooper's solatium claim.

**6. Danielle Skinner**[21]

Danielle Skinner is the sister of Charles Cooper, Jr. *See* Ex. 23 at ¶ 3. Growing up, Danielle and Charles were inseparable and did everything together. *Id.* at ¶ 5. Their bond was not just based on the fact that they were family, but on the countless memories they created together. *Id.* Even as

[21] Danielle Skinner's New York birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 23, Declaration of Danielle Skinner, dated April 7, 2026.

life became busier, Danielle's connection with her brother remained strong. *Id.* He often joined her family and extended relatives for gatherings. *Id.* Their conversations were deep and were filled with laughter and plans for the future. *Id.* Danielle described her brother as compassionate and wise beyond his years. *Id.* at ¶ 4. Charles and his soon-to-be wife assisted Danielle in caring for her daughter and always put family first. *Id.* Observing Charles with his nieces and nephews was a testament to the kind of love and joy he brought into their lives. *Id.* at ¶ 6. Danielle described that Charles was not just an uncle in title but was an active mentor, playmate, and sometimes even a confidant to them. *Id.*

Danielle learned about her brother's death after her father called her after officers had visited his house to deliver the devastating news. *Id.* at ¶ 7. She remembers feeling a sense of disbelief, hoping that it was all a misunderstanding. *Id.* However, the reality of the situation quickly set in. *Id.* Danielle was devastated by the loss of her brother. *Id.* She explained that words could not fully capture the depth of grief that enveloped her and the family. *Id.* Now, simply mentioning her brother's name brings Danielle to tears. *Id.* at ¶ 9.

The death of Charles has affected her family's mental health. *Id.* at ¶ 9. [redacted] Communication amongst the family has suffered. *Id.* According to Danielle, [redacted] The loss of her brother has also meant that her children will never have the chance to know their uncle. *Id.* This reality adds another layer of sorrow to the loss she's experiencing. *Id.*

Danielle described that the devastation felt at the time of her brother's passing has not diminished. *Id.* at ¶ 10. It has settled into a permanent ache which permanently changed her family.

*Id.* As they move forward, they do so with the understanding that their lives will forever be marked by this loss. *Id.*

Plaintiffs have requested, and I recommend that the Court award the baseline amount of $2.5 million for Danielle Skinner's solatium claim.

**E. JOSHUA KLINGER – JUNE 14, 2005 – FALLUJAH, IRAQ**

On June 14, 2005, LCpl. Joshua Klinger was serving in the 1st Battalion, 6th Marines in Fallujah, Iraq when an IED detonated near the road where LCpl. Klinger was performing foot patrol. *See* ECF No. 9 at ¶ 1022; Ex. 4 (ECF No. 33-1) at 29-30. According to the autopsy report, LCpl. Klinger died of [redacted][22] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Klinger was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for inter alia the June 14, 2005 attack in which LCpl. Joshua Klinger was killed. *See* Ex. 1.

LCpl. Klinger's surviving father, mother, sister, and brother—Philip Klinger, Sharon J. Klinger, Alison R. Elphick, and Seth D. Klinger—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1024-1029. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of LCpl. Klinger's society, companionship, comfort, advice and counsel. *Id.* at ¶ 1029. The following chart reflects the claims asserted by Philip Klinger, Sharon J. Klinger, Alison R. Elphick, and Seth D. Klinger in their individual capacities arising out of the June 14, 2005, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

[22] Ex. 24, Final Autopsy Examination Report for Klinger, Joshua P., dated June 30, 2005.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Philip Klinger | LCpl. Joshua Klinger's father | Solatium claim $5 million | Declaration of Philip Klinger, dated March 27, 2026, including copy of his proof of U.S. citizenship | 25 |
| Sharon Klinger | LCpl. Joshua Klinger's mother | Solatium claim $5 million | Declaration of Sharon Klinger, dated March 28, 2026, including copy of her proof of U.S. citizenship | 26 |
| Alison Elphick | LCpl. Joshua Klinger's sister | Solatium claim $2.5 million | Declaration of Alison Elphick, dated April 28, 2026, including copy of her proof of U.S. citizenship | 27 |
| Seth Klinger | LCpl. Joshua Klinger's brother | Solatium claim $2.5 million | Declaration of Seth Klinger, dated March 27, 2026, including copy of his proof of U.S. citizenship | 28 |

### 1. Philip Klinger[23]

Philip Klinger is the father of Joshua Klinger. *See* Ex. 25 at ¶ 3. Philip described his son Joshua as someone with an "innate ability to bring joy and laughter into any room." *Id.* ¶ 4. He vividly recalled that when Joshua was about five or six, he turned communion cups into makeshift goggles during a church service. *Id.* Despite his efforts to keep his composure, Philip could not resist laughing. *Id.* Joshua's sense of humor always connected the family to others. *Id.* When their new pastor and wife met the family for the first time, everyone was instantly put at ease by Joshua's spoon antics. *Id.* In addition to his great sense of humor, Joshua was musically talented. *Id.* Philip

[23] Philip Klinger's United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 25, Declaration of Philip Klinger, dated March 27, 2026.

recounted the time Joshua played the piano by ear at an auction, drawing an impromptu audience. *Id.*

Philip enjoyed watching Joshua grow into a young man and relishes in the memory of teaching him to play baseball, hunting together, family vacations, playing chess, mowing the lawn on the tractor, and watching the Philadelphia Phillies play. *Id.* at ¶ 5. Philip shared many of his son's experiences that were like a rite of passage including the moment Joshua received his driver's license and the time he bagged his first buck while hunting. *Id.* When Joshua attended boot camp, he kept in touch with his father by sending heartfelt letters. *Id.* He was determined to excel as a Marine, and his family took pride in his achievements. *Id.*

At around 5:20 in the morning on June 14, 2005, Philip and his wife Sharon were awakened by the sound of their doorbell. *Id.* at ¶ 7. When they answered the door, they were greeted by two Marines who delivered the devastating news of their son's death. *Id.* Philip recalled that their words were so profound that it felt as though a piece of his heart had been "forcibly removed." *Id.* "The world seemed to stand still in that moment." *Id.* Their other children, who were awoken by the commotion, learned of Joshua's death after joining Philip and his wife in the living room. *Id.* The ripple effect of Joshua's death was immediate. *Id.* The finality of their loss became surreal when Joshua's personal belongings were returned from Iraq and during the subsequent viewing of his memorial service. *Id.* at ¶ 8.

Following the death of his son, Philip felt as though his "world came to a standstill." *Id.* at ¶ 8. [redacted] The family's home that was once filled with laughter became "silent." Typical family routines, like attending church services, "were abandoned" as they struggled with grief that seemed "insurmountable." *Id.* The loss of Joshua was a constant presence in their lives.

*Id.* They were acutely reminded when Joshua's watch sounded every night at 9:30 at night. *Id.* Philip described the alarm as "a call to remember and to love." *Id.* To honor Joshua's memory and all who lost their lives serving our country, the family became involved in community events. *Id.* The family has learned to create a "new normal" that allows them to honor Joshua's legacy while moving forward. *Id.*

Philip is now retired, and Joshua's siblings have now started families of their own. *Id.* Joshua's absence is felt in every family gathering. *Id.* at ¶ 9. They share stories of Joshua with their grandchildren to keep his memory alive. *Id.* While nineteen years have gone since Joshua passed, he will forever remain 21 years old. *Id.* This is a reminder of a young man whose life was cut far too short with a future left unfulfilled. *Id.* Philip often ponders on the life his son might have led including whether he would have gotten married, had children, and how his career would have progressed in the Marines. *Id.* He finds solace in knowing that Joshua found his calling in the Marines and excelled. *Id.* "As we hold him in our memories, we do so with pride, calling him our son, brother, friend, and hero." *Id.* "His absence is a wound that never fully heals, but his spirit and love continue to guide and inspire us, forever cherished and forever missed." Id.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Philip Klinger's solatium claim.

**2. Sharon Klinger[24]**

Sharon Klinger is the mother of Joshua Klinger. *See* Ex. 26 at ¶ 3. From the moment Joshua entered this world, "he was a gift." *Id.* at ¶ 4. Sharon described her son as energetic, musically inclined, and humorous. *Id.* Despite challenges with his seizure disorder, Joshua was brave and

[24] Sharon Klinger's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 26, Declaration of Sharon Klinger, dated March 28, 2026.

optimistic. *Id.* Sharon bonded with her son over games, music, their love of the night sky, and conversations about life, Heaven, and God. *Id.* at ¶¶ 4-5. Joshua's remarkable talent for the piano and guitar is a gift he often shared with others while at church or with his fellow Marines while performing the National Anthem on his electric guitar. *Id.* at ¶ 4. His sense of humor had a "few heart-stopping moments." *Id.* Sharon recalled Joshua's attempt to emulate Evil Knievel which resulted in a few scrapes. *Id.* She cherishes moments spent together with her son including family vacations, swimming at the local pool, attending sporting events, or helping him with homework. *Id.* at ¶ 5.

Following the September 11th terrorist attacks, Joshua had a desire to serve his county. *Id.* at ¶ 6. The family was proud of his commitment. *Id.* After Joshua joined the Marines, he was deployed in March of 2005. *Id.* She recalled that their final family trip before his deployment was filled with love "along with the unspoken fears of goodbye." *Id.* Despite the distance and challenges of communication during his deployment, Sharon connected with her son as often as possible. *Id.* ¶ 5.

On the day Sharon learned of her son's death, it was Flag Day and she was unable to sleep. Sharon recalled feeling an "inexplicable chill" on a hot June night. *Id.* at ¶ 7. At 5:30 that morning, Sharon was already awake when the doorbell rang. *Id.* She described that she instinctively knew who was at the door before answering it. *Id.* When she peered out the window and saw two Marine Casualty and Call Officers, her worst fears were confirmed. *Id.* When they informed her that Joshua had been killed in Iraq, she became so overwhelmed by grief that it "defies description." *Id.* Sharon fell down to her knees and was unable to bear the weight of the loss. *Id.*

The death of Joshua has left Sharon to navigate a life that feels "perpetually incomplete." *Id.* at ¶ 8. Sharon described that losing her son was like losing a part of herself. *Id.* The initial

devastation forced the family to a standstill, unable to function as they did before. *Id.* Sharon and her husband took significant time off work to mourn the loss of their son and begin the healing process. *Id.* As a Gold Star Mother, Sharon dedicated herself to ensuring that Joshua's memory lives on. *Id.* The family came together to support each other and engage in community events to honor their son. *Id.* Sharon described that their faith, family and friends have been pillars in their journey. *Id.* As time has passed, Joshua's siblings have pursued educations, started families, and established their careers. *Id.* Sharon is now retired. *Id.* These milestones were celebrated but are also bittersweet reminders of Joshua's absence. *Id.*

In their family, the saying "if we say their names, they will never be forgotten" resonates deeply. *Id.* at ¶ 9. They are committed to teaching the younger generations about their Uncle Joshua. *Id.* "The injustice of his early death often leaves us pondering the life he might have led." *Id.* "Despite this, the family takes solace in knowing that Joshua served with pride and courage." Id.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Sharon Klinger's solatium claim.

**3. Alison Elphick[25]**

Alison Elphick is the sister of Joshua Klinger. *See* Ex. 27 at ¶ 3. As her younger brother of only two years, Alison and Joshua spent their childhood creating adventures and mischief. *Id.* at ¶ 4. They spent countless hours playing outdoors, attending Sunday School and singing in the church choir. *Id.* at ¶¶ 4, 5. Even after Alison went to college, their relationship remained strong. *Id.* at ¶5. Alison described that her brother's spiritual journey shaped who he was and fostered a strong bond

[25] Alison R. Elphick's birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 27, Declaration of Alison R. Elphick, dated April 28, 2026.

with their minister, family, and church community. *Id.* at ¶ 6. Joshua had a unique sense of humor and "could light up any room." *Id.* Joshua was also a self-taught musician, teaching himself guitar and piano. *Id.* at ¶ 5. He was incredibly talented and could play songs by ear. *Id.* at ¶ 4. Alison recalled when her brother played "Canon in D" at their cousin's wedding. *Id.* at ¶ 4. This performance was so meaningful that Alison later played the same song at her own wedding in his memory. *Id.* One of Alison's most cherished memories of her brother was their time spent on a family trip to Myrtle Beach prior to his deployment. *Id.* at ¶ 5. They enjoyed miniature golfing and shared drinks at Margaritaville. *Id.* Alison deeply cherishes this memory of her brother.

On June 14, 2005, Alison was home with her family when she was abruptly awakened at 5:30 AM by a knock at the door. *Id.* at ¶ 7. They were greeted by two casualty officers in their Dress Blues. *Id.* Before they could deliver the news, the shock of their presence caused Alison to fall down the stairs. *Id.* The moment the casualty officers informed them of her brother's death, her parents were consumed with anguish, and Alison found herself in a daze. *Id.* That summer following the loss of Joshua was a blur marked by moments of solace Alison was able to find in her work as a camp counselor at the local YMCA and when the presence of their friends and children offered a temporary "escape from the pain" *Id.*

Alison and her family are deeply rooted in the community where they participate in events to honor Joshua's memory. She and her husband gave their son Joshua's middle name to pay tribute. *Id.* Prior to his death, Joshua maintained a close relationship with Alison's husband, Christopher. *Id.* at ¶ 8. His absence at their wedding in 2006 was profoundly felt and only deepened during the birth of her children, the marriage of their youngest brother, and the numerous family gatherings and celebrations without Joshua present. *Id.* Alison described that the grief "ebbs and flows" unpredictably which is often triggered by stories, songs, or visiting places that remind her

of memories shared with him. Now that Alison is approaching the age her parents were when they learned of Joshua's death, the thought of enduring such a loss is unimaginable. *Id.*

To channel her grief, Alison initiated a committee at the elementary school she attended with Joshua that is dedicated to honoring military members of their community and remembering those who have fallen. *Id.* at ¶ 9. This has assisted Alison in processing her grief while simultaneously serving to honor her brother's memory. *Id.* The loss of Joshua has drawn their family closer as they cherish their time together. *Id.* Memorial Day and military-affiliated services have become especially important to them. *Id.* Alison believes that her family will continue to grow stronger and more compassionate. *Id.* at ¶ 10. Sharing Joshua's story with others who have experienced a loss of a military family member has allowed the family to build bonds and assist them in healing. *Id*.

The death of Joshua has left a "lasting scar." *Id.* Alison often grapples with what ifs. *Id.* Her children long for a relationship with their Uncle Josh that they will never have the chance to experience. *Id.* "These moments of wondering what could have been, coupled with the certainty of our eventual reunion in Heaven, emphasize the complexity of grief combined with love, that defines our family's journey forward. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Alison Elphick's solatium claim.

**4. Seth Klinger[26]**

Seth Klinger is the brother of Joshua Klinger. *See* Ex. 28 at ¶ 3. Growing up four years his senior, Joshua set the pathway for Seth and was the person Seth always looked up to. *Id.* at ¶ 4.

[26] Seth Klinger's United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 28, Declaration of Seth Klinger, dated March 27, 2026.

They created countless memories playing and watching sports or playing instruments. *Id.* Seth recalled their "jam sessions" with him on the drums and Joshua playing the guitar. *Id.* The brothers often spent every day and night together and were inseparable. *Id.* at ¶ 5. Their summers were filled with late nights watching Jay Leno and Conan O'Brian. *Id.* As the brothers grew older, they developed their own circle of friends and interests. *Id.* While they did not speak as often as when they were kids, there was an unspoken understanding that the "distance was merely a phase." *Id.* Memories of his time spent with his brother laughing, playing music, and receiving his brother's advice are memories he will always carry. *Id.* at ¶ 4.

On June 14, 2005, Seth was on summer break before his senior year of high school. *Id.* at ¶ 7. Seth had his alarm set for his landscaping job but was instead awakened by his sister who delivered the devastating news that Joshua had been killed in Iraq. *Id.* Seth hoped that it was just a cruel joke because the reality of losing Josh seemed impossible. *Id.* As he made his way downstairs, the sight of his parents speaking with two Marines confirmed the news. *Id.* It was like a nightmare he could not wake from. *Id.* Seth's world shattered. *Id.* The pain that enveloped the family was "indescribable." The support and love of the community provided Seth and his family with a small comfort during this time. *Id.*

Seth's senior year of high school was shadowed by grief that was always present. *Id.* at ¶ 8. This was evident even when the family took photographs where they managed to smile even through their pain. *Id.* He described that they were once a vibrant family of five which was "abruptly reduced to four." *Id.* The loss of his brother has left an emptiness in their hearts and changed their lives in ways that words are unable to capture. *Id.* As he approaches the 20-year mark since his brother's death, [redacted] "Our family lives with the knowledge that

there will always be an empty space at our table, a missing voice in our conversations, and a void in our hearts that nothing can fill." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Seth D. Klinger's solatium claim.

**F. JONATHAN FLORES – JUNE 15, 2005, ATTACK – RAMADI**

On June 15, 2005, LCpl. Jonathan Flores was serving in Alpha Company, 1st Battalion, 5th Marines when an IED detonated beneath the vehicle Flores was traveling in, killing LCpl. Flores and four others including LCpl. Chad Mayard. *See* ECF No. 9 at ¶ 201; Ex. 4 at 30-31. According to his autopsy report, LCpl. Flores [redacted][27] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Flores was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the June 15, 2005 attack in which LCpl. Jonathan Flores was killed. *See* Ex. 1.

LCpl. Flores' surviving father, mother, sister, and brothers—Ruben Flores, Delia Flores, Melony Flores, Jason Flores, Joshua Flores, and Timothy Alvarez—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 203-209. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of LCpl. Jonathan R. Flores's society, companionship, comfort, advice and counsel. *Id.* at ¶ 209. The following chart reflects the claims asserted by Ruben Flores, Delia Flores, Melony Flores, Jason Flores, Joshua Flores, and Timothy Alvarez in their individual

[27] Ex. 29, Final Autopsy Report for Flores, Jonathan Ruben, dated July 18, 2005.

capacities arising out of the June 15, 2005, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Ruben Flores | LCpl. Jonathan Flores' father | Solatium claim $6.25 million | Declaration of Ruben Flores, dated March 14, 2025, including copy of his proof of U.S. citizenship | 30 |
| Delia Flores | LCpl. Jonathan Flores' mother | Solatium claim $6.25 million | Declaration of Delia Flores, dated April 24, 2026, including copy of her proof of U.S. citizenship | 31 |
| Melony Flores | LCpl. Jonathan Flores' sister | Solatium claim 2.5 million | Declaration of Melony Flores, dated April 21, 2026, including copy of her proof of U.S. citizenship | 32 |
| Jason Flores | LCpl. Jonathan Flores' brother | Solatium claim $2.5 million | Declaration of Jason Flores, dated April 3, 2026, including copy of his proof of U.S. citizenship | 33 |
| Joshua Flores | LCpl. Jonathan Flores' brother | Solatium claim $3.125 million | Declaration of Joshua Flores, dated April 3, 2026, including copy of his proof of U.S. citizenship | 34 |
| Timothy Alvarez | LCpl. Jonathan Flores' brother | Solatium claim $2.5 million | Declaration of Timothy Alvarez, dated April 7, 2026, including copy of his proof of U.S. citizenship | 35 |

**1. Ruben Flores[28]**

Ruben Flores is the father of Jonathan Flores—his firstborn son. *See* Ex. 30 at ¶ 3. From the beginning, Jonathan and his father were very close. *Id.* at ¶ 4. Ruben and his wife, Delia, watched their son grow up into an amazing man. *Id.* Jonathan had diverse talents and interests. *Id.* He played baseball, ran track, played the cello in the orchestra, and participated in JROTC in high school. *Id.* Ruben was a very proud father. *Id.* Ruben described all of his five children, including Jonathan, as the heart of their household. *Id.* at ¶ 5. The family was very close, and Ruben spent every day with Jonathan prior to him attending bootcamp. *Id.* When Jonathan joined the military, Ruben still spoke with him on a weekly basis. After his deployment, Jonathan was supposed to get married. *Id.* Ruben explained that everyone was looking forward to welcoming Jonathan's fiancé into their family. *Id.* Nothing could have prepared them for losing him. *Id.*

The day Ruben learned of his son's death, two Marines came to their home. *Id.* When they notified them that Jonathan had been killed in Iraq, they were devastated and overcome with grief. *Id.* "The world as I knew it shattered in that moment." *Id.* Notifying Jonathan's loved ones including his siblings, fiancé, best friend, and other family was heartbreaking. *Id.* Since Jonathan's death, [redacted]

[redacted]

[28] Ruben Flores' Texas birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 30, Declaration of Ruben Flores, dated March 14, 2025.

[redacted]

The loss of Ruben's oldest boy has been the worst experience of his life. *Id.* at ¶ 10. Jonathan meant so much to many people. *Id.* His siblings needed him during the crucial years of their lives growing up and still need him today. *Id.* "There are no more hugs from Jonathan," "[n]o more talks and no grandchildren from him." *Id.* Jonathan is deeply missed by his family, and every day is an ongoing challenge without him. *Id.* Ruben and his wife keep his memory alive by telling stories of Jonathan to their grandchildren. *Id.* "The loss of my firstborn son is a wound that time cannot heal." *Id.* "I will never get over this." *Id.* "It has changed my life." Id.

Plaintiffs respectfully request an upward enhancement to Ruben Flores' claims based on [redacted] The case for an upward enhancement is supported by these portions of Ruben's declaration:

[redacted]

[redacted]

[redacted]

[redacted]

Plaintiffs rely on the same cases that supported an upward enhancement for Julie Prats, page 26, *supra*.

Based on the hardships recounted by Ruben Flores, I recommend that the Court award an upward enhancement of 25% of his baseline award resulting in an award of $6.25 million for Ruben Flores' solatium claim.

**2. Delia Flores[29]**

Delia Flores is the mother of Jonathan Flores. *See* Ex. 31 at ¶ 3. Jonathan was Delia's "beacon of joy" and "instrumental" to the family. *Id.* at ¶ 4. Their family was close-knit and spent most of their time together. *Id.* at ¶ 5. Their home was filled with laughter in large part due to Jonathan's loving nature. *Id.* at ¶ 6. His presence also made weekly gatherings at their house unforgettable. *Id.* Delia recalled how proud she was of her son at his high school graduation and when he went to Marine bootcamp. *Id.* at ¶ 4. As Jonathan grew older, Delia spoke with her son every day on the phone. *Id.* at ¶ 5. When he deployed, they kept in touch weekly. *Id.* Delia described Jonathan as "irreplaceable." *Id.* at ¶ 6. "I will never forget him." *Id.* at ¶ 4.

Delia learned about her son's death when two Marines arrived at her door at home. *Id.* ¶ 7. She recalled that the moment she saw them, a sense of dread washed over her. *Id.* When they

[29] Delia Flores' United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 31, Declaration of Delia Flores, dated March 8, 2025.

informed her that Jonathan was killed in Iraq, her world was shattered. *Id.* Delia was unable to comprehend that her beloved son was gone. *Id.* "My heart broke in a way I never knew was possible." *Id.*

[redacted] The responsibility of raising their family and management household bills became insurmountable. *Id.* at ¶ 9. [redacted]

Jonathan's siblings have now married and started their own families. *Id.* at ¶ 10. Jonathan was not here to witness any of their milestones or achievements. *Id.* Delia agonizes over the lost opportunity to have grandchildren from Jonathan. *Id.* She is acutely aware of this fact as she witnesses all of Jonathan's friends who now have children. *Id.* Jonathan is beloved by all who knew him, the family still receiving messages from those who knew him. *Id.*

Jonathan will always be Delia's firstborn son. *Id.* at ¶ 11. "Death does not change that, nor does it diminish the love I hold for him." *Id.* "The pain of his absence is a constant reminder of what we've lost." *Id.* "Our hearts and lives are forever broken." *Id.*

Plaintiffs have requested an upward enhancement to Delia Flores' claims based on [redacted] The case for an upward departure is slightly less clear when compared to her husband who [redacted]

[redacted][30]

On balance, I believe that Delia also deserves an upward enhancement, and I therefore recommend that the Court award her an upward enhancement of 25% of her baseline award resulting in an award of $6.25 million for Delia Flores' solatium claim.

**3. Melony Flores[31]**

Melony Flores is the sister of Jonathan Flores. *See* Ex. 32 at ¶ 3. Melony and Jonathan were close, and their bond as siblings grew as they got older, especially when Melony learned of his impending deployment. *Id.* at ¶ 4. Every conversation and moment shared with her brother was infinitely more precious to Melony. *Id.* Moments shared together at family barbeques, watching scary movies, attending concerts, listening to music, playing video games, or simply going for drives now feel incredibly precious to Melony. *Id.* at ¶¶ 5, 6. Even during his military service, Melony stayed connected with her brother despite the distance and their busy schedules. *Id.* at ¶ 5.

Melony recounted the day her brother called her from a bus stop in San Diego, and she shared the news that Jonathan was going to be an uncle. *Id.* at ¶ 4. His reaction was one of the most significant and heartwarming moments of her life. *Id.* Jonathan immediately shouted, "I'm gonna be a Tio!" *Id.* He was convinced that Melony was going to have a boy, and his excitement was palpable, even though he ended up being wrong. *Id.*

Melony arrived at work early the day she found out about her brother's death and had fallen asleep in an exam room when she was suddenly awakened by her boss. *Id.* at ¶ 7. Initially, Melony

[30] In addition, the Declaration of Jason Flores, Ex. 33, ¶ 9 indicates that Delia [redacted] And the Declaration of Joshua Flores, Ex. 34, ¶ 10, indicates that Jonathan's death [redacted]

[31] Melony Flores' Texas birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 32, Declaration of Melony Flores, dated March 4, 2025.

feared that she had overslept and was late for her shift. *Id.* As Melony was escorted to the doctor's offices, her boss told her, "Today is not gonna be a good day." *Id.* Melony was greeted by her brother's godmother, Nina, and her daughter. The moment Nina said, "The Lord has called your brother home," Melony's world was shattered. Her instinctive reaction was to clutch her stomach being pregnant at the time. *Id.* She recalled that a wave of disbelief and impending grief washed over her. Melony felt as though her heart stopped beating. *Id.*

Following the death of her brother, [redacted] Due to their shared experience of losing Jonathan, the family is closer now than they once were. *Id.*

Jonathan's absence has taught Melony to cherish the moments she has with her family more deeply. *Id.* at ¶ 9. When the family experiences moments of joy it is often overshadowed by profound grief. *Id.* "I see the enduring sadness in my parents' eyes." *Id.* "We strive to move forward but the emptiness and sorrow of not having him with us persist." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Melony Flores' solatium claim.

**4. Jason Flores[32]**

Jason Flores is the brother of Jonathan Flores. *See* Ex. 33 at ¶ 3. Jonathan was a role model for his younger brother Jason who deeply admired him. *Id.* at ¶ 4. Jason described Jonathan as

[32] Jason Flores' Texas birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 33, Declaration of Jason Flores, dated April 24, 2026.

dedicated and someone who excelled at everything he did such as playing baseball, running track, and mastering the cello. *Id.* Jonathan actively participated in ROTC and was committed to achieving his goals. *Id.* In addition to his determination, Jonathan was loving towards his siblings. *Id.* Due to his perfect attendance at school, Jonathan won two bicycles in one year in recognition of his efforts at school. *Id.* Instead of keeping the bikes for himself, Jonathan gave them to Jason and his twin brother. *Id.* Growing up just three years apart, Jason and Jonathn did everything together. *Id.* "There is no better way to say it, we were boys and did boy things." *Id.* at ¶ 5. "Everything you could imagine doing, we did." *Id.* Jonathan had the ability to instantly develop meaningful connections with people and was loved by everyone who knew him. *Id.* at ¶ 6. Some of Jason's fondest memories are the ones he spent with his brother getting into mischief or enjoying their childhood. *Id.* at ¶ 5.

Jason was fifteen years old when her learned of his brother's death. *Id.* at ¶ 6. The doorbell rang at his family's home early in the morning, and when his mother answered the door, two Marines stood there. *Id.* at ¶ 7. Jason described that in that moment "everything changed forever." *Id.* By the time the sun came up that morning, the family was surrounded by loved ones comforting them during the initial hours after receiving the devastating news. *Id.* The media coverage of Jonathan's death brought an additional layer of devastation. *Id.*

Jonathan's death resulted in Jason growing up without his brother presence. *Id.* at ¶ 10. Moments such as holidays, birthdays, and even ordinary everyday life have never been the same. *Id.* The adjustment to life without Jonathan was incredibly difficult for everyone as demonstrated by [redacted] *Id.* at ¶ 9. When Jason was an adult, he realized the financial hardship his parents faced in raising a family with four surviving children on

insurance proceeds without a steady income. *Id.* Jonathan was an integral piece to their family, and his death is something the family carries with them each day. *Id.* at ¶ 10.

The family was drawn together in their grief and supported each other. *Id.* They each had to learn to exist in their new reality without Jonathan. *Id.* Jason and his twin brother eventually joined the military, married, and had children. *Id.* He described that the resemblance of his children's features and personalities to their uncle Jonathan is uncanny. *Id.* The family often reminisces about the times shared with Jonathan and make it a point to teach their children about their uncle. *Id.* Jonathan's presence will always live on through his family. *Id.* Sorrow can be triggered in a moment with a song or a situation that reminds him of Jonathan. *Id.* at ¶ 11. "Each day brings its own challenges, some are filled with laughter as we recall fond memories, while others weigh heavily as we navigate the loss." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Jason Flores' solatium claim.

**5. Joshua Flores[33]**

Joshua Flores is the brother of Jonathan Flores. *See* Ex. 34 at ¶ 3. Jonathan was a role model and a reliable support system to his younger brother Joshua. *Id.* at ¶ 4. While their parents worked, Jonathan looked after his siblings. *Id.* Joshua recalled how important it was to look out at the audience during his orchestra concert and see his brother there cheering him on. *Id.* Growing up together, the brothers went on many adventures that included riding bikes, playing video games, and staying outside until the streetlights came on. *Id.* at ¶ 5. Even though Joshua was his younger brother, Jonathan included him when hanging out with friends or going to the mall and the movies.

[33] Joshua Flores' Texas birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 34, Declaration of Joshua Flores, dated April 21, 2026.

*Id.* at ¶ 6. Joshua recalled that his brother was always the friend that brought laughter to the group and was "the heart" of their gatherings. *Id.* Jonathan was sure to instill certain values such as the importance of education and serving our country. *Id.* at ¶ 4. This heavily influenced Joshua's decision to join the Navy. Id

Joshua was at home when two Marines approached his family's home. *Id.* at ¶ 7. Because his room is the closest to the door, Joshua answered and saw two Marines at the doorstep. *Id.* The sight of them brought a sense of dread, and he immediately knew that they were there to give devastating news before a word was spoken. *Id.* The short time it took to get his parents felt like an eternity. *Id.* When they informed them of Jonathan's death, Joshua descended into darkness. *Id.* He felt as though everything went black and was in a state of shock. *Id.*

Following the loss of Jonathan, [redacted] *Id.* at ¶ 8. Any mention of his brother would cause him to shut the conversation down and leave the room. *Id.* According to Joshua, it took him years to even be able to talk about his brother's death. *Id.* [redacted]

The death of Jonathan significantly impacted their once tight-knit family. *Id.* at ¶ 10. According to Joshua, [redacted] The family bond frayed to the point where shared meals and time together became rarities for about a decade after

their loss *Id.* Joshua explained that he and his brother Jason navigated adolescence on their own. *Id.*

Joshua ensures that his children, nieces, and nephews know about their uncle Jonathan and honor him through visiting his grave multiple times a year. *Id.* at ¶ 11. "The ripple effects of Jonathan's death are far-reaching and extend beyond those of us who knew and loved him." *Id.* "We ensure Jonathan's memory lives on through stories and shared memories." *Id.*

Plaintiffs have requested an upward enhancement for Joshua Flores' claims based on the close nature of his relationship with his brother and [redacted] Joshua explains [redacted] in these words in paragraph 8 of his Declaration:

> [redacted]

Given the fact that Joshua's [redacted], Plaintiffs request for an upward enhancement of 25% of his baseline award seems reasonable, and I therefore recommend that the Court award him an upward enhancement of 25% of his baseline award resulting in an award of $3.125 million for Joshua Flores' solatium claim.

### 6. Timothy Alvarez[34]

Timothy Alvarez is the youngest brother of Jonathan Flores. *See* Ex. 35 at ¶ 3. Because he was only three years old when Jonathan was killed, Timothy's recollections are faint, and he relies heavily on the stories shared by family. *Id.* at ¶ 4. His parents and siblings often tell Timothy about how much Jon loved him and how Jon would always let his little brother follow him around, including when Jon spent time with his girlfriend. *Id.* Through the shared memories, Timothy has come to know Jon as a loving brother who inspires their family. *Id.* Timothy's mother shared that before he was deployed, Jon told my mom not to let me forget him. *Id.*

Due to his young age, Timothy did not understand the immediate impact of his brother's death. *Id.* at ¶ 5. He can recall several family members and friends coming over to their house for a long time and that everyone was crying. *Id.* Over the years, Timothy was able to grasp the harrowing effects of Jonathan's death. *Id.*

Timothy thinks about his brother every day despite losing him in 2005. *Id.* at ¶ 6. The loss of Jonathan has tested their strength as a family as they experience moments of "brokenness." *Id.* The loss of Jonathan has also profoundly affected Timothy's relationship with his older twin brothers, particularly when the twins joined the Navy. *Id.* Timothy fears losing another sibling or his parents." *Id.* As he grew older, Timothy became more cognizant of the finality of death. *Id.* Timothy often wonders how different life would have been if Jonathan were still here. *Id.* at ¶ 7. He carries of photo in his wallet of Jonathan giving him kiss when he was a baby. *Id.* "The tragedy of his death has shattered our family in ways that feel irreparable." *Id.* "Our lives were violently shaken, leaving us to piece together what remains." *Id.*

[34] Timothy Alvarez's United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 35, Declaration of Timothy Alvarez's, dated March 3, 2025.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Timothy Alvarez's solatium claim.

### G. CHAD MAYNARD – JUNE 15, 2005, ATTACK – RAMADI

On June 15, 2005, LCpl. Chad Maynard was serving in the Alpha Company, 1st Battalion, 5th Marines when an IED detonated beneath the vehicle LCpl. Maynard was traveling in, killing LCpl. Maynard and four others including LCpl. Jonathan Flores. *See* ECF No. 9 at ¶ 201; Ex. 4 (ECF No. 33) at 30-31. According to the Report of Casualty, LCpl. Maynard died as a result of [redacted][35] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Maynard was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the June 15, 2005 attack in which LCpl. Chad Maynard was killed. *See* Ex. 1.

LCpl. Maynard's surviving spouse, daughter, father, mother, sister, and brothers—Rebecca Maynard, Gene Maynard, Cynthia Smith, Lisa Ware, Jeremiah Maynard, Jacob Maynard, and Breanne Maynard—are Plaintiffs in this case.[36] *See* ECF No. 9 at ¶¶ 212-221. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of LCpl. Chad Maynard's society, companionship, comfort, advice and counsel. *Id.* at ¶ 221. The following chart reflects the claims asserted by Rebecca Maynard, Gene Maynard, Cynthia Smith, Lisa Ware, Jeremiah Maynard, Jacob Maynard, and Breanne Maynard in their individual capacities arising out of the June 15, 2005, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

[35] Ex. 36, Report of Casualty for Maynard, Chad Bryant.

[36] Plaintiffs have indicated that LCpl. Maynard's daughter, Lanae Maynard (included in the Amended Complaint as "L.M."), will submit her proposed findings of fact and conclusions of law separately.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Rebecca Maynard | LCpl. Chad Maynard's surviving spouse | Solatium claim $8 million | Declaration of Rebecca Maynard, dated March 22, 2026, including copy of her proof of U.S. citizenship | 37 |
| Gene Maynard | LCpl. Chad Maynard's father | Solatium claim $6.25 million | Declaration of Gene Maynard, dated January 25, 2025, including copy of his proof of U.S. citizenship | 38 |
| Cynthia Smith | LCpl. Chad Maynard's mother | Solatium claim $5 million | Declaration of Cynthia Smith, dated February 7, 2025, including copy of her proof of U.S. citizenship | 39 |
| Lisa Ware | LCpl. Chad Maynard's sister | Solatium claim 3.125 million | Declaration of Lisa Ware, dated February 3, 2025, including copy of her proof of U.S. citizenship | 40 |
| Jeremiah Maynard | LCpl. Chad Maynard's brother | Solatium claim $3.125 million | Declaration of Jeremiah Maynard, dated February 3, 2025, including copy of his proof of U.S. citizenship | 41 |
| Jacob Maynard | LCpl. Chad Maynard's brother | Solatium claim $3.125 million | Declaration of Jacob Maynard, dated January 31, 2025, including copy of his proof of U.S. citizenship | 42 |
| Breanne Maynard | LCpl. Chad Maynard's sister | Solatium claim $3.125 million | Declaration of Breanne Maynard, dated January 15, 2025, including copy of her proof of U.S. citizenship | 43 |

### 1. Rebecca Maynard[37]

Rebecca Maynard is the surviving spouse of Chad Maynard. *See* Ex. 37 at ¶ 3. Chad and Rebecca met in high school, and she wishes she met him earlier to have more stories to share with their daughter about him. *Id.* at ¶ 4. Rebecca described her husband as "an amazing man." *Id.* Chad and Rebecca loved taking drives, listening to music, or simply enjoying each other's company. *Id.* at ¶ 5. She recalled the moment they learned that they were expecting their daughter just before Chad's deployment to Iraq. *Id.* at ¶ 4. They were looking forward to creating a life together, raising their daughter, moving into a bigger home, and decorating her nursery. *Id.* Rebecca had a scare during her pregnancy while Chad was deployed and feared that she miscarried her baby. *Id.* However, after a trip to the hospital, she was still there and healthy as can be. *Id.* She recalled how excited she was as she anxiously awaited Chad's call to let him know everything was fine with the baby and that he was still going to be a daddy. *Id.* Chad ran outside and dropped to his knees thanking God. They were excited to start their life together. *Id.*

During Chad's deployment, Rebecca had another pregnancy scare when she went into early labor. *Id.* at ¶ 7. In order to have help while her husband was in Iraq, Rebecca went to live with her mother temporarily. *Id.* She was at her mother's home when two Marines came to her mother's house and knocked on the door. *Id.* Rebecca's sister answered and informed her that the Marines were there to speak with her. *Id.* When she opened the door, and they confirmed that she was Rebecca Maynard, they informed her that her husband had been killed. *Id.* Rebecca was eight months pregnant at this time. *Id.* As soon as she could process their words, she turned around to find her sister but immediately collapsed to her knees, crying uncontrollably. *Id.* She was so

---

[37] Rebecca Maynard's Arizona birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 37, Declaration of Rebecca Maynard, dated March 22, 2026.

overwhelmed by grief that she started hyperventilating and began to vomit. *Id.* Rebecca described being inconsolable in that moment and unable to comprehend the depth of the loss. *Id.* Further compounding her grief, Rebecca was instructed by the Marines to not contact or inform anyone until they had the opportunity to share the news with Chad's parents. *Id.* This was incredibly difficult as Chad's father called and begged Rebecca to tell him what was going on. *Id.*

The loss of her husband has caused Rebecca to face immense mental and emotional challenges. *Id.* at ¶ 10. Raising their daughter has been the only thing that keeps Rebecca going because she knows she has to be strong despite the overwhelming grief she experiences. *Id.* Their daughter has missed out on having the love, guidance, and experiences her father could have provided. *Id.* [redacted]

The loss of Rebecca's husband has also strained relationships with other family members. *Id.* at ¶ 10. [redacted]

In addition to the emotional impact, their family struggled financially. *Id.* at ¶ 9. [redacted] Their daughter grew up with only the basics and could not experience a vacation or a trip to Disney

World, that her father would have wanted for her. If Chad were here to support his family, their daughter's childhood would not have been so hard. *Id.*

The loss of Chad has left permanent scars on both Rebecca and their daughter. *Id.* at ¶ 11. He was everything to her and their family. *Id.* "When Chad died, it felt like a part of me died with him." *Id.* "His absence is not something we will ever truly recover from." Id.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $8 million for Rebecca Maynard's solatium claim.

#### 2. Gene Maynard[38]

Gene Maynard is the father of Chad Maynard. *See* Ex. 38 at ¶ 3. Chad was not just Gene's son but was one of his closest friends. *Id.* at ¶ 4. After Gene and Chad's mother divorced, Chad lived with Gene. *Id.* Despite his busy schedule as a truck driver, Gene spent as much time as he could with his children. *Id.* at ¶ 5. They enjoyed fishing, camping, and simple evenings spent talking about their days. *Id.* at ¶ 4. When Chad accompanied Gene on road trips across the county, they had the best times and talked for hours. *Id.* at ¶ 5. He loved buying Chad special toys from each stop and watching his eyes light up with joy. *Id.* Gene was heavily involved in Chad's life, from driving him from ROTC activities to attending his Marine boot camp graduation. *Id.*

The last day Gene spent with his son was at a truck stop in Paris, California, prior to Chad's deployment to Iraq. *Id.* This is the last time he ever saw his son, and it is a day he will never forget. *Id.* After he was deployed, Chad and Gene stayed connected through calls and emails. *Id.* Gene recalled the joy in his son's voice when he told Gene he was going to be a father. *Id.* Gene promised to look after his wife and daughter. *Id.* This is a promise that Gene holds sacred. *Id.*

[38] Gene Maynard's United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 38, Declaration of Gene Maynard, dated January 25, 2025.

While he was in Springfield, Missouri beginning a new chapter with a trucking company, Gene received a call from a Marine Corps sergeant that shattered his world. *Id.* at ¶ 7. Gene was informed that his son, Chad, had been killed in Iraq. *Id.* Standing alone in the parking lot on a break from orientation, Gene's world shattered. *Id.* The immediate shock was like a visceral punch that left him reeling and struggling to grasp that his son was gone forever. *Id.* Sharing the devastating news with his wife was heartbreaking. *Id.* Gene described that when Chad died, he lost a son and a piece of his heart. *Id.* at ¶ 4. [redacted] They struggled to recognize the son and brother they knew beneath the makeup that concealed his injuries. *Id.*

Since Chad's death, [redacted] He began working a local job with Mission Industries which allowed him to be surrounded by others. *Id.* at ¶ 10. Gene explained that he once earned $1,600 a week in pay and made $700 a week after leaving his trucking job. *Id.* According to Gene, the reduction in income of over $230,000 in lost earnings from 2005 until his retirement in 2010 further compounded his grief but the job change became necessary after Chad's death [redacted] *Id.* In addition to the loss of income, Chad found himself spending upwards of $10,000 on travel expenses for memorials and funerals. *Id.*

The quality of the lives of the family has been irrevocably diminished by Chad's absence. *Id.* at ¶ 11. They are haunted by his absence during milestones and celebrations. *Id.* at ¶ 12. His presence is especially missed on the anniversary of his death, holidays, and birthdays. *Id.* Gene explained that the loss of a loved one is something not family should have to endure. *Id.* "Our hope is that by sharing our story, the depth of our loss and the enduring impact of Chad's death can be truly understood." *Id.*

Plaintiffs respectfully request an upward enhancement to Gene Maynard's claims based on [redacted]

Plaintiffs request for an upward enhancement is consistent with prior awards, and I recommend that the Court award an enhancement of 25% of the baseline amount resulting in an award of $6.25 million for Gene Maynard solatium damages.

**3. Cynthia Smith[39]**

Cynthia Smith is the mother of Chad Maynard. *See* Ex. 39 at ¶ 3. Chad was not just Cynthia's son, but he was a "beacon of joy" from the moment he entered this world. *Id.* at ¶4. From his early days, Chad had a fighting spirit. *Id.* Born two months premature, he spent his first month of life in the NICU. *Id.* On the day Cynthia brought him home, she dressed him in a Cabbage Patch doll outfit because he was so tiny. *Id.* Cynthia cherished the years she spent as a stay-at-

[39] Cynthia Smith's Arkansas birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 39, Declaration of Cynthia Smith, dated February 7, 2025.

home mom, before he started preschool, when it was just the two of them during the day. *Id.* at ¶ 5. They explored parks, libraries, and visited McDonald's. *Id.* Even when Cynthia and Chad's father separated, moments she spent with her son were filled with joy. *Id.* at ¶ 4. Memories of their camping trips where they hiked, built campfires, and roasted marshmallows are deeply cherished by Cynthia. Id. at ¶ 5. She remembers the days spent on the lake teaching Chad to water ski, which were filled with laughter and "a memorable lesson in persistence and letting go." *Id.*

Cynthia was incredibly proud of her son's involvement in ROTC, high school events, and watching him graduate high school and enter the Marine Corps. *Id.* Chad's graduation from boot camp was especially memorable due to the surprise visit from his brother Jacob who served two tours in Iraq. *Id.* at ¶ 6. The last time Cynthia spoke with her son was on Mother's Day in 2005. *Id.* at ¶ 4.

In June 2005, Cynthia was living in Seattle, Washington, due to her husband Scott's medical procedure. *Id.* at ¶ 7. She received a call from her ex-husband, Gene, which was unusual as they rarely spoke. *Id.* She was immediately filled with dread when he asked, "Cindy, have you heard about Chad?" *Id.* When Gene informed her of her son's death, she collapsed to the floor and was overcome by grief. *Id.* Cynthia felt as though she was being swallowed by a "big, dark hole" as she cried. *Id.* Her life was forever altered as she entered into the "club no parent ever wants to join." *Id.*

Cynthia learned that her son was not supposed to be on duty that night but volunteered to replace another Marine. *Id.* at ¶ 8. She is a woman of faith and trusts in God's timing even though she misses her son dearly. *Id.* Cynthia explained that Chad was doing "what he had wanted to do for most of his life: being a Marine." *Id.* The absence of her son is felt every day and is a constant reminder of the piece of herself that is forever lost. *Id.* at ¶ 9. As a mother, losing one of her three

children is a pain that is not lessened by time. *Id.* She still uses her password [redacted] which often reminds her of what she is missing. *Id.* The loss of Chad has impacted the entire family. *Id.* [redacted]

On the anniversary of Chad's death, the family gathers at his grave in Colorado where they clean his headstone and decorate it with flowers. *Id.* Cynthia agonizes over the inability to celebrate holidays including Christmas, Thanksgiving, a birthday, or New Year with her son. *Id.* at ¶ 10. Additionally, Chad will never have the chance to meet his nieces and nephews or be part of their lives. *Id.* Triggers from a photograph, song, favorite place, or familiar accent can instantly bring the raw pain of the loss back as the day Cynthia learned of his passing. *Id.* "The hole his passing has left will never be filled, and he will forever be remembered and missed." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Cynthia Smith's solatium claim.

**4. Lisa Ware[40]**

Lisa Ware is the sister of Chad Maynard—her youngest brother. *See* Ex. 40 at ¶¶ 3, 4. Chad "was a beacon of pride" for Lisa and their entire family. *Id.* at ¶ 4. Lisa recalls Chad's ambition to join the military and his completion of boot camp. Chad was determined to wear his Dress Blues on the day of his high school graduation. *Id.* Despite the initial resistance from the administration

[40] Lisa Ware's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 40, Declaration of Lisa Ware, dated February 3, 2025.

at his high school, Chad walked across the stage in his uniform. *Id.* Their family cheered the loudest and were filled with immense pride. *Id.*

Lisa always maintained a close relationship with her brother. *Id.* at ¶5. They stayed connected through frequent phone calls. *Id.* Lisa and her son, Kosta, also took several trips from Utah to Colorado to visit Chad. *Id.* Their family loved the outdoors and often went camping, boating, or simply enjoying nature together. *Id.* at ¶ 6. During the family's trip to Lake Powell, Lisa began to see Chad as a young man with a bright future and not just as her little brother. *Id.* at ¶ 5. She was proud of the person he was becoming. *Id.*

Chad was a positive role model and mentor to his nephew. *Id.* at 6. Her son admired Chad and was inspired to join the JROTC with aspirations of following in his uncle's footsteps. *Id.* Chad taught Kosta how to play the bass guitar and gifted him one prior to leaving for boot camp. *Id.* Kosta was also gifted a beloved pair of cowboy boots from Chad that Kosta wore with pride. *Id.* As a single parent, Kosta's bond with his uncle Chad was a "blessing." *Id.*

Lisa was at work when she received a call from her father. *Id.* at ¶ 7. This was unusual because he did not often call while she was at work. *Id.* The sound of his voice, heavy with grief, alerted Lisa that something was terribly wrong. *Id.* Her father delivered the devastating news that Chad had been killed in Iraq. *Id.* Lisa's reaction was visceral. *Id.* A loud scream escaped her as she yelled "NO" into the phone. *Id.* Her colleagues looked in shock as her scream echoed into the office. *Id.* Lisa was in disbelief and complete shock all while experiencing overwhelming grief. *Id.* She left work to return home and deliver the heartbreaking news to her son that his uncle had been killed. *Id.* They both cried inconsolably. *Id.*

Since the loss of her brother, [redacted]

[redacted] Attending memorials is a way that Lisa honors her brother. *Id.* at ¶ 10. However, the costs associated with traveling have created financial strain. *Id.*

Chad's death is a constant presence that impacts their family. *Id.* at ¶¶ 10-11. [redacted] "Our family, a unit missing one of its core members, forever mourning the loss of a son, a brother, a husband, and a father who was taken from us far too soon."

Plaintiffs have requested an upward enhancement for Lisa Ware's claim based on the [redacted] Lisa describes [redacted] in paragraphs 8 and 9 of her Declaration:

> [redacted]

[redacted]

Twenty years passed between Chad's death and Lisa's Declaration. It appears that she has been unable to [redacted] Given the suffering she describes, I recommend that the Court award an upward enhancement of 25% of her baseline award resulting in an award of $3.125 million for Lisa Ware's solatium claim.

**5. Jeremiah Maynard[41]**

Jeremiah Maynard is the brother of Chad Maynard. *See* Ex. 41 at ¶ 3. As a premature baby, Chad was resilient from the very beginning. *Id.* He was so tiny he fit into the palm of their father's hand. *Id.* at ¶ 4. Through countless adventures together, including fishing, camping, shooting guns, attending church, bike rides, and playing video games, Jeremiah bonded with his younger brother, Chad. *Id.* As Jeremiah grew older and left the house, he maintained a relationship with Chad and spent a lot of time with him, especially when his dad was away for work. *Id.* at ¶ 5. Chad would often come over to Jeremiah's girlfriend's house to hang out, play games, and talk about life and his future plans. *Id.*

[41] Jeremiah Maynard's California birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 41, Declaration of Jeremiah Maynard, dated February 3, 2025.

Jeremiah described Chad as a person with an infectious humor who could recall the funniest zingers from movies at just the right moment. *Id.* at ¶ 6. His charm and wit made it impossible to interact with him and not come away liking him. *Id.* One of the most poignant memories Jeremiah has of Chad occurred right before his deployment to Iraq. *Id.* at ¶ 5. Immediately after his graduation from the Marine Corps and high school, Chad got into a bit of trouble for underage drinking. *Id.* at ¶ 5. Jeremiah bailed his brother out of jail, and the judge dismissed the charge after learning of his deployment. *Id.* After court, Chad stopped by Jeremiah's detail shop and thanked him with a big hug. *Id.* That was the last time he saw him. *Id.*

The day Jeremiah learned of his brother's death, he had just finished a long day at work and was attempting to unwind at home when his father called. *Id.* at ¶ 7. His voice was heavy with a sorrow as he broke the news to Jeremiah that Chad had been killed in Iraq. *Id.* Initially, Jeremiah responded with sheer disbelief and denial. *Id.* "How could something so tragic happen to Chad, of all people?" Chad had overcome so much in his life, and with his wife Becky expecting, it seemed unfathomable to Jeremiah that he would be taken in such a manner. *Id.* Jeremiah recalled the wave of anger that washed over him. *Id.* In a rage, he found himself outside, screaming into the void. As reality set in, tears began to stream down his face. *Id.*

Since losing Chad, [redacted]

[redacted]

Additionally, costs of travel for Chad's annual memorial have created a financial strain. *Id.* at ¶ 10.

Since they lost Chad, significant events have occurred in his absence, from Jeremiah's daughter's birthdays to family milestones like hunting trips and concerts they had planned together. *Id.* at ¶ 8. These missed moments serve as a constant reminder of what they've lost. *Id.* Jeremiah created a shrine in his home to honor Chad's memory. *Id.* He continues to question: "why was he taken from us so young, and why am I still here?" He often wonders what Chad would be like if he were still alive. *Id.* This thought haunts Jeremiah and fuels his ongoing battle with depression. *Id.* He often finds himself "in a continuous fight with God over the injustice of Chad's early departure." *Id.* Finding a glimpse of happiness and joy has become one of his greatest life struggles. *Id.*

The family has become more aware of the preciousness of their time together and holds onto each other a little tighter. *Id.* at ¶ 11. "My little brother was a fighter from the moment he entered this world, and he left it in the same way—fighting." *Id.* at ¶ 12. "In his brief 19 years, he impacted us in ways that are immeasurable, leaving behind a legacy of courage, love, and resilience." *Id.*

Plaintiffs have requested an upward enhancement to Jeremiah Maynard's claims based on [redacted] Parts of Jeremiah's Declaration seem particularly pertinent to the request:

> [redacted]

[redacted]

[redacted]

[redacted]

It appears that Jeremiah has been in a 20-year struggle to deal with Chad's death and that he has yet to [redacted] Accordingly, I recommend that the Court grant Plaintiffs' request for an upward enhancement and award Jeremiah an upward enhancement of 25% of his baseline award resulting in an award of $3.125 million for Jeremiah Maynard's solatium claim.

**6. Jacob Maynard[42]**

Jacob Maynard is the brother of Chad Maynard. *See* Ex. 42 at ¶ 3. Chad was not just his brother, but a "built-in best friend." *Id.* at ¶ 4. They were inseparable and spent their days playing guitars, bouncing on the trampoline, and "engaging in the timeless art of throwing dirt clods at each other." *Id.* at ¶ 5. Their adventures were filled with laughter, camaraderie and the type of mischief "only brothers can get into." *Id.* As they grew older, the brothers remained connected

[42] Jacob Maynard's birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 42, Declaration of Jacob Maynard, dated January 31, 2025.

through calls, emails, and letters. *Id.* Serving in the Marine Corps together and living with Chad and his wife after Jeremiah returned from Iraq brought them even closer together. *Id.* at ¶ 4. Jeremiah described his brother as loyal, dedicated and selfless. *Id.* at ¶ 6. "[H]e was the epitome of a 'shirt off his back' kind of person." *Id.*

Jacob was newly married and stationed in North Carolina when he learned of his brother's death. *Id.* at ¶ 7. He was approached by his wife with tears streaming down her face in the parking lot of their apartment. *Id.* His life was changed forever, and she told him, "Chad's dead." *Id.* In disbelief, Jacob found himself unable to speak. *Id.* He called his father who confirmed the heartbreaking truth of his brother's death. *Id.* Jacob was overwhelmed with grief as reality began to sink in. *Id.* His unit leaders confirmed the news the next day and arranged for Jacob to meet his brother's casket at Dover. *Id.*

Chad was not present to see Jacob graduate from college, celebrate his promotion to Master Sergeant, or join him in retirement from the Marines. *Id.* at ¶ 8. He missed out on seeing the property Jacob found, going on hunting trips, and countless other moments that they should have shared together. *Id.* Since Chad's death, [redacted]

The family has suffered emotionally, physically, and financially due to the death of Chad. *Id.* at ¶ 11. His wife and child were left in a precarious financial situation due to loss of Chad who

was their main source of income. *Id.* at ¶ 10. [redacted] Chad's death has paradoxically drawn the wider family closer together as they find ways to support one another through grief. *Id.*

"Losing Chad was like losing a part of myself, a best friend whose presence was integral to my sense of self and my understanding of the world." *Id.* at ¶ 8.

Plaintiffs have requested an upward enhancement for Jacob Maynard's claim based on their close relationship and [redacted] The case for an upward enhancement is bolstered by paragraphs 8 and 9 of Jacob's Declaration:

> [redacted]

When Chad died in 2005, Jacob also was in military service. Within two years of Chad's death, [redacted] support Plaintiffs' request for an upward enhancement for Jacob, and I recommend

that the Court award an upward enhancement of 25% of his baseline award resulting in an award of $3.125 million for Jacob Maynard's solatium claim.

**7. Breanne Maynard**[43]

Breanne Maynard is the sister of LCpl. Chad B. Maynard. *See* Ex. 43 at ¶ 3. Breanne's relationship to her brother Chad was "almost akin to best friends" rather than siblings. *Id.* at ¶ 5. Childhood memories of dressing Chad up and pretending he was her sister or playing house brings Breanne joy. *Id.* When Breanne and Chad were younger, they shared a love for their stuffed bears. *Id.* Chad's "Little Beggar Bear" holding a special place in her heart. *Id.* Family traditions like attending church and Sunday dinners brought them closer together. *Id.* Breanne recalls family adventures camping, boating and saving up for a trip to Disneyland and Universal Studios. *Id.* Even after moving away, their connection remained strong as they we made efforts to visit each other and stayed in touch through calls and emails. *Id.* at¶ 5. Breanne recalled one of the most touching moments when Chad shared the news of his that he was going to be a father and his desire to name his daughter after Breanne. *Id.* at ¶ 4.

Breanne learned of her brother's death as she was headed to lunch from work. *Id.* at ¶ 7. After receiving a missed call from her father, she called him back and was taken back by the emotion in her father's voice. *Id.* He informed her that Chad died in Iraq and her world shattered. *Id.* Breanne screamed "no" and collapsed on the parking lot asphalt. *Id.*

Since the loss of her brother, [redacted]

[43] Breanne Maynard's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 43, Declaration of Breanne Maynard, dated January 15, 2025.

[redacted]

Due to the loss of her brother, Breanne reevaluated her life's priorities and decided to start a family over completing her education and pursuit of a career as a dental hygienist. *Id.* This life change significantly reduced her earning potential over the years. *Id.* at ¶ 10. According to Breanne, attending memorials has resulted in travel costs, including airline tickets, hotel stays, and car rentals, have amounted to "tens of thousands dollars." *Id.*

The details of her brother's death haunt Breanne. *Id.* at ¶ 12. Her personal struggle with accepting his death is also fueled by her harrowing experience of seeing his almost unrecognizable body during the funeral. *Id.* Breanne described that Chad's story is a narrative that his shared with her children "feels akin to a character from a storybook rather than a beloved family member." *Id.* "The fact that Chad's death came at the hands of such a cowardly act compounds our grief, leaving us to grapple with the senselessness of his loss." Id.

Plaintiffs have requested an upward enhancement to Breanne Maynard's claims based on [redacted] Although her claim bears some similarity to her siblings for whom I have recommended an upward enhancement, I do not believe one is warranted for Breanne. She states in paragraph 6 of her Declaration that [redacted]

[redacted]

It appears that Breanne was able to go back to work and to complete her studies. Accordingly, I recommend that the Court award the baseline amount of $2.5 million for Breanne Maynard's solatium claim.

### H. DAVID KREUTER – AUGUST 3, 2005, ATTACK – BARWANAH

As part of Operation Quick Strike in Barwanah, Lima Company, 3d Battalion, 25th Marines set out in an Amphibious Assault Vehicle (AAV) to locate the perpetrators of an ambush that had killed multiple scout snipers a few days prior. Ex. 4 at 35. The AAV was struck by an IED that flipped the AAV and set it on fire resulting in the deaths of 14 Marines including Sgt. David Kreuter. ECF No. 9 at ¶¶ 1086, 1091, 1096; Ex. 4 at 35-36. Sgt. Kreuter's Report of Casualty listed his cause of death as [redacted][44] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Sgt. Kreuter was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the August 3, 2005 attack in which Sgt. David Kreuter was killed. *See* Ex. 1.

Sgt. Kreuter's parents and sister—Kenneth Kreuter, Patricia Murray, and Laura Kreuter—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1095-1102. Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of Sgt. Kreuter's society, companionship, comfort, advice and counsel. *Id.* ¶ 1102. The following chart reflects the claims asserted by Kenneth Kreuter, Patricia Murray, and Laura Kreuter in their individual capacities arising out of

[44] Ex. 44, Report of Casualty for Kreuter, David Kenneth John.

the August 3, 2005, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Kenneth Kreuter | Sgt. David Kreuter's father | Solatium claim $5 million | Declaration of Kenneth Kreuter, dated April 15, 2026, including copy of his proof of U.S. citizenship | 45 |
| Patricia Murray | Sgt. David Kreuter's mother | Solatium claim $5 million | Declaration of Patricia Murray, dated April 8, 2026, including copy of her proof of U.S. citizenship | 46 |
| Laura Kreuter | Sgt. David Kreuter's sister | Solatium claim $2.5 million | Declaration of Laura Kreuter, dated April 8, 2026, including copy of her proof of U.S. citizenship | 47 |

#### 1. Kenneth Kreuter[45]

Kenneth Kreuter is the father of David Kreuter. *See* Ex. 45 at ¶ 3. From birth, David "was a deeply cherished child," and Kenneth took "an active role in his upbringing," consistently guiding and supporting him through all stages of life, including education, athletics, and eventual military service. *Id.* at ¶ 4. Their relationship was defined by sustained involvement and emotional depth, reflected in "countless moments together," including attending church, participating in sporting events, and engaging in meaningful conversations about "life, responsibility, and his future." *Id.* David's role within the family extended beyond that of a child; David was "the heartbeat of our family," particularly in his leadership role as an older brother, where he "set[] an

[45] Kenneth Kreuter's United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 45, Declaration of Kenneth Kreuter, dated April 15, 2026.

example for his sisters" with maturity beyond his years. *Id.* Family life was characterized by daily routines and traditions—morning preparations, family dinners, and shared activities—that reinforced unity and connection. *Id.* Even as David matured, attending college and serving in the Marines, the relationship evolved to include "less frequent, yet more profound" interactions, including long drives that facilitated deeper conversations about life, responsibilities, and aspirations. *Id.* Among the most painful losses described is David's anticipation of fatherhood, as he had expressed excitement and hope for "his unborn child, who he sadly never got to meet." *Id.*

While at work, he was unexpectedly summoned to a meeting, where the presence of "two Marine sergeants and my wife… spoke volumes before a word was even uttered." *Id.* at ¶ 5. Upon realizing that his son had been killed in Iraq, he experienced immediate shock and emotional collapse, stating that he and his wife could only "hold each other and cry" while attempting to process the loss. *Id.* The task of informing their family—gathering "three generations" to share the news—was "heart-wrenching," extending the trauma across the broader familial network. *Id.*

Following David's death, [redacted]

Kenneth describes the continuing impact of his son's death as pervasive and unrelenting. The loss has "cast a long, unyielding shadow over our family," transforming even joyful occasions into painful reminders of absence, particularly during the family's "once joyous birthday season," which is now marked by grief. *Id.* at ¶ 7. [redacted] His own role within

the family expanded significantly, as he now must "bridge the gap created by David's absence," providing emotional support to his wife and daughters while attempting to manage the family's collective grief. *Id.* Compounding the emotional harm, relationships within the family have been strained and altered. He describes [redacted] *Id.* The family dynamic has been permanently reshaped, with roles and relationships shifting in response to the loss. *Id.*

David was "a beacon of kindness, dedication, and responsibility," whose life represented the promise of becoming "a father, husband, and provider," all of which were cut short. *Id.* at ¶ 8. The loss, he explains, has caused "personal damage to those who knew him and loved him," a pain that is "felt daily" and represents "a wound that time may never fully heal." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Kenneth Kreuter's solatium claim.

**2. Patricia Murray[46]**

Patricia Murray is the mother of David Kreuter. *See* Ex. 46 at ¶ 3. David was "not just my son; he was a friend, a confidant, and a source of endless love and laughter in our home," and from birth, he brought "an immense amount of joy" into her life. *Id.* at ¶ 4. Their relationship was marked by daily communication, deep emotional connection, and shared experiences, including "the kind of deep conversations that only occur between a mother and her son," which she identifies as foundational to their "unbreakable bond." *Id.* at ¶¶ 4–5. Patricia's connection with David was "a daily constant," built through "constant interaction" and enriched by family traditions such as

[46] Patricia Murray's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 46, Declaration of Patricia Murray, dated April 8, 2026.

vacations, shared meals, and involvement in one another's activities. *Id.* at ¶¶ 5–6. Their conversations encompassed "everything—his life, his dreams of marriage, his brave commitment to the military, and the anticipation of his deployment," reflecting both emotional intimacy and mutual trust. *Id.* at ¶ 5. David's role within the family extended beyond the parent-child relationship, as he maintained strong bonds with his sisters and contributed to a "tight-knit unit" defined by mutual support and shared experiences. *Id.* at ¶ 6.

While delivering a gift for her infant grandson, Patricia encountered Marines at the door and immediately realized the meaning of their presence after hearing media reports of the IED attack. *Id.* at ¶ 7. She describes her reaction as "a profound sadness" marked by "a torrent of tears," coupled with the overwhelming burden of informing the rest of her family. *Id.* The process of notifying loved ones—her husband, daughters, and extended relatives—was "heart-wrenching," requiring her to relay the news repeatedly while coping with her own shock and grief. *Id.*

Following David's death, [redacted]

[redacted]

David's death has "cast a profound shadow over our family," transforming even joyful occasions into painful reminders of absence and creating an ongoing sense of anxiety, sadness, and unresolved grief. *Id.* at ¶ 10. She describes persistent thoughts of "what if" and a feeling of being "cheated out of a future with him," while noting that her daughters continue to miss their brother daily, leaving the family "incomplete and fractured." *Id.* Relationships within the family have been strained, [redacted] David's absence is felt "each day," particularly during milestones and ordinary moments he would have shared, and his death has left "a hole in my heart that I know will never close." *Id.* at ¶ 11. The loss continues to shape how she and her family perceive the world, interact with others, and experience both joy and sorrow, as they carry forward "the ongoing effects of his absence" in every aspect of their lives. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Patricia Murray's solatium claim.

**3. Laura Kreuter[47]**

Laura Kreuter is the sister of David Kreuter. *See* Ex. 47 at ¶ 3. David was "not just my older brother; he was my hero, my protector, and my confidant," a constant presence who provided comfort and security from childhood through adulthood. *Id.* at ¶ 4. Their bond was formed through

[47] Laura Kreuter's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 47, Declaration of Laura Kreuter, dated April 8, 2026.

shared daily life—family meals, road trips, and hours spent together—and reinforced through emotional intimacy, including frequent conversations, guidance during personal hardships, and continued communication even during his military deployment. *Id.* at ¶¶ 4–5. David was a formative influence who "shap[ed] me in countless ways," leaving behind memories that remain central to her identity. *Id.* at ¶ 4. Laura and David maintained frequent communication through phone calls and online messaging while David was away for training and deployed to Iraq, describing those exchanges as "a lifeline that kept our relationship strong." *Id.* at ¶ 5. His absence has been profoundly felt in "countless moments" and milestones he should have shared. *Id.* David's presence within the broader family—as a supportive son, brother, and friend—further amplifies the magnitude of the loss, as he was known for being "generous, caring, and always putting others before himself." *Id.*

While at work, Laura was unexpectedly called to the front office and initially treated it lightly, only to be confronted by Marines standing with her parents, at which point she immediately understood that David had been killed. *Id.* at ¶ 6. She recounts being overwhelmed, breaking down "crying hysterically," and attempting to flee from the reality, while her father's physical support was necessary to steady her. *Id.* The intensity of her emotional collapse required her to be driven home, and she struggled to communicate the news even to close friends, while the wider community learned of David's death through media reports. *Id.*

[redacted]

[redacted]

David's death has also had pervasive effects on family dynamics and relationships. His loss has "cast a profound and enduring shadow over our family," with his absence felt daily in conversations, gatherings, and milestones. *Id.* at ¶ 8. Relationships have become strained, [redacted] The family lives with a constant awareness that "there will be no new memories… no new photographs with him," and that holidays and celebrations are now overshadowed by a sense of absence and incompleteness. *Id.* at ¶¶ 8–9. She describes her own emotional state as one of ongoing struggle, where [redacted] She also emphasizes the lack of closure due to the condition of David's remains, explaining that they were "denied… any traditional forms of closure," including an open-casket funeral, which has intensified and prolonged the grieving process. *Id.* "We will never be whole again," and the grief has fundamentally altered how she and her family experience relationships, joy, and daily life. *Id.* The loss continues to shape their emotional well-being, relationships, and perception of the future, leaving lasting psychological scars that persist across every aspect of their lives. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Laura Kreuter's solatium claim.

## I. GEORGE R. DRAUGHN, JR. – SEPTEMBER 1, 2005 ATTACK – YUSUFIYAH

On September 1, 2005, SSgt. George R. Draughn, Jr. was with the 108th Cavalry's E Troop conducting a patrol along Route Peggy between Mahmudiyah and Yusufiyah when his HMMWV was struck with an IED. *See* Ex. 6 at 21; *see also* ECF No. 9 at ¶ 1128. SSgt. Draughn was killed when an IED detonated near the vehicle he was traveling in. *Id.* According to the certificate of death, SSG Draughn died of [redacted][48] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which SSgt. Draughn was killed on November 5, 2025 (ECF No. 53), and on January 27, 2026, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the September 1, 2005 attack in which SSgt. George R. Draughn, Jr. was killed. *See* Ex. 2.

SSgt. Draughn's surviving father and sisters—George R. Draughn, Sr., Stephanie Barfield, Charlene Swenson [f/k/a "Charlene Demming"], and Lessie White—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1130-1137. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of SSgt. George R. Draughn, Jr.'s society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1137. The following chart reflects the claims asserted by George R. Draughn, Sr., Stephanie Barfield, Charlene Swenson, and Lessie White in their individual capacities arising out of the September 1, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| George R. Draughn, Sr. | SSgt. George R. Draughn, Jr.'s father | Solatium claim $5 million | Declaration of George R. Draughn, Sr., dated April 18, 2026, including copy of his proof of U.S. citizenship | 49 |

[48] Ex., 48, Certificate of Death (Overseas) for Draughn, George Ray Jr.

| | | | | |
|---|---|---|---|---|
| Stephanie Barfield | SSgt. George R. Draughn, Jr.'s sister | Solatium claim $2.5 million | Declaration of Stephanie Barfield, dated April 28, 2026, including copy of her proof of U.S. citizenship | 50 |
| Charlene Swenson | SSgt. George R. Draughn, Jr.'s sister | Solatium claim $2.5 million | Declaration of Charlene Swenson, dated April 21, 2026, including copy of her proof of U.S. citizenship | 51 |
| Lessie White | SSgt. George R. Draughn, Jr.'s sister | Solatium claim $3.125 million | Declaration of Lessie White, dated April 14, 2026, including copy of her proof of U.S. citizenship | 52 |

**1. George Draughn, Sr.[49]**

George Draughn, Sr. is the father of George R. Draughn, Jr. *See* Ex. 49 at ¶ 3. The two shared countless moments bonding and making memories. *Id*. at ¶ 4. Mr. Draughn described how he and his son bonded through shared hobbies and adventures. Specifically, George and his son participated in Cub Scouts and fishing trips. *Id*. As his son grew older, George spoke with his son every day to discuss present challenges and future aspirations. *Id*. When George, Jr.'s own son was born, Mr. Draughn was there to support him, and the two bonded over fatherhood. *Id*. Mr. Draughn explained that his son was deeply committed to raising his son who was the centerpiece of his life. *Id*. at ¶ 5. Mr. Draughn described George, Jr. as a man who devoted himself wholly to being a present father who created moments of joy with his child. *Id*.

Mr. Draughn was home when members of the military came to deliver the devastating news that his son was killed in Iraq. *Id*. at ¶ 6. He described that the weight of their words hit him "like

[49] George R. Draughn, Sr.'s Louisiana birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 49, Declaration of George R. Draughn, Sr., dated April 18, 2026.

a blow" leaving him in heartache. *Id*. His son's presence and wisdom are profoundly missed by Mr. Draughn, and his absence is felt in everything he does. *Id*. at ¶ 4. While the death of George, Jr. has brought many of the family members closer together, it has made it difficult for others to connect with the family. *Id*. at ¶ 7. Despite the passage of time, there is a profound sadness that the family faces and each person has grieved the loss of George, Jr. in different ways. *Id*.

The moments shared with George, Jr. will always be remembered by his father. Id. at ¶ 8. Mr. Draughn stated that there is a void in his life due to the loss of his son. *Id*. "[W]hile healing may come with time, the pain of my son's passing will remain vividly felt in our hearts." *Id*.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for George Draughn, Sr.'s solatium claim.

**2. Stephanie Barfield[50]**

Stephanie Barfield is the sister of George R. Draughn, Jr. *See* Ex. 50 at ¶ 3. She recalled the day George was born and how thrilled she was to finally have a brother after growing up with two sisters. *Id*. at ¶ 4. Because she was older than George by thirteen years, Stephanie naturally became like a second mom to her younger brother. *Id*. at ¶ 4. As their parents worked, Stephanie cared for him daily by making sure he was fed and completed his homework. Id. at ¶ 5. She has fond memories of George playing little league football, participating in Cub Scouts, learning to drive, and graduating high school. *Id*. at ¶¶ 4-5. After he joined the Army National Guard, George moved closer to his sister allowing them to spend more time together. *Id*. at ¶ 5. George confided in Stephanie, sharing his dreams of getting married, buying a home, and raising his son. *Id*. George was someone who had a deep love for family, especially for his son, Akeem Draughn. *Id*. at ¶ 6.

[50] Stephanie Barfield's Georgia birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 50, Declaration of Stephanie Barfield, dated April 10, 2026.

He loved spending time with family, particularly during barbeques, Thanksgiving, and Christmas. *Id*.

The day before Stephanie learned of her brother's death, she missed a call from him in Iraq. *Id*. at ¶ 7. The following day, Stephanie received a call from her sister who was serving in the Air Force at the time. *Id*. Their conversation was normal, and she had no idea that anything was wrong. *Id*. When Stephanie arrived home from work, her sister was at her home waiting for her, which was unusual. *Id*. When she got out of the car, her sister delivered the terrible news, that George was killed in Iraq on September 1st. *Id*. Overwhelmed by grief, Stephanie fainted. *Id*. George was scheduled to come home for R&R that October. *Id*. In the days that followed, Stephanie felt as though she was living outside of her own body. *Id*. She tried to convince herself that the news was a mistake and that their family would receive a call clearing it up, but that call never came. *Id*. [redacted]

Stephanie's life is profoundly impacted by the death of her brother. *Id*. at ¶ 8. Significant milestones such as his son's graduation, births of great nieces and nephews, and their father's baptism occurred without George's presence even though he was a significant part of their family. *Id*. Stephanie longs for her brother and life without him has been more difficult. *Id*. Prior to his death, George was someone that Stephanie confided in and turned to for advice. *Id*. She often finds herself wishing to talk with her brother because he played such an essential role in her support system. *Id*.

The absence of George continues to weigh heavily on Stephanie's heart. *Id*. at ¶ 8. Watching their parents mourn the loss of their son has been devastating for Stephanie who stated

"they have never been the same." *Id*. at ¶ 10. George was an integral part of their family and there is a void without him. *Id*. Stephanie described that grief and pain have caused tension in the family, straining once strong relationships. The family shares the weight of the grief which touches every aspect of their lives. *Id*.

Each year that passes without George is a painful reminder that he never got the opportunity to live the life he so passionately envisioned. Id. at ¶ 11. "All his dreams are left unfulfilled." Id. Stephanie stated, "[t]he loss of my very loved baby brother has left our family shattered." Id.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Stephanie Barfield's solatium claim.

### 3. Charlene Swenson[51]

Charlene Swenson is the sister of George R. Draughn, Jr. *See* Ex. 51 at ¶ 3. Growing up as the youngest sibling and only boy among three sisters meant that George's relationship with his siblings was quite unique. *Id*. at ¶ 4. Charlene stated that she and her brother grew up side-by-side and shared countless happy moments together. *Id*. Charlene recalled George's laughter and heartfelt conversations. *Id*. She described George as an "exceptional person" who was "warm-hearted." *Id*. He brought joy to everyone around him and his presence brought the family closer together. *Id*. at ¶ 5. When George became a father, this only deepened his connection with Charlene and the rest of the family. *Id*.

Charlene was serving in the military at the time of her brother's death. *Id*. at ¶ 6. She received a call from her parents informing her of George's death in Iraq. *Id*. This news left Charlene utterly heartbroken. *Id*. She had to muster the courage to deliver this news to her sister,

[51] Charlene Swenson's Louisiana birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 51, Declaration of Charlene Swenson, dated April 21, 2026.

Stephanie, at her home. *Id*. Charlene recalled finding solace in the comfort of her family during this difficult time. *Id*. [redacted]

Following George's death, Charlene avoided going around her family with her military uniform because she worried that it would remind their family of the attack that took George's life. *Id*. at ¶ 8. The manner in which the family interacts with one another has shifted and is often overshadowed by moments of sorrow and reflection. *Id*. The loss of George continues to linger. *Id*. at ¶ 9. "Even as time moves forward, the emotional emptiness he left behind remains, reminding us of the irreplaceable role he played in our lives." *Id*.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Charlene Swenson's solatium claim.

**4. Lessie White[52]**

Lessie White is the sister of George R. Draughn, Jr. *See* Ex. 52 at ¶ 3. Although George was the younger sibling, he treated Lessie as if she was the little sister. *Id*. at ¶ 4. Lessie treasures their time spent bowling, roller skating, and attending family gatherings. *Id*. at ¶ 5. George always looked out for Lessie and her daughters, treating them with love and dedication. *Id*. at ¶ 4. He assisted Lessie with school drop-offs while she worked and often babysat his nieces without hesitation. *Id*. Lessie could always depend on her brother no matter the circumstance. *Id*. One of the most memorable moments shared with George was the day of Lessie's wedding. *Id*. Moments before Lessie was to marry, George came home just in time to change into his suit at the church and walk her down the aisle. *Id*. This is a memory that she will forever cherish. *Id*. Lessie and George stayed connected over the years even when George was deployed. *Id*. at ¶ 5. He shared

[52] Lessie White's Georgia birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 52, Declaration of Lessie White, dated April 14, 2026.

with Lessie his future goals, including his plans after returning from Iraq. *Id*. Lessie described her brother as a person who was kind, thoughtful, compassionate, and selfless. *Id*. at ¶ 6.

On September 1, 2005, at 2:45 PM, Lessie was at home getting ready for work when she received a call from her oldest daughter who was visiting her grandfather at the time. *Id*. at ¶ 7. Her daughter informed her that two military personnel arrived at her grandfather's door informing him that his only son was killed. *Id*. Lessie became overwhelmed and screamed. *Id*. She was barely able to breathe and was in shock. *Id*. Feeling utterly helpless in the moment, Lessie ran to her neighbor's house for support. *Id*. Just the week prior, George confided in Lessie that he would be returning home to surprise their father for his 65th birthday on September 17th. *Id*. Lessie kept that secret and was anticipating the soon return of her brother. *Id*. Learning that he had been killed mere days short of his return shattered Lessie. *Id*.

After the death of her brother, [redacted] The loss of George impacted their family and is something they continue to cope with every day. *Id*. at ¶ 11. According to Lessie, [redacted] The relationships in the family shifted with Lessie's nephews, becoming more akin to sons to her parents. *Id*. The frequency of communication with family members has also lessened. *Id*. "My life feels irreversibly changed without him—his smile, his laugh, and his voice are irreplaceable, and I ache for them every day. His absence leaves a hole in our family and in my heart that we will carry forward with us forever." *Id*. at ¶ 12.

Plaintiffs have requested an upward enhancement to Lessie White's claims based on [redacted] They rely on the prior awards that I relied on to recommend an upward enhancement to Julie Prats, page 26, supra. [redacted] Accordingly, I recommend that the Court grant the Plaintiffs' request and award an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Lessie White's solatium damage.

**J. JAMES D. ELLIS – OCTOBER 2, 2006 ATTACK – TAJI**

On October 2, 2006, Troop A, 7th Squadron, 10th Cavalry was patrolling on Route Fordyce near Taji, Iraq, when the lead M1114 HMMWV in the patrol struck a deep-buried IED that lifted the HMMWV into the air where it landed nearly 20 meters away from the blast site. ECF No. 9 at ¶ 1654, Ex. 5 at 28-29. Conflicting reports noted that the IED contained either 50 pounds or 500 pounds of explosives, but the blast killed four soldiers including Spc. Santos Armijo and SSgt. James Ellis. Ex. 5 at 29. According to his Report of Casualty, SSgt. Ellis died as a result of [redacted][53] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which SSgt. Ellis was killed on February 26, 2025 (ECF No. 41), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the October 2, 2006 attack in which SSgt. James D. Ellis was killed. *See* Ex. 1.

SSgt. Ellis' surviving spouse and daughter—Ulrica L. Ellis and Ja'Niayah Ellis—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1662-1664. The Plaintiffs suffered severe mental

[53] Ex. 53, Report of Casualty for Ellis, James Darren.

anguish, extreme emotional pain and suffering, and loss of James D. Ellis' society, companionship, comfort, advice, and counsel. *Id*. at ¶ 1664. The following chart reflects the claims asserted by Ulrica L. Ellis and Ja'Niayah Ellis in their individual capacities arising out of the October 2, 2006, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Ulrica Ellis | SSgt. James D. Ellis' wife | Solatium claim $8 million | Declaration of Ulrica Ellis, dated April 21, 2026, including copy of her proof of U.S. citizenship | 54 |
| Ja'Niayah Ellis | SSgt. James D. Ellis' daughter | Solatium claim $5 million | Declaration of Ja'Niayah Ellis, dated April 17, 2026, including copy of her proof of U.S. citizenship | 55 |

**1. Ulrica Ellis[54]**

Ulrica Ellis is the surviving spouse of James D. Ellis. *See* Ex. 54 at ¶ 3. Ulrica described her husband as her best friend, the love of her life, and an incredible father. *Id*. at ¶ 4. They met through a mutual friend and quickly developed a deep connection. *Id*. The couple shared many experiences through travel and their love for food. *Id*. Every moment together was precious, and Ulrica described that their life was filled with love and laughter. *Id*. at ¶ 5. They often had deep conversations and a connection that was not diminished due to physical distance during James' deployment. *Id*. Ulrica explained that her husband was a great person, true friend, and her life partner. *Id*. His love for family exuded in everything he did, always putting family first. *Id*. During

[54] Ulrica Ellis's Georgia birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 54, Declaration of Ulrica Ellis, dated April 21, 2026.

his deployment, they had lunch dates through phone calls. *Id*. They eagerly made plans for future activities when James returned home. *Id*. Ulrica stayed with family in Tallahassee, Florida while James was deployed to have support from her family in carrying for their daughter, Ja'Niayah who was just three months old when James first deployed. *Id*. at ¶ 7.

The day Ulrica learned of her husband's death, two Army officers arrived at her family's home in Florida, and Ulrica was awoken by her parents. *Id*. The officers showed Ulrica a photo of her husband taken the day he deployed and informed her that he was killed. *Id*. The shock was overwhelming, and Ulrica found herself screaming, crying, and in physical distress, unable to accept the news she was just given. *Id*. This was the darkest and hardest day of Ulrica's life. *Id*. It was a "nightmare come to life." *Id*.

[redacted]

In addition to struggling with her own mental health, Ulrica faced family and financial challenges alone. Prior to his death, James and Ulrica made all decisions together. *Id*. at ¶ 6. This is a partnership that Ulrica misses deeply. *Id*. Ulrica had to pick up the pieces to care for their daughter who was just one when James died. *Id*. at ¶ 7. His absence has left a missing piece in

their life that was so important it had profound effects to their wellbeing and quality of life. *Id*. at ¶ 6. Ulrica became a single parent who strived to provide for their daughter and keep James's memory alive. *Id*. The loss of her husband means that their child is deprived of the chance to create cherished family memories with both parents and to feel the security and love that comes from having both a mother and a father in her life. *Id*. at ¶ 11. Ulrica quickly assumed the role of head of household and sought employment without having completed her college degree. *Id*. at ¶ 10. [redacted] The financial stress in managing costs associated with extracurricular activities and college tuition is a burden Ulrica shoulders alone. *Id*. [redacted]

[redacted]

Ulrica explained that the absence of her husband's support, guidance, and love leaves a burden on her shoulders that she must carry alone, as she strives to be both a mother and father to their child. *Id*. at ¶ 12. The tragic manner of James' death has intensified her trauma leaving her to feel a pain the seems almost insurmountable. *Id*. "Every day, we are reminded of the life we once

shared and the future we had envisioned together, now shattered." *Id*. "His death is a heartache we feel each and every day." *Id*.

Plaintiffs request, and I recommend, that the Court award the baseline amount of $8 million for Ulrica Ellis's solatium claim.

**2. Ja'Niayah Ellis[55]**

JaNiayah Ellis is the daughter of James D. Ellis. *See* Ex. 55 at ¶ 3. When she was just thirteen months old, Ja'Niayah lost her father. *Id*. at ¶ 4. Ja'Niayah explained that living in a home where the loss of her father is always felt meant that there has been a constant shadow in her life. *Id*. She grappled with the mental toll of growing up without him her entire life relying on memories of others to learn more about her dad. *Id*. at ¶¶ 4-5. Ja'Niayah was told that he was a dedicated father who cared for her deeply. *Id*. at ¶ 5. She keeps the stories of her father's love close to her heart. *Id*.

At an early age, Ja'Niayah questioned why her father was not present. *Id*. at ¶ 6. While in kindergarten, Ja'Niayah started to process the death of her father. *Id*. at ¶ 6. When Ja'Niayah began to comprehend the finality of death she was confused and conflicted, struggling to understand why someone would want to harm her father. *Id*. She felt as though she was being punished and forced to grow up without her father, yet she did not do anything wrong. *Id*.

Ja'Niayah was left to navigate the world without a father who was unjustly taken away. *Id*. at ¶ 6. His absence during milestones including Ja'Niayah learning to ride a bike, celebrating holidays, her high school graduation, and seeing her off to college are a source of deep sorrow. *Id*. at ¶¶ 5, 7. Growing up without any memories of her father has been incredibly frustrating for

[55] Ja'Niayah Ellis' Texas birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). See Ex. 55, Declaration of Ja'Niayah Ellis, dated April 17, 2026.

Ja'Niayah. *Id*. at ¶ 7. He was not present to witness any of her achievements or guide her through life's challenges. *Id*. The lack of her father's guidance and support has impacted her identity as she struggles to define herself. *Id*. This has led to confusion and anger in her life, as she tries to find who she is without him. *Id*. According to Ja'Niayah, [redacted]

Ja'Niayah also experienced financial challenges after her father's death. *Id*. at ¶ 9. [redacted] However, the loss of her father has deepened her faith and made her more resilient. *Id*. The bond between Ja'Niayah and her mother is also strong as they depend heavily on each other for support. *Id*.

The impact of her father's death is an ever-present undercurrent in her life, influencing her choices, relationships, and outlook on the future. *Id*. at ¶ 11. "As I enter this new stage of life, I carry with me the weight of his absence, along with the strength and resilience his memory inspires." *Id*.

Plaintiffs have requested the baseline award of $5 million for Ja'Niayah Ellis' solatium claim. Courts in this District have not always agreed on whether children younger than three should be entitled to the baseline award. Some decisions reduce the award on the ground that a young child experienced loss less than an older child, while other decisions view the loss of a parent as worse for a younger child given that the child will have less parental guidance over a lifetime. Given that Ja'Niayah seems to have genuinely struggled to understand the loss of her

father and that her chances of future success might well have diminished without the guidance and financial support of her father, I recommend that the Court approve the Plaintiffs' request and award $5 million for Ja'Niayah Ellis' solatium claim.

### K. DARRYL BOOKER – JANUARY 20, 2007, ATTACK – BAGHDAD

On January 20, 2007, two Black Hawk helicopters were following an eastbound route from Taji to Camp Liberty in Baghdad when the tail helicopter, Easy 40, was hit and taking fire from ground insurgents and was brought down to the ground where it was hit by an RPG causing the helicopter to burst in flames killing all 12 individuals on board including SSgt. Darryl Booker. Ex. 5 at 32-34; ECF No. 9 at ¶ 1823. SSgt. Booker's autopsy report stated that he [redacted][56]

Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which SSgt. Booker was killed on February 26, 2025 (ECF No. 41), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the January 20, 2007 attack in which SSgt. Darryl Booker was killed. *See* Ex. 1.

SSgt. Booker's surviving wife, daughter, mother, and brothers—Myrtle Booker, Derica Booker, Maria Loney, Andre Booker, and Norman Loney, Jr.—are Plaintiffs in this case.[57] *See* ECF No. 9 at ¶¶ 1822-1833. Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of SSgt. Booker's society, companionship, comfort, advice and counsel. *Id.* ¶ 1833. The following chart reflects the claims asserted by Myrtle Booker, Derica

[56] Ex. 56, Final Autopsy Report for Booker, Darryl D., dated February 15, 2007, at 3.

[57] Plaintiffs have indicated that SSgt. Booker's stepson, Dante Cheathem, will submit his proposed findings of fact and conclusions of law separately.

Booker, Maria Loney, Andre Booker, and Norman Loney, Jr. in their individual capacities arising out of the January 20, 2007, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Myrtle Booker | SSgt. Darryl Booker's wife | Solatium claim $8 million | Declaration of Myrtle Booker, dated March 16, 2026, including copy of her proof of U.S. citizenship | 57 |
| Derica Booker | SSgt. Darryl Booker's daughter | Solatium claim $5 million | Declaration of Derica Booker, dated March 18, 2026, including copy of her proof of U.S. citizenship | 58 |
| Maria Loney | SSgt. Darryl Booker's mother | Solatium claim $5 million | Declaration of Maria Loney, dated March 16, 2026, including copy of her proof of U.S. citizenship | 59 |
| Andre Booker | SSgt. Darryl Booker's brother | Solatium claim $2.5 million | Declaration of Andre Booker, dated March 16, 2026, including copy of his proof of U.S. citizenship | 60 |
| Norman Loney, Jr. | SSgt. Darryl Booker's brother | Solatium claim $2.5 million | Declaration of Norman Loney, Jr., dated April 1, 2026, including copy of his proof of U.S. citizenship | 61 |

**1. Myrtle Booker**[58]

Myrtle Booker is the wife of Darryl Booker. *See* Ex. 57 at ¶ 3. Darryl was not only her husband but "our protector and the epitome of what a man should be," a central figure who unified

[58] Myrtle Booker's Virginia birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 57, Declaration of Myrtle Booker, dated March 16, 2026.

and sustained the household through his devotion to "God, family, and country." *Id.* at ¶ 4. Their relationship was defined by deep affection and shared life milestones, including their marriage in 2002 and the purchase of their first home in 2003, as well as everyday moments of joy—watching football together, sharing laughter, and creating "unforgettable memories" through spontaneous acts of kindness and celebration. *Id.* Their marriage was one of continuous closeness and communication. Myrtle and Darryl were "inseparable from the moment we met," maintaining constant contact through "two or more calls throughout the day" to share details of their lives, discuss their children, and plan for the future. *Id.* at ¶ 5. This daily connection deepened further during his deployment, when their conversations increasingly centered on his service and their shared aspirations. *Id.* Their relationship was "unbreakable, rooted in mutual respect, love, and shared dreams." *Id.* Darryl's role as a devoted father, husband, and family member amplified the magnitude of the loss, as his relationships were characterized by "love, loyalty, and a shared sense of fun," making his presence a central source of joy for both immediate and extended family. *Id.* at ¶ 7.

Myrtle recalls on January 20, 2007, when military personnel arrived at her home, she immediately sensed the reason for their visit, and the officer's confirmation that "the Blackhawk helicopter carrying my husband had been shot down, leaving no survivors" triggered overwhelming shock and grief. *Id.* at ¶ 8. She reacted with disbelief, physically striking herself while praying for strength, as her children clung to her and cried in despair, capturing the intensity of the emotional collapse experienced in that moment. *Id.* The process of informing family members further compounded the trauma as Myrtle traveled to deliver the news in person to relatives, including her husband's brother's family and his parents, recounting scenes of anguished

reactions, including her mother-in-law's repeated cries of "no, no, no" upon seeing her arrive. *Id.* at ¶ 9.

The consequences of her husband's death have been pervasive and enduring within her family where "the vibrant family gatherings that once brought us together have stopped," leaving "a palpable emptiness" and the sense that a central piece of the family structure has been "irrevocably lost." *Id.* at ¶ 10. While she has attempted to process the grief through faith and memory, her children have coped in isolation, resulting in a family dynamic marked by emotional distance and individualized grief rather than shared healing. *Id.* "The dynamics within our family have shifted significantly," as each member navigates life without Darryl and adapts to a new reality defined by his absence. *Id.* The emotional consequences—ongoing grief, disrupted relationships, and the enduring absence of a central familial figure—remain ever-present, reflecting a loss that continues to shape her daily life and family structure in profound and lasting ways. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $8 million for Myrtle Booker's solatium claim.

**2. Derica Booker[59]**

Derica Booker is the daughter of Darryl Booker. *See* Ex. 58 at ¶ 3. Derica's father was "not just a parent; he was my pillar of support and my biggest cheerleader," maintaining a close and supportive relationship with her despite the physical distance created by his military service. *Id.* at ¶ 4. Even when he was deployed and unable to attend her sixteenth birthday, he reassured her that they would celebrate together upon his return—a promise left unfulfilled by his death. *Id.*

[59] Derica Booker's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 58, Declaration of Derica Booker, dated March 18, 2026.

Derica emphasizes that her father was also her "best friend," consistently present in her life through encouragement, guidance, and emotional support. *Id.* at ¶ 5. She describes their relationship as one in which he supported "every" plan she shared with him, reinforcing her confidence and aspirations. *Id.* at ¶ 4. His death deprived her of that ongoing guidance and companionship, leaving her to navigate adulthood without his presence during milestones she had always anticipated sharing with him, including "my graduation and other future events." *Id.* at ¶ 5.

Derica lost her father "at the tender age of 16," and the loss profoundly shaped her emotional development. *Id.* at ¶ 8. She recounts witnessing soldiers arrive at her home and deliver the devastating news to her mother, experiencing firsthand the moment "the world… crumbled around us," an event that remains vividly imprinted in her memory. *Id.* at ¶ 7. The trauma of that moment marked a sudden transition from stability to grief, leaving lasting emotional effects.

The continuing impact of her father's absence is pervasive across both major milestones and daily life. He was not present for pivotal achievements, including "my high school and college graduations" and obtaining her professional license, experiences that were "tinged with sadness because he couldn't be there to see how far I've come." *Id.* at ¶ 8. His absence has made life "significantly more challenging," both emotionally and practically, for herself and her mother. *Id.* In addition to emotional harm, her father's death caused substantial financial hardship for the family. "The loss of my dad's salary created a financial burden," forcing the family to make "difficult decisions to keep afloat" and adapt to the sudden loss of income while coping with grief. *Id.* at ¶ 9. Although they have maintained a degree of stability, she emphasizes that the financial strain has been significant and ongoing. *Id.*

Her father's death fundamentally altered the family's structure and relationships. He had been "the glue that held us together," and his absence has led to noticeable changes in

communication, roles, and overall family dynamics. *Id.* at ¶ 10. While the family has, in some respects, drawn closer through shared grief, the loss has nonetheless "forever altered" their functioning and sense of cohesion. *Id.* Although Derica expresses hope that this litigation process may provide some measure of closure, she underscores that the emotional injury remains ongoing and deeply rooted, reflecting a permanent loss that continues to shape her life and well-being. *Id.* at ¶ 11.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Derica Booker's solatium claim.

**3. Maria Loney[60]**

Maria Loney is the mother of Darryl Booker. *See* Ex. 59 at ¶ 3. Darryl, her oldest son, was not only deeply loved but an integral part of her daily life, with their bond reflected in small but meaningful rituals such as competing to say "I love you" first at the end of phone calls—a tradition preserved in their final conversation on January 3, 2007. *Id.* at ¶ 4. Darryl was "not just my son; he was a great man of God," whose absence has created "a void in my heart" that remains unfilled. *Id.* Maria raised Darryl through daily involvement, including picking him up from basketball practice and after-school jobs, attending church together, and maintaining close contact well into his adulthood. *Id.* at ¶ 5. Their relationship continued to be active and emotionally intimate, with regular phone calls and "Sunday dinners prepared for him and his family," demonstrating an ongoing interdependence and deep familial connection. *Id.* She highlights shared interests—such as a mutual appreciation for dressing well and finding bargains—as further evidence of a relationship built on companionship, shared experiences, and respect. *Id.* Darryl was "a pillar of

[60] Maria Loney's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 59, Declaration of Maria Loney, dated March 16, 2026.

strength and integrity," deeply involved in the church and committed to his wife, daughter, and extended family. *Id.* at ¶ 6. His presence fostered unity and connection, and "his presence brought us closer," making his absence felt across all aspects of family life. *Id.*

While attending church, Maria was approached by her husband and sons, whose urgency and distress signaled the tragedy before words were spoken. *Id.* at ¶ 7. She "knew that we had lost Darryl" and, upon realization, "dropped to my knees outside, overwhelmed by grief," reflecting the acute emotional impact of the loss. *Id.* She characterized the news as "a blow from which I knew recovery would be a long journey," underscoring the lasting nature of the trauma. *Id.*

Darryl's death has profoundly reshaped her family's emotional life and relationships. He was "a pillar of strength and joy within our home," whose absence has fundamentally altered family routines, particularly Sunday gatherings and shared communication, which once centered around him. *Id.* at ¶ 8. Although the loss has brought family members closer in some respects—deepening their faith and reliance on one another—she emphasizes that the pain remains constant, describing his absence as "a constant pain." *Id.* While Maria expresses a commitment to honoring Darryl's memory through faith and familial strength, she acknowledges that the loss continues to define her experience, as she and her family strive to "keep his spirit alive" while living with the permanent emotional consequences of his absence. *Id.* at ¶¶ 8–9.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Maria Loney's solatium claim.

**4. Andre Booker[61]**

Andre Booker is the brother of Darryl Booker. *See* Ex. 60 at ¶ 3. Darryl was "not just a sibling… [but] a guiding figure, a second father," serving as both protector and confidant, and embodying qualities of "strength and kindness" that shaped Andre's life. *Id.* at ¶ 4. Their bond was rooted in lifelong companionship, reflected in shared childhood experiences, humor, and a deep emotional reliance on one another. *Id.* Growing up, Andre and Darryl were "inseparable," living together and sharing "every aspect of our lives," from routine daily activities to significant family experiences. *Id.* at ¶ 5. Even in adulthood, when they no longer lived under the same roof, they preserved this closeness through weekly calls and visits, continuing to share both "trivial" and "significant" aspects of their lives. *Id.* Andre confided in his brother "as I would have with no one else," underscoring the unique and irreplaceable nature of their relationship. *Id.* Andre further describes Darryl as a central and unifying figure within the family. Darryl was "deeply integrated into the fabric of our family," consistently present at gatherings and serving as a source of "joy and comfort" through shared meals, spontaneous visits, and emotional support during times of need. *Id.* at ¶ 6. His absence, therefore, is not limited to a single relationship, but rather leaves "a lasting emptiness" that affects the entire family system. *Id.*

While Andre was at work, he received a call from his wife informing him that Darryl had been killed in a helicopter crash in Iraq, a moment he describes as "shocking and devastating" and one he "find[s] difficult to revisit even now." *Id.* at ¶ 7. This moment was life-altering and continues to carry emotional weight long after the event itself. *Id.*

[61] Andre Booker's Virginia birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 60, Declaration of Andre Booker, dated March 16, 2026.

Following his brother's death, [redacted] Nevertheless, "the fabric of our family life has been irrevocably altered," with the absence most acutely felt during milestones and celebratory events that once brought the family together. *Id.* at ¶ 8. Even positive occasions, such as his son's graduation, are now "tinged with sorrow" due to Darryl's absence. *Id.* The family lost not only a loved one but also "a spiritual leader and a compassionate listener," roles Darryl fulfilled within the household. *Id.* at ¶ 10. In his absence, Andre has attempted to assume some of these responsibilities but acknowledges that "I am not my brother," and that Darryl's guidance "cannot be replicated." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Andre Booker's solatium claim.

**5. Norman Loney, Jr.[62]**

Norman Loney, Jr. is the brother of Darryl Booker. *See* Ex. 61 at ¶ 3. Darryl was "not just my brother; he was my oldest brother, a pillar in our family, and a guiding force," whose influence extended beyond ordinary sibling roles to one of protector, mentor, and moral example. *Id.* at ¶ 4. Norman and Darryl had a relationship formed through shared upbringing and continuous interaction. Living together, they developed an "unbreakable bond" grounded in everyday life—shared activities such as basketball, attending church every Sunday, and ongoing communication through regular calls and visits even after Darryl joined the military. *Id.* at ¶ 5. Their conversations,

[62] Norman Loney, Jr.'s Virginia birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 61, Declaration of Norman Loney, Jr., dated April 1, 2026.

he explains, were "filled with laughter, shared dreams, and the comfort that only siblings can provide," reflecting a sustained emotional closeness that persisted into adulthood. *Id.* Darryl's presence provided both companionship and guidance, shaping Norman's formative years and influencing his values and outlook on life. *Id.* at ¶ 6. Darryl served as a moral anchor within the family, describing him as "the moral compass of our family," whose advice to "do the right thing" was consistently embodied in his actions. *Id.* His leadership role, both in daily interactions and in broader family life, created a sense of stability and cohesion, making his loss particularly consequential for the family's structure and emotional well-being. *Id.*

On a Sunday—a day traditionally associated with family gathering—Norman received a call informing them of Darryl's death while their mother was at church, requiring the family to go together to deliver the devastating news in person. *Id.* at ¶ 7. He describes the reaction as one of "disbelief" and "profound sorrow," reflecting the immediate emotional devastation that followed the confirmation of Darryl's death. *Id.*

The consequences of Darryl's death have been pervasive and enduring and have plunged their family into "a state of devastation and profound sorrow," where the pain was so intense that family members found themselves "engulfed in grief, crying for what felt like an eternity." *Id.* at ¶ 8. Darryl's absence removed a figure who was both admired and emulated, thereby affecting the family's overall well-being and quality of life. *Id.* At the same time, the family has relied on its collective bond to cope with the loss, explaining that they have "clung to each other for support," with shared memories and love for Darryl serving as a foundation for navigating their grief. *Id.* The "shadow of Darryl's death looms large over our family," even as they strive to focus on his life and legacy. *Id.* at ¶ 9. Darryl's influence remains a "guiding light," shaping Mr. Loney's actions and decisions and continuing to affect the family's identity and values. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Norman Loney, Jr.'s solatium claim.

### L. BRIAN CHEVALIER – MARCH 14, 2007 ATTACK – MUFREK

On March 14, 2007, Cpl. Brian Chevalier was serving in the United States Army in Mufrek, Iraq when the vehicle in which his unit was traveling was struck by an IED and was attacked by insurgents firing rocket-propelled grenades. *See* ECF No. 9 at ¶ 2005; Ex. 6 at 50. The deep-buried IED breached the hull of the Stryker vehicle, flipped the vehicle on its side, and threw Cpl. Chevalier out of the driver's hatch. Ex. 6 at 50. According to his autopsy examination report, Cpl. Chevalier died of [redacted][63] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpl. Chevalier was killed on November 5, 2025 (ECF No. 53), and on January 27, 2026, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for inter alia the March 14, 2007 attack in which Cpl. Chevalier was killed. *See* Ex. 2.

Cpl. Chevalier's surviving mother, June Worbington, is a plaintiff in this case. *See* ECF No. 9 at ¶¶ 2008-2010. The Plaintiff suffered severe mental anguish, extreme emotional pain and suffering, and loss of Brian Chevalier's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 2010. The following chart reflects the claims asserted by June Worbington in her individual capacity arising out of the March 14, 2007, attack as well as the evidence setting forth the bases of her claims. That evidence is provided as an exhibit to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s)** | **Evidence** | **Exhibit** |
|---|---|---|---|---|

[63] *See* Ex. 62, Autopsy Examination Report for Chevalier, Brian Luther.

| | | | | |
|---|---|---|---|---|
| June Worbington | Cpl. Brian Chevalier's mother | Solatium claim $5 million | Declaration of June Worbington, dated April 24, 2026, including copy of her proof of U.S. citizenship | 63 |

### 1. June Worbington[64]

June Worbington is the mother of Brian Chevalier—her first born son. *See* Ex. 63 at ¶¶ 3, 4. June described her son as the "light of my life." *Id.* at ¶ 4. Brian often showed his love by cooking meals for June after work or surprising her with flowers just to say, "Mom, I love you." *Id.* They enjoyed watching NASCAR together, especially during the races when they were able to see Dale Earnhardt Sr. in person. *Id.* June recalled that her son's excitement during those races was infectious. *Id.* They shared a love for the outdoors often spending time fishing and camping. *Id.* at ¶ 5. At sixteen years old, Brian became a father and embraced the responsibility of raising his daughter. *Id.* at ¶ 6. He did everything in his power, including joining the military, to provide for her so that she could have a good life. *Id.* Before his deployment, Brian lived with his mom and younger brother with whom he also shared a close bond with. *Id.* June vividly recalls the heartfelt goodbye she had with her son at the airport before he deployed where he told her he loved her. *Id.* at ¶ 4. June reminded him to never say "goodbye" just "till we meet again." *Id.* As Brian walked toward the plane, all June could do was cry. *Id.* After he left, she sat in the parking lot and cried, overwhelmed with emotion. *Id.* That was the last time she was able to embrace her son. *Id.*

Growing up, Brian had a cousin, CB, who was one of his closest friends. *Id.* at ¶ 6. Tragically, at only nineteen years old, CB died due to complications with Cystic Fibrosis. *Id.* Brian

[64] June Worbington's birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 63, Declaration of June Worbington, dated April 24, 2026.

told his mother that if anything ever happened to him, he wanted to be buried next to CB. *Id.* Heartbreakingly, June would have to fulfill this request. She arrived home from work one day and received a call from Brian's ex-wife informing her that Brian had been killed in Iraq. *Id.* at ¶ 7. Initially, June thought she was joking but when she realized it was true, June dropped the phone and fell to her knees. *Id.* June recalled crying and saying "no, this is not true, not Brian." *Id.* The commotion awoke Brian's brother, Dustin, who picked up the phone. *Id.* When Dustin received the news, he was in shock and it took some time to process that he lost his brother. *Id.* Soon after she received word of Brian's death, June was comforted by her best friend who called her boyfriend and church family requesting that they come to support June during this time. *Id.*

June experienced a range of emotions including anger due to the manner in which she learned of her son's death. *Id.* She was so upset that she called the recruiting office and screamed at them for letting her hear the news from Brian's ex-wife instead of the military. *Id.* She received an apology and was informed someone would come to her home. *Id.* When the military personnel arrived and confirmed the news, June became distraught all over again, barely able to keep upright. *Id.* Her pastor's wife had to hold onto June to prevent her from falling. *Id.* June recounted that all she could do was cry and ask, "Why him, Lord?" *Id.* "Take me instead." *Id.*

Following the death of her son, June's life has been irrevocably changed. *Id.* at ¶¶ 8-9. She misses her child every single day and the pain of losing him never seems to ease. *Id.* at ¶ 8. Brian never got the chance to walk his mother down the aisle at her wedding in August 2007 or experience the love of his grandchildren. *Id.* Brian's brother and father have also been deeply impacted by his death. *Id.* at ¶ 9. June stated that "it's something that words cannot truly explain, and no one can fully understand unless they've been through it." *Id.* The day Brian died, June lost a part of herself and a part of her heart along with him. *Id.* She can no longer bring herself to watch

NASCAR although it was once something she and Brian bonded over. *Id.* Brian's daughter has been forced to grow up without her father which has caused June even more heartbreak. *Id.* at ¶ 10.

"I will think of him every single day and cry on his birthday and the anniversary of his passing." *Id.* "[I]f there were a stairway to heaven, I would climb it every day just to see him." *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for June Worbington's solatium claim.

### M. RYAN BISHOP – APRIL 14, 2007, ATTACK – YUSUFIYAH

Cpl. Ryan Bishop was killed on April 14, 2007 during a dismounted patrol by 2d Platoon, Charlie Company, 4th Battalion, 31st Infantry near Route Starbucks north of Yusifiyah when an IED detonated. *See* Ex. 6 at 28; ECF No. 9 at ¶ 2089. At Cpl. Bishop's memorial service on April 18, 2007, his commander said, "He wanted to do his part for his country, and I always remember him being the first one to clean his weapon after missions…. He would always make coffee in the morning over a wood fire…. The coffee wasn't for him; it was for everyone else…. Bishop had the kind of selfless service you could not learn. You either have it or you don't."[65] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpl. Bishop was killed on November 5, 2025 (ECF No. 53), and on January 27, 2026, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the April 14, 2007 attack in which Cpl. Ryan Bishop was killed. *See* Ex. 2.

Cpl. Bishop's wife, Melanie Hopley, is a Plaintiff in this case. *See* ECF No. 9 at ¶¶ 2088-2092. Plaintiff has suffered severe mental anguish, extreme emotional pain and suffering, and loss of Cpl. Bishop's society, companionship, comfort, advice and counsel. *Id.* ¶ 2092. The following

[65] Ex. 64, Darrell E. Fawley III, *4-31 Infantry in Iraq's Triangle of Death* (McFarland & Co. 2019) at ch. 5.

chart reflects the claims asserted by Melanie Hopely in her individual capacity arising out of the April 14, 2007, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Melanie Hopley | Cpl. Ryan Bishop's wife | Solatium claim $8 million | Declaration of Melanie Hopley, dated April 28, 2026, including copy of her proof of U.S. citizenship | 65 |

**1. Melanie Hopley[66]**

Melanie Hopley is the wife of Ryan Bishop. *See* Ex. 65 at ¶ 3. Ryan was not only her husband but her closest friend, and their marriage was defined by deep companionship rooted in shared laughter, affection, and mutual support. *Id.* at ¶ 4. After meeting through mutual friends and marrying in July 2005, they were "inseparable," finding joy both in social time with friends and in quiet moments alone, with "every second we shared felt truly special." *Id.* Their bond was tested by tragedy even before Ryan's death, [redacted] Rather than withdrawing, Ryan became more determined and motivated, channeling his grief into honoring his mother's memory and excelling in his responsibilities. *Id.* During their time stationed at Fort Drum, they built a life filled with shared adventure, especially fishing trips across upstate New York. *Id.*

During Ryan's deployment to Iraq, Melanie remained closely connected to him despite distance. *Id.* She worked alongside Ryan's father at Starbucks in Texas and sent "hundreds of

[66] Melanie Hopley's Texas Birth Certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 65, Declaration of Melanie Hopley, dated April 28, 2026.

pounds of coffee to the troops," later learning that Ryan faithfully made coffee for his squad each morning, a ritual that brought comfort and connection to those around him. *Id.* After Ryan was killed, she traveled to New York to be with the battalion when they returned home and experienced a bittersweet closeness as his fellow soldiers shared stories of Ryan's "spirit and cheerfulness, even in difficult times." *Id.* at ¶ 5. "His death remains the most devastating event of my life." *Id.*

Ryan was deeply devoted to relationships beyond their marriage maintaining weekly communication with his best friend Shawn Johnson and forming a loving bond with Shawn's son Sean, prioritizing visits and shared activities whenever possible. *Id.* at ¶ 6. Ryan stayed closely connected with longtime friends Kellie and Karin Geiger, spoke with his parents several times a week, and visited them biweekly despite long drives, his East Texas accent emerging during these calls as a sign of affection and familiarity. *Id.* at ¶ 7. Ryan consistently demonstrated "a genuine dedication to others and wholehearted love for his relationships." *Id.*

On April 15, 2007, a chaplain from Fort Hood arrived with military representatives and informed her and Ryan's father that Ryan "had been killed in action." *Id.* at ¶ 8. Melanie broke down immediately, crying and holding Ryan's father as waves of disbelief and despair took hold. *Id.* The chaplain handed her a check and explained the immediate steps to bring family in for the funeral, marking the sudden transition into the reality of widowhood and loss. *Id.*

Following Ryan's death, [redacted] She turned to long-distance running, eventually participating in the Nike World Run, and immersed herself in college life through athletics, martial arts, and outdoor activities while attending Tyler Junior College and later Austin College. *Id.* These efforts were essential in helping her cope and "rebuild my sense of self,"

even though she continues to carry the weight of grief. *Id.* Melanie ultimately completed her education and became a nurse, but these accomplishments occurred alongside unresolved grief rather than replacing it. *Id.* at ¶ 10.

Although the family has attempted to heal through shared trips and remembrance, the loss "has deeply affected our overall well-being and quality of life," leaving many struggling with depression and emotional withdrawal. *Id.* at ¶ 11. [redacted] Melanie anticipated spending her life with Ryan, but he was "taken from me far too soon," leaving no opportunity to have children during their brief marriage. *Id.* at ¶ 12. Military funerals, veteran salutes, and even her work in hospital settings serve as emotional triggers that bring the loss sharply back into focus. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $8 million for Melanie Hopley's solatium claim.

**N. CHRISTOPHER WEST – FEBRUARY 4, 2008, ATTACK – MUQDADIYAH**

On February 4, 2008, Task Force Falcon conducted a nighttime heliborne assault operation near Abu Sayda village that allegedly housed AQI insurgents. Ex. 6 at 77. As a part of the team was entering the courtyard of a building on the assault list, the team medic, Spc. Christopher West, and others moved across an intersection when Spc. West was killed by a command-wire IED. *Id.* at 78; *see also* ECF No. 9 at ¶ 2536. Spc. West was posthumously laterally appointed to the rank

of Corporal.[67] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpl. West was killed on November 5, 2025 (ECF No. 53), and on January 27, 2026, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the February 4, 2008 attack in which Cpl. Christopher West was killed. *See* Ex. 2.

Cpl. West's surviving father and sisters—John West, Cameron West, and Lauren West—are plaintiffs in this case.[68] *See* ECF No. 9 at ¶¶ 2535-2542. Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of Cpl. West's society, companionship, comfort, advice and counsel. *Id.* ¶ 2542. The following chart reflects the claims asserted by John West, Cameron West, and Lauren West in their individual capacities arising out of the February 4, 2008, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| John West | Cpl. Christopher West's father | Solatium claim $5 million | Declaration of John West, dated April 28, 2026, including copy of his proof of U.S. citizenship | 67 |
| Cameron West | Cpl. Christopher West's sister | Solatium claim $2.5 million | Declaration of Cameron West, dated April 28, 2026, including copy of her proof of U.S. citizenship | 68 |
| Lauren West | Cpl. Christopher West's sister | Solatium claim $2.5 million | Declaration of Lauren West, dated April 28, 2026, including copy of her proof of U.S. citizenship | 69 |

[67] Ex. 66, Report of Casualty for West, Christopher John Lee.
[68] Cpl. West's mother, Hattie West, is also named as a plaintiff in this case; however, she passed away on in March 2026. Plaintiffs have indicated that a motion to substitute her estate will be filed once an estate representative is appointed.

### 1. John West[69]

John West is the father of Christopher West ("CJ"). *See* Ex. 67 at ¶ 3. CJ was "not only my son but my partner, my student, and my friend." *Id.* at ¶ 4. Their bond was marked by mentorship and pride, including significant milestones such as CJ's rite-of-passage gift of a family ring and John's personal participation in pinning CJ's "Blood wings" following his graduation from Airborne School, a moment filled with "tears, laughter, and an unspoken understanding" as CJ prepared for deployment to Iraq. *Id.* John recounts a relationship defined by shared life experiences and emotional closeness. He describes bonding with CJ through sports, including strategizing together in soccer and baseball, as well as fishing trips and travel experiences that created lasting memories. *Id.* CJ "was more than my son—he was a piece of my heart and soul," and his son's character—marked by "integrity, honesty, and a deep sense of love for his family"—continues to serve as a guiding influence in his life. *Id.* CJ's close relationships extended throughout the family, particularly with his mother and sisters, forming a "tightly knit and protective" family unit grounded in trust and unconditional love. *Id.* at ¶ 5.

While returning to his office in Washington, D.C., John received a call from his wife and, even before answering, he had "this gut feeling" that CJ had been killed. *Id.* at ¶ 6. Upon confirmation, he describes physical and emotional collapse, stating that his "legs felt weak" and that he "broke down crying," later expressing his anguish through rage and despair, including punching a wall and experiencing an overwhelming desire for revenge. *Id.* His grief rendered him disoriented and unable to function, as he recalls having little memory of traveling through the

[69] John West's Alabama birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 67, Declaration of John West, dated April 28, 2026.

airport or the flight home, despite being conscious of the intensity of his emotional distress. *Id.* [redacted]

John chose to process his grief independently despite its profound effects. *Id.* at ¶ 7. The emotional impact of CJ's death had significant financial consequences, as he "lost motivation to pursue opportunities" that could have improved his family's financial condition, and CJ's absence also meant losing an important source of both "financial" and "everyday support." *Id.* at ¶ 8. The loss also caused severe and lasting damage to the entire family unit. "CJ's death tore our family apart in ways that I could never have imagined," describing distinct and serious effects on each member of the family. *Id.* at ¶ 9. He characterizes his own experience as falling into "a dark abyss of grief," while [redacted]

The long-term consequences of CJ's death have been devastating and compounding as [redacted] He describes the family as now "dysfunctional," struggling to cope with the enduring emotional damage caused by CJ's death. *Id.* John seeks to carry his son's memory in enduring and

symbolic ways. He obtained a tattoo reading "To my Sun my only Son, Both are the same," which he explains represents the permanent nature of his bond with CJ and the depth of his loss. *Id.*

Plaintiff have requested, and I recommend, that the Court award the baseline amount of $5 million for John West's solatium claim.

**2. Cameron West[70]**

Cameron West is the sister of Christopher West ("CJ"). *See* Ex. 68 at ¶ 3. Cameron and her brother were "Irish twins born just a year apart," sharing a connection so close that they viewed each other as "my best friend," with their lives defined by mutual trust, loyalty, and constant companionship. *Id.* at ¶ 4. Their closeness is reflected in the fact that CJ named her as his Primary Next of Kin, demonstrating that he "trusted me deeply… knowing I would always fight for him," a responsibility she has carried forward in the aftermath of his death. *Id.* Cameron and CJ were "inseparable growing up," attending Texas A&M together after graduating high school early and navigating their coursework through a "divide and conquer" approach marked by teamwork, debate, and mutual encouragement. *Id.* She describes their relationship as filled with "endless conversations and debates about life," with his humor and insight serving as a source of strength in both ordinary and challenging moments. *Id.* During his deployment, they maintained frequent communication, and she anticipated introducing him to his first niece, only for him to be killed "on his final mission and never [get] the chance to hold her," a loss she describes as deeply heartbreaking. *Id.*

CJ played a central role in holding their family together. She describes a "deep and unbreakable bond" among family members, in which CJ served as a unifying force, recognized by

---

[70] Cameron West's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 68, Declaration of Cameron West, dated April 28, 2026.

naming his entire immediate family as primary next of kin. *Id.* at ¶ 5. After his death, she and her mother undertook the "heart-wrenching task" of identifying his body and preserving his dignity, an experience that exposed them to traumatic details and required ongoing advocacy for his "integrity and legacy." *Id.* Their family life prior to his death was characterized by closeness, joy, and shared traditions, including gatherings, family outings, and community engagement shaped by values of "God, Country, and Family." *Id.*

The day she learned of CJ's death, Cameron awoke in the early morning with a sense of dread and, upon receiving a call from her sister and hearing the words "Come home," realized that "everything changed forever," describing the moment as "lightning struck my soul." *Id.* at ¶ 6. She explains that the emotional devastation extended beyond the immediate moment, contributing to long-term damage within her family, including the eventual death of her mother, which she attributes in part to the emotional toll of losing her son. *Id.*

Following CJ's death, Cameron [redacted]

[redacted]

Her brother's death also caused substantial financial harm. Once a middle-class family, [redacted]

The emotional and relational impact on the family has been profound. The loss was "an unbearable blow—raw, unfiltered emotional pain that brought all of us… to our knees," resulting in lasting physical and psychological decline among family members. *Id.* at ¶ 9. [redacted] She emphasizes that her brother's final moments reflected his reliance on his family, calling out to his parents and sisters, reinforcing the depth of their bond and the magnitude of the loss. *Id.* at ¶ 11.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Cameron West's solatium claim.

**3. Lauren West[71]**

Lauren West is the sister of Christopher West ("CJ"). *See* Ex. 69 at ¶ 3. From his birth, Lauren felt "an innate sense of protectiveness over him," and that throughout their lives they were "inseparable," maintaining constant contact even when apart and sharing a bond in which he was "not just my brother but my best friend." *Id.* at ¶ 4. Their relationship was grounded in complete mutual trust, reflected in his reliance on her to serve as his medical power of attorney and his confidence that she would act without letting "my emotions cloud my judgment." *Id.* Even during his deployment, they maintained near-constant communication through "almost daily emails and frequent calls," underscoring the depth and continuity of their connection. *Id.* From childhood, Lauren and CJ's relationship combined "fierce competition and unwavering support," whether in academics, athletics, or personal challenges. *Id.* She recounts formative moments, such as defending him from a bully and, in turn, his protectiveness over her, illustrating a reciprocal dynamic of care. *Id.* As young adults, their closeness continued through college and beyond, where she acted as his "home away from home," supporting him with daily needs and providing guidance, and later through cohabitation after college where they maintained their routines of spending time together and supporting each other. *Id.* CJ served as "the peacekeeper of our family and the glue that held us all together," giving his presence a central emotional function within the household. *Id.*

CJ maintained particularly strong bonds with both parents and siblings, including a close, affectionate relationship with their mother, whom she describes as his "biggest cheerleader," and a relationship with their father marked by shared experiences and "an unmistakable pride and

[71] Lauren West's Texas birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 69, Declaration of Lauren West, dated April 28, 2026.

unbreakable bond." *Id.* at ¶ 5. His connection with their youngest sister was described as "inseparable," as they shared school, activities, and life experiences as "confidants and partners in crime." *Id.* He also shared meaningful relationships with extended family, including their aunt, with whom he traveled extensively and built a close, almost maternal connection. *Id.* These overlapping relationships demonstrate that CJ was a central figure whose presence unified the family.

The day Lauren learned of CJ's death, she and her mother were awakened by a knock at the door from police and a chaplain delivering the news. *Id.* at ¶ 6. She describes being overcome with "uncontrollable sobbing and trembling," experiencing disbelief and shock, particularly because she had spoken with him shortly beforehand. *Id.* The news came as "an abrupt and crushing blow." *Id.* Notifying others required contacting family and friends individually and later making a public social media post, all while relying on one another for emotional support during the immediate aftermath. *Id.*

Following CJ's death, [redacted] Despite these efforts, the emotional impact of her brother's death has remained profound and persistent. *Id.* The loss "created a tremendous void in our family," one that permeates daily life such that "even moments of happiness feel bittersweet because he isn't here to share them." *Id.* at ¶ 8. Their home itself has become a memorial space, with a large portrait of CJ displayed prominently as a constant reminder of his absence. *Id.* [redacted]

[redacted]

Following her mother's death, Lauren has felt isolated and disconnected, stating that [redacted]

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Lauren West's solatium claim.

**O. RONALD PHILLIPS, JR. – SEPTEMBER 25, 2008, ATTACK – BAHABAN**

As part of Operation Blue Ridge Mountain, 2d Platoon, Alpha Company, 3d Brigade, 7th Infantry was patrolling between the villages of Bahaban and Sindij in Babil Province on September 25, 2008 when the lead vehicle in the patrol was attacked with a powerful deep-buried IED resulting in the death of SSgt. Ronald Phillips, Jr. Ex. 6 at 33-35; ECF No. 9 at ¶ 2724. Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which SSgt. Phillips was killed on November 5, 2025 (ECF No. 53), and on January 27, 2026, the Court

entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the September 25, 2008 attack in which SSgt. Ronald Phillips, Jr. was killed. *See* Ex. 2.

SSgt. Phillips' surviving parents, brothers, daughter, and son—Ronald Phillips, Sr., Wanda Phillips, Troy Phillips, Devrick Phillips, Destinee Phillips, and Jaalen Phillips—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 2723-2732. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of SSgt. Phillips' society, companionship, comfort, advice, and counsel. *Id*. at ¶ 2732. The following chart reflects the claims asserted by Ronald Phillips, Sr., Wanda Phillips, Troy Phillips, Devrick Phillips, Destinee Phillips, and Jaalen Phillips in their individual capacities arising out of the September 25, 2008, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Ronald Phillips, Sr. | SSgt. Ronald Phillips, Jr.'s father | Solatium claim $5 million | Declaration of Ronald Phillips, Sr., dated April 29, 2026, including copy of his proof of U.S. citizenship | 70 |
| Wanda Phillips | SSgt. Ronald Phillips, Jr.'s mother | Solatium claim $5 million | Declaration of Wanda Phillips, dated April 29, 2026, including copy of her proof of U.S. citizenship | 71 |
| Troy Phillips | SSgt. Ronald Phillips, Jr.'s brother | Solatium claim $2.5 million | Declaration of Troy Phillips, dated April 22, 2026, including copy of his proof of U.S. citizenship | 72 |

| | | | | |
|---|---|---|---|---|
| Devrick Phillips | SSgt. Ronald Phillips, Jr.'s brother | Solatium claim $2.5 million | Declaration of Devrick Phillips, dated April 17, 2026, including copy of his proof of U.S. citizenship | 73 |
| Destinee Phillips | SSgt. Ronald Phillips, Jr.'s daughter | Solatium claim $5 million | Declaration of Destinee Phillips, dated April 17, 2026, including copy of her proof of U.S. citizenship | 74 |
| Jaalen Phillips | SSgt. Ronald Phillips, Jr.'s son | Solatium claim $5 million | Declaration of Jaalen Phillips, dated April 17, 2026, including copy of his proof of U.S. citizenship | 75 |

**1. Ronald Phillips, Sr.[72]**

Ronald Phillips, Sr. is the father of Ronald Phillips, Jr. *See* Ex. 70 at ¶ 3. Mr. Phillips and his son shared a close, loving father–son bond and left enduring emotional and practical wounds that continue to shape his life. Ronald, Jr. was "an incredibly devoted and hardworking person who cared deeply for his family and everyone around him," and they shared a particularly close relationship grounded in shared interests and constant connection. *Id.* at ¶ 4. Central to their bond was basketball, which his son played throughout youth and high school, and which they discussed regularly, attended together, and used as a touchstone in nearly every conversation. *Id.* at ¶¶ 4–5. Mr. Phillips recounts a childhood and adulthood filled with shared activities—fishing, camping, cooking out, and spending time together at home—that strengthened their relationship and created lasting memories. *Id.* He describes one humorous incident involving a backyard cookout where

[72] Ronald Phillips, Sr.'s South Carolina birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 70, Declaration of Ronald Phillips, Sr., dated April 29, 2026.

supposedly cool coals sparked a fire large enough to summon the fire department, an episode that captured the laughter and closeness they shared. *Id.* at ¶ 4. Even as his son grew older, they remained deeply connected, speaking by phone weekly during the three years before his death, always beginning with basketball before turning to family and friends. *Id.* at ¶ 5. Their final conversation centered on his son's dream of owning a black Escalade, a dream "he never got to fulfill," a painful detail made bittersweet when the funeral home coincidentally had just purchased one, meaning "he did get his black Escalade in the end." *Id.*

Ronald, Jr. was a deeply selfless and compassionate person who consistently put others before himself. *Id.* at ¶ 6. He recalls how his son refused new sneakers so that money could instead be used for food, quietly retrieving his savings from a Bible and telling Mr. Phillips to prioritize the family's needs. *Id.* His home was often filled with friends, sometimes hosting as many as twenty teenagers, reflecting his son's welcoming spirit and "magnetic personality." *Id.* Family gatherings, trips to Myrtle Beach and Atlantic Beach, and lively get-togethers at home were defined by "love, laughter, and togetherness," all of which his son cultivated naturally. *Id.*

On the morning of September 25, 2008, Mr. Phillips received a call from his son's best friend informing him that soldiers were at his house. *Id.* at ¶ 7. Coming from a military family, Mr. Phillips immediately understood the meaning and confirmed the news directly with one of the soldiers, who told him that Ronald had been killed. *Id.* The moment felt "as though someone had hit me with a bat— I was completely shattered." *Id.* Later that day, he awoke his wife and told her the news while holding her tightly, and he took care to ensure that his son's brother received the information in a supportive setting by first contacting his girlfriend. *Id.*

Following his son's death, Mr. Phillips relied on faith, family, friends, and support organizations, including SOS and other Gold Star families, to provide understanding and comfort

during his grief. *Id.* at ¶ 8. These sources of support were essential to surviving the emotional toll of the loss. *Id.* His son's death also created financial vulnerability for himself and his wife. *Id.* at ¶ 9. Ronald, Jr. had always assured them "that we would never have to worry about anything—that he would take care of us," a promise that can no longer be fulfilled. *Id.* Now elderly, living on Social Security, and dealing with disabilities, Mr. Phillips explains that the stability his son provided is "deeply missed," leaving them in a more precarious position and underscoring how much responsibility his son had assumed for the family's well-being. *Id.* The emotional consequences have been profound and permanent: Ronald, Jr. can no longer provide leadership and guidance to his brothers; he will never seeing his children graduate; never attend a father-daughter dance; and never walk his daughter down the aisle. *Id.* at ¶ 10. The loss has strained Mr. Phillips' relationship with his grandchildren, leaving him feeling increasingly distant and disconnected. *Id.*

Sharing the same name deepens the ache, and he describes missing "his voice, his laughter, his love, and the moments where he'd say, 'Daddy, I love you,'" which linger in his thoughts daily. *Id.* at ¶ 11. "The death of a child is a parent's worst fear realized," and each day is accompanied by a heavy, indescribable weight that never goes away, especially during family gatherings where the absence of his son is unmistakable. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Ronald Phillips, Sr.'s solatium claim.

### 2. Wanda Phillips[73]

Wanda Phillips is the mother of Ronald Phillips, Jr. ("Ron"). *See* Ex. 71 at ¶ 3. Ron was "an incredible person who brought energy and laughter into the room wherever he went," recounting early memories that reflected his confidence, humor, and determination, including a childhood football game where he stepped in unexpectedly and delivered the winning touchdown after asking, "Who me, coach?" *Id.* at ¶ 4. Wanda describes Ron as hardworking and driven from an early age, noting that he worked at McDonald's continuously from age fourteen to nineteen and thoughtfully considered his future after graduation. *Id.* After discussions with her, Ron chose to attend Job Corps, an experience she describes as "enriching" and formative for him. *Id.* She recalls one of his happiest moments at a family basketball tournament that fulfilled a dream Ron had shared of playing alongside his father and younger brother—a moment of pure joy that he "carried … always." *Id.* Her most cherished memories of Ron center on "his passion, his laughter, and his love for family." *Id.* at ¶ 5.

Wanda and Ron had an extraordinarily close relationship as she was a stay-at-home parent who spent "every day with him from birth," and he was her firstborn, which created a bond that never weakened. *Id.* at ¶ 6. Even after Ron moved away, they remained deeply connected as Ron would call her "every other day" to check on family, ask for advice, and stay involved in her life—including calling from Germany to ask for her macaroni-and-cheese recipe. *Id.* When home, he spent time working alongside his father, reinforcing the family connection he valued so deeply. *Id.* Wanda also described Ron as "the glue that held our family, friends, and even new students at school together," noting his ability to connect with people of all backgrounds and make everyone

[73] Wanda Phillips' Alabama birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 71, Declaration of Wanda Phillips, dated April 29, 2026.

feel valued. *Id.* at ¶ 7. She recalls family rap sessions focused on life goals, as well as basketball games, beach outings, and time spent with friends, stating that Ron was "the life of the party" who made ordinary moments extraordinary. *Id.*

Wanda recalls her husband woke her after receiving a call from soldiers who were at their home, and upon hearing the news, she "ran out of the house in a frantic attempt to go to my son." *Id.* at ¶ 8. She recalls lying "in the street, overwhelmed with grief, screaming and crying," while her husband informed family members. *Id.*

Following Ron's death, [redacted]

Ron was deeply attentive to her and her husband's financial needs, particularly because they live on a fixed income. *Id.* at ¶ 10. Ron "always took care to ensure that we had what we needed financially," and the stability he provided is profoundly missed. *Id.* Since Ron's death, the family's overall closeness has diminished, laughter feels harder to come by, and Ron's younger brother—who viewed him as "the perfect role model"—has been left without his guidance. *Id.* at ¶ 11. The family's dynamics "have shifted forever," and every aspect of their lives continues to be affected by his absence. *Id.* Losing Ron "shattered me as a person," and when the bond they shared was broken, "it changed me forever." *Id.* at ¶ 12.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Wanda Phillips' solatium claim.

**3. Troy Phillips**[74]

Troy Phillips is the brother of Ronald Phillips, Jr. *See* Ex. 72 at ¶ 3. Ron was "more than just a sibling; he was my second father and my hero" and a central guiding force in Troy's life. *Id.* at ¶ 4. Their relationship reflected the classic big-brother dynamic of protection, instruction, and unwavering support, but lived "in real life for us." *Id.* From childhood onward, Ron took on a paternal role, teaching, encouraging, and consistently standing by him in ways Troy states "no one else ever has." *Id.* Ron actively shaped his early adulthood and self-confidence. *Id.* Ron bought him his first car, took him everywhere, and supported his creative ambitions, particularly his music. *Id.* He describes a moment when, after showing Ron music he had been working on, Ron immediately reinforced that belief by buying him the same beat machine and telling their mother, " 'Mama, TC's gonna make it,' " a statement that encapsulated Ron's faith in his younger brother. *Id.* "Since I was a kid, it was always me and him," and their lives were defined by shared laughter, joy, and Ron's ability to light up every room with humor, dancing, and playfulness. *Id.* Above all, Troy emphasizes that Ron's devotion to family set him apart, describing him as "truly family-oriented and a hero long before his passing in Iraq." *Id.* Troy describes Ron as someone whose presence unified everyone around him because Ron "was loved by everyone he came across," had "no enemies," and carried himself with "kindness, compassion, and unwavering support" rooted in a deep relationship with God. *Id.* at ¶ 5.

Early in the morning on September 25, 2008, between 5 and 6 a.m., Troy father told him the news of Ron's passing, which at first felt unreal "until I heard my mother's gut-wrenching screams, which made everything sink in." *Id.* at ¶ 6. Soon afterward, Army representatives arrived

[74] Troy Phillips' South Carolina birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 72, Declaration of Troy Phillips, dated April 22, 2026.

and confirmed the death, cementing the reality of the loss. *Id.* In the immediate aftermath, Troy struggled with denial and was initially unable or unwilling to speak about the loss as word spread quickly due to how loved his brother was. *Id.*

Despite the depth of his grief following Ron's death, Troy chose to shoulder the pain without formal intervention. *Id.* at ¶ 7. "Since Ron's death, we are barely getting by these days," and the shift in financial status has made it "incredibly difficult" to make ends meet and adjust to "the financial void it has created." *Id.* at ¶ 8.

Ron was "the life of our family," and his absence created "a void that cannot be filled." *Id.* at ¶ 9. For Troy personally, losing Ron meant losing "my big brother, my friend, and in many ways, a second dad figure." *Id.* While he acknowledges that his parents' loss of their firstborn carries its own unique pain, he emphasizes that the entire family shares a grief that "lingers to this day." *Id.* In response, they try to move forward by sharing memories, laughing, crying, and celebrating Ron's life, which has, in some ways, drawn them closer together even as life feels fundamentally altered. *Id.* Troy describes Ron as "an exceptionally kind and good-hearted person," and losing someone so undeservedly is profoundly unfair and will continue to shape his life and his family's future as they attempt to live alongside both love and absence. *Id.* at ¶ 10.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Troy Phillips' solatium claim.

**4. Devrick Phillips**[75]

Devrick Phillips is the brother of Ronald Phillips, Jr. *See* Ex. 73 at ¶ 3. Ron was a man who "deeply cherished the relationships he built throughout his life," maintaining strong bonds with his

[75] Devrick Phillips' United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 73, Declaration of Devrick Phillips, dated April 17, 2026.

children, family, and close friends, and consistently demonstrating "unwavering respect, love, and responsibility toward them." *Id.* at ¶ 4. Ron was both a devoted family man and a loyal friend who invested his time and energy into cultivating trust and meaningful connection, making himself a constant and reliable presence in the lives of those he cared about. *Id.* According to Devrick, Ron lived intentionally, prioritizing relationships through family gatherings, frequent phone calls, and simple moments of shared connection. He explains that Ron "spent his days meaningfully," ensuring he was present for both ordinary and significant moments, leaving no doubt as to how deeply he valued the people in his life. *Id.* Ron's compassion and dependability defined him and continue to be remembered as central aspects of his character. *Id.*

Prior to learning of his brother's death, Devrick had moved to Columbia, South Carolina, and he recalls receiving a phone call from his father informing him that Ron had been killed in Iraq. *Id.* at ¶ 5. During that call, he could hear his mother "screaming and crying" in the background, immediately conveying the gravity of the loss. *Id.* He was left in "complete shock and numbness" by the news. *Id.* Notifying others and speaking about Ron's death has been extraordinarily difficult, and "even today, it's almost impossible to speak about my brother's passing without breaking down." *Id.* Ron's absence, he explains, remains a heavy emotional weight that affects both him and his family every day. *Id.*

Following Ron's death, [redacted]

[redacted] Although the family has, in some ways, grown closer through mutual support, the strain of loss has also challenged relationships, and moments of celebration are now "tinted with sadness," particularly during milestones and gatherings where Ron's absence is unmistakable. *Id.* at ¶ 8. While time may allow for coping, "the reality of his absence will continue to shape how we move forward," leaving lasting effects on their emotional well-being and family life that cannot be fully expressed in words. *Id.* at ¶ 9.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $2.5 million for Devrick Phillips' solatium claim.

**5. Destinee Phillips**[76]

Destinee Phillips is the daughter of Ronald Phillips, Jr. *See* Ex. 74 at ¶ 3. Prior to his death, her father was "a deeply loving and inspirational figure in my life," serving as both a parent and a protector who taught her "discipline, integrity, and strength." *Id.* at ¶ 4. They shared a close bond grounded in trust and respect, and she lived with him, creating a daily, nurturing relationship she states she will "forever treasure in his absence." *Id.* Some of her most cherished memories with her father were the simple, everyday moments of family life, including road trips, ice-cream outings, cooking breakfast together on holidays, and watching movies as a family. *Id.* at ¶¶ 4–5. Even though he was killed while Destinee was still young, these moments left a lasting imprint, and "his love and lessons resonate with me every day." *Id.* at ¶ 4. In the years before his death,

[76] Destinee Phillips' South Carolina birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 74, Declaration of Destinee Phillips, dated April 17, 2026.

they spoke whenever possible, and he consistently checked on her and her brother's well-being and school progress, making clear his ongoing involvement and care. *Id.* at ¶ 5.

Destinee learned of her father's death while she was in elementary school. *Id.* at ¶ 7. At the time, she and her brother believed he would be coming home soon and were anticipating a family trip to Disney World. *Id.* Instead, adults sat them down and explained that "he wasn't coming back." *Id.* Because she was "only in the 2nd grade," she did not fully understand the meaning of the loss at that moment, though she vividly remembers seeing everyone crying around her. *Id.* As she grew older, the reality of his absence set in more deeply, and she began to feel "distant and not as outgoing or excited about life as I once was." *Id.* Losing her father at such a young age created an emptiness she continues to carry. *Id.* She struggled with confusion surrounding his death. *Id.* She learned later that news of her father's death spread through her school and even the media, which is how many of her friends found out about it. *Id.*

Her father's absence has been most acutely felt during major life milestones, including changing schools, getting her driver's license, attending prom, graduating, and earning her degree. *Id.* at ¶ 8. He was not present to provide guidance, encouragement, or celebration during these moments, making each transition "more challenging" both emotionally and practically. *Id.* Growing up without him affected her "sense of stability" and reminded her repeatedly of "what could have been if he were still here." *Id.* While Destinee has not sought professional psychological counseling or medical treatment for her grief, [redacted] Her father was "a pillar of support and stability for our family," and his death caused a major shift in family roles and responsibilities. *Id.* at ¶ 11. Over time, this loss also led to distancing within the family, stating

that "we are no longer as close-knit as we once were," and that she finds herself withdrawing rather than reaching out to loved ones. *Id.*

In addition to emotional harm, [redacted]

Losing her father deprived Destinee and her brother of growing up with his "wisdom and strength," leaving lasting gaps in both personal development and family well-being. *Id.* at ¶ 12. While acknowledging the enduring struggles, she explains that she and her family find some solace in preserving his memory, holding onto "the love and values he left us," and ensuring that his legacy continues through his children. *Id.*

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Destinee Phillips' solatium claim.

**6. Jaalen Phillips**[77]

Jaalen Phillips is the son of Ronald Phillips, Jr. *See* Ex. 75 at ¶ 3. His father was "an incredible father and role model who deeply cared for his family," and they shared a close bond built through everyday life, including staying up together to watch basketball games and learning to play and appreciate the sport side by side. *Id.* at ¶ 4. He recalls his father's humor and competitive spirit as central to making family time joyful, whether through video games or simple evenings together, and identifies the last night he saw his father before deployment as "one of the

---

[77] Jaalen Phillips' U.S. Department of State Consular Report of Birth Abroad and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 75, Declaration of Jaalen Phillips, dated April 17, 2026.

fondest memories I have of him," a moment he continues to treasure. *Id.* Living with his father allowed him to experience his "love, dedication, and warmth as a parent" on a daily basis. *Id.*

After his parents separated, Jaalen spent substantial time with his father, sharing custody and maintaining frequent contact. *Id.* at ¶ 5. In the three years before his father's death, they spent time together equally between parents and "often talked on the phone," with conversations focused on his life, school, and their shared love of sports. *Id.* Their relationship was "a bond that meant everything to me," noting that his father consistently pushed him to "be the best version of myself" while providing steady love and care. *Id.* Since his father's death, he deeply feels the absence during milestones such as graduations and other life events, even as his father's influence remains "profound and cherished." *Id.* He further describes his father as someone who maintained deep and joyful relationships throughout the family, and he had "a knack for cracking jokes and spreading laughter, lighting up any room he walked into." *Id.* at ¶ 6. Being around him was consistently "always a joy," and those memories continue to define how Jaalen remembers his father's role in the family. *Id.*

Jaalen learned of his father's death while he was still in elementary school. *Id.* at ¶ 7. He and his sister believed their father was coming home soon and were excited about a planned trip to Disney World, only to notice adults shaking their heads before sitting them down and explaining that "he wasn't coming back." *Id.* At that age, he "didn't understand what it meant," but vividly remembers the surrounding grief and confusion, a confusion that deepened as he grew older and the permanence of the loss became clearer. *Id.* Because he was so young, he largely kept the loss to himself, unsure how to express or process it. *Id.* He later learned that news of his father's death spread through his school and into the media, which is how many of his peers found out. *Id.*

The absence of his father has affected every stage of Jaalen's life. His father "missed my entire childhood," never being present for graduations or other milestones, and his absence continues to weigh heavily during achievements such as performing in college dance programs, moments he wishes his father could have witnessed and shared with him. *Id.* at ¶ 8. His loss also placed greater strain on his mother, who had to assume both nurturing and disciplinary roles without the partner support his father would have provided. *Id.* The loss "has made life harder for us emotionally" and required the family to grow stronger in unexpected ways. *Id.* [redacted]

The family struggled to process grief openly, often keeping emotions bottled up, while Jaalen himself matured quickly, taking on emotional-support roles and prioritizing others' needs over his own. *Id.* at ¶ 11. He describes moments of internalized guilt and feelings of having "failed him somehow," even as he works to support the family and move forward. *Id.* Although scholarships and support eased some burdens, the loss remains central to his identity and experience. *Id.* He concludes that his father's death was a "turning point" that forever altered the family's trajectory, leaving a permanent gap that is "a constant reminder of how much he meant to me," especially when surrounded by others who still have their fathers present. *Id.* at ¶ 12.

Plaintiffs have requested, and I recommend, that the Court award the baseline amount of $5 million for Jaalen Phillips' solatium claim.

## CONCLUSION

For the reasons stated above and the analysis set forth, I set forth in the following chart the solatium damage awards that I recommend for each of the 56 Plaintiffs whose claims are addressed in this R&R. An asterisk (*) in the chart asterisk indicates that Plaintiffs requested an upward enhancement), and I indicate where my recommendation differs from Plaintiffs' request.

My recommendation is that for each Plaintiff the Court should enter final judgments for solatium damages and punitive damages as set forth below.

| Plaintiff | Victim | Relation to Victim | Date of Attack | Recommended Solatium Damages | Recommended Punitive Damages |
|---|---|---|---|---|---|
| Mary LaGarce | Cpl. Christopher Belchik | Wife | 8/22/2004 | $8,000,000.00 | $8,000,000.00 |
| Lynn Lenker | Cpl. Christopher Belchik | Mother | 8/22/2004 | $5,000,000.00 | $5,000,000.00 |
| James Lenker | Cpl. Christopher Belchik | Stepfather | 8/22/2004 | $5,000,000.00 | $5,000,000.00 |
| Brian Belchik | Cpl. Christopher Belchik | Brother | 8/22/2004 | $2,500,000.00 | $2,500,000.00 |
| Julie Prats * | Cpl. Christopher Belchik | Sister | 8/22/2004 | $3,125,000.00 | $3,125,000.00 |
| Robin K. Read | Sgt. Brandon Read | Mother | 9/6/2004 | $5,000,000.00 | $5,000,000.00 |
| Denise Godbolt | Sgt. Lee Godbolt | Mother | 3/26/2005 | $5,000,000.00 | $5,000,000.00 |
| Charley Godbolt | Sgt. Lee Godbolt | Brother | 3/26/2005 | $2,500,000.00[78] | $2,500,000.00 |
| Charles Cooper, Sr. | PFC Charles Cooper, Jr. | Father | 4/29/2005 | $5,000,000.00 | $5,000,000.00 |
| Steven Cooper | PFC Charles Cooper, Jr. | Brother | 4/29/2005 | $2,500,000.00 | $2,500,000.00 |

[78] Plaintiffs request $3,125,000.00 for his claim.

| | | | | | |
|---|---|---|---|---|---|
| Jennifer Morrison | PFC Charles Cooper, Jr. | Half-Sister | 4/29/2005 | $500,000.00 | $500,000.00 |
| Laverne Cooper | PFC Charles Cooper, Jr. | Brother | 4/29/2005 | $2,500,000.00 | $2,500,000.00 |
| David Cooper, Sr. | PFC Charles Cooper, Jr. | Brother | 4/29/2005 | $2,500,000.00[79] | $2,500,000.00 |
| Danielle Skinner | PFC Charles Cooper, Jr. | Sister | 4/29/2005 | $2,500,000.00 | $2,500,000.00 |
| Philip Klinger | LCpl. Joshua Klinger | Father | 6/14/2005 | $5,000,000.00 | $5,000,000.00 |
| Sharon Klinger | LCpl. Joshua Klinger | Mother | 6/14/2005 | $5,000,000.00 | $5,000,000.00 |
| Alison Elphick | LCpl. Joshua Klinger | Sister | 6/14/2005 | $2,500,000.00 | $2,500,000.00 |
| Seth Klinger | LCpl. Joshua Klinger | Brother | 6/14/2005 | $2,500,000.00 | $2,500,000.00 |
| Ruben Flores * | LCpl. Jonathan Flores | Father | 6/15/2005 | $6,250,000.00 | $6,250,000.00 |
| Delia Flores * | LCpl. Jonathan Flores | Mother | 6/15/2005 | $6,250,000.00 | $6,250,000.00 |
| Melony Flores | LCpl. Jonathan Flores | Sister | 6/15/2005 | $2,500,000.00 | $2,500,000.00 |
| Jason Flores | LCpl. Jonathan Flores | Brother | 6/15/2005 | $2,500,000.00 | $2,500,000.00 |
| Joshua Flores * | LCpl. Jonathan Flores | Brother | 6/15/2005 | $3,125,000.00 | $3,125,000.00 |
| Timothy Alvarez | LCpl. Jonathan Flores | Brother | 6/15/2005 | $2,500,000.00 | $2,500,000.00 |
| Rebecca Maynard | LCpl. Chad Maynard | Wife | 6/15/2005 | $8,000,000.00 | $8,000,000.00 |
| Gene Maynard * | LCpl. Chad Maynard | Father | 6/15/2005 | $6,250,000.00 | $6,250,000.00 |
| Cynthia Smith | LCpl. Chad Maynard | Mother | 6/15/2005 | $5,000,000.00 | $5,000,000.00 |

[79] Plaintiffs request $3,125,000.00 for his claim.

| | | | | | |
|---|---|---|---|---|---|
| Lisa Ware * | LCpl. Chad Maynard | Sister | 6/15/2005 | $3,125,000.00 | $3,125,000.00 |
| Jeremiah Maynard * | LCpl. Chad Maynard | Brother | 6/15/2005 | $3,125,000.00 | $3,125,000.00 |
| Jacob Maynard * | LCpl. Chad Maynard | Brother | 6/15/2005 | $3,125,000.00 | $3,125,000.00 |
| Breanne Maynard | LCpl. Chad Maynard | Sister | 6/15/2005 | $2,500,000.00[80] | $2,500,000.00 |
| Kenneth Kreuter | Sgt. David Kreuter | Father | 8/3/2005 | $5,000,000.00 | $5,000,000.00 |
| Patricia Murray | Sgt. David Kreuter | Mother | 8/3/2005 | $5,000,000.00 | $5,000,000.00 |
| Laura Kreuter | Sgt. David Kreuter | Sister | 8/3/2005 | $2,500,000.00 | $2,500,000.00 |
| George R. Draughn, Sr. | SSgt. George R. Draughn, Jr. | Father | 9/1/2005 | $5,000,000.00 | $5,000,000.00 |
| Stephanie Barfield | SSgt. George R. Draughn, Jr. | Sister | 9/1/2005 | $2,500,000.00 | $2,500,000.00 |
| Charlene Swenson | SSgt. George R. Draughn, Jr. | Sister | 9/1/2005 | $2,500,000.00 | $2,500,000.00 |
| Lessie White * | SSgt. George R. Draughn, Jr. | Sister | 9/1/2005 | $3,125,000.00 | $3,125,000.00 |
| Ulrica Ellis | SSgt. James D. Ellis | Wife | 10/2/2006 | $8,000,000.00 | $8,000,000.00 |
| Ja'Niayah Ellis | SSgt. James D. Ellis | Daughter | 10/2/2006 | $5,000,000.00 | $5,000,000.00 |
| Myrtle Booker | SSgt. Darryl Booker | Wife | 1/20/2007 | $8,000,000.00 | $8,000,000.00 |
| Derica Booker | SSgt. Darryl Booker | Daughter | 1/20/2007 | $5,000,000.00 | $5,000,000.00 |
| Maria Loney | SSgt. Darryl Booker | Mother | 1/20/2007 | $5,000,000.00 | $5,000,000.00 |
| Andre Booker | SSgt. Darryl Booker | Brother | 1/20/2007 | $2,500,000.00 | $2,500,000.00 |
| Norman Loney, Jr. | SSgt. Darryl Booker | Brother | 1/20/2007 | $2,500,000.00 | $2,500,000.00 |
| June Worbington | Cpl. Brian Chevalier | Mother | 3/14/2007 | $5,000,000.00 | $5,000,000.00 |

[80] Plaintiffs request $3,125,000.00 for her claim.

| | | | | | |
|---|---|---|---|---|---|
| Melanie Hopley | Cpl. Ryan Bishop | Wife | 4/14/2007 | $8,000,000.00 | $8,000,000.00 |
| John West | Cpl. Christopher West | Father | 2/4/2008 | $5,000,000.00 | $5,000,000.00 |
| Cameron West | Cpl. Christopher West | Sister | 2/4/2008 | $2,500,000.00 | $2,500,000.00 |
| Lauren West | Cpl. Christopher West | Sister | 2/4/2008 | $2,500,000.00 | $2,500,000.00 |
| Ronald Phillips, Sr. | SSgt. Ronald Phillips, Jr. | Father | 9/25/2008 | $5,000,000.00 | $5,000,000.00 |
| Wanda Phillips | SSgt. Ronald Phillips, Jr. | Mother | 9/25/2008 | $5,000,000.00 | $5,000,000.00 |
| Troy Phillips | SSgt. Ronald Phillips, Jr. | Brother | 9/25/2008 | $2,500,000.00 | $2,500,000.00 |
| Devrick Phillips | SSgt. Ronald Phillips, Jr. | Brother | 9/25/2008 | $2,500,000.00 | $2,500,000.00 |
| Destinee Phillips | SSgt. Ronald Phillips, Jr. | Daughter | 9/25/2008 | $5,000,000.00 | $5,000,000.00 |
| Jaalen Phillips | SSgt. Ronald Phillips, Jr. | Son | 9/25/2008 | $5,000,000.00 | $5,000,000.00 |

Dated: May 18, 2026

Respectfully submitted,

/s/Stephen A. Saltzburg
Special Master