UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

---------------------------------------------------------------------------x

RUBEN V. FLORES, *et al.*,

Plaintiffs,

-against-

ISLAMIC REPUBLIC OF IRAN, *et al.*,

Defendant.

---------------------------------------------------------------------------x

**Case No.: 22-cv-1512 (JEB)**

**SPECIAL MASTER ERIC D. GREEN'S REPORT AND RECOMMENDATION REGARDING DAMAGES FOR 48 PLAINTIFFS IDENTIFIED IN THE COURT'S ORDERS OF SEPTEMBER 24, 2025, AND JANUARY 27, 2026**

# TABLE OF CONTENTS


INTRODUCTION .......... 1

I. PROCEDURAL BACKGROUND .......... 1

II. CATEGORIES OF CLAIMS AND PROPOSED DAMAGES FRAMEWORK .......... 2

A. Solatium Damages .......... 3

B. Punitive Damages .......... 5

III. THE 48 PLAINTIFFS' INJURIES .......... 6

A. ERNESTO BLANCO – DECEMBER 28, 2003, ATTACK – QARYAT ASH-SHABIBI .......... 6

1. Gloria Caldas .......... 8

2. José Blanco-Garciá .......... 10

3. Carmen Blanco-Jimenez .......... 11

B. CHANCE PHELPS – APRIL 9, 2004, ATTACK – BABIL PROVINCE, IRAQ .......... 15

1. Gretchen Mack .......... 16

2. John Phelps .......... 18

C. DEAN PRATT – AUGUST 2, 2004, ATTACK – FALLUJAH, IRAQ .......... 20

1. Geraldine Morris .......... 21

2. John R. Morris .......... 23

3. Donald Pratt .......... 25

D. JUSTIN REPPUHN – NOVEMBER 10, 2004, ATTACK – FALLUJAH .......... 27

1. Terri Winieckie .......... 28

2. Ashley Reppuhn-Braley .......... 30

3. Adam Reppuhn .......... 32

E. WILLIAM JACOBSEN, JR. – DECEMBER 21, 2004, ATTACK – FOB MAREZ, MOSUL .......... 35

1. Riikka Jacobsen .......... 37

2. Avalon Jacobsen .......... 39

3. Leonidas Jacobsen .......... 42

4. Sedric Jacobsen .......... 43

5. William Jacobsen, III .......... 46

F. LYNN R. POULIN, SR. – DECEMBER 21, 2004, ATTACK – FOB MAREZ, MOSUL .......... 50

1. **Jeanne Poulin** .......... **51**

G. **CHARLES WELLS, JR. – MARCH 30, 2005, ATTACK – AL QAIM** .......... **53**

1. **Charles Wells, Sr.** .......... **54**
2. **Orlean Wells** .......... **57**
3. **Terry Wells** .......... **59**

H. **JONATHAN GRANT – MAY 11, 2005, ATTACK – KARABILAH** .......... **60**

1. **Eva Grant-Trujillo** .......... **62**
2. **Cynthia Grant** .......... **67**
3. **Evan Grant** .......... **69**
4. **Alma Roybal** .......... **71**
5. **Alana Salazar** .......... **74**
6. **Travis Roybal** .......... **76**
7. **Isaiah Roybal** .......... **78**
8. **Lorin Roybal** .......... **80**

I. **VEASHNA MUY – JUNE 23, 2005, ATTACK – FALLUJAH** .......... **81**

1. **Levan Muy** .......... **83**
2. **Pechrenya Hul** .......... **85**

J. **AARON H. REED – AUGUST 3, 2005, ATTACK – BARWANAH** .......... **87**

1. **Stephen Reed** .......... **88**

K. **WILLIAM BRETT WIGHTMAN – AUGUST 3, 2005, ATTACK -- BARWANAH** .......... **89**

1. **William Wightman** .......... **90**

L. **MICHAEL JOSEPH McMULLEN – DECEMBER 24, 2005, ATTACK – RAMADI** .......... **92**

1. **David McMullen** .......... **94**
2. **Jeanette Roberts** .......... **96**

M. **GEORGE ANTHONY LUTZ II – DECEMBER 29, 2005, ATTACK – FALLUJAH** .......... **99**

1. **George Lutz** .......... **101**
2. **Patricia Lutz** .......... **102**
3. **Kenneth Lutz** .......... **104**
4. **Sarah Hummel** .......... **106**
5. **Hannah Cohen** .......... **108**

6. **Rachel Lutz** .......... 110

N. **MATTHEW EDWARD BAYLIS – MAY 30, 2007, ATTACK – BAGHDAD** .......... 114

1. **Richard Baylis** .......... 115

2. **Marc Baylis** .......... 119

O. **WILLIAM JARED CROUCH – JUNE 2, 2007, ATTACK – HADID** .......... 121

1. **Kathy Rushing** .......... 122

2. **John Crouch** .......... 125

P. **JUSTIN PENROD – AUGUST 11, 2007, ATTACK – ARAB JABOUR** .......... 128

1. **Tina Tuttle** .......... 129

2. **Listia Gideon** .......... 131

Q. **CHAD GROEPPER – FEBRUARY 17, 2008, ATTACK – BAQUBAH** .......... 134

1. **Stephanie Groepper** .......... 135

2. **Clarissa Groepper** .......... 138

**CONCLUSION** .......... 140

# TABLE OF AUTHORITIES

**Cases**

*Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8 (D.D.C. 2009) ........................................... 3

*Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677 (D.D.C. Mar. 22, 2023)........................................................................................................................... 5

*Bova v. Islamic Republic of Iran*, No. 15-cv-1074 (RCL), 2020 WL 2838582 (D.D.C. May 31, 2020)................................................................................................................................ 5

*Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730 (D.D.C. July 19, 2022)................................................................................................................ 24, 66, 113

*Est. of Brown v. Islamic Republic of Iran*, 872 F. Supp. 2d 37 (D.D.C. 2012) ............................. 5

*Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006) ........................... 4

*Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20 (2009)...................................... 3, 4

*Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236 (D.D.C. 2020) ........................................ 3

*Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015)...................................... 3

*Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20 (D.D.C. 2022).......................................... 4

*Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54 (D.D.C. 2018) ........................... 24, 66, 113

*Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955 (D.D.C. Aug. 15, 2023)........................................................................................................................... 3

*Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924 (D.D.C. Dec. 27, 2023)................................................................................................................ 24, 66, 113

*Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16 (D.D.C. 2022)............................................ 4

*Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57 (D.D.C. 2015) .......................................... 3

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51 (D.D.C. 2010).................................. 4, 5

*Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16 (D.D.C. 2011) .............................. passim

*Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44 (D.D.C. 2012) ....................................... 4

*Owens v Republic of Sudan*, 71 F. Supp. 3d 252 (D.D.C. 2014) ................................................... 4

*Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859 (JEB), 2025 U.S. Dist. LEXIS 125115 (D.D.C. July 1, 2025) ......................................................................................................... 5, 6

*Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) ..................................... 4

*Roth v. Islamic Republic of Iran* 78 F. Supp. 3d 349 (D.D.C. 2015)......................................... 3, 4

*Stearns v. Islamic Republic of Iran*, Case No. 1:17-cv-131-RCL, 2022 WL 4764905 (D.D.C. Oct. 3, 2022).......................................................................................................................... 1

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010) ................................ 3, 4, 5

*Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012) .......................................... 5

**Statutes**

28 U.S.C. § 1605A(a)(2)(A)(ii)(I) ........................................................................................ passim
28 U.S.C. § 1605A(c) ......................................................................................................... passim

## INTRODUCTION

The Special Master respectfully submits his Report and Recommendations Regarding Damages as to the injuries sustained by 42 of the 510 Plaintiffs for whom the Court granted default judgment as to liability against the Defendants Islamic Republic of Iran and Syrian Arab Republic in its September 24, 2025, Order, and 6 of the 134 Plaintiffs for whom the Court granted default judgment as to liability against the Defendants Islamic Republic of Iran and Syrian Arab Republic in its January 27, 2026, Order. Where appropriate and accepted by the Special Master, this Report and Recommendation incorporates material, information, and language provided by Plaintiffs' counsel and court rulings and orders. The Special Master has carefully reviewed all of this information and in every case the Findings of Fact, Conclusions of Law, and Recommendations are those of the Special Master.

## I. PROCEDURAL BACKGROUND

On October 11, 2024, Plaintiffs filed their Motion for Default Judgment as to Liability for First Wave of Attacks, ECF No. 26, on behalf of Plaintiffs injured in 33 attacks. On November 22, 2024, Plaintiffs filed their Motion for Default Judgment as to Liability for Second Wave of Attacks, ECF No. 33, on behalf of Plaintiffs injured in an additional 39 attacks. On February 26, 2025, Plaintiffs filed their Motion for Default Judgment as to Liability for Third Wave of Attacks, ECF No. 41, on behalf of Plaintiffs injured in an additional 43 attacks. Default judgment as to liability was granted in favor of Plaintiffs on September 24, 2025, as to all 115 attacks for which default judgment had been sought. *See* Ex. 1.

On October 22, 2025, Plaintiffs moved to appoint five Special Masters—Jim Letten, Esq.; Jack McKay, Esq.; Professor Franklin D. Rosenblatt; Professor Eric D. Green, and Professor Stephen A. Saltzburg—to issue Reports and Recommendations ("R&Rs") for damages of

Plaintiffs impacted by the Court's September 24, 2025, Order. *See* ECF No. 50. The Court granted this motion on October 27, 2025. ECF No. 52. Further, the Court issued an Administrative Plan Governing Five Special Masters stating, "[w]ithin six months of receiving damages submissions for Plaintiffs' claims, each Special Master shall submit Reports and Recommendations to the Court via ECF containing findings of fact and conclusions of law regarding each item of compensatory damages." ECF No. 52-1 at 4.

On November 5, 2025, Plaintiffs filed their Motion for Default Judgment as to Liability for Fourth Wave of Attacks, ECF No. 53, on behalf of Plaintiffs injured in 37 attacks in Babil Province and Diyala Province. Default judgment as to liability was granted in favor of Plaintiffs on January 27, 2026, as to all 37 attacks for which default judgment had been sought. *See* Ex. 2.

On April 30, 2026, Plaintiffs moved the Court for a modification to the Administrative Plan Governing Five Special Masters to permit them to address damages for those Plaintiffs whose claims were addressed in the Court's January 27, 2026 Order granting default judgment as to liability for an additional 37 attacks. *See* ECF No. 62. By Minute Order, the Court granted Plaintiffs' requested modification to the Administrative Plan Governing Five Special Masters. *See* Minute Order dated May 1, 2026.

## II. CATEGORIES OF CLAIMS AND PROPOSED DAMAGES FRAMEWORK

Plaintiffs have submitted to me their Proposed Findings of Fact and Conclusions of Law requesting damages for 48 immediate-family Plaintiffs whose loved ones were killed in various attacks traceable to Iran and Syria that were part of the first four waves of attacks for which liability has been entered by the Court. All Plaintiffs are family members of U.S. military servicemen who were killed in action by the attacks in Iraq addressed in the Court's September 24, 2025, Order and

the Court's January 27, 2026, Order. This Circuit follows a damages framework under Foreign Sovereign Immunities Act ("FSIA") cases.

To recover damages against Iran and Syria, Plaintiffs "must prove that the consequences of the [defendants'] conduct were reasonably certain (i.e., more likely than not) to occur, and must prove the amount of damages by a reasonable estimate." *Gration v. Islamic Republic of Iran*, No. 21-cv-1859 (BAH), 2023 WL 5221955, at *29 (D.D.C. Aug. 15, 2023) (quoting *Roth v. Islamic Republic of Iran* 78 F. Supp. 3d 349, 402 (D.D.C. 2015)). Courts may rely on written declarations from family member claimants describing the attack's effect on him or her. *See, e.g., Moradi v. Islamic Republic of Iran*, 77 F. Supp. 3d 57, 72-73 (D.D.C. 2015).

**A. Solatium Damages**

Under the FSIA, a state sponsor of terrorism is responsible for intentional infliction of emotional distress, the resulting pain and suffering, and solatium of immediate family members of individuals killed in an attack for which a state sponsor of terrorism provided material support or resources. *See Ewan v. Islamic Republic of Iran*, 466 F. Supp. 3d 236, 245 (D.D.C. 2020); *Est. of Heiser*, 659 F. Supp. 2d at 27. In these scenarios, family members do not need to be present at the scene of the terrorist attack to recover under a theory of intentional infliction of emotional distress. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 80 (D.D.C. 2010); *Est. of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 27 (2009); *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 115 (D.D.C. 2015). Solatium damages seek to compensate family members for "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C. 2009).

Courts in this Circuit generally follow established baseline awards for solatium claims of family members of victims who died in terrorist attacks. *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 52 (D.D.C. 2007). These baseline values are based on the application of general principles of tort law. *See Roth*, 78 F. Supp. 3d at 399 (citing *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 54 (D.D.C. 2012) (holding that courts assessing damages under the FSIA "rely on well-established principles of law, such as those found in the Restatement (Second) of Torts and other leading treatises"); *Est. of Heiser*, 659 F. Supp. 2d at 24. Applying these baseline values "help[s] ensure that similarly situated victims receive comparable awards." *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 36 (D.D.C. 2022).

Under this framework, relatives of deceased servicemen are generally awarded baseline damages amounts of $8 million for spouses, $5 million for children and parents, and $2.5 million for siblings. *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 85 (D.D.C. 2010); *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 260 (D.D.C. 2006); *Owens v Republic of Sudan*, 71 F. Supp. 3d 252, 260 (D.D.C. 2014). However, these baseline awards are "not set in stone." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010).

Decisions to deviate from the baseline and award upward departures depend on various factors. See e.g. *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011) (factors such as "an especially close relationship between the plaintiff and decedent, particularly in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing"); *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 38 (D.D.C. 2022) (children who were minors when their parents died have been awarded $6.25 million); *Est. of Brown v. Islamic Republic of Iran*, 872 F.

Supp. 2d 37, 43 (D.D.C. 2012) (upward departure was warranted where sister suffered a nervous breakdown that required medical treatment, and she was prescribed medication for approximately one year); *Murphy*, 740 F. Supp. 2d at 79 (noting that self-destructive behavior is "uniquely acute suffering warranting an upward departure"). Upward enhancements to the baseline values can range from approximately 20 to 100 percent depending on the individual plaintiff's circumstances. *See Bova v. Islamic Republic of Iran*, No. 15-cv-1074 (RCL), 2020 WL 2838582, at *9 (D.D.C. May 31, 2020) (awarding 20 percent enhancement where mother suffered "precipitous emotional decline due to the death of her son" and attempted suicide); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (finding severe mental distress arising from death warranted 25 percent enhancement); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 40-41 (D.D.C. 2012) (awarding plaintiff 40 percent enhancement due to suffering from post-traumatic stress disorder, persistent grief, and depression coupled with decline in school grades and lack of motivation); *Oveissi*, 768 F. Supp. 2d at 29-30 (finding plaintiff's enduring trauma including depression, anger, and alcoholism following the victim's death warranted a 50 percent enhancement).

**B. Punitive Damages**

In addition to solatium damages, Plaintiffs also seek punitive damages which "serve to punish and deter the action which they [are] awarded." *Valore*, 700 F. Supp. 2d at 87. The terrorism exception to the FSIA specifically addresses the award of punitive damages. *See* 28 U.S.C. § 1605A(c). This Court has previously expressed a level of skepticism regarding the "actual deterrent effect of punitive damages" in *Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859 (JEB), 2025 U.S. Dist. LEXIS 125115, at *5 (D.D.C. July 1, 2025)[1]; however, this Court

[1] This case was initially filed as a related case to the *Pautsch* case.

nevertheless found, "[g]iven the reprehensibility of Defendants' actions, punishment beyond compensatory relief may aid not only to hold [Defendants] morally accountable but also to deter similar misconduct by the two nations in the future." *Id.* at *4. In *Pautsch*, this Court awarded punitive damages in an amount equal to compensatory damages. *Id.* at *6 (following other courts in this District that have awarded such requests in similar cases). Plaintiffs here request the entry of punitive damages in the same manner as was entered in the companion *Pautsch* case.

## III. THE 48 PLAINTIFFS' INJURIES

Plaintiffs describe below 15 of the attacks for which this Court found Iran and Syria liable as well as the injuries Plaintiffs sustained due to the loss of their loved ones.[2]

### A. ERNESTO BLANCO – DECEMBER 28, 2003, ATTACK – QARYAT ASH-SHABIBI

On December 28, 2003, the U.S. Army's 1st Battalion, 504th Parachute Infantry Regiment was conducting a support mission in Qaryat Ash-Shabibi near Karmah when an IED exploded near their vehicle. ECF No. 9 at ¶¶223-224; Ex. 4 (ECF No. 33-1) at 9-10. Cpt. Ernesto Blanco was killed in the attack. *Id.* According to his autopsy report, Cpt. Blanco sustained the following injuries to his head: [redacted]

[2] Claims for economic loss for the estates of those who were killed—to the extent a claim for the estate has been asserted—will be included in a distinct Findings of Fact and Conclusions of Law to be submitted at a later date.

[redacted][3] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpt. Blanco was killed on November 22, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the December 28, 2003 attack in which Cpt. Ernesto Blanco was killed. *See* Ex. 2.

Cpt. Blanco's surviving parents and sister—Gloria Caldas, Jose Blanco, and Carmen Blanco-Jimenez—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 222-229. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of Cpt. Blanco's society, companionship, comfort, advice and counsel. *Id.* ¶ 229. The following chart reflects the claims asserted by Gloria Caldas, Jose Blanco, and Carmen Blanco-Jimenez in their individual capacities arising out of the December 28, 2003, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Gloria Caldas | Cpt. Ernesto Blanco's mother | Solatium claim $5,000,000.00 | Declaration of Gloria Caldas, dated January 29, 2025, including copy of her proof of U.S. citizenship | 8 |
| José Blanco-Garciá | Cpt. Ernesto Blanco's father | Solatium claim $5,000,000.00 | Declaration of José Blanco-Garciá, dated April 16, 2026, including copy of his proof of U.S. citizenship | 9 |
| Carmen Blanco-Jimenez | Cpt. Ernesto Blanco's sister | Solatium claim $3,125,000.00 | Declaration of Carmen Blanco-Jimenez, dated January 29, 2025, | 10 |

[3] Ex. 7, Final Autopsy Report for Blanco, Ernesto Manuel, dated August 26, 2004 at 1-2.

| | | | | |
|---|---|---|---|---|
| | | | including copy of her proof of U.S. citizenship | |

**1. Gloria Caldas[4]**

Gloria Caldas is the mother of Cpt. Ernesto Blanco. *See* Ex. 8 at ¶ 3. From the moment her son was born, he brought joy to the family. *Id.* at ¶ 4. Gloria was a single mother and raised Ernesto and his sister on her own. *Id.* Their family was close-knit, and they "did everything together," describing themselves as "a team of three." *Id.* Gloria was extremely close to her son and spent every day with him. *Id.* When he attended college, she visited him every other week. *Id.* Gloria has "countless memories" of her son as their time together was filled with laughter and a strong bond. *Id.* Even ordinary household tasks were meaningful shared experiences because they enjoyed each other's company and "made the best out of any situation." *Id.* After Ernesto joined the military and was stationed at Fort Bragg, North Carolina, Gloria made frequent visits to see him. *Id.* When he was deployed to Afghanistan and Iraq, Ernesto made sure to call regularly, and his homecomings were marked by "grand family celebrations." *Id.*

Ernesto shared close bonds with his grandparents, aunts, uncles, and cousins. *Id.* at ¶ 5. His relationship with his sister, whom Gloria described as his best friend, was an example of the depth of his capacity for friendship and love. *Id.* During his college years, he found a second family in the Corps of Cadets and formed close friendships. *Id.* He enjoyed playing music, attending pool parties, and celebrating with loved ones and "was always the heart and soul of every gathering." *Id.*

[4] Gloria Caldas' United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 8, Declaration of Gloria Caldas, dated January 29, 2025.

Gloria was visiting her parents' home when she learned of her son's death. *Id.* at ¶ 6. Upon her arrival, she saw two soldiers sitting on her parents' sofa. *Id.* Her mother told her that some of Ernesto's friends were there to see her. *Id.* As one of the soldiers began to speak and told her that something terrible had happened to her son, "the world around me blurred." *Id.* She could not bear to listen and could not grasp the reality that her son was gone. *Id.* The shock was overwhelming, and all she can remember is that her doctor had to be called to manage her severe anxiety. *Id.*

Following the loss of her son, [redacted]

Before her son's death, Gloria was employed as a Senior Vice President at a bank, but after Ernesto's death, [redacted] Gloria and her daughter Carmen have been "forever changed." *Id.* at ¶ 9. In the aftermath of Ernesto's death, [redacted] Family gatherings became less frequent, with celebrations becoming rare. *Id.* Ernesto had been extremely close with his cousins, and after his death, [redacted] The family dynamic fundamentally shifted, leaving what was once a close-knit family of three "painfully reduced to two." *Id.*

Plaintiffs have requested a baseline award of $5 million for Gloria Caldas' solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**2. José Blanco-Garciá[5]**

José Blanco-García is the father of Cpt. Ernesto Blanco. *See* Ex. 9 at ¶ 3. Ernesto was "the embodiment of joy and love in our family," and "the bond that held his mother and me together." *Id.* at ¶ 4. Ernesto's birth is a profound moment that remains vivid in José's memory. *Id.* Ernesto "brought such a sparkle of joy to our lives" and was "a blessing." *Id.* The family was extremely close and shared interests in music, the arts, and literature. *Id.* at ¶ 5. During his adolescence, Ernesto developed a passion for the guitar, which further strengthened the family bond. *Id*

When Ernesto was fifteen years old, he moved to Texas with his mother and sister. *Id.* at ¶ 6. Despite extensive work-related travel, José called his son daily, visited him during vacations, and cared for him during summers spent living together. *Id.* Ernesto later attended college at Texas A&M University and developed a deep appreciation for Texas. *Id.* The two shared frequent reunions marked by memorable experiences. *Id.* Even during Ernesto's military service, their bond remained unbroken, and whenever Ernesto was not deployed, they spoke every day about their lives, dreams, and shared faith. *Id.* Father and son became Christians around the same time, which guided their conversations about life's challenges and strengthened their emotional bond. *Id.* at ¶ 7. After Ernesto's death, the loss left José [redacted] *Id.* Spending time with Ernesto "was the purest joy of my life," and Ernesto was "the first person I loved unconditionally," a source

[5] José Blanco-Garciá's United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 9, Declaration of José Blanco-Garciá, dated April 16, 2026.

of pride, and a moral example to those around him. *Id.* at ¶ 8. Rather than hoping Ernesto would emulate him, he aspired to emulate his son's character, values, and principles. *Id.*

José was at home listening to "Heart of Gold" by Neil Young when a uniformed military officer rang the doorbell. *Id.* at ¶ 9. After the officer confirmed he was Ernesto's father, he informed José that his son was deceased. *Id.* José's "world plunged into complete darkness." *Id.* The shock was so severe that his memory of the immediate aftermath does not align with his wife's recollection, and he was unable to process what transpired. *Id.*

Following his son's death, [redacted]

Plaintiffs have requested a baseline award of $5 million for José Blanco-Garciá's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

### 3. Carmen Blanco-Jimenez[6]

Carmen Blanco-Jimenez is the sister of Cpt. Ernesto Blanco. *See* Ex. 10 at ¶ 3. Ernesto was seventeen months older than Carmen, and as his younger sister, she "never knew a time without him." *Id.* at ¶ 4. Ernesto was "my universe, my built-in best friend," and they shared "an indescribable bond and did everything together from the moment I could walk." *Id.* They played

[6] Carmen Blanco-Jimenez's Puerto Rico birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 10, Declaration of Carmen Blanco-Jimenez, dated January 29, 2025.

together, confided in one another, and became dancing partners. *Id.* During their parents' tumultuous relationship and the challenging relocation from Puerto Rico to the United States amid their mother's illness, they relied heavily on one another for emotional support. *Id.* While their mother was hospitalized, they were cared for by extended family, but Carmen and Ernesto "had each other to lean on during this time." *Id.* Ernesto had a vibrant spirit and was "the life of every party" whose presence transformed family gatherings. *Id.* Ernesto would play guitar and sing, drawing people around him with his "loud, fun, and humorous" personality where there was "never a dull moment when he was around." *Id.*

As they grew up, the siblings remained inseparable, attending one another's activities and supporting each other's interests. *Id.* at ¶ 5. Carmen attended Ernesto's baseball games, and he watched her ballet classes and performances. *Id.* "We were a team, always." *Id.* Although Ernesto was one grade ahead in school, they socialized together, attended prom with friends, and navigated adolescence side by side. *Id.* Ernesto was "the heart of our family," her "wingman," and "the best friend I could ever ask for." *Id.*

Their first significant separation occurred when Ernesto left for college, and Carmen "cried for weeks." *Id.* at ¶ 6. But they spoke nightly by phone, and she visited him as often as possible. *Id.* Their close relationship endured through his military deployments, with conversations continuing whenever possible, whether he was overseas or stateside. *Id.* After Carmen gave birth to her son, Trystan, in November 2001, Ernesto spent time with him before deploying again. *Id.* Their discussions focused on family, future plans, and hopes that their children would grow up together, as well as reflections on the challenges they had already overcome and the life still ahead of them. *Id.* Ernesto's friends from college and military service became an extension of the family, and he had a remarkable ability to remain in contact regardless of distance. *Id.* at ¶ 7. When he

visited home, quiet family time often turned into large gatherings marked by music, food, and open hospitality because Ernesto was "the glue that held us all together," fostering an atmosphere of love and laughter within both family and community. *Id.*

Carmen learned of her brother's death after receiving a call from her grandfather, who informed her that two uniformed officers were present at his condominium. *Id.* at ¶ 8. She contacted her uncle, a Navy veteran, asking whether there was any explanation other than confirmation of her brother's death. *Id.* She also called her father and asked him directly whether Ernesto was dead to which he responded, "yes." *Id.* At the time, Carmen was already traveling to her grandparents' home to celebrate their anniversary, but that celebration turned to complete shock and feeling "as though I wanted to die right there with him." *Id.* "Our family was over," and this was "the moment that my whole life changed and shattered into a million pieces." *Id.* Losing Ernesto was losing a part of her soul. *Id.*

Following Ernesto's death, [redacted] *Id.*

The family previously referred to themselves as "The Three Musketeers"—Carmen, Ernestor, and their mother—but now only two remain. *Id.* at ¶ 10. [redacted] Carmen has assumed the role of caregiver for her mother, a responsibility she and Ernesto would have

shared. *Id.* Carmen has grown distant from cousins because her presence appears to remind them of the shared loss. *Id.* Carmen's children—a daughter aged seventeen and a son aged twenty-two—will never know their uncle except through "stories and photographs." *Id.* at ¶ 11. Her husband will never know the brother-in-law who could have enriched his life. *Id.* Each day she struggles to move forward knowing that "the person I shared my entire existence with is forever gone." *Id.* "The world is a sadder place without him" *Id.*

Plaintiffs have requested an upward enhancement to Carmen Blanco-Jimenez's claims based on the close nature of her relationship with her brother and [redacted]. *See Bernhardt*, 2023 WL 2598677, at *16 (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); id. (awarding Mary Heather Wise a 25 percent upward departure because she "suffered from adrenal exhaustion and now suffers from PTSD"); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Valore*, 700 F. Supp. 2d at 86 (granting upward departures when family members experienced "a general feeling of permanent loss or change caused by the decedent's absence" or received "medical treatment for depression and related affective disorders"). Plaintiffs request an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Carmen Blanco-Jimenez's solatium damages.

Plaintiffs have requested an upward enhancement for Carmen Blanco-Jimenez's solatium claim. Based on the relevant precedents, the Special Master recommends that the Court grant an

upward adjustment of 25% to Carmen to $3,125,000 on her solatium claim because of the documented [redacted] as well as for the loss of the special relationship with her only sibling.

### B. CHANCE PHELPS – APRIL 9, 2004, ATTACK – BABIL PROVINCE, IRAQ

On April 9, 2004, a command convoy was transporting Brigadier General John Kelly from Fallujah to head up a Marine force south of Baghdad when the five-vehicle convoy was ambushed in a complex attack where an IED was detonated in front of the convoy which then came under fire from three seven-man teams spraying the convoy with machine gun, AK-47, and rocket-propelled grenade fire. ECF No. 9 at ¶¶ 261-263; Ex. 6 (ECF No. 53-1) at 13-16. PFC Chance Phelps was the 240G machine gunner in the trail vehicle who was directing fire on the enemy positions when he was shot and killed by enemy fire. Ex. 6 at 15. PFC Phelps' death certificate listed his cause of death as [redacted][7] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which PFC Phelps was killed on November 5, 2025 (ECF No. 53), and on January 27, 2026, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the April 9, 2004 attack in which PFC Chance Phelps was killed. *See* Ex. 2.

PFC Phelps' surviving parents—Gretchen Mack and John Phelps—are Plaintiffs in this case. *See* ECF No. 9 at ¶¶ 260-268. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of PFC Phelps' society, companionship, comfort, advice and counsel. *Id*. ¶ 268. The following chart reflects the claims asserted by Gretchen Mack and John Phelps in their individual capacities arising out of the April 9, 2004, attack, as well as the

[7] Ex. 11, Certificate of Death (Overseas) for Phelps, Chance Russell.

evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Gretchen Mack | PFC Chance Phelps' mother | Solatium claim $5,000,000.00 | Declaration of Gretchen Mack, dated April 2, 2026, including copy of her proof of U.S. citizenship | 12 |
| John Phelps | PFC Chance Phelps' father | Solatium claim $5,000,000.00 | Declaration of John Phelps, dated April 2, 2026, including copy of his proof of U.S. citizenship | 13 |

### 1. Gretchen Mack[8]

Gretchen Mack is the mother of PFC Chance Phelps, her only son, with whom she shared an exceptionally close and enduring bond. Ex. 12 at ¶¶ 3-4.. Chance was not only her child, but also a beloved stepson to Jeff Mack, a devoted brother to Kelley, and a cherished grandson to John and Margaret Gingrich. *Id.* at ¶ 4. From an early age, Chance demonstrated warmth, humor, and an uncommon ability to connect with others, qualities that defined his relationships both within his family and beyond it. *Id.* at ¶¶ 4–5. He loved the outdoors and athletics, including football and baseball, and was known for his generosity of spirit and desire to help others. *Id.* at ¶ 4. After September 11, 2001, Chance enlisted in the United States Marine Corps where he earned the deep respect of his fellow Marines who regarded him as "the glue of their platoon," and whose lives he saved during his deployment. *Id.* Those Marines remain close friends of the family today. *Id.*

[8] Gretchen Mack's Nebraska Birth Certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 12, Declaration of Gretchen Mack, dated April 2, 2026.

From the time of Chance's birth, Gretchen describes her family as "incredibly close-knit" with family life centered on shared experiences—summers spent at the lake or on friends' ranches, school-year rituals involving sporting events, and holidays that were always celebrated together. *Id.* at ¶ 5. Gretchen was a constant presence in Chance's life through every stage of his development, maintaining daily communication with him even after both he and his sister entered military service. *Id.* Living with Chance, watching him grow, and sharing in his aspirations reinforced a mother-son relationship that she describes as "deep" and "unbreakable." *Id.* Family activities—hiking, fishing, camping, waterskiing, and hunting trips with Chance's father and stepfather—were central to their shared life and to Chance's role as a unifying presence. *Id.*

Gretchen recalls with exacting clarity the night she learned of Chance's death when Marine Corps Casualty Officers arrived at her home at approximately 2:00 a.m. to inform her that Chance had been killed in Iraq. *Id.* at ¶ 6. That moment "shattered our world," marking the instant Gretchen realized she would never again see his smile or hear his laughter. *Id.* In the immediate aftermath, Gretchen and her family were forced to notify grandparents and Chance's sister, extending the wave of grief through the family. *Id.*

Following Chance's death, [redacted]

The impact of Chance's death irreversibly altered the structure and functioning of her family. *Id.* at ¶ 8. They experienced enduring relationship dysfunction and a significant

deterioration in the family's overall well-being and quality of life. *Id.* [redacted] The absence Chance left is a constant presence that continues to influence family dynamics, individual mental health, and outlook on life in ways that are both visible and difficult to articulate. *Id.* at ¶ 9.

Plaintiffs have requested a baseline award of $5 million for Gretchen Mack's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**2. John Phelps**[9]

John Phelps is the father of Chance Phelps. Ex. 13 at ¶ 3. Chance was a central source of joy and pride in his family's life. *Id.* at ¶ 4. John's relationship with Chance was a close and enduring father-son bond marked by shared experiences, mutual respect, and deep affection. *Id.* They spent significant time together engaged in outdoor activities such as hunting and fishing. *Id.* Chance was athletic and participated in wrestling and football during high school. *Id.* He was known for his sense of humor, his willingness to take on summer jobs, and his diligence in performing household responsibilities. *Id.* At the time of his death, Chance had been expected to serve as the best man at his sister's wedding, a role he was unable to fulfill due to his untimely death. *Id.*

Inspired by the events of September 11, 2001, Chance joined the United States Marine Corps motivated by courage and patriotism. *Id.* Chance was held in high esteem by his fellow

[9] John Phelps' Wyoming birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 13, Declaration of John Phelps, dated April 2, 2026.

Marines, many of whom have remained in contact with the family. *Id.* Chance's service and death have been memorialized publicly, including through the HBO film *Taking Chance*, which depicts the escort of his remains back to Dubois, Wyoming, and through the dedication of a chow hall at Marine Corps Air Ground Combat Center Twentynine Palms in his name. *Id.*

Throughout his life, Chance maintained strong and meaningful relationships with his family members. *Id.* at ¶ 5. While Chance lived with his mother and stepfather in Colorado, he sustained a bond with John rooted in love and understanding. *Id.* Chance shared a close relationship with his sister, Kelley, whom he admired, and he held respect for his future brother-in-law, Rob. *Id.*

John learned of Chance's death when Marines arrived at his home at approximately 5:00 a.m. to inform him of Chance's death. *Id.* at ¶ 6. This event permanently altered the course of his life. *Id.*

Since Chance's death, John experiences a persistent sense of absence marked by the loss of future milestones Chance will never reach and descendants who will never be born. *Id.* at ¶ 7. Chance was the last male to carry on the family name, and his death marked the end of that lineage. *Id.* Despite the depth of this loss, the family continues to strive to honor Chance's sacrifice while carrying the weight of his absence each day. *Id.* Each Memorial Day, the family gathers at Chance's gravesite, a tradition that serves as an act of remembrance and a solemn acknowledgment of the personal cost the family has borne. *Id.* at ¶ 8. Chance's death reshaped family dynamics, including a closer relationship between John, Chance's mother, and her husband. *Id.* at ¶ 9. He describes this closeness as a bond forged through shared loss and continuing sorrow. *Id.* Although Chance is no longer present, John states that his memory continues to unite the family. *Id.*

Plaintiffs have requested a baseline award of $5 million for John Phelps' solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

### C. DEAN PRATT – AUGUST 2, 2004, ATTACK – FALLUJAH, IRAQ

On August 2, 2004, Echo Company, 2d Battalion, 1st Marines was engaged in an operation immediately north of Fallujah when their position was struck with mortar fire resulting in the death of Cpl. Dean Pratt. ECF No. 9 at ¶ 353; Ex. 3 at 42-43. Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpl. Pratt was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the August 2, 2004 attack in which Cpl. Dean Pratt was killed. *See* Ex. 1.

Cpl. Pratt's mother, stepfather, and brother—Geraldine Morris, John R. Morris, and Donald Pratt—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 352-358. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Cpl. Pratt's society, companionship, comfort, advice, and counsel. *Id*. at ¶ 358. The following chart reflects the claims asserted by Geraldine Morris, John R. Morris, and Donald Pratt in their individual capacities arising out of the August 2, 2004, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Geraldine Morris | Cpl. Dean Pratt's mother | Solatium claim $5,000,000.00 | Declaration of Geraldine Morris, dated April 10, 2026, including copy of her proof of U.S. citizenship | 14 |

| | | | | |
|---|---|---|---|---|
| John R. Morris | Cpl. Dean Pratt's stepfather | Solatium claim $5,000,000.00 | Declaration of John R. Morris, dated April 2, 2026, including copy of his proof of U.S. citizenship | 15 |
| Donald Pratt | Cpl. Dean Pratt's brother | Solatium claim $2,500,000.00 | Declaration of Donald Pratt, dated April 2, 2026, including copy of his proof of U.S. citizenship | 16 |

### 1. Geraldine Morris[10]

Geraldine Morris is the mother of Dean Pratt. Ex. 14 at ¶ 3. Geraldine shared an exceptionally close relationship with her son. *Id.* at ¶ 4. "Dean was not just my son; he was the light of our family." *Id.* Their relationship was "truly wonderful, the kind you dreamed of having with your son." *Id.* Their family was "very close knit" and spent significant time together. *Id.* Geraldine's most cherished memories with Dean arose from ordinary, everyday moments. *Id.* Dean "had this incredible ability to turn mundane activities into cherished memories," and living with him "was a blessing, as his presence in our home was a constant source of happiness and comfort." *Id.*

Throughout Dean's life, Geraldine and her son spent "every possible moment together," engaging in fishing, camping, and hiking, and attending baseball and football games together. *Id.* at ¶ 5. These activities formed the foundation of their bond. *Id.* As Dean grew older and lived farther from home, they remained in frequent contact by phone, making use of every opportunity to stay connected. *Id.* Dean also maintained a wide circle of friends and relatives who cherished

[10] Geraldine Morris' United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 14, Declaration of Geraldine Morris, dated April 10, 2026.

him. *Id.* at ¶ 6. Among these relationships was a lifelong friendship with Tom Parker, which she describes as emblematic of Dean's loyalty and ability to form enduring personal bonds. *Id.* Dean also shared close relationships with his grandparents and uncles, nurtured through regular visits, shared meals, and frequent family gatherings. *Id.* Dean had an ability to "light up a room and bring laughter to any occasion" making him "the heart of our family." *Id.*

Geraldine learned of Dean's death from the Marine Corps, traveling from Anchorage, Alaska, to her home in North Pole, Alaska. *Id.* at ¶ 7. Upon receiving the news, "it felt as though my heart, along with those of our entire family, was ripped out." *Id.* In the days that followed, Geraldine and other family members bore the responsibility of notifying relatives of Dean's death through a series of "tearful phone calls," each serving as a painful confirmation of the loss they were facing. *Id.* at ¶¶ 7–8.

The impact of Dean's death has been lasting and profound. His loss has "left an indelible mark on our family and friends," significantly affecting their overall well-being and quality of life. *Id.* at ¶ 8. His absence is felt daily and has fundamentally altered the routines and joy of everyday living. *Id.* While the family has drawn closer together in the aftermath of this loss, that closeness has emerged from shared grief and the effort to support one another through enduring sorrow. *Id.*

Plaintiffs have requested a baseline award of $5 million for Geraldine Morris' solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

### 2. John R. Morris[11]

John R. Morris is the stepfather of Dean Pratt. *See* Ex. 15 at ¶ 3. John first met Dean when Dean was two years old and raised him until Dean decided to serve in the United States military. *Id.* at ¶ 4. John's relationship with Dean deepened when he married Dean's mother when Dean was eleven years old, and they became more than family; they became companions in shared activities and experiences. *Id.* John and Dean spent extensive time together as a family hiking, fishing, horseback riding, shooting, and playing baseball. *Id.* One particularly vivid memory involved a three-mile hike to a mountain lake to fish for Grayling. *Id.* During a rest stop, Dean sat on a fallen tree that unexpectedly flung him backward, causing him to tumble "ass over tea kettle" demonstrating Dean's good-natured spirit. *Id.* Dean's personality and strong bond with his family made him irreplaceable in John's life. *Id.* Although John worked full time while Dean was growing up, he deeply valued the time they spent together. *Id.* at ¶ 5. Evenings, weekends, summers, and winters were devoted to shared activities, including ice fishing during snowy winters and camping and boating in the summers. *Id.*

Dean often referred to his friends as his "partners in crime" and regularly brought them to the family home, sharing laughter and companionship. *Id.* at ¶ 6. Despite his wide circle of friends, Dean reserved his deepest affection for his family. *Id.* He shared a particularly close bond with his uncles and his brother, taking joy in their company and valuing time spent together. *Id.*

John learned of Dean's death while he was at work. *Id.* at ¶ 7. His wife called to deliver the news. *Id.* John experienced overwhelming shock and pain and was unable to comprehend how such a loss could have occurred. *Id.*

---

[11] John R. Morris' United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 15, Declaration of John R. Morris, dated April 2, 2026.

Dean's death profoundly affected the entire family. *Id.* at ¶ 8. [redacted] Although relationships with other family members remain strong, Dean's brother, DJ, has been visiting more often, which has provided some measure of comfort. *Id.* Nevertheless, John describes the loss of his child as a pain that defies words and weighs on him every single day. *Id.* at ¶ 9. A parent should never have to bury a child, and doing so feels unnatural, an inversion of life's expected order. *Id.*

While John R Morris is not Dean's biological father, the class of plaintiffs who may recover solatium damages "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members" despite not being legally or biologically related to the victim. *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730, at *42 (D.D.C. July 19, 2022). To establish this "functional equivalence" of a close family member, plaintiffs must show that they were "treated like" a victim's spouse, child, parent, or sibling. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (finding that stepsiblings recover functionally equivalent to siblings when they were "treated like" a brother or sister); *Oveissi* 768 F. Supp. 2d at 27 (holding that interactions between a stepparent and child "were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924, at *7 (D.D.C. Dec. 27, 2023) (finding a stepparent to be a functional equivalent of a parent notwithstanding an ongoing relationship between the victim and their biological parent because of the supplementary role played by the stepparent in the parental role).

Here, based on his declaration and the facts set forth above, Plaintiffs submit that John R. Morris qualifies under the law as the functional equivalent of Cpl. Dean Pratt's father based on the

fact that he was "treated like" Cpl. Pratt's father, and his evident loss and grief resembles that of a biological father.

Plaintiffs have requested a baseline award of $5 million for John R. Morris' solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

### 3. Donald Pratt[12]

Donald Pratt is the brother of Dean Pratt. *See* Ex. 16 at ¶ 3. From childhood through adulthood, Donald and Dean shared an unusually close sibling relationship marked by constant companionship and mutual reliance. *Id.* at ¶¶ 4–5. They grew up together in a small town in Montana, spending nearly every day together, sharing sports, friends, and significant life experiences. *Id.* at ¶ 5. Donald described his brother as "a remarkable person, defined by his resilience and dedication," and explained that their bond had "a depth that only siblings can truly understand." *Id.* at ¶ 4. A defining event in Dean's youth profoundly shaped both brothers: at age sixteen, Dean underwent a bone marrow transfusion and survived. *Id.* Donald witnessed his brother's struggle and recovery, describing the experience as "a testament to his strength and will to survive." *Id.* Dean's recovery was not merely physical; according to Donald, Dean treated his survival as a second chance at life, graduating from high school and later committing himself to military service. *Id.* Donald viewed this path as reflective of Dean's character and sense of duty. *Id.*

Even during Dean's deployment to Iraq, the brothers remained closely connected. *Id.* at ¶ 5. "Every call he made home was a cherished moment, discussing his future, his niece, and the

[12] Donald Pratt's United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 16, Declaration of Donald Pratt, dated April 2, 2026.

myriad activities we planned once he was out of the corps." *Id.* When Dean was able to return home on leave, he reintegrated fully into family life, spending time with Donald, their family, and friends, going out socially and reconnecting with the people and places that anchored him. *Id*. Donald attested that Dean's lifelong friendship with Tom Parker was "nothing short of exceptional" and emblematic of Dean's ability to form meaningful and enduring bonds. *Id*. at ¶ 6. "His love for the outdoors brought us countless camping trips and exhilarating rides on 4-wheelers, which were not just adventures but the threads that wove our family closer." *Id.*

Donald learned of Dean's death when two Marines arrived at his wife's workplace looking for him. *Id*. at ¶ 7. His wife called him saying the Marines needed to speak with him, and he was informed that Dean had been killed the day before. *Id.* The timing compounded the trauma: it was Donald's birthday. *Id*. Rather than celebration, the day became permanently associated with grief. *Id*. After learning of Dean's death, Donald directed the Marines to North Pole, Alaska, where his mother was located, and chose to personally deliver the news to her after arranging for his father to be present for support. *Id*.

Dean's death has had a profound and lasting impact on the Pratt family. *Id.* at ¶ 8. [redacted] For more than twenty years, holidays have been transformed from celebrations into reminders of absence. *Id*. Family milestones, particularly those involving Dean's niece, are marked by the awareness that Dean is not present to share them. *Id*. While the family has relied on one another to cope, the loss continues to shape their collective experience. *Id*. Each birthday remains overshadowed by the memory of learning of Dean's death, and Donald's daughter "lost her chance to know one of the earth's finest souls." *Id*.

Plaintiffs have requested a baseline award of $2.5 million for Donald Pratt's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

### D. JUSTIN REPPUHN – NOVEMBER 10, 2004, ATTACK – FALLUJAH

LCpl. Justin Reppuhn was driving a seven-ton truck on MSR Michigan in the Shark's Fin area near two bridges over the Euphrates River that led to downtown Fallujah when the vehicle rammed into a berm that had been placed over the roadway with an IED hidden inside. Ex. 3 at 49-50. The truck fall off an embankment after which it came under small-arms fire. *Id.* In one account of the attack, it was reported that "the truck driver, Lance Corporal Justin Reppuhn, had been killed when the truck rolled over, but everyone else survived the crash with only a few minor injuries."[13] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Reppuhn was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the November 10, 2004 attack in which LCpl. Justin Reppuhn was killed. *See* Ex. 1.

LCpl. Reppuhn's surviving mother and siblings—Terri Winieckie, Ashley Reppuhn-Braley, and Adam Reppuhn—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 526-532. Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of LCpl. Reppuhn's society, companionship, comfort, advice and counsel. *Id.* ¶ 532. The following chart reflects the claims asserted by Terri Winieckie, Ashley Reppuhn-Braley, and Adam Reppuhn in their individual capacities arising out of the November 10, 2004, attack, as well as the evidence

[13] Ex. 17, Excerpt of Richard S. Lowry, *New Dawn: The Battles for Fallujah* (Savas Beatie 2010).

setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Terri Winieckie | LCpl. Justin Reppuhn's mother | Solatium claim $5,000,000.00 | Declaration of Terri Winieckie, dated April 16, 2026, including copy of her proof of U.S. citizenship | 18 |
| Ashley Reppuhn-Braley | LCpl. Justin Reppuhn's sister | Solatium claim $2,500,000.00 | Declaration of Ashley Reppuhn-Braley, dated April 3, 2026, including copy of her proof of U.S. citizenship | 19 |
| Adam Reppuhn | LCpl. Justin Reppuhn's brother | Solatium claim $3,125,000.00 | Declaration of Adam Reppuhn, dated February 27, 2026, including copy of his proof of U.S. citizenship | 20 |

**1. Terri Winieckie**[14]

Terri Winieckie is the mother of Justin Reppuhn. *See* Ex. 18 at ¶ 3. From the time of his birth, Terri and Justin ("JD") shared what she describes as "a special bond that only grew stronger with time." *Id.* at ¶ 4. JD "had a way of making every day brighter," and his "laughter and joy was infectious, making every moment spent together memorable." *Id.* During JD's childhood, Terri devoted herself to raising her children as she did not work outside the home. *Id.* at ¶ 5. This allowed her to provide constant care and attention and contributed to the formation of what she describes as an "unbreakable bond" with JD. *Id.* As he grew older, their relationship evolved into one marked

[14] Terri Winiecke's Michigan birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 18, Declaration of Terri Winiecke, dated April 16, 2026.

by openness and trust, where they could discuss "anything and everything," allowing him to share his thoughts, dreams, and fears without judgment. *Id.* Within the family, JD acted as a unifying presence, bringing people together through sports, shared activities, and family gatherings. *Id.* at ¶ 6. He shared a particularly close bond with his brother. *Id.* Outside the home, his friends and Marine family consistently described him as loyal, courageous, and warm. *Id.* These relationships were formed through shared experiences, mutual support, and enduring friendship. *Id.*

Terri vividly recalls learning of her son's death as she was standing by the living room window when a car approached her home. *Id.* at ¶ 7. She briefly hoped it was JD returning to surprise her, but that hope was shattered when Marines exited the vehicle. *Id.* She collapsed to her knees, overwhelmed by grief, and describes that moment as the instant her world fell apart. *Id.* Telling her family was marked by intense anguish. *Id.* At the time, her youngest son was asleep in JD's bed, and her husband learned of the tragedy when he heard her scream. *Id.* Her daughter was not present and learned of her brother's death later upon returning home. *Id.*

After JD's death, [redacted]

[redacted]

Plaintiffs have requested an award of $5 million for Terri Winieckie's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**2. Ashley Reppuhn-Braley[15]**

Ashley Reppuhn-Braley is the sister of Justin Reppuhn. *See* Ex. 19 at ¶ 3. Growing up in a family of five, they were inseparable and shared daily life together, including childhood milestones, holidays, and routines *Id.* at ¶¶ 4–5. They attended birthdays and church holidays together, played together at home and outdoors, walked to the school bus together, and spent extended time with one another in recreational and family activities. *Id.* Justin "was always there and understood all of the feelings that I was going through." *Id.* at ¶ 5. As teenagers, the siblings continued to spend extensive time together as their family built a home in Hemlock, Michigan, sharing everyday experiences, neighborhood friendships, and family traditions. *Id.* at ¶ 6. After both obtained driver's licenses, they spent hours together driving and listening to music, and Ashley attended Justin's high school football games, describing herself as "his most important person there cheering him on." *Id.* She was proud of Justin when he graduated from high school and later learned of his decision to enlist in the United States Marine Corps. *Id.*

Ashley and her family accompanied him when he departed for Marine Corps boot camp, writing him letters throughout his training. *Id.* at ¶ 7. She attended his graduation from boot camp, describing the emotional reunion and her observation that Justin cried upon seeing his family and

[15] Ashley Reppuhn-Braley's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 19, Declaration of Ashely Reppuhn-Braley, dated April 3, 2026.

knowing "we were so proud of him." *Id.* After his graduation, the family celebrated together, capturing what would become their last photograph as a family of five. *Id.* The last conversation Ashley had with her brother occurred during a late-night phone call while he was deployed when he told her, "It's not good here—If anything happens to me, please take care of mom." *Id.* at ¶ 9. She later learned that Justin was killed when the vehicle he was driving struck an IED-filled berm, killing him instantly. *Id.* at ¶¶ 12, 18. Learning about her brother's death "was the most traumatic experience of my life." *Id.* at ¶ 12. When Justin's body was returned at the same airport where they had dropped him off to be deployed, "it was bone chilling." *Id.* at ¶ 17.

[redacted]

Plaintiffs have requested an award of $2.5 million for Ashley Reppuhn-Braley's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**3. Adam Reppuhn**[16]

Adam Reppuhn is the brother of Justin Reppuhn. *See* Ex. 20 at ¶ 3. He and his brother shared what he described as "an unbreakable bond," having been inseparable from early childhood and spending nearly all of their time together growing up. *Id.* at ¶ 4. Their relationship was built through constant shared activity, including bonfires, clearing trails in the woods for four-wheelers, hunting and fishing trips, and competitive sports, where their "friendly rivalry brought out the best in us." *Id.* Justin was "a mentor and a friend," someone who pushed Adam to excel and with whom every challenge was faced together. *Id.* Adam recounts playing ice hockey with his brother on Wardine Pond, without skates, and feeling "like the most important person in the world" when Justin passed him the puck. *Id.* He also recalls an incident where Justin accidentally kicked a beer bottle resulting in a broken glass injury to Adam's hand that they wrapped with duct tape to avoid attracting the attention of law enforcement—an anecdote that, in Adam's words, reflects "the essence of who JD was – a remarkable brother, a constant companion, and the best friend I could ever ask for." *Id.*

As they grew older, the two continued to spend nearly all of their time together, sharing a love of loud music, working on cars, installing stereo systems, attending parties, and even working together. *Id.* at ¶ 5. Living with his brother was like living with "a constant companion who knew me better than I knew myself." *Id.* From approximately 2002 to 2004 after Justin joined the

[16] Adam Reppuhn's Louisiana birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 20, Declaration of Adam Reppuhn, dated February 27, 2026.

military, communication was reduced to "rare and brief phone calls," constrained by the conditions of Justin's service. *Id.* Despite those limitations, the brothers continued to use every opportunity to share life events and discuss future plans and goals, and "our bond remained constant" notwithstanding the physical separation. *Id.*

Justin was the emotional center of both the family and the larger community. *Id.* at ¶ 7. His "magnetic personality" made him "the heart of our family," and he had an unusual ability to connect people across social circles, such that "everyone called JD to see what was going on." *Id.* His absence left Adam without direction at a formative period of his life, particularly while still in high school. *Id.*

Adam learned of his brother's death when two Marines arrived unannounced at his home—an experience he described as a realization of "my worst nightmares." *Id.* at ¶ 9. The news that Justin had been killed "shattered the world as I knew it," leading Adam to seek comfort first from his grieving family and then from a high school teacher in an effort to process the loss. *Id.* The news spread quickly through the small town of Hemlock, a community that had "lost not just a resident but a hero." *Id.* Adam participated in notifying others, including a local news outlet, as a means of honoring Justin's memory and acknowledging that he would never return home. *Id.*

Following Justin's death, [redacted]

Adam was eighteen years old at the time of his brother's death, and the emotional shock eclipsed any immediate awareness of financial or practical consequences. *Id.* at ¶ 11. He describes waking each day to the realization that Justin would never come home as a life-altering condition that overshadowed all other concerns. *Id.* Justin's death also fundamentally altered family dynamics. *Id.* at ¶ 12. [redacted] Adam visits Justin's gravesite at Roselawn, where he listens to music or takes shots of Jack Daniel's in an attempt to feel close to him again. *Id.* Justin was "the glue that held us together, and without him, we've been left to navigate a world that feels incomplete." *Id.*

Plaintiffs have requested an upward enhancement of Adam Reppuhn's claims based on his [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). Plaintiffs request an enhancement of 25%

of his baseline award resulting in an award of $3.125 million for Adam Reppuhn's solatium claim. While no amount of money is sufficient to compensate a survivor for the loss of a sibling like Justin, the Special Master concludes based on the precedents in comparable cases that the base amount of $2,500,000 should be adjusted upward by 25% because of the demonstrated extreme impact on his brother Adam, including evidence of [redacted] and recommends an award of $3.125 million to the Court.

**E. WILLIAM JACOBSEN, JR. – DECEMBER 21, 2004, ATTACK – FOB MAREZ, MOSUL**

Forward Operating Base Marez was located on the outskirts of Mosul, Iraq, and on December 21, 2004, the dining hall on the base was the site of the deadliest single attack on U.S. troops since the invasion of Iraq had begun. Ex. 3 at 67. A suicide bomber dispatched by Ansar al Sunna—an organization closely affiliated with Al-Qaeda in Iraq—detonated himself in the dining hall killing 22 people (14 U.S. soldiers) including Cpt. William Jacobsen, Jr. from Alpha Company, 1st Battalion, 24th Infantry Regiment. *Id.*; *see also* ECF No. 9 at ¶¶ 708, 713, 718, 728, 733, 740, 747, 752. Cpt. Jacobsen's death certificate listed his cause of death as [redacted][17] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpt. Jacobsen was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the December 21, 2004 attack in which Cpt. William Jacobsen, Jr. was killed. *See* Ex. 1.

Cpt. Jacobsen's surviving wife and children—Riikka Jacobsen, Avalon Jacobsen, Leonidas Jacobsen, Sedric Jacobsen, and William Jacobsen, III—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 717-726. Plaintiffs have suffered severe mental anguish, extreme emotional pain and

[17] Ex. 21, Certificate of Death (Overseas) for Jacobsen, Jr., William W.

suffering, and loss of Cpt. Jacobsen's society, companionship, comfort, advice and counsel. *Id.* ¶ 726. The following chart reflects the claims asserted by Riikka Jacobsen, Avalon Jacobsen, Leonidas Jacobsen, Sedric Jacobsen, and William Jacobsen, III in their individual capacities arising out of the December 21, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Riikka Jacobsen | Cpt. William Jacobsen, Jr.'s wife | Solatium claim $8,000,000.00 | Declaration of Riikka Jacobsen, dated March 31, 2025, including copy of her proof of U.S. citizenship | 22 |
| Avalon Jacobsen | Cpt. William Jacobsen, Jr.'s daughter | Solatium claim $5,000,000.00 | Declaration of Avalon Jacobsen, dated November 4, 2025, including copy of her proof of U.S. citizenship | 23 |
| Leonidas Jacobsen | Cpt. William Jacobsen, Jr.'s son | Solatium claim $5,000,000.00 | Declaration of Leonidas Jacobsen, dated April 10, 2026, including copy of his proof of U.S. citizenship | 24 |
| Sedric Jacobsen | Cpt. William Jacobsen, Jr.'s son | Solatium claim $5,000,000.00 | Declaration of Sedric Jacobsen, dated March 31, 2025, including copy of his proof of U.S. citizenship | 25 |
| William Jacobsen, III | Cpt. William Jacobsen, Jr.'s son | Solatium claim $6,250,000.00 | Declaration of William Jacobsen, III, dated April 14, 2026, including copy of his proof of U.S. citizenship | 26 |

### 1. Riikka Jacobsen[18]

Riikka Jacobsen is the wife of William Jacobsen, Jr. *See* Ex. 22 at ¶ 3. Riikka met William during missionary work in Dallas, Texas, in 1993. *Id.* at ¶ 4. Their journey together as husband and wife began in December 1995 in Salt Lake City, and they were married for nine years before his death, during which time they had four children. *Id.* Their family shared a love of outdoor activities, particularly exploring the woods of Kentucky. *Id.* After putting their children to bed, they spent time together enjoying each other's company, watching movies, and sharing ice cream. *Id.* They were "best friends and partners in every sense." *Id.* They shared interests such as reading, fitness, and CrossFit, and had plans to run a marathon together—a goal Riikka later completed in William's honor after his death. *Id.* Their relationship was deeply intertwined with raising young children and navigating the demands of parenthood together. *Id.* at ¶ 5. They spent time working out, watching movies, competitively playing Pac Man, and talking about their future, their faith, and ordinary aspects of daily life. *Id.*

Despite frequent separations resulting from military service, William maintained close relationships with his family, particularly his father. *Id.* at ¶ 6. Weekly Sunday phone calls between father and son were a regular and meaningful part of his life. *Id.* Holidays spent together, though infrequent, were highly valued and marked by shared meals, laughter, and time spent playing board games. *Id.*

Riikka learned of her husband's death through a late-night visit from a Captain and a Chaplain to her home in Lacey, Washington, while her children were asleep. *Id.* at ¶ 7. She experienced an immediate sense of disbelief and a hope that "they had the wrong house, the wrong

[18] Riikka Jacobsen's United States passport and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 22, Declaration of Riikka Jacobsen, dated March 31, 2025.

person," particularly because she had spoken with her husband the night before. *Id.* After receiving the news, she sat on the edge of the couch rocking back and forth, attempting to cope with the shock and grief. *Id.* That day was "unequivocally, the worst day of my life." *Id.* The following morning, she informed her children and relied on her sister, who was visiting at the time, to help notify extended family when she was unable to do so herself. *Id.*

Following William's death, [redacted]

[redacted] Parenting alone has presented ongoing difficulties, and family relationships have been strained, including [redacted] Looking ahead, she knows her adult children and her grandson will live without William's presence. *Id.* at ¶ 11. She observes the military careers of her husband's peers and reflects on what he might have achieved had he lived. *Id.* Riikka's

children's ongoing need for their father, "a role I cannot fully embody," underscores the enduring and irreversible impact of his death. *Id.*

Plaintiffs have requested an award of $8 million for Riikka Jacobsen's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**2. Avalon Jacobsen[19]**

Avalon Jacobsen is the daughter of William Jacobsen, Jr. *See* Ex. 23 at ¶ 3. Avalon was only two years old when her father was killed, and because of her young age at the time of his death, she has no independent memories of her father. *Id.* at ¶ 4. Nevertheless, she has learned through family stories and keepsakes that she was very close to him and "very much a daddy's girl." *Id.* Among the most meaningful items she has retained is a video message in which her father expressed excitement to hear her voice. *Id.* She also treasures a photograph showing her "perched high on his shoulders during a hike." *Id.* Although she lived with him for only two years, she was "enveloped in his love," a foundation she continues to feel deeply despite her inability to remember it firsthand. *Id.* Throughout her life, Avalon's understanding of her father has been shaped by the accounts of those who knew him and by the loss she has experienced growing up without him. *Id.* at ¶ 5. According to these stories, her father was a constant presence in the family's life, and they were described as inseparable, with time together marked by care, laughter, and devotion. *Id.* He was not only a parent but also "my protector, my guide, and the person who cherished our family above all else." *Id.* His absence has been deeply felt during significant life milestones she has experienced without him, including her graduation, her hopes for marriage, thoughts of having

[19] Avalon Jacobsen's Kentucky birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 23, Declaration of Avalon Jacobsen, dated November 4, 2025.

children of her own, and ordinary moments throughout her childhood in which his presence "would have meant the world." *Id.*

Avalon has also grown up witnessing the profound effect of her father's death on the rest of her family. *Id.* at ¶ 6. She recalls the visible grief and lasting pain experienced by her mother and older brothers. *Id.* It was clear he was the "cornerstone" of the family, and his death left "a void impossible to fill." *Id.* She describes him as a man of deep faith who devoted his nonworking time to his children and to maintaining close relationships with his siblings, prioritizing family through playful interaction with his children and meaningful conversations with his brother and sisters. *Id.*

The circumstances surrounding her father's death were communicated to Avalon through family accounts rather than personal recollection. *Id.* at ¶ 7. Military officers delivered the news by knocking on her mother's door, a moment witnessed by her aunt. *Id.* Her aunt later recounted how she supported Avalon's mother and informed the rest of the family of the loss. *Id.* Although she cannot remember the event itself, the lack of memory does not diminish the impact of her father's death. *Id.*

Since her father's death, Avalon's life has been marked by grief and an ongoing struggle to cope with the absence of someone she never truly had the opportunity to know. *Id.* at ¶ 8. [redacted] William's absence has been especially painful during major moments in her life, including graduation, the birth of her nephew, moving into her first apartment, and other experiences in which she missed his guidance and presence. *Id.* Growing up without any memories of her father is one of the most difficult aspects of her life. *Id.*

Avalon's emotional loss has also been intertwined with financial hardship experienced by her family. *Id.* After her father's death, [redacted]

From a financial perspective, while the family received life insurance proceeds, her mother was required to use most of those funds over time to meet the demands of raising children as a single parent. *Id.* at ¶ 10. Her mother was also forced to leave college to care for the family, a decision that had lasting consequences for their financial stability. *Id.* As a result, her mother continues to face financial difficulties and struggles to make ends meet. *Id.*

Growing up without a father affected Avalon's daily life and sense of belonging. *Id.* at ¶ 11. She felt "conspicuously different" during childhood experiences such as school Father's Day activities and "daddy-daughter dances." *Id.* She has had to navigate major life milestones without the guidance typically provided by a parent, including practical matters such as learning how to do taxes and applying for college. *Id.* [redacted] Avalon recognizes that her future wedding day will be a painful reminder of her loss. *Id.* at ¶ 12.

Plaintiffs have requested an award of $5 million for Avalon Jacobsen's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**3. Leonidas Jacobsen[20]**

Leonidas Jacobsen is the son of William Jacobsen, Jr. *See* Ex. 24 at ¶ 3. Leonidas was five years old when his father was killed. *Id.* at ¶ 4. He explains that "what losing my Dad when I was just five years old was like is hard [to] articulate," noting that while his memories of his father feel distant, they "profoundly shape who I am today." *Id.* He recalls playing outside with his father and engaging in games while also describing difficulty accessing detailed memories causing a sense of loss over the fact that he does not remember more. *Id.* The most vivid memory he identifies is the last time he saw his father in person, when his father walked away toward the buses that would take him to the airport and ultimately to Iraq. *Id.* At that moment, he recalls being "engulfed by a wish for him to turn back and embrace us one last time." *Id.* Whenever there was an opportunity, William prioritized spending time with his children and creating memories with them. *Id.* at ¶ 5. Although difficult to describe due to his young age at the time, these memories left "snippets of joy and warmth" that he continues to hold onto. *Id.*

Leonidas learned of his father's death when his mother gathered the children in her room and told them that their father had been killed. *Id.* at ¶ 6. The weight of the news was "almost impossible to comprehend." *Id.* It remains something he "seldomly bring[s] up in conversations now." *Id.* The absence of his father remains an ongoing presence in his life. *Id.* at ¶ 7. The pain of his father never being able to see him play football, a commitment that required significant time

[20] Leonidas Jacobsen's Tennessee birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 24, Declaration of Leonidas Jacobsen, dated April 10, 2026.

and energy stays with him. *Id.* He longs for the pride that his father would have at who he has become and to introduce his father to a future spouse or have him present at other major life events. *Id.* William's death made life "markedly more challenging" for both Leonidas and his mother, and that this adversity has shaped his character and approach to life. *Id.*

Leonidas has relied on the support of family and friends to navigate his loss rather than seeking medical professionals or therapists. *Id.* at ¶ 8. The loss of his father fundamentally reshaped every aspect of his family's life in ways that are difficult to articulate. *Id.* at ¶ 9. It would be easier to explain "how his absence hasn't affected us," because William's death "has truly defined our identity and the course of our lives." *Id.* Following William's death, his mother was forced into the role of raising four children on her own. *Id.* The loss of his father continues to become more pronounced as the family reaches new life milestones. *Id.* at ¶ 10. He describes the pain associated with watching his brother begin fatherhood and considering the possibility of starting his own family, knowing that their children "will never know the warmth, wisdom, and love of their grandpa." *Id.* Explaining his father's absence to future generations will itself be a source of heartache and a reminder of what has been lost. *Id.*

Plaintiffs have requested an award of $5 million for Leonidas Jacobsen's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**4. Sedric Jacobsen**[21]

Sedric Jacobsen is the son of William Jacobsen, Jr., and was six years old at the time of his father's death. *See* Ex. 25 at ¶¶ 2–4. Although very young, he retained vivid memories of his father

[21] Sedric Jacobsen's United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 25, Declaration of Sedric Jacobsen, dated March 31, 2025.

and their relationship. *Id.* at ¶ 4. These memories included walking upstream together in a river, completing obstacle courses, his father painting camouflage on his face, and a moment when they caught a frog in an Easter egg "to scare my mother." *Id.* He vividly remembers his father's laugh, which his father "offered generously to others," and recalled listening to him speak at the dinner table for hours, "understanding maybe a quarter of what he was saying, but being content to stay there forever." *Id.* Sedric described William as "a thoughtful father" and stated that he "always felt that I could confide in him and that he would have all the answers and protection I would ever need." *Id.* at ¶ 5. His father's love of reading profoundly influenced Sedric, though he did not discover his own love of reading until after his father's death. *Id.* "I'm broken when I think about all the conversations that we could have had about books together." *Id.* As he matured, Sedric came to understand how closely aligned their personalities would have been. *Id.*

His father was a mentor and protector. *Id.* at ¶ 6. His father was someone who welcomed questions and offered thoughtful responses, and who provided comfort during childhood fears, including waking him from a bad dream and helping him replace it with a happier one. *Id.* His father also spent individualized time with each of his children in order to offer specific guidance and love. *Id.* His father was a peacemaker who brought the family together and "mended relationships with his insistence on the bond of family." *Id.* William treated Sedric's mother, Riikka, with reverence and respect and expected his children to do the same. *Id.*

To this day, Sedric recalls the setting, where he was sitting, the expression on his mother's face, and the profound sense of disbelief when he learned of his father's death. *Id.* at ¶ 7. The shock was "palpable," and he "didn't cry, I just went numb." *Id.* Witnessing the impact of the loss on his mother and siblings compounded his grief. *Id.*

His father's death fundamentally altered the structure and functioning of the family. *Id.* at ¶ 8. His mother was forced to become a single parent while grieving the loss of her husband. *Id.* [redacted] Their father's death forced Sedric and his siblings to grow up quickly. *Id.* at ¶ 9. They assisted their mother with household responsibilities and finances as soon as they were able to work, and his older brother attempted to assume a paternal role. *Id.* [redacted]

The absence of his father has remained a constant presence throughout Sedric's life as William missed major milestones such as graduations, his wedding, and the birth of his son with each of these moments proving "bittersweet," combining joy with a "palpable absence." *Id.* at ¶ 10. Shortly after the birth of his son, while holding him, Sedric was overcome with anger and grief that his father could not hold his grandson, stating, "I cried for a long time." *Id.* He is devastated that his son will never know his father. *Id.* Sedric continues to worry about his mother's financial future as she relied on William for financial matters. *Id.* at ¶ 11. [redacted]

Sedric feels that the loss of his father [redacted] The loss has been immeasurable because the family lost "our hero" and the wisdom and parenting his father provided. *Id.* He stated that he is "less prepared, less able, less wise, and less resilient" because he never received the guidance his father would have given him, concluding that "we were robbed in a way that cannot be repaid." *Id.*

Plaintiffs have requested an award of $5 million for Sedric Jacobsen's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

### 5. William Jacobsen, III[22]

William Jacobsen III ("William III") is the son of William Jacobsen, Jr. ("William, Jr."). *See* Ex. 26 at ¶ 3. William III was the firstborn son, and William, Jr. was an extraordinary presence in his life. *Id.* at ¶ 4. Because his father was still navigating college at the time of his birth, the two formed a close bond early on, sharing experiences often unavailable to his younger siblings. *Id.* From an early age, William, Jr. took William III on walks, teaching him to appreciate nature while feeding ducks and spending time outdoors. *Id.* Throughout William III's childhood, his father maintained a "playful yet paternal approach," often "training" his children like "little soldiers" during their time in the woods. *Id.* They bonded over shared interests such as Yu-Gi-Oh cards and the Lord of the Rings trilogy, invented games during cold car rides, and spent time together doing ordinary tasks like washing dishes, taking long drives, and listening to his father read aloud—experiences William III describes as enduring and cherished memories reflecting his father's love,

[22] William Jacobsen, III's Utah birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 26, Declaration of William Jacobsen, III, dated April 14, 2026.

wisdom, and the irreplaceable bond they shared. *Id.* Father and son spent extensive time watching the Lord of the Rings films and discussing the characters, instilling in William III a love of storytelling and reading. *Id.* at ¶ 5. In the three years preceding his father's death, they spoke daily, discussing basketball, other sports, and participating in outdoor and "Army"-themed activities such as exploring the woods together. *Id.* As the oldest son, William III shared the most time with his father and, although he was only eight years old when his father died, he felt the weight of attempting to step into the role of the man of the household thereafter. *Id.* He deeply wishes his father could have been part of milestone events in his life such as "my marriage and the arrival of my first child." *Id.*

William, Jr. was a deeply respected and relied-upon figure within his extended family. *Id.* at ¶ 6. As the oldest of six children, he served as a primary source of support and guidance to his siblings, who frequently turned to him for advice and assistance. *Id.* He was particularly close with one brother who has struggled significantly since William, Jr.'s passing. *Id.* William, Jr. also had a meaningful relationship with his maternal grandmother ("Granny") including a final visit before his deployment that remains among the declarant's most cherished memories. *Id.* Granny was devastated by William, Jr.'s passing and herself passed away shortly after him. *Id.* William, Jr. was close with his parents, calling them regularly on Sundays to discuss his children and his military experiences—conversations that resonated deeply with his father, a retired Army veteran. *Id.*

William III learned of his father's death when his mother gathered the children in her bedroom and explained that there had been an explosion and that their father was among those who did not survive. *Id.* at ¶ 7. At only eight years old, William III was shattered, inconsolable, and overwhelmed with grief. *Id.* Since his father's death, William III's life has changed in profound

and enduring ways. *Id.* at ¶ 8. [redacted] William, Jr.'s death has resulted in his missing numerous milestones: William III's childhood, baptism, graduations, first job, driver's license, first car, selection as fraternity president in college, speaking engagements, sporting events, and school dances—events William III deeply wishes his father had witnessed. *Id.* Following his father's death, William III assumed significant responsibility at a young age in an effort to support his mother, [redacted]

[redacted] The family continues to reflect on what the decedent's life would be like today, the guidance he would have offered, and the relationships he would have formed with grandchildren he will never meet. *Id.*

Plaintiffs have requested an upward enhancement of William Jacobsen III's claims based on his [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). Plaintiffs request an enhancement of 25% of his baseline award resulting in an award of $6.25 million for William Jacobsen III's solatium claim.

Although no amount of money can compensate William III for the terrible loss of his father at age 8, based on the precedents in comparable cases, the Special Master recommends an upward adjustment from the baseline award based on the evidence of the severe impact on William III of his father's death including [redacted] caused by his father's death. The Special Master recommends an award of $6.25 million.

### F. LYNN R. POULIN, SR. – DECEMBER 21, 2004, ATTACK – FOB MAREZ, MOSUL

Forward Operating Base Marez was located on the outskirts of Mosul, Iraq, and on December 21, 2004, the dining hall on the base was the site of the deadliest single attack on U.S. troops since the invasion of Iraq had begun. Ex. 3 at 67. A suicide bomber dispatched by Ansar al Sunna—an organization closely affiliated with Al-Qaeda in Iraq—detonated himself in the dining hall killing 22 people (14 U.S. soldiers) including Sgt. Lynn Poulin, Sr. from the 133d Engineer Battalion. *Id.*; *see also* ECF No. 9 at ¶¶ 708, 713, 718, 728, 733, 740, 747, 752.[23] According to his Report of Casualty, SSgt. Poulin died as a result of [redacted][24] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which SSgt. Poulin was killed on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the December 21, 2004 attack in which SSgt. Lynn R. Poulin, Sr. was killed. *See* Ex. 1.

SSgt. Poulin's surviving wife, Jeanne Poulin, is a plaintiff in this case. *See* ECF No. 9 at ¶¶ 746-750. The Plaintiff has suffered severe mental anguish, extreme emotional pain and suffering, and loss of SSgt. Poulin's society, companionship, comfort, advice and counsel. *Id.* ¶ 750. The following chart reflects the claims asserted by Jeanne Poulin in her individual capacity arising out of the December 21, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Jeanne Poulin | SSgt. Lynn R. Poulin, Sr.'s wife | Solatium claim $8,000,000.00 | Declaration of Jeanne Poulin, dated March 31, | 28 |

[23] He was posthumously promoted to the rank of Staff Sergeant in the United States Army.
[24] Ex. 27, Report of Casualty for Poulin, Lynn Robert Sr.

| | | | | |
|---|---|---|---|---|
| | | | 2025, including copy of her proof of U.S. citizenship | |

### 1. Jeanne Poulin[25]

Jeanne Poulin is the wife of Lynn Poulin, Sr. *See* Ex. 28 at ¶ 3. Jeanne describes Lynn as far more than her husband, stating that he was her "best friend," her "soulmate," and the love of her life since their teenage years. *Id.* at ¶ 4. From the beginning of their relationship, they shared a deeply affectionate and joyful bond, marked by constant laughter, shared jokes, and an intensity of love that she explains "hurt sometimes" because of how strong it was. *Id.* Their life together was devoted entirely to each other. *Id.* Jeanne and Lynn spent 28 years as best friends before becoming engaged, a foundation that shaped their marriage and daily life together. *Id.* at ¶ 5. Their relationship was built around shared passions and time spent together, including attending concourses and pits, driving hot rods, and dancing, which Lynn especially loved. *Id.* Even during the last year of his life, when Lynn was deployed, they maintained their closeness through frequent communication, often spending hours talking online about everyday life, memories, and the future. *Id.* Lynn was a man with "a heart like no one else," someone who instinctively helped neighbors and family whenever they were in need. *Id.* at ¶ 6. Her father regarded Lynn as one of his own children, and Lynn developed a close, brother-like relationship with her brother, further integrating himself into the family. *Id.* Lynn's kindness, humor, and support left a lasting impression on everyone who knew him. *Id.*

The day she learned of Lynn's death, Jeanne saw news reports of casualties in Iraq and reassured herself that Lynn's unit was not involved. *Id.* at ¶ 7. She attended her scheduled

[25] Jeanne Poulin's Maine birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 28, Declaration of Jeanne Poulin, dated March 31, 2025.

twelve-hour night shift, unaware that Lynn's name had already been broadcast on the news. *Id.* While at work, she was summoned to a boardroom, where she encountered two uniformed soldiers waiting to inform her of his death. *Id.* Her son was present, visibly distraught, along with her brother and others. *Id.* She describes the moment as one in which "everything went blank," marking the instant her life irrevocably changed. *Id.*

Following Lynn's death, [redacted]

With their children grown, Jeanne explains that Lynn was the cornerstone of her daily life and household. *Id.* at ¶ 10. In addition to emotional support, he handled many practical responsibilities, including home maintenance, mechanical work, plumbing, and general household tasks. *Id.* [redacted] she now struggles to perform these tasks on her own, and the cost of hiring help is daunting, and no one is able to do things as Lynn once did. *Id.* at ¶¶ 10-11. [redacted] Jeanne feels Lynn's absence in the practical realities of daily living and

long-term planning. *Id.* at ¶ 11. Lynn was "a huge piece" of herself, and without him, her life contains a void that feels impossible to fill. *Id.*

Plaintiffs have requested an award of $8 million for Jeanne Poulin's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

### G. CHARLES WELLS, JR. – MARCH 30, 2005, ATTACK – AL QAIM

In March 2005, AQI was establishing control over the west portion of the Anbar Province and specifically in Al-Qaim near the Syrian border with Iraq. Ex. 4 at 21-22. On March 30, 2005 as part of AQI's assertion of control in this area, a Combat Logistics Battalion-2 HMMWV struck an IED comprised of a mine between Al-Qaim and Haditha resulting in the death of Marine Warrant Officer Charles Wells, Jr. ECF No. 9 at ¶ 862; Ex. 4 at 21-22. Warrant Officer Wells' autopsy report states his cause of death was [redacted][26] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Warrant Officer Wells was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the March 30, 2005 attack in which Marine Warrant Officer Charles Wells, Jr. was killed. *See* Ex. 1.

Warrant Officer Wells' surviving parents and brother—Charles Wells, Sr., Orlean Wells, and Terry Wells—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 861-867. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of Warrant Officer Wells' society, companionship, comfort, advice and counsel. *Id.* ¶ 867. The following chart reflects

[26] Ex. 29, Autopsy Examination Report for Wells, Charles Gary Jr., dated May 5, 2005 at 1.

the claims asserted by Charles Wells, Sr., Orlean Wells, and Terry Wells in their individual capacities arising out of the March 30, 2005, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Charles Wells, Sr. | Warrant Officer Charles Wells, Jr.'s father | Solatium claim $6,250,000.00 | Declaration of Charles Wells, Sr., dated April 13, 2026, including copy of his proof of U.S. citizenship | 30 |
| Orlean Wells | Warrant Officer Charles Wells, Jr.'s mother | Solatium claim $5,000,000.00 | Declaration of Orlean Wells, dated April 8, 2026, including copy of her proof of U.S. citizenship | 31 |
| Terry Wells | Warrant Officer Charles Wells, Jr.'s brother | Solatium claim $2,500,000.00 | Declaration of Terry Wells, dated April 20, 2026, including copy of his proof of U.S. citizenship | 32 |

**1. Charles Wells, Sr.[27]**

Charles Wells, Sr. is the father of Charles Wells, Jr. *See* Ex. 30 at ¶ 3. Mr. Wells describes his son as "my heart walking outside my body," explaining that from the moment of his birth, Charles brought light, purpose, and joy into his life. *Id.* at ¶ 4. They shared a deeply bonded father–son relationship grounded in daily presence, shared sports activities, and church attendance. *Id.* Sports served as a primary means through which they connected, often without words. *Id.* Mr. Wells and his son were inseparable throughout Charles' life. *Id.* at ¶ 5. They attended family

[27] Charles Wells, Sr.'s Georgia birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 30, Declaration of Charles Wells, Sr., dated April 13, 2026.

gatherings together and spoke daily, whether in person or by phone, up until the time of Charles' death. *Id.* Their constant communication and shared living arrangement only deepened their relationship, making every moment together meaningful. *Id.* Charles was a kind, respectful, and ambitious young man who was deeply loved by everyone he met. *Id.* at ¶ 6. He was driven to succeed and invested fully in his relationships with family and friends. *Id.* Mr. Wells supported Charles in every endeavor and watched with pride as his character and determination shaped his relationships and pursuits. *Id.*

Mr. Wells learned of his son's death when military service members arrived at his home to deliver the news. *Id.* at ¶ 7. The moment was one in which "the world seemed to stop," leaving him shattered, heartbroken, and overcome with disbelief. *Id.* He recalls wishing the news were a mistake and even wishing that the loss had been his own life instead of his son's. *Id.* Informing others of Charles' death only intensified the pain, as the reality of the loss spread through family and friends. *Id.*

Following his son's death, Mr. Wells states that his life was irrevocably altered. *Id.* at ¶ 8. [redacted]

[redacted]

Plaintiffs have requested an upward enhancement of Charles Wells, Sr.'s claims based on his [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). Plaintiffs request an enhancement of 25% of his baseline award resulting in an award of $6.25 million for Charles Wells, Sr.'s solatium claim.

Although no amount of money is sufficient to compensate Charles Wells, Sr. for the loss of his son, based on the precedents in comparable cases and the affidavits and exhibits outlining the impact of Mr. Wells' loss, including evidence of [redacted], the Special Master recommends an upward adjustment of 25% from the baseline amount and that the Court award Charles Wells, Sr. $6.25 million.

**2. Orlean Wells[28]**

Orlean Wells is the mother of Charles Wells, Jr. *See* Ex. 31 at ¶ 3. Charles, her firstborn child, was an exceptional young man who embodied ambition, compassion, and a deep commitment to both family and service. *Id.* at ¶ 4. From an early age, Charles demonstrated intelligence, discipline, and athletic ability, excelling in football, basketball, and soccer. *Id.* After completing his education, he worked as a UPS manager and served as a firefighter before deciding to join the military, a decision Orlean describes as consistent with his desire to serve others and his country. *Id.* Charles was also the center of family gatherings, particularly during holidays, where his presence brought joy and energy to everyone around him. *Id.* Before deploying to Iraq, he made a deliberate effort to see his family, actions that, in hindsight, feel deeply significant to her. *Id.* She recounts a difficult conversation in which Charles spoke openly about both the fulfillment he felt in serving and the strains that accompanied it—an exchange that continues to resonate with her. *Id.* Charles was a strong and confident young man who remained gentle and respectful with his mother. *Id.* at ¶ 5. He shared close and loving relationships with his siblings, naturally assuming a leadership role—guiding his brothers with firm but caring direction and being fiercely protective of his younger sister. *Id.*

Orlean learned of her son's death while returning home from work. *Id.* at ¶ 6. As she arrived at her mother's house, Charles' father and three other men met her in the front yard to deliver the devastating news that Charles had been killed by a roadside bomb in Iraq. *Id.* She felt overwhelming hopelessness and disbelief, unable to reach or hold her son, and crying out in prayer

[28] Orlean Wells' Alabama birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 31, Declaration of Orlean Wells dated April 8, 2026.

in the immediate aftermath. *Id.* Word of his death spread quickly, sparing her the task of notifying others, and she focused on praying for strength for her remaining children. *Id.*

Following Charles's death, Orlean sought comfort through her faith and community rather than formal medical treatment. *Id.* at ¶ 7. She turned to her pastor, his wife, church members, and close friends for prayer, guidance, and emotional support. *Id.* These spiritual and social connections have been central to her ability to cope with the loss and remain her primary source of healing. *Id.* Aside from the emotional turmoil, her family experienced significant financial impact following Charles's death. *Id.* at ¶ 8. Charles had consistently helped her during times of financial difficulty and played an important role in supporting and caring for his younger siblings. *Id.* His absence created both emotional and financial hardship for the family, leaving a gap that has been difficult to manage. *Id.*

At times, Orlean struggles to accept that Charles is truly gone, only to be confronted with the reality during birthdays, holidays, and visits to his grave. *Id.* at ¶ 9. Nothing feels the same without his presence, and she finds it painful to talk about him at times. *Id.* While her family continues to work together to move forward, she nevertheless feels as though a piece of herself is missing. *Id.* at ¶ 10. She deeply misses Charles's caring nature and the assurance that he would always be there to help her if she needed support. *Id.* She struggles daily with his absence, and the pain is compounded by [redacted]

Plaintiffs have requested an award of $5 million for Orlean Wells' solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**3. Terry Wells[29]**

Terry Wells is the brother of Charles Wells, Jr. *See* Ex. 32 at ¶ 3. Terry and his brother shared an exceptionally close and supportive bond defined by Charles' constant care, patience, and protection. *Id.* at ¶ 4. Charles regularly helped him navigate tasks and daily life, assuming the role of guide and protector. *Id.* Terry recalls memories of learning to play basketball with his brother and riding on his motorcycle—experiences that represented freedom, joy, and trust, all made meaningful because they were shared together. *Id.* Growing up, the brothers were inseparable, living together and spending virtually every day side by side. *Id.* at ¶ 5. Even when adulthood and military service took his brother far away, they maintained frequent contact, speaking at least once a week and often discussing plans for future reunions and shared milestones. *Id.* Charles was his closest friend, and at since his death, Terry constantly feels the absence of someone who would have been present for all of life's important moments. *Id.* Charles had "a heart of gold," particularly in the care he showed toward him. *Id.* at ¶ 6. Charles was keenly aware of Terry's vulnerabilities and consistently ensured his safety and well-being, while also extending that same kindness and leadership to the rest of the family. *Id.* Charles consistently served as the emotional center and "glue" that held the family together. *Id.*

Terry learned of his brother's death when his parents delivered the news at home. *Id.* at ¶ 7. The moment was shattering and surreal, and he was unable to comprehend how someone so full of life could be gone. *Id.* The moment marked a clear division between life before and after his brother's death. *Id.* Following Charles's death, [redacted]

[29] Terry Wells' Alabama birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 32, Declaration of Terry Wells dated April 20, 2026.

[redacted] The loss of his brother had far-reaching consequences for the entire family. *Id.* at ¶ 9. The emotional security and happiness they once knew were replaced by persistent sorrow, and the family has struggled to adapt to a new reality without Charles. *Id.* [redacted] Charles' absence represents not only the loss of his presence, but the loss of future conversations, shared experiences, guidance, and love. *Id.* at ¶ 10.

Plaintiffs have requested an award of $2.5 million for Terry Wells' solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**H. JONATHAN GRANT – MAY 11, 2005, ATTACK – KARABILAH**

In May 2025, the U.S. Marines launched Operation Matador as a "response to the rise of AQI activity in western Anbar Province for the purpose of eliminating insurgents and foreign fighters in the Jazeera desert north of the Euphrates River near the Syrian border." *See* Ex. 4 at 25. On May 11, 2005, Lima Company, 3d Battalion, 25th Marines traveling in an Amphibious Assault Vehicle struck a triple-stacked landmine approximately eight miles from the Syrian border in Karabilah, Iraq resulting in the death of LCpl. Jonathan Grant who was stuck in the vehicle when it caught fire. *Id.*; *see also* ECF No. 9 at ¶¶ 938, 951-952. According to his autopsy report, the medical examiner [redacted] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Grant was killed on November 25, 2024 (ECF No. 33), and on

[30] Ex. 33, Final Autopsy Report for Grant, Jonathan Walter, dated June 23, 2005.

September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the May 11, 2005 attack in which LCpl. Jonathan Grant was killed. *See* Ex. 1.

LCpl. Grant's surviving fiancée, children, mother, and siblings—Eva Grant-Trujillo, Cynthia Grant, Evan Grant, Alma M. Roybal, Alana Roybal, Travis Roybal, Isaiah Roybal, and Lorin Roybal—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 937-949. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of LCpl. Grant's society, companionship, comfort, advice and counsel. *Id.* ¶ 949. The following chart reflects the claims asserted by Eva Grant-Trujillo, Cynthia Grant, Evan Grant, Alma M. Roybal, Alana Roybal, Travis Roybal, Isaiah Roybal, and Lorin Roybal in their individual capacities arising out of the May 11, 2005, attack, as well as the evidence setting forth the bases of those claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Eva Grant-Trujillo | LCpl. Jonathan Grant's fiancée | Solatium claim $8,000,000.00 | Declaration of Eva Grant-Trujillo, dated April 14, 2026, including copy of her proof of U.S. citizenship | 34 |
| Cynthia Grant | LCpl. Jonathan Grant's daughter | Solatium claim $5,000,000.00 | Declaration of Cynthia Grant, dated March 20, 2026, including copy of her proof of U.S. citizenship | 35 |
| Evan Grant | LCpl. Jonathan Grant's son | Solatium claim $5,000,000.00 | Declaration of Evan Grant, dated March 24, 2026, including copy of his proof of U.S. citizenship | 36 |

| | | | | |
|---|---|---|---|---|
| Alma Roybal | LCpl. Jonathan Grant's mother | Solatium claim $5,000,000.00 | Declaration of Alma Roybal, dated April 1, 2026, including copy of her proof of U.S. citizenship | 37 |
| Alana Salazar f/k/a Alana Roybal | LCpl. Jonathan Grant's sister | Solatium claim $2,500,000.00 | Declaration of Alana Salazar, dated March 24, 2026, including copy of her proof of U.S. citizenship | 38 |
| Travis Roybal | LCpl. Jonathan Grant's brother | Solatium claim $2,500,000.00 | Declaration of Travis Roybal, dated April 1, 2026, including copy of his proof of U.S. citizenship | 39 |
| Isaiah Roybal | LCpl. Jonathan Grant's brother | Solatium claim $2,500,000.00 | Declaration of Isaiah Roybal, dated April 2, 2026, including copy of his proof of U.S. citizenship | 40 |
| Lorin Roybal | LCpl. Jonathan Grant's brother | Solatium claim $2,500,000.00 | Declaration of Lorin Roybal, dated April 1, 2026, including copy of his proof of U.S. citizenship | 41 |

#### 1. Eva Grant-Trujillo[31]

Eva Grant-Trujillo is the fiancée of Jonathan Grant and the mother of his two children. *See* Ex. 34 at ¶ 3. Jonathan was not only her fiancé but "the love of my life, the father of our two beautiful children, my best friend, my other half, and my high school sweetheart." *Id.* at ¶ 4. Their relationship began in high school and continued for more than seven years, during which they were

[31] Eva Grant-Trujillo's New Mexico birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 34, Declaration of Eva Grant-Trujillo, dated April 14, 2026.

inseparable and built a life together filled with shared challenges, love, and memories. *Id*. He worked extra shifts so that Eva could attend her senior prom and consistently encouraged her pursuit of becoming a teacher, supporting her independence and reminding her never to give up. *Id.* His words—"*If I can serve and protect our country, you can do anything you set your mind to*"—have continued to inspire her daily. *Id*. Living with Jonathan was "a blessing" marked by joy, laughter, and a deep sense of partnership. *Id.* Their shared life included raising their children, Cynthia and Evan, and spending nearly all their free time together when not separated by work, school, or military obligations. *Id.* at ¶ 5. They enjoyed movies at home, working out, and attending classic car shows, a hobby Jonathan particularly loved. *Id.* Jonathan had been raised primarily by his grandmother and lacked strong connections with his immediate family until later in life. *Id.* at ¶ 6. As he developed relationships with his mother, stepfather, siblings, and father, weekly family dinners became a tradition, strengthening family bonds. *Id*. He also maintained a deep relationship with his grandmother, Margie Warner, and cultivated friendships spanning his childhood, shared interests, and military service. *Id*.

Eva learned of Jonathan's death while driving to pick up their children after staying late at work during her first year of teaching kindergarten. *Id.* at ¶ 7. Jonathan's grandmother, as next of kin, received the initial notification but was unable to comprehend it due to having recently received a letter from Jonathan stating he would be coming home sooner than expected. *Id.* After Jonathan's commanding officer explained the circumstances to the family, Eva was informed by Jonathan's uncle that Jonathan had been killed. *Id.* She was overcome with shock and disbelief and had to tell their five-year-old daughter, Cynthia, that her father had been killed. *Id.* Their son, Evan, was seventeen months old at the time. *Id.* In the days following Jonathan's death, family members gathered together as news spread rapidly through their close-knit community. *Id.* Eva

found it extremely difficult to notify others and relied on her brother and mother to inform much of her family. *Id.* She recalls her grandmother telling her to be thankful for the time she had with Jonathan and for their children, words that brought some comfort. *Id.* Initial information indicated Jonathan was killed when his convoy struck an explosive device, though Eva was too overwhelmed at the time to process additional details. *Id.*

Planning Jonathan's funeral required arrangements she never imagined making. *Id.* at ¶ 8. His rosary was held at their former high school gymnasium due to the large number of attendees, and his funeral Mass took place at the church where he had served as an altar server. *Id.* When Jonathan's remains arrived at the airport, the family was allowed to meet the casket on the tarmac. *Id.* She recalls thinking the casket "appeared too short" for Jonathan, who was six feet tall, intensifying her shock and disbelief. *Id.* A large procession followed the hearse from the airport to the funeral home, joined by numerous vehicles, law enforcement escorts, and community members along the roadside. *Id.* Jonathan was the tenth casualty of the Iraq War from the State of New Mexico. *Id.*

During the rosary, their seventeen-month-old son walked around Jonathan's casket, an image later published by *The Santa Fe New Mexican*. *Id.* at ¶ 9. Eva was also approached by a woman who had flown on the same plane carrying Jonathan's remains, who recounted that the pilot announced the presence of a fallen Marine and that passengers observed a moment of silence in his honor. *Id.* Jonathan was buried with full military honors at Santa Fe National Cemetery. *Id.*

Following Jonathan's death, [redacted] Discussing the circumstances of Jonathan's death remains extremely difficult for her. *Id.* [redacted]

[redacted]

Financially, Jonathan's death imposed substantial hardship. *Id.* at ¶ 11. [redacted]

Jonathan's death permanently altered the course of their family's lives. *Id.* at ¶ 12. Because his body was returned in a closed casket, accepting the reality of his death was particularly difficult. *Id.* Eva lost her partner and future plans, and their children lost a lifetime of guidance and support from their father. *Id.* [redacted] Despite these challenges, their family maintains strong bonds with many of Jonathan's loved ones and fellow Marines, including participation in memorial events such as the *Eyes of Freedom* exhibit honoring Jonathan and others killed in Iraq. *Id.*

The impact of Jonathan's death continues decades later. *Id.* at ¶ 13. [redacted] Their daughter has faced major life events without her father, and their son grew up without paternal

guidance and shared activities. *Id.* Their grandchildren know Jonathan only through stories, photographs, and visits to his gravesite. *Id.*

While Eva Grant-Trujillo is not Jonathan's wife, the class of plaintiffs who may recover solatium damages "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members" despite not being legally or biologically related to the victim. *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730, at *42 (D.D.C. July 19, 2022). To establish this "functional equivalence" of a close family member, plaintiffs must show that they were "treated like" a victim's spouse, child, parent, or sibling. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (finding that stepsiblings recover functionally equivalent to siblings when they were "treated like" a brother or sister); *Oveissi* 768 F. Supp. 2d at 27 (holding that interactions between a stepparent and child "were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924, at *7 (D.D.C. Dec. 27, 2023) (finding a stepparent to be a functional equivalent of a parent notwithstanding an ongoing relationship between the victim and their biological parent because of the supplementary role played by the stepparent in the parental role).

Here, based on his declaration and the facts set forth above, Plaintiffs submit that Eva Grant-Trujillo qualifies under the law as the functional equivalent of LCpl. Jonathan Grant's wife based on the length of their relationship, their cohabitation, their two shared children, her active participation in planning Jonathan's funeral, and the fact that she was "treated like" LCpl. Grant's wife, and her evident loss and grief resembles that of a legal spouse. Plaintiffs have requested an award of $8 million for Eva Grant-Trujillo's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

### 2. Cynthia Grant[32]

Cynthia Grant is the daughter of Jonathan Grant. *See* Ex. 35 at ¶ 3. From her earliest years, Jonathan served as Cynthia's primary caregiver during periods when he was not deployed, taking an active role in raising her while her mother pursued her education and work. *Id.* at ¶¶ 4–5. Jonathan emphasized values of strength and equality, particularly teaching her that "girls could be as strong as boys," including routinely having her perform pull-ups on playground monkey bars as a playful but meaningful lesson. *Id.* at ¶ 4. His presence at her school in military uniform was a source of pride, and his everyday interactions—such as time spent at her great grandmother's home and shared routines—formed enduring childhood memories rooted in stability, care, and affection. *Id.* Jonathan was deeply involved in Cynthia's daily life until his death, spending time with her at the gym, caring for family members together, and taking drives around town listening to music. *Id.* at ¶ 5. Although Cynthia was only five years old when he passed away, these experiences left lasting impressions that continue to influence her life. *Id.* Jonathan's devotion to family extended beyond Cynthia to her younger brother and extended relatives. *Id.* at ¶ 6. Family gatherings—particularly birthdays held at their great grandmother's home—were traditions he fostered to maintain close family bonds, emphasizing togetherness and shared experiences. *Id.* These gatherings left a lasting influence on how Cynthia values and maintains those relationships today. *Id.*

Cynthia memories of learning of her father's death are blurred due to her young age. *Id.* at ¶ 7. She recalls attending his funeral in a local high school gym filled with mourners, a powerful experience that conveyed the significance of her father's life and service, leaving her with both

[32] Cynthia Grant's New Mexico birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 35, Declaration of Cynthia Grant dated March 20, 2026.

pride and profound grief. *Id.* The magnitude of the loss made a lasting emotional impact despite the passage of time. *Id.*

The loss of her father fundamentally altered the course of Cynthia's life and her family's stability. *Id.* at ¶ 8. Raised thereafter by a single mother supporting two children on a teacher's salary, the family experienced significant emotional and financial strain. *Id.* at ¶¶ 8, 10. Cynthia witnessed her mother carrying the responsibility of both parents, often working additional jobs and sacrificing family time to make ends meet. *Id.* These circumstances shaped Cynthia's understanding of hardship, resilience, and loss from an early age. *Id.* at ¶ 8. [redacted]

The financial consequences of Jonathan's death further compounded the family's hardship. *Id.* at ¶ 10. Limited resources required Cynthia's mother to take on additional employment, reducing time together as a family and underscoring the long-term economic effects of his loss. *Id.* [redacted] Cynthia's children, ages five and three, regularly visit their grandfather's grave and have expressed sadness about never meeting him, with her daughter stating that it is "not fair." *Id.* Cynthia anticipates future milestones—particularly her wedding day—where her father's absence will be acutely felt. *Id.* at ¶ 12.

Plaintiffs have requested an award of $5 million for Cynthia Grant's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**3. Evan Grant[33]**

Evan Grant is the son of Jonathan Grant. *See* Ex. 36 at ¶ 3. His father was a United States Marine who was killed in an attack in Iraq when Evan was only two years old and his sister was almost six. *Id.* at ¶ 4. Because of his age at the time, Evan has no direct memories of his father. *Id.* His understanding of who his father was comes from stories shared by family members, which describe him as strong, independent, and deeply devoted to his family. *Id.* One of the most meaningful remaining connections Evan has to his father is a photograph taken shortly before his father's final mission, depicting him holding Evan, his sister, and their mother while dressed in uniform. *Id.* That photograph "means the absolute world" to Evan. *Id.* Although Evan lived with his father briefly as an infant, he never had the opportunity to speak with him or form long-term memories of him. Jonathan's absence has meant that his father missed "every major event" in his life, including "first days of school, birthdays, graduations, and moments where I long to have him by my side." *Id.*

Jonathan was described as a devoted family man who spent his non-working time with his loved ones and was deeply committed to his relationship with Evan's mother. *Id.* at ¶ 6. They planned to marry upon his return from Iraq and envisioned a future together. *Id.* That future was permanently cut short by Jonathan's death during his deployment, depriving their family of planned milestones and shared life experiences. *Id.*

[33] Evan Grant's New Mexico birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 36, Declaration of Evan Grant dated March 24, 2026.

Evan's understanding of his father's death has been shaped by family accounts and public reporting. *Id.* at ¶ 7. One particularly vivid image is from a newspaper article that included a photograph of Evan as a toddler drinking from a sippy cup in front of his father's casket. *Id.* Although he does not remember the event itself, the image represents "the gravity of my loss—a father I never really had the chance to know." *Id.* The newspaper highlighted his father's heroic actions, and that reporting became an important part of how his family remembered and honored him. *Id.* Reflecting on this now, Evan is overcome with sadness about "what life could have been like if he had survived." *Id.*

Because he was too young to retain any memories, Evan grew up without his father's presence during formative milestones which was "incredibly emotionally damaging and draining." *Id.* at ¶ 8. Evan believes his father would have been "the greatest source of guidance I could have ever asked for," but his life has been shaped by constant uncertainty, with him repeatedly asking himself "what if" and feeling that his father's absence altered his life trajectory. *Id.* As he has grown older, pursued his education, and worked toward his future career, including a path in optometry, Evan continues to feel the absence of his father's guidance and support. *Id.*

Despite the ongoing emotional impact of his father's death, Mr. Grant has not sought professional psychological counseling or medical treatment for grief though the emotional effects have nonetheless been enduring and carried with him throughout his life. *Id.* at ¶ 9. Jonthan's death also resulted in significant financial hardship for his family with Evan's mother assuming full financial responsibility for the household after his father's death because his father had been the primary breadwinner. *Id.* at ¶ 10. She worked multiple jobs to support the family, while raising Evan and his sister alone. *Id.* [redacted]

[redacted]

Growing up without Jonathan was profoundly difficult for Evan, his sister, and their mother. *Id.* at ¶ 11. He was frequently told that he resembled his father, which caused sadness because he never knew him personally, but also strengthened his sense of connection to him. *Id.* As he matured, Evan came to see similarities not only in appearance but also in character, and he strives to embody "the strength and love people say he carried." *Id.* Because his mother worked multiple jobs, Evan spent significant time with his grandparents, developing a close relationship with them that he continues to value. *Id.* At the same time, the loss of his father permanently changed family dynamics, leaving his mother to assume every parental and financial responsibility on her own. *Id.* As he considers having children of his own, Evan finds it painful that they will never know their grandfather or experience his love and guidance. *Id.* at ¶ 12. Evan misses his father every day and carries the weight of that loss as a defining part of his identity and his family's ongoing life experience. *Id.*

Plaintiffs have requested an award of $5 million for Evan Grant's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**4. Alma Roybal[34]**

Alma Roybal is the mother of Jonathan Grant. *See* Ex. 37 at ¶ 3. Jonathan was her oldest of five children and, from an early age, demonstrated kindness and responsibility. *Id.* at ¶ 4. He was born when Alma was nineteen years old and raised largely by his grandmother, whom he

[34] Alma Roybal's New Mexico birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 37, Declaration of Alma Roybal dated April 1, 2026.

deeply respected and loved. *Id.* Alma was immensely proud of the man Jonathan became. *Id.* Despite becoming a father at the age of seventeen, Jonathan embraced parenthood with dedication. *Id.* His children, Cynthia and Evan, and their mother, Eva, were central to his life, and he worked tirelessly to provide for them and ensure their happiness. *Id.* One of Alma's proudest experiences was witnessing Jonathan's journey into fatherhood. *Id.*

Jonathan insisted that Alma be present at the births of his children. *Id.* His commitment to his family extended beyond his children to supporting Eva's goal of becoming a teacher, and the family assisted whenever needed. *Id.* When Jonathan informed Alma that he had enlisted in the Marines, she felt both pride and fear. *Id.* His decision to serve reflected his selflessness, bravery, and concern for others. *Id.*

Because Jonathan spent much of his childhood with his grandmother, Alma did not see him as often as she wished. *Id.* at ¶ 5. As he grew older, they worked to strengthen their relationship, sharing long conversations about family, unity, and happiness. *Id.* Before Jonathan deployed to Iraq, Alma promised him that she would always look after his children. *Id.* Their discussions frequently centered on his children's future, their education, and Jonathan's own goal of earning a degree in criminal justice. *Id.* Jonathan was a devoted father and ensured his children were cared for even when it required family support. *Id.* Although Alma attempted to dissuade him from joining the Marines, his resolve remained firm. *Id.*

Jonathan was known for his ability to build lasting relationships, from childhood friends to fellow Marines. *Id.* at ¶ 6. He touched many lives through his work as a pizza restaurant manager and security guard. *Id.* Within his family, Jonathan was a guiding presence as a big brother, offering protection and gentle leadership to his siblings. *Id.* He shared a love of sports with siblings and cousins, using it as a way to connect and create memories. *Id.* Jonathan's presence brought

laughter and warmth to family life, and his absence has left a void that continues to shape daily life. *Id.*

Alma learned of Jonathan's death during the week leading up to Mother's Day in May 2005. *Id.* at ¶ 7. On Friday, May 13, her son Travis called and told her, *"Mom! Jonathan died!"* *Id.* The drive home with her husband felt endless. *Id.* Upon arrival, she learned that her other children had already been informed by their pastor. *Id.* Whether she called her sister or her sister called her is unclear to her, but the devastating message was repeated. *Id.* Alma collapsed to the floor, overwhelmed by grief. *Id.*

Following Jonathan's death, [redacted] Although the healing process continues, Jonathan's absence remains apparent at family gatherings and life milestones. *Id.* Alma has relied on the support of her children and grandchildren for her grief, and while this approach has not been easy, it reflects personal coping choices rooted in family support. *Id.* at ¶ 9. She acknowledges that professional assistance can be valuable, but she chose a different path in managing her loss. *Id.* Jonathan's death permanently altered the family. *Id.* at ¶ 11. Alma has navigated emotions including heartbreak, sadness, anger, loneliness, and frustration since May 2005. *Id.* At the same time, the loss brought the family closer together and underscored the importance of cherishing life and loved ones. *Id.* Alma immersed herself in work as a coping mechanism, and her love for her children, grandchildren, and great-grandchildren deepened, and her faith in God remains a source of strength. *Id.* Alma hopes Jonathan's death continues to remind the family of the importance of unity and appreciation for each moment. *Id.* at ¶ 12. Burying her

son was the most difficult ordeal of her life, and watching her grandchildren grow up without their father serves as a continual reminder of his absence. *Id.*

Plaintiffs have requested an award of $5 million for Alma Roybal's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**5. Alana Salazar[35]**

Alana Salazar is the sister of Jonathan Grant. *See* Ex. 38 at ¶ 3. Much of their early relationship developed at their grandmother's home, where they spent significant time together engaging in ordinary childhood activities that fostered a lasting connection, including playing games and spending time on a trampoline. *Id.* at ¶¶ 4–5. As they grew older, their bond deepened rather than diminished. *Id.* Jonathan's transition into adulthood and parenthood further strengthened their sibling relationship. *Id.* at ¶ 4. Alana recalls being included in pivotal moments of her brother's life, including his anticipation of becoming a father and her presence during the births of his children. *Id.* She frequently assisted with childcare, developing close bonds with Jonathan's children as well. *Id.* Jonathan also maintained a consistent presence in her life, showing continued interest in her personal well-being and daily activities. *Id.* at ¶ 5. As adults, they remained in regular contact, seeing each other at least weekly and speaking multiple times per week by phone. *Id.*

Jonathan played a central role within the broader family unit. *Id.* at ¶¶ 6, 10–11. He maintained close and loving relationships with their parents, remaining actively involved in their lives. *Id.* at ¶ 6. He also had a particularly meaningful relationship with their grandmother. *Id.* He

[35] Alana Salazar's New Mexico birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 38, Declaration of Alana Salazar dated March 24, 2026.

was deeply devoted to his children and to the mother of his children, whom Alana describes as "his world." *Id.*

Jonathan's decision to join the military was a significant and emotionally weighty event for the family. *Id.*at ¶ 4. Alana recalls deep conversations surrounding that decision, the family's eventual support, and witnessing his faith and engagement with his church community prior to deployment. *Id.*

Alana learned of her brother's death when, after work, a friend urged her to go to church to meet with a pastor. *Id.* at ¶ 7. She was told that she needed to immediately be with her family because "something had happened to Jonathan." *Id.* The drive home was marked by intense dread, which was confirmed upon seeing her parents' distress and then receiving confirmation of Jonathan's passing at her grandmother's home. *Id.* Upon hearing the news, she collapsed, describing overwhelming grief and a profound sense of brokenness. *Id.*

In the days following Jonathan's death, Alana experienced profound emotional distress. *Id.* She isolated herself, remaining alone in her room for extended periods, and struggled under the weight of grief shared by her close-knit family. *Id.* [redacted] Memories such as "the sound of his voice" are fading, and she will never again experience "the warmth of his tight bear hugs." *Id.* at ¶ 10. [redacted]

The passage of time has underscored Jonathan's absence as his children have grown, his fiancée remarried, and milestones have been reached without him. *Id.* at ¶ 10. Events Alana

envisioned sharing with her brother—such as graduations, marriage, and the birth of her first child—now feel incomplete. *Id.* at ¶ 5. Although the tragedy has brought Alana closer to her remaining siblings, it has also left an indelible mark on her family. *Id.* at ¶ 11.

Plaintiffs have requested an award of $2.5 million for Alana Salazar's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**6. Travis Roybal[36]**

Travis Roybal is the brother of Jonathan Grant. *See* Ex. 39 at ¶ 3. At the time of Jonathan's death, Mr. Roybal was fifteen years old. *Id.* at ¶ 7. He and Jonathan shared a close and enduring relationship marked by daily companionship, shared activities, and emotional support. *Id.* at ¶ 4. Jonathan was Travis' mentor and friend who provided guidance, encouragement, and a sense of stability throughout Travis' childhood and adolescence. *Id.* Their relationship included routine activities such as exercising together at the gym, riding along during Jonathan's delivery shifts, playing video games, watching movies, and spending long periods driving and talking together. *Id.* at ¶¶ 4-5. Ordinary moments—such as sharing chocolate milk and strawberries or wrestling on the living room floor—held lasting significance and remain vivid in Travis' memory. *Id.* Jonathan "believed in me and instilled hope and dreams for the future," both personally and for his family. *Id.* at ¶ 4.

Despite the demands of adulthood, Jonathan maintained close contact with Travis before his deployment. *Id.* at ¶ 5. Travis helped Jonathan and his fiancée Eva move into a new apartment shortly before Jonathan left for duty. *Id.* During that time, Jonathan shared plans for his future,

[36] Travis Roybal's New Mexico birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 39, Declaration of Travis Roybal dated April 1, 2026.

including building a lowrider Impala, hosting gatherings upon his return, and continuing to provide for his children and fiancée. *Id.* Jonathan expressed optimism and ambition and spoke frequently about the life he intended to build after his military service. *Id.*

Jonathan's death had an immediate and lasting emotional impact on Travis. *Id.* at ¶ 7. He learned of his brother's death when his aunt called the family home and informed him that Jonathan had been killed in action. *Id.* Travis was then responsible for telling his mother, whose reaction he recalls with enduring distress. *Id.* The phone call announcing Jonathan's death was "the beginning of a profound, enduring sorrow for our family." *Id.*

Following Jonathan's death, [redacted] "It was when Jonathan passed that I found Jesus," and that faith-based mentorship has remained an important source of emotional support in coping with the loss. *Id.* at ¶¶ 8–9. Jonathan's death also contributed to financial strain within the family. *Id.* at ¶ 9. His loss was accompanied by debt and financial hardship that compounded the emotional burden of grief. *Id.* The loss has affected the family across generations. *Id.* at ¶ 10. [redacted] Travis recalls a quote Jonathan left behind that remains significant to the family: "in the end we will remember not the words of our enemies but the silence of our friends." *Id.* Their family is "a body missing a vital part." *Id.* Jonathan's service and death as a Marine came at "a tremendous personal cost" to those who loved him. *Id.* at ¶ 11.

Plaintiffs have requested an award of $2.5 million for Travis Roybal's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**7. Isaiah Roybal[37]**

Isaiah Roybal is the brother of Jonathan Grant. *See* Ex. 40 at ¶ 3. Jonathan Grant was Isaiah's mentor and a central source of guidance and inspiration throughout his life. *Id.* at ¶ 4. Isaiah recalls a specific memory in which an unplanned visit from Jonathan turned into "an impromptu boxing training session right in our living room," an experience marked by laughter, teaching, and brotherly bonding. *Id.* Jonathan was "always ready to teach, to share a moment of joy, and to strengthen our bond," and living with him involved learning "the ropes of life through his actions and words." *Id.* Isaiah tries to carry the values and memories Jonathan left behind. *Id.* Although Jonathan was the oldest sibling and moved out first, he consistently made efforts to remain present in the lives of his family members. *Id.* at ¶ 5. Isaiah spoke with Jonathan just days before his death. *Id.* Jonathan had called looking for their mother, who was not home at the time, but Isaiah was able to speak with him. *Id.* "Those last words he spoke to me are near and dear to me even to this day." *Id.* Within the family, Jonathan was "the embodiment of strength, love, and guidance," fulfilling multiple roles as "an exceptional brother, a devoted son, a loving fiancé, and a caring dad." *Id.* at ¶ 6.

Isaiah learned of Jonathan's death while returning home from school with his brother Travis. *Id.* at ¶ 7. The two were engaged in their usual after-school routine when the phone rang. *Id.* Travis answered and immediately began crying, signaling that something was wrong. *Id.* Their

[37] Isaiah Roybal's New Mexico birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 40, Declaration of Isaiah Roybal dated April 2, 2026.

aunt informed them that Jonathan had been killed. *Id.* Isaiah experienced "a sorrow so deep, it's a feeling that never truly leaves you." *Id.* The responsibility of sharing the news with other family members was emotionally overwhelming and remains largely a blur in his memory. *Id.*

Following Jonathan's death, Isaiah navigated the aftermath of the loss without professional mental-health services, relying instead on personal coping mechanisms and support from family and friends to endure the loss of his brother and mentor. *Id.* at ¶ 8. Jonathan's death also affected the family's financial circumstances. *Id.* at ¶ 9. [redacted] Isaiah has watched Jonathan's children grow up without their father which has been a continual reminder of the loss. *Id.* at ¶ 10. As the youngest sibling, Isaiah describes Jonathan's death as "a harsh introduction to the extremities of grief," stating that he felt isolated and lacked someone who could understand what he was experiencing. *Id.* "I never felt I had anyone around to help me through my sorrow and grief." *Id.* Jonathan's absence has left "a piece of me hurting that feels as though it will never be fully mended." *Id.* at ¶ 11.

Plaintiffs have requested an award of $2.5 million for Isaiah Roybal's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**8. Lorin Roybal[38]**

Lorin Roybal is the brother of Jonathan Grant. *See* Ex. 41 at ¶ 3. Jonathan was Lorin's closest friend. *Id.* at ¶ 4. In the years immediately preceding Jonathan's military service, their relationship deepened substantially through shared interests, including sports, cars, and movies. *Id.* Their similar sense of humor resulted in constant joking and teasing, making their time together "filled with laughter." *Id.* One of the most significant experiences Lorin witnessed was Jonathan becoming a father. *Id.* Jonathan's joy and love for his children were "unparalleled," and it was evident that "he would do anything for them." *Id.* According to Lorin, Jonathan's children "were his world," and his devotion to them was inspiring. *Id.* Before Jonathan's deployment, the brothers shared deep conversations about God and life, revealing a different side of Jonathan and strengthening their bond. *Id.* Their relationship became especially close during the later years of Lorin's teenage life. *Id.* at ¶ 5. Although they had spent less time together during early childhood due to Jonathan being the eldest sibling and already living away from home, they became inseparable during these later years. *Id.* Their shared time included long conversations, watching sports, playing basketball, enjoying meals together, and spending meaningful time with Jonathan's children. *Id.* Following Jonathan's entry into military service, their bond continued to strengthen. *Id.* They met several times each month, engaging in conversations about work, family, and their hopes and ambitions. *Id.* These discussions were "deep, meaningful exchanges." *Id.*

Jonathan's devotion to his family was central to his identity, particularly his commitment to his fiancée and children. *Id.* at ¶ 6. His role as a father and partner was paramount, and his actions consistently reflected that his family was his highest priority. *Id.*

---

[38] Lorin Roybal's New Mexico birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 41, Declaration of Lorin Roybal dated April 1, 2026.

Lorin heard troubling rumors at church about Jonathan and rushed home to learn that Jonathan had been killed. *Id.* at ¶ 7. The news left the family devastated and in complete shock. *Id.* Immediate family members gathered in mourning, struggling to comprehend that Jonathan would never return home. *Id.* As they processed the loss, they notified relatives and friends outside the immediate family by telephone. *Id.*

Lorin has relied on the support of his family to navigate and manage his grief. *Id.* at ¶ 8. [redacted] Jonathan's children, who were too young at the time to fully understand their loss, were forced to grow up without their father's guidance and support. *Id.* This absence is especially evident during major life events, including graduations, weddings, and the births of Jonathan's grandchildren. *Id.* The loss also strained relationships among surviving family members as each coped with the grief in different ways. *Id.* "It's important to acknowledge that while Jonathan's death has left a mark of grief on our family, it has also deepened our appreciation for the sacrifices made by those who serve." *Id.* at ¶ 10.

Plaintiffs have requested an award of $2.5 million for Lorin Raybal's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**I. VEASHNA MUY – JUNE 23, 2005, ATTACK – FALLUJAH**

On June 23, 2005, an SVBIED struck a Medium Tactical Vehicle Replacement ("MTVR") carrying Marines from Regimental Combat Team 8 on MSR Michigan in the middle of Fallujah. ECF 9 at ¶ 1037; Ex. 4 at 31-32. The vehicle also came under small-arms fire after the explosion, and the MTVR was set on fire resulting in five Marine killed, including PFC Veashna Muy. *Id.* The autopsy report for PFC Muy states that he [redacted]

[redacted][39] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which PFC Muy was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the June 23, 2005 attack in which PFC Veashna Muy was killed. *See* Ex. 1.

PFC Muy's sister and half-brother—Levan Muy and Prechrenya Hul—are Plaintiffs in this case. See ECF No. 9 at ¶¶ 1036-1041. The Plaintiffs have suffered severe mental anguish, extreme emotional pain and suffering, and loss of PFC Muy's society, companionship, comfort, advice, and counsel. *Id*. at ¶ 1041. The following chart reflects the claims asserted by Levan Muy and Prechrenya Hul in their individual capacities arising out of the June 23, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Levan Muy | PFC Veashna Muy's sister | Solatium claim $2,500,000.00 | Declaration of Levan Muy, dated February 17, 2026, including copy of her proof of U.S. citizenship | 43 |
| Pechrenya Hul | PFC Veashna Muy's brother | Solatium claim $2,500,000.00 | Declaration of Pechrenya Hul, dated April 9, 2026, including copy of his proof of U.S. citizenship | 44 |

[39] Ex. 42, Autopsy Examination Report for Muy, Veashna, dated September 8, 2005.

### 1. Levan Muy[40]

Levan Muy is the sister of Veashna Muy. *See* Ex. 43 at ¶ 3. Veashna was the middle child of three children raised by their single mother. *Id.* at ¶ 4. As the youngest and only daughter, Levan shared a particularly close bond with Veashna, whom she describes not only as a sibling but as a protector within the family. *Id.* Because their eldest brother had a disability requiring constant care, Veashna assumed responsibility as a guardian figure for the family. *Id.* Despite those responsibilities, he completed high school with a defined goal of serving in the military. *Id.* His enlistment in the Marines was a source of immense pride for the family, and he pursued that path without the obligations of a romantic partner or children, reflecting his dedication and selflessness. *Id.* Veashna became a Marine before turning twenty years old, progressing from a protective presence at home to a servicemember whose role deeply shaped Levan's life. *Id.* Levan and Veashna grew up living under the same roof, sharing daily life and formative experiences that established an unusually close sibling relationship. *Id.* at ¶ 5. Their birthdays were one day apart, and they celebrated them together. *Id.* They appeared together in school photographs, and their lives were "intertwined in the most intimate ways." *Id.* Even after Veashna entered military service, they remained closely connected, communicating every three days. *Id.* When Veashna returned home, he spent his time with family during his off days, reinforcing the continuity of their bond despite physical distance and the demands of his military career. *Id.*

Veashna's capacity for maintaining close relationships extended beyond the immediate family. *Id.* at ¶ 6. He developed a significant bond with his uncle who was incarcerated, and he actively encouraged family members to write letters so that his uncle would not feel isolated,

[40] Levan Muy's California birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 43, Declaration of Levan Muy dated February 17, 2026.

recognizing the emotional importance of continued connection. *Id.* This effort resulted in a lasting and meaningful relationship between Veashna and his uncle that remained significant until Veashna's death. *Id.* More broadly, Veashna was generous in his personal relationships, regularly spending time with relatives and friends and taking them out to eat or shop, or speaking with them by phone. *Id.*

Levan learned of her brother's death when two Marines came to the family home during the night and informed her mother that Veashna's unit had been involved in a shootout and that his vehicle had exploded. *Id.* at ¶ 7. The Marines indicated that additional information would follow. *Id.* The period immediately thereafter was one defined by disbelief and hope that Veashna might still be alive. *Id.* In the days that followed, the family continued to hope for his survival, encouraging prayers. *Id.* That hope was ultimately extinguished, and the family was required to inform relatives that Veashna had, in fact, passed away in combat. *Id.* "I still almost don't believe that he is gone, because I never got to see his body." *Id.*

Following Veashna's death, Levan made the personal choice to deal with emotions and grief on her own which she described as both difficult and isolating. *Id.* at ¶ 8. "The absence of professional support in my healing process reflects a deeply personal choice in confronting the profound loss of my brother." *Id.*

Plaintiffs have requested an award of $2.5 million for Levan Muy's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**2. Pechrenya Hul[41]**

Pechrenya Hul is the half-brother of Veashna Muy. *See* Ex. 44 at ¶ 3. Pechrenya was ten years old when he first learned that he had a brother and sister. *Id.* at ¶ 4. Until that point, he believed he was an only child. *Id.* Coming home from school and finding his siblings in the living room was initially confusing and overwhelming, but that confusion quickly turned into excitement and happiness upon realizing he was no longer alone. *Id.* The experience of suddenly having siblings close to his age was something he had always wished for, and his brother's presence, though brief, was "profoundly impactful, filling a piece of me I didn't know I needed." *Id.* Veashna made it a priority to enrich Pechrenya's life, frequently giving him gifts and taking him on outings. *Id.* at ¶ 5. His brother and sister made everyday life feel celebratory, and having siblings was a new and exhilarating experience. *Id.* Pechrenya and Veashna shared interests and spent extensive time together skateboarding, an activity his brother introduced with patience and enthusiasm. *Id.* Veashna was a mentor who taught Pechrenya lessons about perseverance, kindness, and respect for others regardless of circumstance. *Id.* Their bond was reinforced through these shared activities and through Veashna's surprise visits after school, which Pechrenya states he "cherished deeply." *Id.*

The three years they shared together before Veashna joined the Marines were precious. *Id.* Veashna was independent and loyal, with a natural inclination to guide and teach. *Id.* at ¶ 6. Veashna actively observed Pechrenya's actions, gently correcting him and introducing him to new manners and ways of thinking. *Id.* This guidance extended to the rest of the family as Veashna

[41] Pechrenya Hul's California birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 44, Declaration of Pechrenya Hul dated April 9, 2026.

consistently sought to spend time with each family member, sharing his support and attention. *Id.* Veashna was a unifying presence, bringing warmth and cohesion to family gatherings. *Id.*

Pechrenya learned of Veashna's death while he was at school several days after it happened. *Id.* at ¶ 7. His sister and mother attempted to tell him gently, but no amount of preparation could lessen the impact. *Id.* He was devastated beyond words and entered a period of grief so severe that he struggled to eat, sleep, or engage in normal daily activities. *Id.* He recalls crying continuously "from dusk till dawn," and describes a physical reaction of nausea and shock upon being told definitively that Veashna would not be coming home. *Id.*

In addition to emotional loss, Veashna's death caused financial instability within the household. *Id.* at ¶ 8. After his parents separated, Veashna assumed the role of a father figure and provider, ensuring the family's needs were met while their mother maintained the home and cared for the children. *Id.* With Veashna's death, the family lost that financial and structural support. *Id.* As a consequence of Veashna's death, [redacted] Family gatherings ceased, and members of the family became isolated from one another as each attempted to cope independently. *Id.* Over time, [redacted] The loss of his brother dismantled the family's foundational structure and permanently altered their relationships and roles. *Id.*

Plaintiffs have requested an award of $2.5 million for Pechrenya Hul's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

### J. AARON H. REED – AUGUST 3, 2005, ATTACK – BARWANAH

As part of Operation Quick Strike in Barwanah, Lima Company, 3d Battalion, 25th Marines set out in an Amphibious Assault Vehicle (AAV) to locate the perpetrators of an ambush that had killed multiple scout snipers a few days prior. Ex. 4 at 35. The AAV was struck by an IED that flipped the AAV and set it on fire resulting in the deaths of 14 Marines including LCpl. Aaron H. Reed. ECF No. 9 at ¶¶ 1086, 1091, 1096; Ex. 4 at 35-36. According to a Casualty Report issued on August 4, 2005, LCpl. Reed's cause of death was noted as [redacted][42] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Reed was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the August 3, 2005 attack in which LCpl. Aaron H. Reed was killed. *See* Ex. 1.

LCpl. Reed's father, Stephen Reed, is a plaintiff in this case. *See* ECF No. 9 at ¶¶ 1090-1094. The Plaintiff suffered severe mental anguish, extreme emotional pain and suffering, and loss of LCpl. Reed's society, companionship, comfort, advice, and counsel. *Id*. at ¶ 1094. The following chart reflects the claims asserted by Stephen Reed in his individual capacity arising out of the August 3, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|

[42] Ex. 45, Casualty Report No. SLL5348A for Reed, Aaron H.

| | | | | |
|---|---|---|---|---|
| Stephen Reed | LCpl. Aaron H. Reed's father | Solatium claim $5,000,000.00 | Declaration of Stephen Reed, dated April 8, 2026, including copy of his proof of U.S. citizenship | 46 |

### 1. Stephen Reed[43]

Stephen Reed is the father of Aaron Reed. *See* Ex. 46 at ¶ 3. Their relationship was "a bond that is both profound and indescribable," built on "the unspoken, everyday moments that define a father-son connection." *Id.* at ¶ 4. Stephen witnessed his son's growth and shared the daily aspects of life together as the foundation of their relationship, and "[e]ach day brought its own set of joys, challenges, and quiet moments, weaving a tapestry of memories that are invaluable to me." *Id.*

Learning of his son's death was "one of profound shock and heartbreak, forever etched in my memory." *Id.* at ¶ 5. He was informed of Aaron's death during a home visit by the Marine Corps, and he recalled feeling "a sense of disbelief, as if the world around me had come to a standstill." *Id.* Sharing this news with other family members was "one of the most difficult things I've ever had to do." *Id.*

Following the loss of his son, [redacted] Aaron's death left the family "utterly devastated," affecting "every aspect of our lives and the very fabric of our family." *Id.* at ¶ 7. The family's overall well-being and quality of life were "profoundly impacted," leaving them to navigate a world that "feels significantly dimmer without his presence." *Id.* The

[43] Stephen Reed's United States passport and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 46, Declaration of Stephen Reed dated April 8, 2026.

grief affected family relationships, as each family member struggled with sorrow in different ways, sometimes "struggling to find the right words or actions to support one another." *Id.* Stephen anticipates the long-term effects of Aaron's death "with a heavy heart." *Id.* at ¶ 8. The loss of his son was not "a singular event but an ongoing journey of grief and adaptation for our family," and the way they navigate the world has been "forever changed." *Id.*

Plaintiffs have requested an award of $5 million for Stephen Reed's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

### K. WILLIAM BRETT WIGHTMAN – AUGUST 3, 2005, ATTACK -- BARWANAH

As part of Operation Quick Strike in Barwanah, Lima Company, 3d Battalion, 25th Marines set out in an Amphibious Assault Vehicle (AAV) to locate the perpetrators of an ambush that had killed multiple scout snipers a few days prior. Ex. 4 at 35. The AAV was struck by an IED that flipped the AAV and set it on fire resulting in the deaths of 14 Marines including LCpl. William Brett Wightman. ECF No. 9 at ¶¶ 1086, 1091, 1096; Ex. 4 at 35-36. LCpl. Wightman's autopsy report noted [redacted][44] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which LCpl. Wightman was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the August 3, 2005 attack in which LCpl. William Brett Wightman was killed. *See* Ex. 1.

LCpl. Wightman's father, William Wightman, is a plaintiff in this case. *See* ECF No. 9 at ¶¶ 1086-1089. The Plaintiff suffered severe mental anguish, extreme emotional pain and suffering,

[44] Ex. 47, Final Autopsy Examination Report for Wightman, William B., dated August 22, 2005 at 2.

and loss of LCpl. Wightman's society, companionship, comfort, advice, and counsel. *Id*. at ¶ 1089. The following chart reflects the claims asserted by William Wightman in his individual capacity arising out of the August 3, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| William Wightman | LCpl. William Brett Wightman's father | Solatium claim $5,000,000.00 | Declaration of William Wightman, dated April 2, 2026, including copy of his proof of U.S. citizenship | 48 |

### 1. William Wightman[45]

William Wightman is the father of William Brett Wightman ("Brett"). *See* Ex. 48 at ¶ 3. Brett was a source of profound pride and emotional connection. *Id.* at ¶ 4. Brett's life was marked by significant achievements, including service as team captain of his high school football team, qualifying for the state finals in high jump, and being crowned prom king. *Id.* Beyond those accomplishments, Brett was defined by his character. *Id.* Following Brett's death, a classmate approached William and his wife during Brett's calling hours and explained that although she was not among the popular students at school, she considered Brett a friend. *Id.* That interaction reflected Brett's inclusive nature, as he "never judged" and "was always kind and there for anyone in need of a friend." *Id.* Brett's "smile and laughter were infectious." *Id.* Beginning when Brett was approximately three years old, following William's divorce from Brett's mother, father and son spent countless weekends together. *Id.* at ¶ 5. Their time was filled with shared activities such

[45] William K. Wightman's Ohio birth certificate and declaration confirm that he is a U.S. citizen, and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 48, Declaration of William Wightman, dated April 2, 2026.

as sports, watching movies, and having pizza together. *Id.* As Brett grew older, their activities changed, but the closeness of their relationship remained constant, rooted in shared time and experiences. *Id.* Even after Brett enlisted in the Marine Corps, he continued to visit nearly every weekend or, when unable to do so, maintained regular contact by phone. *Id.* William cherished hearing Brett's stories about his service and his unit, and he recalls sitting on his deck eagerly awaiting Brett's visits, knowing that time spent together would always be meaningful. *Id.* Their relationship developed into a deep friendship that William "deeply miss[es]." *Id.*

Brett's relationships within the family were similarly strong as he formed a close bond with William's wife, Kim. *Id.* Brett also maintained close relationships with friends from high school and with extended family, including his cousin. *Id.* He spent time attending baseball games, such as Cincinnati Reds games, and socializing with those close to him. *Id.* Brett was "growing up exactly as I had hoped," surrounded by meaningful relationships, love, and engagement with family and friends. *Id.*

William's memory of learning about Brett's death is vivid and painful. *Id.* at ¶ 6. At the time, he was working the third shift loading airplanes, and during a break, he stepped outside and looked up at the night sky, thinking about Brett and wondering what he was doing at that moment. *Id.* After completing his shift, William drove home while listening to the morning news on the radio when he heard that fourteen Marines had been killed by an IED in Iraq. *Id.* He discussed the news with his wife and attempted to reassure her, believing Brett's unit was not involved. *Id.* That belief was shattered when Kim woke him abruptly, saying, "They're here." *Id.* He experienced a mix of anger and helplessness, alongside a sense of calm, as he came to terms with the loss of "Brett, who meant the world to me." *Id.* Brett's death affected not only his immediate family but

also the wider Ohio community, as many of the Marines killed that day were from the state, creating both communal and deeply personal grief. *Id.*

The loss of Brett, William's only child, left what he describes as an irreplaceable hole in his life. *Id.* at ¶ 7. He continues to struggle with persistent "what ifs," reflecting on the future and possibilities that ended with Brett's death. *Id.* The family has attempted to cope by keeping Brett's memory alive through constant conversation and remembrance. *Id.* Even years later, these discussions regularly bring tears, underscoring the enduring pain of the loss and the depth of their love for Brett. *Id.* In his efforts to preserve Brett's memory, William established a foundation in Brett's name, which serves both as a tribute and as a continuing reminder of the loss left by Brett's absence. *Id.* at ¶ 8.

Plaintiffs have requested as award of $5 million for William Wightman's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

### L. MICHAEL JOSEPH McMULLEN – DECEMBER 24, 2005, ATTACK – RAMADI

On December 24, 2005, the Army's 243d Engineer Company and 180th Transportation Company were conducting a convoy in Ramadi on MSR Michigan when an IED detonated engulfing the first vehicle in the convoy in flames. Ex. 4 at 54. SSgt. Michael Joseph McMullen pulled the driver of the first vehicle out when a second IED detonated that [redacted] that led to SSG McMullen's death on 10 January 2006 at Walter Reed Army Medical Center in Washington, DC." *Id.*; *see also* ECF No. 9 at ¶¶ 1301-1303. SSgt. McMullen's autopsy report found [redacted]

[redacted]

[redacted][46] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which SSgt. McMullen was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the December 24, 2005 attack in which SSgt. Michael Joseph McMullen was killed. *See* Ex. 1.

SSgt. McMullen's father and sister—David McMullen and Jeanette Roberts—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1300-1309. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Michael Joseph McMullen's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1309. The following chart reflects the claims asserted by David McMullen and Jeanette Roberts in their individual capacities arising out of the December 24, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| David McMullen | SSgt. Michael Joseph McMullen's father | Solatium claim $5,000,000.00 | Declaration of David McMullen, dated February 11, 2025, including copy of his proof of U.S. citizenship | 50 |
| Jeanette Roberts | SSgt. Michael Joseph McMullen's sister | Solatium claim $3,125,000.00 | Declaration of Jeanette Roberts, dated March 24, 2026, including copy of her proof of U.S. citizenship | 51 |

[46] Ex. 49, Final Autopsy Report for McMullen, Michael Joseph, dated September 25, 2006 at 9.

### 1. David McMullen[47]

David McMullen is the father of Michael Joseph McMullen. *See* Ex 50 at ¶ 3. He became Michael's father following his marriage to Michael's mother, Robin, in 1984, at which time he adopted Michael and undertook the responsibilities of fatherhood. *Id.* at ¶ 4. Although his work as an over-the-road truck driver periodically took him away from home, their family life included regular shared time, including household projects and family game nights. *Id.* Michael was consistently present in the family's daily life and was described as intelligent, respectful, and easy-going. *Id.* He excelled academically and also distinguished himself in sports, music, and drama. *Id.* Michael initially aspired to become an executive chef and worked with experienced chefs, earning a scholarship to attend culinary school. *Id.* He ultimately chose a path of service and became a professional firefighter and paramedic, a role in which he excelled and found fulfillment. *Id.* His life and career choices reflected values of service, responsibility, and contribution to others. *Id.*

Michael maintained strong and consistent relationships with his family. *Id.* at ¶ 5. His relationship with his mother was particularly close, marked by regular communication and emotional support, including during his deployment in Kuwait, where he found ways to reassure her of his safety. *Id.* He maintained close bonds with siblings, extended family, and friends, regularly prioritizing time with them and demonstrating that relationships were sustained through consistent presence and effort. *Id.*

On December 24, 2005, the family received notice that Michael had been gravely injured in Iraq. *Id.* at ¶ 6. The notification occurred during a family Christmas gathering, abruptly altering

[47] David McMullen's Pennsylvania birth certificate and declaration confirm that he is a U.S. citizen and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 50, Declaration of David McMullen, dated February 11, 2025.

the holiday. *Id.* Initially, the family was told Michael would be transported to Germany, then they were informed that plans had changed and he would be brought directly to the United States. *Id.* The family was advised that he had survived the immediate critical period and was coming home, though he remained gravely wounded. *Id.* He was later transported to Walter Reed Medical Center, where, despite medical intervention, he never regained consciousness, and he died with family present. *Id.*

Following Michael's death, the family relied heavily on the Salisbury Fire Department, the community Michael served. *Id.* Through daily communication with the Department's Public Affairs Officer, the family coordinated notifications, updates, and dissemination of information to fellow firefighters, extended family, and the local community. *Id.* Personal visits, phone calls, and official communications were used to inform others of Michael's condition and death. *Id.*

David has managed his grief through personal means, including faith, rather than seeking professional medical treatment. *Id.* at ¶ 7. Michael's death resulted in significant financial consequences for the family. *Id.* at ¶ 8. [redacted] The emotional impact of Michael's death has been profound and enduring. *Id.* at ¶ 9. Michael's mother suffered the loss of her firstborn, an event that permanently altered the family's emotional landscape. *Id.* Michael's birthday is commemorated annually at Arlington, reinforcing the sense of loss and sacrifice. *Id.* Despite this, the family has grown closer in the aftermath, relying on resilience and mutual support. *Id.*

Michael's life was characterized as one of service rather than personal gain, and his death represents the permanent loss of future milestones, including marriage, children, and continued community service. *Id.* at ¶ 10. [redacted]

[redacted] Visits to Arlington and the presence of Michael's name on memorials serve as continual reminders of the life taken and the future denied. *Id.*

Plaintiffs have requested an award of $5 million for David McMullen's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**2. Jeanette Roberts[48]**

Jeanette Roberts is the sister of Michael Joseph McMullen. *See* Ex. 51 at ¶ 3. Michael was her older brother, and their relationship was close and enduring. *Id.* at ¶ 4. Jeanette recalls growing up with Michael and describes their shared childhood memories as warm and joyful. *Id.* One memory that remains especially vivid occurred during a family holiday trip to Hershey Park, where the park was decorated for Christmas. *Id.* She remembers eating chocolate together and joking that they were "on the brink of getting diabetes," and specifically remembers Michael insisting on buying a "jester-style Santa hat." *Id.* She still has a photograph of Michael, their brother Brian, and herself, with Michael wearing that hat and smiling. *Id.* The photograph, his smile, and the Santa hat—now kept by her father—"encapsulate the warmth and joy Michael brought into our lives." *Id.* Jeanette and Michael spent countless hours together listening to the 1990s grunge music he loved while rollerblading and skating. *Id.* at ¶ 5.

Even after Michael moved out of the family home at age 22, their relationship remained close. *Id.* They maintained their sibling bond through weekly family dinners and frequent phone calls, despite busy work schedules. *Id.* Michael also had a particularly close relationship with their

[48] Jeanette Roberts' Pennsylvania birth certificate and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 51, Declaration of Jeanette Roberts, dated March 24, 2026.

mother, Robin McMullen, serving not only as her son but as one of her closest confidants. *Id.* Beyond his family life, Michael formed strong bonds through his work as a firefighter and EMT. *Id.* His career was more than a job as it connected him to a brotherhood. *Id.* He spent his free time with his coworkers at barbecues, bonfires, and fishing trips, and was frequently at the center of social gatherings. *Id.* Michael's "presence made every gathering brighter." *Id.*

When Jeanette learned of Michael's death, it was a moment that "shattered" her world. *Id.* at ¶ 7. She had recently returned from visiting him at Walter Reed Medical Center, where he was being treated for severe injuries sustained on Christmas Eve 2005. *Id.* Despite the seriousness of his condition, she had been "holding onto a sliver of hope," having been told earlier that his injuries would not be fatal. *Id.* She learned of his death when her father appeared unexpectedly at her workplace, Barnes & Noble, and told her she needed to come home immediately. *Id.* Michael had died from an infection that spread to his brain; she was informed that, had he survived, he would have been left with no brain function and unable to walk. *Id.*

In the aftermath of Michael's death, [redacted] Michael's death changed the course of her life. *Id.*

[redacted]

Michael's death also altered the dynamics of their family in lasting ways. *Id.* at ¶ 11. The attention surrounding his passing complicated the grieving process for all of them. *Id.* [redacted] At the time of Michael's death, Jeanette was pregnant with her son, who was later born without ever having the opportunity to meet his uncle. *Id.* Weekly family dinners became monthly as each family member processed their grief differently. *Id.* Over time, her younger brother married and moved away, seeking distance from memories tied to the loss. *Id.* While she remains close with her father, her mother has since passed away, and her contact with her younger brother has become sporadic. *Id.*

Plaintiffs request an upward enhancement of Jeanette Roberts' claims based on her [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). Plaintiffs request an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Jeanette Roberts' solatium claim.

Although no amount of money is sufficient to compensate Jeanette Roberts for the tragic death of her brother, based on the precedents in comparable cases, the Special Master recommends an upward adjustment of 25% of the baseline award for a sibling, to a total of $3.125 million because of the extended suffering she had to endure while Michael was hospitalized for his injuries before he died, and the extreme impact that had on Jeanette, including [redacted]

### M. GEORGE ANTHONY LUTZ II – DECEMBER 29, 2005, ATTACK – FALLUJAH

On December 29, 2005, Cpl. George Anthony Lutz II was manning the gun turret in a HMMWV as part of a patrol with Weapons Company, 2d Battalion, 6th Marines in downtown Fallujah when he was shot in the chest by a single sniper bullet. Ex. 4 at 55; ECF No. 9 at ¶¶ 1311-1312. Cpl. Lutz's Report of Casualty noted his cause of death as [redacted][49] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpl. Lutz was killed on November 25, 2024 (ECF No. 33), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the December 29, 2005 attack in which Cpl. George Anthony Lutz II was killed. *See* Ex. 1.

Cpl. Lutz's surviving parents and siblings—George Lutz, Patricia Lutz, Kenneth Lutz, Sarah Hummel, Hannah Cohen, and Rachel Lutz—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 1310-1320. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of George Anthony Lutz II's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 1320. The following chart reflects the claims asserted by George Lutz, Patricia Lutz, Kenneth Lutz, Sarah Hummel, Hannah Cohen, and Rachel Lutz in their individual capacities arising out of

[49] Ex. 52, Report of Casualty for Lutz, George Anthony II.

the December 29, 2005, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| George Lutz | Cpl. George Anthony Lutz II's father | Solatium claim $5,000,000.00 | Declaration of George Lutz, dated January 27, 2025, including copy of his proof of U.S. citizenship | 53 |
| Patricia Lutz | Cpl. George Anthony Lutz II's mother | Solatium claim $5,000,000.00 | Declaration of Patricia Lutz, dated January 27, 2025, including copy of her proof of U.S. citizenship | 54 |
| Kenneth Lutz | Cpl. George Anthony Lutz II's brother | Solatium claim $2,500,000.00 | Declaration of Kenneth Lutz, dated January 10, 2025, including copy of his proof of U.S. citizenship | 55 |
| Sarah Hummel | Cpl. George Anthony Lutz II's sister | Solatium claim $2,500,000.00 | Declaration of Sarah Hummel, dated January 8, 2025, including copy of her proof of U.S. citizenship | 56 |
| Hannah Cohen | Cpl. George Anthony Lutz II's sister | Solatium claim $2,500,000.00 | Declaration of Hannah Cohen, dated January 15, 2025, including copy of her proof of U.S. citizenship | 57 |
| Rachel Lutz | Cpl. George Anthony Lutz II's sister | Solatium claim $2,500,000.00 | Declaration of Rachel Lutz, dated April 17, 2026, including copy of her proof of U.S. citizenship | 58 |

**1. George Lutz[50]**

George Lutz is the father of George Anthony Lutz II. *See* Ex. 53 at ¶ 3. Mr. Lutz's relationship with his son "was the epitome of a close father/son bond." *Id.* at ¶ 4. In the three years prior to his son's death, they "made it a point to spend time together and talk regularly, sharing the joys and challenges of life," with frequent conversations centered on his son's experiences as a new father and the raising of his own family. *Id.* The loss has left a persistent void, particularly during milestones his son should have witnessed, and Mr. Lutz finds himself wishing his son "could have been here to witness" his children's milestones and "the everyday moments that we often take for granted." *Id.* His son's relationships within the family were exceptionally close and emotionally significant. *Id.* at ¶ 5. His son and his siblings "were not just brothers and sisters but also his closest friends," and his son played a central role in family life by making "each family gathering memorable" and filling the home "with laughter and warmth." *Id.* His son's ability to connect with others extended beyond the immediate family and "touch[ed] the lives of many friends," underscoring the breadth of the personal loss experienced by those who knew him. *Id.*

The day that Mr. Lutz learned of his son's death was an otherwise ordinary day that was shattered when "the knock on the door by the army notification team" brought the devastating news. *Id.* at ¶ 6. Standing in the doorway of the family home—a place filled with shared memories—he was confronted with "the most devastating news," and sharing the news with other family members and friends was "one of the hardest things I've ever had to do." *Id.* Each conversation "reopened the wound," making the loss feel more real and more painful each time. *Id.*

[50] George Lutz's United States passport and declaration confirm that he is a U.S. citizen and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 53, Declaration of George Lutz, dated January 27, 2025.

The effect of his son's death on the family has been devastating and far-reaching. *Id.* at ¶ 8. Family dynamics have shifted significantly, particularly because his son "was the sole support of his family," leaving his wife and children without that support and requiring extended family members to "make significant adjustments to fill the void he left behind." *Id.* Mr. Lutz characterizes the loss of someone who was simultaneously "a son, a father, a husband, a brother, a grandson, an uncle, and a cousin" as "profound and far-reaching" and affecting "every aspect of our lives." *Id.* at ¶ 9.

Plaintiffs have requested an award of $5 million for George Lutz's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**2. Patricia Lutz[51]**

Patricia Lutz is the mother of George Anthony Lutz II ("Tony"). *See* Ex. 54 at ¶ 3. Tony was "the kind of person whose presence was a comfort and whose laughter was infectious," and that even shortly before his deployment, he sought more time with his parents, asking them to return to Fort Bragg just a week after a visit so they could spend additional time together. *Id.* at ¶ 4. That final visit, now preserved in photographs of Tony with "his wife, his three-year-old son, and newborn daughter," has become a central emotional anchor for her grief, particularly as "living without him has been an unimaginable challenge." *Id.* As a stay-at-home mother, Patricia spent every day with Tony, homeschooling him and his siblings through seventh grade and later teaching at the Christian school he attended. *Id.* at ¶ 5. Tony and his wife lived with his parents for a period, and even after they moved out, Patricia maintained closeness through weekly phone calls and

[51] Patricia Lutz's United States passport and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 54, Declaration of Patricia Lutz, dated January 27, 2025.

visits. *Id.* Tony's death has "robbed me of the chance to witness so many milestones I had dreamt of sharing with him—his children's graduations, marriages, and the simple joy of watching him grow older." *Id.*

Tony was a central emotional pillar within the family, and "Tony's heart was vast" serving not only as a brother but also as "a protector, a confidant, and at times, a stand-in father figure," including walking his sister to a father-daughter banquet when their father was away. *Id.* at ¶ 6. His devotion to family continued into adulthood, and his role as a father was where "his brilliance in love truly shone," where his adoration for his children was "palpable" and became "the essence of his being." *Id.* His daily conversations with his father and sustained closeness with siblings reflected a family structure built on "respect, love, and mutual admiration." *Id.*

Learning of Tony's death was a moment of overwhelming trauma. *Id.* at ¶ 7. Patricia recalls two uniformed military officers arriving at the family home to deliver "the heart-shattering news of our son's death," describing the experience as a "tidal wave of grief that seemed to drown out the world." *Id.* The timing intensified the shock as a season normally filled with joy became one of "unspeakable sorrow." *Id.* Reliving the pain repeatedly as she and her husband informed siblings, relatives, and friends of his death was "a reminder of the magnitude of our loss." *Id.*

In response to the collapse of her emotional stability following Tony's death, [redacted]

[redacted], it also produced a lasting shift in family dynamics. *Id.* The absence of "his warm hugs and bright smile" continues to shape every aspect of family life, from celebrations and milestones to ordinary daily moments. *Id.* at ¶ 10.

Plaintiffs have requested an award of $5 million for Patricia Lutz's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**3. Kenneth Lutz[52]**

Kenneth Lutz is the brother of George Anthony Lutz II ("Tony"). *See* Ex. 55 at ¶ 3. Tony "was not just a sibling to me; he was my best friend," and their relationship was grounded in constant companionship, mutual reliance, and emotional closeness. *Id.* at ¶ 4. One of the most significant periods of their lives occurred when they lived together during the birth of Tony's first son, a time that allowed Kenneth to witness "firsthand the kind of loving father he became from day one." *Id.* Their conversations—whether daily or spaced by circumstances—were "always filled with laughter, advice, and support." *Id.* Growing up, the brothers were inseparable, spending "every day together" and developing a shared identity around cross-country running. *Id.* at ¶ 5. Training together daily was not merely athletic preparation but their "special time to talk about life, share our dreams, and support each other through everything." *Id.* Even when life diverged—Tony entering military service and Kenneth relocating to California—their bond "remained unbreakable," maintained through regular communication two to three times per week. *Id.* Tony was someone with "a heart as vast as the ocean" whose ability to love and connect defined his role

[52] Kenneth Lutz's United States passport and declaration confirm that he is a U.S. citizen and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 55, Declaration of Kenneth Lutz, dated January 10, 2025.

within the family. *Id.* at ¶ 6. Tony maintained deep, meaningful relationships with his parents, wife, children, and siblings, and "family meant everything to him." *Id.*

Kenneth learned of Tony's death in Virginia visiting a friend when the military arrived at the family home to deliver the news. *Id.* at ¶ 7. By the time Kenneth returned, it was his father who told him his brother had been killed. *Id.* They "both broke down, crying uncontrollably and embracing each other in a way that words cannot fully capture," a memory that will "forever remain with me." *Id.* Sharing the news with others is largely a blur, consisting of phone calls that repeated the same shock and sorrow. *Id.*

Following Tony's death, Kenneth's grieving process has been "a deeply personal one," navigated without professional intervention. *Id.* at ¶ 8. Tony's death profoundly altered the entire family structure. *Id.* at ¶ 9. "The loss of Tony has impacted our family in ways that words can scarcely capture." *Id.* His wife—and future children—have been "deprived of the chance to know him personally," and family gatherings "have never been the same since his passing." *Id.* Since Tony's death, Kenneth has taken on an expanded role in his niece's life, striving to provide "the involvement and support [Tony] undoubtedly would have offered." *Id.* The toll is continuing on his father, who has devoted his life to honoring fallen service members, including Tony, a commitment that requires reliving the loss daily. *Id.* Kenneth states that Tony's death "will undoubtedly continue to impact my family for generations," noting with particular pain that his children "will never have the chance to meet him, to learn from him, and to experience the love and joy he brought into every room." *Id.* at ¶ 10. He describes Tony as "the best uncle they could have ever wished for," and explains that the knowledge future generations will only know Tony through stories and memories "adds a layer of sadness to our grief." *Id.*

Plaintiffs have requested an award of $2.5 million for Kenneth Lutz's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**4. Sarah Hummel**[53]

Sarah Hummel is the sister of George Anthony Lutz II ("Tony"). *See* Ex. 56 at ¶ 3. Tony, her younger brother by two and a half years, was Sarah's "classmate, my field trip buddy, and the first member of any club I started," making him a constant presence throughout her life from childhood onward. *Id.* at ¶ 4. When Tony decided to join the Army, motivated by a desire "to combat the forces behind the September 11 events," she supported him actively, sending "lengthy letters every week during his boot camp days," and describes his enthusiasm for training and learning as "infectious." *Id.* Their adult lives were also intertwined including the period when both siblings were expecting children at the same time. *Id.* She recounts with particular pain the joy they shared "discussing our pregnancies and dreaming of our children growing up together as cousins," a future that was never realized. *Id.* The last time she saw Tony—when he visited to meet her newborn son, whom she named David Anthony in his honor—remains a treasured memory, including Tony's playful remark about "taking David home with him in his suitcase." *Id.* Their final shared Thanksgiving in 2004 is described as a cherished but haunting memory, "filled with hopes for future gatherings that were never to be." *Id.*

Throughout their lives, Sarah and Tony maintained an exceptionally close bond. *Id.* at ¶ 5. Growing up with Tony was "an adventure filled with shared experiences and unwavering support," marked by attending "every one of each other's extracurricular activities," sharing meals, and

[53] Sarah Hummel's United States passport and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 56, Declaration of Sarah Hummel, dated January 8, 2025.

worshiping together every Sunday. *Id.* In the three years prior to his death, they spoke "sometimes daily or at least weekly," discussing his Army experiences, his growing family, and her new life in California, as well as their shared excitement about their children's futures. *Id.* "Tony was not just my brother; he was my confidant, my support system, and my advisor," and Sarah emphasizes her grief over his absence from milestones she assumed he would witness. *Id.* Tony was a "central figure" during holidays and gatherings, where he actively engaged with everyone and made moments memorable. *Id.* at ¶ 6. His approach to relationships—focused on nurturing, celebrating successes, and offering support—continues to shape how the family understands connection and loss. *Id.*

Learning of Tony's death "altered the course of my life." *Id.* at ¶ 7. Her father's early-morning phone call, "filled with inconsolable crying," signaled the tragedy, and the drive to her parents' home was marked by dread and anxiety. *Id.* When her father met her in the driveway and told her Tony had been killed, she experienced profound shock and numbness, describing the following days as ones of "paralyzing grief." *Id.* Sharing the news with others fell largely on her father, while she followed up in "heart-wrenching conversations," as public and media attention underscored the breadth of Tony's impact. *Id.*

[redacted]

[redacted]

Beyond personal and financial harm, Tony's death fundamentally altered family roles. *Id.* at ¶ 10. Her son—who carries Tony's name—"will now only know his uncle through the stories we tell." *Id.* The pain of his absence "doesn't diminish; it evolves," becoming part of her identity, marked by an unending longing for "his presence, his voice, and his guidance." *Id.* at ¶ 11.

Plaintiffs have requested an award of $2.5 million for Sarah Hummel's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**5. Hannah Cohen**[54]

Hannah Cohen is the sister of George Anthony Lutz II ("Tony"). *See* Ex. 57 at ¶ 3. Tony "was my protector, my confidant, and the glue that held our family together with his vibrant, 'up for anything' personality," and from childhood he embraced his role as the older sibling, ensuring she always felt included and supported. *Id.* at ¶ 4. He was "the life of every family gathering," bringing energy and joy wherever he went. *Id.* Hannah recounts a childhood and early adulthood defined by deep closeness, characterized by "weekly family dinners and game nights" filled with "endless laughter" due to his "quick wit and infectious humor." *Id.* at ¶ 5. Even when their lives diverged geographically—with her attending college in northern Virginia and him stationed at Fort Bragg with his family—Tony made a point of staying closely connected through frequent phone

[54] Hannah Cohen's United States passport and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 57, Declaration of Hannah Cohen, dated January 15, 2025.

calls and online chats, offering "brotherly advice" and emotional reassurance. *Id.* Witnessing him before deployment and observing his transformation into "a devoted, loving father" was, she states, "profoundly moving," and his tenderness toward his son and infant daughter reflected "the incredible man he was." *Id.*

Tony maintained deep and distinct relationships with each member of the family, including siblings Kenny and Sarah and their parents George and Patty. *Id.* at ¶ 6. His "charisma and genuine interest in people's lives" allowed him to form quick connections, but "it was with our family that his heart truly lay." *Id.* He traveled with the family, attended school functions, and "never miss[ed] any of my plays or concerts," demonstrating that he consistently "show[ed] up in full force to support one another," a value he deeply cherished. *Id.*

While attending a Christmas Conference in Washington, D.C., Hannah sensed "something was terribly wrong" when handed the phone by her then-boyfriend, now late husband. *Id.* at ¶ 7. Hearing her father's tears and her mother's breaking voice with the news of her brother's death "shattered me," and standing in the hotel room, she felt "an overwhelming urge to escape the unbearable pain." *Id.* The drive home was "a blur of grief and disbelief," marking her first experience with the "finality of death," which she describes as "profound and devastating." *Id.* Although much of the task of notifying others was handled by family due to how quickly the news spread, the calls she personally made—"sobbing and grappling with my brother's absence"—were among "the hardest conversations I've ever had." *Id.*

Following Tony's death, [redacted]

[redacted]

The loss profoundly damaged Hannah's mental and emotional well-being and altered family relationships in lasting ways. *Id.* at ¶ 9. [redacted] In response to the tragedy, her sister and brother-in-law relocated from California to Virginia to care for Tony's wife and children, "reshaping our family dynamics" as they assumed caregiver roles while grieving themselves. *Id.* Hannah's children "will grow up never knowing their uncle," never receiving "his love, guidance, and the joy he brought into our lives." *Id.* at ¶ 10. The support system Tony provided has been "irrevocably shattered," forcing her to navigate life "without his wisdom and encouragement." *Id.*

Plaintiffs have requested an award of $2.5 million for Hannah Cohen's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**6. Rachel Lutz**[55]

Rachel Lutz was adopted by George Anthony Lutz II's ("Tony's") parents after Tony died, but she was part of the household long before that and seeks to be recognized as the functional equivalent of a sister to Tony. Rachel describes the death of her adopted brother, Tony, as a deeply traumatic loss layered onto an already fragile life history marked by severe childhood abuse, instability, and neglect. She explains that she knew Tony's mother, Patricia, from the age of two

[55] Rachel Lutz's Virginia birth certificate and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 58, Declaration of Rachel Lutz, dated April 17, 2026.

through church, and that Patricia "took me under her wing" after Rachel suffered "terrible abuse throughout my childhood with my biological mother and brother." *See* Ex. 58 at ¶ 4. By the time she came to live with the Lutz family around age sixteen, she was "withdrawn, non-verbal, and unhealthy," having never been enrolled in school, taken to a doctor, or exposed to normal social settings. *Id.* The Lutz family, including Tony and his then-girlfriend Tiffany, "were the first ones to enroll me in school, take me to the doctor, spend quality time with me, and allow me to be truly a kid." *Id.* When her biological mother attempted to take her away, Rachel chose to remain with the Lutz family, after which her biological mother "never contacted me or the Lutz's again," and she was formally adopted in 2007. *Id.* at ¶¶ 4–5.

Within this context, Rachel describes Tony as a formative and stabilizing figure whose influence profoundly shaped her development. *Id.* at ¶ 6. Although he was "only in my life for a few years," he "left a mark on my heart," and "his advice was a guiding light, shaping the path I chose in life." *Id.* Despite her extreme shyness and trauma history, Tony "always made the effort to connect with me, accepting me wholeheartedly as his sister," a gesture she describes as filling her "with love and gratitude." *Id.* Among the tangible reminders of their bond, she identifies a bracelet he gave her as "more than just an accessory; it's a piece of him, a tangible memory of the bond we shared." *Id.*

During the years before her formal adoption, she and Tony shared frequent, meaningful interactions, bonding over "family movie nights, engaging in playful games, and cheering for the Redskins," as well as talking "a couple of times a week," during which he "never missed an opportunity to crack a joke or offer me advice." *Id.* at ¶ 7. She describes Tony as "a beacon of joy and positivity in our family," someone with a rare capacity for "acceptance and inclusion" who

was "easily one of my grandmother's favorite grandchildren." *Id.* at ¶ 8. He was "an incredible father to his two children," dedicating time to them that was "filled with love and laughter." *Id.*

Rachel describes the moment she learned of Tony's death as frozen in time and profoundly disorienting. *Id.* at ¶ 9. A few days after Christmas, while she was "absorbed in a game of sudoku at the kitchen table," she heard the doorbell and then her grandmother's cries and her father's tears. *Id.* Seeing "two soldiers standing at the door in their crisp uniforms removed any lingering hope" of a misunderstanding. *Id.* Even after being called downstairs, the disbelief persisted, and she found herself "half-expecting him to walk through the door," making it impossible for her to return to ordinary activities. *Id.* She describes the formal memorial moment—hearing his full name called aloud—as the point at which "the full weight of his loss hit us with unbearable clarity," confronting the family with the permanence of his absence. *Id.*

Following Tony's death, [redacted] Tony's death profoundly altered family dynamics and daily functioning. *Id.* at ¶ 11. Certain music and movies remain "too painful to watch" for her mother because they evoke memories of Tony, while anniversaries of his birth and death trigger fresh waves of grief among siblings. *Id.* Family activities such as "going out to eat as a family or watching a movie together became unimaginable for a while," reflecting the depth of collective trauma. *Id.* [redacted] In

response to the loss, her sister-in-law Tiffany moved in with Rachel's sister Sarah and her husband for support, illustrating how the family was forced to "adapt to new roles and dynamics." *Id.*

Finally, Rachel states that the impact of her brother's death is enduring and inescapable. She believes "the shadow of my brother's death … will linger over my family indefinitely," with emotional "triggers … omnipresent" in daily life. *Id.* at ¶ 12. Holidays and anniversaries are "particularly challenging times," and her father's continued interviews about Tony's life, as well as her own writing about the aftermath, reflect an ongoing effort to process a loss that remains ever-present. *Id.* The journey through grief, she explains, is "long and winding," shaped by remembrance and the necessity of learning to live with Tony's absence rather than moving beyond it. *Id.*

While Rachel Lutz is not George Anthony Lutz II's biological sister and was not formally adopted by the family until after he passed, the class of plaintiffs who may recover solatium damages "include[s] members of the victim's household who are viewed as the functional equivalents of immediate family members" despite not being legally or biologically related to the victim. *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 WL 2817730, at *42 (D.D.C. July 19, 2022). To establish this "functional equivalence" of a close family member, plaintiffs must show that they were "treated like" a victim's spouse, child, parent, or sibling. *See Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (finding that stepsiblings recover functionally equivalent to siblings when they were "treated like" a brother or sister); *Oveissi* 768 F. Supp. 2d at 27 (holding that interactions between a stepparent and child "were sufficiently frequent and of such a nature as to render them equivalent to those interactions typical of a parent-child relationship"); *Karcher v. Islamic Republic of Iran*, No. 16-cv-232 (CKK), 2023 WL 8934924, at *7 (D.D.C. Dec. 27, 2023) (finding a stepparent to be a functional equivalent of

a parent notwithstanding an ongoing relationship between the victim and their biological parent because of the supplementary role played by the stepparent in the parental role).

Here, based on her declaration and the facts set forth above, Plaintiffs submit that Rachel Lutz qualifies under the law as the functional equivalent of Cpl. George Anthony Lutz II's sister based on the following facts: the Lutz family brought Rachel into their home and out of an abusive environment where Tony provided a studying brother influence to Rachel's life, she was treated as his sister, she was regarded as a member of the family regardless of whether an adoption had made that fact a reality, and her evident loss and grief resembles that of a biological sister.

Plaintiffs have requested an award of $2.5 million for Rachel Lutz's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**N. MATTHEW EDWARD BAYLIS – MAY 30, 2007, ATTACK – BAGHDAD**

On the evening of May 30, 2007, Charlie Company, 2d Battalion, 12th Infantry was conducting a night mission in the AQI stronghold of Masafee in Dora in the southern portion of Baghdad when they came under fire in the courtyard of a house. Ex. 5 at 42-43; ECF No. 9 at ¶¶ 2172-2173. Lt. Nathan Stone was hit by enemy fire, and Spc. Matthew Edward Baylis provided suppression fire for Lt. Stone to be evacuated; however, as Spc. Baylis attempted to reach cover, he was hit by enemy fire in the throat and leg. *Id.* Spc. Baylis' autopsy report determined he died from [redacted][56] Plaintiffs filed a motion seeking default

[56] Ex. 59, Final Autopsy Report for Baylis, Matthew Edward, dated June 21, 2007 at 3.

judgment as to liability against Iran and Syria for the attack in which Spc. Baylis was killed on February 26, 2025 (ECF No. 41), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the May 30, 2007 attack in which Spc. Matthew Edward Baylis was killed. *See* Ex. 1.

Spc. Baylis' father and brother—Richard Baylis and Marc Baylis—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 2171-2179. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Matthew Edward Baylis' society, companionship, comfort, advice, and counsel. *Id.* at ¶ 2179. The following chart reflects the claims asserted by Richard Baylis and Marc Baylis in their individual capacities arising out of the May 30, 2007, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Richard Baylis | Spc. Matthew Edward Baylis' father | Solatium claim $6,250,000.00 | Declaration of Richard Baylis, dated January 29, 2026, including copy of his proof of U.S. citizenship | 60 |
| Marc Baylis | Spc. Matthew Edward Baylis' brother | Solatium claim $2,500,000.00 | Declaration of Marc Baylis, dated April 10, 2026, including copy of his proof of U.S. citizenship | 61 |

**1. Richard Baylis**[57]

[57] Richard Baylis' United States passport and declaration confirm that he is a U.S. citizen and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 60, Declaration of Richard Baylis, dated January 29, 2026.

Richard Baylis is the father of Matthew Edward Baylis. *See* Ex. 60 at ¶ 3. From Matthew's early childhood, Richard shared an exceptionally close and active relationship with his son. *Id.* at ¶ 4. Beginning when Matthew was approximately five years old, sports became a central part of their bond, particularly through the years Richard spent as Matthew's assistant coach. *Id.* Their relationship was reinforced through routine shared experiences, including post-game conversations over donuts or pizza, attendance at car shows and boating outings, and extended time spent together engaging in Matthew's interests and curiosity. *Id.* Earning his U.S. Coast Guard certification at age fifteen was a moment of pride for both father and son. *Id.* Matthew was respectful, charming, and widely admired within his community. *Id.* He was well regarded by teachers, coaches, and local business owners, and his memory continues to be honored in his hometown, including businesses displaying his photographs and the naming of the Specialist Matthew Baylis Memorial Bridge in Bohemia, New York. *Id.*

Matthew was the center of his family's life from birth, and Richard spent nearly every day with him prior to Matthew's enlistment in the U.S. Army. *Id.* at ¶ 5. Richard observed Matthew's transition from adolescence into military service, noting that even during Matthew's deployment to Iraq, their communication remained constant. *Id.* Matthew shared his fears, frustrations, and personal experiences with his father, including moments where he found joy playing music with children overseas. *Id.* The last conversation Richard had with his son occurred on Matthew's twentieth birthday, approximately ten days before his death. *Id.* In addition to Richard, Matthew communicated regularly with his mother, Laurie, calling weekly to reassure her during his military service. *Id.* at ¶ 6. He shared a close bond with his brother, Marc, marked by confidentiality and mutual respect, and was romantically involved with his girlfriend Lisa, with whom he discussed plans for marriage and future employment with the New York City Fire Department. *Id.* Matthew's

decision to enlist in the Army reflected a commitment to service that was respected by those close to him. *Id.*

The day Richard learned of Matthew's death was "one of the darkest days of our lives." *Id.* at ¶ 7. While at work, he was informed that Army officers were waiting at the family home. *Id.* He returned home immediately and requested to be told the news before his wife arrived. *Id.* Upon being informed of Matthew's death, Richard collapsed to the floor. *Id.* When Laurie arrived and the officers repeated the notification, both parents experienced intense shock, grief, and disbelief. *Id.* They "have never been the same since." *Id.* Following notification, Richard personally called family members located across multiple states with each call being "torturous" and reinforcing the permanence of the loss. *Id.* at ¶ 8.

In the years since Matthew's death, Richard has experienced ongoing and severe grief. *Id.* at ¶ 9. [redacted] The continual realization that Matthew will never witness or participate in family milestones—including the lives of his niece and nephew—has deepened the emotional toll. *Id.* [redacted]

The loss of Matthew also resulted in financial consequences. *Id.* at ¶ 11. In 2007, [redacted]

[redacted]

Matthew's death caused significant deterioration in family relationships. *Id.* at ¶ 12. In the immediate aftermath, [redacted]

[redacted] Richard continues to feel Matthew's presence daily and frequently visits his grave. *Id.* at ¶ 14. He has participated in Patriot Guard activities at military funerals to honor fallen service members. *Id.* In 2008, the family established the Specialist Matthew E. Baylis Memorial Fund to support veterans and their children through educational scholarships. *Id.* Richard participates in scholarship presentations, which evoke both pride and grief. *Id.* Although Matthew's memory continues to inspire acts of service and charitable support, "a part of us was lost with him," and that the depth of grief remains ongoing and immeasurable. *Id.* at ¶ 15.

Plaintiffs have requested an upward enhancement of Richard Baylis' claims based on his [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C.

Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). Plaintiffs request an enhancement of 25% of his baseline award resulting in an award of $6.25 million for Richard Baylis' solatium claim.

Although no amount of money can compensate Richard Baylis for the terrible loss of his son Matthew, based on the precedents in comparable cases, the Special Master recommends that the Court award the baseline amount of $5 million.

**2. Marc Baylis[58]**

Marc Baylis is the brother of decedent Matthew Baylis. *See* Ex. 61 at ¶ 3. From the time Matthew was born, Marc was closely involved in his life, witnessing his "first steps, his first words, and the countless milestones that followed." *Id.* at ¶ 4. Despite a ten-year age difference, Marc described their relationship as marked by an "unbreakable" bond. *Id.* As the older sibling, Marc frequently acted as Matthew's babysitter and spent significant time caring for him during childhood, sharing routine activities such as playing together at home and spending time with family. *Id.* at ¶ 5. As the brothers grew older, their lives diverged. *Id.* Marc moved out of the family home in 1994, and as Matthew entered his teenage years, their interactions became less frequent, limited by physical distance and Matthew's increasing independence. *Id.* Matthew

[58] Marc Baylis' New York birth certificate and declaration confirm that he is a U.S. citizen and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 61, Declaration of Marc Baylis, dated April 10, 2026.

became more immersed in the social world of his peers, spending time with friends and his girlfriend, which reduced the frequency of meaningful interaction between the brothers. *Id.* Even so, the brothers were able to come together for a 2005 Iron Maiden concert that gave Marc a view into Matthew as an adult. *Id.* Despite these changes, Marc remained emotionally connected to Matthew and later reflected that he wished he had been able to remain more involved in his life and decisions, particularly Matthew's decision to enlist in the United States Army directly after high school. *Id.*

Matthew's military service was a source of pride for Marc but also a cause of persistent concern. *Id.* at ¶ 4. The last time Marc saw his brother was in October 2006, during a visit to Matthew's military base in Colorado. *Id.* This meeting became their final farewell, although Marc did not recognize it as such at the time. *Id.*

On May 31, 2007, Marc was in San Diego when he received a phone call from his father informing him of his brother's death. *Id.* at ¶ 6. The moment was devastating and left him struggling to comprehend the reality of the loss. *Id.* Marc immediately traveled to New York following the call. *Id.* Marc's girlfriend at the time—now his wife—assisted him in communicating the news while providing emotional support during the immediate aftermath. *Id.*

Following Matthew's death, Marc experienced profound grief that affected his emotional and psychological well-being. *Id.* at ¶ 7. [redacted]

The impact of Matthew's death deeply affected the entire family. *Id.* at ¶ 9. His parents experienced significant grief, and Marc observed changes in family dynamics following the loss.

*Id.* The family was enveloped by a lasting sense of emptiness, with Matthew's absence felt during everyday life and significant occasions alike. *Id.* [redacted]

Plaintiffs have requested an award of $2.5 million for Marc Baylis' solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

### O. WILLIAM JARED CROUCH – JUNE 2, 2007, ATTACK – HADID

On June 2, 2007, Arrow Red Platoon, A Troop, 2d Squadron, 1st Cavalry was engaged in a cordon-and-search operation near Khan Bani Saad when the platoon was re-routed as part of a Quick Reaction Force for a downed helicopter. Ex. 6 at 63-64. While traveling through Khan Bani Saad, the lead Stryker vehicle in the convoy struck an IED that blew Cpl. William Jared Crouch—the Stryker's driver—onto the front of the Stryker and pinning him there while the Stryker caught fire making Cpl. Crouch's extraction impossible. *Id.*; *see also* ECF No. 9 at ¶ 2181. Despite extensive charring of his body, the autopsy report identified Cpl. Crouch's cause of death as [redacted][59] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Spc. Crouch was killed on November 5, 2025 (ECF No. 53), and on January 27, 2026, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the June 2, 2007 attack in which Spc. William Jared Crouch was killed. *See* Ex. 2.

[59] Ex. 62, Final Autopsy Report for Crouch, William Jared, dated June 21, 2007, at 3.

Spc. Crouch's mother and brother—Kathy Rushing and John Crouch—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 2180-2186. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of William Jared Crouch's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 2186. The following chart reflects the claims asserted by Kathy Rushing and John Crouch in their individual capacities arising out of the June 2, 2007, attack as well as the evidence setting forth the bases of her claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Kathy Rushing | Spc. William Jared Crouch's mother | Solatium claim $5,000,000.00 | Declaration of Kathy Rushing, dated April 9, 2026, including copy of her proof of U.S. citizenship | 63 |
| John Crouch | Spc. William Jared Crouch's brother | Solatium claim $3,125,000.00 | Declaration of John Crouch, dated April 10, 2026, including copy of his proof of U.S. citizenship | 64 |

### 1. Kathy Rushing[60]

Kathy Rushing is the mother of William Jared Crouch. *See* Ex. 63 at ¶ 3. Jared was Kathy's middle son and brought significant joy and pride to her family. *Id.* at ¶ 4. He joined the Army immediately after high school, an ambition he had held since childhood, including dressing as a soldier for Halloween and playing army with toy guns. *Id.* He was meticulous and driven from a young age, earning a perfect attendance award in high school and making significant efforts to

[60] Kathy Rushing's United States passport and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 63, Declaration of Kathy Rushing, dated April 9, 2026.

ensure punctuality. *Id.* Although he did not play sports, he maintained discipline through daily exercise, including doing hundreds of push-ups and staying active. *Id.* Jared connected easily with others, as reflected by numerous kind notes from classmates in his high school yearbook praising his listening skills and warm personality. *Id.* He balanced humor with responsibility, including carrying shaving supplies to school because his thick hair caused a visible five o'clock shadow by midday. *Id.* He demonstrated independence early in life by secretly completing enlistment paperwork during Mardi Gras while his family was away on a ski trip. *Id.*

Though reserved at home, Jared was outgoing with friends and had a magnetic personality. *Id.* Kathy fondly recalls his playful nature and sense of adventure, including dressing as Jim Carrey's character from *The Mask* for Halloween and fully immersing himself in the role by quoting the movie and entertaining those around him. *Id.* He enjoyed action films and history, watching movies starring Sylvester Stallone and Arnold Schwarzenegger and eagerly anticipating films such as *300*. *Id.* Jared had a tattoo replicating his late biological father's police shield, symbolizing pride and admiration for his father, who died when Jared was thirteen years old. *Id.*

Although Jared was somewhat of a loner growing up, he developed especially close relationships later, including with his best friend Rebecca, who was often the first person he contacted. *Id.* at ¶ 5. Through platforms such as MySpace, he expanded his friendships, and his battle buddies continue to honor him through shared memories and tributes, including on Memorial Day. *Id.* He demonstrated care for others through acts of kindness, such as picking up lunch for a fellow soldier at Fort Lewis while his family was visiting. *Id.* He was also close with his girlfriend Sammi and spent time sharing meals with her family, and Kathy believes the relationship might have led to marriage had circumstances been different. *Id.* Jared's friendships were so meaningful that some friends later named their children after him. *Id.* Within his family, Jared shared an

especially strong bond with his brother John, connected by their shared interest in guns and the Army. *Id.* They spent extensive time together participating in paintball, laser tag, and going to movies. *Id.*

On the evening of June 2, 2007, Kathy was home alone while her husband and stepsons attended a drag racing event approximately forty-five minutes away. *Id.* at ¶ 6. She was letting her dog out when she heard barking and went outside, where she saw two individuals in military uniforms with gold buttons approaching—an officer and a chaplain—who asked if she was Kathy Rushing. *Id.* She immediately felt dread and dizziness and sat on the steps as time seemed to freeze. *Id.* Although no details were initially provided, she instinctively sensed that something terrible had happened. *Id.* The men declined to provide information until her husband returned so she would not be alone. *Id.* During the forty-five-minute wait, she attempted small talk while worrying about her sons, Jared, who was on the front lines, and John, who was on R&R in Qatar. *Id.* When her husband arrived, the men informed them on behalf of the Department of Defense that Jared had been killed in action. *Id.* They were devastated and cried while consoling one another. *Id.*

Jared's death profoundly altered the family's life. *Id.* at ¶ 7. His passing brought the blended family closer together and reinforced their faith and appreciation for time spent together. *Id.* His loss influenced family members in lasting ways, including motivating his half-brother Jeremy to pursue a career as an orthopedic surgeon and reinforcing his brother John's commitment to military service. *Id.* The grief was overwhelming, particularly learning the circumstances of his death and attending his closed-casket burial. *Id.* It took months for Kathy to regain stability. *Id.* Receiving Jared's personal belongings, including his car, helped her retain tangible connections to his life. *Id.* She continues to listen to a voicemail recording of his voice on particularly difficult days. *Id.* Over the seventeen years since his death, the family has grown, and Jared's siblings have

built families of their own, making Kathy a grandmother of nine, and together, the family continues to remember Jared through shared stories, laughter, and tears, honoring his enduring legacy. *Id.*

Plaintiffs have requested an award of $5 million for Kathy Rushing's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**2. John Crouch**[61]

John Crouch is the brother of William Jared Crouch ("Jared"). *See* Ex. 64 at ¶ 3. Jared was "more than just my older brother; he was my lifelong competitor, my protector, and my inspiration," and they "grew up doing everything together—kickboxing, watching cartoons, going to the movies," with a dynamic defined by constant closeness, rivalry, and guidance. *Id.* at ¶ 4. After their father's death, the bond deepened, shaped by their father's advice to "love your brother, protect him," which John describes as a lasting reminder to support one another through hardship. *Id.* Throughout childhood and early adulthood, the brothers shared nearly every aspect of life, including bunk beds, clothes, movies, anime, and confidences kept "from everyone else." *Id.* at ¶ 5. Although they drifted somewhat during high school, John joined him in celebrating military milestones such as basic training and AIT ceremonies. *Id.* Their final Christmas together was particularly poignant, filled with teasing about deployments, shared plans to "meet up overseas," and moments John states he will "never forget." *Id.* at ¶¶ 4–5. Jared was a quiet, reserved person who was socially awkward but deeply loyal and kind. *Id.* at ¶ 6. At family gatherings, Jared often kept to himself unless discussing topics he loved, such as war history, yet he "loved everyone

[61] John Crouch's Louisiana birth certificate and declaration confirm that he is a U.S. citizen and was so at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 64, Declaration of John Crouch, dated April 10, 2026.

deeply" and would "go out of his way to help others," letting his actions "speak volumes about his kindness and loyalty." *Id.*

John learned of his brother's death while he was six months into his deployment at FOB Bucca in Iraq. *Id.* at ¶ 7. His commanding officer and first sergeant summoned him late at night and informed him that Jared had been killed by an IED. *Id.* It was an immediate emotional collapse: "I ran out the door, stopped after a few steps, and broke down in tears," consumed by memories of their last conversation, concern for his mother, and an "overwhelming desire to take my brother home." *Id.* He was unable to accompany Jared's body back to the United States, and after calling his mother, he "didn't want to talk to anyone else or share the news further," underscoring the isolating nature of the trauma. *Id.*

As a direct result of Jared's death, [redacted] He relocated to Texas in an effort to distance himself from reminders of loss, yet still feels the emotional weight acutely, particularly when returning to Louisiana, where childhood memories are "both beautiful and painful." *Id.* [redacted]

[redacted]

Plaintiffs have requested an upward enhancement of John Crouch's claims based on his [redacted] *See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). Plaintiffs request an enhancement of 25% of his baseline award resulting in an award of $3.125 million for John Crouch's solatium claim.

Although no amount of money can compensate John Crouch for the terrible loss of his brother Jared, based on the precedents in comparable cases, the Special Master recommends that the Court award John $3.125 million, an upward adjustment of 25% from the baseline amount, because of the severe impact on John, including his [redacted]

## P. JUSTIN PENROD – AUGUST 11, 2007, ATTACK – ARAB JABOUR

On August 11, 2007, 2d Platoon, Bravo Company, 1st Battalion, 30th Infantry was patrolling along the west bank of the Tigris River south of Patrol Base Murray when Spc. William Edwards was shot by a sniper firing from "Building 140." Ex. 5 at 55. The platoon proceeded to enter "Building 140" to attempt to apprehend the sniper, but while they were clearing the building, an IED detonated the building killing four soldiers immediately—including Spc. Justin Penrod—and setting the building on fire. *Id.*; *see also* ECF No. 9 at ¶ 2342. According to his Report of Casualty, Spc. Penrod died of [redacted][62] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Spc. Penrod was killed on February 26, 2025 (ECF No. 41), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the August 11, 2007 attack in which Spc. Justin Penrod was killed. *See* Ex. 1.

Spc. Penrod's mother and sister—Tina Tuttle and Listia Gideon f/k/a Listia Lyons—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 2341-2346. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Justin Penrod's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 2346. The following chart reflects the claims asserted by Tina Tuttle and Listia Gideon in their individual capacities arising out of the

[62] Ex. 65, Report of Casualty for Penrod, Justin Owen.

August 11, 2007, attack as well as the evidence setting forth the bases of their claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Tina Tuttle | Spc. Justin Penrod's mother | Solatium claim $5,000,000.00 | Declaration of Tina Tuttle, dated April 17, 2026, including copy of her proof of U.S. citizenship | 66 |
| Listia Gideon f/k/a Listia Lyons | Spc. Justin Penrod's sister | Solatium claim $3,125,000.00 | Declaration of Listia Gideon, dated March 4, 2026, including copy of her proof of U.S. citizenship | 67 |

**1. Tina Tuttle**[63]

Tina Tuttle is the mother of Justin Penrod. *See* Ex. 66 at ¶ 3. Justin, her youngest child, "was not just a part of my life; he was my heart walking outside my body," and their bond was "unbreakable, strengthened by both love and adversity." *Id.* at ¶ 4. Despite early hardships, including abandonment by his father and struggles in school, Justin's grew into "a facilitator at Lincoln Challenge and then to a devoted father and soldier" with a "tenderness and kindness" and instinct to help others. *Id.* Even eighteen years later, "the emptiness he left remains unfilled," underscoring the enduring magnitude of his loss. *Id.* As a single mother, Tina and Justin's lives were "intertwined in the best way," forged through shared challenges such as cleaning houses together before preschool and enduring frightening medical crises, including his grand mal seizures at eight months old. *Id.* at ¶ 5. These experiences created "a testament to our shared life,

[63] Tina Tuttle's United States passport and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 66, Declaration of Tina Tuttle, dated April 17, 2026.

a life filled with love, challenges, and the unbreakable connection between a mother and her son." *Id.* Even as Justin married and deployed to Iraq, their closeness persisted, marked by shared lunches and constant communication. *Id.* The last voicemail she received from him—a playful birthday message calling her an "ole bat"—remains preserved because "it was the last time I heard him." *Id.*

Justin's heart "was as vast as the ocean," encompassing step-siblings, grandparents, extended family, and close friends who relied on him. *Id.* at ¶ 6. She recounts his instinctive devotion to family, such as rushing to help his sister during a snowstorm, and notes that the depth of his relationships was evident in the "sea of faces at his funeral" and in the fact that his best friend took on the sacred role of laying him to rest. *Id.*

On what began as a peaceful Sunday morning as she prepared for church, "the abrupt arrival of the army at my doorstep shattered that peace, plunging me into a state of shock and disbelief." *Id.* at ¶ 7. She prayed desperately that there had been a mistake, only to be confronted with "the reality [that] was inescapable." *Id.* The pain of that moment was "indescribable," a "deep, searing loss that words fail to capture," and one that revisits her "as vivid now as it was then" despite counseling and the passage of time. *Id.*

In the aftermath, [redacted] The loss of her son "forever changed my life," making prior

concerns insignificant compared to the magnitude of losing her child. *Id.* at ¶ 9. While grief reshaped her perspective, Tina's faith became her refuge, eventually leading her to found a women's ministry where her testimony serves others in grief. *Id.* Nevertheless, the "blank space left by my son's death" is like "living with a piece of my heart forever missing," comparable to "the loss of a limb" that alters "every aspect of existence." *Id.* at ¶ 10.

Plaintiffs have requested an award of $5 million for Tina Tuttle's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**2. Listia Gideon[64]**

Listia Gideon is the sister of Justin Penrod. *See* Ex. 67 at ¶ 3. Justin "was not just a sibling to me; he was my best friend and my protector," and their relationship was built on trust, shared experiences, and an "unspoken" closeness forged through living together and spending long nights watching movies and talking "all night, where time seemed to stand still." *Id.* at ¶ 4. She recalls everyday moments—such as Justin taking her car to go fishing overnight—are core memories of their relationship that stay with her. *Id.* Growing up, their bond was reinforced through constant shared activity and companionship. *Id.* at ¶ 5. Their childhood days were spent "swimming, playing ball, riding bikes," building snow forts in winter, and ending evenings dancing to *Dirty Dancing*. *Id.*

As adults, they remained close despite periods of physical distance, intentionally staying connected and cherishing visits. *Id.* Listia highlights two pivotal moments: Justin meeting her daughter for the first time and her final visit to Alabama before his deployment, "not knowing it

[64] Listia Gideon's Illinois birth certificate and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 67, Declaration of Listia Gideon, dated March 4, 2026.

would be our last." *Id.* Justin changed after his first tour, becoming more reserved, yet his devotion to family remained unmistakable through action rather than words. *Id.* at ¶ 6. He moved to Alabama and lived with her for several years, choosing proximity to family even while struggling internally, which she describes as "a testament to his unwavering commitment to family." *Id.*

Listia remembers being isolated at home as "a new mom to a 6-month-old baby" when she learned of her brother's death. *Id.* at ¶ 7. Her husband at the time delivered the news, and she knew instantly from his expression that something was terribly wrong. *Id.* The conversations that followed are largely lost to memory, "overshadowed by the overwhelming grief that consumed me," but the realization that "my brother would never come home" remains indelibly imprinted on her life. *Id.*

Following the loss, [redacted]

[redacted]

She also describes substantial financial harm linked directly to her grief and declining health. *Id.* at ¶ 10. [redacted]

[redacted]

Plaintiffs have requested an upward enhancement of Listia Gideon's claims based on her [redacted]

*See Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (awarding an upward departure of 25% where the Plaintiff "became self-destructive, turning to alcohol and drugs in an unfortunate attempt to dull her emotional pain."); *Bernhardt v. Islamic Republic of Iran*, No. 18-cv-2739 (TJK), 2023 WL 2598677, at *16 (D.D.C. Mar. 22, 2023) (awarding Janet Paresi a 25 percent upward departure because she endured a "drawn out and incredibly difficult" grieving process); *Thuneibat v. Syrian Arab Republic*, 167 F. Supp. 3d 22, 45, 53 (D.D.C. 2016) (awarding Samira Khorma a 25 percent upward departure after her personality changed following her son's death, turning from a "lively socialite to a recluse," she became depressed to the point of requiring medication, and she developed conditions including diabetes as a result of becoming less active); *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010). Plaintiffs request an enhancement of 25% of her baseline award resulting in an award of $3.125 million for Listia Gideon's solatium claim.

Although no amount of money can compensate Listia Gideon for the devastating loss of her brother Justin, based on the precedents in comparable cases, the Special Master recommends that the Court award Listia the baseline award for a sibling of $2.5 million.

### Q. CHAD GROEPPER – FEBRUARY 17, 2008, ATTACK – BAQUBAH

On February 17, 2008, Reconnaissance Team, 2d Battalion, 23d Infantry scouts air assaulted into the village of Bodija in Diyala Province in pursuit of AQI terrorists when a group of AQI members were able to sneak out of the village with the scout unit behind them resulting in a firefight that killed Cpl. Chad Groepper. Ex. 6 at 81-82; ECF No. 9 at ¶ 2555. Cpl. Groepper's autopsy report found that he [redacted][65] Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Cpl. Groepper was killed on November 5, 2025 (ECF No. 33), and on January 27, 2026, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the February 17, 2008 attack in which Cpl. Chad Groepper was killed. *See* Ex. 2.

Cpl. Groepper's wife and daughter—Stephanie Groepper and Clarissa Groepper—are plaintiffs in this case. *See* ECF No. 9 at ¶¶ 2554-2559. The Plaintiffs suffered severe mental anguish, extreme emotional pain and suffering, and loss of Chad Groepper's society, companionship, comfort, advice, and counsel. *Id.* at ¶ 2559. The following chart reflects the claims asserted by Stephanie Groepper and Clarissa Groepper in their individual capacities arising out of the February 17, 2008, attack as well as the evidence setting forth the bases of his claims. That evidence is provided as exhibits to the accompanying Eubanks Declaration.

[65] Ex. 68, Final Autopsy Report for Groepper, Chad David, dated February 28, 2008, at 6.

| Plaintiff | Relationship to Direct Victim | Claim(s) Asserted | Evidence | Exhibit |
|---|---|---|---|---|
| Stephanie Groepper | Cpl. Chad Groepper's wife | Solatium claim $8,000,000.00 | Declaration of Stephanie Groepper, dated February 3, 2026, including copy of her proof of U.S. citizenship | 69 |
| Clarissa Groepper | Cpl. Chad Groepper's daughter | Solatium claim $5,000,000.00 | Declaration of Clarissa Groepper, dated February 3, 2026, including copy of her proof of U.S. citizenship | 70 |

**1. Stephanie Groepper**[66]

Stephanie Groepper is the wife of Chad Groepper. See Ex. 69 at ¶ 3. Chad "was not just my husband; he was my best friend, the love of my life, and an incredible father to our child." *Id.* at ¶ 4. Their relationship and bond formed on what began as a blind date. *Id.* Their marriage—officiated by a friend "in sweatpants and amidst the aroma of a cooking steak"—captured the authenticity and closeness of their connection, along with shared dreams of a future vow renewal that "remained unfulfilled." *Id.* Even during Chad's deployment to Iraq, their marriage remained emotionally close, especially during Stephanie's pregnancy and the birth of their daughter. *Id.* Chad was "a devoted father, even in the short time he had with her," leaving behind memories and photographs that now serve as proof of his love and involvement. *Id.* Their daily life together was characterized by "laughter, love, and the kind of deep connection that comes from truly knowing and understanding each other," from simple pleasures like backyard water fights to long-term plans for the future. *Id.*

[66] Stephanie Groepper's Washington birth certificate and declaration confirm that she is a U.S. citizen and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 69, Declaration of Stephanie Groepper, dated February 3, 2026.

From the beginning of their relationship, they were "inseparable," maintaining closeness despite military demands by finding moments to connect—bringing him dinner during charge-of-quarters duty, sneaking snacks to him while he was in the field, and sharing leisure activities like floating on the lake. *Id.* at ¶ 5. During deployment, they stayed connected through phone calls, emails, and a pregnancy scrapbook she created so he could experience milestones from afar. *Id.* at ¶ 6. Chad shared an "unbreakable bond" with fellow soldiers, a brotherhood so strong she joked about having "multiple husbands" because of how often they gathered in their home. *Id.* at ¶ 7. He was a steadfast friend who embodied generosity and reliability through small but meaningful acts, such as repairing a friend's driveway, and he maintained strong connections with his sisters and brother-in-law despite geographic distance. *Id.*

While living with her parents and caring for their newborn, Stephanie was awakened by her father to confront "the uniformed men at our door," an encounter that triggered a visceral reaction of denial and grief as she "slammed the door and collapsed." *Id.* at ¶ 8. She describes the experience as unreal, stating, "This wasn't supposed to be my story; such tragedies were meant for the screen, not my doorstep." *Id.* The days that followed were marked by numbness and disbelief, compounded by the loss of her job due to her inability "to function in the wake of such devastating news." *Id.* She recalls little of notifying others, relying instead on the military to inform Chad's parents while she sought reassurance from a fellow military spouse, struggling to comprehend "a world without Chad, my partner, my best friend, and the father of our child." *Id.*

[redacted]

[redacted]

The financial consequences of Chad's death were immediate and enduring. *Id.* at ¶ 10. [redacted] Despite her gratitude for assistance, "the stability his presence would have provided" cannot be replaced. *Id.*

Chad's death transformed their family into a single-parent household, where "1/3 of our family is no longer with us," exposing their daughter to heightened risks in academics and mental health. *Id.* at ¶ 11. Stephanie lost her partner and primary support system, forcing increased reliance on her parents for childcare and emotional support and influencing major life decisions, including purchasing a home near them. *Id.* At the same time, [redacted]

Since Chad's death, Stephanie has been required to assume multiple roles—"both mother and father, provider, and caregiver"—while [redacted] Her daughter has now lived nearly 17 years without her father, confronting milestones and daily realities that repeatedly expose that loss, including [redacted]

[redacted] Chad's absence will shadow every future milestone, from learning to drive—where her daughter recently experienced a breakdown after being reminded of her father—to imagining her wedding day without him present to walk her down the aisle. *Id.* at ¶ 14. [redacted]

Plaintiffs have requested an award of $8 million for Stephanie Groepper's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

**2. Clarissa Groepper[67]**

Clarissa Groepper is the daughter of Chad Groepper. *See* Ex. 70 at ¶ 3. Although her relationship with her father was "brief and largely unknown," it nonetheless "holds a special place in my heart," grounded in evidence of his love preserved through photographs and a single recording of his voice speaking her name. *Id.* at ¶ 4. Hearing that recording was "an overwhelmingly emotional moment" and a "heartbreaking realization that this voice was all I had left of him," as she was "only four months old when he was taken from us in an attack in Iraq." *Id.* Growing up without any living memory of her father has been a defining feature of Clarissa's life. *Id.* at ¶ 5. She does not recall a specific moment when she was told of his death, but rather having "always known, a deep, instinctual understanding that he wasn't coming back." *Id.* His absence has been "a constant companion throughout my life, a sadness that matured with me from

[67] Clarissa Groepper's Washington birth certificate and declaration confirm that she is a U.S. citizen, and was so at the time of the attack. She is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 70, Declaration of Clarissa Groepper, dated February 3, 2026.

childhood into adulthood." *Id.* Despite being surrounded by reminders of his presence in the home, she grew up with "a keen sense of loss for the father I never got to know." *Id.* at ¶ 4.

Her father's absence has shaped Clarissa's emotional development and outlook on life. *Id.* at ¶ 6. [redacted] she anticipates that every major life milestone—"graduation, marriage, children, and every moment in between"—will be "overshadowed by the void his absence has created." *Id.* This void manifests in ordinary experiences such as father-daughter dances, parental advice, and shared milestones that never occur. *Id.* Clarissa has "always felt the weight of his absence, a weight that has made every step forward more challenging." *Id.*

[redacted]

The loss of her father also imposed tangible financial hardship during her early childhood. *Id.* at ¶ 8. [redacted]

Clarissa's earliest memories are marked by witnessing her mother's intense grief, even as she tried to protect her daughter from its full force. *Id.* at ¶ 9. Her mother was required to assume "both the roles of mother and father," a burden Clarissa now recognizes as requiring extraordinary strength. *Id.* While the loss "undeniably brought my mother and me closer together," creating an "unbreakable" bond rooted in shared grief, it also "shifted" family roles permanently, with her mother bearing all responsibilities alone. *Id.* Clarissa lives with "an ache for a relationship that was never given the chance to blossom, for conversations that will never take place, and for memories that will never be made." *Id.* at ¶ 10. The stories she has been told about her father are "all I have," and while cherished, they are "no substitute for the personal memories I wish I could recall." *Id.* "No child should have to grow up in the shadow of such a loss," yet that is "the hand I have been dealt," one she carries forward as "a bittersweet reminder of what was lost and the love that remains." *Id.*

Notwithstanding the fact that Clarissa Groepper was only four months old at the time of her father's death, Plaintiffs have requested the baseline award of $5 million for Clarissa Groepper's solatium claim. The Special Master agrees with this request and recommends that the Court enter an award in this amount.

## CONCLUSION

For the reasons stated above and the analysis set forth, I recommend that the Court approve the following awards for Plaintiffs' solatium claims and recommend that the Court enter final judgments for each Plaintiff's solatium damages and punitive damages as set forth below:

| Plaintiff | Victim | Relation to Victim | Date of Attack | Recommended Solatium Damages | Recommended Punitive Damages |
|---|---|---|---|---|---|
| Gloria Caldas | Cpt. Ernesto Blanco | Mother | 12/28/2003 | $5,000,000.00 | $5,000,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| Jose Blanco-Garcia | Cpt. Ernesto Blanco | Father | 12/28/2003 | $5,000,000.00 | $5,000,000.00 |
| Carmen Blanco-Jimenez | Cpt. Ernesto Blanco | Sister | 12/28/2023 | $3,125,000.00 | $3,125,000.00 |
| Gretchen Mack | PFC Chance Phelps | Mother | 4/9/2004 | $5,000,000.00 | $5,000,000.00 |
| John Phelps | PFC Chance Phelps | Father | 4/9/2004 | $5,000,000.00 | $5,000,000.00 |
| Geraldine Morris | Cpl. Dean Pratt | Mother | 8/2/2004 | $5,000,000.00 | $5,000,000.00 |
| John R. Morris | Cpl. Dean Pratt | Stepfather | 8/2/2004 | $5,000,000.00 | $5,000,000.00 |
| Donald Pratt | Cpl. Dean Pratt | Brother | 8/2/2004 | $2,500,000.00 | $2,500,000.00 |
| Terri Winieckie | LCpl. Justin Reppuhn | Mother | 11/10/2004 | $5,000,000.00 | $5,000,000.00 |
| Ashley Reppuhn-Braley | LCpl. Justin Reppuhn | Sister | 11/10/2004 | $2,500,000.00 | $2,500,000.00 |
| Adam Reppuhn | LCpl. Justin Reppuhn | Brother | 11/10/2004 | $3,125,000.00 | $3,125,000.00 |
| Riikka Jacobsen | Cpt. William Jacobsen, Jr. | Wife | 12/21/2004 | $8,000,000.00 | $8,000,000.00 |
| Avalon Jacobsen | Cpt. William Jacobsen, Jr. | Daughter | 12/21/2004 | $5,000,000.00 | $5,000,000.00 |
| Leonidas Jacobsen | Cpt. William Jacobsen, Jr. | Son | 12/21/2004 | $5,000,000.00 | $5,000,000.00 |
| Sedric Jacobsen | Cpt. William Jacobsen, Jr. | Son | 12/21/2004 | $5,000,000.00 | $5,000,000.00 |
| William Jacobsen, III | Cpt. William Jacobsen, Jr. | Son | 12/21/2004 | $6,250,000.00 | $6,250,000.00 |
| Jeanne Poulin | Sgt. Lynn Poulin, Sr. | Wife | 12/21/2004 | $8,000,000.00 | $8,000,000.00 |
| Charles Wells, Sr. | Warrant Officer Charles Wells, Jr. | Father | 3/30/2005 | $6,250,000.00 | $6,250,000.00 |
| Orlean Wells | Warrant Officer | Mother | 3/30/2005 | $5,000,000.00 | $5,000,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| | Charles Wells, Jr. | | | | |
| Terry Wells | Warrant Officer Charles Wells, Jr. | Brother | 3/30/2005 | $2,500,000.00 | $2,500,000.00 |
| Eva Grant-Trujillo | LCpl. Jonathan Grant | Fiancee | 5/11/2005 | $8,000,000.00 | $8,000,000.00 |
| Cynthia Grant | LCpl. Jonathan Grant | Daughter | 5/11/2005 | $5,000,000.00 | $5,000,000.00 |
| Evan Grant | LCpl. Jonathan Grant | Son | 5/11/2005 | $5,000,000.00 | $5,000,000.00 |
| Alma Roybal | LCpl. Jonathan Grant | Mother | 5/11/2005 | $5,000,000.00 | $5,000,000.00 |
| Alana Salazar | LCpl. Jonathan Grant | Sister | 5/11/2005 | $2,500,000.00 | $2,500,000.00 |
| Travis Roybal | LCpl. Jonathan Grant | Brother | 5/11/2005 | $2,500,000.00 | $2,500,000.00 |
| Isaiah Roybal | LCpl. Jonathan Grant | Brother | 5/11/2005 | $2,500,000.00 | $2,500,000.00 |
| Lorin Roybal | LCpl. Jonathan Grant | Brother | 5/11/2005 | $2,500,000.00 | $2,500,000.00 |
| Levan Muy | PFC Veashna Muy | Sister | 6/23/2005 | $2,500,000.00 | $2,500,000.00 |
| Pechrenya Hul | PFC Veashna Muy | Brother | 6/23/2005 | $2,500,000.00 | $2,500,000.00 |
| Stephen Reed | LCpl. Aaron H. Reed | Father | 8/3/2005 | $5,000,000.00 | $5,000,000.00 |
| William Wightman | LCpl. William Brett Wightman | Father | 8/3/2005 | $5,000,000.00 | $5,000,000.00 |
| David McMullen | SSgt. Michael Joseph McMullen | Father | 12/24/2005 | $5,000,000.00 | $5,000,000.00 |

| | | | | | |
|---|---|---|---|---|---|
| Jeanette Roberts | SSgt. Michael Joseph McMullen | Sister | 12/24/2005 | $3,125,000.00 | $3,125,000.00 |
| George Lutz | Cpl. George Anthony Lutz II | Father | 12/29/2005 | $5,000,000.00 | $5,000,000.00 |
| Patricia Lutz | Cpl. George Anthony Lutz II | Mother | 12/29/2005 | $5,000,000.00 | $5,000,000.00 |
| Kenneth Lutz | Cpl. George Anthony Lutz II | Brother | 12/29/2005 | $2,500,000.00 | $2,500,000.00 |
| Sarah Hummel | Cpl. George Anthony Lutz II | Sister | 12/29/2005 | $2,500,000.00 | $2,500,000.00 |
| Hannah Cohen | Cpl. George Anthony Lutz II | Sister | 12/29/2005 | $2,500,000.00 | $2,500,000.00 |
| Rachel Lutz | Cpl. George Anthony Lutz II | Adopted Sister | 12/29/2005 | $2,500,000.00 | $2,500,000.00 |
| Richard Baylis | Spc. Matthew Edward Baylis | Father | 5/30/2007 | $5,000,000.00 | $5,000,000.00 |
| Marc Baylis | Spc. Matthew Edward Baylis | Brother | 5/30/2007 | $2,500,000.00 | $2,500,000.00 |
| Kathy Rushing | Cpl. William Jared Crouch | Mother | 6/2/2007 | $5,000,000.00 | $5,000,000.00 |
| John Crouch | Cpl. William Jared Crouch | Brother | 6/2/2007 | $3,125,000.00 | $3,125,000.00 |
| Tina Tuttle | Spc. Justin Penrod | Mother | 8/11/2007 | $5,000,000.00 | $5,000,000.00 |
| Listia Gideon | Spc. Justin Penrod | Sister | 8/11/2007 | $2,500,000.00 | $2,500,000.00 |
| Stephanie Groepper | Cpl. Chad Groepper | Wife | 2/17/2008 | $8,000,000.00 | $8,000,000.00 |
| Clarissa Groepper | Cpl. Chad Groepper | Daughter | 2/17/2008 | $5,000,000.00 | $5,000,000.00 |

Dated: May 19, 2026

Respectfully submitted,

________________________________
Eric D. Green
Special Master