UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

-------------------------------------------------------------------------x

RUBEN V. FLORES, *et al.*,

Plaintiffs,

-against-

ISLAMIC REPUBLIC OF IRAN, *et al.*,

Defendant.

-------------------------------------------------------------------------x

**Case No.: 22-cv-1512 (JEB)**

**SPECIAL MASTER'S REPORT AND RECOMMENDATIONS REGARDING DAMAGES FOR FOUR SURVIVING PLAINTIFFS IDENTIFIED IN THE COURT'S SEPTEMBER 24, 2025, ORDER**

# TABLE OF CONTENTS

INTRODUCTION .......... 1

I. PROCEDURAL BACKGROUND .......... 1

II. CATEGORIES OF CLAIMS AND PROPOSED DAMAGES FRAMEWORK .......... 2

A. Economic-Loss Claims .......... 2

B. Wounded in Action—Plaintiffs who Survived Terrorist Attacks .......... 4

C. Punitive Damages .......... 6

III. THE WOUNDED IN ACTION PLAINTIFFS' INJURIES .......... 6

A. ALEXANDER M. SARGENT – NOVEMBER 19, 2004, ATTACK – FALLUJAH, IRAQ .......... 7

1. Assault, Battery and Intentional Infliction of Emotional Distress .......... 8

a. Alexander M. Sargent's Background .......... 8

b. Injuries at Point of Attack .......... 9

c. Mr. Sargent's Physical Injuries Resulting from the Attack .......... 9

d. Mr. Sargent's PTSD Resulting from the Attack .......... 11

e. Impact .......... 13

f. Request for Nonpecuniary Compensatory Damages .......... 15

2. Economic-Loss Claim .......... 16

B. JERRY OLDHAM - MARCH 9, 2005, ATTACK – BAGHDAD .......... 17

1. Assault, Battery, and Intentional Infliction of Emotional Distress Claim .......... 18

a. Jerry Oldham's Background .......... 18

b. The Attack and Immediate Aftermath .......... 19

c. The Ongoing Impact of the Attack Upon Mr. Oldham .......... 22

d. Request for Nonpecuniary Compensatory Damages .......... 24

C. JUSTIN E. HENDRICKSON – MAY 7, 2005, ATTACK – AL KARMAH, IRAQ24

1. **Assault, Battery and Intentional Infliction of Emotional Distress ...................... 26**

a. **Justin Hendrickson's Background ............................................................... 26**

b. **Injuries at Point of Attack........................................................................... 27**

c. **Mr. Hendrickson's Pain While in Inpatient ................................................... 30**

d. **Mr. Hendrickson's Resulting Physical Pain .................................................... 30**

e. **Mr. Hendrickson Screened Positive for TBI and PTSD After the Attack .... 31**

f. **Other Related Impact ..................................................................................... 33**

g. **Request for Nonpecuniary Compensatory Damages....................................... 35**

2. **Economic-Loss Claim ........................................................................................ 38**

D. **JOHN LAMIE- AUGUST 3, 2005, ATTACK – BAGHDAD .................................. 39**

1. **Assault, Battery, and Intentional Infliction of Emotional Distress Claim.......... 41**

a. **John Lamie's Background ............................................................................. 41**

b. **The Vehicle-Borne Improvised Explosive Device ("VBIED") Attack .......... 42**

c. **Mr. Lamie's Injuries Immediately Following the Attack ............................... 44**

d. **Mr. Lamie is Confronted with Emotional and Physical Challenges While at Home ................................................................................................................. 45**

e. **Mr. Lamie Continues to be Impacted by the Attack ...................................... 47**

f. **Mr. Lamie Seeks Treatment Through Counseling and Medication in the United States ................................................................................................ 48**

g. **Mr. Lamie Extends His Military Career ......................................................... 49**

h. **Mr. Lamie's Challenges Continue in Iraq and in the U.S............................... 50**

i. **Ongoing PTSD and Depression ........................................................................ 50**

j. **Mr. Lamie Suffers from Survivor's Guilt....................................................... 60**

k. **Mr. Lamie Suffered from Alcohol Abuse ........................................................ 61**

l. **Memory Issues and Headaches........................................................................ 63**

m. **Long-term Impact Upon Mr. Lamie ................................................................. 64**

**n. Request for Damages ... 65**

**CONCLUSION** ... 66

# TABLE OF AUTHORITIES

**Cases**


*Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.D.C. Mar. 8, 2024) .......... 6

*Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 47 (D.D.C. 2023) .......... 15

*Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 U.S. Dist. LEXIS 127290 (D.D.C. July 19, 2022).......... 36, 37

*Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2023 U.S. Dist. LEXIS 85564 (D.D.C. May 16, 2023), *rev'd on other grounds in K.E.F.V. v. Islamic Republic of Iran*, 2025 U.S. App. LEXIS 10226 (D.C. Cir. Apr. 29, 2025).......... 37

*Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) .......... 4

*Lee v. Islamic Republic of Iran*, No. 19-cv-830 (APM), 2023 U.S. Dist. LEXIS 204966 (D.D.C. Oct. 15, 2023) .......... 6, 35, 36

*Lee v. Islamic Republic of Iran*, No. 19-cv-830, 2022 WL 20210706 (D.D.C. June 30, 2022) ... 36

*Miller v. Juarez Cartel*, 2022 U.S. Dist. LEXIS 112463 (D. N.D. 6-24-2022) .......... 3

*Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51 (D.D.C. 2010).......... 2

*Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859 (JEB), 2025 U.S. Dist. LEXIS 125115 (D.D.C. July 1, 2025).......... 6

*Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859-JEB, 2025 U.S. Dist. LEXIS 157765 (D.D.C. Aug. 14, 2025) .......... passim

*Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007).......... 4

*Stearns v. Islamic Republic of Iran*, No. 17-cv-131 (RCL) (D.D.C.), Doc. 182 (July 18, 2024) ... 3

*Swinney v. Islamic Republic of Iran*, No. 20-cv-2316 (ACR), 2025 U.S. Dist. LEXIS 103493 (D.D.C. May 30, 2025).......... 37, 38

*Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1 (D.D.C. 2010).......... 4

*Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010) .......... 4, 6

*Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84 (D.D.C. 2014), *aff'd in part, vacated in part on other grounds* sub nom. *Owens v. Republic of Sudan*, 864 F.3d 751, 825 (D.C. Cir. 2017), *vacated* sub nom. *Opati v. Republic of Sudan*, 590 U.S. 418 (2020) .......... 5, 36, 37

**Statutes**

28 U.S.C. § 1605A(a)(2)(A)(ii)(I) .................................................................... 8, 18, 26, 41

28 U.S.C. § 1605A(c) ........................................................................................... passim

## INTRODUCTION

The Special Master respectfully submits this Report and Recommendations (R&R) regarding damages as to the injuries sustained by four of the 510 Plaintiffs for whom the Court granted default judgment as to liability against the Defendants Islamic Republic of Iran ("Iran") and Syrian Arab Republic ("Syria") in its September 24, 2025, Order. [1]

## I. PROCEDURAL BACKGROUND

On October 11, 2024, Plaintiffs filed their Motion for Default Judgment as to Liability for First Wave of Attacks, ECF No. 26, on behalf of Plaintiffs injured in 33 attacks. On November 22, 2024, Plaintiffs filed their Motion for Default Judgment as to Liability for Second Wave of Attacks, ECF No. 33, on behalf of Plaintiffs injured in an additional 39 attacks. On February 26, 2025, Plaintiffs filed their Motion for Default Judgment as to Liability for Third Wave of Attacks, ECF No. 41, on behalf of Plaintiffs injured in an additional 43 attacks. Default judgment as to liability was granted in favor of Plaintiffs on September 24, 2025, as to all 115 attacks for which default judgment had been sought. Ex. 1.

On October 22, 2025, Plaintiffs moved to appoint five Special Masters—Jim Letten, Esq.; Jack McKay, Esq.; Professor Franklin D. Rosenblatt; Eric D. Green, Esq.; and me—to issue R&Rs for damages of Plaintiffs impacted by the Court's September 24, 2025, Order. *See* ECF No. 50. The Court granted this motion on October 27, 2025. ECF No. 52. Further, the Court issued an Administrative Plan Governing Five Special Masters stating, "[w]ithin six months of receiving damages submissions for Plaintiffs' claims, each Special Master shall submit Reports and

[1] I have reviewed all of the exhibits provided to me by the Plaintiffs which are too voluminous to file on the docket. Plaintiffs have indicated that they will provide the exhibits to the Court upon request. I cite the exhibits in this R&R to indicate what I have relied upon.

Recommendations to the Court via ECF containing findings of fact and conclusions of law regarding each item of compensatory damages." ECF No. 52-1 at 4.

On November 5, 2025, Plaintiffs filed their Motion for Default Judgment as to Liability for Fourth Wave of Attacks, ECF No. 53, on behalf of Plaintiffs injured in 37 attacks in Babil Province and Diyala Province. Default judgment as to liability was granted in favor of Plaintiffs on January 27, 2026, as to all 37 attacks for which default judgment had been sought. *See* Ex. 2.

On April 30, 2026, Plaintiffs moved the Court for a modification to the Administrative Plan Governing Five Special Masters to permit them to address damages for those Plaintiffs whose claims were addressed in the Court's January 27, 2026 Order granting default judgment as to liability for an additional 37 attacks. *See* ECF No. 62. By Minute Order, the Court granted Plaintiffs' requested modification to the Administrative Plan Governing Five Special Masters. *See* Minute Order dated May 1, 2026.

## II. CATEGORIES OF CLAIMS AND PROPOSED DAMAGES FRAMEWORK

I submit this Report and Recommendations recommending damages for four Plaintiffs injured in four separate attacks traceable to Iran and Syria. Plaintiffs are U.S. military servicemen that served in Iraq or U.S. military contractors working in Iraq and were personally injured in these attacks. The relevant damages framework under Foreign Sovereign Immunities Act ("FSIA") cases for those who sustained personal injuries not resulting in death is set forth below. While the framework this Circuit follows has "strong precedential support," the numbers "are not set in stone." *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 79 (D.D.C. 2010).

### A. Economic-Loss Claims

Pursuant to 28 U.S.C. § 1605A(c)(4), "damages may include economic damages." Two of the Plaintiffs seek compensation for economic losses for lost wages, benefits, and retirement pay. To support their claims for economic loss, Plaintiffs rely on expert reports submitted by Dr. Stan

Smith, Stephanie Uhl, and Kyle Lauterhahn who are all affiliated with Smith Economics Group, Ltd., based in Chicago, Illinois.

Dr. Smith has worked as an economic and financial consultant since 1974. He is the President of Smith Economics Group, Ltd., headquartered in Chicago, Illinois, which provides economic and financial consulting nationwide. Dr. Smith served as the Vice President of the National Association of Forensic Economics for three years and is the founder of Ibbotson Associates' Stock, Bonds, Bills, and Inflation (SBBI) Yearbook, Quarterly, Monthly, and SBBI/PC Services. He wrote the first textbook on Forensic Economic Damages that has been used in courses at various universities, such as the University of Wisconsin and Penn State University. Dr. Smith has previously provided expert reports regarding economic losses in terrorism cases. *See, e.g., Stearns v. Islamic Republic of Iran*, No. 17-cv-131 (RCL) (D.D.C.), Doc. 182 at 9-10 (July 18, 2024); *Miller v. Juarez Cartel*, No. 20-cv-132, 2022 U.S. Dist. LEXIS 112463, at *173-*178 (D.N.D. June 24, 2022).

Stephanie Uhl holds a Master's Degree in Business Administration from the University of Chicago, and she currently serves as the President of Smith Economics Group, Ltd., and has worked as an economic and financial analyst and consultant since 2001. She has "performed thousands of economic analyses in a great variety of engagements, including damages analysis in personal injury and wrongful death cases, business valuation, financial analysis, contract losses, a wide range of class action matters, employment discrimination, and defamation." *See* Ex. 5 at 2.

Kyle Lauterhahn holds his Master's Degree in Sustainable Management from the DePaul University Graduate School of Business, and he currently serves as an Economist at Smith Economics Group, Ltd. He "has performed economic analyses in a great variety of engagements, including damages analysis in personal injury and wrongful death cases, business valuation,

financial analysis, contract losses, a wide range of class action matters, employment discrimination, and defamation." *Id.* at 2-3.

**B. Wounded in Action—Plaintiffs who Survived Terrorist Attacks**

In addition to economic-loss damages, Plaintiffs seek pain-and-suffering damages for their assault, battery, and IIED claims. Courts in this District have adopted a baseline assumption that victims of terrorist attacks who have suffered physical injuries such as compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as "lasting and severe psychological pain," are entitled to $5 million in compensatory damages. *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007) ("Peterson II"). This baseline amount is then adjusted based on the nature of the injury, the pain associated with it, the duration of the hospitalization, and the degree and length of impairment. See *Id.* at 52 n.26. A downward departure to $2-3 million may be appropriate "where victims suffered only minor shrapnel injuries or minor injury from small-arms fire." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 84 (D.D.C. 2010) (citing Peterson II, 515 F. Supp. 2d at 54-55). A victim who exhibits "more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead," by contrast, may warrant a larger award of $7-12 million. *Id.* (citing *Peterson II*, 515 F. Supp. 2d at 54). For victims who "suffered severe and lasting psychological harm," but no physical injuries, courts have established $1.5 million as the baseline award. *Peterson II*, 515 F. Supp. 2d at 56. This amount is also subject to departure depending on the circumstances. *See, e.g., Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 16-17 (D.D.C. 2010) (awarding $3 million to victim diagnosed with PTSD who attempted suicide); *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 275 (D.D.C. 2003) (awarding $7 million in damages to plaintiff whose paramount injury was emotional disorders).

This Court, in *Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859-JEB, 2025 U.S. Dist. LEXIS 157765 (D.D.C. Aug. 14, 2025), looked to "the more granulated framework for direct physical injuries that Judge John D. Bates of our district articulated in *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84 (D.D.C. 2014), *aff'd in part, vacated in part on other grounds* sub nom. *Owens v. Republic of Sudan*, 864 F.3d 751, 825 (D.C. Cir. 2017), *vacated* sub nom. *Opati v. Republic of Sudan*, 590 U.S. 418 (2020)." 2025 U.S. Dist. LEXIS 157765, at *5. In *Pautsch*, this Court parsed out six categories of plaintiffs:

1. Plaintiffs "who suffered little to no physical injury"—awarded $1.5 million;
2. Plaintiffs "who suffered injuries 'such as lacerations and contusions caused by shrapnel'"—awarded $2 million;
3. Plaintiffs who sustained "more serious physical injuries, such as broken bones, head trauma, some hearing or vision impairment, or impotence"—awarded $2.5 million;
4. Plaintiffs with more serious injuries such as "spinal injuries not resulting in paralysis, more serious shrapnel injuries, head trauma, or serious hearing impairment"—awarded $3 million;
5. Plaintiffs sustaining "baseline" injuries such as "vision impairment, many broken bones, severe shrapnel wounds or burns, lengthy hospital stays … and permanent injuries"—awarded $5 million; and
6. Plaintiffs with "even more grievous wounds such as lost eyes [or] extreme burns … or [who] endured months of recovery in hospitals"—awarded $7.5 million.

2025 U.S. Dist. LEXIS 157765, at *5-*6 (citing *Wamai*, 60 F. Supp. 3d at 92-93).

In connection with the damage claim of Plaintiff Justin E. Hendrickson, Plaintiffs suggest that a more apt damages model is set forth in *Lee v. Islamic Republic of Iran*, No. 19-cv-830

(APM), 2023 U.S. Dist. LEXIS 204966 (D.D.C. Oct. 15, 2023), where Judge Mehta adopted a different six-category damages framework associated with Explosively Formed Penetrator ("EFP") attacks in Iraq carried out against U.S. servicemen and women. I address Plaintiffs' argument, *infra*, in connection with the Hendrickson claim.

### C. Punitive Damages

Plaintiffs also seek punitive damages which "serve to punish and deter the action which they [are] awarded." *Valore*, 700 F. Supp. 2d at 87. The terrorism exception to the FSIA specifically addresses the award of punitive damages. *See* 28 U.S.C. § 1605A(c). This Court has previously expressed a level of skepticism regarding the "actual deterrent effect of punitive damages" in *Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859 (JEB), 2025 U.S. Dist. LEXIS 125115, at *5 (D.D.C. July 1, 2025)[2]; however, this Court nevertheless found, "[g]iven the reprehensibility of Defendants' actions, punishment beyond compensatory relief may aid not only to hold [Defendants] morally accountable but also to deter similar misconduct by the two nations in the future. *Id.* at *4. In *Pautsch*, this Court awarded punitive damages in an amount equal to compensatory damages. *Id.* at *6 (following other courts in this District that have awarded such requests in similar cases). Plaintiffs here request the entry of punitive damages in the same manner as was entered in the companion *Pautsch* case.

## III. THE WOUNDED IN ACTION PLAINTIFFS' INJURIES

I describe below the four attacks for which this Court found the Defendants Iran and Syria liable as well as the injuries Plaintiffs sustained.[3]

---

[2] This case was initially filed as a related case to the *Pautsch* case.

[3] The attacks that injured Alexander M. Sargent, Jerry Oldham, Justin E. Hendrickson, and John Lamie were caused by acts of extrajudicial killing because the attacks all resulted in the death on an individual or individuals who were not the perpetrators of the attacks. Therefore, the decision in *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024), does not bar the claims of plaintiffs injured as a result of these attacks. *See Borochov*, 94 F.4th at 1060-61 (finding no jurisdiction under 28 U.S.C. § 1605A "[b]ecause the perpetrator did not kill anyone in the attack that injured the Golans, no extrajudicial killing occurred").

### A. ALEXANDER M. SARGENT – NOVEMBER 19, 2004, ATTACK – FALLUJAH, IRAQ

On November 19, 2004, Alexander M. Sargent was serving in the India Company, 3d Battalion, 1st Marines in the Jubail District of southwest Fallujah, Iraq. *See* ECF No. 9 at 598-602; ECF No. 26-1 at 53-54. Mr. Sargent and his unit were conducting a detailed search of a house when insurgents threw multiple fragmentation grenades into the building, and their unit came under machine gun fire. *Id.* Mr. Sargent was wounded in the attack, and three members of his unit—LCpl Phillip West, LCpl Joseph Welke, and Cpl Bradley Arms—were killed in the attack. *Id.* Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Mr. Sargent was injured on October 11, 2024 (ECF No. 26), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for inter alia the November 19, 2004 attack in which Alexander M. Sargent was injured. *See* Ex. 1.

Mr. Sargent suffered severe physical and mental anguish and extreme emotional pain and suffering as a result of the attack. *See* ECF. No. 9, ¶ 602. The following chart reflects the claims asserted by the Plaintiff injured in the November 19, 2004, attack, as well as the evidence setting forth the bases of those claims. That evidence was provided to me as exhibits to the Declaration of John M. Eubanks ("Eubanks Declaration").

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted**[4] | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Alexander M. Sargent | Self | Assault, Battery, and Intentional Infliction of Emotional | Declaration of Alexander M. Sargent dated May 8, 2026, including a copy of his proof of U.S. citizenship | 2 |

[4] The values listed in this chart are reflective of the requests made by Plaintiffs. I have left Plaintiffs' requests in place here; however, my recommendations are set forth at the end of the discussion for each plaintiff and in the chart at the end of this Report and Recommendations.

| | | | | |
|---|---|---|---|---|
| | | Distress $7 million | Medical Records, 2005-2018 | 2A |
| | | | Certificate of Release or Discharge from Active Duty | 2B |
| | | | Testimony by Dr. Charles Marmar, in *Karcher*. | 3 |
| | | | Expert Report of Dr. Charles Marmar, used in *Karcher* | 4 |
| | | Economic Loss Claim $3,892,691 | Expert Report of Dr. Stan Smith, Stephanie Uhl, and Kyle Lauterhahn regarding economic loss for Alexander M. Sargent, dated May 20, 2026 | 5 |

Mr. Sargent brings claims for assault, battery, and intentional infliction of emotional distress, which have caused physical and emotional injuries. He also brings economic-loss claims.

### 1. Assault, Battery and Intentional Infliction of Emotional Distress

#### a. Alexander M. Sargent's Background[5]

Alexander M. Sargent was born in [redacted]. *See* Ex. 2 at ¶ 3. As a child of a Marine Officer, Mr. Sargent frequently moved around the country and was what many consider "a military brat." *Id.* at ¶ 4. Mr. Sargent was the eldest of two children in his family. *Id.* at ¶¶ 3-4. His mother was a real estate agent who loved to garden. *Id.* at ¶ 4. While their family relocated often, a significant part of his childhood was spent in [redacted]. *Id.* During his high school years, Mr. Sargent described himself as someone who was not focused on obtaining a high achieving academic performance. *Id.* at ¶ 5. However, he scored all 4's on his AP exams. *Id.* Mr. Sargent participated in theater, cross country, and garage band. *Id.* After graduation, Mr. Sargent was

[5] Alexander M. Sargent's Virginia birth certificate and declaration confirm this he is a U.S. citizen and was at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 2, Declaration of Alexander M. Sargent, dated May 8, 2026.

determined to serve his country and be a better man. *Id.* at ¶ 6. He enlisted in the Marines on August 28, 2000 and entered active duty in 2001. *Id.* at ¶ 7. His first duty station was at Camp Pendleton, California. During his service, Mr. Sargent was a Rifleman and Infantry Team Leader in West Pac, the Iraqi Invasion, and Operation Iraq Freedom in both Karmah and Fallujah, Iraq. *Id.*

**b. Injuries at Point of Attack**

On November 19, 2004, Mr. Sargent and his unit were clearing a house in the Jubail District of southwest Fallujah, Iraq when they came under gunfire. *Id.* at ¶ 8. Instantly, they lost one Marine who was struck by gunfire. *Id.* As Mr. Sargent attempted to grab his fellow Marine, he was shot in the arm and leg. *Id.* He recalled that his right arm and hand were "nearly detached" and he "had a giant hole in [his] right thigh." *Id.* at ¶ 9. The pain from his injuries became so intense, he went into shock and was unable to move. *Id.* During the attack, two more Marines were struck and killed before another squad made entry into the building. *Id.* at ¶ 8. Mr. Sargent recalls being transported to Al Asad Air Base in Iraq, Landstuhl, Germany, and Andrews Air Force base in Maryland for medical treatment. *Id.* Mr. Sargent explained that he nearly lost his right arm and was unable to walk for about a year. *Id.* at ¶ 11.

**c. Mr. Sargent's Physical Injuries Resulting from the Attack**

According to a medical report, Mr. Sargent received a "gunshot wound to the right forearm with large segmental loss of the radius, treated with serial debridement and open reduction internal fixation with a locking plate and antibiotic impregnated bone cement space as well as a serratus free flap with full thickness skin graft for coverage and extensor tendon spacer placement." Ex. 2A at 000001. Due to the gunshot wound to his left thigh, the overlying skin adherence "limited his ability to flex his leg, and a palpable subcutaneous thickening over the left curve of his right thigh." *Id.* To address his resulting wounds, Mr. Sargent underwent an operation that included:

> RIGHT RADIUS FLAP ELEVATION AND ILIAC CREST BONE GRAFT TO 5 CM RADIUS DEFECT WITH ADDITIONAL PLATE AND SCREW FIXATION. SCAR REVISION, RIGHT THIGH. EXTENSOR POLLICIS LONGUS TENDON SPACER FOR STAGED EXTENSOR TENDON RECONSTRUCTION.

*Id.* at 000002.

Mr. Sargent's diagnosis included "right radius segmental bone defect status post gunshot wound to the right thigh, scar adhesion of the right thigh, myositis ossificans, and status post serratus flap." *Id.* In 2007, he received an x-ray of his right elbow. *Id.* at 000244. The findings revealed trauma to the right forearm with a healed radial fracture, a long metal plate, compression screws, and multiple punctate shrapnel fragments. *Id.* Since the attack, Mr. Sargent has undergone 13 reconstructive surgeries and treatment for an Acinetobacter infection that he contracted during the injury. Ex. 2 at ¶ 11.

Because of the attack, Mr. Sargent's right hand no longer functions as it did before. *Id.* at ¶ 13. He described that it takes him longer to do everyday tasks, such as tying his shoes. *Id.* His right hand does not extend to the plane of his arm and the sensation in his fingers is very limited except for his pinky. *Id.* Prior to the attack, Mr. Sargent used to play the piano, but because his right thumb has no mobility, he is no longer able to play. *Id.* Mr. Sargent learned to use his left hand to eat, write, or grab items due to the numbness felt in his right hand. Ex. 2A at 000082.

Mr. Sargent's right knee has degraded because of the gunshot wound which has "taken running away from [him]"—a once daily activity. Ex. 2 at ¶ 13. Even once mundane movements such as walking downstairs is now a challenge due to his unstable leg and knee. *Id.* Mr. Sargent underwent reconstructive surgery on his arm where his serratus was removed. *Id.* He experiences pain daily from both extremities and in his back. *Id.* This pain is so severe that Mr. Sargent has backed out of a lot of engagements. *Id.*

**d. Mr. Sargent's [redacted] Resulting from the Attack**

In addition to his physical injuries, Mr. Sargent [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

#### e. Impact

Due to the injuries Mr. Sargent sustained in the attack, he has experienced a loss of enjoyment of life. He reported that he [redacted]

[redacted] *Id.* at 000139. He expressed that he once became so "unmotivated to perform basic activities of daily living including showering, cleaning, and eating." *Id.* Mr. Sargent carries around "significant guilt" because he was injured and other soldiers lost their lives. *Id.* at 000083. Everyday tasks such as maintenance of his home and vehicles are responsibilities that have to be passed onto someone else, because of his injuries. Ex. 2 at ¶ 14.

Mr. Sargent reported that his injuries were so severe that he spent 12 months in a military hospital, and his military career ended following the attack. Ex. 2A at 000140.[6] He described that he "never had a well thought out plan for [his] life after the military." Ex. 2 at ¶ 15. He obtained his bachelor's in economics in 2009, started his own moving company, "Local Muscle Moving Company," in 2010, and earned his MBA in 2015 from Worcester Polytech. *Id.*[7] Mr. Sargent previously worked as an assistant manager of a self-storage facility and later became the co-founder of "Mi-Box Maine" following the start up of his moving company. *Id.* Despite this success, Mr. Sargent [redacted] which caused him to become a "silent partner" to the business he started. *Id.* at ¶ 16. His business partners were initially understanding, however, the sympathy did not last forever. *Id.* By 2023, Mr. Sargent became unemployed and remains so today. *Id.* According to Mr. Sargent, "I have been unable to work [redacted]" *Id.* Prior to 2023, Mr. Sargent received 70% disability from the VA which was increased to 100% in 2023. *Id.* at ¶ 17. On February 26, 2026, Mr. Sargent was awarded a house in Springfield, Louisiana through the Military Warrior Foundation. *Id.* It is his long-term goal to become financially stable and debt free. *Id.*

---

[6] *See also* Ex. 2B, Certificate of Release or Discharge from Active Duty (separation date listed as November 28, 2005, as a SGT.).

[7] *See also* Ex. 2A at 000140.

In addition to impacting his ability to work, [redacted] Mr. Sargent has been divorced twice and later viewed the relationships as abusive. Ex. 2A at 000140. He has two daughters. Id.

Today, Mr. Sargent [redacted] The attack that caused his injuries "has been forever life changing." *Id.* at ¶ 18. "The long-term effects and symptoms because of the gunshot wound to my arm and leg have and will permanently affect me for the rest of my life. The course of my life was directed for me because my decision-making ability became extremely limited and I imagine it will only further decrease as both my arm and leg further degrade." *Id.*

**f. Request for Nonpecuniary Compensatory Damages**

Plaintiffs have requested an award of $7 million in nonpecuniary compensatory damages for Alexander M. Sargent's assault, battery, and intentional infliction of emotional distress claims.

Mr. Sargent was shot in the right arm and hand which were "nearly detached" and he "had a giant hole in [his] right thigh." Ex. 2 at ¶ 9. He has undergone 13 surgeries to address the injuries he sustained in the attack, and he is permanently disabled. He now suffers from [redacted] Furthermore, the resulting injuries from the attack have left permanent deformities. *See Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 47 (D.D.C. 2023) (Court awarding $7 million where plaintiff was shot three times, lives with severe permanent injuries, and

suffers from PTSD). For the reasons stated above, I recommend that the Court approve Plaintiffs' request of an award of $7 million in compensatory damages for Alexander M. Sargent.[8]

**2. Economic-Loss Claim**

Mr. Sargent seeks compensation for economic losses in the form of lost wages, benefits, and loss of housekeeping and household management services. See 28 U.S.C. § 1605A(c). To support the claims for these economic losses, Plaintiffs have submitted the expert report of Dr. Stan Smith, Stephanie Uhl, and Kyle Lauterhahn (collectively "SEG").

To project Mr. Sargent's future income stream if not for the November 19, 2004, attack, SEG incorporated evidence that Mr. Sargent wished to pursue a military career and overlaid that information against statistical data generated by the Bureau of Labor Statistics ("BLS"), the Department of Labor, military pay websites, and other sources. Ex. 5 at 3; Ex. 2 at ¶ 7. From these sources, SEG calculated the present value of Mr. Sargent's lost income and loss of value of housekeeping and household management services, assuming that Mr. Sargent, who was 23 years old when he was injured, (1) would continue service at the rank of Sergeant (E-5) through December 2011; (2) would have employee benefits that grow at the same rate as wages and are discounted to present value at the same discount rate; and (3) would have annual employment each year through expected ability to work. SEG adjusted these income figures for wages and benefits for Mr. Sargent. *Id.*

Based on the analysis and calculations provided by SEG, Plaintiffs have requested, and I recommend, that the Court award $3,474,300 for loss of wages and benefits and $418,661 for household service loss for a total of $3,892,691 in economic damages for Alexander M. Sargent. *Id.* at 14, 16.

---

[8] This award seems consistent with the damages approach taken in *Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859-JEB, 2025 U.S. Dist. LEXIS 157765 (D.D.C. Aug. 14, 2025),

### B. JERRY OLDHAM - MARCH 9, 2005, ATTACK – BAGHDAD

On the March 9, 2005, an SVBIED attack was carried out against the Iraqi Ministry of Agriculture and the adjacent Al-Sadeer Hotel that housed DynCorp International ("DynCorp") contractors supporting the operations of the Ministry of Agriculture. *See* ECF No. 41-1 at 15-16. Jerry Oldham, a DynCorp contractor, was injured during the attack, and at least one member of the Iraqi police was killed. *See Id.* Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Mr. Oldham was injured on February 26, 2025 (ECF No. 41), and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the March 9, 2005, attack in which Jerry Oldham was injured. *See* Ex. 1.

Mr. Oldham is a Plaintiff in this case. *See* Amended Complaint, ECF No. 9 at ¶¶ 829-35. The following chart reflects the evidence setting forth the bases of those claims. That evidence was provided to me as exhibits to the Eubanks Declaration

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Jerry Oldham | Self | Assault, Battery, IIED<br>$1.5 million | Copy of Jerry Wayne Oldham's passport | 6 |
| | | | Declaration of Jerry W. Oldham, dated March 15, 2026 | 7 |

Mr. Oldham brings claims for assault, battery, and intentional infliction of emotional distress, which have caused physical and emotional injuries.

### 1. Assault, Battery, and Intentional Infliction of Emotional Distress Claim[9]

#### a. Jerry Oldham's Background

Jerry Oldham was born in [redacted], and during his childhood, he lived in South Carolina, West Virginia, and Georgia. *See* Ex. 7 at ¶¶ 2, 4. Although he attended high school in Georgia, he ultimately earned his G.E.D. in South Carolina. *Id.* When he was around 19 years old, he worked at the Ponderosa Steakhouse, and during that period, he met Amire Carag, who would later become his wife. *Id.* at ¶¶ 5, 6. He subsequently worked at the Hard Rock Café, during which time he became a volunteer firefighter at the Murrells Inlet-Garden City Fire Department. *Id.* at ¶ 7.

Jerry became a patrol officer with the Georgetown County Sheriff's Department after he attended and completed training at the South Carolina Criminal Justice Department. *Id.* In 2002, he left the Sheriff's Department and became a police officer at the Georgetown City Police Department; he remained in that position through sometime in 2004. *Id.*

In late 2004, because he had known police officers who worked for DynCorp abroad in areas involving defense-related contracts, Jerry applied for a position with the company. *Id.* at ¶¶ 8, 9. He was accepted and was offered a salary which was "at least three, if not four times the salary I was earning as a police officer." *Id.* at ¶ 9. Because he and his wife had had two daughters by this point in time, Jerry "hoped that working for DynCorp for a couple of years would help me cover the expenses of my house and support my family." *Id.*

Following his acceptance, Jerry attended the training DynCorp required, and in or around January 2005, he deployed to Iraq. *Id.* Once there, he was temporarily assigned to the Movement

[9] Jerry Oldham's United States passport and declaration confirm this he is a U.S. citizen and was at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Exs. 6 and 7.

Control Unit which was "responsible for picking up new DynCorp employees at the airport and bringing them back to the [Al-Sadeer] hotel complex or other locations." *Id.* at ¶ 11. The Al-Sadeer Hotel complex was comprised of a few buildings, and Jerry was housed in a room on the second floor of the L-shaped portion of the main hotel building, a building which had six or seven floors. *Id.* at ¶ 10. According to Jerry, concrete barriers – which were approximately 20 feet tall – were situated around the complex; a four-foot cinder block wall with poles and metal sheets also served as an additional barrier. *Id.*

**b. The Attack and Immediate Aftermath**

The hotel complex included a gym which was located on the bottom floor on the rear side of the main building. *Id.* at ¶ 12. Generally, when Jerry was scheduled for a morning mission, he worked out in the gym in the afternoon, and when he had afternoon assignments, he went to the gym in the morning. *Id.* However, on March 9, 2005, Jerry did not follow that routine. Even though he had an afternoon mission scheduled, having woken up around 4:30am or 5:00am, he decided to get some breakfast and go to the gym. *Id.* at ¶ 13. When he arrived at the gym early that morning, he opted to use the treadmill which faced windows which basically ran from the floor to the ceiling. Then, he put his headphones on and began jogging. *Id.* at ¶ 14.

At around 6:30am, moments after Jerry saw guards running outside the building – through the large windows in front of him – he felt an explosion and then found himself on the floor. *Id.* at ¶¶ 14, 15. He recently recalled, "[T]he glass 'wall' in front of me had shattered. There was glass everywhere." *Id.* at ¶ 15. When he reflected upon his initial injuries and mental state, he described them in the following way:

> Pieces of glass had hit my body, mostly my legs. I looked down and saw blood on my legs as well as a few shards of glass which were embedded into my skin. I was very confused. After all, it was all so sudden and happened out of nowhere. My mind kept trying to figure out what had just happened. With all the destruction around me, all the debris, I could not seem to wrap my head around any of it. I think

I was in some type of shock.

*Id.* at ¶ 16.

Later that day, when Jerry saw a doctor, he recalled how he still had pieces of glass in his legs. For example, he explained, "one piece in my right leg was around the size of a quarter, and others were larger than the size of a BB." *Id.* at ¶ 26.

Jerry's understanding of what occurred during the March 9, 2005, attack was derived from conversations with others. He was told that "around 1,500 pounds of explosives" had been placed on a garbage truck, and that truck had broken through a guarded area near a gate and began heading towards the hotel. *Id.* at ¶¶ 20, 21. The explosives had been detonated when the truck hit the four-foot cinder block wall, and as a result, people were injured, and some men had been killed. *Id.* at ¶ 21.

Soon after the explosion, once Jerry got his bearings and began to calm down, he "shifted into an autopilot mode" and "knew I had to get back to my room to get my vest, my gun, and my gear, and help in any way I could." *Id.* at ¶ 17. He recently described "the crunch of glass under my feet as I took each step as I left the gym" and the "chaos" he witnessed as he headed to his room – with "people running everywhere." *Id.* Despite the fact that the explosives had been detonated outside of the building, "about 80 to 100 feet from my room," Jerry's room sustained significant damage. *Id.* at ¶ 18. He vividly recalled the room's condition and shared his recollections as follows:

> The door to my room had been blown out; there was no door at all in the doorway. What was left of the frame of my large window – it was approximately six feet by six feet – was laying on the bed. The glass from the window was everywhere. It was on the carpet, the floor, etc. My stuff was all over the floor, too. The explosion had taken place on the side of the building where my room was located. The attackers had detonated the explosives about 80 to 100 feet from my room. When I looked out of the hole that had been my window, I saw lots of smoke.

*Id.*

> The explosive force had essentially blown my window into the room, and then the overpressure or shockwave that followed had sucked a lot of it out.

*Id.* at ¶ 19.

After Jerry retrieved his gear from his room, he joined people at the front of the building in preparation for another attack, something which he, having worked with SWAT teams, feared would take place. *Id.* at ¶¶ 22, 23. In his words, he "stood with others, standing ready for what might happen next. . . [and] waited with everyone else, on guard, doing what I had to do." *Id.* As he remained at this post, he saw "men whose heads and faces were bleeding." *Id.* at ¶ 22. All the while, he remained "nervous and anxious," and although "[i]t felt like forever," he believed he probably "only stood there a few hours." *Id.* at ¶ 23.

Following "all clear" announcements, Jerry decided to assess the extent of damage himself; while doing so, he recalled seeing the following: "I saw more men who had sustained injuries. I saw more bloody faces. Some had been bandaged. I also think I saw a toe or a finger on the ground outside the building as well as a piece of skin or what looked like a piece of someone's face." *Id.* at ¶ 24. He added that throughout the process, [redacted] In addition, he saw many vehicles on fire, many of which had been destroyed, including the Chevy Tahoe he rode in for his missions. *Id.* at ¶ 25.

Jerry struggled to try to sleep that night, but he was never successful. Initially, he tried to sleep in his room after "put[ting] a blanket over the open hole where my window had been." *Id.* at ¶ 27. He further explained, "[A]s I lay there alone in my room, all the images – from the gym, outside, and well, the entire experience – came back to me. The images were very fresh, and it was

impossible to fall asleep." *Id.* In addition, during the night, he was forced to deal with arms fire outside and to listen to "rounds hitting the building." *Id.* at ¶ 28. When this occurred, he "rolled off the bed and braced myself between the bed and the wall. Then, shifting again into 'ready mode,' I got dressed and waited a while." *Id.* At some point, he decided to leave his room and go to someone else's room, but even there, he could not sleep. He never slept that night. *Id.*

Pieces of glass remained in Jerry's legs for a while after the attack, for he described feeling "tiny bumps" on his shin, and at times, when he rubbed the area, "shiny pieces" fell into his hand. *Id.* at ¶ 31. Over time, other pieces "worked their way to the surface of the skin on their own." *Id.* Separate from the injuries to his legs, Jerry also dealt with tinnitus, a ringing he experienced in his right ear, along with hearing loss in that ear. He reported that he still suffers from the ringing today, and it is louder than it used to be, something a doctor had warned him about years earlier. *Id.* at ¶ 29. Moreover, he has admitted that "the ringing in my ear is a constant reminder of what I lived through that day." *Id.* at ¶ 37.

**c. The Ongoing Impact of the Attack Upon Mr. Oldham**

Following the attack, Jerry completed his contract and continued for a second year as a DynCorp employee. *Id.* at ¶ 32. Early on, and continuing for years afterwards, he "kept dreaming about what I actually experienced along with what I saw throughout the complex afterwards" and has admitted: [redacted]

Jerry has considered various similarities and distinct differences between what he experienced as a police officer and what he witnessed and lived through during and following the Al-Sadeer Hotel attack. When he attempted to describe some of those differences and how he has been affected by the attack and the aftermath, he did so in the following way:

[redacted]

*Id.* at ¶ 34.

He has also acknowledged that even though years have passed, the images – which clearly filled his mind during the earlier years following the attack – "still hit me at unexpected times," something he said, "has been challenging to deal with, too." *Id.* at ¶ 35. He also shared that the "disturbing memories and emotions connected to them usually come to the surface on or around March 9th," the anniversary of the date of the attack. *Id.* at ¶ 36. Moreover, he admitted that he "will never forget what happened" and he "feel[s] an anger when I think about those who were injured and killed and the senseless destruction. . . I hate what happened that day, and I hate that I cannot fully let go of the images and the memories." *Id.* at ¶ 37.

Jerry has also struggled with the following realization: "[I]f I had not gotten up early, and if I had not left the room to go to the gym, I probably would be dead because either the impact of the large frame striking the bed would have killed me, or I would have been sucked out with the shockwave." *Id.* at ¶ 19. Although he appreciates the fact that he is alive, he has confessed, "[T]o know I came so close to death – as if I had cheated death – is something that I have trouble dealing with. To this day, that fact is beyond upsetting." *Id.* He added that "knowing how close I was to losing my life, losing the past years with my wife and children, is still hard to deal with" and confessed, "The truth is, I don't think anyone ever really gets over surviving an experience like that. I know I haven't." *Id.* at ¶ 37.

#### d. Request for Nonpecuniary Compensatory Damages

Plaintiffs have requested, and I recommend, that the Court award $1.5 million for Jerry Oldham's assault, battery, and intentional infliction of emotional distress claims, commensurate with the $1.5 million awarded to each of Wallace Byars and Richard Vessell in *Pautsch* — two other DynCorp civilian contractors who were present at the Al-Sadeer Hotel on March 9, 2005. *See Pautsch*, 2025 U.S. Dist. LEXIS 157765, at *25-26, *33-34. Like Messrs. Byars and Vessell, Mr. Oldham sustained primarily psychological injuries from the attack. He experienced nightly nightmares for years following the attack and has endured persistent intrusive images of the carnage he witnessed. Those images continue to resurface at unexpected times and intensify around each March 9th anniversary. He has grappled with the knowledge that, had he followed his usual routine and remained in his room that morning, the window frame that landed on his bed would likely have killed him — a reality he describes as "beyond upsetting" and one he has never fully come to terms with. Additionally, Mr. Oldham suffered glass shard injuries and permanent tinnitus and hearing loss, which are consistent with the injuries sustained by those *Pautsch* plaintiffs.

### C. JUSTIN E. HENDRICKSON – MAY 7, 2005, ATTACK – AL KARMAH, IRAQ

On May 7, 2005, Corporal (Cpl.) Justin E. Hendrickson was serving in the Lima Company, 3d Battalion, 8th Marines in Karmah, Iraq. See ECF No. 9 at ¶ 918-921; ECF No. 33-1 at 22-23. While conducting a routine resupply patrol, an IED struck the vehicle Mr. Hendrickson was traveling in with his unit. *Id.* U.S. Marine LCpl. Michael Postal was killed in the attack and Mr. Hendrickson sustained serious injuries that resulted in a subsequent below-the-knee amputation of his right leg. *Id.* Plaintiffs filed a motion seeking default judgment as to liability against Iran and Syria for the attack in which Mr. Hendrickson was injured on November 25, 2024 (ECF No. 33),

and on September 24, 2025, the Court entered an Order accompanied by a Memorandum Opinion assessing liability against Iran and Syria for *inter alia* the May 7, 2005, attack in which Justin E. Hendrickson was injured. *See* Ex. 1.

Mr. Hendrickson suffered severe physical and mental anguish and extreme emotional pain and suffering. ECF No. 9 at ¶ 921. The following chart reflects the claims asserted by Mr. Hendrickson, as well as the evidence setting forth the bases of those claims. That evidence was provided to me as exhibits to the Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| Justin Edward Hendrickson | Self | Assault, Battery, and Intentional Infliction of Emotional Distress<br>$12 million | Declaration of Justin E. Hendrickson dated April 30, 2026, including a copy of his proof of U.S. citizenship | 8 |
| | | | Medical Records from Walter Reed Medical Center, May 2005 – November 2005 | 8A |
| | | | VA Blue Button Report June 29, 2018 – October 2, 2020 | 8B |
| | | | Medical records from James E. Van Zandt VA Medical Center | 8C |
| | | | Expert Report of Dr. Russell Gore, used in *Karcher*. | 9 |
| | | | Expert Report of Dr. Charles Marmar, used in *Karcher*. | 4 |
| | | | Expert Report of Dr. Stan Smith, Stephanie Uhl, and Kyle Lauterhahn regarding economic loss for Justin E. Hendrickson, dated May 14, 2026 | 10 |

| | | | | |
|---|---|---|---|---|
| | | Economic Loss Claim $4,121,235 | | |

Mr. Hendrickson brings claims for assault, battery, and intentional infliction of emotional distress, which have caused physical and emotional injuries. He also brings economic loss claims.

**1. Assault, Battery and Intentional Infliction of Emotional Distress[10]**

**a. Justin Hendrickson's Background**

Justin E. Hendrickson was born in [redacted] and is the middle child of three siblings. *See* Ex. 8 at ¶ 3. Mr. Hendrickson grew up with his older brother Bruce Jr. and younger brother Andrew in a low-middle class family. *Id.* at ¶ 4. Their mother was a woman who wore many hats as she worked in various professions to provide for them. *Id.* Their father was an operator at one of the local power plants. *Id.* Mr. Hendrickson described his them as a typical family who vacationed together, had usual arguments, but who loved one another. *Id.* In addition to being close with his immediate family, Mr. Hendrickson was surrounded by great grandparents, grandparents, aunts, and uncles who all played key roles in helping him to grow and become the man he is today. *Id.* at ¶ 5. He developed lifelong friendships with his schoolmates that he met during his early years of childhood. *Id.* Growing up, Mr. Hendrickson enjoyed hunting, and playing sports year-round, from soccer to track and field, and cross country. *Id.* at ¶ 6. He also played in the school band and was an above average student academically. *Id.*

Upon graduation from [redacted] in May 2001, Mr. Hendrickson began planning his future in the military. *Id.* at ¶¶ 7, 8. He wanted an

[10] Justin E. Hendrickson's United States passport and declaration confirm that he is a U.S. citizen and was at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Ex. 8, Declaration of Justin E. Hendrickson, dated April 30, 2026.

adventure, to see the world, challenge himself, and serve his country, so Mr. Hendrickson joined the United States Navy in 2001. *Id.* at ¶ 8. After leaving Military Entrance Processing Station (MEPS), he went to Great Lakes, Illinois where he completed his recruit training before being stationed at Camp Pendleton, California. *Id.* at ¶ 9. Mr. Hendrickson had aspirations to deploy and see the world and serve as a medical officer or physician's assistant. *Id.* at ¶ 10. At Camp Pendleton, he was assigned to the Naval Hospital and attended the Field Medical Service School completing medical training at the Naval Medical Center in Balboa, California. *Id.*

Mr. Hendrickson was stationed in Camp Lejeune, North Carolina and served as a Field Medical Service Technician. *Id.* at ¶ 11. He was deployed to Okinawa, the Philippines, and South Korea in 2002. Mr. Hendrickson was deployed to Afghanistan as a Hospital Corpsman in 2003 and was deployed to Al-Karmah, Iraq the same year. *Id.*

**b. Injuries at Point of Attack**

On May 7, 2005, Mr. Hendrickson was working as a Senior Line Corpsman and provided medical coverage as well as other duties for the Lima Company Headquarters Platoon. *Id.* at ¶ 12. In the early morning hours, Mr. Hendrickson and the other service members arrived in the Al-Anbar Province on the outskirts of Al-Karmah, Iraq to resupply a forward outpost. *Id.* After that mission was complete, they left to begin the second part of the mission to convoy from the outpost and recon for a future outpost. *Id.* The convoy consisted of a gun truck in the front, 2 five tons in the middle, and Mr. Hendrickson's vehicle in the rear pulling security. *Id.* Mr. Hendrickson traveled in a Humvee with three Marines that consisted of a driver, radioman, and rifleman. *Id.* The Humvee they were in was nicknamed "Hill Billy UP Armor Vehicle" because it had "only extra thin mental slapped to the sides and sandbags on the floor." *Id.* at ¶ 13.

Mr. Hendrickson checked his watch and saw that it was 8:20 a.m. *Id.* at ¶ 12. They were traveling on a road that was known for IEDs and ambushes because of the vehicles slowing down

to navigate the s-curve road. *Id.* When the vehicle approached the s-curve, it was struck by an IED, which Mr. Hendrickson later learned, consisted of three 155mm artillery rounds that had been planted in the ground. *Id.*

Mr. Hendrickson recalled the immediate sound of the blast that turned into his "ears ringing, screaming, a huge fireball, and smoke rolling over the vehicle." *Id.* at ¶ 13. Mr. Hendrickson recounted that he "felt burning throughout [his] whole body." *Id.* at ¶ 14. The burning pain was so intense that when he felt something hit his femur and shoot out the other side, his body went into shock and shut his pain receptors down. *Id.* He was positioned on the back bench of the vehicle and was jolted forward into a spare tire in the back. *Id.* at ¶ 13. The rifleman who was in the back with Mr. Hendrickson also fell forward and the barrel of his M16 hit Mr. Hendrickson in the back of the head under his helmet. *Id.* at ¶ 14. Timed seemed to slowdown, and Mr. Hendrickson was unaware of his injuries at the time. *Id.* at ¶ 15. The driver stopped the vehicle and everyone called "doc." *Id.* at ¶ 14. Mr. Hendrickson attempted to stand up to find his med bag to treat the Marines but he immediately fell down when he took a step onto his right foot. *Id.* at ¶ 15. He assessed that his right great calcaneus of heel bone was completely blown off and his med bag was completely shredded and thrown into a canal on the left side. *Id.* The rifleman attempted to radio for help; however, the radio was transmitting but not receiving after the blast. *Id.*

As the driver maneuvered around to the back to open the door, Mr. Hendrickson could see that the driver's fingers on his left hand were blown off. *Id.* The rifleman passed out due to his tib fib fracture and loss of blood. *Id.* Mr. Hendrickson turned slowly while on the floor of the back of the vehicle and called in a nine line Casualty evac. *Id.* at ¶ 16. As he turned back around, the driver of the Humvee was "slumped over the back of the vehicle." *Id.* The radioman came around to help, and Mr. Hendrickson observed that he was cut up and hard of hearing due to his eardrums being

ruptured from the blast. *Id.* With the radioman's help, Mr. Hendrickson got the driver to the ground and waited for help to arrive. *Id.* The driver went in and out of consciousness and time seemed to slow. *Id.* at ¶ 17. One of the Marines placed a pressure dressing on Mr. Hendrickson's right heel and elevated his leg using the tow chain on the back of the HMMWV. *Id.* When the lead vehicle in the convoy returned, Mr. Hendrickson was able to motivate and direct his Jr. line Corpsman to care for the injured and evacuate them back to higher level of care. *Id.* When Mr. Hendrickson was loaded into a HMMWV, he noticed that the driver of his vehicle had a large baseball-size hole under his Left Axillary. *Id.*

Mr. Hendrickson remained conscious to provide instructions on how to navigate the med evac vehicle back to Fallujah surgical center. *Id.* at ¶ 18. His junior corpsman worked on the driver of Mr. Hendrickson's vehicle, and another Marine attempted to insert a large bore IV into his vein, but the catheter went through his forearm. *Id.* Mr. Hendrickson refused further attempts. *Id.*

When they arrived at Fallujah Surgical, Mr. Hendrickson was unloaded and underwent "multiple washouts and was transferred to Baghdad, Landstuhl, and then Bethesda Naval Hospital and Walter Reed Army Med center." *Id.* Mr. Hendrickson learned that the driver of the HMMWV died from his wounds shortly after arriving at Fallujah Medical Center where they attempted an emergency Thoracotomy. *Id.* Mr. Hendrickson described the following initial injuries:

> I received shrapnel in my neck, jaw, c-spine, hands, bilateral forearms, bilateral thighs, right calcaneus, buttocks, bilat hamstrings, right knee, face/cheeks, and slammed my head into the spare tire, on top of taking a metal rifle barrel to the head during the explosion and violent stop. The intensity of this combined almost simultaneously was 10 plus out on the pain scale. It was the worst pain I have ever experienced. The pain was a sharp searing/burning sensation throughout my entire body at the same time. I also had a throbbing headache, visions changes which contributed to me wanting to blackout from the ringing in my ears which all accumulated physically and mentally on how I felt in regards to the pain.

*Id.* at ¶ 19.

### c. Mr. Hendrickson's Pain While in Inpatient

Mr. Hendrickson received inpatient treatment between May through September 2005. *Id.* at ¶ 21. At Bethesda Naval Medical Center, he underwent treatment for pain control, hemodynamic stability, and constipation relief from the pain meds he was on. *Id.* at ¶ 20. Mr. Hendrickson [redacted] and treatment for Leishmaniasis, a traumatic brain injury. *Id.* Mr. Hendrickson's right calcaneus was examined on May 16, 2005. Ex. 8A at 000064. The doctor concluded that he had "extensive comminute fracture of the right calcaneus with significant bone loss." *Id.* Due to the injury to his right leg, Mr. Hendrickson received a traumatic below-the-knee amputation of his right leg at Bethesda Naval Medical Center and was transferred to Walter Reed Army Medical Center post amputation for rehab/prosthetic and continuing care. Ex. 8 at ¶ 21. Mr. Hendrickson was accompanied by his mother, who stayed by his bedside the entire duration of his inpatient treatment. *Id.* at ¶ 22. Other family members also took off time to be with him. *Id.*

### d. Mr. Hendrickson's Resulting Physical Pain

The injuries Mr. Hendrickson sustained in the May 7, 2005, attack have negatively impacted him physically and emotionally. *Id.* at ¶ 24. The right transtibial, below the knee, amputation limits his ability to carry out tasks such as "the need to stand for showering, cooking, and cleaning." *Id.* These tasks are particularly difficult if he experiences skin breakdown making it impossible to use his prosthesis. *Id.* Mr. Hendrickson described that he is always in constant pain due to his injuries. *Id.* at ¶ 25. His right calf has atrophied and spasms if he overworks that leg. *Id.* This has led to him not moving as quickly.

Prior to the attack, Mr. Hendrickson was an avid long-distance runner, played soccer and was active physically. *Id.* Today, he is unable to play soccer, and his running is severely limited to shorter distances because of the atrophy in his right lower extremities. *Id.* To this day, he

experiences pain "all day every day." *Id.* at ¶ 28. Mr. Henderickson experiences phantom pain in his right lower extremity as well as cramps and spasms in his left leg from the years of picking up the slack for his right leg. *Id.* His neck, especially on the right side, is always in pain and tight. *Id.*

In 2008, Mr. Hendrickson was diagnosed with Chronic Cervical Strain, shrapnel posterior to C4 vertebrae and Cervico-occipital Cephalgia—a headache that is provoked by neck movement or pressure over tender points in the neck with associated reduced range of movement of the cervical spine. Ex. 8C at 000038, 000041. The medical notes conclude that shrapnel located in the c-spine is "due to IED explosion in service." *Id.* at 000040. There are scars and disfigurement to his head, face, and neck due to shrapnel shards from the attack. Ex. 8C at 000042. Mr. Hendrickson was also diagnosed with migraine headaches and reflux disease due to the manual repositioning of his larynx. Ex. 8C at 000028-29. He was prescribed Omeprazole to treat the reflux disease. *Id.*

In 2013, Mr. Hendrickson was diagnosed with lumbar strain and reported back aches. Ex. 8B at 000711. During this time, he also reported ankle pain with grinding and pops after being up all day on his foot. *Id.* at 000780. Both hips were also achy with the right hip in greater pain than the left. *Id.* at 000795.

#### e. Mr. Hendrickson Screened Positive for TBI and PTSD After the Attack

Mr. Hendrickson described that emotionally, he "truly always feel[s] numb." Ex. 8 at ¶ 29. It is difficult for him to relate to people and engage his emotions—which has caused relationships to end. *Id.* His emotional state negatively impacts his interactions with friends, family, and his spouse. He explained that he is more "guarded" and closed off. *Id.* [redacted] Near the anniversary of the attack, Mr. Hendrickson [redacted]

[redacted]

During an initial psychiatric assessment on May 24, 5002, "no psychiatric diagnosis or condition on Axis I" was identified. Ex. 8A at 000068. On November 9, 2007, Mr. Hendrickson screened positive for TBI. Ex. 8C at 00061-62. On August 18, 2008, [redacted] *Id.* at 000034, 000037. During this time, he reported [redacted]

According to Dr. Marmar, "[t]hose surviving EFP attacks frequently present as complex poly-trauma cases, with multiple physical injuries, disfiguring facial and skin trauma, multiple limb amputations, chronic pain, Substance Use Disorders, severe depression, and persistent treatment refractory PTSD." Ex. 4 at 15. Dr. Gore described that:

> TBI is an acquired brain injury that occurs when a sudden trauma causes damage to the brain. Examples of such trauma include circumstances when a person's head suddenly and violently strikes an object, an object pierces the skull and enters the brain tissue, or when a person's brain is exposed to blast waves. Blasts are the leading cause of TBI in the conflicts in Iraq and Afghanistan, and the rise of TBI in these conflicts is attributable to the increased use of Improvised Explosive Devices (IEDs).

Ex. 9 at 4-5.

"Mild TBI actually increases the risk for cognitive and psychiatric disorders such as memory loss, amnesia, depression, post-traumatic stress disorder (PTSD), and schizophrenia months after injury." *Id.* at 6.

**f. Other Related Impact**

Following his discharge from inpatient treatment, Mr. Hendrickson had to move back in with his parents because he needed assistance in dealing with his physical disabilities. Ex. 8 at ¶ 22. This also meant that his parents experienced increased costs for food and bills out of their pocket. *Id.* In hindsight, Mr. Hendrickson can only imagine how the injuries he sustained in the attack negatively impacted his family and relationships with those he loves. *Id.* at ¶ 26. His family and friends dealt with his injuries post-amputation including [redacted]

Because of the attack, Mr. Hendrickson's military career was abruptly ended. *Id.* at ¶ 31. He planned to become a general surgeon through financial assistance from the Vocational Rehabilitation program. *Id.* However, he was unable to focus on his studies due to what he went through, financial stress, grieving the loss of the Marine who died in the attack, as well as the loss of his limb. *Id.* Mr. Hendrickson directly attributes the attack to affecting his ability to become a general surgeon. *Id.* Instead of achieving his goal of becoming a general surgeon, Mr. Hendrickson became a Registered Nurse. *Id.* However, he is unable to stand for long periods of time which limits his ability to move and provide effective care. *Id.* at ¶ 32. He has to distance himself from MRI machines which reduces the types of positions he is able to accept. *Id.*

Mr. Hendrickson is currently employed as a traveling Staff Nurse with Aya Healthcare. *Id.* at ¶ 33. He has been in this position on a contract basis for the past two years with varying wages.

*Id.* Due to his injuries, there are modifications to his role including a workload adjustment to how fast he can ambulate, particularly when he is experiencing sores or skin breakdown. *Id.* He is also restricted to moving certain patients because of the weight limits on his limbs and prosthetics. *Id.*

In 2019, an adapted accessible home designed by the Homes for Our Troops (HFOT) was donated to Mr. Hendrickson. *Id.* at ¶ 34. This assisted him in living as normal of a life as possible. *Id.* But he still faces challenges in performing what others would consider "normal" activities. *Id.* Only one of the family vehicles is modified to allow Mr. Hendrickson to operate it. *Id.* at ¶ 35. The adaptation to the vehicle is costly, over approximately $2,500, and exceeds the limit covered by the VA. *Id.*

Mr. Hendrickson described that his life is "irrevocably" changed by the May 7, 2005, IED attack. *Id.* at ¶ 37. It has set back his progressional development, financial stability, and "more importantly, set back the timeline to be in an environment to have children." *Id.* On June 30, 2007, Mr. Hendrickson married Jennie Hendrickson, whom he met after he sustained injuries from the attack. *Id.* at ¶ 23. The couple decided to delay starting a family until Mr. Hendrickson could heal his emotional and physical traumas caused by the attack. *Id.* However, [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

g. **Request for Nonpecuniary Compensatory Damages**

Plaintiffs have requested an award of $12 million for Justin Edward Hendrickson's assault, battery, and intentional infliction of emotional distress claims. They rely on the decision in *Lee v. Islamic Republic of Iran*, No. 19-cv-830 (APM), 2023 U.S. Dist. LEXIS 204966 (D.D.C. Oct. 15, 2023), adopting the following six-category damages framework associated with Explosively Formed Penetrator ("EFP") attacks in Iraq in recognition of the unique and devastating injuries associated with EFP attacks:

| Category | Characteristic Injuries | Proposed Damages |
|---|---|---|
| **Category 1** | Psychological injuries (without TBI diagnosis/severe shrapnel/ fractures/orthopedic injuries/polytrauma) | Baseline: $2 million<br>Range: $1.5 - $8 million |
| **Category 2** | Mild TBI with psychological injuries (without severe shrapnel/fractures/ orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $5 million<br>Range: $3 - $7 million |
| **Category 3** | Mild TBI with psychological injuries (with severe shrapnel/fractures/orthopedic injuries) | Baseline: $7 million<br>Range: $4 - $10 million |
| **Category 4** | Mild TBI with psychological injuries (with polytrauma/traumatic amputations) | Baseline: $15 million<br>Range: $10 - $20 million |
| **Category 5** | Moderate/severe TBI (without severe shrapnel/fractures/orthopedic injuries/ polytrauma/traumatic amputations) | Baseline: $20 million<br>Range: $15 - $25 million |
| **Category 6** | Moderate/severe TBI (with severe shrapnel/fractures/orthopedic injuries/polytrauma/traumatic amputations) | Baseline: $30 million<br>Range: $25 - $50 million |

Mr. Hendrickson's injuries include a traumatic brain injury, a below-the-knee amputation of his right leg, shrapnel embedded near his cervical spine, [redacted] and he experiences constant

pain. Plaintiffs make a persuasive argument that the injuries to Justin Edward Hendrickson are similar to those of Brian Taylor who also received a below-the-knee amputation and was diagnosed with TBI and PTSD, even though the Hendrickson attack did not involve an EFP. *Lee v. Islamic Republic of Iran*, No. 19-cv-830, 2022 WL 20210706, at *48 (D.D.C. June 30, 2022), report and recommendation adopted, No. 19-cv-00830 (APM), 2023 U.S. Dist. LEXIS 204966 (D.D.C. Oct. 15, 2023) (awarding Brian Taylor $17 million in damages).

Thus far, I am not aware that any court in this District has applied the EFP framework to attacks that did not involve EFPs. I note that the largest category of awards that the Court adopted in *Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859-JEB, 2025 U.S. Dist. LEXIS 157765 (D.D.C. Aug. 14, 2025), was $7.5 million. But the Court in *Pautsch* relied upon Judge Bates' decision in *Wamai*. Judge Bates has since recognized that a higher award can be appropriate for very severe injuries. In *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2022 U.S. Dist. LEXIS 127290 (D.D.C. July 19, 2022), he applied *Peterson* and *Valore* in the context of plaintiffs' requests for "substantial upward adjustments" for three soldiers who sustained significant injuries in non-EFP bombings in Afghanistan.

Sgt. Jared Lemon was injured in an IED attack in Kandahar Province, Afghanistan on April 11, 2010. 2022 U.S. Dist. LEXIS 127290, at *100. Following the explosion, Sgt. Lemon lost consciousness, but when he roused, he learned "the bones in his right arm had been pulverized by shrapnel from the IED." *Id.* at *102. After attempts to save his arm in Kandahar, Germany, and then at Walter Reed Medical Center in Washington, D.C., Sgt. Lemon agreed to the amputation of his right arm. *Id.* at *102-*103. He also sustained blast-wave internal injuries, shrapnel through his body, perforation of his eardrums, phantom limb pain, bone spurs from the amputated arm, a

TBI, severe psychological damage, and daily pain from the injuries he sustained. *Id.* at *103-*105; *see also id*. at *156-*158.

Sgt. Lemon's injuries mirror those sustained by Mr. Hendrickson, and Judge Bates found his "injuries to be greater than those suffered by the plaintiffs in ... *Wamai* who were awarded $7.5 million, *see* 60 F. Supp. 3d at 93-94." *Id.* at *163. Therefore, Judge Bates awarded $9 million to Sgt. Lemon in pain-and-suffering damages. *Id.* Mr. Hendrickson's injuries in the IED attack in Karmah mirror those sustained by Sgt. Lemon in Kandahar Province. Neither attack involved EFPs.

In a later opinion in *Cabrera*, Judge Bates again issued upward adjustments to two claims based on the recommendations of a Special Master that exceeded the maximum awards in *Wamai* and *Pautsch*. *Cabrera v. Islamic Republic of Iran*, No. 19-cv-3835 (JDB), 2023 U.S. Dist. LEXIS 85564 (D.D.C. May 16, 2023), *rev'd on other grounds in K.E.F.V. v. Islamic Republic of Iran*, 2025 U.S. App. LEXIS 10226 (D.C. Cir. Apr. 29, 2025) (awarding damages of $8 million to SSgt. Jonathan Benton and $9 million to Sgt. Eric M. Hunter).

In addition, Judge Reyes addressed claims of various victims of attacks similar to the one in which Mr. Hendrickson was injured. *See Swinney v. Islamic Republic of Iran*, No. 20-cv-2316 (ACR), 2025 U.S. Dist. LEXIS 103493 (D.D.C. May 30, 2025). LCpl. Kevin Rumley was injured in an IED attack near the Syria-Iraq border on April 8, 2004. "He had sustained a traumatic brain injury (TBI), a broken right femur, multiple fragmentation wounds to both legs, his right arm, left shoulder, face, and right hand along with extensive 3rd degree burns and nerve damage to both lower extremities." 2025 U.S. Dist. LEXIS 103493, at *60-*61 (included in the Report and Recommendation of Special Master Deborah Greenspan that was adopted in its entirety by Judge Reyes). "The entirety of his inpatient hospitalization accounted for 1 ½ years and a total of 32

surgeries" related to burn skin grafts, fixation of his right femur, a MRSA infection, knee arthroplasty, and "a left saphenous vein graft to increase circulation to his left lower extremity" due to "severe neuropathic pain and weakness in his lower extremities." *Id.* at *61-*62. He also sustained vision loss along with PTSD and short-term memory issues; however, in May 2024, he obtained his Ph.D.in Social Work. *Id.* at *62-*63.

The Special Master in *Swinney* recommended, and the Court approved, damages of $12.75 million. The Special Master stated, "Kevin Rumley's injuries are extensive, devastating, and in some cases permanent. The pain of 32 surgeries, coupled with the long term hospital stay and permanent vision loss support an award far above the 'baseline.'" *Id.* at *97-*98. It is arguable that Mr. Hendrickson's injuries are similar in kind.[11]

Given the severe nature of Mr. Hendrickson's injuries and recent upward departures from the baseline amounts, my recommendation is that the Court award $9 million for his compensatory damages.

**2. Economic-Loss Claim**

Mr. Hendrickson also seeks compensation for economic losses in the form of lost wages, benefits, and loss of housekeeping and household management services. See 28 U.S.C. § 1605A(c). To support the claims for these economic losses, Plaintiffs submit an expert report prepared by Dr. Stan Smtih, Stephanie Uhl, and Kyle Lauterhahn (collectively "SEG").

To project Mr. Hendrickson's future income stream if not for the May 7, 2005, attack, SEG incorporated evidence that Mr. Hendrickson wished to end his military service in June 2006 when his five-year enlistment commitment was going to end, with a plan to enter medical training as a civilian to become a Physician Assistant and overlaid that information against statistical data

[11] In *Swinney*, upward adjustments to awards between $7.75 million (Timothy J. Pope, Jr.) and $8.75 million (Michael S. Anderson) were granted for individuals with less-severe injuries than those sustained by Mr. Hendrickson.

generated by the Bureau of Labor Statistics ("BLS"), the Department of Labor, military pay websites, and other sources. Ex. 10 at 4-6.[12] From these sources, SEG calculated the present value of Mr. Hendrickson's lost income and loss of value of housekeeping and household management services, based on the following assumptions regarding Mr. Hendrickson, who was 22 years old when he was injured:

(1) but for his injury, he would have left military service at the end of June 2006;

(2) by July 2012, he would have entered a career as a Physician Assistant;

(3) he would have employee benefits that grow at the same rate as wages and are discounted to present value at the same discount rate; and

(4) he would have annual employment each year through expected ability to work.

SEG adjusted these income figures for wages and benefits for Mr. Hendrickson. *Id.*

Plaintiffs have requested, and I recommend, that the Court award $3,984,140 for loss of wages and benefits and $137,095 for loss of household services for a total of $4,121,235 in economic damages for Justin Hendrickson, as calculated by SEG. *Id.* at 9, 11.

**D. JOHN LAMIE- AUGUST 3, 2005, ATTACK – BAGHDAD**

In 2005, then-Specialist ("SPC") John Lamie was serving as a member of the United States Army in Baghdad, Iraq. *See* ECF No. 48-1, at 20-21. On August 3, 2005, while SPC John Lamie was manning a checkpoint on the road into Baghdad, the M113 armed personnel carrier in which he was located was struck by a Vehicle-Borne Improvised Explosive Device ("VBIED"). As a result of the attack, SPC Lamie was injured, and Sergeant ("SGT") Jerry Ganey, Jr. was killed. *See Id.* The Court found satisfactory evidence in the record to "conclude with a high degree of likelihood that AQI was responsible," *id.*, and granted default judgment against Iran and Syria. *See*

[12] *See also* Ex. 8 at ¶ 31.

Ex. 1.

SPC Lamie is a Plaintiff in this case. *See* Amended Complaint, ECF No. 9 (“AC”), ¶¶ 1080-85. The following chart reflects John Lamie’s claims as a Plaintiff who was injured in the August 3, 2005, attack as well as the evidence setting forth the bases of those claims. That evidence was provided to me as exhibits to the Eubanks Declaration.

| **Plaintiff** | **Relationship to Direct Victim** | **Claim(s) Asserted** | **Evidence** | **Exhibit** |
|---|---|---|---|---|
| John Lamie | Self | Assault, Battery, IIED<br>$4 million | Copy of John Lamie’s U.S. passport | 11 |
| | | | Declaration of John Lamie, dated April 7, 2026 | 12 |
| | | | Form DD214 | 12A |
| | | | Excerpts from John Lamie’s medical records | 12B |
| | | | Physical Evaluation Board (PEB) Proceedings, dated October 30, 2009 | 12C |
| | | | Army Combat-Related Special Compensation Branch Decision Letter, dated April 17, 2012 | 12D |
| | | | Medical Expert Report of Dr. Charles Marmar dated September 15, 2018, Karcher, PX-163 | 4 |
| | | | Testimony by Dr. Charles Marmar in the Karcher trial | 3 |
| | | | Medical Expert Report of Dr. Russell Gore dated November 23, 2018, Karcher, PX-161 | 9 |

Mr. Lamie brings claims for assault, battery, and intentional infliction of emotional distress, which have caused physical and emotional injuries.

**1. Assault, Battery, and Intentional Infliction of Emotional Distress Claim[13]**

**a. John Lamie's Background**

John Lamie was born in Jacksonville, Florida, on August 6, 1984. Ex. 12 at ¶ 2. He was the youngest of three children and was less than two years younger than his brother Gene. *Id.* at ¶ 4. John's family moved to Georgia when he was in elementary school. *Id.* at ¶ 5. By the time John was 16 years old, he had already considered the possibility of joining the Army. In addition to talking about the idea with Gene, John also spoke with an uncle who had served in the Air Force. *Id.* at ¶ 6. During his teen years, John "knew I was 'all in' – I wanted to do whatever I could do for my country. I knew that the military would be my career, and through it, I would experience life and the world." *Id.*

At the age of 17, John's parents signed the paperwork so John could join the Georgia National Guard, and while in high school, he attended basic training at Fort Leonard Wood in Missouri. *Id.* at ¶ 7. John had participated in school sports and had been a cheerleader; however, after signing up with the National Guard, he stopped participating in those activities to avoid injuries and, instead, continued to focus on "becoming as physically fit as possible," something that had been a priority for him for quite some time. *Id.* at ¶ 8. In 2003, when John graduated from Clinch County High School, he "was over six feet tall and 220 pounds of solid muscle." *Id.*

John completed his Advanced Individual Training at Fort Lenoard Wood, and his designated Military Occupational Specialty was to train him to be "a combat engineer who focused on mines and explosives." *Id.* at ¶ 9. He then attended pre-deployment training at Fort Stewart in Georgia and in the Mojave Desert in California. *Id.* at ¶ 10.

---

[13] John Lamie's United States passport and declaration confirm that he is a U.S. citizen and was at the time of the attack. He is therefore eligible to bring claims under 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I) and 1605A(c). *See* Exs. 11 and 12.

John deployed to Iraq in May 2005 and was stationed at Camp Stryker in Baghdad. *Id.* at ¶¶ 10, 11. He and his unit often went out on missions multiple times each day; he took on various responsibilities including driving and operating a machine gun. *Id.* at ¶ 11.

**b. The Vehicle-Borne Improvised Explosive Device ("VBIED") Attack**

Towards the end of the day on August 3, 2005, John and others in his unit traveled by Humvee to a site where some soldiers had been killed. *Id.* at ¶ 12. There, he and his fellow squad members boarded an M113, an armored vehicle which used "a track system instead of wheels," something John called, "the track." *Id.* Once inside the track, John sat below the cupola, SPC Mathew Gibbs was positioned on the outside on top of the vehicle, and Staff Sergeant ("SSG") Charles Warren and Camden Pate were seated by the back door. *Id.* at ¶¶ 12, 13. Both SPC Michael Rowen and SGT Jerry Ganey, Jr. were outside the track, and while SGT Ganey was checking IDs at the front and to the left of the track, SPC Rowen walked behind the vehicle to attend to something. *Id.* at ¶¶ 13, 14.

While at the checkpoint, John gave a small stuffed animal to a little Iraqi girl. *Id.* at ¶ 14. After her brother or another child took it from her, she returned to the track, and John gave her a small dog stuffed animal to replace the first one. *Id.* Moments later, there was an explosion, at which point John's "world went white." *Id.* at ¶ 15. At some point, John was told that after a car "rolled up" close to the track, someone "had detonated a car bomb as a VBIED." *Id.* at ¶ 16. He added, "The analysis of the crater and the blast radius had been compared to dropping a 1,500-pound bomb. And we were at ground zero." *Id.*

John crawled to exit the vehicle, and he described the scene before him as "pure carnage." *Id.* at ¶ 17. When he assessed the scene and the status of his fellow soldiers, he saw Pate on fire; he also saw Gibbs' dead body lying on the top of the vehicle. *Id.* Moreover, SSG

Warren's legs "were literally folded underneath him" and "laying close to his head," and Warren, who was unaware of the situation, "kept asking if his legs were gone." *Id.* John recalled how "horrible [it was] to see it all and hear Warren's requests." *Id.* Warren died as a result of the attack. *Id.* Medical records from 2009 referenced the attack in the following way: "In Aug05, CPL Lamie and his unit were hit with a VBIED. He was in a track vehicle when the vehicle with explosives detonated near his vehicle. There were three deaths in this incident and other major injuries." Ex. 12B at LAMIE000001.

SGT Ganey had been thrown approximately 150 feet from the track and was dead when his body was found. Ex. 12 at ¶ 21. John watched people lift Ganey's body – "about half of his body had been burned" – to place it in the helicopter and saw that Ganey's gun "had been fused to his body armor because of the intensity of heat of the blast." *Id.* John also saw first-hand the severity of Pate's injuries – his body had been "scorched by the blast, and parts of his body had been severely burned." *Id.* at ¶ 18. John also recalled, "When I watched a medic try to cut off his [Pate's] clothes, I saw that some of Cam's skin had been fused to the material." *Id.* He recently described what he witnessed as "incredibly disturbing" and admitted that he "can still see all of it in my mind." *Id.* John also shared that he "was devastated by what I had seen happen to my squad, my buddies who I'd served with for months." *Id.* at ¶ 21.

After the blast, John also saw the body of the little Iraqi girl, the one he had just given the small dog to; the back of her head "had been blown off because of the car bomb." *Id.* at ¶ 19. The girl had been killed, but the little stuffed animal dog survived. *Id.* at ¶ 37. Recently, when John thought about his interaction with that Iraqi girl, he explained that he wished there had been no more toys to give her, or that he had simply sent her away, *id.* at ¶ 19, suggesting that in his mind, had he been unable to or refused to give her another stuffed animal, she would not have been killed.

Because of the reality of what occurred, John "feel[s] guilty and responsible for the fact that she was still so close to us when the bomb went off. I see her face; that face will always be with me." *Id.* Those images have stayed with him for years.

**c. Mr. Lamie's Injuries Immediately Following the Attack**

John was physically impacted by the explosion, resulting in memories separate from those involving the injuries to and deaths of his squad members. John described what occurred prior to his exit from the vehicle in the following way:

> The concussive force threw me into the side of the vehicle, and I felt as if all the air in my lungs had been sucked out; I could not draw a breath at all. I remained awake, and I immediately began hearing a ringing in my ears. I was very disoriented as I looked around, and I had double vision, unable to see anything clearly. As I think back on it, what I went through was like what they show in war movies, the time when things seem to be going in slow motion, and you can't quite focus or process what is going on.

*Id.* at ¶ 15. John also "felt pain in my back, as well as in my both of my legs, knees, and even my jaw"; however, he also recalled, "The worst was the pain was in the front of my head – it was like someone had stuck an ice pick in it and was turning it around and around," which he has also described as a "messed up lobotomy." *Id.* at ¶ 22.

After being transported back to the base, John "still tasted the explosives and the other odors from the attack site – the smells of burning metal, dirt, and human skin – in the back of my throat," something he has described as "incredibly disgusting and disturbing, too." *Id.* at ¶ 23. The "horrible images of what I had just lived through" filled his mind, he could not really eat, and he wanted to be alone. *Id.* Despite the fact that intellectually, John knew regardless of if he had been positioned differently, etc., there was nothing he could have done to prevent the attack, he struggled with questions like: "It could've been me," and "Why wasn't it me?" and found it "unbearable to consider that I might have failed my unit." *Id.* at ¶ 24. These and similar questions, and the emotions connected to them, are elements of John's "survivor's guilt," and are addressed

in more detail *infra*.

**d. Mr. Lamie is Confronted with Emotional and Physical Challenges While at Home**

**1) Onset of PTSD-Related Symptoms, Behaviors, and Distress**

Very soon after the attack, John began experiencing symptoms and displaying behaviors consistent with his PTSD diagnosis. In 2009, the findings within John's military Physical Evaluation Board ("PEB") evaluation, which not only considers a service member's condition, but also whether the service member is fit for continued service, describe John's disability as follows: "Posttraumatic Stress Disorder (PTSD) onset during first combat tour in Iraq where Soldier experienced the loss of half his squad in a VBIED attack." Ex. 12C.

Prior to the attack, John and SSG Warren had requested leave time, and SSG Warren's request had been granted because his wife had recently had a baby; however, because Warren had been killed, John received the necessary authorization for approximately two weeks of leave time in Georgia. Ex. 12 at ¶ 25. John arrived home a few days before his 21st birthday, and although he "didn't really want to celebrate or socialize with anyone," his uncle and friends took him to a local bar. *Id.* at ¶ 26. After he heard one of SPC Gibbs's favorite songs, "Bake Me a Country Ham," at the bar, John "lost it." *Id.* He recalled, "There I was, in the middle of the bar, crying for the loss of Gibbs and my buddies." *Id.* His uncle failed to effectively calm him down because, according to John, "I couldn't process what he was saying because my pain was too deep, and it was too fresh." *Id.* John has admitted that the loss he suffered "was, at times, overwhelming" (*id.* at ¶ 27); [redacted] Ex. 12B at LAMIE000874, LAMIE000399, LAMIE000371, LAMIE000239. These emotions and behaviors

were far from all John was forced to deal with upon his return.

[redacted] Fortunately for John, his brother Gene, who was stationed in the United States, obtained permission to go home while John was still in Georgia. *Id.* at ¶ 28. Once together, John shared some of what he was dealing with – including the guilt – and Gene's support proved to be helpful. *Id.*

[redacted]

As challenging and distressful as John found interacting with his family and friends to be, some of his most overwhelming and emotional moments on leave took place while he was away from them. For example, [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

### 2) Tinnitus and Headaches: Exacerbation and Impact

While at home, John continued to suffer through the ringing in his ears – known as tinnitus – as well as pain in both ears. He described what he experienced as akin to "someone turn[ing] a speaker's tone up really, really high," and at times, the intensity of the related pain "drove him crazy." *Id.* at ¶ 32. In addition, although he had experienced some headaches and acid reflux prior to the attack, these conditions worsened after August 3, 2005. *Id.* at ¶¶ 33,34. He also described the severity of the headaches – which he specifically recalled suffering through while on leave – as follows: "[T]he headaches were sharp and piercing and seemed like they were coming from behind my eyes." *Id.* at ¶ 33. With regard to the acid reflux, he believed "the added stress and distress I was trying to deal with" dramatically exacerbated the condition. *Id.* at ¶ 34. The fact that he experienced headaches over the years is also briefly addressed *infra*.

### e. Mr. Lamie Continues to be Impacted by the Attack

Upon his return to Iraq, John continued to deal with issues when he was awake as well as

at night. In an effort to address this, he admitted, [redacted]

John recalls [redacted]

During the balance of his tour, John literally held onto something which directly connected him to the attack and the deaths of the little Iraqi girl and his squad members. He kept the small stuffed animal dog with him, the one that he had given to the Iraqi girl and had survived the attack. He explained: "Its legs fit through my body armor, and I strapped it to me with a zip-tie. I felt I had to have it with me, and it stayed with me for the rest of the tour." *Id.* at ¶ 37.

**f. Mr. Lamie Seeks Treatment Through Counseling and Medication in the United States**

After his tour ended in June 2006, John remained in the National Guard and relocated to Fort Stewart in Georgia. *Id.* at ¶ 40. [redacted]

These records also confirm that John [redacted]

Around this time and continuing for a few years, he treated the ongoing pain and ringing in his ears, as well as the pain in his back and legs, with 800mg Ibuprofen, the same dosage the military had previously provided. *Id.* at ¶ 42. Sometime later, he was prescribed stronger medication, [redacted] *Id.* at ¶¶ 33, 42.

**g. Mr. Lamie Extends His Military Career**

While stateside, John was forced to endure another personal tragedy: [redacted]

In December 2007, John met and began dating Jennifer Sears, and in 2008, John's obligation with the National Guard ended. *Id.* at ¶ 44. When he approached the National Guard to sign up again, they would not let him do so "because my parents had already lost one son." *Id.* at ¶ 45. Determined to serve, John enlisted in the regular Army in April 2008. *Id.*[14] Following his

[14] *See also* Ex. 12A.

enlistment, John met various physical training requirements and was stationed at Fort Riley in Kansas. *Id.* at ¶ 46. John and Jennifer were married in June 2008. *Id.* at ¶ 44.

**h. Mr. Lamie's Challenges Continue in Iraq and in the U.S.**

John deployed to Iraq in the fall of 2008. *Id.* at ¶ 47. He has admitted that once there, [redacted]

[redacted]

**i. Ongoing PTSD and Depression**

John recalled that not long after the incident, when he was home on leave, [redacted]

He did not return to Iraq; he, instead, remained in Georgia and was assigned to Fort Riley, where he [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

In his expert report, Dr. Russell Gore, qualified by the *Karcher* court as an expert in TBI and its consequences, diagnosis, and treatment,[15] discussed the connections between PTSD and traumatic brain injuries, in part, in the following way: "Importantly, the brain networks implicated in TBI-associated persistent symptoms overlap with brain networks implicated in multiple psychiatric disorders including depression, anxiety, and PTSD." Ex. 9 at 51.

[15] *See* ECF No. 75, *Karcher*, Dec. 4, 2019, Tr. at 7:23-8:2.

[redacted]

A 2009 Physical Evaluation Board assessment, conducted prior to John's departure from the military, identified the following ongoing symptoms and behaviors as part of its "Disability Description": [redacted] John was honorably and medically retired from the military as of December 31, 2009, having attained the rank of Corporal. Ex. 12 at ¶ 52; *see also* Ex. 12A.

In 2012, the Combat-Related Special Compensation Branch issued a decision letter which identified John's [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[16] https://pmc.ncbi.nlm.nih.gov/articles/PMC3425466/.

[redacted]

[redacted]

[redacted]

[redacted]

17 https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/021483s003lbl.pdf.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Dr. Charles Marmar, qualified by the *Karcher* court as an expert regarding post-traumatic stress disorder, major depressive disorder, neurocognitive disorder following traumatic brain injury, as well as PTSD in veterans, provided the following definition and sources within his expert report: "PTSD is a trauma and stress-related disorder, defined by the co-occurrence of reexperiencing, avoidance, negative beliefs and hyperarousal symptoms in survivors of extreme stress exposure. . . PTSD is a common outcome of multiple kinds of traumatic events, including high levels of combat exposure." Ex. 4 at 3. Regardless of the source or sources of John's symptoms, it is clear that he has suffered with long-term effects stemming from the attack, suffered from the exacerbation of those effects as his tours continued, and continues to suffer today.

Dr. Marmar also explained the trajectory of PTSD for combat veterans:

> Among combat veterans, approximately 25% develop PTSD and among those who do develop PTSD, approximately one-third of them develop a severe chronic complex form of the disorder lasting decades to a lifetime. Up to 25% of combat veterans experience a delayed onset PTSD months to years after combat exposure.

*Id.* at 7.

The expert report further details how it is common for veterans to develop various conditions and exhibit a range of symptoms – including those connected to PTSD, depression, and alcohol abuse. Referencing studies focusing upon Vietnam veterans' experiences, Dr. Marmar further described conditions he deemed "related" to PTSD, as follows:

> PTSD rarely occurs in a pure form by itself. For example, among Vietnam veterans,

> 84% with PTSD met diagnostic criteria for related conditions, including alcoholism and depression. . . . The most common co-occurring disorders were Alcohol Abuse, MDD [major depressive disorder] and Generalized Anxiety Disorder. Co-occurring disorders including MDD and Alcohol Use Disorder are common in civilians as well as in veterans with PTSD.

*Id.*

As previously noted, John has [redacted]

#### j. Mr. Lamie Suffers from Survivor's Guilt

John also continues to be plagued with g[redacted]

[redacted]

[redacted]

[redacted]

Dr. Marmar testified as to a basis for and the impact survivor's guilt may have in the following way:

> Survivor's guilt is a sense of guilt about the fact that I am alive or I am alive and not injured when the people that I deeply cared about on the battlefield died or were badly injured. You know, when I ask war fighters why they served, particularly in a volunteer army, they often say to me: I went to war to serve my country. But I fought in war to bring my teammates back. So my goal changed once I was in battle. And if they leave their teammates injured or dead on the battlefield, they can often have searing guilt for being the ones that walked away. And survivor's guilt is specifically a high risk for depression, suicide and alcohol use.

Ex. 3 at T3-124:7-20.

Moreover, consistent with the survivor's guilt he endured, [redacted]

[redacted]

[redacted]

[redacted]

k. **Mr. Lamie Suffered from** [redacted]

In his expert report, Dr. Marmar explained, "Most people who suffer PTSD suffer with it more or less silently and use alcohol to try to manage their painful reminiscences." Ex. 3 at T3-121:9-12. He further noted, "In our culture, the commonest 'treatment' for those suffering from PTSD, alone or in combination with TBI and MDD, is self-medication with alcohol which may initially alleviate anxiety and depressive symptoms but over time complicates and intensifies the symptoms of PTSD, TBI and MDD." Ex. 4 at 14.

Dr. Marmar's testimony further explained the connection between and effects upon PTSD when excessive alcohol use is part of someone's routine:

> In the short term, it may be partially effective. In the long term, repeated use of alcohol increases anxious arousal, increases emotion control weaknesses and makes the PTSD worse. So what we found is that people who have PTSD and who use alcohol excessively have more severe PTSD, more chronic PTSD and are more difficult to treat with evidence-based treatments.

Ex. 3 at T3-122:9-16.

Dr. Marmar also noted, "[S]urvivor's guilt is specifically a high risk for depression, suicide and alcohol use." *Id.* at T3-124:18-20. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**I.** [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**m. Long-term Impact Upon Mr. Lamie**

As described *supra*, John's [redacted] still affect him today, notably during Georgia's hot summers and autumns. *Id.* at ¶ 55. At present, [redacted]

In 2026, John confessed that [redacted] It is interesting to note that John still has the Iraqi girl's little dog, and he keeps it, along with "my guidon, a military streamer of sorts representing my unit." He considers the items a "tribute" of sorts and admits that "[i]t may be hard for me to look at them." *Id.* at ¶ 58.

John recalled that after he initially signed up with the National Guard, his goal was to serve for 30 years or attain the rank of sergeant major, whichever came first – he now admits, and is clearly saddened by the fact that "[b]ecause of what I lived through, what I suffer with, and how

I've changed, I had to give up on that goal and the dream about what years in the military could have given me." *Id.* at ¶ 61. Recently, when he attempted to self-assess how he has changed and express his thoughts about those changes, he continued to use the image of the person he sees when he looks in the mirror, which was briefly referenced *supra*, and shared the following:

> I see a person who cannot do lots of things like he used to do, not even fully take care of himself. I never worried about flashbacks or traffic or remembering to do something, but the man in the mirror does. The man in the mirror has dreaded going to sleep because he was afraid of the nightmares he might have. I am that man, and I've had to deal with all of that. Maybe some of this seems illogical, but it's how I feel. And I expect I will feel that way until the day I die.

*Id.* at ¶ 62.

**n. Request for Damages**

Plaintiffs have requested that the Court award $4 million for John Lamie's assault, battery, and intentional infliction of emotional distress claims.

John Lamie resembles Dennis O'Malley in *Pautsch*, who received $2.5 million for lacerations resulting in persistent nerve damage, PTSD, depression, chronic sleep disruption, and lasting mobility limitations. *See Pautsch v. Islamic Republic of Iran*, No. 20-cv-3859 (JEB), 2025 U.S. Dist. LEXIS 157765, at *27-*31 (D.D.C. Aug. 14, 2025). John's injuries, however, are meaningfully more severe in ways that warrant an upward departure from that award.

It appears that John falls between categories 3 and 4 identified in *Pautsch*. John carries a 100% permanent Service-Connected VA disability rating, [redacted] His physical injuries include permanent tinnitus and chronic debilitating headaches requiring tinted eyewear that have persisted since the day of the attack. His cognitive and memory deficits, manifested by his difficulty learning new tasks, inability to navigate familiar

routes without GPS, and failure to retain short lists of items, have progressively worsened over twenty years, documented continuously in medical records from 2005 through 2024. He was medically retired from the Army at the rank of Corporal on December 31, 2009, foreclosing his goal of a 30-year military career. And his [redacted] As John himself has put it: "I expect I will feel that way until the day I die."

Given the severity of his injuries, Plaintiffs' request for damages appears reasonable and consistent with *Pautsch.* Accordingly, I recommend that the Court award $4 million for John Lamie's assault, battery, and intentional infliction of emotional distress claims

## CONCLUSION

For the reasons stated above and the analysis set forth, I recommend that the Court approve the following awards for Plaintiffs' damages for sustaining personal injuries in attacks in Iraq:

| Plaintiff/Victim | Date of Attack | Recommended Damages for Assault, Battery, and Intentional Infliction of Emotional Distress | Recommended Damages for Economic Loss | Recommended Punitive Damages |
|---|---|---|---|---|
| Alexander M. Sargent | 11/19/2004 | $7,000,000.00 | $3,892,691.00 | $10,892,691.00 |
| Jerry Oldham | 3/9/2005 | $1,500,000.00 | | $1,500,000.00 |
| Justin E. Hendrickson | 5/7/2005 | $9,000,000.00 | $4,121,235.00 | $13,121,235.00 |
| John Lamie | 8/3/2005 | $4,000,000.00 | | $4,000,000.00 |

Dated: June 5, 2026

Respectfully Submitted,

/s/Stephen A. Saltzburg
Special Master